IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 1 4 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GLORIA L. GARCIA a/k/a | § | |
| GLORIA GUZMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-017 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| YOLANDA PEREZ, as Postmaster, United | § | |
| States Post Office, Santa Rosa, Texas, and | § | |
| ELENA OLIVAREZ, as an employee of the | § | |
| United States Post Office, Santa Rosa, Texas, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM AND AUTHORITIES IN SUPPORT OF
DEFENDANT ELENA OLIVAREZ'S MOTION FOR SUMMARY JUDGMENT**

**I.    Introduction**

Defendant Elena Olivarez ("Olivarez") performed janitorial duties at the United States

Post Office located in Santa Rosa, Texas ("Post Office") under the supervision of the United

States Postal Service ("U.S. Postal Service"). Despite the fact that the U.S. Postal Service

exercised exhaustive control over even the most minute aspects of her job duties and job

performance, Defendant United States of America ("USA") alleges that she was an independent

contractor and has refused to substitute itself for her as a Defendant in this slip-and-fall action

filed pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, and common

law of torts.[1]

_____

[1] USA's Answer 4.

The USA's position is devoid of any factual or legal support. Therefore, Olivarez requests the Court to enter judgment as a matter of law as to her status as an employee of the U.S. Postal Service who was acting within the course and scope of her employment in relation to the events and allegations of this lawsuit and that Defendant USA be substituted as the defendant herein in place of Olivarez.

## II.    Standard of Review

A party may be granted summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."[2]  The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact.[3]

In order to defeat a motion for summary judgment, the opposing party must establish that there is a genuine dispute of material fact; "it must do more than simply show that there is some metaphysical doubt as to the material facts."[4]  A fact in dispute is material only if it "might affect the outcome of the suit under the governing law."[5]  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]  The

---

[2] Fed. R. of Civ. P. 56 (c).

[3] Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[4] Matsushita Electric Indus. Co v. Zenith Radio Corp, 475 U.S. 574, 587 (1986).

[5] Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

[6] Id.

adverse party may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial.[7]  In determining whether genuine issues of fact exist, all ambiguities are resolved and all inferences drawn in favor of the non-moving party.[8]

## III.    Statement of Relevant Facts

Olivarez worked for nine years as a custodian at the Santa Rosa Post Office before retiring.[9]  Her normal job duties included cleaning the lobby area by the mailboxes, the counter at the service desk, the sidewalk, the parking lot, and the bathrooms in the Post Office.[10]  She did this work every day, Monday through Friday, from 6:30 a.m. to 8:00 a.m.[11]

On Friday, November 12, 1999, she was performing her duties at the Post Office and while mopping the lobby area by the mailboxes, she noticed that Plaintiff was on the ground.[12] She did not hear Plaintiff fall and first noticed her on the floor while she was backing up as she mopped the area across the hall from Plaintiff's post office box.[13]  Plaintiff alleges in her suit that the area around her post office box was wet and caused her to slip and fall.[14]  Plaintiff filed the

---

[7] Rice-Lamar, 232 F.3d at 840.

[8] Id.

[9] Olivarez Depo. 6.

[10] Olivarez Depo. 8.

[11] Olivarez Depo. 59-60.

[12] Olivarez Depo. 23.

[13] Olivarez Depo. 20.

[14] Complaint 7.

instant action on February 1, 2002, against Defendant USA; Yolanda Perez, as Postmaster of the Post Office; and Olivarez, as an employee of the Post Office.[15]

Plaintiff alleged both the Postmaster and Olivarez to be employees of the Post Office.[16] With no opposition from Plaintiff, USA substituted for the Postmaster as named defendant pursuant to the FTCA.[17] However, USA has denied that Olivarez was its employee alleging instead that she was an independent contractor. Olivarez filed her answer which included the affirmative defense of being improperly named a defendant in the action because of her status as an employee of the U.S. Postal Service.[18]

**IV.    Defendant USA should be substituted as the defendant herein in place of Olivarez because she was an employee of the U.S. Postal Service and acting within the course and scope of her employment when the events at issue took place.**

The many duties and responsibilities of the USA are conducted by individuals yet the FTCA makes USA liable for the individuals' activities as long as they are employees of the government.[19] While the sovereign immunity doctrine limits many of the actions brought against the USA or against its employees, the FTCA waives the doctrine but only for the acts of the

---

[15] Complaint 1, 2, 3 and 4.

[16] Complaint 3, 4, 7 and 8.

[17] USA's Unopposed Motion to Sub. and Order.

[18] Olivarez Answer 10.

[19] 28 U.S.C. § 2671 (2003).

employees of a "federal agency."[20]  The one specific exclusion to the definition of an agency found in the FTCA is "any contractor with the United States."[21]

The United States Supreme Court and the Court of Appeals for the Fifth Circuit have applied the law of agency when determining if a person is an employee or contractor with a federal agency and have determined that the most significant test in the determination to be government control over the individual.[22]  Extensive instructions and control over the detailed physical performance of the contractor are indicative of government control that overcomes the independent contractor status.[23]

USA in the instant action labeled Olivarez as a contractor because of the existence of a contract between the U.S. Postal Service, a federal agency, and Olivarez.[24]  However, the contract was in existence only the first few years of Olivarez's employment at the Post Office and even when the contract was in existence, Olivarez worked under the direct supervision of the Postmaster and the Post Office Clerk.[25]  There are voluminous amounts of regulations that Olivarez was made to follow when performing her janitorial duties and she understood that the Postmaster was the immediate supervisor who would oversee her work.  In applying the government control test to Olivarez's custodial duties and responsibilities, her status as an

---

[20] Id.

[21] Id.

[22] United States v. Logue, 412 U.S. 521, 527 (1973), Rodriguez v. Sarabyn, 129 F.3d 760, 765 (5th Cir. 1997).

[23] Logue, at 527-8.

[24] USA Resp. to Interrog. No. 12.

[25] Olivarez Depo. 6, 10, 33 and 58.

employee of a federal agency is established and requires USA to be substituted as the only

Defendant herein.

**A.    U.S. Postal Service exercised a significant amount of control over Olivarez's employment as custodian at the  Post Office which overcomes any independent contractor status alleged by USA.**

Apart from supervising Olivarez's work, the Postmaster would also set Olivarez's

schedule requiring her to come into the office five times a week at 6:00 a.m. which was later

changed to 6:30 a.m.[26]  Whenever she needed a day off, she would have to ask the Postmaster for

permission to take a day off and whenever she was needed, she was called in and understood she

had no discretion to refuse to show up.[27]

When Olivarez was at work, she had to follow the many regulation and guidelines

required of a custodian working for the U.S. Postal Service.  Olivarez was required to mop,

sweep, dust, clean the windows, clean the sidewalk, the doors, and the bathrooms as per the

instructions of the Postmaster.[28]  The schedule she was assigned was determined under the

guidance of the U.S. Postal Service's Housekeeping Postal Facilities Maintenance Handbook.[29]

The Handbook lists "frequency ranges" of the times needed in a week to clean certain areas and

breaks down the minutes per square foot for the time it should take a custodian to clean an area.[30]

For smaller facilities like the Santa Rosa Post Office, the manual gives the Postmaster discretion

---

[26] Olivarez Depo. 59-60.

[27] Olivarez Depo. 61-3.

[28] Olivarez Depo. 8 and 10.

[29] USA Prod. No 7, "C" and "E."

[30] USA Prod. No. 7, "C" (pages 4-1, 4-14, 4-15, 4-29 and 4-30).

to "determine [the] frequencies outside the ranges (above or below) listed" which allowed the Postmaster to set the schedule required of Olivarez.[31]

Olivarez also described several times during her deposition that not only did she understand that the Postmaster supervised her work, but that she never talked to anyone outside of the Post Office employees when it came to her job duties or performance.[32] The U.S. Postal Service also has a detailed manual to assist supervisors, like the Postmaster or her assistant, in determining if employees like Olivarez perform their required duties.[33]

The detailed physical performance that the U.S. Postal Service required of Olivarez were all supervised by the Postmaster and no one else. The job duties, scheduling and responsibilities were not delineated in a contract between Olivarez and the Postmaster but instead were found in the exhaustive list of the regulations cited above. These regulations were not decided by Olivarez, but by the U.S. Postal Service. The regulations and the supervision were all provided by USA's federal agency which demonstrate a significant amount of control over Olivarez's employment as custodian at the Post Office.

Additionally, the U.S. Postal Service's relationship with Olivarez was different than the ones maintained with actual contractors who provided maintenance services and floor care at the Post Office. In response to interrogatories served upon USA by Plaintiff, it lists Olivarez as one of four contractors that "performed actual repairs and maintenance of the Post Office."[34] Plaintiff

---

[31] Id. (page 4-1).

[32] Olivarez Depo. 7, 8, 37-8 and 58.

[33] USA Prod. No 7, "D."

[34] USA Resp. to Interrog. No 12.

also requested supporting documentation concerning this same matter and the USA provided five

different documents indicating a contractual arm's length relationship between three out of the

four persons or companies listed in the response to the interrogatory.[35] Conspicuously missing

from USA's responses is a copy of a contract, proposal, or receipt for services executed by

Olivarez which would evidence the "contractual" nature of Olivarez's services. The different

relationship between the U.S. Postal Service and Olivarez when compared to actual contractors

further establishes the amount of control over Olivarez's work. The only relationship that

properly identifies the one between Olivarez and the U.S. Postal Service is an

employee/employer relationship especially when considering its authority to control the detailed

physical activity performed by Olivarez. This overcomes any independent contractor status

alleged by USA.

**B.    Along with the U.S. Postal Service's control over Olivarez's detailed physical performance, the law of agency establishes that Olivarez was an employee of the U.S. Postal Service and not an independent contractor.**

While the amount of control exercised by the Federal Government is an important factor

in determining Olivarez's status as an independent contractor or an employee, courts have also

applied the law of agency to distinguish one from the other.[36] The list of factors that may

establish an employee relationship include the following: (1) the work does not require one who

is highly educated or skilled, (2) the work is typically done by an employee in the locale, rather

than an independent contractor, (3) the employer supplies the tools, instrumentalities, or place of

work, (4) the employment is for a considerable period of time with regular hours, (5) the method

---

[35] USA Prod. No 9, "A", "F" and "G".

[36] See <u>Logue</u>, at 527 (citing RESTATEMENT (SECOND) OF AGENCY § 2 (1958)).

of payment is by the hour or month, (6) the work is full-time employment by one employer, (7) the work is part of the employer's regular business; and (8) the parties believe they have created an employment relationship.[37]

When applying the factors listed above, Olivarez's status as an employee of the U.S. Postal Service is established. Olivarez's duties did not require skill or education, she would mop, sweep, dust, clean the windows, clean the sidewalk, the doors, and the bathrooms.[38] The U.S. Postal Service's extensive regulations concerning housekeeping duties indicates the existence of many employees at other post offices across the Country.[39] The U.S. Postal Service also provided for Olivarez the Lysol disinfectant, the Windex glass cleaner, the paper towels, the mop, the mop bucket, the "wet floor" sign and the broom to use during her work at the Post Office.[40] Olivarez worked for USA at the Post Office for nine years from 6:00 a.m. or 6:30 a.m. to 8:00 a.m. Monday through Friday.[41] The Postmaster asked Olivarez to enter into an employment relationship with the U.S. Postal Service so that she could receive a check on a regular basis instead of being uncertain as to when she would be paid, which happened with her previous employer.[42] Olivarez also explained that she sometimes would be asked to come into work after her shift was over, in effect placing her "on-call" beyond her usual shift and

---

[37] Rodriguez v. Sarabyn, at 765 (citing RESTATEMENT (SECOND) OF AGENCY § 220(2) & cmt. h (1958)).

[38] Olivarez Depo. 8.

[39] USA Prod. No 7, "C" and "E."

[40] Olivarez Depo. 9, 36, 75 and 76.

[41] Olivarez Depo. 6 and 59-60.

[42] Olivarez Depo. 33.

precluding her from any other employment except for the U.S. Postal Service.[43] The cleaning of a post office is a part of the U.S. Postal Service's regular business requiring detailed manuals indicating each of the duties and job requirements of employees like Olivarez.[44] Finally, Olivarez testified that she was asked by the Postmaster to end all contractual relationships with her previous employer and as far as she understood she was to work for the U.S. Postal Service under the supervision of the Postmaster.[45] These facts establish through the law of agency that Olivarez's relationship with the U.S. Postal Service was that of an employee and not an independent contractor.

**C.    Olivarez was acting within the course and scope of her employment when the common law tort allegations alleged by Plaintiff were committed.**

It is undisputed that on November 12, 1999, when Plaintiff alleges to have fallen, the only other person present at the Post Office was Olivarez who at that time was in the middle of her Friday shift.[46] Olivarez testified that she was mopping the area in hopes of finishing by the time the Postmaster arrived to open the main service area at the Post Office.[47] It is also undisputed that she was using the supplies provided by the U.S. Postal Service, including the "Wet Floor" sign, a mop bucket and a mop.[48] Olivarez also testified that she placed the "Wet

---

[43]  Olivarez Depo. 60.

[44]  USA Prod. No 7, "C", "D" and "E."

[45]  Olivarez Depo. 6, 10, 33 and 58.

[46] Olivarez Depo. 24.

[47]  Id.

[48]  Olivarez Depo. 36, 75 and 76-7.

Floor" sign as instructed by the Postmaster.[49] USA does not deny that Olivarez was following the directions of the Postmaster on November 12, 1999. In fact, Olivarez continued her employment long after the day of the incident giving rise to this action.

These facts demonstrate that Olivarez was at the Post Office at the time scheduled by her supervisor, the Postmaster, that she was using the supplies provided by the U.S. Postal Service and that she was following their instructions. At the time of the alleged incident, Olivarez was engaged in the very duties for which she was employed. There was no other reason for Olivarez to be at the Post Office than to meet her employment duties, which means that she was acting within the course and scope of her employment when the common law tort allegations alleged by Plaintiff were committed.

## V.     Conclusion

For these reasons stated in Defendant Elena Olivarez's Motion for Summary Judgment and argued above, Defendant respectfully asks that her Motion be in all things granted.

Respectfully Submitted,

**TEXAS RIOGRANDE LEGAL AID, INC.**
316 S. Closner
Edinburg, Texas 78539
(956)383-5673
(956)383-4688 Fax

BY:     _____
Pablo J. Almaguer
State Bar No. 24004523
S.D. Tex. No. 22597
Attorney-in-Charge for Defendant
Elena Olivarez

---

[49] Olivarez Depo. 9 and 76-7

## CERTIFICATE OF SERVICE

I, Pablo J. Almaguer, hereby certify that a true and correct copy of the foregoing document has been served upon opposing counsel on this the _14th_ day of **April, 2004**, as follows:

Jason R. Mann
J. EDWARD MANN, JR. & ASSOCIATES
222 E. Van Buren, Suite 701
PO Box 231
Harlingen, TX 78551-0231
*Hand Delivered*

Steven T. Schammel, Asst. U.S. Attorney
UNITED STATES ATTORNEY'S OFFICE
1701 W. Highway 83, Suite #600
McAllen, TX 78501
*Hand Delivered*

Pablo J. Almaguer

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| GLORIA L. GARCIA a/k/a<br>GLORIA GUZMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and<br>YOLANDA PEREZ, as Postmaster, United<br>States Post Office, Santa Rosa, Texas, and<br>ELENA OLIVAREZ, as an employee of the<br>United States Post Office, Santa Rosa, Texas,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    CIVIL ACTION NO. B-02-017 |

## DECLARATION OF PABLO JAVIER ALMAGUER

I, Pablo Javier Almaguer, declare the following based on personal knowledge:

1.    My name is Pablo Javier Almaguer, and I reside in McAllen, Hidalgo County, Texas. I am over the age of eighteen years and am competent to testify to the facts contained in this declaration. I am an attorney of record for Defendant Elena Olivarez in the above-styled action.

2.    Attached as an exhibit to this declaration at Tab 1 is a true and correct copy of the Complaint filed by Plaintiff Gloria Garcia a/k/a/ Gloria Guzman in the above-styled action.

3.    Attached as an exhibit to this declaration at Tab 2 is a true and correct copy of the USA's Answer filed in the above-styled action.

4.    Attached as an exhibit to this declaration at Tab 3 is a true and correct copy of the

1

Motion to Substitute the USA as Defendant in the stead of Yolanda Perez (Unopposed) with attached Certification of Scope of Employment filed by USA in the above-styled action.

5.    Attached as an exhibit to this declaration at Tab 4 is a true and correct copy of the Order of Substitution substituting USA for Yolanda Perez as Defendant in the above-styled action and signed on the 16th day of May, 2002.

6.    Attached as an exhibit to this declaration at Tab 5 is a true and correct copy of the Answer filed by Elena Olivarez in the above-styled action.

7.    Attached as an exhibit to this declaration at Tab 6 is a true and correct copy of USA's response to Plaintiff's Interrogatory Number 12.

8.    Attached as an exhibit to this declaration at Tab 7 are true and correct copies of Defendant USA's response to Plaintiff's Request for Production Number 9.  The documents are labeled as Exhibits "A","F" and"G."

9.    Attached as an exhibit to this declaration at Tab 8 are true and correct copies of excerpts of Defendant USA's response to Plaintiff's Request for Production Number 7.  The documents are labeled as Exhibit "C."

10.    Attached as an exhibit to this declaration at Tab 9 are true and correct copies of excerpts of Defendant USA's response to Plaintiff's Request for Production Number 7.  The documents are labeled as Exhibit "D" and "E."

11.    Attached as an exhibit to this declaration at Tab 10 is a true and correct copy of the select pages from the Oral Deposition of Elena Olivarez.

12.    Each of the foregoing exhibits were produced by the parties in the course of discovery in this litigation.

2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Pablo Javier Almaguer

Executed on:    4-14-04

3

**TABLE OF EXHIBITS**

| Tab | Document | Abbreviated Reference |
|---|---|---|
| 1 | Plaintiff Gloria Garcia a/k/a Gloria Guzman's Original Complaint | Complaint [paragraph number] |
| 2 | United States of America's Answer to Plaintiff's Original Complaint | USA's Answer [paragraph number] |
| 3 | Motion to Substitute the United States of America as Defendant in the stead of Yolanda Perez (Unopposed) | USA's Unopposed Motion to Sub. and Order |
| 4 | Order of Substitution substituting USA for Yolanda Perez as Defendant | USA's Unopposed Motion to Sub. and Order |
| 5 | Defendant Elena Olivarez's Answer | Olivarez Answer [paragraph number] |
| 6 | Defendant USA's response to Plaintiff's Interrogatory Number 12 | USA Resp. to Interrog. No. 12 |
| 7 | Exhibits "A,'"'F," and "G" to Defendant USA's response to Plaintiff's Request for Production Number 9 | USA Prod. 9, [exhibit letter] |
| 8 | Excerpts of Exhibit "C" from Defendant USA's response to Plaintiff's Request for Production Number 7 | USA Prod. 7, [exhibit letter (page number)] |
| 9 | Excerpts of Exhibits "D" and "E" from Defendant USA's response to Plaintiff's Request for Production Number 7 | USA Prod. 7, [exhibit letter] |
| 10 | Excerpts of Oral Deposition of Elena Olivarez | Olivarez Depo. [page number] |

United States District Court
Southern District of Texas
FILED

FEB 0 1 2002

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

GLORIA L. GARCIA A/K/A           §
GLORIA GUZMAN                    §
                                 §
V.                               §
                                 §     CIVIL ACTION NO. _____
                                 §
UNITED STATES OF AMERICA, and    §
YOLANDA PEREZ, as Postmaster,    §
United States Post Office, Santa Rosa §
Texas, and ELENA OLIVAREZ, as    §
an employee of the United States Post §
Office, Santa Rosa, Texas        §

B-02-017

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

Plaintiff, GLORIA L. GARCIA A/K/A GLORIA GUZMAN, in this action complains of the UNITED STATES OF AMERICA, YOLANDA PEREZ, as Postmaster of the United States Post Office, Santa Rosa, Texas, and ELENA OLIVAREZ, as an employee of the United States Post Office, Santa Rosa, Texas, Defendants in this action, and for cause of action shows the following:

### A. Parties

1.     Plaintiff, GLORIA L. GARCIA a/k/a GLORIA GUZMAN, is an individual who is a citizen of the State of Texas, and a resident of Cameron County, Texas.

2.     Defendant, UNITED STATES OF AMERICA, UNITED STATES POSTAL SERVICE, may be served by delivering a copy of the summons and of the complaint to the United States Attorney for the Southern District of Texas. Defendant may also be served by sending a copy of the summons and of the complaint by registered or certified mail to the

Attorney General of the United States At Washington, District of Columbia.

3.      Defendant, YOLANDA PEREZ, as Postmaster, United States Post Office, Santa Rosa, Texas may be served by serving the United States and by also sending a copy of the summons and of the complaint by registered or certified mail to Defendant.

4.      Defendant, ELENA OLIVAREZ, as an employee of the United States Post Office, Santa Rosa, Texas may be served by serving the United States and by also sending a copy of the summons and of the complaint by registered or certified mail to Defendant.

## B. Jurisdiction

5.      The Court has jurisdiction over the lawsuit because the action arises under the Federal Tort Claims Act and 28 U.S.C. § 1346(b), and U.S.C. §1331.

## C. Conditions Precedent

6.      Plaintiff timely presented this claim in writing to the United States Postal Service. This suit is filed within six months of the agency's final written notice of its denial of the claim.

## D. Facts

7.      On November 12, 1999, at 7:10 a.m., Plaintiff entered the United States Post Office, Santa Rosa in Cameron County, Texas (hereinafter sometimes referred to as USPS, Santa Rosa) to collect her mail.   While Plaintiff collected her mail, a custodian, ELENA OLIVAREZ, employed by USPS, Santa Rosa, mopped the floor behind her.  Plaintiff turned to exit after closing her post office box and suffered a personal injuries when she slipped and fell on the wet floor.   At the time of Plaintiff's injuries, the light fixtures in the area were

inoperable, resulting in poor visibility, and "Caution Wet Floor" signs were not displayed in the vicinity of Plaintiff's fall in such a manner to adequately warn Plaintiff of any dangerous conditions. Plaintiff sustained injuries to both her left and right knees which required surgery and causing her permanent scarring and pain and suffering which will likely continue for the rest of her natural life.   As further result of her injuries, Plaintiff suffered mental anguish and financial hardship as a result of the loss of her employment, resulting in a loss of earnings in the amount of $3,387.44, and medical expenses in the total amount of $17,968.23.

### E. Count 1 - Federal Tort Claims Act

8.     This act by the United States Postal Service was negligent.  Specifically, Post Master, YOLANDA PEREZ, was acting within the course and scope of her employment and had a duty to exercise ordinary care in her duty to oversee the upkeep and maintenance of the USPS of Santa Rosa, Texas, including overseeing the proper placement of warning signs and proper operation of light fixtures.  Additionally, ELENA OLIVAREZ, a custodian for the USPS, Santa Rosa,  was acting within the course and scope of her employment and had a duty to exercise ordinary care in maintaining the USPS of Santa Rosa, Texas, in placing warning signs appropriately in the vicinity of any maintenance being performed, and in exercising ordinary care when mopping the floors in high traffic areas of the USPS, Santa Rosa, especially when performing her duties in close proximity to its patrons. Under the laws of the State of Texas, a private person would

be liable to Plaintiff for this act. In accordance with 28 U.S.C. § 1346(b), the United States

is liable to Plaintiff for her damages for the personal injury described below.

9.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered

the following injuries and damages:

      a.    $21,355.44 as actual damages (lost wages $3,387.44, plus medical
            expenses $17,968.23);

      b.    Damages for Pain and Suffering;

      c.    Damages for Mental Anguish;

      d.    Costs of suit;

      e.    Prejudgment and post-judgment interest; and

      f.    All other relief the court deems appropriate.

### G. Prayer

10.    For these reasons, Plaintiff asks for judgment against Defendants for

      a.    Physical pain and mental anguish in the past and future;

      b.    $21,355.44 as actual damages (lost wages $3,387.44, plus medical
            expenses $17,968.23);

      c.    Damages for Pain and Suffering;

      d.    Lost earnings;

      e.    Damage to earning capacity;

      f.    Disfigurement in the past and future;

      g.    Medical expenses in the past and future; and

h.      Physical impairment in the past and future.

Respectfully submitted,

**J. EDWARD MANN, JR. & ASSOCIATES**

Jason R. Mann
State Bar No. 24004793
Federal Bar No. 23543
222 E. Van Buren, Suite 701
P. O. Box 231
Harlingen, Texas 78551-0231
Telephone: 956/428-4114
Facsimile: 956/428-9494
Attorney for Plaintiff

## JURY DEMAND

Plaintiff, GLORIA L. GARCIA a/k/a GLORIA GUZMAN, asserts her rights under the Seventh Amendment to the U.S. Constitution and demands a trial by jury on all issues, in accordance with Federal Rule of Civil Procedure 38.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 2 2 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GLORIA L. GARCIA A/K/A | * | |
| GLORIA GUZMAN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. B-02-017 |
| | * | |
| UNITED STATES OF AMERICA, and | * | |
| YOLANDA PEREZ, as Postmaster, | * | |
| United States Post Office, Santa Rosa, | * | |
| TX, and ELENA OLIVAREZ, as an | * | |
| Employee of the United States Post | * | |
| Office, Santa Rosa, Texas, | * | |
| Defendants. | * | |

## UNITED STATES OF AMERICA'S ANSWER
## TO PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, defendant herein, by and through Michael T. Shelby, United States Attorney for the Southern District of Texas, hereby files its answer to Plaintiff's Original Complaint. The defendant answers the consecutively numbered paragraphs as follows:

### A. PARTIES

1. Defendant has insufficient information to admit or deny plaintiff's residency or citizenship as alleged in paragraph 1 of the complaint. To the extent an answer is required, the defendant denies the allegation in paragraph 1.

2. The allegations in paragraph 2 of the complaint constitute plaintiff's allegations regarding service on the United States of America, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 2 may be construed as containing allegations of fact, they are denied.

3. The allegations in paragraph 3 of the complaint constitute plaintiff's allegations regarding service on Yolanda Perez, Postmaster of the United States Post Office, Santa Rosa, Texas, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 3 may be construed as containing allegations of fact, they are denied. Moreover, defendant avers that Yolanda Perez is not a proper party defendant in this case.

4. The allegations in paragraph 4 of the complaint constitute plaintiff's allegations regarding service on Elena Olivarez, a named defendant in this case, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 4 may be construed as containing allegations of fact, they are denied. Defendant denies that Elena Olivarez is an employee of the United States Postal Service as alleged in paragraph 4 of the complaint.

## B. JURISDICTION

5. The allegations in paragraph 5 of the complaint set forth plaintiff's allegations of jurisdiction to which no response is required. To the extent the Court requires a response, the allegations are denied.

## C. CONDITIONS PRECEDENT

6. The allegations in the first sentence of paragraph 6 of the complaint constitute plaintiff's allegations regarding the timeliness of the filing of her administrative claim, which is a conclusion of law to which no response is required. To the extent the allegations in the first sentence of paragraph 6 may be construed as containing allegations of fact, they are denied. Defendant admits the second sentence of paragraph 6.

2

## D. FACTS

7. Defendant admits the first sentence of paragraph 7 of the complaint. Defendant admits the allegations in the second sentence of paragraph 7 of the complaint that custodian Elena Olivarez was mopping the floor near plaintiff as plaintiff collected her mail but denies that Ms. Olivarez was an employee of the Postal Service as alleged in the second sentence of paragraph 7. Defendant has insufficient evidence to admit or deny the allegations contained in the third sentence of paragraph 7 of the complaint and, therefore, denies same. Defendant denies the allegations in the fourth sentence of paragraph 7 of the complaint. Defendant admits that plaintiff alleges injuries to both her left and right knees and admits further that plaintiff had surgery on her knees as alleged in the fifth sentence of paragraph 7 of the complaint, but defendant is without sufficient information to admit or deny the remaining allegations in the fifth sentence of paragraph 7 and, therefore, denies same. Defendant denies the allegations in the sixth sentence of paragraph 7 of the complaint.

## E. COUNT 1 - FEDERAL TORT CLAIMS ACT

8. Defendant denies the allegations in the first sentence of paragraph 8 of the complaint. Defendant admits that Postmaster Yolanda Perez was acting within the course and scope of her employment at all relevant times as alleged in the second sentence of paragraph 8. The remaining allegations in the second sentence of paragraph 8 constitute conclusions of law to which no response is required; if a response is required, however, defendant denies same. Defendant avers that Elena Olivarez was a contractor custodian and denies that Ms. Olivarez was an employee of the Postal Service as alleged in the third sentence of paragraph 8. The remaining allegations in the third sentence of paragraph 8

3

constitute conclusions of law to which no response is required; if a response is required, however, defendant denies same. The allegations in the fourth sentence of paragraph 8 constitution conclusions of law to which no response is required. To the extent the Court requires a response, however, defendant denies the allegations in the fifth sentence of paragraph 8.

9. Defendant denies the allegations in paragraph 9 of the complaint.

## F. PRAYER

10. No answer is required to the allegations in paragraph 10 of the complaint because the allegations are in the nature of a prayer for relief. To the extent that an answer is deemed necessary, however, defendant denies the allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

In accordance with Rule 8(c) of the Federal Rules of Civil Procedure, defendant hereby asserts the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

The Court lacks jurisdiction over any claims asserted herein against the United States Postal Service under the Federal Tort Claims Act (FTCA) because the conduct at issue and alleged to be negligent was that of a contractor of the United States of America rather than an employee. 28 U.S.C. §2671. As such, the United States of America is not responsible for the alleged acts or omissions, and has not waived its sovereign immunity for such claims.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's recovery is limited to the amount claimed administratively in plaintiff's administrative claim filed with the United States Postal Service. 28 U.S.C. §2675(b).

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's relief under the FTCA is limited to "money damages" only. See 28 U.S.C. §1346(b). Accordingly, this Court lacks jurisdiction to award any other type of relief in law or equity.

## FOURTH AFFIRMATIVE DEFENSE

Pre-judgment interest is not recoverable against the United States under the FTCA. See 28 U.S.C. §2674.

## FIFTH AFFIRMATIVE DEFENSE

Under the FTCA, the Plaintiff is not entitled to a trial by jury. This case shall be tried by the Court without a jury. 28 U.S.C. §2402.

## SIXTH AFFIRMATIVE DEFENSE

The damages alleged in plaintiff's complaint were proximately caused by plaintiff's own negligence and not the acts or omissions of an employee or agent of the defendant.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's recovery, if any, is reduced and/or barred by the applicable Texas common or statutory law governing comparative negligence.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent that any of plaintiff's injuries or damages alleged in her complaint were proximately and/or solely caused by a third party, and not the United States, plaintiff's claim for recovery is, therefore, reduced and/or barred accordingly.

## NINTH AFFIRMATIVE DEFENSE

Defendant denies plaintiff's injuries and/or damages were caused and/or contributed to by any fault attributable to it, but, in the event this Court does attribute such fault to the United States of America, then, in the alternative, the United States specifically pleads the

applicability of superseding and/or intervening cause as a defense and a bar to recovery against the United States by plaintiff.

## TENTH AFFIRMATIVE DEFENSE

Any injuries and/or damages claimed by plaintiff herein are the result of pre-existing condition rather than any fault or conduct of defendant.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to properly serve the necessary parties to this action.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff has named improper party defendants in this action.

WHEREFORE, defendant requests that Plaintiff's Original Complaint be dismissed with prejudice, and that all relief requested be denied. Defendant requests all other relief, both law and equity, to which it is entitled.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant U.S. Attorney
600 E. Harrison, #201
Brownsville, TX 78520
(956) 548-2554 Fax (956) 548-2549
Texas State Bar No. 00800490
Federal I.D. No. 10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing United States of America's Answer To Plaintiff's Original Complaint was mailed on this the _22nd_ day of April, 2002 via Certified Mail, Return Receipt Requested to Jason R. Mann, Attorney at Law, 222 E. Van Buren, Suite #701, P.O. Box 231, Harlingen, TX 78551-0231.

NANCY L. MASSO
Assistant U.S. Attorney

6

*5*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 1 4 2002

Michael N. Milby
Clerk of Court

GLORIA L. GARCIA A/K/A    *
GLORIA GUZMAN,            *
        Plaintiff,        *
                          *
v.                        *    Civil Action No. B-02-017
                          *
UNITED STATES OF AMERICA, and  *
YOLANDA PEREZ, as Postmaster,  *
United States Post Office, Santa Rosa,  *
TX, and ELENA OLIVAREZ, as an  *
Employee of the United States Post  *
Office, Santa Rosa, Texas,  *
        Defendants.        *

## MOTION TO SUBSTITUTE THE UNITED STATES OF AMERICA AS DEFENDANT IN THE STEAD OF YOLANDA PEREZ (UNOPPOSED)

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the United States of America, by and through Michael T. Shelby, United States Attorney for the Southern District of Texas, and respectfully requests this Court for an order substituting it as the defendant in the above-entitled and numbered cause in lieu of Yolanda Perez with regard to all the common law tort allegations alleged to have been committed by Yolanda Perez while she was acting within the course and scope of her employment with the United States Postal Service.[1] (See Certification of Scope of Employment attached as Exhibit "A").

Any remedy available to plaintiff must be exclusively against the United States of America pursuant to *28 U.S.C. §2674* and *28 U.S.C. §2679(b)*.

Attached to this motion to substitute, as Government's Exhibit "A", is a certification by the United States Attorney for the Southern District of Texas, executed pursuant to the

---

[1] At paragraph 8 of her Complaint, Plaintiff concedes that Yolanda Perez was acting within the course and scope of her employment as an employee of the United States Postal Service with regard to the incident and allegations raised in her Complaint.

provisions of *28 U.S.C. §2679(d)(1)*, as amended by the Federal Employees Liability Reform and Tort Compensation Act of 1988 (FTCA), *Public Law 100-694*, and of *28 C.F.R. §§15.3* and *50.15*, which certifies that named defendant Yolanda Perez was, at all times relevant to this lawsuit, acting within the course and scope of her employment as an employee of the United States at the time of the alleged conduct made by subject matter of the above-captioned and numbered civil action.

The purpose of this Act is to provide federal employees with absolute immunity from personal liability for money damages for common law or state law torts or other violations of state law when the employees are acting within the scope of their employment. An action against the United States under the FTCA for such claims is "exclusive of any other civil action or proceeding for money damages by reasons of the same subject matter against the employee." *28 U.S.C. §2679(b)(1)*.

Title *28 U.S.C. §2679(d)* implements the exclusive remedy provision by authorizing the Attorney General to issue a scope of employment certification. Upon proper certification by the Attorney General or his designee that the federal employee was acting within the scope of his/her employment, the action shall be deemed to be an action against the United States under the FTCA and substitution of the United States is mandated. *28 U.S.C. §2679(d)*. The Attorney General has delegated the authority to make such certification to the United States Attorneys. *28 C.F.R. 15.3*.

As previously indicated, attached hereto as Government's Exhibit "A" is the certification of the U. S. Attorney that Yolanda Perez was acting within the scope of her employment with respect to the actions alleged by the plaintiff. The Government's certification is *prima facie* evidence that the challenged conduct of the employee is within the scope of employment. *Brown v. Armstrong*, 949 F.2d 1007 (8th Cir. 1991).

Accordingly, the United States should be substituted for Yolanda Perez and she should be dismissed from this action as to all common law tort allegations set forth in plaintiff's complaint. *Mitchell v. Carlson,* 896 F.2d 128, 133-36 (5th Cir. 1990).

Respectfully submitted,

MICHAEL T. SHELBY
UNITED STATES ATTORNEY

NANCY L. MASSO
Assistant United States Attorney
600 East Harrison St., No. 201
Brownsville, TX 78520
Tel:    (956) 548-2554
Fax:   (956) 548-2549
State Bar No. 00800490
Federal I.D. No. 10263

## STATEMENT OF CONSULTATION

On May 10, 2002, Plaintiff's attorney of record, Jason Mann, advised that he did not oppose this motion.

Signed May 14th, 2002.

NANCY L. MASSO
Assistant U. S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing Motion to Substitute the United States of America As Defendant In the Stead of Yolanda Perez was mailed via certified mail, return receipt requested to the following:

Jason R. Mann
Attorney at Law
222 E. Van Buren, Suite 701
P.O. Box 231
Harlingen, Texas 78551-0231

May 14, 2002
Date

NANCY L. MASSO
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RECEIVED BY

FEB/MAY 10  AM 11: 30

GLORIA L. GARCIA A/K/A    *
GLORIA GUZMAN,            *
        Plaintiff,        *
                          *
v.                        *        Civil Action No. B-02-017
                          *
UNITED STATES OF AMERICA, and  *
YOLANDA PEREZ, as Postmaster,  *
United States Post Office, Santa Rosa,  *
TX, and ELENA OLIVAREZ, as an  *
Employee of the United States Post  *
Office, Santa Rosa, Texas,    *
        Defendants.       *

## CERTIFICATION

The undersigned Michael T. Shelby, United States Attorney for the Southern District of Texas, pursuant to the provisions of *29 U.S.C. §2679(d)(1)*, as amended by the Federal Employees Liability Reform and Tort Compensation Act of 1988, *Public Law 100-694*, and by virtue of the authority vested under *28 C.F.R. §§15.3* and *50.15* hereby certifies as follows:

Upon the basis of information now available with respect to the circumstances of the incidents upon which plaintiff's claims are based, I am of the opinion that Yolanda Perez was acting within the scope of her employment as an employee of the United States Government at the time of the conduct alleged by plaintiff.

Dated this 30th day of April, 2002.

MICHAEL T. SHELBY
United States Attorney

GOVERNMENT
EXHIBIT
"A"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
ENTERED

**MAY 16 2002**

Michael N. Milby, Clerk of Court
By Deputy Clerk

GLORIA L. GARCIA A/K/A          *
GLORIA GUZMAN,                   *
          Plaintiff,             *
                                 *
v.                               *       Civil Action No. B-02-017
                                 *
UNITED STATES OF AMERICA, and    *
YOLANDA PEREZ, as Postmaster,    *
United States Post Office, Santa Rosa, *
TX, and ELENA OLIVAREZ, as an    *
Employee of the United States Post *
Office, Santa Rosa, Texas,       *
          Defendants.            *

*THIS ORDER GRANTS DOCKET NO. 5*

**ORDER OF SUBSTITUTION**

It appears to this Court that this action brings claims for monetary damages against Yolanda Perez for alleged tortious acts arising out of actions taken by her within the scope of her employment with the United States Postal Service.

ACCORDINGLY IT IS ORDERED pursuant to *28 U.S.C. §2679(d)(1)*, as amended by the *Public Law 100-694*, that the United States is hereby substituted as the defendant herein in the place of the named defendant, Yolanda Perez, in both her official and individual capacities, with regard to the common law tort allegations raised in the plaintiff's complaint. Further, because the complaint alleges only common law tort allegations against Yolanda Perez, Ms. Perez's name should deleted from the caption of these proceedings as a named defendant.

IT IS FURTHER ORDERED that all the defenses of the United States are not affected by this certification and order.

IT IS FURTHER ORDERED that as to all common law tort claims alleged against defendant Yolanda Perez, in her official and individual capacities, the United States is hereby substituted as a defendant in the stead of Yolanda Perez.

SIGNED on this the 6 day of MAY, 2002.

PRESIDING JUDGE

4

United States District Court
Southern District of Texas
RECEIVED

AUG 0 5 2002

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| GLORIA L. GARCIA a/k/a GLORIA GUZMAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and YOLANDA PEREZ, as Postmaster, United States Post Office, Santa Rosa, Texas, and ELENA OLIVAREZ, as an employee of the United States Post Office, Santa Rosa, Texas,<br><br>Defendants. | § § § § § § § § § § § § § § § § |

CIVIL ACTION NO. B-02-017

## ELENA OLIVAREZ'S ANSWER

ELENA OLIVAREZ, hereinafter Defendant, answers the Complaint as follows:

1. Insofar as responsive pleading is permitted or required, the Defendant, on information and belief, admits to the allegations set forth in paragraphs 1, 2, 3 and 4.

2. The Defendant admits to the allegations set forth in paragraph 5 of the Complaint, only insofar as subject matter jurisdiction is proper in this Court, and otherwise denies the allegations set forth therein.

3. The Defendant lacks sufficient knowledge of information to admit or deny the allegations set forth in paragraph 6 of the Complaint, and such allegations therefore are denied.

4. The Defendant admits to the allegations set forth in paragraph 7 of the Complaint, only insofar as Plaintiff, on information and belief, entered the United States Post Office in Santa Rosa, Cameron County, Texas, on November 12, 1999, and otherwise denies the allegations set

forth therein.

5. The Defendant lacks sufficient knowledge or information to admit or deny the allegation set forth in paragraph 8 of the Complaint, only insofar as Defendant, Yolanda Perez, on information and belief, was acting within the course and scope of her employment and had a duty to exercise ordinary care in her duty to oversee the upkeep and maintenance of the USPS of Santa Rosa, Cameron County, Texas, including overseeing the proper placement of warning signs and proper operation fo light fixtures, and such allegations are therefore denied. Defendant further denies all other allegations set forth in paragraph 8.

6. The Defendant denies the allegations set forth in paragraph 9 of the Complaint, including any and all subparts therein.

7. The Defendant denies the allegations set forth in paragraph 10 of the Complaint, including any and all subparts therein, and denies that the Plaintiff is entitled to any of the relief sought in her prayer for relief.

8. Any and all allegations made in the Complaint which have not heretofore been admitted or denied are denied.

## Affirmative Defenses

9. The Plaintiff has failed to plead a claim against Defendant for which relief can be granted.

10. Plaintiff has improperly named Defendant in this action.

11. The Defendant, continuing to deny any and all liability, nonetheless affirmatively pleads that the injuries, if any, that may have been sustained by Plaintiff, as alleged in her Complaint, occurred as a direct result of Plaintiff's negligent failure to exercise ordinary care for

her safety.

12. The Defendant, continuing to deny any and all liability, nonetheless affirmatively pleads that the injuries, if any, that may have been sustained by Plaintiff, as alleged in her Complaint, were the result of a pre-existing condition rather than any fault or conduct of Defendant.

WHEREFORE, PREMISES CONSIDERED, the Defendant, having answered, prays that the Plaintiff take nothing by her Complaint, and that the Defendant be allowed to go hence with her costs, and further be granted general relief.

Respectfully Submitted,

**TEXAS RURAL LEGAL AID, INC.**
316 S. Closner
Edinburg, Texas 78539
(956)383-5673
(956)383-4688 Fax

BY: _____
Pablo J. Almaguer
State Bar No. 24004523
S.D. Tex. No. 22597

Attorney-in-Charge for Defendant
Elena Olivarez

Defendant Elena Olivarez's Answer                                    Page 3

## CERTIFICATE OF SERVICE

I, Pablo J. Almaguer, hereby certify that a true and correct copy of the foregoing

document has been forwarded by certified mail, return receipt requested, to the following counsel

of record, on the 5th day of August, 2002:

Jason R. Mann
J. EDWARD MANN, JR. & ASSOCIATES
222 E. Van Buren, Suite 701
PO Box 231
Harlingen, TX 78551-0231

Nancy Masso, Asst. U.S. Attorney
UNITED STATES ATTORNEY'S OFFICE
600 E. Harrison #201
Brownsville, TX 78520


_____
Pablo J. Almaguer

one example, in the Santa Rosa Post Office, the custodian would mop only one side of a hallway or corridor at a time. Since only one side was mopped at a time, employees and customers would have a dry area on which to walk.

**INTERROGATORY NO. 11:** When was the floor at the Santa Rosa Post Office last stripped, refinished and / or spray buffed prior to Plaintiff's fall accident.

**RESPONSE TO INTERROGATORY NO. 11:**

The last time the Santa Rosa Post Office floors were stripped, refinished and / or spray buffed was likely July 1996. The floors have not been stripped, waxed or buffed since the present Postmaster began in that position in May 1998.

**INTERROGATORY NO. 12:** Please indicate the company(ies) and / or individual(s) outside the Defendant's own organization that performed actual repairs and maintenance of the Santa Rosa Post Office. Name the person(s) and / or organization(s) and the actual employees thereof who performed the actual floor and building maintenance work.

**RESPONSE TO INTERROGATORY NO. 12:** Until approximately October 2000, Defendant and the Landlord of the post office building operated (mistakenly) as if building repairs were the responsibility of the Landlord. The Landlord therefore has the names of companies performing actual repairs of the building through most of that period. Otherwise, Defendant responds as follows:

Ms. Elena Olivarez
C/o Pablo Javier Almaguer
Texas Rural Legal Aid Inc.
316 South Closner
Edinburg, TX 78531
(Ms. Olivarez was the custodian at the Santa Rosa Post Office pursuant to a contract

with the Postal Service.  She performed routine, daily cleaning and maintenance at the Post Office.)

Paul Camacho
1306 E. Clifton
Weslaco, TX  78546
(Mr. Camacho stripped, waxed and sealed the Post Office floors in July 1996.)

Lara's Pest Control
1005 E. Washington
Harlingen, TX  78550
(Company performed pest control services to the Post Office in 1999.)

Villarreal, Inc.
__?_ East Hidalgo Avenue
Raymondville, TX  78580
(Company performed electrical repairs at Post Office.)


**INTERROGATORY NO. 13:**  Please indicate whether all of the interior lights in the Santa Rosa Post Office were operational at the time of Plaintiff's injury.

**RESPONSE TO INTERROGATORY NO. 13:**

Unknown.  The workroom lights are turned on and off by employees and were operational.  Employees do not activate the lobby lights; rather, the lights go on when activated by a motion sensor.  The postal employees do not remember at this time whether the sensor was working the lights properly at the time of Plaintiff's claimed injury.

**INTERROGATORY NO. 14:**  Did you or any employee of the Santa Rosa Post Office or the United States of America receive any complaint, warning or other notice concerning a dangerous or defective condition existing at the Santa Rosa Post Office prior to the Plaintiff's accident subject to this lawsuit?

**RESPONSE TO INTERROGATORY NO. 14:**

7

# EXHIBIT "A"

# Production Request No. 7

# B-02-017

## VILLARREAL, INC.
Electrical Contractors
209 East Hidalgo Avenue
RAYMONDVILLE, TEXAS 78580
(956) 689-2607

**JOB INVOICE**

**19431**

| BILL TO | Santa Rosa Post Office |
| ADDRESS | 216 S. Main St |
| CITY | Santa Rosa, TX |

JOB NAME AND LOCATION

CUSTOMERS ORDER NO

ORDER TAKEN BY

PHONE

DATE PROMISED

**DESCRIPTION OF WORK**

Change out ballast to
lobby light. Also change out photo cell to
entry lights.

| QUANTITY | DESCRIPTION OF MATERIAL USED | PRICE | AMOUNT |
|---|---|---|---|
| 2 | PM-23 W ballast | | |
| 1 | photo cell #5 PT-15 | | |
| 1 | module control | | |
| 1 | photo cell (lobbenson) | | |

Quoto price: 437 50

**LABOR**

| HOURS | | AMOUNT |
|---|---|---|
| MECHANICS | | |
| HELPERS | | |

SIGNATURE

(I hereby acknowledge the satisfactory completion of the above described work)

TOTAL LABOR

TOTAL MATERIALS

TOTAL LABOR

TAX

---

**CUSTOMER'S RECEIPT** — DO NOT SEND THIS RECEIPT FOR PAYMENT
KEEP IT FOR YOUR RECORDS

844726548284 991223 785930 *437*50

SERIAL NUMBER    YEAR. MONTH. DAY    POST OFFICE    U S DOLLARS AND CENTS

PAY TO

ADDRESS

CHECK WRITER IMPRINT AREA

FROM

ADDRESS

COUPON OR USED FOR




# LARA'S PEST CONTROL

### 1005 E WASHINGTON
### HARLINGEN, TEXAS 78550

## (956) 428-5490

11-17-99

Santa Rosa Post Office Bldg

Spray Inside and outside

35.00 Quarterly

For the control of Ants, Roaches, and spiders.

Beto Tijerina

11-17-99

Called him back &
requested their service!
12-10-99




# INTERNAL REVENUE SERVICE TD 1099 REPORTING VENDOR PAYMENT LOG

### Calendar QTR _I_ , CY 199 _2000_

Post Office Name: _Santa Rosa_    Zip +4 _78593_ - _9958_

Reporting Finance Number: _488105_    Office Phone # _(956) 636 1325_

Payee Name: _Luis P Montiel_    *(As listed on tax filing info and/or Social Security Card)*

Payee TIN:  SSN: _____-___-_____

OR

EIN: ___- _2 450 44 2260-1_

Address: _1005 E Washington_

City: _Harlingen_    State: _TX_    Zip +4 _78550_

| Invoice/Payment Amount (Include description of service done) | Date Paid |
|---|---|
| 35 00 | 12/15/99 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

QUARTER TOTAL $ _35 00_

This form is for postal use only, it should be forwarded to your District Accounting Office  Do not send to the IRS or the San Mateo ASC.    07/97

**Hilario and Alma G. Rincones**
**P. O. Box 269**
**Sebastian, TX 78594**

October 14, 2000

Yolanda Perez
Postmaster
US Post Office
Santa Rosa, TX 78593

Dear Ms. Perez:

In looking through my to do box I ran across the enclosed statement which had been left unpaid as an oversight on my part. However, in renegotiating our Post Office lease with Ms. Sandra Rybicki, I became aware that we are not responsible for paying ordinary repairs to the Post Office Building. Please contact Mr. Doug Pitner, in San Antonio and discuss this with him. I am sending you this statement so that you may take care of it or have it taken care of by the proper office.

If you have any question, please call me at my cell number 956-571-8394.

rio & Alma G. Rincones
P.O. Box 269
ebastian, TX 78594



SANTA ROSA
OCT 11 2000
TX 78593
USPS

Yolanda Perez
Postmaster
U.S. Post Office
Santa Rosa, TX 78593

# EXHIBIT "F"

# Production Request No. 7

# B-02-017

FROM

PAUL CAMACHO PH 9685562
1306 E. CLIFTON
WESLACR TX 78596

# PROPOSAL

Page No. _____
of _____ Pages

| PROPOSAL SUBMITTED TO: | PHONE | DATE 7/1/96 |
|---|---|---|
| NAME   SANTA ROSA Post Office | JOB NAME | |
| STREET | STREET | |
| CITY | CITY | STATE |
| STATE   TX. | | |

We hereby submit specifications and estimate for: STRIPPING FLOOR &
SEALING AND 1 COAT OF STRIP 3 COATS OF WAX

We hereby propose to furnish labor and materials - complete in accordance with the above specifications, for the sum of

THREE HUNDRED TWENTY FIVE dollars ($ 325 00/100 ) with payment to be made as follows:

_____

All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accident or delays beyond our control. This proposal subject to acceptance within _____ days and is void thereafter at the option of the undersigned.

Authorized Signature _____

## ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.

ACCEPTED:

Signature _____

DATE _____

Signature _____

FORM NO 52-110

# EXHIBIT "G"

# Production Request No. 7

# B-02-017

JUL 16 REC'D

| U.S. Postal Service | 1. Requisition Number 3 | 2. Request Date 7/11/96 | 3. Required Delivery Date ASAP | Page Number 1 |
|---|---|---|---|---|

## REQUISITION FOR SUPPLIES, SERVICES, OR EQUIPMENT

See Instructions on Reverse

| 4. Job Order Number (Maintenance Use Only) | | | | | Number of Pages |
|---|---|---|---|---|---|
| WC | Acronym | Equipment No. | EC | Work Order No | 1 |

5. ☐

U. S. POSTAL SERVICE
ATTN: RAY GARCIA - POO
SAN ANTONIO, TX. 78284-9992

6. From: (Facility Name, Address and ZIP + 4)
SANTA ROSA
216 N. MAIN ST
SANTA ROSA, TX. 78593-9288

7. Complete Delivery Address
216 N. MAIN ST.
SANTA ROSA, TX. 78593-9998

8. For Information Call

| a. Name RAMIRO ALDAPE | b. PEN Telephone Number (210) 636-1333 |
|---|---|

| 9. Budget Finance No. 48-8105 | 10. Prop. Acct. Fin. No. | 11. Acct. No | 12. FEDSTRIP Address Code 187D10 | 13. CAG J | 14. PCN | 16. Requestor ☐ VMF ☑ Other | 16 ID No |
|---|---|---|---|---|---|---|---|

### 17. Description

| PSN, NSN, PSIN or Part Number (a) | Supplies, Services, or Equipment Requested (b) | Quantity (c) | Unit (d) | Unit Price (e) | Estimated Cost (f) |
|---|---|---|---|---|---|
| | STRIP FLOOR - 1 COAT OF SEALER - 3 COATS OF WAX. | | | | 325,00 |

18. Justification
FLOOR HAS NOT BEEN WAX SINCE 1992.
FLOOR LOOK BAD.

19. Suggested Source of Supply *SEE PROPOSAL ATTACHED
PAUL CAMACHO-FLOOR CLEANING - WESLACO, TX. 78596

### 20. Requesting and Approval Signatures

| a. Requested By Ramiro Aldape PM | b. Approved By RG Garcia 7/11/96 Mgt Post Office Opr(A) | c. Certifying Funds Available |
|---|---|---|
| | Amount | Signature |
| d. Sectional Center Approval | e. Division Approval | f. Other Approval |

### Procurement Use Only

| 21 Source of Supply | 22. Contract/Order Number |
|---|---|
| 23 Notes | 24. Order Date |
| 25 Processed By (Title and Signature) | |

PS Form 7381, January 1989

# EXHIBIT "C"

# Production Request No. 7

# B-02-017



**UNITED STATES POSTAL SERVICE™**

# *Housekeeping Postal Facilities*

*Maintenance Handbook*
*MS-47*

*Publication:  TL-3, 6-1-83*

**INSTRUCTION SHEET**

# MS-47
## Housekeeping Postal Facilities
## (TL-3; June 1, 1983)

**PACKAGE CONTENTS**   3 cable ties
Instruction Sheet
1- by 11-inch printed strip to insert in spine pocket
of binder
Registration Card
MS handbook

### Cable Ties and MS Handbook

Use the three cable ties as temporary rings for this handbook. Thread a cable tie through each hole at the side of the handbook. Pull the end of each cable tie through its locking end, forming a ring with a diameter sufficient to allow page turning. Be sure to form the same diameter for each ring. Trim excess length of cable tie with scissors.

### Other

Fill in reverse side of User Registration Card; mail the card to the Maintenance Technical Support Center.

Retain Instruction Sheet and 1- by 11-inch printed strip for use with 3-ring binder.

### 3-RING BINDER

### Ordering 3-Ring Binder

MS-47 is designed for use with a 3-ring, 8½- by 11-inch binder. To order the binder from the Topeka or Somerville Materiel Distribution Center, use Form 7380, *MDC Supply Requisition*, and enter O399A in the Postal Service Item Number column.

### Placing Handbook in 3-Ring Binder

Snip temporary cable-tie rings and remove them from handbook holes. Set aside front handbook cover. Place handbook and back cover in binder.

### Inserting Materials in Binder Pockets

**1- by 11-inch printed spine insert**. Insert strip into clear plastic pocket on spine of binder.

**Front cover**. Slip handbook front cover into clear plastic pocket on front of binder.



**UNITED STATES POSTAL SERVICE.**

# *Housekeeping Postal Facilities*

*Maintenance Handbook*
*MS-47*

U. S. Postal Service
Washington, DC

| | |
|---|---|
| Housekeeping Postal Facilities | Transmittal Letter 3 |
| Handbook MS-47 | June 1, 1983 |

A. EXPLANATION

The attached document is the complete revision and reissue of MS-47, Housekeeping -- Postal Facilities. It is to be used to assist in determining the realistic custodial staffing level for your facility commensurate with your responsibilities for maintaining a clean, healthy and safe work environment for postal employees and customers.

Paragraph 340 of this handbook, "Scheduling," refers to a national handbook or system by which large offices operate. For Class A offices, it is MS-63, for Class B offices - MS-65, and for BMC's - the Interim BMC Maintenance Staffing Guidelines and Criteria. Instructions for small offices regarding use of the handbook are contained therein.

Staffing remains a three step procedure in which an inventory is taken, frequency of performance is determined, and staffing requirements are developed. It is imperative that the instructions in this handbook be carefully followed in order to complete the staffing package for each of your facilities. In using this revised handbook, a new building inventory must be completed before proceeding to determine frequency of performance and staffing levels. The three step procedure should be reviewed and recalculated at least annually so that required staffing adjustments will be implemented.

B. DISTRIBUTION

1. Initial. Copies of this issue are being initially distributed to all facilities.

2. Additional Copies. Order additional copies from the Maintenance Technical Support Center, P.O. Box 1600, Norman, OK 73070-6708 using Form 1286 (Request for USPS Publications) or Form 7380 (Supply Center Requisition). Headquarters offices order through the Document Control Division.

C. RECISSIONS

All copies of the MS-47 preliminary handbook are hereby cancelled and should be discarded.

D. COMMENTS AND QUESTIONS

Recommendations for improving the guidelines, information and procedures contained in this handbook are solicited from all sources. Anyone wishing to make such recommendations should submit them to:

Director
Maintenance Technical Support Center
P.O. Box 1600
Norman, OK  73070-6708

# CONTENTS

### CHAPTER 1 INTRODUCTION

| | | |
|---|---|---|
| 110 | General | 1-1 |
| 120 | Scope | 1-1 |
| 130 | Cleaning Service Contracts | 1-1 |
| 140 | Determining Staffing Requirements | 1-1 |
| 150 | Scheduling Custodial Personnel | 1-2 |
| 160 | Performance Standards | 1-2 |
| 170 | Safety | 1-2 |
| 180 | Sample Forms | 1-2 |
| 190 | Appendix | 1-2 |

### CHAPTER 2 DETERMINING STAFFING REQUIREMENTS

| | | |
|---|---|---|
| 210 | Methods of Determining Requirements | 2-1 |
| 220 | Form 4869, Building Inventory | 2-1 |
| 230 | Form 4839, Custodial Scheduling Worksheet | 2-3 |
| 240 | Form 4852, Workload Analysis and Summary | 2-3 |

### CHAPTER 3 SCHEDULING CUSTODIAL PERSONNEL

| | | |
|---|---|---|
| 310 | Written Work Assignments | 3-1 |
| 320 | Determining Unit Performance Times | 3-1 |
| 330 | Form 4776, Preventive-Custodial Maintenance Route | 3-1 |
| 340 | Scheduling | 3-2 |

### CHAPTER 4 PERFORMANCE STANDARDS

| | | |
|---|---|---|
| 410 | Performance Standards | 4-1 |
| 420 | Area Cleaning | 4-2 |
| 430 | Component Cleaning | 4-22 |

### CHAPTER 5 HOUSEKEEPING INSPECTION

| | | |
|---|---|---|
| 510 | General | 5-1 |
| 520 | Inspections | 5-1 |
| 530 | Housekeeping Inspection Form 4851 | 5-1 |
| 540 | Reports | 5-2 |

### SAMPLE FORMS

| | | |
|---|---|---|
| Sample 1-1 | Completed Form 4869 | S-2 |
| 1-2 | Completed Form 4839 | S-3 |
| 1-3 | Completed Form 4852 | S-4 |
| 2-1 | Completed Form 4869 | S-5 |
| 2-2 | Completed Form 4839 | S-6 |
| 2-3 | Completed Form 4839 | S-7 |
| 2-4 | Completed Form 4852 | S-8 |
| 3-1 | Completed Form 4776 | S-9 |

# CONTENTS

## CHAPTER 1 INTRODUCTION

110   General ............................................................................................ 1-1
120   Scope ............................................................................................. 1-1
130   Cleaning Service Contracts.............................................................. 1-1
140   Determining Staffing Requirements ................................................ 1-1
150   Scheduling Custodial Personnel...................................................... 1-2
160   Performance Standards.................................................................. 1-2
170   Safety ............................................................................................ 1-2
180   Sample Forms................................................................................. 1-2
190   Appendix ....................................................................................... 1-2

## CHAPTER 2 DETERMINING STAFFING REQUIREMENTS

210   Methods of Determining Requirements ........................................... 2-1
220   Form 4869, Building Inventory........................................................ 2-1
230   Form 4839, Custodial Scheduling Worksheet.................................. 2-3
240   Form 4852, Workload Analysis and Summary.................................. 2-3

## CHAPTER 3 SCHEDULING CUSTODIAL PERSONNEL

310   Written Work Assignments.............................................................. 3-1
320   Determining Unit Performance Times .............................................. 3-1
330   Form 4776, Preventive-Custodial Maintenance Route ...................... 3-1
340   Scheduling ..................................................................................... 3-2

## CHAPTER 4 PERFORMANCE STANDARDS

410   Performance Standards.................................................................. 4-1
420   Area Cleaning ................................................................................ 4-2
430   Component Cleaning........................................................................ 4-22

## CHAPTER 5 HOUSEKEEPING INSPECTION

510   General .......................................................................................... 5-1
520   Inspections .................................................................................... 5-1
530   Housekeeping Inspection Form 4851................................................ 5-1
540   Reports .......................................................................................... 5-2

## SAMPLE FORMS

Sample  1-1   Completed Form 4869 ............................................................ S-2
        1-2   Completed Form 4839 ............................................................ S-3
        1-3   Completed Form 4852 ............................................................ S-4
        2-1   Completed Form 4869 ............................................................ S-5
        2-2   Completed Form 4839 ............................................................ S-6
        2-3   Completed Form 4839 ............................................................ S-7
        2-4   Completed Form 4852 ............................................................ S-8
        3-1   Completed Form 4776 ............................................................ S-9

# CHAPTER 4
# PERFORMANCE STANDARDS

## 410  PERFORMANCE STANDARDS

411  This section provides details essential to estimate the total custodial workload.

## 412  Changes in Performance Standards

Unit performance represents engineering standards which apply to each custodial task. They may be changed only after documented evaluation of new techniques or equipment indicate the need to change. Unit performance standards may only be revised at the national level to ensure compliance with the current *National Agreements*.

## 413  Tasks Without Performance Standards

Some tasks are assigned to custodial maintenance that do not have a performance standard. To facilitate staffing for these tasks maintenance management may estimate the annual time requirement for these tasks based on local experience and historical data. This time must be included on the staffing form in accordance with the instructions in paragraph 244. Time may be included only if the task is normally considered to be a custodial activity.

## 414  Safety

When it is necessary to put up ropes and wet floor signs, a time factor should be added for the performance of these safety related functions.

## 415  Frequency of Performance

The frequency ranges listed in Chapter 4 of this handbook for performing the indicated custodial tasks should be applicable to most postal facilities. The frequency selected for a particular task should be within the specified range, and the specific frequency choses is dependent upon local conditions. Local management may determine that frequencies outside the ranges (above or below) listed are required due to local conditions. If one or more of the frequencies selected are below the range(s) listed in this handbook, the custodial staffing package shall be submitted with appropriate justification to Regional Maintenance Management. Implementation of custodial tasks with frequencies below the specified range(s) requires prior Regional Maintenance Management approval.

420   AREA CLEANING

| Performance | Equipment and Material | Performance Per Work-Day | Unit Performance (Min.) | Frequency Range |
|---|---|---|---|---|
| **6. PLATFORM (Dock)** | | | | |
| (1) Cleaning | | | | |
| Sweep entire area with treated sweeping equipment or pedestrian type power vacuum sweeper. | Treated sweeping equipment or power vacuum sweeper. Treated dust cloth Sponge cloth Plastic spray bottle Toy broom and dust pan Trash container | 45,000 sq. ft. | .0106 | 3 to 7 times per week. |
| Dust wipe vestibule doors and door glass. | | | | |
| Empty trash containers. | | | | |
| (2) Policing | | | | |
| Spot sweep cluttered areas. | Treated sweeping equipment Toy broom and dust pan Trash container | 90,000 sq. ft. | .0053 | On all tours In area(s) used, except when cleaned on same tour. |
| Pick up and dispose of large pieces of trash and empty boxes. | | | | |
| Empty trash containers. | | | | |

420  AREA CLEANING

**b. SERVICE/BOX LOBBY**

(1) Cleaning

| Performance | Equipment and Material | Performance Per Work-Day | Unit Performance (Min.) | Frequency Range |
|---|---|---|---|---|
| Dust desks, tables and screenline. | Treated sweeping equipment | 30,000 sq. ft. | .016 | 5 to 7 times per week. |
| Damp wipe desk tops and counter top. | Toy broom and dust pan Treated dust cloth Plastic spray bottle | | | |
| Arrange patron desk supplies. | Sponge cloth Pail | | | |
| Empty cigarette urns; damp wipe inside and out. | Window squeegee Trash container Polyethelene trash can liners | | | |
| Sweep entire floor with treated sweeping equipment. | | | | |
| Empty trash baskets; insert clean polyethelene liner. | | | | |
| Spot-clean smudges from walls and counter front. | | | | |
| Damp wipe bulletin board glass. | | | | |
| Wash lobby door glass. | | | | |

## 430  COMPONENT CLEANING

### 1. FLOOR CARE

| Performance | Equipment and Material | Performance Per Work-Day | Unit Performance (Min.) | Frequency Range |
|---|---|---|---|---|
| (1) Damp mopping | | | | |
| (Not for wood floors) | | | | |
| Mop floor with mop dipped in detergent solution mixed according to manufacturer's instructions and wring out tightly. | Mop bucket and wringer Wet mop Liquid detergent Wet floor sign Rope | 32,000 sq. ft. | .015 | As specified in appropriate area. |
| Pick up detergent solution from floor. | | | | |
| (2) Wet mopping | | | | |
| (Not for wood floors) | | | | |
| Apply detergent solution mixed according to manufacturer's instructions and allow to stand 5 minutes. Agitate detergent solution on floor with mop and pick up. | 2 mop buckets with 1 wringer 2 wet mops Liquid detergent Wet floor sign Rope | 16,000 sq. ft. | .03 | As specified in appropriate area. |
| Rinse floor with clear water, changing water frequently. Pick up rinse water. | | | | |
| (3) Automatic Scrubber-Vacuum (Battery Operated) | | | | |
| Machine applies cleaning solution, agitates with brush, and vacuums up dirty solution. | Automatic scrubber vacuum Wet mop Wet floor sign Rope | 75,000 sq. ft. | .0064 | As specified in appropriate area. |
| Pick up excess solution from corners and edges with wet mop. | | | | |

## 430   COMPONENT CLEANING

### m.   CARPET CARE

#### (1) Shampooing

| Performance | Equipment and Material | Performance Per Work-Day | Unit Performance (Min.) | Frequency Range |
|---|---|---|---|---|
| Vacuum carpet thoroughly. | Industrial vacuum cleaner<br>Floor scrubbing machine with solution tank and shower-feed brush<br>Carpet shampoo<br>Pail for mixing<br>Hand scrub brush<br>Stiff-bristled brush<br>4" x 4" plastic squares or discs cut from polyethelene trash can liner | 2,000 sq. ft. | .24 | 1 to 4 time(s) per year. |
| Mix shampoo and water according to manufacturers instructions. | | | | |
| Wet brush bristles thoroughly before placing brush on machine. | | | | |
| Tilt machine back (with wheels in down position) until brush is no longer in contact with carpet. | | | | |
| Feed shampoo into brush. | | | | |
| Raise wheels and shampoo carpet with slow, overlapping brush passes. Feed shampoo sparingly. | | | | |
| Vacuum carpet frequently to remove shampoo entrapped dirt. | | | | |
| Use a hand scrub brush dipped in shampoo solution for corners. | | | | |
| Set pile in one direction with stiff-bristled brush. Use discs pre-cut from a polyethelene trash liner under metal furniture glides to prevent rust stains on damp carpet. | | | | |

# EXHIBIT "D"

# Production Request No. 7

# B-02-017

maintenance
handbook



Associate Office Postmaster's
Facilities Maintenance Guidelines

Maintenance Series Handbook MS-110

Publication: TL-2, January 15, 1988



**U.S. Postal Service**
**Washington, DC  20260-7310**

| | |
|---|---|
| **Maintenance Handbook MS-110** | **Transmittal Letter 2** |
| **Associate Office Postmaster's Facilities Maintenance Guidelines** | **January 15, 1988** |

## A. Explanation

This is a complete revision of Maintenance Handbook MS-110, *Associate Office Postmaster's Facilities Maintenance Guidelines.*

## B. Distribution

1. **Initial.** Copies of this complete issue are being distributed to all facilities. Management should ensure that maintenance personnel are provided with this handbook.

2. **Additional Copies.** Order additional copies by submitting Form 7380, *Supply Center Requisition*, to the Supply Center, specifying HBKMS110.

## C. Rescissions

Maintenance Handbook Handbook MS-110, Transmittal Letter 1, is rescinded and should be discarded.

## D. Comments and Questions

Suggestions for improving this handbook are solicited from all sources. Anyone wishing to make such recommendations should use the preaddressed comment cards at the back of this handbook.

## E. Effective Date

These instructions are effective upon receipt.

*Charles Beard*

for

*James C. Wilson*
*Director*
*Office of Maintenance Management*
*Engineering & Technical Support*
   *Department*



maintenance
handbook

**Associate Office Postmaster's
Facilities Maintenance Guidelines**

Maintenance Series Handbook MS-110

Publication: TL-2, January 15, 1988

Published by the

MAINTENANCE TECHNICAL SUPPORT CENTER
OFFICE OF MAINTENANCE MANAGEMENT
UNITED STATES POSTAL SERVICE
111 Chesapeake Street
P.O. Box 1600
Norman, Oklahoma  73070-6708

Portions of this handbook have been derived from vendor-supplied information. The handbook is for use only by the U.S. Postal Service. Persons or organizations outside of the USPS must obtain permission in writing from the Maintenance Technical Support Center, Office of Maintenance Management, United States Postal Service.

## LIST OF EFFECTIVE PAGES

The following is a list of the effective pages and the current version of each page in this maintenance handbook.

| PAGE NUMBER | TRANSMITTAL LETTER | PAGE NUMBER | TRANSMITTAL LETTER |
|---|---|---|---|
| i through x<br>1-1 through 1-3<br>2-1 through 2-7<br>3-1 through 3-9<br>4-1 through 4-4<br>5-1<br>6-1 through 6-2<br>7-1 through 7-7<br>8-1 through 8-4<br>9-1 through 9-7<br>A-3<br>B-3<br>C-3 through C-5<br>D-3<br>E-3<br>F-3 | | | |

### RECORD OF CHANGES

| CHANGE NUMBER | DATE | TITLE OR BRIEF DESCRIPTION | ENTERED BY |
|---|---|---|---|
|  |  |  |  |

## FOREWORD

The design and purpose of this handbook is to provide a comprehensive, easy reference document to help you, the Postmaster, in maintaining your facility in the best possible condition. To assist you in developing a program of maintenance awareness and to direct you in effecting the necessary actions to correct known or expected facility deficiencies, this handbook presents the following:

Chapter 1 is an introduction to the critical role the Postmaster/installation head plays in the maintenance of the facility.

Chapter 2 covers information on good housekeeping practices, including contract cleaning checklists.

Chapter 3 contains information for the day-to-day maintenance, inspection, and monitoring of repair and maintenance.

Chapter 4 contains procedures for handling emergency repairs.

Chapter 5 includes maintenance responsibilities for Postmasters with facilities in USPS-owned buildings.

Chapter 6 includes responsibilities for Postmasters with facilities in leased buildings where the USPS is responsible for maintenance.

Chapter 7 contains responsibilities for Postmasters with facilities in leased buildings where the owner is responsible for maintenance.

Chapter 8 covers maintenance situations in General Services Administration controlled buildings.

Chapter 9 includes contracting procedures for maintenance.

Appendixes are lists of referenced USPS service offices or organizations.

The handbook chapters on housekeeping (Chapter 2), building inspection (Chapter 3), and contracting procedures (Chapter 9) are applicable to all USPS facilities.

THIS PAGE INTENTIONALLY LEFT BLANK

**CHAPTER 4** ............................................................................ **4-1**

EMERGENCY REPAIRS ................................................................... 4-1
410   GENERAL ....................................................................... 4-1
420   EMERGENCY SITUATIONS ..................................................... 4-1
      421   General ................................................................. 4-1
      422   USPS-Owned Buildings ................................................. 4-1
      423   Leased Buildings with USPS Responsible for Maintenance ............... 4-1
      424   Leased Buildings with Lessor Responsible for Maintenance ............. 4-2
430   ADDITIONAL INFORMATION .................................................... 4-3

**CHAPTER 5** ............................................................................ **5-1**

USPS-OWNED BUILDINGS ............................................................... 5-1
510   GENERAL ....................................................................... 5-1
520   IN-HOUSE MAINTENANCE CAPABILITY ........................................ 5-1
530   NO MAINTENANCE CAPABILITY ............................................... 5-1
540   CONTRACT MAINTENANCE AND REPAIRS ...................................... 5-1
550   EMERGENCY REPAIRS ......................................................... 5-1

**CHAPTER 6** ............................................................................ **6-1**

LEASED FACILITIES WITH USPS RESPONSIBLE FOR MAINTENANCE ................... 6-1
610   GENERAL ....................................................................... 6-1
620   LESSOR MAINTENANCE RESPONSIBILITY ..................................... 6-1
630   LEASE FILE–DETERMINATION OF RESPONSIBILITY ........................... 6-1
640   POST OFFICE MAINTENANCE RESPONSIBILITIES .............................. 6-1
650   IN-HOUSE MAINTENANCE CAPABILITY ........................................ 6-2
660   NO MAINTENANCE CAPABILITY ............................................... 6-2
670   CONTRACT MAINTENANCE AND REPAIRS ...................................... 6-2
680   EMERGENCY REPAIRS ......................................................... 6-2

**CHAPTER 7** ............................................................................ **7-1**

LEASED FACILITIES WITH LESSOR RESPONSIBLE FOR MAINTENANCE ................ 7-1
710   GENERAL ....................................................................... 7-1
720   LEASE FILE–DETERMINATION OF RESPONSIBILITY ........................... 7-1
      721   File Maintenance ....................................................... 7-1
      722   Knowledge of Lease Provisions ........................................ 7-1
      723   Considerations Prior to Repair ........................................ 7-2
            723.1   Repairs Needed Due to USPS Negligence ....................... 7-2
            723.2   Repairs or Renovations Considered as Building Improvements .... 7-2
            723.3   Repairs Viewed as Preventive Maintenance ..................... 7-2
730   BUILDING REPAIRS ............................................................ 7-2
740   LESSOR MAINTENANCE ENFORCEMENT ....................................... 7-3
      741   General ................................................................. 7-3
      742   Lessor Contact and Initial Confirming Letter ......................... 7-3
      743   Completion Date ....................................................... 7-3
      744   Second Letter ......................................................... 7-3
      745   Lessor Failure to Complete Work ...................................... 7-3
750   EMERGENCY REPAIRS ......................................................... 7-4

**CHAPTER 8** ............................................................................ **8-1**

GENERAL SERVICES ADMINISTRATION (GSA) CONTROLLED BUILDINGS ............. 8-1
810   GENERAL ....................................................................... 8-1
820   EMERGENCY REPAIRS ......................................................... 8-1

**CHAPTER 9** .................................................................................................. **9-1**

CONTRACTING PROCEDURES ............................................................................. 9-1
910   PROCEDURES FOR REPAIR WITHIN SPENDING AUTHORITY ...................................... 9-1
        912.1   Obtaining Estimates ......................................................................... 9-1
        912.2   Allowing Exceptions ........................................................................ 9-1
        912.3   Following Job Completion .................................................................. 9-1
920   PROCEDURES FOR PAYMENT .......................................................................... 9-1
930   PROCEDURES FOR REPAIR OVER SPENDING AUTHORITY ............................................ 9-2
940   PROCEDURES AT MSC LEVEL ......................................................................... 9-2
        941   General ......................................................................................... 9-2
        942   Within MSC Purchasing Authority ............................................................ 9-2
        943   Over MSC Purchasing Authority ............................................................. 9-2

**APPENDIX A** ................................................................................................ **A-1**

FACILITIES SERVICE OFFICES ............................................................................ A-1
List of Facilities Service Offices ........................................................................ A-3

**APPENDIX B** ................................................................................................ **B-1**

FACILITIES SERVICE CENTERS ........................................................................... B-1
List of Facilities Service Centers ....................................................................... B-3

**APPENDIX C** ................................................................................................ **C-1**

DIVISIONAL OFFICES ..................................................................................... C-1
List of Divisional Offices ................................................................................ C-3

**APPENDIX D** ................................................................................................ **D-1**

MAINTENANCE OVERHAUL AND TECHNICAL SERVICE CENTERS ..................................... D-1
List of Maintenance Overhaul and Technical Service Centers ........................................ D-3

**APPENDIX E** ................................................................................................ **E-1**

PROCUREMENT AND MATERIEL MANAGEMENT SERVICE OFFICES (PMMSO) .......................... E-1
List of Procurement and Materiel Service Offices (PMMSO) .......................................... E-3

**APPENDIX F** ................................................................................................ **F-1**

PROCUREMENT SERVICE OFFICES (PSO) ............................................................... F-1
List of Procurement Service Centers (PSO) ............................................................ F-3

**USER COMMENT POSTCARD** ................................................................................ **xi**

# LIST OF EXHIBITS

Exhibit   1-1. Blueprint for Plant Security ........................................................ 1-2
Exhibit   2-1. Contract Cleaning Checklists .................................................... 2-3
Exhibit   2-2. Form 4851, Housekeeping Inspection ........................................ 2-7
Exhibit   3-1. Inspection Form ..................................................................... 3-5
Exhibit   4-1. Form 7426, Designation of Emergency Repair Personnel ............... 4-4
Exhibit   7-1. Letter to Contacted Lessor ...................................................... 7-5
Exhibit   7-2. Letter to Uncontacted Lessor ................................................... 7-6
Exhibit   7-3. Second Letter ........................................................................ 7-7
Exhibit   8-1. USPS-GSA Agreement ............................................................ 8-2
Exhibit   9-1. Form 1552-B, Disbursements .................................................... 9-3
Exhibit   9-2. Section 750, HBK F-1, Post Office Accounting Procedures ............ 9-4
Exhibit   9-3. Form 1412-A, Daily Financial Report .......................................... 9-5
Exhibit   9-4. Form 1412-B, Daily Financial Report .......................................... 9-6
Exhibit   9-5. Form 7381, Requisition for Supplies, Services or Equipment ........... 9-7

# EXHIBIT "E"

# Production Request No. 7

# B-02-017

**maintenance
handbook**



# Floors, Care and Maintenance

Maintenance Series Handbook MS-10

TL-1, 5-15-88

**Instruction Sheet**

# MS-10
## Floors, Care and Maintenance
## (TL-1, May 1988)

### ORDERING INFORMATION

|       |            |
|-------|------------|
| **PSIN:** | HBKMS10 |
| **PSN:**  | 7610020009895 |

### PACKAGE CONTENTS

Instruction sheet
MS-10
Spine Insert Sheet
Front/Back Covers

### SPINE INSERT

If you are using a 3-ring binder with your MS handbook, cut out spine insert and slip it into the spine pocket.

### COVERS

If you are using a 3-ring binder with your MS handbook, slip handbook front cover into front pocket. If you are using cable ties with your MS handbook, place the front cover on top of the transmittal letter. Place back cover after the comment cards.

### 3-RING BINDER

This handbook is designed for use with a 3-ring, 8-1/2- by 11-inch binder, a front pocket, and a minimum 1-1/8 inch spine pocket. To order binders from the Topeka or Somerville Materiel Distribution Center, use Form 7380, *MDC Supply Requisition*, and enter O399A in the Postal Service Item Number column.

**U.S. Postal Service**
**Washington, DC  20260-7310**

| | |
|---|---|
| **Maintenance Handbook MS-10**<br>**Floors, Care and Maintenance** | **Transmittal Letter 1**<br>**May 15, 1988** |

## A. Explanation

Maintenance Handbook MS-10, *Floors, Care and Maintenance*, replaces Handbook S-3, *Floors, Care and Maintenance*, dated September 1969.

## B. Distribution

1. **Initial.** Copies of this handbook are being distributed to all facilities.  Management should ensure that these handbooks are provided to maintenance personnel.

2. **Additional Copies.** Order additional copies by submitting Form 7380, *Supply Center Requisition*, to the Supply Center, specifying HBKMS10.

## C. Rescissions

Handbook S-3, *Floors, Care and Maintenance*, issued September 1969, is rescinded.

## D. Comments and Questions

Suggestions for improving this handbook are solicited from all sources.  Anyone wishing to make such recommendations should use the preaddressed comment cards at the back of this handbook.

## E. Effective Date

These instructions are effective upon receipt.


James C. Wilson
*Director*
*Office of Maintenance Management*
*Engineering & Technical Support*
*  Department*



maintenance
handbook

UNITED STATES POSTAL SERVICE
U.S.MAIL

Floors. Care and Maintenance

Maintenance Series Handbook MS-10

TL-1, 5-15-88

## EFFECTIVE PAGES

The following is a list of the effective pages and the current version of each page in this handbook.

| PAGE NUMBER | TRANSMITTAL LETTER | PAGE NUMBER | TRANSMITTAL LETTER |
|---|---|---|---|
| i    through  xv | TL-1 | | |
| 1-1 | TL-1 | | |
| 2-1  through  2-5 | TL-1 | | |
| 3-1  through  3-3 | TL-1 | | |
| 4-1  through  4-2 | TL-1 | | |
| 5-1  through  5-2 | TL-1 | | |
| 6-1  through  6-9 | TL-1 | | |
| 7-1  through  7-10 | TL-1 | | |
| 8-1  through  8-3 | TL-1 | | |
| A-1 | TL-1 | | |
| B-1  through  B-2 | TL-1 | | |
| C-1  through  C-3 | TL-1 | | |
| IN-1  through  IN-2 | TL-1 | | |

## RECORD OF CHANGES

The following space is provided for recording changes you make to this handbook.

| CHANGE | DATE | TITLE OR BRIEF DESCRIPTION | ENTERED BY |
|--------|------|----------------------------|------------|
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |
|        |      |                            |            |

MS-10 (TL-1, 5-15-88)

## PREFACE

This handbook on floor care and maintenance applies to all facilities occupied by the U. S. Postal Service where the Service is responsible for cleaning and maintenance.

This handbook is for guidance of postmasters, maintenance managers, building superintendents, and others directly involved in the care and maintenance of floors and grounds.

All employees engaged in the maintenance or cleaning of floors and grounds must be provided with a copy and are required to be familiar with the contents.

These procedures must be followed in order to prolong the life and preserve the beauty of our floors while obtaining the required level of appearance without waste of workhours.

THIS PAGE INTENTIONALLY LEFT BLANK

## CONTENTS

PREFACE ........................................................................................ v
TABLES ........................................................................................ xi
ILLUSTRATIONS ........................................................................................ xii
SAFETY SUMMARY ........................................................................................ xiii

CHAPTER 1.   IMPORTANCE OF FLOOR CARE .................................................. 1-1

110   INTRODUCTION ........................................................................ 1-1
120   TYPES OF FLOORING ................................................................. 1-1
130   CHANGES IN FLOOR FINISHES .................................................... 1-1

CHAPTER 2.   SAFETY ........................................................................ 2-1

210   INTRODUCTION ........................................................................ 2-1
220   USPS SAFETY PUBLICATIONS .................................................... 2-1
230   EQUIPMENT ............................................................................ 2-1
    231   Storage ............................................................................ 2-1
    232   Use .................................................................................. 2-2
        232.1   Electrical Equipment .................................................. 2-2
        232.2   Mechanized Equipment .............................................. 2-2
        232.3   Ride-On Equipment (Sweepers/Scrubbers) ..................... 2-2
        232.4   Power-Driven, Walk-Behind Equipment .......................... 2-3
        232.5   Protective Equipment .................................................. 2-3
240   SUPPLIES ............................................................................. 2-3
    241   Storage ............................................................................ 2-3
    242   Use .................................................................................. 2-3
    243   Recordkeeping ................................................................... 2-4
250   MATERIAL .............................................................................. 2-4
    251   Disposal ........................................................................... 2-4
    252   Handling ........................................................................... 2-4
260   REPORTING UNSAFE CONDITIONS OR NEEDED REPAIRS ..................... 2-5
270   WET FLOORS ........................................................................... 2-5

CHAPTER 3.   CARE OF EQUIPMENT ........................................................ 3-1

310   INTRODUCTION ........................................................................ 3-1
320   MECHANICAL EQUIPMENT ........................................................ 3-1
    321   Floor Machines ................................................................... 3-1
    322   Power-Operated, Combination Scrubber/Vacuums .................... 3-1
    323   Mechanized Sweepers .......................................................... 3-2
    324   Wet/Dry Vacuums ............................................................... 3-2
    325   Carpet Extractors ............................................................... 3-3
330   MANUAL EQUIPMENT ................................................................. 3-3
    331   Buckets and Wringers ......................................................... 3-3
    332   Wet Mops ......................................................................... 3-3
    333   Dusting Tools ..................................................................... 3-3
    334   Squeegees ......................................................................... 3-3

**CHAPTER 4.  FLOOR MATS** ................................................................. 4-1

410  INTRODUCTION  ..................................................................... 4-1
420  TYPES OF MATS ..................................................................... 4-1
430  APPLICATION OF MATS ............................................................. 4-1
440  CLEANING OF MATS  ................................................................ 4-2

**CHAPTER 5.  SNOW AND ICE REMOVAL** ................................................... 5-1

510  INTRODUCTION  ..................................................................... 5-1
520  SNOW AND ICE REMOVAL PLAN ....................................................... 5-1
530  MAINTENANCE AND SAFETY OF EQUIPMENT ............................................. 5-1
540  DE-ICING PRODUCTS  ................................................................ 5-1
     541  Recommendations ............................................................. 5-1
     542  Use ......................................................................... 5-1
     543  Precautions  ................................................................ 5-1
     544  Removal  .................................................................... 5-2

**CHAPTER 6.  CLEANING METHODS**  ........................................................ 6-1

610  INTRODUCTION  ..................................................................... 6-1
620  POLICING .......................................................................... 6-1
630  DRY MAINTENANCE ................................................................... 6-1
640  SWEEPING .......................................................................... 6-1
     641  Manual ...................................................................... 6-1
          641.1  General  ............................................................. 6-1
          641.2  Applications ........................................................ 6-1
          641.3  Equipment ........................................................... 6-2
          641.4  Treated Cloths ...................................................... 6-2
          641.5  Treated Mops ........................................................ 6-2
          641.6  Procedure ........................................................... 6-2
     642  Mechanized .................................................................. 6-3
650  MOPPING ........................................................................... 6-3
     651  Damp ........................................................................ 6-3
          651.1  Applications ........................................................ 6-3
          651.2  Equipment and Products .............................................. 6-3
          651.3  Procedure ........................................................... 6-3
     652  Wet ......................................................................... 6-4
          652.1  Applications ........................................................ 6-4
          652.2  Equipment and Products .............................................. 6-4
          652.3  Procedure ........................................................... 6-4
660  SCRUBBING ......................................................................... 6-5
     661  Hand ........................................................................ 6-5
          661.1  Applications ........................................................ 6-5
          661.2  Equipment and Products .............................................. 6-5
          661.3  Procedure ........................................................... 6-5
     662  Machine ..................................................................... 6-6
          662.1  Applications ........................................................ 6-6
          662.2  Equipment and Products .............................................. 6-6
          662.3  Procedure ........................................................... 6-6
670  SPRAY BUFFING ..................................................................... 6-7
     671  Applications ................................................................ 6-7
     672  Solutions ................................................................... 6-7
     673  Equipment and Products ...................................................... 6-7
     674  Procedure ................................................................... 6-8
     675  Changes ..................................................................... 6-8

**680  BURNISHING** ........................................................................... 6-8
    681   Description ................................................................ 6-8
    682   Advantages ................................................................ 6-8
    683   Procedure .................................................................. 6-8
    684   Equipment and Products ................................................ 6-9

**CHAPTER 7.  APPLICATION METHODS** ................................................. 7-1

**710  INTRODUCTION** ........................................................................ 7-1
**720  RESILIENT AND NONRESILIENT FLOORS** .................................... 7-1
    721   Wet Stripping (Initial Preparation) ................................ 7-1
       721.1   Applications ..................................................... 7-1
       721.2   Equipment and Products ..................................... 7-1
       721.3   Procedure ........................................................ 7-1
    722   Dry Stripping ............................................................ 7-2
       722.1   Applications ..................................................... 7-2
       722.2   Equipment and Products ..................................... 7-2
       722.3   Procedure ........................................................ 7-3
    723   Dry Scrubbing .......................................................... 7-3
       723.1   Applications ..................................................... 7-3
       723.2   Equipment and Products ..................................... 7-3
       723.3   Procedure ........................................................ 7-3
    724   Resilient Floor Sealer and Finish .................................. 7-4
       724.1   Applications ..................................................... 7-4
       724.2   Equipment and Products ..................................... 7-4
       724.3   Procedure ........................................................ 7-4
    725   Nonresilient Floor Sealer and Finish .............................. 7-5
       725.1   Applications ..................................................... 7-5
       725.2   Equipment and Products ..................................... 7-6
       725.3   Procedure ........................................................ 7-6
**730  CONCRETE FLOORS** .................................................................. 7-7
    731   Applications ............................................................. 7-7
    732   Equipment and Products .............................................. 7-7
    733   Procedure ................................................................ 7-7
       733.1   Preparing the Floor ........................................... 7-7
       733.2   Sealing the Floor .............................................. 7-7
**740  WOOD FLOORS** ........................................................................ 7-8
    741   Applications ............................................................. 7-8
    742   Machine Scrubbing with Surface Renewer ....................... 7-8
       742.1   Equipment and Products ..................................... 7-8
       742.2   Procedure ........................................................ 7-8
    743   Machine Scrubbing with Combination Cleaner and Surface Finish ........ 7-8
       743.1   Equipment and Products ..................................... 7-8
       743.2   Procedure ........................................................ 7-9
    744   Mopping with Combination Cleaner and Surface Finish ....... 7-9
       744.1   Equipment and Products ..................................... 7-9
       744.2   Procedure ........................................................ 7-9
    745   Sealing with Urethane Sealer ....................................... 7-10
**750  ALKALI-DAMAGED LINOLEUM FLOORS** ..................................... 7-10
    751   Recognition .............................................................. 7-10
    752   Equipment and Products .............................................. 7-10
    753   Procedure ................................................................ 7-10

**CHAPTER 8.  CORRECTION OF PROBLEMS** ......................................... 8-1

**810  INTRODUCTION** ........................................................................ 8-1
**820  CORRECTION** ........................................................................... 8-1

APPENDIX A.  STAIN REMOVAL GUIDE ....................................... A-

APPENDIX B.  COMPUTER ROOM FLOOR CARE ............................... B-

APPENDIX C.  CUSTODIAL CHART ........................................... C-

INDEX ...................................................................... IN-

COMMENT CARD

## TABLES

Table   8-1. Problem-Cause-Remedy Chart  ........................................................ 8-1

Case 1:02-cv-00017    Document 32    Filed in TXSD on 04/14/2004    Page 86 of 107

## ILLUSTRATIONS

Figure   2-1.  Custodial Cart Blocking Doorway  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   2-2.  Properly Completed Form 4707  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   2-3.  Frayed Cord, Ground Prong Missing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   2-4.  Protective Goggles  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   2-5.  OSHA Form 174  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   2-6.  Proper and Improper Methods of Lifting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-

Figure   3-1.  Low RPM Floor Machine 160 to 185 RPM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-

Figure   3-2.  Battery-Powered, Combination Scrubber/Vacuum  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-

Figure   3-3.  Battery-Powered, Walk-Behind, Mechanized Sweeper  . . . . . . . . . . . . . . . . . . . . . . . . . .  3-

Figure   4-1.  Mat has Curled Edge - Unsafe  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-

Figure   4-2.  Employee Properly Rolling Up Mat for Cleaning  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-2

Figure   6-1.  Toy Broom and Pickup Pan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-1

Figure   6-2.  Proper Use of Putty Knife  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-2

Figure   6-3.  Mop in Figure-Eight Motion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-4

Figure   6-4.  Mop 1″ Away and Parallel to Wall  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6-5

Figure   7-1.  Mop 8″ Away and Parallel to Wall  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7-

09:10  1      A    My name is Elena Olivarez.

09:10  2      Q    And where do you live?

09:10  3      A    Santa Rosa.

09:10  4      Q    How close do you live to the post office in

09:10  5  Santa Rosa?

09:10  6      A    I don't know very well in measurements, but it

09:10  7  must be about a mile -- less than a mile.

09:10  8      Q    When did you first start working at the post

09:10  9  office in Santa Rosa?

09:10  10     A    I think it was in the '90s, but I'm not sure

09:11  11  exactly if it was in the '90s or a couple of years later.

09:11  12  I had been working there for about nine years --

09:11  13     Q    Okay.

09:11  14     A    -- or something like that.

09:11  15     Q    Do you currently work there?

09:11  16     A    I don't work anymore now.

09:11  17     Q    Okay.  What is your understanding of how you were

09:11  18  employed by the United States Postal Service the first

09:11  19  year that you worked there?

09:11  20     A    I had a contract the first years, and then

09:12  21  shortly after that, the post office started to pay me.

09:12  22     Q    Do you remember how you were being paid November

09:12  23  12th, 1999, at the post office?

09:12  24     A    I was still receiving checks by that contract --

09:12  25  excuse me.  No, it wasn't that way.  I think I was already

09:12    1    being paid by the post office.

09:12    2        Q    Did you file tax returns for that year?

09:12    3        A    Yes.

09:12    4        Q    Okay.  Would you make those tax returns available

09:12    5    for my inspection?

09:12    6        A    I don't have them right now with me.

09:13    7        Q    If I give you a form that will enable me to get

09:13    8    them, will you sign it so that I can get them?

09:13    9        A    Yes.

09:13   10        Q    What is your social security number?

09:13   11        A    Can I take it from my purse?

09:13   12        Q    Sure.

09:13   13        A    The thing is that I don't like to be untrue in

09:13   14    relation to the number.  It's 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.

09:14   15        Q    Thank you.  Who told you when and where to be

09:14   16    with respect to your job at the United States Post Office

09:14   17    in Santa Rosa?

09:14   18        A    When I got the job?

09:14   19        Q    Start off there and go all the way through the

09:14   20    end of your employment.

09:15   21        A    I worked there -- when I started working there, I

09:15   22    worked there very well at the time, ever since that

09:15   23    accident happened.

09:15   24        Q    Was someone from the U.S. Postal Service the one

09:15   25    that set your schedule and told you what to do?

09:15   1      A    When I started to work there, yes, I was told --

09:15   2   they told me what I had to do and everything.

09:15   3      Q    What was your normal working schedule November

09:15   4   12th, 1999?

09:16   5      A    I would sweep.  I would mop.  I would also dust.

09:16   6   I would also dust the tables.  I would clean the windows

09:16   7   and the doors and the bathrooms, and I would also do

09:16   8   things like cleaning the floors.  And what else?  Well,

09:16   9   little things that I had to do.  I would sweep.  I would

09:16   10  mop.  I would dust.  I would clean outside as well.

09:16   11     Q    Did you receive any instruction from anyone on

09:16   12  how to do these tasks?

09:16   13     A    Yes.

09:17   14     Q    Who did you receive the instructions from?

09:17   15     A    Through the agreement when I had the contract.

09:17   16  The agreement.

09:17   17     Q    Did -- isn't it true that the U.S. Postal Service

09:17   18  provided you with particular ways to do things such as

09:17   19  mopping?

09:17   20     A    Yes, but they didn't have a hard time with me

09:17   21  because I have -- I had been doing that type of work for

09:17   22  years.

09:17   23          MR. MANN:  Objection, nonresponsive to

09:17   24  everything after yes.

09:17   25     A    Yes.

```
09:17    1       Q    (BY MR. MANN)  Isn't it true that the U.S.
09:17    2   Postal Service also told you specifically how to place
09:17    3   warning wet signs when you were mopping?
09:18    4       A    Yes, they would tell me, and -- and when it would
09:18    5   rain, I was also asked to put them.  I was told to put
09:18    6   them because it was very wet.
09:18    7       Q    Isn't it true that the U.S. Postal Service
09:18    8   provided you all of the mops and equipment necessary to do
09:18    9   your job?
09:18   10       A    What do you mean?  Like when I needed a new mop,
09:18   11   for example, yes, they would give me everything.
09:18   12       Q    And a bucket?
09:18   13       A    Everything.
09:18   14       Q    Everything?
09:18   15       A    They would give me everything.
09:18   16       Q    Isn't it true that the United States Postal
09:19   17   Service wanted you to do things a particular way?
09:19   18       A    Can you explain it to me again, please?
09:19   19       Q    They wanted you to -- the United States Postal
09:19   20   Service wanted you to mop a certain way?
09:19   21       A    No, they never told me so.  Since I knew how to
09:19   22   do my work, I haven't -- I worked there for many years.  I
09:19   23   knew how to deal with my work, and they would tell me that
09:19   24   they did not have any problem with me and they were very,
09:19   25   very happy with my job.
```

| | | |
|---|---|---|
| 09:19 | 1 | MR. MANN:  Objection, nonresponsive. |
| 09:19 | 2 | Q   (BY MR. MANN)   They did -- the United States |
| 09:19 | 3 | Postal Service did provide the initial training? |
| 09:20 | 4 | A   Yes, and they would give me cassettes to look at. |
| 09:20 | 5 | They would give me time to watch them. |
| 09:20 | 6 | Q   Who would oversee your work on a daily basis? |
| 09:20 | 7 | A   Who would oversee?  What do you mean? |
| 09:20 | 8 | Q   Who would supervise your work? |
| 09:20 | 9 | A   Ms. Perez and the other lady, Lydia. |
| 09:20 | 10 | Q   On a normal day, what sort of requests would |
| 09:20 | 11 | Ms. Perez have for you to do certain tasks? |
| 09:20 | 12 | A   She would almost never ask me to do a certain |
| 09:20 | 13 | type of work.  Once in a while when I would forget to do |
| 09:21 | 14 | something, but it wasn't something normal. |
| 09:21 | 15 | Q   Did you ever receive any manuals from the United |
| 09:21 | 16 | States Postal Service? |
| 09:21 | 17 | A   From the post office -- from the United States. |
| 09:21 | 18 | You mean from the post office? |
| 09:21 | 19 | Q   Yes. |
| 09:21 | 20 | A   No, I don't remember.  I don't remember, but all |
| 09:21 | 21 | those papers on how to manage my work, I would read them, |
| 09:21 | 22 | whatever was sent to me with a contract. |
| 09:21 | 23 | Q   Can you read English fairly well? |
| 09:21 | 24 | A   Yes, I know how to read well, and I understand |
| 09:22 | 25 | it.  There are certain words that I don't understand and |

09:40  1    Q    (BY MR. MANN)   You obviously remember a lot about

09:40  2   when Ms. Guzman fell, so let's get to that.   Did you see

09:40  3   her fall?

09:40  4    A    No, I didn't see her.

09:40  5    Q    Where -- do you remember where you were when she

09:40  6   fell?

09:40  7    A    I was right here (indicating).   I was right here

09:40  8   in the hall in the lobby.   She was around here, and I was

09:40  9   here on the last P.O. boxes, and I was mopping.

09:40  10   Q    So after she was there, you mopped?

09:40  11   A    The floor was not wet where she fell because I

09:40  12  hadn't started to mop yet.

09:41  13        MR. MANN:   Objection, nonresponsive.

09:41  14   Q    (BY MR. MANN)   You just said that you were

09:41  15  mopping.   Now you're saying that you were not mopping?

09:41  16   A    Well, yes, I was mopping here.   I mopped all this

09:41  17  part here and the tables.   When this lady arrived, when

09:41  18  she was there, I hadn't mopped there.   The first thing

09:41  19  that I mopped was only an edge -- the edges here, but on

09:41  20  this side, on this side.   And when I started to mop, when

09:41  21  I turned facing towards the P.O. boxes, I was walking,

09:41  22  mopping backwards, and she was here.   I realized that she

09:41  23  was sitting down on the floor, but I didn't see her and I

09:42  24  didn't see anything.   I didn't hear anything either, so I

09:42  25  had just started mopping, but it was dry in this area.

09:45  1          THE INTERPRETER:  I'm sorry?

09:45  2     Q    (BY MR. MANN)  How do you know that's the area

09:45  3  she slipped on?

09:45  4     A    Because when I was mopping back, I mopped with

09:45  5  her -- I tripped with her.

09:45  6     Q    Were you facing backwards to her?

09:45  7     A    I was facing here, and she was behind me.

09:45  8     Q    Okay.

09:45  9     A    That's why I didn't see her, and I didn't know

09:45  10  what happened.

09:45  11     Q    Okay.  Did you go behind her out to the front of

09:46  12  the post office at any time while she was present in the

09:46  13  post office at her post office box?

09:46  14     A    What do you mean?  I'm sorry.

09:46  15     Q    The entire time Ms. Guzman was at her post office

09:46  16  box, were you in the same or similar location or did you

09:46  17  pass by her in two different areas of the post office?

09:46  18     A    I don't understand you.

09:46  19     Q    I'm going to point at Deposition Exhibit 2.  You

09:46  20  say that you were here when Ms. Guzman was in the

09:46  21  building.  While she was here where you've written where

09:46  22  she was, did you go anywhere else in the building or were

09:47  23  you always here?

09:47  24     A    As I said, I stayed here.  I didn't leave or go

09:47  25  to another area, and I did not start to mop until she -- I

09:47  1   didn't mop, not here in the front, while she was on the

09:47  2   floor.  Everything was dry.

09:47  3              MR. MANN:  Objection, nonresponsive.

09:47  4        A    I had to wait because she was there.  She

09:47  5   remained there for a big while.  I was in a rush because I

09:47  6   wanted to finish because it was about a quarter to 8:00,

09:47  7   and I had to finish cleaning in the area where Ms. Perez

09:47  8   comes.  So, anyway, I waited, and then when I saw that a

09:47  9   long time had passed, I started to mop, but in front of

09:48  10  her here -- here in the back part because I didn't mop in

09:48  11  this area until she passed -- she passed by.  The floor

09:48  12  was not wet when she fell there.

09:48  13       Q    You never saw her slip?

09:48  14       A    No, I didn't see her.

09:48  15       Q    So you don't know where she slipped, then, do

09:48  16  you?

09:48  17       A    No, I don't know how or where.

09:48  18       Q    But you do admit that while Ms. Guzman was there,

09:48  19  you did actually mop some of the floor somewhere in the

09:48  20  building?

09:48  21       A    Not in the area where she was standing.

09:48  22             MR. MANN:  Objection, nonresponsive.

09:48  23       A    It was not wet.

09:48  24       Q    (BY MR. MANN)  Just answer the question that is

09:49  25  asked.  While Ms. Guzman was in the building, you did mop?

| | | |
|---|---|---|
| 10:04 | 1 | Q    (BY MR. MANN)   I'm not concerned about who paid |
| 10:04 | 2 | your taxes or if you got a refund. |
| 10:04 | 3 | A    Yes.  Yes, I understand.  My husband would pay |
| 10:04 | 4 | for the taxes. |
| 10:04 | 5 | Q    What I'm asking is what your working relationship |
| 10:04 | 6 | was with the Indianapolis company versus if you worked |
| 10:04 | 7 | directly at any point in time for the United States Postal |
| 10:05 | 8 | Service? |
| 10:05 | 9 | A    Every year they would give me a raise, $.25 every |
| 10:05 | 10 | year.  It would depend, yes.  That's the way they would |
| 10:05 | 11 | send me things.  Something like that, you mean? |
| 10:05 | 12 | Q    No.  What I'm asking is:  Were you always working |
| 10:05 | 13 | under this contract from Indianapolis or was there ever a |
| 10:05 | 14 | different situation? |
| 10:05 | 15 | A    It was the same thing.  The problem is that they |
| 10:05 | 16 | stopped sending me my check for almost one month, and |
| 10:05 | 17 | that's the reason why I changed to the post office. |
| 10:06 | 18 | Q    When did you change to the post office? |
| 10:06 | 19 | A    I don't remember.  I don't remember. |
| 10:06 | 20 | Q    Was it before Ms. Guzman fell or after? |
| 10:06 | 21 | A    After. |
| 10:06 | 22 | Q    Was it soon after or was it a long time after? |
| 10:06 | 23 | A    Long before -- long after that happened. |
| 10:06 | 24 | Q    Did you get any benefits that you didn't |
| 10:06 | 25 | previously receive once you switched directly with the |

| | | |
|---|---|---|
| 10:11 | 1 | A    I don't know.  I cannot tell you.  I don't know. |
| 10:11 | 2 | Q    Did you deal with her on a daily basis? |
| 10:11 | 3 | A    What kind of contact do you mean? |
| 10:11 | 4 | Q    Well, you testified a while ago that she was in |
| 10:11 | 5 | that utility area with you when you got the mops? |
| 10:11 | 6 | A    She would not get with me here.  She would not go |
| 10:11 | 7 | in with me here where I would come and pick up my buckets |
| 10:12 | 8 | or anything. |
| 10:12 | 9 | Q    Who would you tell when you needed a new mop |
| 10:12 | 10 | bucket? |
| 10:12 | 11 | A    Ms. Perez. |
| 10:12 | 12 | Q    So any time you needed some supplies or had |
| 10:12 | 13 | questions regarding your job duties, you would ask |
| 10:12 | 14 | Ms. Perez? |
| 10:12 | 15 | A    Everything.  Everything to Ms. Perez.  She's the |
| 10:12 | 16 | one who would bring me anything that I would need.  She |
| 10:12 | 17 | would bring it to me. |
| 10:12 | 18 | Q    Ms. Perez never told you where to put signs or |
| 10:12 | 19 | where not to put signs? |
| 10:12 | 20 | A    When I started to work, she told me, "You put |
| 10:12 | 21 | this here," because I didn't know where to put it, you |
| 10:12 | 22 | see.  And she told me, and there I would put them.  That |
| 10:12 | 23 | was the safest place to put them so people that would come |
| 10:12 | 24 | in would not trip. |
| 10:13 | 25 | Q    Okay.  So Ms. Perez is probably the one that told |

10:13    1    you not to put the sign in this area here because people

10:13    2    would trip?

10:13    3              MS. MASSO:   I object to the form of that

10:13    4    question.   We believe that she changed her answer to that

10:13    5    earlier, and now you are changing the testimony in the

10:13    6    form of that question.

10:13    7              MR. MANN:   I don't think there's a proper

10:13    8    objection there, but --

10:13    9              MS. MASSO:   Well --

10:13   10    Q    (BY MR. MANN)   Please go ahead and answer the

10:13   11    question.

10:13   12    A    Ask me again, please.

10:13   13    Q    So Ms. Perez was probably the person, if there

10:13   14    was a person, that told you to put -- to not put a sign in

10:13   15    this area because people would trip?

10:13   16              MS. MASSO:   I still object to the form of the

10:13   17    question.

10:13   18    A    I don't remember who was the one who told me, but

10:14   19    when I started working at first, when I would work, she

10:14   20    would put it there, and that's where I would put it as

10:14   21    well.

10:14   22    Q    Well, there wasn't anyone from Indianapolis in

10:14   23    Santa Rosa, was there?

10:14   24    A    No, nobody came.

10:14   25    Q    So no one from Indianapolis told you anything

10:14   1    about where to put signs or how to mop?

10:14   2        A    They never came.  They never came.  They never

10:14   3    told me anything.

10:14   4        Q    So if anyone told you anything, it would have had

10:14   5    to be a U.S. Postal Service employee?

10:14   6        A    They told me that I could put the wet sign floor

10:14   7    here when I would mop here so that people would understand

10:14   8    that I was mopping here.  I was -- that I was working.

10:14   9        Q    I understand that, and I believe you when you say

10:14   10   that.  I'm just trying to find out if the person that told

10:15   11   you that worked for the U.S. Postal Service.

10:15   12       A    No, it wasn't her.  They didn't tell me.  It was

10:15   13   not them who told me.

10:15   14       Q    It was someone from Indianapolis, then?

10:15   15       A    No.  The person that would work there before I

10:15   16   worked were the people who told me that they would put --

10:15   17   that I could put the bucket there and the sign here.

10:15   18       Q    Oh, okay.  Who was that person; do you remember?

10:15   19       A    No, I don't remember.  I don't remember.

10:15   20       Q    Did they work for the Indianapolis company before

10:15   21   you?

10:15   22       A    No, because this young lady -- or lady did not

10:15   23   last too long at work.

10:15   24       Q    So she was still working there when they hired

10:15   25   you?

| | | |
|---|---|---|
| 10:58 | 1 | Q    Who did you feel you were working for at that |
| 10:58 | 2 | time? |
| 10:58 | 3 | A    For the post office because I was at the post |
| 10:58 | 4 | office. |
| 10:58 | 5 | Q    Okay.  After the contract was done away with, who |
| 10:59 | 6 | did you feel you worked for then? |
| 10:59 | 7 | A    With the post office. |
| 10:59 | 8 | Q    At all times you felt that you were working for |
| 10:59 | 9 | them? |
| 10:59 | 10 | A    Yes. |
| 10:59 | 11 | Q    Did the post office do or say anything to make |
| 10:59 | 12 | you feel otherwise? |
| 10:59 | 13 | A    No, they always treated me well, and they were |
| 10:59 | 14 | very happy with my job. |
| 10:59 | 15 | Q    In fact, you mentioned that you would get a |
| 10:59 | 16 | raise; is that correct? |
| 10:59 | 17 | A    Oh, yes, when I was with the contract, they gave |
| 10:59 | 18 | me a raise.  They would give me a raise every year. |
| 10:59 | 19 | Q    How much? |
| 10:59 | 20 | A    $.25 -- or it would depend, $.25.  $.25 every |
| 10:59 | 21 | year they would give me. |
| 10:59 | 22 | Q    Did they continue doing that or did the post |
| 11:00 | 23 | office do that after the contract was terminated? |
| 11:00 | 24 | A    No, it remained as it was with the contract, but |
| 11:00 | 25 | they didn't give me a raise there. |

| 11:00 | 1 | Q    The post office didn't give you a raise after the |
| 11:00 | 2 | contract terminated? |
| 11:00 | 3 | A    No. |
| 11:00 | 4 | Q    You also mentioned that you were the first one to |
| 11:00 | 5 | get there at the post office; is that correct? |
| 11:00 | 6 | A    Yes. |
| 11:00 | 7 | Q    About what time did you get there? |
| 11:00 | 8 | A    I don't remember if it was the year in which I |
| 11:00 | 9 | would start working at 6:00 or 6:30, but I would get there |
| 11:00 | 10 | first. |
| 11:00 | 11 | Q    Who told you to get there at 6:00? |
| 11:00 | 12 | A    I would not get in by myself.  Lydia and I and |
| 11:01 | 13 | another young fellow that would work there, a student. |
| 11:01 | 14 | Q    I appreciate the answer.  Just listen to my |
| 11:01 | 15 | question carefully.  At what time did you start again? |
| 11:01 | 16 | A    At 6:00. |
| 11:01 | 17 | Q    Who told you to show up at 6:00? |
| 11:01 | 18 | A    We would all start working at the same time at |
| 11:01 | 19 | that time. |
| 11:01 | 20 | Q    Okay.  Did you decide you wanted to show up at |
| 11:01 | 21 | 6:00 or did somebody tell you to show up at 6:00? |
| 11:01 | 22 | A    No, nobody told me.  We would all start working |
| 11:01 | 23 | at the same time.  That's when we started at first to |
| 11:01 | 24 | work.  Later on we started to work at 6:30 like at this |
| 11:01 | 25 | time when she fell. |

```
11:02   1       Q    Who told you to start at 6:30 instead of 6:00?

11:02   2       A    I was told that there had been changes, that they

11:02   3   had been -- that they had changed the working hours there

11:02   4   at the post office because we were starting to work very

11:02   5   early.

11:02   6       Q    You and the other employees were too early?

11:02   7       A    Yes.  Later on they switched us to start working

11:02   8   at 6:30.

11:02   9       Q    So you, just like every other employee, were

11:02   10  changed to go in at 6:30?

11:02   11      A    Yes, at the time that they were told to start

11:02   12  working at 6:30, they told me the same as well.

11:02   13      Q    So you just -- it wasn't up to you to show up at

11:02   14  another time like 8:00, 9:00 or 10:00?

11:02   15      A    No.

11:02   16      Q    You show up whenever they told you?

11:02   17      A    Yes.

11:02   18      Q    How long were you supposed to take to clean that

11:03   19  area, ma'am?  This includes the mopping, the sweeping, the

11:03   20  dusting you said earlier.

11:03   21      A    An hour and 45 minutes, I guess I had.

11:03   22      Q    Is that how long you would take to do all that?

11:03   23      A    Yes, but sometimes I would take half an hour

11:03   24  more.

11:03   25      Q    Okay.  Who told you that you needed to take an
```

11:03  1    hour and 45 minutes?

11:03  2        A    There I was told -- I don't remember who.  I was

11:03  3    told that I had an hour and 45 minutes.

11:03  4        Q    And what days of the week did you show up for

11:03  5    work.  Was it Monday through Friday or did you alternate?

11:03  6        A    Monday through Friday.

11:03  7        Q    Every day?

11:03  8        A    Yes.

11:04  9        Q    You didn't skip any days?

11:04  10       A    When I had important things to do like, for

11:04  11   example, taking my grandchildren to the doctor, I would

11:04  12   take them to the doctor.

11:04  13       Q    Okay.

11:04  14       A    Or if I wasn't too busy or if I had things to do

11:04  15   on my own, I would ask for a day off, but I would tell

11:04  16   them -- I would tell them, "I cannot start working in the

11:04  17   morning, but I will come in the afternoon," and I would do

11:04  18   it like that.  But I would never miss a day.

11:04  19       Q    Who did you tell this to?

11:04  20       A    To Ms. Perez.  I would ask Ms. Perez if it was

11:04  21   okay, if she would need me.

11:04  22       Q    Okay.  So you would get permission from her?

11:05  23       A    Yes, I would ask them for permission when I could

11:05  24   go in the morning and when I couldn't.

11:05  25       Q    Okay.  Are you telling me that if you started at

| | | |
|---|---|---|
| 11:05 | 1 | 6:30 -- I'm going to go back to the previous testimony -- |
| 11:05 | 2 | and you would take about an hour and 45 minutes, maybe two |
| 11:05 | 3 | hours to finish -- |
| 11:05 | 4 | A    More or less two hours. |
| 11:05 | 5 | Q    -- around what time would you leave? |
| 11:05 | 6 | A    Around 8:00 or quarter to 8:00 because it was an |
| 11:05 | 7 | hour and 45 minutes to do the job. |
| 11:05 | 8 | Q    Okay.  And after 8:15 or 8:30, when you left, |
| 11:05 | 9 | were you ever called back to work? |
| 11:05 | 10 | A    You mean the years that I worked there? |
| 11:05 | 11 | Q    (Nods head.) |
| 11:06 | 12 | A    They only called me on one occasion. |
| 11:06 | 13 | Q    Who called you? |
| 11:06 | 14 | A    At that time it was Mr. Aldape. |
| 11:06 | 15 | Q    Was he there before Ms. Perez or something? |
| 11:06 | 16 | A    Oh, yes. |
| 11:06 | 17 | Q    Was he the Postmaster? |
| 11:06 | 18 | A    Yes. |
| 11:06 | 19 | Q    When was it that he called you, like what time, |
| 11:06 | 20 | what month, year?  What do you remember? |
| 11:06 | 21 | A    I don't remember, but he called me once for me to |
| 11:06 | 22 | go and clean there so I -- because another person went |
| 11:06 | 23 | there, I think.  He -- that person had problems with his |
| 11:06 | 24 | stomach, and that person had an accident, and he had -- |
| 11:06 | 25 | that person had an accident, so I was called to clean |

| | | |
|---|---|---|
| 11:06 | 1 | there. |
| 11:07 | 2 | Q    What time was that, more or less, in the day? |
| 11:07 | 3 | A    It was around -- I don't remember very well, but |
| 11:07 | 4 | it was after noontime. |
| 11:07 | 5 | Q    Okay. |
| 11:07 | 6 | A    But I went anyway.  I was there. |
| 11:07 | 7 | Q    And it was long past after 8:30, 9:00 in the |
| 11:07 | 8 | morning? |
| 11:07 | 9 | A    It was after noontime.  That's what I remember. |
| 11:07 | 10 | Q    Okay.  So it was your understanding that if |
| 11:07 | 11 | Ms. Perez was to call you in, you would have to go in to |
| 11:07 | 12 | work? |
| 11:07 | 13 | A    I know, but they would pay me for it. |
| 11:07 | 14 | Q    Okay.  Let me ask you again, ma'am.  If, like |
| 11:07 | 15 | Mr. Aldape, Ms. Perez would call you to come into work |
| 11:07 | 16 | after noon, would you have to come into work? |
| 11:07 | 17 | A    Yes, if I wanted to go, I could go, but when |
| 11:08 | 18 | Mr. Aldape called me, he told me that he needed me |
| 11:08 | 19 | urgently. |
| 11:08 | 20 | Q    Okay. |
| 11:08 | 21 | A    Because he couldn't do the work, but they would |
| 11:08 | 22 | pay me for it.  I wouldn't go there for free. |
| 11:08 | 23 | Q    Okay.  You mentioned earlier when you saw the |
| 11:08 | 24 | diagram and the previous exhibit that you don't mop the |
| 11:08 | 25 | way the diagram was drawn; is that correct? |

11:28   1    Q    Can you mark it with an "X"?

11:28   2    A    (Witness complies.)

11:28   3    Q    Okay.

11:28   4    A    And here there are some long tables -- small

11:29   5  tables, trash cans, and here is another trash can.

11:29   6    Q    Okay.  For the record, you have indicated the

11:29   7  trash cans with a small circle.  You also mentioned, of

11:29   8  course, you had supplies.  Can you tell me what supplies

11:29   9  you had in that utility room?

11:29   10   A    Things that I used to clean the bathrooms.

11:29   11   Q    Can you name and list them, please?

11:29   12   A    Lysol, Windex for the windows -- to clean the

11:29   13  windows, paper towels, and things that I use when I'm

11:29   14  ready to go.  That's what I had.

11:29   15   Q    Was there a mop there, too?

11:30   16   A    In the utility room there I have a mop.  I had it

11:30   17  there all the time in the utility room.

11:30   18   Q    Was there a broom there?

11:30   19   A    Yes, I use a broom sometimes.

11:30   20   Q    Was the bucket and the sign there, too?

11:30   21   A    Where?

11:30   22   Q    In the utility room or in the post office?

11:30   23   A    Yes, when I would finish using them.  When I

11:30   24  would finish using them, I go and place them in the

11:30   25  utility room.

76

| | | |
|---|---|---|
| 11:30 | 1 | Q   Any of these things we just mentioned, did you |
| 11:30 | 2 | ever have to buy any of them? |
| 11:30 | 3 | A   I never bought anything. |
| 11:30 | 4 | Q   So who would provide all of that for you? |
| 11:30 | 5 | A   The post office. |
| 11:30 | 6 | Q   Okay. |
| 11:30 | 7 | MR. ALMAGUER:  No further questions.  Pass |
| 11:30 | 8 | the witness. |
| 11:30 | 9 | MS. MASSO:  No questions. |
| 11:30 | 10 | EXAMINATION |
| 11:30 | 11 | BY MR. MANN: |
| 11:30 | 12 | Q   I've got one question. |
| 11:30 | 13 | A   Yes. |
| 11:31 | 14 | Q   Did Ms. Perez or anyone else in the post office |
| 11:31 | 15 | ever see you mop where you didn't have the bucket in the |
| 11:31 | 16 | close proximity to where you were mopping? |
| 11:31 | 17 | MR. ALMAGUER:  Objection to the form of the |
| 11:31 | 18 | question, speculation.  She wouldn't know what they saw or |
| 11:31 | 19 | didn't. |
| 11:31 | 20 | A   I don't know.  I don't know.  I don't know what |
| 11:31 | 21 | to tell you. |
| 11:31 | 22 | Q   (BY MR. MANN)  Okay.  Did any -- did Ms. Perez or |
| 11:31 | 23 | anyone from the post office ever tell you to keep the mop |
| 11:31 | 24 | bucket close to the mop when you were mopping the floors? |
| 11:31 | 25 | A   On one occasion I asked her if the bucket was |

11:31    1    okay there, and she said it was okay unless I would put it

11:31    2    in the middle -- no -- but not to put it in the middle of

11:32    3    the lobby, that she would think that this was the safest

11:32    4    place to put it because if I would put it here people

11:32    5    would fall down or something to trip.

11:32    6       Q    Okay.  So these types of things would be

11:32    7    questions that you would take to Ms. Perez at the post

11:32    8    office?

11:32    9       A    I would ask her things to be sure.

11:32   10       Q    Okay.

11:32   11          MR. MANN:  No further questions.

11:32   12          (Proceedings concluded at 11:32 a.m.)

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25