

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

APR 1 6 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| GLORIA GARCIA. A/K/A | § |
| GLORIA GUZMAN | § |
|     Plaintiff, | § |
| | § |
| vs. | § |
| | § |
| | § |
| UNITED STATES OF AMERICA, and | § |
| YOLANDA PEREZ, as Postmaster, | § |
| United States Post Office, Santa Rosa, | § |
| Texas, and ELENA OLIVAREZ, as an | § |
| Employee of the United States Post Office, | § |
| Santa Rosa, Texas | § |
|     Defendants. | § |

CIVIL ACTION NO. B-02-017

**THE UNITED STATES'**
**MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendants United States Postal Service and Yolanda Perez, as Postmaster,

United States Post Office, Santa Rosa, Texas, (hereinafter "Postal Service") by and through Michael

Shelby, United States Attorney for the Southern District of Texas, and respectfully moves this Court,

pursuant to Fed. R. Civ. P 56 to dismiss Plaintiff's Complaint, stating the following in support[1].

**I. Plaintiff's Claims and Allegations**

Plaintiff Gloria Garcia (hereinafter "Plaintiff") contends that on November 17, 1999, at

approximately 7:10 AM, she entered the United States Post Office in Santa Rosa, Texas (hereinafter

referred to as the "Santa Rosa Post Office") to collect her mail (*Plaintiff's Original Complaint*, § D,

---

[1] The United States was substituted for Yolanda Perez on August 1, 2003 by order of
Magistrate Judge Black in instrument number 24.

¶ 7). In her deposition, Plaintiff admitted she was there for approximately 15 minutes retrieving and going through her mail (*Plaintiff's Deposition* , p. 17:5-7). While the Plaintiff was present in the Santa Rosa Post Office, Defendant Elena Olivarez was mopping the floor[2] (*Plaintiff's Original Complaint*, § D, ¶ 7). Plaintiff admitted that the location on the floor where she would later fall was dry as she entered the San Benito Post Office (*Plaintiff's Deposition*, p. 74:4-10, 78:23-79-1). Plaintiff admitted that she never noticed Ms. Olivarez just to the west (right) of her, where she alleges she slipped and fell. (*Plaintiff's Deposition, p. 86:23-87:25*). The Plaintiff further alleges that there was water on the floor, and that this, in combination with bad lighting, caused her to slip and fall (*Plaintiff's Original Complaint*, § D, ¶ 7). Plaintiff also alleges that the "Caution Wet Floor" sign was not displayed in the vicinity of the Plaintiff's fall in such a manner as to adequately warn her of the "dangerous" condition (*Id.*, § D, ¶ 7). The Plaintiff further claims injuries to both her left and right knees requiring surgery and caused her, "permanent scarring and pain and suffering," which Plaintiff asserts will affect her for life (*Id.*, § D, ¶ 7). Plaintiff alleges damages, as a result of her injuries, arising from mental anguish loss of earnings and medical expenses.

## II. Statement of the Issues

1.    Was there actual or constructive knowledge of the condition by the United States Postal Service?

---

[2]Plaintiff contends that Elena Olivarez was an employee of the United States Postal Service (USPS) at the time of the alleged incident. However, at the time of the alleged incident Ms. Olivarez was an employee of a private contractor and not of the USPS. Any arguments made herein are not in any way intended to be a waiver of this position.

2.    Did Defendant United States Postal Service exercise reasonable care to reduce or eliminate risk?[3]

3.    Did Defendant United States Postal Service have a duty to exercise reasonable care and was it the proximate cause of Plaintiff's injuries?

## III. Statement of Facts

The Plaintiff contends that on November 17, 1999, at 7:10 AM, she entered the Santa Rosa Post Office to collect her mail (*Plaintiff's Original Complaint*, § D, ¶ 7). At the same time Elena Olivarez, an independent contractor custodian, was in the Santa Rosa Post Office, as was her standard practice, cleaning from 6:00 AM until approximately 8:00 AM. (*Deposition of Elena Olivarez*, at p. 16:6-11; p. 16:19 to 17:3)[4]. Ms. Olivarez placed her sign near the front entrance, the only public entrance, where it would be visible to all who entered (*Id.* at p. 65:20-25, and Exhibit 3). The Plaintiff admits that the sign was present although she later contends that she saw it only upon leaving (*Plaintiff's Original Complaint*, § D, ¶ 7); (*Deposition of Elena Olivarez* at p. 13:10-12, 14:9-11). Ms. Olivarez was going about her rounds but had to stop mopping when the Plaintiff entered the Santa Rosa Post Office (*Deposition of Elena Olivarez*. at p. 47:6-7).

---

[3]The United States Postal Service does not waive its argument that Defendant Olivarez was an independent contractor, and therefore Plaintiff's recovery under the Federal Tort Claims Act is barred. The United States Postal Service makes this argument in the event that the Court finds that Defendant Olivarez was an employee of the United States Postal Service at the time of the fall.

[4]The deposition of Elena Olivarez is attached hereto and incorporated into the Motion for Summary Judgment as Exhibit "1".

Plaintiff arrived at approximately 7:15 A.M. and left at approximately 7:30 A.M. after going through her mail (*Plaintiff's Deposition*, p. 16:21-17:10)[5]. Plaintiff admitted in her deposition that the location where she would later fall was dry as she entered the San Benito Post Office (*Id.* at p. 74:4-10, 78:23-79-1). Plaintiff stood facing her mailbox (south) (*Id.* at p. 18:25-19:5). Elena Olivarez passed behind Plaintiff and began mopping the east end of the hall (*Id.* at p. 19:12-23). Due to the time that Plaintiff spent going though her mail, Elena Olivarez was late in completing her mopping (*Deposition of Elena Olivarez* at p. 22:17-23, p. 46:21 to 47:3, p. 26:23).

Elena Olivarez resumed her mopping after waiting and began by mopping the edge of the hallway behind where the Plaintiff was located (*Deposition of Plaintiff* at p. 20:16-20). With the edge complete, Ms. Olivarez then began to mop from the closed off (east) end of the hall (*Deposition of Plaintiff, p. 55:2-6*). Ms. Olivarez began moving backwards towards the Plaintiff. (*Deposition of Elena Olivarez* at p. 20:20-25 and 21:1-5, 54:13-25). As Ms. Olivarez approached the Plaintiff she moved, "slowly so [Gloria Garcia] would have time, and I wanted to see if she would move." (*Elena Olivarez* at p. 49:10-12). Plaintiff took a step to her right, west towards the windows. (*Oral Deposition of Gloria Garcia, p. 21:24-25,55:7-10*, 86:17-22). Elena Olivarez testified during her oral deposition that she never heard the Plaintiff fall or cry-out as she allegedly hit the ground Ms. Olivarez's first inclination that the Plaintiff had fallen was when Ms. Olivarez bumped into the Plaintiff as she continued to walk backwards. (*Elena Olivarez* at 21:1-5, 55:23-25). Plaintiff admitted in her deposition that she never noticed Ms. Olivarez just to the west of her, where she alleges she slipped and fell. (*Oral Deposition of Gloria Garcia, p. 86:23-87:25*). The Plaintiff left

---

[5]The deposition of Plaintiff Gloria Garcia is attached hereto and incorporated into the Motion for Summary Judgment as Exhibit "2".

without showing any injury and stating that she was in a hurry. (*Elena Olivarez* at 65:13-15, 57:6-18, 27:1-2 and changes 27:4-8). Through repeated questioning by Plaintiff's attorney, Elena Olivarez was adamant that she had not mopped the location where the Plaintiff had fallen. (*Elena Olivarez* at p. 20:11-12, 20:24-25, 21:1, 21:14-17, 21:24-25, 22:1, 22:17-23, and 24:18-23; by Ms. Masso for the United States 47:6-7, 49:15-17). Plaintiff also admitted she never saw Ms. Olivarez to the west of her mopping in the area where she fell.(*Oral Deposition of Gloria Garcia, p. 55:10*, 87:1-25)

## IV. Standard of Review Fed. R. Civ. P. 56

Rule 56 of the Federal Rules of Civil Procedure mandates that summary judgment be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.; *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (*per curiam*). The moving party bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant who is a defendant may discharge its burden by pointing out an absence of proof on any one of the essential elements of the plaintiff's claim. *Celotex*, 477 U.S. at 325. The moving party, however, need not negate the elements of the nonmovant's case. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322-23.

Moreover, disputes over irrelevant facts will not preclude summary judgment. Only material facts - those capable of affecting the outcome under existing law - infringe upon the summary judgment analysis. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also, Hanchey v. Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990) (fact issue must be "outcome determinative"). The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075.

## V. Argument

In order to prevail in Texas in a negligence action under premises liability the Plaintiff must prove:

     (1)    Actual or constructive knowledge of some condition on the premises by the owner/operator;

     (2)    That the condition posed an unreasonable risk of harm;

     (3)    That the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and

     (4)    That the owner/operator's failure to use such care proximately caused the plaintiff's injury.

*See Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1975); *June v. Dan Kirby Associates,* 1995 WL 506012, at ¶ 7 (Tex. App.-Hous. (14 Dist.)); *Richards v. U.S.*, 369 U.S. 1, 9-10, 82 U.S.Ct. 585, 591 (1962) "[I]n the Tort Claims Act Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred.").

## 1. No Actual or Constructive Knowledge Of Condition By Occupier

The Plaintiff contends through her *Original Complaint* that there was water on the floor of the Santa Rosa Post Office. (§ D, ¶ 7). Plaintiff through her own deposition admitted that the floor

in the vicinity where she fell was dry before she stopped to check her mail. (*Oral Deposition of Gloria Garcia*, p. 74:4-10, 78:23-79-1). By Plaintiff's own admission she was there no more than 15 to 20 minutes. (*Plaintiff's Original Complaint*, § D, ¶ 7); (*Oral Deposition of Gloria Garcia,* p. 16:21-17:10). However, Plaintiff contends that the floor was wet at the time that she turned to leave. (*Oral Deposition of Gloria Garcia*, p. 74:11-13). Ms. Olivarez, in her deposition, states that she had not mopped that portion of the hall where the Plaintiff was standing. (*Oral Deposition of Elena Olivarez.* at p. 20:11-12, p. 20:24-25, p. 21:1, p. 21:14-17, p. 21:24-25, p. 22:1, p. 22:17-23, p. 24:18-23, p. 47:6-7, p. 49:15-17). Furthermore, during her deposition Plaintiff admitted she never saw Ms. Olivarez to the west of her, let alone mopping the area, where Plaintiff allegedly fell.(*Oral Deposition of Gloria Garcia, p. 55:10*, 87:1-25)

If neither the custodian nor Plaintiff placed the wet mop in the location of Plaintiff's fall, then the Court is presented with the issue of how water (if any) somehow arrived on the floor during the 15 minutes she was present and aware of her surrounds. In that brief period of time, the United States Postal Service could not have reasonably gained either actual or constructive knowledge of any "wet" condition. The burden that falls on the occupier is whether the occupier knew or by the exercise of reasonable care could have discovered the condition. *H. Joachimi v. City of Houston*, 712 S.W.2d 861, 865 (1st Ct. App. Tex. 1986). The Court there held that three and one-half (3.5) hours to four (4) hours did not, "establish, nor permit a legitimate inference that the a dangerous condition existed a sufficient length of time to provide the appellee a reasonable opportunity to discover that dangerous condition. *See Coffee v. F.W. Woolworth Co.*, 536 S.W.2nd 539, 541 (Tex. 176)." *H. Joachimi,* 712 S.W.2d at 861. Texas and Federal Courts have held that even if a condition is created by the occupier, they cannot be charged with knowledge as a matter of law.

*Folks*, 10 F.3d at 1178; *Keetch v. Kroger Co.*, 845 S.W.2d 262, 266 (Tex, 1993).

At the time of the alleged fall, Plaintiff admitted the present where she fell in the San Benito Post Office were the custodian, Ms. Olivarez, and the Plaintiff. (*Oral Deposition of Gloria Garcia*, p. 55:14-17). It is the position of Defendant United States Postal Service that Ms. Olivarez was the employee of an independent contractor. While she later became a United State Postal Service employee, she was not an employee at the time of the alleged fall (*Oral Deposition of Elena Olivarez*, 13: 2-16, 33:18-23, 41:1-7). As such the, only person who possibly had a reasonable opportunity to know of any condition was not even an employee of Defendant United States Postal Service, but an independent contractor. Even if Ms. Olivarez had known of the condition, that knowledge cannot be imputed on the United States Postal Service. *Lane v United States*, 843 F.SUPP. 190, 192 (N.D. Texas 1993); *United States v. Orleans*, 425 U.S. 807, 813-814, 96 S.Ct. 1971, 1975-76; *Logue v. United States*, 412 U.S. 521, 528, 93 S.CT. 2215, 2219-20 (1973). Thus the United States Postal Service is entitled to summary judgment as Plaintiff cannot prove as a matter of law, an essential element of the case.

## 2. Defendant United States Postal Service Exercised Reasonable Care to Reduce or Eliminate Risk.[6]

Since *Corbin*, Texas courts have held that one of the elements that the Plaintiff bears the burden of proving is that the occupier did not exercise reasonable care to reduce or eliminate the risk on the premises. 648 S.W.2d 296. Defendant Olivarez had been provided with a United States Postal Service safety handbook by her employer in Indiana. (*Oral Deposition of Elena Olivarez* at p. 11:3-19). Plaintiff admits that there was a wet floor sign in the small San Benito Post Office, but states

---

[6] See note 2.

that she did not see it until after her fall. (*Original Complaint* § D, ¶ 7); (*Oral Deposition of Elena Olivarez* at p. 13:10-12, 14:9-11). However, this must be view in light of the fact that Plaintiff also did not see that the ceiling light near her mailbox was out because she is, "not very observant." (*Oral Deposition of Gloria Garcia*, p. 23:1-6). The yellow wet floor sign was placed at the only public entrance to the facility. (*Elena Olivarez* at p. 65:20-25, and Exhibit 3).

In addition to the yellow warning sign, Elena Olivarez was present in the Santa Rosa Post Office at the time that the Plaintiff was there. Ms. Olivarez took her time, and found other work to do so that she would not jeopardize the safety of the Plaintiff. (*Oral Deposition of Elena Olivarez* at p. 22:18-23). When Ms. Olivarez finally began to resume her mopping, she did so in a place that would not interfere with the travel of the Plaintiff to the front door to the Santa Rosa Post Office. (*Oral Deposition of Elena Olivarez* at p. 24:4-12). Elena Olivarez even took her time and proceeded slowly towards Plaintiff. (*Id.* at p. 29:10-12).

The Plaintiff should have been more than well aware of the potential of a wet floor, Elena Olivarez provided ample notice to the Plaintiff of the potential hazard presented by the wet floor, and therefore the burden to reduce or eliminate the risk has been met. Thus the United States Postal Service is entitled to summary judgment as Plaintiff cannot prove as a matter of law, an essential element of the case.

**3. Defendant United States Postal Service Had No Duty To Exercise Reasonable Care and Was Not the Proximate Cause of Injuries**

As was previously stated, the short length of time that any water may have been on the ground was insufficient to for the Defendant United States Postal Service to become aware of any

potentially dangerous condition.[7]  *H. Joachimi,* 712 S.W.2d at 861.  Without sufficient time to discover the alleged wet spot, the occupier Defendant United States, could not reasonably be expected to know of its presence and act accordingly.    Thus the United States Postal Service is entitled to summary judgment as Plaintiff cannot prove as a matter of law, an essential element of the case.

## VI. Conclusions

For the foregoing reasons, Defendants' respectfully prays that the Court grant this Defendants' Motion for Summary Judgment because Plaintiff cannot prove actual or constructive knowledge by the Defendant United States Postal Service; Defendant United States Postal Service exercised reasonable care to reduce or eliminate risk;[8] or Defendant United States Postal Service had no duty to exercise reasonable care and was not the proximate cause of injuries.

Respectfully submitted,

MICHAEL SHELBY
UNITED STATES ATTORNEY

STEVEN T. SCHAMMEL
Assistant U. S. Attorney
1701 W. Highway 83, Suite #600
McAllen, Texas  78501
(956) 618-8010
(956) 618-8016 (fax)
State Bar No.  24007990

---

[7]United States does not admit or concede that there was any water present when the Plaintiff allegedly fell.

[8] See note 2.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing Defendants' Motion for Summary

Judgment was mailed via First-Class Mail to the following:


Jason R. Mann
J. EDWARD MANN, JR. & ASSOCIATES
222 E. Van Buren, Suite 701
PO Box 231
Harlingen, TX 78551-0231

Attorney for Plaintiff

Pablo J. Almaguer
TEXAS RURAL LEGAL AID, INC.
316 S. Closner
Edinburg, Texas 78539

Attorney for Elena Olivarez

on this the ____15th____ day of ____April____ , 2004.

Steven T. Schammel
Assistant U. S. Attorney

1          IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2               BROWNSVILLE DIVISION

3   GLORIA L. GARCIA a/k/a        )
    GLORIA GUZMAN,                )
4          Plaintiff             )
                                  )
5                                 )
    VS.                           )    CIVIL ACTION NO. B-02-017
6                                 )
                                  )
7   UNITED STATES OF AMERICA,    )
    and YOLANDA PEREZ, as        )
8   Postmaster, UNITED STATES    )
    POST OFFICE, SANTA ROSA,     )
9   TEXAS, and ELENA OLIVAREZ,)
    as an employee of the        )
10  UNITED STATES POST OFFICE, )
    SANTA ROSA, TEXAS            )
11         Defendants.           )

12

    ***********************************************************
13

14                  ORAL DEPOSITION OF

15                    ELENA OLIVAREZ

16                    June 18, 2003

    ***********************************************************
17       ORAL DEPOSITION OF ELENA OLIVAREZ, produced as a

18  witness at the instance of the Plaintiff, and duly sworn,

19  was taken in the above-styled and numbered cause on the

20  18th of June, 2003, from 9:08 a.m. to 11:32 a.m., before

21  Heather Hall, CSR in and for the State of Texas, reported

22  by machine shorthand, at the Law Offices of J. Edward Mann

23  & Associates, 222 East Van Buren, Suite 701, Harlingen,

24  Texas, pursuant to the Federal Rules of Civil Procedure

25  and the provisions attached hereto.



1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3        Mr. Jason R. Mann
         LAW OFFICES OF J. EDWARD MANN, JR. & ASSOCIATES
4        222 East Van Buren, Suite 701
         Harlingen, Texas  78550
5
     FOR THE DEFENDANT THE UNITED STATES OF AMERICA:
6
         Ms. Nancy L. Masso
7        UNITED STATES ATTORNEY'S OFFICE
         SOUTHERN DISTRICT OF TEXAS
8        600 East Harrison, Suite 201
         Brownsville, Texas  78520
9
     FOR THE DEFENDANT ELENA OLIVAREZ:
10
         Mr. Pablo J. Almaguer
11       LAW OFFICES OF TEXAS RURAL LEGAL AID
         316 Closner
12       Edinburg, Texas  78539

13   ALSO PRESENT:

14       Ms. Cecilia Turrent, Interpreter
         Ms. Gloria Guzman, Plaintiff
15       Mr. Juan Olivarez, Defendant's husband

16

17

18

19

20

21

22

23

24

25

1

2    Job No. <u>2003-203</u>

3                  STIPULATIONS FOR THE DEPOSITION OF
                            <u>**ELENA OLIVAREZ**</u>
4
     Taken on:   <u>06/18/03</u>               Deposition Location:
5    Beginning:  <u>9:08 a.m.</u>              <u>J. Edward Mann, Jr.</u>
     Finish:  <u>11:32 a.m.</u>               <u>222 East Van Buren</u>
6    Pursuant to:  <u>Rules</u>               <u>Harlingen, Texas</u>

7    SIGNATURE OF WITNESS:

8        1.  ( ) Is waived.
         2.  (X) The witness shall read and sign this
9    deposition before any notary by:
             (X) reading the original transcript sent to
10   his/her attorney.  Attorney:  <u>Mr. Pablo Almaguer</u>
             ( ) reading the original transcript sent to
11   witness.
             ( ) coming to the reporter's office.
12       3.  (X) If the original deposition is released from
     the reporter's possession and is not returned for timely
13   filing with the custodial attorney, a copy may be filed,
     unsigned and uncorrected.
14           It is also understood that the court reporter
     assumes no responsibility for filing when the attorneys
15   agree to release the original deposition.

16
     OBJECTIONS:
17
         1.  (X) All objections will be made in accordance with
18   the Federal Rules.
         2.  ( ) All objections will be made in accordance with
19   the Texas Rules.

20
     EXHIBITS:
21
         Exhibit Nos. 1 and 2.
22

23

24                      ---oo0oo---

25

```
1                              INDEX

2   Appearances .......................................    2

3   Stipulations ......................................    3

4   ELENA OLIVAREZ

5         Examination by Mr. Mann .....................    5
          Examination by Ms. Masso ....................   42
6         Examination by Mr. Almaguer .................   50
          Examination by Mr. Mann .....................   68
7         Examination by Mr. Almaguer .................   74
          Examination by Mr. Mann .....................   76
8
    Signature and Changes .............................   78
9
    Reporter's Certificate ............................   80
10

11                            EXHIBITS

12  NO.   DESCRIPTION                                   PAGE

13  1     Copy of maintenance handbook .................   11

14  2     Drawing of Santa Rosa Post Office ............   14

15

16

17

18

19

20

21

22

23

24                              .

25
```

```
 1              (Interpreter sworn.)
 2                   ELENA OLIVAREZ,
 3   having been first duly sworn, testified through the duly
 4   sworn interpreter as follows:
 5                     EXAMINATION
 6   BY MR. MANN:
 7      Q    Good morning.  My name is Jason Mann --
 8      A    Good morning.
 9      Q    -- and I represent Gloria Guzman in reference to
10   a November 12th, 1999 incident where she slipped and fell
11   at the post office.
12      A    Yes.
13      Q    I am going to be asking you a series of questions
14   regarding many things regarding your background, and I am
15   going to ask you questions regarding your particular
16   employment or your relationship with the United States
17   Postal Service and some questions regarding the specific
18   instances of the November 12th, 1999 fall.
19      A    Yes.  It's okay.
20      Q    If ever you don't understand a question that I
21   have asked, then ask that I rephrase it or ask it again so
22   that you can understand it.
23      A    It's okay.
24      Q    Thank you.  Please state your name for the
25   record.
```

```
09:10   1      A    My name is Elena Olivarez.

09:10   2      Q    And where do you live?

09:10   3      A    Santa Rosa.

09:10   4      Q    How close do you live to the post office in

09:10   5    Santa Rosa?

09:10   6      A    I don't know very well in measurements, but it

09:10   7    must be about a mile -- less than a mile.

09:10   8      Q    When did you first start working at the post

09:10   9    office in Santa Rosa?

09:10   10     A    I think it was in the '90s, but I'm not sure

09:11   11   exactly if it was in the '90s or a couple of years later.

09:11   12   I had been working there for about nine years --

09:11   13     Q    Okay.

09:11   14     A    -- or something like that.

09:11   15     Q    Do you currently work there?

09:11   16     A    I don't work anymore now.

09:11   17     Q    Okay.  What is your understanding of how you were

09:11   18   employed by the United States Postal Service the first

09:11   19   year that you worked there?

09:11   20     A    I had a contract the first years, and then

09:11   21   shortly after that, the post office started to pay me.

09:12   22     Q    Do you remember how you were being paid November

09:12   23   12th, 1999, at the post office?

09:12   24     A    I was still receiving checks by that contract --

09:12   25   excuse me.  No, it wasn't that way.  I think I was already
```

09:12  1    being paid by the post office.

09:12  2        Q    Did you file tax returns for that year?

09:12  3        A    Yes.

09:12  4        Q    Okay.  Would you make those tax returns available

09:12  5    for my inspection?

09:12  6        A    I don't have them right now with me.

09:13  7        Q    If I give you a form that will enable me to get

09:13  8    them, will you sign it so that I can get them?

09:13  9        A    Yes.

09:13  10       Q    What is your social security number?

09:13  11       A    Can I take it from my purse?

09:13  12       Q    Sure.

09:13  13       A    The thing is that I don't like to be untrue in

09:13  14   relation to the number.  It's 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.

09:14  15       Q    Thank you.  Who told you when and where to be

09:14  16   with respect to your job at the United States Post Office

09:14  17   in Santa Rosa?

09:14  18       A    When I got the job?

09:14  19       Q    Start off there and go all the way through the

09:14  20   end of your employment.

09:15  21       A    I worked there -- when I started working there, I

09:15  22   worked there very well at the time, ever since that

09:15  23   accident happened.

09:15  24       Q    Was someone from the U.S. Postal Service the one

09:15  25   that set your schedule and told you what to do?

09:15  1        A    When I started to work there, yes, I was told --

09:15  2    they told me what I had to do and everything.

09:15  3        Q    What was your normal working schedule November

09:15  4    12th, 1999?

09:16  5        A    I would sweep.  I would mop.  I would also dust.

09:16  6    I would also dust the tables.  I would clean the windows

09:16  7    and the doors and the bathrooms, and I would also do

09:16  8    things like cleaning the floors.  And what else?  Well,

09:16  9    little things that I had to do.  I would sweep.  I would

09:16  10   mop.  I would dust.  I would clean outside as well.

09:16  11       Q    Did you receive any instruction from anyone on

09:16  12   how to do these tasks?

09:16  13       A    Yes.

09:17  14       Q    Who did you receive the instructions from?

09:17  15       A    Through the agreement when I had the contract.

09:17  16   The agreement.

09:17  17       Q    Did -- isn't it true that the U.S. Postal Service

09:17  18   provided you with particular ways to do things such as

09:17  19   mopping?

09:17  20       A    Yes, but they didn't have a hard time with me

09:17  21   because I have -- I had been doing that type of work for

09:17  22   years.

09:17  23            MR. MANN:  Objection, nonresponsive to

09:17  24   everything after yes.

09:17  25       A    Yes.

09:17   1      Q     (BY MR. MANN)   Isn't it true that the U.S.

09:17   2   Postal Service also told you specifically how to place

09:17   3   warning wet signs when you were mopping?

09:18   4      A     Yes, they would tell me, and -- and when it would

09:18   5   rain, I was also asked to put them.   I was told to put

09:18   6   them because it was very wet.

09:18   7      Q     Isn't it true that the U.S. Postal Service

09:18   8   provided you all of the mops and equipment necessary to do

09:18   9   your job?

09:18  10      A     What do you mean?   Like when I needed a new mop,

09:18  11   for example, yes, they would give me everything.

09:18  12      Q     And a bucket?

09:18  13      A     Everything.

09:18  14      Q     Everything?

09:18  15      A     They would give me everything.

09:18  16      Q     Isn't it true that the United States Postal

09:19  17   Service wanted you to do things a particular way?

09:19  18      A     Can you explain it to me again, please?

09:19  19      Q     They wanted you to -- the United States Postal

09:19  20   Service wanted you to mop a certain way?

09:19  21      A     No, they never told me so.   Since I knew how to

09:19  22   do my work, I haven't -- I worked there for many years.   I

09:19  23   knew how to deal with my work, and they would tell me that

09:19  24   they did not have any problem with me and they were very,

09:19  25   very happy with my job.

1            MR. MANN:   Objection, nonresponsive.

2      Q     (BY MR. MANN)   They did -- the United States

3  Postal Service did provide the initial training?

4      A     Yes, and they would give me cassettes to look at.

5  They would give me time to watch them.

6      Q     Who would oversee your work on a daily basis?

7      A     Who would oversee?   What do you mean?

8      Q     Who would supervise your work?

9      A     Ms. Perez and the other lady, Lydia.

10     Q     On a normal day, what sort of requests would

11 Ms. Perez have for you to do certain tasks?

12     A     She would almost never ask me to do a certain

13 type of work.   Once in a while when I would forget to do

14 something, but it wasn't something normal.

15     Q     Did you ever receive any manuals from the United

16 States Postal Service?

17     A     From the post office -- from the United States.

18 You mean from the post office?

19     Q     Yes.

20     A     No, I don't remember.   I don't remember, but all

21 those papers on how to manage my work, I would read them,

22 whatever was sent to me with a contract.

23     Q     Can you read English fairly well?

24     A     Yes, I know how to read well, and I understand

25 it.   There are certain words that I don't understand and

1   then I have to ask questions.

2                    (Exhibit No. 1 marked.)

3       Q   (BY MR. MANN)   Okay.   I'm going to show you what

4   has been marked as Plaintiff's Deposition Exhibit 1, which

5   was produced by the United States Postal Service, and ask

6   if you recognize it?

7       A   Do I have to read it all?

8       Q   No, just do you recognize it?

9       A   It's like a handbook.

10      Q   Were you provided this handbook?

11      A   Not from the post office.

12      Q   Who provided this to you?

13      A   When I signed my agreement.   When I did the

14  agreement, I was given one, but not from the post office,

15  with the contract.   When I signed my contract, they gave

16  it to me, but it was not this document, but it does say

17  similar things almost, things that I cannot lift like

18  heavy things and -- and almost everything that it says,

19  it's the same.

20      Q   Do you still maintain a copy of what was given to

21  you when you signed your contract with the post office?

22      A   Well, yes, but I don't remember where I have them

23  now.   I don't remember where.

24      Q   Do you think you could find them?

25      A   Well, maybe I will be able to find them in case I

09:24  1   still have them at home.

09:24  2       Q    Let's look at this Exhibit 1, and I would like

09:24  3   for you to look at page 6-4.  Do you see a picture of

09:24  4   someone mopping?

09:24  5       A    Yes.  This one, this is the wrong way.  I don't

09:24  6   mop like this.

09:24  7       Q    Did the manual that you received when you signed

09:24  8   your contract have something similar to this in it?

09:24  9       A    No.

09:24  10      Q    Did it have anything regarding how you are

09:24  11   supposed to mop?

09:24  12      A    Yes, I had to read the papers, and it's -- that's

09:25  13   the way I use my mop.  That's the way I mop, the way it

09:25  14   says on the paper.

09:25  15      Q    Okay.  And the paper was provided from the United

09:25  16   States Postal Service?

09:25  17      A    No, no.  I wasn't with the post office.

09:25  18      Q    I'm sorry.  Maybe you misunderstood my question.

09:25  19      A    What do you mean?

09:25  20      Q    What I asked was:  Was that the manual that you

09:25  21   had from the Postal Service?

09:25  22      A    No.

09:25  23      Q    Not who did you get it from, but was the manual

09:25  24   created by the Postal Service?

09:25  25      A    From the post office, I did not receive any

1    paper.  They didn't give me anything.

2        Q    Who did give you something?

3        A    Through the contract that I got from Indiana.

4            THE INTERPRETER:  Indiana?

5            MR. ALMAGUER:  Indianapolis.

6        Q    (BY MR. MANN)  What company is it in Indianapolis

7    that you worked for?

8        A    I don't remember the name, but I have the papers.

9    Those contracts, I have them kept, I think so.  I think I

10   do have them.

11       Q    And it's your understanding that this company

12   from Indiana was hired by the U.S. Postal Service, and

13   then subsequently hired you to perform these sort of

14   maintenance services?

15       A    I think they did because there at the post office

16   I signed a document.

17       Q    Okay.  Did you ever meet anyone from

18   Indianapolis?

19       A    No.

20       Q    You just signed a paper that said you worked for

21   someone from Indianapolis?

22       A    Yes.

23       Q    Do you know if the Postal Service provided the

24   manual that you received from the Indianapolis people from

25   the post office?

09:27    1    A    That if I knew?

09:27    2    Q    Yes.

09:28    3    A    No, I didn't know.  I didn't know.

09:28    4    Q    You were given instructions on where to place

09:28    5    signs, weren't you?

09:28    6    A    Oh, yes.

09:28    7    Q    And you were given instructions on where to rope

09:28    8    off areas if necessary, weren't you?

09:28    9    A    On where to put the signs or what do you mean?

09:28    10   Q    Did you ever rope off an area that was wet?

09:28    11   A    I had a sign that they gave me -- or that reads

09:28    12   "Wet Floor."

09:28    13            MR. MANN:  Objection, nonresponsive.

09:28    14   Q    (BY MR. MANN)  Did you ever rope off an area?

09:29    15   A    No.

09:29    16            MR. MANN:  Can I have an exhibit sticker?

09:29    17            (Tendering exhibit labels.)

09:29    18            MR. MANN:  Thank you.

09:29    19            (Exhibit No. 2 marked.)

09:29    20   Q    (BY MR. MANN)  I am going to show you what I have

09:29    21   marked as Deposition Exhibit No. 2, which was also

09:29    22   provided by the United States Postal Service to me, and

09:29    23   ask if you recognize that as a depiction of the post

09:29    24   office in Santa Rosa?

09:29    25   A    This is the entrance, isn't it?

09:29  1      Q      Yeah.

09:29  2      A      Here there were letters in all this area.

09:29  3      Q      Would you mark on here the different places that

09:30  4  you would place a wet sign when you were mopping?

09:30  5      A      First of all, I mop here -- here on the window,

09:30  6  and then I continue here, and I would have a sign here

09:30  7  when I would be mopping.  And I would place it here, and I

09:30  8  would place a bucket here.  Then, I would mop all the way

09:30  9  here, and the sign was turned around here.

09:30  10     Q      Go ahead -- would you go ahead and mark that with

09:30  11  the pen, please?

09:30  12     A      The wet floor sign?

09:30  13     Q      Yes.

09:30  14     A      It was here (drawing).

09:30  15     Q      Did you ever place it anywhere else in the

09:30  16  building when you were mopping?

09:30  17     A      It would be here so people will know, when they

09:31  18  go in, for them to know that it's wet.

09:31  19     Q      Okay.  Would it be possible to rope off the area

09:31  20  that is on the right side of the post office where the

09:31  21  P.O. box's are?

09:31  22     A      I would put them here where I would think it was

09:31  23  correct because the people that would pass by would trip

09:31  24  with the buckets.

09:31  25     Q      Okay.

1    A    And I thought it was dangerous to put them here,

2  so I thought it was better to put them here since there

3  were less P.O. boxes in this area.  Most of the time,

4  people come to this area.

5    Q    At what time did you normally mop that area?

6    A    I would start working at 6:00 so that by 7:45

7  everything would be clean here.  And I would go to the

8  window so that before Ms. Perez would be there, I would

9  have enough time to clean all this area here.  Then I

10  would go here.  I would mop this area, and then I would

11  mop all this area from here to here.

12        I would mop everything in front before people

13  would arrive.  All this side, I would mop first.  And then

14  I would finish, and then I would be mopping all the

15  edges -- all the edges, and then I would use my mop again

16  to mop.

17    Q    Okay.  Wasn't it part of your instruction to mop

18  small areas at a time?

19    A    That is the way I would mop.  I would mop here

20  first because if I would mop here first, then I would be

21  close to the areas where they would open here, and I

22  wanted to leave this area free.  How can I explain it to

23  you?  Here -- because it's very small here, and then

24  people would start coming in, and then I would have had a

25  hard time to be mopping here.  I would always finish

1   mopping 15 minutes before 8:00 so that I would have 15

2   minutes to clean this area here in the window to have it

3   ready for Ms. Perez to arrive.

4        Q    So your answer is that you did it your way and

5   not necessarily the way that maintenance handled -- told

6   you to do it?

7        A    They never told me what to do first.  I would do

8   it the way that I would think it was easier to do.

9        Q    Okay.  And when you are talking about 6:15 to

10  8:00, you are talking about in the morning, a.m.?

11       A    Yes, because it would take me about one hour --

12  one hour to finish all this front part, the lobby here --

13  the lobby where the people would go in.

14       Q    Do you remember there ever being a problem with

15  the lights in this post office box area?

16       A    Well, we were having problems -- electric

17  problems with that light because the people from -- the

18  electricians had already arrived, but they were having

19  problems.

20       Q    And this was on the day that Ms. Gloria Guzman

21  fell, isn't it?

22       A    Yes, before she was here -- before she fell, as

23  she said, the electricians had -- had been here, but they

24  hadn't been able to fix the problem yet.

25       Q    So would you agree with me that it was darker

09:36  1    than normal in that area?

09:36  2         A    I don't think it was too dark.

09:36  3              MR. MANN:   Objection, nonresponsive.

09:36  4         Q    (BY MR. MANN)  I didn't ask you if it was too

09:36  5    dark.  I asked you if it was darker than it normally was.

09:36  6         A    Just a little bit.  Almost nothing.

09:36  7         Q    How many more lights were working there?

09:36  8         A    All the lights were working except the one that

09:36  9    was here -- back here.

09:36  10        Q    So except for the one in the area where she fell,

09:36  11   the rest of the lights were on?

09:36  12        A    All the lights were on except for that one,

09:37  13   except for one bulb.  There was one light not working.

09:37  14        Q    What kind of lights are these?

09:37  15        A    Those long ones.  The one was off, and the other

09:37  16   one wasn't.

09:37  17        Q    Okay.

09:37  18        A    But the light, anyway, was there.

09:37  19        Q    When you mop, do you mop with a wet mop or a

09:37  20   wrung-out damp mop?

09:37  21        A    It's -- the mop is not too wet when I mop.  I

09:37  22   don't leave -- I don't leave the area too wet, kind of

09:38  23   just damp.  More dry than wet.

09:38  24        Q    Does the sun in the daytime help illuminate the

09:38  25   hall area where the post office boxes are?

09:38   1      A    Yes.

09:38   2      Q    So visibility is better in the day than it is in

09:38   3   the morning?

09:38   4              THE INTERPRETER:  In the day --

09:38   5              MR. MANN:  Than in the morning.

09:38   6      A    In the morning you can see the same way as in the

09:38   7   daytime because there is a lot of light.

09:38   8      Q    (BY MR. MANN)  So it's easier to see a wet floor

09:38   9   in the morning -- I mean in the day than it is in the

09:38  10   morning?

09:38  11              MS. MASSO:  I will object to the form of the

09:38  12   question.  I don't think that's what she testified to at

09:39  13   all.

09:39  14      A    What do you mean?

09:39  15      Q    (BY MR. MANN)  Would you agree with me that when

09:39  16   you have more light, it's easier to see a wet, just mopped

09:39  17   floor?

09:39  18      A    I don't see a difference, if it's more wet or

09:39  19   less wet, if you can see better during daytime or

09:39  20   nighttime.  It's the same to me.  It's the same.

09:39  21      Q    So if it's pitch dark, you can see a wet floor as

09:39  22   good as you can if it's light out?

09:39  23      A    When it's dark, it's not the same, but it wasn't

09:39  24   dark.

09:39  25              MR. MANN:  Objection, nonresponsive.

09:40    1    Q    (BY MR. MANN)    You obviously remember a lot about

09:40    2    when Ms. Guzman fell, so let's get to that.    Did you see

09:40    3    her fall?

09:40    4    A    No, I didn't see her.

09:40    5    Q    Where -- do you remember where you were when she

09:40    6    fell?

09:40    7    A    I was right here (indicating).    I was right here

09:40    8    in the hall in the lobby.    She was around here, and I was

09:40    9    here on the last P.O. boxes, and I was mopping.

09:40    10    Q    So after she was there, you mopped?

09:40    11    A    The floor was not wet where she fell because I

09:40    12    hadn't started to mop yet.

09:41    13            MR. MANN:    Objection, nonresponsive.

09:41    14    Q    (BY MR. MANN)    You just said that you were

09:41    15    mopping.    Now you're saying that you were not mopping?

09:41    16    A    Well, yes, I was mopping here.    I mopped all this

09:41    17    part here and the tables.    When this lady arrived, when

09:41    18    she was there, I hadn't mopped there.    The first thing

09:41    19    that I mopped was only an edge -- the edges here, but on

09:41    20    this side, on this side.    And when I started to mop, when

09:41    21    I turned facing towards the P.O. boxes, I was walking,

09:41    22    mopping backwards, and she was here.    I realized that she

09:41    23    was sitting down on the floor, but I didn't see her and I

09:42    24    didn't see anything.    I didn't hear anything either, so I

09:42    25    had just started mopping, but it was dry in this area.

```
09:42   1    Where she was sitting down, I hadn't mopped yet.  I mopped
09:42   2    a little bit here, and I realized that she was sitting
09:42   3    there on the floor, that's when I saw her because I
09:42   4    tripped a little bit with her.  That's when I realized she
09:42   5    was there.
09:42   6         Q    You didn't really see where she fell, you just
09:42   7    knew that she fell?
09:42   8         A    I knew that she fell because I tripped with her
09:42   9    with the mop.
09:42  10         Q    Okay.  But you were close to where she was, and
09:42  11    you stated you began mopping this area?
09:42  12         A    I didn't continue.  When she fell, I didn't
09:42  13    continue mopping.
09:42  14         Q    But before she fell, you had mopped something in
09:43  15    that area?
09:43  16         A    Nothing.  Nothing.  There where she was standing,
09:43  17    I hadn't done anything.
09:43  18              MR. MANN:  Objection, nonresponsive.
09:43  19         Q    (BY MR. MANN)  In the post office box area, after
09:43  20    Ms. Guzman was already in the area, you continued to mop
09:43  21    certain sections, correct?
09:43  22         A    No, I hadn't mopped.
09:43  23         Q    Mind you, you are under oath.
09:43  24         A    Here where she was -- I'm not lying to you.
09:43  25    Where she fell, the floor was not wet.  I can swear that
```

1  the floor was not wet.

2      Q    But you don't know where she fell, do you?

3      A    What do you mean by that?  I don't know where she

4  fell.

5      Q    You don't know where she slipped?  You don't know

6  where she fell on the ground?

7      A    I didn't see anything.  I didn't see anything.

8  When she fell, I didn't know.  I didn't hear.  I didn't

9  feel.  I didn't know anything.

10     Q    Had you mopped any part of this post office box

11  area within five minutes of Ms. Guzman's presence in that

12  area?

13     A    I did realize when she arrived -- but all this

14  area was already dry.  I had already mopped this part

15  here, and it was already wet --

16          THE INTERPRETER:  Sorry.  It was already dry.

17     A    It was already dry.  But when she arrived here, I

18  didn't know what time she arrived, but she was here.  She

19  was here standing for a long time.  I didn't mop.  I

20  didn't mop because she was here, so I started to dust some

21  tables that were here in front, but the floor in the area

22  where she fell was not wet.  I can swear that it was not

23  wet.

24     Q    (BY MR. MANN)  How do you know that that is the

25  area she slipped on?

```
09:45  1        THE INTERPRETER:  I'm sorry?
09:45  2    Q   (BY MR. MANN)  How do you know that's the area
09:45  3  she slipped on?
09:45  4    A   Because when I was mopping back, I mopped with
09:45  5  her -- I tripped with her.
09:45  6    Q   Were you facing backwards to her?
09:45  7    A   I was facing here, and she was behind me.
09:45  8    Q   Okay.
09:45  9    A   That's why I didn't see her, and I didn't know
09:45 10  what happened.
09:45 11    Q   Okay.  Did you go behind her out to the front of
09:46 12  the post office at any time while she was present in the
09:46 13  post office at her post office box?
09:46 14    A   What do you mean?  I'm sorry.
09:46 15    Q   The entire time Ms. Guzman was at her post office
09:46 16  box, were you in the same or similar location or did you
09:46 17  pass by her in two different areas of the post office?
09:46 18    A   I don't understand you.
09:46 19    Q   I'm going to point at Deposition Exhibit 2.  You
09:46 20  say that you were here when Ms. Guzman was in the
09:46 21  building.  While she was here where you've written where
09:46 22  she was, did you go anywhere else in the building or were
09:47 23  you always here?
09:47 24    A   As I said, I stayed here.  I didn't leave or go
09:47 25  to another area, and I did not start to mop until she -- I
```

09:47  1   didn't mop, not here in the front, while she was on the

09:47  2   floor.   Everything was dry.

09:47  3              MR. MANN:   Objection, nonresponsive.

09:47  4        A    I had to wait because she was there.   She

09:47  5   remained there for a big while.   I was in a rush because I

09:47  6   wanted to finish because it was about a quarter to 8:00,

09:47  7   and I had to finish cleaning in the area where Ms. Perez

09:47  8   comes.   So, anyway, I waited, and then when I saw that a

09:47  9   long time had passed, I started to mop, but in front of

09:48  10  her here -- here in the back part because I didn't mop in

09:48  11  this area until she passed -- she passed by.   The floor

09:48  12  was not wet when she fell there.

09:48  13       Q    You never saw her slip?

09:48  14       A    No, I didn't see her.

09:48  15       Q    So you don't know where she slipped, then, do

09:48  16  you?

09:48  17       A    No, I don't know how or where.

09:48  18       Q    But you do admit that while Ms. Guzman was there,

09:48  19  you did actually mop some of the floor somewhere in the

09:48  20  building?

09:48  21       A    Not in the area where she was standing.

09:48  22             MR. MANN:   Objection, nonresponsive.

09:48  23       A    It was not wet.

09:48  24       Q    (BY MR. MANN)   Just answer the question that is

09:49  25  asked.   While Ms. Guzman was in the building, you did mop?

09:49   1       A    When she lifted up from here, she came here to

09:49   2   the front where it was already mopped.  But it was dry

09:49   3   here already, and here, when she came to this area, I

09:49   4   started to mop here, but she didn't go back anymore.  She

09:49   5   left and she went -- she went to her home.  She went.

09:49   6               MR. MANN:  Objection, nonresponsive.

09:49   7       Q    (BY MR. MANN)  While Ms. Guzman was in the

09:49   8   building at the post office in Santa Rosa, did you mop?

09:49   9       A    Where?  Where?

09:49  10       Q    It does not matter.  Anywhere.  Did you mop?

09:50  11       A    I didn't start to mop until she moved from this

09:50  12   place and she left.  Then I started to mop here.

09:50  13       Q    So your testimony is that you were not mopping

09:50  14   the floor at any time while Ms. Guzman was in the

09:50  15   building?

09:50  16               MR. ALMAGUER:  Objection as to the form of

09:50  17   the question.  It's a misstatement of the evidence as to

09:50  18   what she testified.

09:50  19               MS. MASSO:  I join in that objection.

09:50  20       Q    (BY MR. MANN)  You can go ahead and answer the

09:50  21   question.

09:50  22       A    What do you mean?  I don't understand what -- I

09:50  23   don't understand you.  I don't understand what you are

09:50  24   trying to tell me.  I did not mop -- when she was here, I

09:50  25   did not mop.  I did not mop anything here.  I did not mop

09:50  1   until she left this place because this is the area that

09:51  2   was not mopped yet.

09:51  3       Q    Do you remember what time this was?

09:51  4       A    When she came here it was already quarter to

09:51  5   7:00.  That's when she stood up from here, and that time I

09:51  6   don't forget because that's the time that I had to come to

09:51  7   this place and sign.  I lost time here in this area

09:51  8   because she remained there for a while.

09:51  9       Q    So you're saying you lost time because you were

09:51  10  supposed to have that area mopped and then moved on to

09:51  11  cleaning the windows, correct?

09:51  12      A    Yes, I had some time here -- about losing time

09:51  13  because I didn't want to mop this side because she was

09:51  14  here.

09:51  15      Q    And you stated earlier, I believe, that you

09:52  16  mopped the window counter section first, and then you went

09:52  17  to this P.O. box area next?

09:52  18      A    I mopped all this area here.  At 6:00 I start to

09:52  19  clean and mop because it almost takes me an hour to mop

09:52  20  all this here.

09:52  21      Q    Okay.

09:52  22      A    And it was a quarter to -- 15 minutes were

09:52  23  missing.  It was already 15 minutes late.  It was time for

09:52  24  me to be here because I was waiting for her to move.

09:52  25      Q    What happened once you bumped into her?

09:52   1        A    I asked her what had happened to her and why she
09:52   2   was there.    That's when she told me that she had fallen.
09:53   3        Q    Did anyone else from the United States Postal
09:53   4   Service come to that area?
09:53   5        A    There was nobody, just us -- she and I.
09:53   6        Q    Why didn't you place a wet sign in this area if
09:53   7   you had already mopped in this area and this area was
09:53   8   already dried?
09:53   9        A    Because I hadn't started mopping here.
09:53   10        Q    Were you going to move the sign over here when
09:53   11   you started mopping?
09:53   12        A    I placed it -- when I placed the sign, I put it
09:53   13   turned like this because I am not allowed to put it here
09:53   14   because people can trip with the sign.
09:54   15        Q    So you were expressly told not to put the sign in
09:54   16   this area?
09:54   17        A    Well, I was told not to put here the bucket nor
09:54   18   the sign because people that come here can trip or
09:54   19   something.
09:54   20        Q    Well, who told you that?
09:54   21        A    At the post office.    I was told that it was not
09:54   22   okay for me to put the bucket here, and if I would put it
09:54   23   here, I had to turn it so that people would notice that
09:54   24   the floor was wet on this side.
09:54   25        Q    Okay.    I got it about this part.    I'm just trying

09:54  1  to find out who told you at the post office, "Don't put
09:54  2  the sign here and don't put the mop here."
09:54  3       A    No, no one told me.
09:54  4       Q    Well, how did you know not to put it there, then?
09:55  5       A    Only because I thought that if I would put it
09:55  6  here, people -- people would turn here and trip with the
09:55  7  bucket or with the sign.
09:55  8            MR. MANN:  Can you read back some of her
09:55  9  deposition, a few questions ago, where she responded,
09:55  10  "They told me not to put the mop and sign in that area
09:55  11  because someone would trip."  Would you read it back for
09:56  12  her please?
09:56  13            THE REPORTER:  Question:  "So you were
09:56  14  expressly told not to put the sign in this area?"
09:56  15            Answer:  "Well, I was told not to put here
09:56  16  the bucket nor the sign because people that come here can
09:56  17  trip or something."
09:56  18            Question:  "Well, who told you that?"
09:56  19            Answer:  "At the post office.  I was told
09:56  20  that it was not okay for me to put the bucket here, and if
09:56  21  I would put it here, I had to turn it so that people would
09:56  22  notice that the floor was wet on this side."
09:56  23       Q    (BY MR. MANN)  Do you now want to change your
09:56  24  answer to the last response?
09:56  25       A    Yes.  Yes.

```
09:56   1        Q    It's okay to go ahead and tell me who told you
09:56   2   that.
09:56   3        A    I was wrong with that question.  I was wrong.  On
09:56   4   my own, I would think that -- that I should not put the
09:56   5   bucket nor the sign here because when people turn, people
09:57   6   would trip or would get hurt.
09:57   7        Q    So no one told you, then, and the last response
09:57   8   was incorrect?
09:57   9        A    No.  Yes, it was incorrect.
09:57  10        Q    Is there anything else in the deposition so far
09:57  11   that is incorrect that you need to fix?
09:57  12        A    No, everything is correct because the most
09:57  13   important thing is that where the lady was, the floor was
:57  14   not wet when she fell.
09:57  15             MR. MANN:   Objection, nonresponsive.
09:57  16        Q    (BY MR. MANN)  Where were the supplies and
09:57  17   buckets located when you started in the morning?
09:58  18        A    I would put them here.  I would put the bucket
09:58  19   here and here the sign.
09:58  20        Q    I'm starting a little bit before you -- where is
09:58  21   the closet that they were located in?
09:58  22        A    I would keep them in a closet that they have,
09:58  23   like a utility place there.  I had space to take the water
09:58  24   and all that.
09:58  25        Q    And you had a key to this closet?
```

09:58  1      A    They would not lock this closet because -- so I

09:58  2  would come in, and I would take my things out of there.  I

09:58  3  would keep the keys only from the main door, and when I

09:58  4  was going to clean this area where the windows are, and to

09:59  5  enter inside, which is the same key.

09:59  6      Q    So you're saying that you could enter into the

09:59  7  back of the post office without a key?

09:59  8      A    No.  No, I can't enter from the back part.  I

09:59  9  can't.

09:59  10     Q    How did you get to the utility area again?

09:59  11     A    I would enter from the front door, and then I

09:59  12  would enter through here to go to the office.

09:59  13     Q    And the office was unlocked at all times?

09:59  14     A    She would lock them all the time.

09:59  15     Q    Who is "she"?

09:59  16     A    Ms. Perez or the person who would remain there at

09:59  17  the end.

09:59  18     Q    Was Ms. Perez there every morning that you

10:00  19  started or at least some other person?

10:00  20     A    No, I would start, and then Lydia would come in.

10:00  21  We would start together, and Ms. Perez would arrive at

10:00  22  8:00.

10:00  23     Q    Who is Lydia?

10:00  24     A    She is one of the workers that she has there, a

10:00  25  person that works for her all the time.

10:00    1    Q    And she had the key to the office so that you

10:00    2    could get to the back?

10:00    3    A    Yes, she was inside -- no.  No, wait.  She didn't

10:00    4    have any keys to go to the back.  The only way we were

10:01    5    able to leave that area was to -- we were able to go out

10:01    6    from the inside, but we are unable to go back.

10:01    7    Q    Maybe you're missing my question.  I'm just

10:01    8    trying to find out who opens the door for you at 6:00 if

10:01    9    the person who, with the keys, didn't get there until

10:01    10    8:00?

10:01    11    A    They gave me keys for me to go in.

10:01    12    Q    Okay.

10:01    13    A    I have keys to go in because I would start -- I

10:01    14    would enter there half an hour before them.

10:01    15    MS. MASSO:  I think she said that the

10:02    16    Postmaster locked everything up at night.  She didn't say

10:02    17    anything about her having the only keys so --

10:02    18    MR. MANN:  I asked her if she had a key to

10:02    19    get in, and she said, no, she didn't have any keys, but

10:02    20    now she said she has keys.  That's fine.  It took a long

10:02    21    time to get there.

10:02    22    A    They would give me keys for me to go in because

10:02    23    they asked me to get there at 6:00, and then they changed

10:02    24    it to 6:30.

10:02    25    Q    (BY MR. MANN)  Okay.  Were you ever a regular

```
10:02   1    employee with the United States Postal Service?
10:02   2                    MR. ALMAGUER:   Objection to the form of the
10:02   3    question.   That's asking for a legal conclusion.
10:02   4        Q    (BY MR. MANN)  Go ahead and answer the question.
10:02   5        A    Can you ask me again, please?
10:02   6        Q    Were you ever a regular employee of the United
10:03   7    States Postal Service?
10:03   8                    MR. ALMAGUER:   Same objection.
10:03   9        A    Besides this job?
10:03  10        Q    (BY MR. MANN)  No, what I'm asking is:  Did you
10:03  11    ever get a W-2 from the United States Postal Service
10:03  12    directly?   A W-2 is an IRS form.
10:03  13        A    What for, to file?
10:03  14        Q    To file taxes.
10:03  15        A    Yes, they would send me something.
10:03  16        Q    The United States Postal Service would?
10:03  17        A    I don't remember, but I would get some forms --
10:03  18    that form to file my income.
10:03  19        Q    Did you get any benefits from the United States
10:03  20    Postal Service directly?
10:04  21        A    Not directly.  I had to file every year to get it
10:04  22    with my husband, and then I would have to pay my interest.
10:04  23    Isn't it correct?
10:04  24                    MR. OLIVAREZ:  Sir, I pay her taxes.
10:04  25                    MR. ALMAGUER:  No.
```

10:04  1    Q    (BY MR. MANN)  I'm not concerned about who paid

10:04  2  your taxes or if you got a refund.

10:04  3    A    Yes.  Yes, I understand.  My husband would pay

10:04  4  for the taxes.

10:04  5    Q    What I'm asking is what your working relationship

10:04  6  was with the Indianapolis company versus if you worked

10:04  7  directly at any point in time for the United States Postal

10:05  8  Service?

10:05  9    A    Every year they would give me a raise, $.25 every

10:05  10  year.  It would depend, yes.  That's the way they would

10:05  11  send me things.  Something like that, you mean?

10:05  12    Q    No.  What I'm asking is:  Were you always working

10:05  13  under this contract from Indianapolis or was there ever a

10:05  14  different situation?

10:05  15    A    It was the same thing.  The problem is that they

10:05  16  stopped sending me my check for almost one month, and

10:05  17  that's the reason why I changed to the post office.

10:06  18    Q    When did you change to the post office?

10:06  19    A    I don't remember.  I don't remember.

10:06  20    Q    Was it before Ms. Guzman fell or after?

10:06  21    A    After.

10:06  22    Q    Was it soon after or was it a long time after?

10:06  23    A    Long before -- long after that happened.

10:06  24    Q    Did you get any benefits that you didn't

10:06  25  previously receive once you switched directly with the

```
10:06    1   United States Postal Service?

10:06    2       A    Benefits like what?

10:07    3       Q    I'm just asking the question.  Medical?

10:07    4       A    No, they didn't give me anything like that.  They

10:07    5   didn't give me any benefits.

10:07    6       Q    Were -- once you switched to being directly

10:07    7   employed by the United States Postal Service, were you

10:07    8   ever told to mop the floor and do all of your maintenance

10:07    9   items any different than you had previously done?

10:07   10       A    They didn't tell me anything.

10:07   11       Q    Okay.

10:07   12       A    Everything continued the same way.

10:07   13       Q    Everything regarding your contact with the United

10:07   14   States Postal Service employees on-site was the same as

10:08   15   before?

10:08   16       A    Everything was the same as always.

10:08   17       Q    You didn't get a new manual from the United

10:08   18   States Postal Service?

10:08   19       A    No.

10:08   20       Q    Have you talked to anyone besides your attorney

10:09   21   about this accident that occurred November 12th, 1999?

10:09   22       A    No, only with my husband.  I spoke with him, and

10:09   23   I told him what had happened.

10:09   24       Q    What did you tell him?

10:09   25       A    That the lady -- well, according to her, she said
```

| | | |
|---|---|---|
| 10:11 | 1 | A     I don't know.  I cannot tell you.  I don't know. |
| 10:11 | 2 | Q     Did you deal with her on a daily basis? |
| 10:11 | 3 | A     What kind of contact do you mean? |
| 10:11 | 4 | Q     Well, you testified a while ago that she was in |
| 10:11 | 5 | that utility area with you when you got the mops? |
| 10:11 | 6 | A     She would not get with me here.  She would not go |
| 10:11 | 7 | in with me here where I would come and pick up my buckets |
| 10:12 | 8 | or anything. |
| 10:12 | 9 | Q     Who would you tell when you needed a new mop |
| 10:12 | 10 | bucket? |
| 10:12 | 11 | A     Ms. Perez. |
| 10:12 | 12 | Q     So any time you needed some supplies or had |
| 10:12 | 13 | questions regarding your job duties, you would ask |
| 10:12 | 14 | Ms. Perez? |
| 10:12 | 15 | A     Everything.  Everything to Ms. Perez.  She's the |
| 10:12 | 16 | one who would bring me anything that I would need.  She |
| 10:12 | 17 | would bring it to me. |
| 10:12 | 18 | Q     Ms. Perez never told you where to put signs or |
| 10:12 | 19 | where not to put signs? |
| 10:12 | 20 | A     When I started to work, she told me, "You put |
| 10:12 | 21 | this here," because I didn't know where to put it, you |
| 10:12 | 22 | see.  And she told me, and there I would put them.  That |
| 10:12 | 23 | was the safest place to put them so people that would come |
| 10:12 | 24 | in would not trip. |
| 10:13 | 25 | Q     Okay.  So Ms. Perez is probably the one that told |

10:13  1   you not to put the sign in this area here because people

10:13  2   would trip?

10:13  3              MS. MASSO:  I object to the form of that

10:13  4   question.  We believe that she changed her answer to that

10:13  5   earlier, and now you are changing the testimony in the

10:13  6   form of that question.

10:13  7              MR. MANN:  I don't think there's a proper

10:13  8   objection there, but --

10:13  9              MS. MASSO:  Well --

10:13  10      Q    (BY MR. MANN)  Please go ahead and answer the

10:13  11  question.

10:13  12      A    Ask me again, please.

10:13  13      Q    So Ms. Perez was probably the person, if there

10:13  14  was a person, that told you to put -- to not put a sign in

10:13  15  this area because people would trip?

10:13  16             MS. MASSO:  I still object to the form of the

10:13  17  question.

10:13  18      A    I don't remember who was the one who told me, but

10:14  19  when I started working at first, when I would work, she

10:14  20  would put it there, and that's where I would put it as

10:14  21  well.

10:14  22      Q    Well, there wasn't anyone from Indianapolis in

10:14  23  Santa Rosa, was there?

10:14  24      A    No, nobody came.

10:14  25      Q    So no one from Indianapolis told you anything

1   about where to put signs or how to mop?

2       A    They never came.  They never came.  They never

3   told me anything.

4       Q    So if anyone told you anything, it would have had

5   to be a U.S. Postal Service employee?

6       A    They told me that I could put the wet sign floor

7   here when I would mop here so that people would understand

8   that I was mopping here.  I was -- that I was working.

9       Q    I understand that, and I believe you when you say

10  that.  I'm just trying to find out if the person that told

11  you that worked for the U.S. Postal Service.

12      A    No, it wasn't her.  They didn't tell me.  It was

13  not them who told me.

14      Q    It was someone from Indianapolis, then?

15      A    No.  The person that would work there before I

16  worked were the people who told me that they would put --

17  that I could put the bucket there and the sign here.

18      Q    Oh, okay.  Who was that person; do you remember?

19      A    No, I don't remember.  I don't remember.

20      Q    Did they work for the Indianapolis company before

21  you?

22      A    No, because this young lady -- or lady did not

23  last too long at work.

24      Q    So she was still working there when they hired

25  you?

10:16   1      A    Yes, I went with her so she could tell me what to

10:16   2   do and how I needed to start doing the job and

10:16   3   everything -- the work and everything.

10:16   4      Q    And then they fired her?

10:16   5      A    She -- she couldn't work anymore because she

10:16   6   already had another job.

10:16   7      Q    Okay.  So she quit?

10:16   8      A    Yes.

10:16   9      Q    Okay.  Is it your understanding that the United

10:17   10  States Postal Service retained the power -- the authority

10:17   11  to tell you whether, where, how, and why to mop?

10:17   12              MS. MASSO:  And what?  What was the --

10:17   13              MR. MANN:  And why.

10:17   14     A    Why to mop?  I'm sorry.

10:17   15     Q    (BY MR. MANN)  For what reason.  Let me restate

10:17   16  the question.

10:17   17     A    To teach me.

10:17   18     Q    Is it your understanding that the United States

10:17   19  Postal Service could tell you whether to mop, where to

10:17   20  mop, how to mop, and for whatever purpose that mopping was

10:17   21  required?

10:17   22              MR. ALMAGUER:  Objection to the form of the

10:18   23  question.  It's a compound question.

10:18   24     Q    (BY MR. MANN)  I'll rephrase it.  Did the United

10:18   25  States -- is it your understanding that the United States

10:18  1    Postal Service had the power and control to tell you

10:18  2    whether to mop?

10:18  3        A    Yes.  Yes, I understand that.  They can tell me

10:18  4    what.

10:18  5        Q    And they can tell you where to mop?

10:18  6        A    That they can tell me, like Ms. Perez or

10:18  7    something like that?

10:18  8        Q    Yes.

10:18  9        A    I don't know that.  I would mop my way on the

10:19  10   jobs that I have always done.  Everybody was satisfied the

10:19  11   way I would do my work.  Still they were very happy.  They

10:19  12   were very satisfied with the work that I was doing, the

10:19  13   way I was doing it.

10:19  14       Q    My question is:  Do you feel or understand that

10:19  15   the Postal Service could tell you, "Mop that area there"?

10:19  16       A    Yes, they can tell me, but it all depends.

10:19  17            MR. MANN:    Objection to the second part of

10:19  18   the question.

10:19  19       Q    (BY MR. MANN)  And they could -- you said the

10:19  20   Postal Service could tell you how to mop?

10:19  21       A    That, I don't know.  I'm not sure about it.

10:19  22       Q    Well, they could tell you where to place the

10:19  23   signs, couldn't they?

10:20  24       A    Oh, yes, of course.  Yes, they can tell me where

10:20  25   to mop, then.

```
10:20   1        Q    Okay.  It wasn't anyone from Indianapolis that
10:20   2   called and told you where to place the signs or where to
10:20   3   mop or how to mop?
10:20   4        A    Not with the contract, nobody told me.  They
10:20   5   never went there.  They would just call and ask me how I
10:20   6   was doing my job, and they would give good references
10:20   7   about me.  Every year they would check on me.
10:20   8        Q    Okay.  And until they missed the checks and
10:20   9   didn't pay you, you were fine with them?
10:20   10       A    Then that's when I called.  I called them and the
10:21   11  same lady told me if I wanted to -- because sometimes I
10:21   12  needed money for important things that I needed, and I
10:21   13  needed that -- at that time I needed the money.  That's
10:21   14  when they asked me that -- she said that if I wanted, they
10:21   15  could pay me from the post office money so I wouldn't have
10:21   16  a hard time with the checks.  That's when I switched, but
10:21   17  that was when I was ready to leave the job.
10:22   18       Q    Okay.  Do you know if anyone else ever fell in
10:22   19  the post office?
10:22   20       A    This is the first time that this happened, but I
10:22   21  don't know if nobody else had fallen.
10:22   22       Q    Okay.  Did you do anything different after she
10:22   23  fell?
10:22   24       A    No, everything continued the same way as the way
10:22   25  I would do it.  It's the same way I would always do it,
```

10:22 1    yes.

10:22 2        Q    Did you ever talk to anyone from the Indianapolis

10:22 3    contracting company after the fall regarding anything

10:22 4    other than your paycheck and your yearly check-ins?

10:22 5        A    No, I never called.

10:23 6        Q    Okay.

10:23 7            MR. MANN:    I'll pass the witness.

10:23 8                    EXAMINATION

10:23 9    BY MS. MASSO:

10:23 10       Q    Ms. Olivarez, my name is Nancy Masso.    I

10:23 11   represent the United States in this lawsuit, and I'll try

10:23 12   to be more brief than Mr. Mann.    I'm going to ask you a

10:23 13   little bit about the nature of your work with the post

10:23 14   office, and a little bit about the incident that happened

10:23 15   involving Ms. Guzman -- or Mrs. Guzman.    You had mentioned

10:23 16   that you had other jobs; is that right?

10:24 17       A    Yes, in hospitals and nursing homes.

10:24 18       Q    And were all these jobs the type where you would

10:24 19   be mopping or cleaning or dusting?

10:24 20       A    Yes, the same way like here at the post office.

10:24 21       Q    Did you have any of these jobs at the same time

10:24 22   that you were working at the post office?

10:24 23       A    No, I only worked here at the post office.

10:24 24       Q    Okay.    And when you said that you stopped working

10:24 25   at the post office, was that because you quit or you

1   retired?

2       A    I stopped working because I was feeling tired and

3   ill.  I wasn't feeling well.

4       Q    During the time that you were working at the post

5   office, was -- did anybody at the post office tell you,

6   "You cannot go and mop offices at the Sheriff's Department

7   or the hospital"?

8           MR. MANN:   Objection, form.

9       A    No.  Can you ask me again?

10      Q    (BY MS. MASSO)  Well, did anybody tell you that

11  you couldn't mop the floor somewhere else in addition to

12  mopping the floors at the post office?

13          MR. MANN:   Objection, hearsay.

14      A    No, nobody did.

15      Q    (BY MS. MASSO)  Nobody told you that you couldn't

16  go?

17          MR. ALMAGUER:  Objection to the form of the

18  question.

19      A    Nobody told me not to do it.

20      Q    (BY MS. MASSO)  And did you feel that you -- if

21  you wanted to go and mop floors at the Sheriff's Office

22  for an hour, let's say, would there be anything that --

23  from the post office that would stop you from seeking that

24  job?

25          MR. ALMAGUER:  Objection to the form,

1    argumentative also.

2              MR. MANN:   Objection, form.

3       A    I don't know.  I don't know.

4       Q    (BY MS. MASSO)  The job that you had at the post

5    office, how long were you actually on the premises of the

6    post office to complete your job?

7       A    In this post office how long?

8       Q    Yes.

9       A    How long at work there?

10      Q    Right.  Did you go in five days a week?

11      A    Monday through Friday.

12      Q    And on average, how long would you be there on a

13   daily basis?

14      A    One hour or 45 minutes.  One hour and 45 minutes.

15   That's what I would work there.

16      Q    And then you were free to go --

17      A    Yes.

18      Q    -- and spend the day as you pleased?

19      A    Yes.

20      Q    And you could even have gotten another job during

21   the same day?

22             MR. ALMAGUER:  Objection as to form,

23   speculative.

24      A    No, I wasn't working, only here at the post

25   office.

10:27  1      Q    (BY MS. MASSO)  I know, but -- and I understand

10:27  2   that, but did Ms. Perez ever say to you, "I don't want you

10:28  3   to get another job"?

10:28  4      A    No, she never told me anything.

10:28  5      Q    Okay.  In terms of your work there at the post

10:28  6   office, you were never asked to sort mail or receive mail?

10:28  7      A    From the post office boxes?

10:28  8      Q    Yes.

10:28  9      A    Like mail for me or --

10:28  10     Q    No, I'm just saying did they ever ask you to go

10:28  11  and do anything other than mop the floors and dust?

10:28  12     A    No.

10:29  13     Q    May I see Exhibit 2?  I'm pointing to this large

10:29  14  rectangle, which to me is on the left side of the diagram.

10:29  15  It says P.O. boxes and P.O. boxes here, and there are P.O.

10:29  16  boxes on this side as well, aren't there?

10:29  17     A    Yes.

10:29  18     Q    Okay.  Are there any windows located down this

10:29  19  wall?

10:29  20     A    Here in this hall there is a big window.

10:29  21     Q    Could you -- I see that you're trying to put a

10:29  22  mark there.  Could you put a mark where that window is?

10:29  23  You can but a big "W" if you want to.

10:29  24     A    (Witness complies.)

10:29  25     Q    Okay.

10:29   1    A    From here to here there is a window.

10:29   2    Q    Okay.  And you have made a mark here.  It kind of

10:30   3    looks like a "Y" from my angle, and was there -- on the

10:30   4    day that Ms. Guzman apparently fell, was that window --

10:30   5    were there any blinds on that window?

10:30   6    A    No, it didn't have anything.

10:30   7    Q    Was there light showing through that window?

10:30   8    A    Yes, a lot of light would come in and off.

10:30   9    Q    Uh-huh.  And it wasn't raining that morning, was

10:30   10   it?

10:30   11   A    No, it wasn't raining.

10:30   12   Q    And if I remember -- if I understood your

10:30   13   testimony correctly, you said that Ms. Guzman entered and

10:30   14   apparently went to her post office box.  Is her post

10:30   15   office box located here?

10:31   16   A    On this side where she was standing, yes, there

10:31   17   are.

10:31   18   Q    Was this the first time you had ever seen

10:31   19   Ms. Guzman in the post office?

10:31   20   A    To be quite honest, I don't know her.

10:31   21   Q    Okay.  And you said she spent quite a bit of time

10:31   22   there?

10:31   23   A    In her lawsuit that she -- when she filed, that

10:31   24   around 7:00 or 7:15 she was there.  She was there quite a

10:31   25   bit of time because when I finished, it was already a

```
10:31  1   quarter to 8:00, so when she lifted herself up and stopped
10:32  2   doing what she was doing, it was already late for me
10:32  3   because I should have been there before.
10:32  4       Q    But did you actually observe Ms. Guzman standing
10:32  5   in this corridor by her post office box?
10:32  6       A    She was standing there.  That's the reason why I
10:32  7   couldn't mop because she was there.
10:32  8       Q    And if I understood your testimony earlier, you
10:32  9   mentioned that you were doing -- dusting some tables or
10:32 10   something over here waiting for Ms. Guzman to leave the
10:32 11   area?
10:32 12       A    Yes.
10:32 13       Q    And she was taking quite a while?
10:32 14       A    To me, it took her some time because when she
10:33 15   fell, it was time for me to have already finished mopping
10:33 16   here and to enter this area.
10:33 17       Q    Okay.  And did you have an opportunity to observe
10:33 18   Ms. Guzman while she was standing here, what was taking
10:33 19   her so long?
10:33 20       A    She was looking at some letters.
10:33 21       Q    Did she seem distressed or concerned at all?
10:33 22       A    To me, she was there for a while before she fell.
10:33 23   She was there for a while.
10:33 24       Q    But did you -- did you take note of anything of
10:33 25   her demeanor before she fell?
```

```
10:33   1        A    When I realized that she had fallen, I asked her
10:34   2    what had happened to her.  She said that she had fallen,
10:34   3    so I asked her how she had fallen because I hadn't seen
10:34   4    her or I hadn't heard anything because I was here, and
10:34   5    she -- in the front, and she was here behind me so I
10:34   6    didn't see her.  When she slipped, I didn't see her.  When
10:34   7    she slipped or if she would have fallen, whatever.
10:34   8        Q    Did you notice her mood at all, what it was like
10:34   9    before she fell?
10:34  10        A    She was okay.
10:34  11        Q    Okay.
10:34  12        A    I think I didn't feel anything that like she had
10:34  13    problems.
10:34  14        Q    Now, what kind of footwear was Ms. Guzman wearing
10:34  15    that day?
10:35  16        A    I don't remember very well, but --
10:35  17             THE INTERPRETER:  Can I ask what she means by
10:35  18    (speaking Spanish)?
10:35  19             MS. MASSO:  I don't have a problem with that.
10:35  20             MR. MANN:  I don't have a problem with that.
10:35  21        A    Like shoes with a high heel.
10:35  22        Q    (BY MS. MASSO)  Do you know how high the heel
10:35  23    was?
10:35  24        A    No, I don't remember.  But they were shoes with
10:35  25    high heels, but I don't know how the shoes were.
```

10:35  1      Q    Were the heels like the narrow pointed ones or

10:35  2  were they the wide ones?

10:35  3      A    I think they were thin ones, pointed ones, but

10:35  4  I'm not sure.

10:35  5      Q    I'm sorry?

10:35  6      A    Thin, but I'm not quite sure.

10:35  7      Q    And if I also -- if I understood your testimony

10:36  8  correctly, you decided to start your mopping at the end of

10:36  9  this hallway, right, behind Ms. Guzman?

10:36 10      A    At the same time that I started to mop, I took

10:36 11  time to mop slowly so she would have time, and I wanted to

10:36 12  see if she would move.

10:36 13      Q    Okay.  So you didn't mop any of this area in that

10:36 14  side?

10:36 15      A    It wasn't wet here.  It wasn't wet here.  When

10:36 16  she fell, it was dry here because I was just going to

10:36 17  start mopping there.

10:36 18      Q    Okay.  Put this area from, let's say the window

10:36 19  all the way to her, you hadn't mopped except for this part

10:37 20  here?

10:37 21      A    All this had already been mopped and dried when

10:37 22  she went in.  It was already dry.

10:37 23      Q    Okay.

10:37 24           MS. MASSO:  I'll pass the witness.

10:37 25          MR. ALMAGUER:  Do you mind if we take a quick

10:37  1  break?  I just want her to take a quick break.  I only

10:37  2  have a few questions.

10:37  3              MR. MANN:  All right.  No problem.

10:37  4              (Brief recess.)

10:44  5                        EXAMINATION

10:44  6  BY MR. ALMAGUER:

10:44  7      Q    Ms. Olivarez, my name is Pablo Almaguer.  You

10:44  8  know me.  I'm going to ask you a few questions to follow

10:44  9  up with the questions the attorneys here asked you, and

10:44  10  excuse me if I repeat some questions to clarify some

10:45  11  stuff --

10:45  12      A    Yes.

10:45  13      Q    -- but we're almost done here, I hope.

10:45  14      A    It's okay.  Hopefully.

10:45  15      Q    And before we begin -- before we begin our

10:45  16  questions here, I want to take a careful, closer look at

10:45  17  Deposition Exhibit No. 2.  Would you agree with me that

10:45  18  it's labeled as Deposition Exhibit No. 2 at the bottom of

10:45  19  the page?  Let me point, ma'am, at the bottom here.  It

10:45  20  says Deposition Exhibit No. 2.

10:45  21      A    Oh, Deposition No. 2, correct.

10:45  22      Q    Okay.  And you have been looking at this page and

10:46  23  answering the questions concerning this diagram.  You have

10:46  24  actually turned it upside down; isn't that correct?

10:46  25      A    Yes, because that's -- otherwise, I don't

1    understand.

2        Q    Why is it that you understand it this way?

3        A    It was far away there, and I left it like that.

4        Q    Okay.

5        A    But I do understand.

6        Q    That's fine.  I just wanted to know.  Where is

7    the entrance to the post office according to this diagram?

8        A    From the outside to the inside?

9        Q    Yes.

10        A    Here.

11        Q    Okay.  And that's labeled already as entrance.

12    You can read that word there?

13        A    I don't -- I cannot see well.  Yes, but I do

14    understand.

15        Q    Tell me what -- tell me where the utility closet

16    is at again.

17        A    I have to go inside from here and go this way

18    back behind and pick up -- or, well, rather from here it's

19    closer.  It's easier, and we get in through here.  Here

20    are the bathrooms, and here there's a utility closet.

21        Q    Okay.  And can you point with the pen to the

22    entrance to that area from the lobby?

23        A    Here.  Here is the lobby.

24        Q    That's fine.

25        A    And here's the entrance to go inside.

```
10:47   1      Q    Right there where your pen is indicating, can you
10:47   2   indicate that with a letter "A"?
10:47   3      A    Yes.   (Witness complies.)
10:48   4      Q    Okay.  You did it upside down.  Do it the way
10:48   5   you're looking at it, though.
10:48   6      A    I'm sorry.  (Witness complies.)
10:48   7      Q    Okay.  And then you mentioned where you put the
10:48   8   sign the day of the accident.
10:48   9      A    Yes, I go out and I put the sign here.
10:48   10     Q    With -- where do the post office boxes start on
10:48   11  that wall there?
10:48   12     A    They start here, but it's just -- it's a short
10:48   13  lobby.
10:48   14     Q    Okay.
10:48   15     A    And all the way here, there are post office
10:48   16  boxes, and all this -- all this area, there are post
10:48   17  office boxes.
10:48   18     Q    And would you mention that -- I'm sorry.  Where
10:48   19  you mentioned that the post office boxes start, can you
10:49   20  mark that with a letter "B"?
10:49   21     A    With a letter?
10:49   22     Q    Yes.
10:49   23     A    Yes.  (Witness complies.)
10:49   24     Q    Letter "B."  That's fine.
10:49   25     A    Here and here.
```

```
10:49  1      Q    Okay.  Now, hold on.  We've got a "B" and a "1";
10:49  2   isn't that correct?
10:49  3      A    I was going to write another letter "B".
10:49  4      Q    Okay.  Stop there.  You don't want to write on it
10:49  5   too much, here.  Can you please scratch one out?  You put
10:49  6   another "B" over here on the side; is that correct?
10:49  7      A    (Witness nods head.)
10:49  8      Q    Why did you put that "B" over there on the side?
10:49  9      A    Because there are P.O. boxes here.
10:49  10     Q    Well, can you mark this other section with a "C,"
10:49  11  then, over here on the side?
10:49  12     A    Where?
10:49  13     Q    The one you mentioned here, the second "B."
10:49  14     A    (Witness complies.)
10:49  15     Q    Okay.  Let me get this correct.  According to the
10:50  16  testimony, you put the sign, on November 19th [sic], the
10:50  17  day of the accident, by the letter "B," is that correct?
10:50  18     A    Yes.
10:50  19     Q    Okay.  And you mopped from that area over by the
10:50  20  area where the letter "C" is at; is that correct?
10:50  21     A    I mopped all this -- all this lobby up to here.
10:50  22     Q    Where the letter "B" is at?
10:50  23     A    Yes, because this is where the P.O. boxes are.  I
10:50  24  had already mopped all this area, and all this up to here
10:50  25  only.
```

54

10:50   1       Q     And then you went up to the letter -- well, which
10:50   2    side of the hallway there did you keep on mopping before
10:51   3    you realized that Ms. Gloria had fallen down?
10:51   4       A     Where did I start first?
10:51   5       Q     Which side did you mop in that hallway there?
10:51   6       A     She fell down here, and I was just going to start
10:51   7    mopping here.
10:51   8       Q     Had you marked the area by the letter "C" -- had
10:51   9    you already mopped the area by the letter "C"?
10:51   10      A     Only on just the edges.
10:51   11      Q     Okay.  And where were you, again, when you said
10:51   12   that you saw Ms. Guzman trip?
10:51   13      A     When I bumped with her?
10:51   14      Q     Yeah.  Where were you mopping at this time, yes?
10:51   15      A     I was just going to start mopping here.
10:51   16      Q     Outside of that diagram, then, can you mark that
10:51   17   with a letter "D" so we'll know which area you were
10:52   18   talking about?
10:52   19      A     Here?
10:52   20      Q     On top of it.  Outside of it.  Around here, ma'am
10:52   21   (indicating.)
10:52   22      A     (Witness complies.)
10:52   23      Q     So right by that letter "D" -- the wall by the
10:52   24   letter "D," you were mopping at that time?
10:52   25      A     Yes, here.

10:52  1    Q    Okay.  And you were going backwards?

10:52  2    A    Yes, I was going backwards.

10:52  3    Q    Now, with a letter "E," outside of this diagram

10:52  4  here, where is more or less, Ms. Gloria Guzman's post

10:52  5  office box as far as you know?

10:52  6    A    I don't know more or less where.  I don't know

10:52  7  more or less where it was.

10:52  8    Q    Okay.  Can you mark with a letter "E", though,

10:52  9  that wall where she fell?

10:52  10   A    Here.  (Witness complies.)

10:53  11   Q    Yes.  Okay.  That "E" is facing you.  That's

10:53  12  fine.  That's fine.  I just wanted to clarify that because

10:53  13  there is no video here and we're pointing back and forth,

10:53  14  and she's only recording this.

10:53  15   A    It's okay.

10:53  16   Q    Okay.  Apart from the window there you marked

10:53  17  earlier when Ms. Masso asked you to do that, is there

10:53  18  another window in that area?

10:53  19   A    Yes, there's another one here on this side.

10:53  20   Q    Can you mark it the same way you did the first

10:53  21  window?

10:53  22   A    (Witness complies.)

10:54  23   Q    Okay.  When you noticed Ms. Guzman fell down, did

10:54  24  you hear anything right before that?

10:54  25   A    No, I didn't hear anything.

10:54  1      Q    No one screamed?  No one said anything?  No one

10:54  2  asked for your help?

10:54  3      A    No, nothing.

10:54  4      Q    You noticed she was -- did she ask you for help?

10:54  5      A    No, she didn't ask me for help.

10:54  6      Q    How did she get up?

10:54  7      A    She was getting up by herself.  She was getting

10:54  8  up, and when I noticed that she was there because I bumped

10:54  9  with her, that's when I turned that I saw her.  She

10:54  10  remained there sitting down for sometime.  I asked her

10:55  11  what had happened to her and why she was there, and she

10:55  12  said that she had fallen.

10:55  13      Q    When she got up, did she grab her ankle or her

10:55  14  knee or her leg?

10:55  15      A    She didn't grab anything.

10:55  16      Q    Did she grab onto the post office box or to the

10:55  17  wall when she got up?

10:55  18      A    No, she got up with her hands on the floor.

10:55  19      Q    About how long did you say, again, in minutes

10:55  20  that she was standing there before she left?

10:55  21      A    I don't know exactly because when she got up from

10:56  22  here, she came here, and then I started to mop.  But I did

10:56  23  not pay any attention to everything else because it was

10:56  24  already late for me to finish doing the job there.

10:56  25      Q    She didn't stop to talk any with Ms. Lydia or

10:56    1    Ms. Perez?

10:56    2         A    No, she didn't talk to anybody.  She left.

10:56    3         Q    Okay.  Did you ever -- did you see her when she

10:56    4    was walking out of the post office -- when she was walking

10:56    5    out?

10:56    6         A    I saw her when she got up from here.  I saw to

10:56    7    check if she was limping or something, but she was walking

10:56    8    well.

10:56    9         Q    Okay.

10:57    10        A    But when she went out, I did not pay attention if

10:57    11    she was limping or if she was hurting.

10:57    12        Q    That's fine.

10:57    13        A    I'm sorry.  Can I tell you -- when she was

10:57    14    halfway up, I felt bad, and I tried to help her to get up

10:57    15    because I thought that she was going to have problems in

10:57    16    getting up, but she didn't.  She was very light.  She was

10:57    17    very light to me.  She didn't force herself to get up at

10:57    18    all.

10:58    19        Q    Okay.  Let me ask you about the issue of this

10:58    20    contract that you mentioned you had with these people --

10:58    21    or a company -- a person or company in Indianapolis.  When

10:58    22    you had that contract -- or under that contract, who did

10:58    23    you think you worked for?

10:58    24        A    I thought that with the contract that I was

10:58    25    working there because I signed those documents.

10:58  1    Q    Who did you feel you were working for at that

10:58  2    time?

10:58  3    A    For the post office because I was at the post

10:58  4    office.

10:58  5    Q    Okay.  After the contract was done away with, who

10:59  6    did you feel you worked for then?

10:59  7    A    With the post office.

10:59  8    Q    At all times you felt that you were working for

10:59  9    them?

10:59  10    A    Yes.

10:59  11    Q    Did the post office do or say anything to make

10:59  12    you feel otherwise?

10:59  13    A    No, they always treated me well, and they were

10:59  14    very happy with my job.

10:59  15    Q    In fact, you mentioned that you would get a

10:59  16    raise; is that correct?

10:59  17    A    Oh, yes, when I was with the contract, they gave

10:59  18    me a raise.  They would give me a raise every year.

10:59  19    Q    How much?

10:59  20    A    $.25 -- or it would depend, $.25.  $.25 every

10:59  21    year they would give me.

10:59  22    Q    Did they continue doing that or did the post

11:00  23    office do that after the contract was terminated?

11:00  24    A    No, it remained as it was with the contract, but

11:00  25    they didn't give me a raise there.

11:00  1    Q    The post office didn't give you a raise after the

11:00  2    contract terminated?

11:00  3    A    No.

11:00  4    Q    You also mentioned that you were the first one to

11:00  5    get there at the post office; is that correct?

11:00  6    A    Yes.

11:00  7    Q    About what time did you get there?

11:00  8    A    I don't remember if it was the year in which I

11:00  9    would start working at 6:00 or 6:30, but I would get there

11:00  10   first.

11:00  11   Q    Who told you to get there at 6:00?

11:00  12   A    I would not get in by myself.  Lydia and I and

11:01  13   another young fellow that would work there, a student.

11:01  14   Q    I appreciate the answer.  Just listen to my

11:01  15   question carefully.  At what time did you start again?

11:01  16   A    At 6:00.

11:01  17   Q    Who told you to show up at 6:00?

11:01  18   A    We would all start working at the same time at

11:01  19   that time.

11:01  20   Q    Okay.  Did you decide you wanted to show up at

11:01  21   6:00 or did somebody tell you to show up at 6:00?

11:01  22   A    No, nobody told me.  We would all start working

11:01  23   at the same time.  That's when we started at first to

11:01  24   work.  Later on we started to work at 6:30 like at this

11:01  25   time when she fell.

11:02  1     Q    Who told you to start at 6:30 instead of 6:00?

11:02  2     A    I was told that there had been changes, that they

11:02  3  had been -- that they had changed the working hours there

11:02  4  at the post office because we were starting to work very

11:02  5  early.

11:02  6     Q    You and the other employees were too early?

11:02  7     A    Yes.  Later on they switched us to start working

11:02  8  at 6:30.

11:02  9     Q    So you, just like every other employee, were

11:02  10  changed to go in at 6:30?

11:02  11     A    Yes, at the time that they were told to start

11:02  12  working at 6:30, they told me the same as well.

11:02  13     Q    So you just -- it wasn't up to you to show up at

11:02  14  another time like 8:00, 9:00 or 10:00?

11:02  15     A    No.

11:02  16     Q    You show up whenever they told you?

11:02  17     A    Yes.

11:02  18     Q    How long were you supposed to take to clean that

11:03  19  area, ma'am?  This includes the mopping, the sweeping, the

11:03  20  dusting you said earlier.

11:03  21     A    An hour and 45 minutes, I guess I had.

11:03  22     Q    Is that how long you would take to do all that?

11:03  23     A    Yes, but sometimes I would take half an hour

11:03  24  more.

11:03  25     Q    Okay.  Who told you that you needed to take an

1  hour and 45 minutes?

2      A    There I was told -- I don't remember who.  I was

3  told that I had an hour and 45 minutes.

4      Q    And what days of the week did you show up for

5  work.  Was it Monday through Friday or did you alternate?

6      A    Monday through Friday.

7      Q    Every day?

8      A    Yes.

9      Q    You didn't skip any days?

10     A    When I had important things to do like, for

11  example, taking my grandchildren to the doctor, I would

12  take them to the doctor.

13     Q    Okay.

14     A    Or if I wasn't too busy or if I had things to do

15  on my own, I would ask for a day off, but I would tell

16  them -- I would tell them, "I cannot start working in the

17  morning, but I will come in the afternoon," and I would do

18  it like that.  But I would never miss a day.

19     Q    Who did you tell this to?

20     A    To Ms. Perez.  I would ask Ms. Perez if it was

21  okay, if she would need me.

22     Q    Okay.  So you would get permission from her?

23     A    Yes, I would ask them for permission when I could

24  go in the morning and when I couldn't.

25     Q    Okay.  Are you telling me that if you started at

6:30 -- I'm going to go back to the previous testimony --
and you would take about an hour and 45 minutes, maybe two
hours to finish --

     A    More or less two hours.

     Q    -- around what time would you leave?

     A    Around 8:00 or quarter to 8:00 because it was an
hour and 45 minutes to do the job.

     Q    Okay.  And after 8:15 or 8:30, when you left,
were you ever called back to work?

     A    You mean the years that I worked there?

     Q    (Nods head.)

     A    They only called me on one occasion.

     Q    Who called you?

     A    At that time it was Mr. Aldape.

     Q    Was he there before Ms. Perez or something?

     A    Oh, yes.

     Q    Was he the Postmaster?

     A    Yes.

     Q    When was it that he called you, like what time,
what month, year?  What do you remember?

     A    I don't remember, but he called me once for me to
go and clean there so I -- because another person went
there, I think.  He -- that person had problems with his
stomach, and that person had an accident, and he had --
that person had an accident, so I was called to clean

11:06   1   there.

11:07   2        Q   What time was that, more or less, in the day?

11:07   3        A   It was around -- I don't remember very well, but

11:07   4   it was after noontime.

11:07   5        Q   Okay.

11:07   6        A   But I went anyway.  I was there.

11:07   7        Q   And it was long past after 8:30, 9:00 in the

11:07   8   morning?

11:07   9        A   It was after noontime.  That's what I remember.

11:07   10       Q   Okay.  So it was your understanding that if

11:07   11  Ms. Perez was to call you in, you would have to go in to

11:07   12  work?

11:07   13       A   I know, but they would pay me for it.

11:07   14       Q   Okay.  Let me ask you again, ma'am.  If, like

11:07   15  Mr. Aldape, Ms. Perez would call you to come into work

11:07   16  after noon, would you have to come into work?

11:07   17       A   Yes, if I wanted to go, I could go, but when

11:08   18  Mr. Aldape called me, he told me that he needed me

11:08   19  urgently.

11:08   20       Q   Okay.

11:08   21       A   Because he couldn't do the work, but they would

11:08   22  pay me for it.  I wouldn't go there for free.

11:08   23       Q   Okay.  You mentioned earlier when you saw the

11:08   24  diagram and the previous exhibit that you don't mop the

11:08   25  way the diagram was drawn; is that correct?

```
11:08   1      A    Can I look at it?

11:08   2      Q    Yes.

11:08   3      A    I don't mop like this.

11:08   4      Q    In what way do you mop, ma'am?

11:09   5      A    Well, let me show you.  I need a mop.  The way I

11:09   6   mop, it's like this.  I go back, back, back (motioning).

11:09   7   I mop.

11:09   8      Q    Okay.  So you are indicating -- for the jury,

11:09   9   you're going left to right?

11:09   10     A    Yes.

11:09   11     Q    Is that correct?

11:09   12     A    Yes, left, right.

11:09   13     Q    Okay.

11:09   14     A    Not like that.

11:09   15     Q    Did Ms. Perez or Ms. Mendoza ever see you mop

11:09   16   that way?

11:09   17     A    Yes, because I mop in the area where they work as

11:09   18   well.

11:09   19     Q    Did they ever tell you to change that type of

11:09   20   mop?

11:09   21     A    No.

11:09   22     Q    Okay.  You also mentioned that you were the first

11:09   23   one to get there and you put the sign there by the

11:09   24   entrance by the letter "B"; is that correct?

11:09   25     A    Yes.
```

11:09  1      Q    So that sign would be there by the time

11:09  2   Ms. Mendoza and Ms. Perez would walk in, correct?

11:10  3      A    They were here inside.

11:10  4      Q    But how did they get in through the building in

11:10  5   the beginning of the day?

11:10  6      A    Through here, through the entrance.

11:10  7      Q    Would they both see the sign there when they came

11:10  8   in the morning?

11:10  9      A    No, because the sign was not here when they

11:10  10  arrived.  The sign is not there when they arrive.

11:10  11     Q    I mean, it was there by the time they got there?

11:10  12     A    When Ms. Perez came in, the sign was already

11:10  13  there.  She starts working there at a quarter to 8:00.

11:10  14     Q    And when Ms. Mendoza came in, was the sign also

11:10  15  there?

11:10  16     A    Yes.

11:10  17     Q    Did they ever tell you to change that sign?

11:10  18     A    No, I was never told.  They never told me

11:10  19  anything.

11:10  20     Q    Is there any other entrance to the post office

11:11  21  for the public apart from that entrance?

11:11  22     A    Only this one.

11:11  23     Q    So everyone that goes in sees this sign?

11:11  24     A    To me, I think they do.  You can see it well

11:11  25  there.

```
11:11   1      Q     You also mentioned earlier in your testimony that
11:11   2   they were happy with your work; is that correct?
11:11   3      A     Oh, yes.
11:11   4      Q     Who is "they"?
11:11   5      A     We never had problems.  Ms. Perez and Lydia.
11:11   6   When Mr. Aldape would work there, he was as well.
11:11   7      Q     Were you concerned that they would be happy with
11:11   8   your work?
11:11   9      A     Yes, because I wouldn't have liked somebody
11:12  10   telling me that they didn't like the work or something,
11:12  11   and I was very happy with them as well, and I worked very
11:12  12   well.
11:12  13      Q     Did you feel that if you didn't meet up to their
11:12  14   standards, they could fire you?
11:12  15      A     I would feel that I was working very happy with
11:12  16   them.  I never felt that they were able to fire me.
11:12  17      Q     Because you were doing a good job?
11:12  18      A     They liked my job.  They liked my work.
11:12  19      Q     Did you mop every day of the week that you worked
11:13  20   there?
11:13  21      A     No.
11:13  22      Q     When did you mop Monday through Friday?
11:13  23      A     Monday, Wednesday, and Friday.
11:13  24      Q     Okay.  Did you do everything else that you
11:13  25   mentioned earlier, dust and sweep, every day of the week
```

1   also?

2        A    When it was time to sweep, to sweep only.  Like

3   on Tuesday and Thursday, I would only sweep and dust.

4        Q    Were you ever asked to do anything outside of the

5   building?

6        A    I had to sweep -- wait.  What was I doing?  I

7   would sweep.  I would clean the parking lot that is in

8   front.  I would sweep in here in the parking lot in front

9   of the post office, that's what I would do.

10       Q    What's to the side of the post office?

11       A    The yard.

12       Q    Grass?

13       A    I also had to mow the lawn.

14       Q    Outside of the post office?

15       A    Yes.

16       Q    Who asked you to do that?

17       A    They did because they would say that I was

18   together with the contract.

19       Q    After the contract was done with and you worked

20   for the post office, they still asked you to do that?

21       A    I still continued to mow the lawn.

22       Q    No one else would do it while you were working

23   there?

24       A    No, only me.

25       Q    And what days of the week did you do that?

11:15   1      A    When it needed to be mowed, I would do it any

11:15   2   day.

11:15   3      Q    So when they told you to do it?

11:15   4      A    They never told me that I needed to mow the lawn.

11:15   5   I would mow it when I would see that it needed to be

11:15   6   mowed.

11:15   7      Q    Okay.  Thank you, ma'am.

11:15   8           MR. ALMAGUER:  I'll pass the witness.

11:15   9                      EXAMINATION

11:15   10  BY MR. MANN:

11:15   11     Q    I have some more questions for you, ma'am.  You

11:15   12  drew a picture on this Deposition Exhibit 2, which is this

11:15   13  picture, and labeled it as the window in front of the P.O.

11:16   14  boxes where the fall occurred.  Do you know what direction

11:16   15  that window faces?

11:16   16     A    To the west -- to the west side.

11:16   17     Q    Where does the sun rise?

11:16   18     A    Oh, wait.  Wait just a minute.  Yes, east side

11:16   19  where the sun rises.  It's on the east side.

11:16   20     Q    You're saying that the front of this building is

11:16   21  east?

11:16   22     A    No, no, no.  This is west.

11:16   23     Q    So early in the morning, when the sun was coming

11:17   24  up November 12th, 1999, the sun would not have been

11:17   25  shining in this window, would it have been?

1        MS. MASSO:  Objection to the form of the

2   question.  I don't believe there is any evidence

3   indicating what time the sun rose that morning.

4        A    Well, when the lady fell, it was almost daytime.

5        Q    (BY MR. MANN)  Okay.

6        A    It was almost daytime.  As I said, it was only a

7   quarter -- only 15 minutes were -- it was only 15 minutes

8   to 8:00 when Ms. Perez arrived.

9        Q    But you would agree with me that the sun does

10   rise in the east and set in the west?

11        A    Yes.

12        Q    Okay.  You mentioned that while Ms. Guzman was at

13   her post office box, you were dusting in this main entry

14   hall?

15        A    Yes, because I was giving her time to move from

16   there so I could start mopping here.

17        Q    And I think you testified -- and I'll ask you if

18   this is correct -- that at some point in time, she was

19   taking too long, so you went ahead and came in here to

20   the -- passed her in the post office box area hall with a

21   mop and bucket?

22        MR. ALMAGUER:  Objection to the form,

23   misstatement as to evidence.

24        A    I had the mop -- the mop and the bucket and the

25   sign.  I had them here.  Here.

1    Q    (BY MR. MANN)   Okay, but you were dusting for a

2    while when Ms. Guzman was here, correct?

3    A    Yes, I was mopping.  I was mopping for a while

4    some small tables that are here to give her time to move.

5    Q    And then at some point in time, while she was

6    still here at what's marked closest to the "E," you came

7    and you were standing closest to where the "D" is,

8    correct?

9    A    When I passed by, she was still standing here,

10   and I was mopping here very slowly to see if she would --

11   sorry, to get up -- sorry, to move.

12   Q    So at that point in time there was a mop and a

13   bucket in this area?

14   A    No bucket.

15   Q    Just the mop?

16   A    I only had the mop.  I only had the mop in my

17   hand.

18   Q    So what would you do when the mop was dirty and

19   you needed to clean it and wring it out so that it was

20   damp?

21   A    I would come back and I would rinse it here.

22   Q    Did you have anything to prevent droplets of

23   water from falling off the mop while you were going back

24   to where the bucket was?

25   A    I think that there were -- there was no way for

1  the mop to be dripping water because the mop -- how can I

2  explain it to you?  The place where I would squeeze the

3  mop -- where I would squeeze the mop was okay, and the

4  mop -- and I had enough strength to squeeze it well in a

5  way that it would not leak water to the floor.  I would

6  leave it more dry than wet.

7      Q    Why did you tell Ms. Guzman, when you were trying

8  to help her up, "Didn't you see the wet floor sign"?

9      A    I didn't tell her anything because the floor was

10  not wet.

11      Q    So you never told her there, "Didn't you see the

12  wet floor sign over there"?

13      A    Wait a minute.  Well, when she remained there for

14  a long time, and at that time some women arrived.  Some

15  women arrived, and they asked -- they told me if the floor

16  is also wet, but the floor wasn't wet.  I said, "The floor

17  wasn't wet when she fell."  I had just mopped the floor

18  right now because she just got up from the floor.  Excuse

19  me, but it's not -- a small spot, not too wet.

20      Q    So some other people came up to this area after

21  she fell?

22      A    Yes, when I finished mopping here, they started

23  to get in, and they would be telling me that the floor is

24  very wet -- very wet, and I said "She fell, but that

25  was -- it's over.  When she fell down, the floor was not

11:23    1    wet," I told them.  And then she said, "Yes, look how you

11:23    2    have it."  And I said, "Yes, but she was already here.

11:23    3    She was already here in front."  That's when I had the

11:23    4    time to mop, when she moved from here.

11:23    5        Q    Do you know who those ladies are that you spoke

11:23    6    with after this about this wet floor?

11:23    7        A    I didn't pay attention to them since I didn't

11:23    8    even know that lady who fell down.  I don't know them.  I

11:23    9    don't know them, but I'm sure that the floor was not wet

11:23   10    when she fell.

11:23   11              MR. MANN:  Objection, nonresponsive.  No

11:23   12    question.

11:24   13        Q    (BY MR. MANN)  Was it Ms. Guzman who was making

11:24   14    you behind schedule this day?

11:24   15        A    Yes, because she was standing here.  She was very

11:24   16    close to the area where I was.

11:24   17        Q    Why didn't you wait until she left the building

11:24   18    before you mopped the area where she was?

11:24   19              MR. ALMAGUER:  I think you asked two

11:24   20    questions because the translator didn't say, "until she

11:24   21    left the building."  That's what you're saying, right?  I

11:24   22    don't think the interpretation was complete.

11:24   23              MR. MANN:  Let me reask the question.

11:24   24              THE INTERPRETER:  I think I agree.  It wasn't

11:24   25    complete.

```
11:24   1       Q    (BY MR. MANN)   Why did you not wait until
11:24   2   Ms. Guzman left the area where her post office box was
11:24   3   located before you moved in with the mop to begin mopping
11:25   4   the area?
11:25   5       A    I didn't mop -- well, I started to mop, but as I
11:25   6   said, I thought she was going to go because she stood
11:25   7   there for a long period of time, and I thought that she
11:25   8   was preparing herself to leave or something when I just
11:25   9   realized she was already sitting down there.
11:25  10       Q    Okay.  So would it be safe to say that you were
11:26  11   trying your best to get the work done on time despite the
11:26  12   fact that she was still next to her post office box?
11:26  13            MR. ALMAGUER:  Objection as to form,
11:26  14   argumentative, and a misstatement of the evidence.
11:26  15       A    I don't know.
11:26  16       Q    (BY MR. MANN)  But you didn't want to be late
11:26  17   with your completion of your work?
11:26  18       A    No, but anyway, I took time -- I gave her time
11:26  19   for her to move from there, but I didn't mop where she
11:26  20   was.  I hadn't gotten to that place, but at the same time,
11:26  21   since I was mopping and walking slowly at the same time, I
11:26  22   felt that something was against me.
11:27  23       Q    How big is this area where the post office boxes
11:27  24   are?  Is it four feet wide, five feet wide?
11:27  25       A    I couldn't tell you because I don't know how big.
```

11:27  1      Q    Would you say it was a large room or a small

11:27  2  room?

11:27  3      A    It's long.

11:27  4      Q    Is it skinny?

11:27  5      A    No, it's a regular type of lobby so people can go

11:27  6  in and out of there.  It's not too reduced.

11:27  7      Q    Did you ever look back when you started mopping

11:27  8  to see if Ms. Guzman was still there?

11:28  9      A    No, I didn't see.

11:28  10     Q    So you wouldn't know if you had passed her up

11:28  11  with the mop until you stumbled over her?

11:28  12     A    No.  No, I just stumbled because I didn't see

11:28  13  her.  I didn't know that she was there on the floor.

11:28  14     Q    Okay.

11:28  15           MR. MANN:  No further questions.

11:28  16           MR. ALMAGUER:  Just two quick questions here,

11:28  17  then I'm done.

11:28  18                    EXAMINATION

11:28  19  BY MR. ALMAGUER:

11:28  20     Q    Can you please -- you have already indicated here

11:28  21  where there are a couple of tables there in the post

11:28  22  office by the windows.  Just to clarify with an "X," can

11:28  23  you mark where the windows are?

11:28  24     A    (Witness complies.)  And here there's another

11:28  25  one.

```
11:28    1        Q    Can you mark it with an "X"?
11:28    2        A    (Witness complies.)
11:28    3        Q    Okay.
11:28    4        A    And here there are some long tables -- small
11:29    5    tables, trash cans, and here is another trash can.
11:29    6        Q    Okay.  For the record, you have indicated the
11:29    7    trash cans with a small circle.  You also mentioned, of
11:29    8    course, you had supplies.  Can you tell me what supplies
11:29    9    you had in that utility room?
11:29   10        A    Things that I used to clean the bathrooms.
11:29   11        Q    Can you name and list them, please?
11:29   12        A    Lysol, Windex for the windows -- to clean the
11:29   13    windows, paper towels, and things that I use when I'm
11:29   14    ready to go.  That's what I had.
11:29   15        Q    Was there a mop there, too?
11:30   16        A    In the utility room there I have a mop.  I had it
11:30   17    there all the time in the utility room.
11:30   18        Q    Was there a broom there?
11:30   19        A    Yes, I use a broom sometimes.
11:30   20        Q    Was the bucket and the sign there, too?
11:30   21        A    Where?
11:30   22        Q    In the utility room or in the post office?
11:30   23        A    Yes, when I would finish using them.  When I
11:30   24    would finish using them, I go and place them in the
11:30   25    utility room.
```

1    Q    Any of these things we just mentioned, did you

2   ever have to buy any of them?

3    A    I never bought anything.

4    Q    So who would provide all of that for you?

5    A    The post office.

6    Q    Okay.

7         MR. ALMAGUER:  No further questions.  Pass

8   the witness.

9         MS. MASSO:  No questions.

10                     EXAMINATION

11  BY MR. MANN:

12   Q    I've got one question.

13   A    Yes.

14   Q    Did Ms. Perez or anyone else in the post office

15  ever see you mop where you didn't have the bucket in the

16  close proximity to where you were mopping?

17        MR. ALMAGUER:  Objection to the form of the

18  question, speculation.  She wouldn't know what they saw or

19  didn't.

20   A    I don't know.  I don't know.  I don't know what

21  to tell you.

22   Q    (BY MR. MANN)  Okay.  Did any -- did Ms. Perez or

23  anyone from the post office ever tell you to keep the mop

24  bucket close to the mop when you were mopping the floors?

25   A    On one occasion I asked her if the bucket was

11:31   1   okay there, and she said it was okay unless I would put it

11:31   2   in the middle -- no -- but not to put it in the middle of

11:32   3   the lobby, that she would think that this was the safest

11:32   4   place to put it because if I would put it here people

11:32   5   would fall down or something to trip.

11:32   6       Q    Okay.  So these types of things would be

11:32   7   questions that you would take to Ms. Perez at the post

11:32   8   office?

11:32   9       A    I would ask her things to be sure.

11:32   10      Q    Okay.

11:32   11              MR. MANN:  No further questions.

11:32   12              (Proceedings concluded at 11:32 a.m.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

CHANGES AND SIGNATURE

PAGE              LINE         CHANGE                    REASON

1

2

3
_____
4
_____
5
_____
6
_____
7
_____
8
_____
9
_____
10
_____
11
_____
12
_____
13
_____
14
_____
15
_____
16
_____
17
_____
18
_____
19
_____
20
_____
21
_____
22
_____
23
_____
24
_____
25
_____

1        I, ELENA OLIVAREZ, have read the foregoing
deposition and hereby affix by signature that same is true
2    and correct, except as noted above.

3                                          _____

                                    ELENA OLIVAREZ
4
THE STATE OF TEXAS )
5

6    COUNTY OF _____ )

7        Before me, _____, on this
day personally appeared ELENA OLIVAREZ, known to me (or
8    proved to me under oath or through _____)
(description of identity card or other document) to be the
9    person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein expressed.

11       Given under my hand and seal of office this
_____ day of _____, 2003.
12

13                                          _____

                                    NOTARY PUBLIC IN AND FOR
14                                         THE STATE OF TEXAS

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3  GLORIA L. GARCIA a/k/a      )
    GLORIA GUZMAN,              )
 4          Plaintiff           )
                                )
 5                              )
    VS.                         )    CIVIL ACTION NO. B-02-017
 6                              )
                                )
 7  UNITED STATES OF AMERICA,   )
    and YOLANDA PEREZ, as       )
 8  Postmaster, UNITED STATES   )
    POST OFFICE, SANTA ROSA,    )
 9  TEXAS, and ELENA OLIVAREZ,  )
    as an employee of the       )
10  UNITED STATES POST OFFICE,  )
    SANTA ROSA, TEXAS           )
11          Defendants.         )

12
                   REPORTER'S CERTIFICATION
13              DEPOSITION OF ELENA OLIVAREZ
                       June 18, 2003
14

15      I, Heather Hall, Certified Shorthand Reporter in and

16  for the State of Texas, hereby certify to the following:

17      That the witness, ELENA OLIVAREZ, was duly sworn by

18  the officer and that the transcript of the oral deposition

19  is a true record of the testimony given by the witness;

20      That the deposition transcript was submitted on

21  ____July 2, 2003____ to the witness or to the

22  attorney for the witness for examination, signature, and

23  return to me by _August 4, 2003___;

24      That the amount of time used by each party at the

25  deposition is as follows:
```

1    Mr. Jason R. Mann - 1 hour, 27 minutes
     Ms. Nancy L. Masso - 0 hours, 14 minutes
2    Mr. Pablo J. Almaguer - 0 hours, 33 minutes

3

4       That pursuant to information given to the deposition

5    officer at the time said testimony was taken, the

6    following includes all parties of record:

7

8       Mr. Jason R. Mann, Attorney for Plaintiffs
        Ms. Nancy L. Masso, Attorney for Defendant
                United States of America
9       Mr. Pablo J. Almaguer, Attorney for Defendant
                Elena Olivarez
10

11      I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties in the

13   action in which this proceeding was taken, and further

14   that I am not financially or otherwise interested in the

15   outcome of the action.

16      Certified to by me this _2ⁿᵈ_ day of

17   _____Juy_____, 2003.

18

19   _Heather Hall_____
     HEATHER HALL, Texas CSR 7971
20   Expiration Date:  12/31/04
     WILSON REPORTING SERVICES
21   P. O. Box 532003
     Harlingen, Texas  78553
22   (956) 412-5700
     (956) 412-5771 Fax
23

24

25

maintenance
handbook



**Floors, Care and Maintenance**

Maintenance Series Handbook MS-10

TL-1, 5-15-88



DEPOSITION
EXHIBIT

olivarez    6/18/03

## PREFACE

This handbook on floor care and maintenance applies to all facilities occupied by the U. S. Postal Service where the Service is responsible for cleaning and maintenance.

This handbook is for guidance of postmasters, maintenance managers, building superintendents, and others directly involved in the care and maintenance of floors and grounds.

All employees engaged in the maintenance or cleaning of floors and grounds must be provided with a copy and are required to be familiar with the contents.

These procedures must be followed in order to prolong the life and preserve the beauty of our floors while obtaining the required level of appearance without waste of workhours.

e.  Bend knees and keep back straight.

f.  Wear hand protection if needed.

g.  Get a good grip on the load.

h.  Hold load close to body with chin tucked in.

i.  Do not twist the torso or fight a "lost load."

j.  Never lift objects in crowded areas. Clear the area to make lifting safer and easier.



**Figure 2-6**
**Proper and Improper Methods of Lifting**

## 260 REPORTING UNSAFE CONDITIONS OR NEEDED REPAIRS

Each Building Services employee should carry a supply of note paper and pencil to report conditions that they are not qualified to correct; for example: broken light switch, broken window, plumbing problem.

## 270 WET FLOORS

In order to avoid serious injuries caused by slips and falls on wet floors, use the following guidelines:

a.  Use Wet Floor signs freely and place them in high visibility areas to alert employees and/or customers.

b.  When possible, close off the area by barricading it with safety rope.

c.  During rainy or snowy weather, place safety matting in employee/customer entrances, such as lobbies and vestibules.

d.  Repeatedly mop up water that has been tracked in.

e.  When mopping or scrubbing floors, complete work in one small section at a time.

f.  After scrubbing or wet mopping the floor, check it for a slippery film. If a film is present, rescrub or mop the floor using a neutralizer to remove the film.

b. Use the proper equipment for the particular size and condition of the floor surface. For general use, use the 24-inch treated mophead with the 24-inch frame size. For large aisles and open areas, use the 36-inch mophead with the 36-inch frame size. For stairs or tight areas, use the 18-inch mophead with the 18-inch frame size.

c. Keep the treated mophead or treated cloth flush (even) with the floor at all times.

d. Sweep with a figure-eight motion. Walking forwards, use the lower wrist to pivot the sweeping mophead at the completion of each side stroke, so as to keep the same edge leading (leading edge) in the sweeping direction.

e. By using the leading edge, small objects may be carried along while sweeping. When objects accumulated at the leading edge become unmanageable, temporarily push them to one side and continue sweeping.

f. Pick up the accumulated objects in a dustpan and place them in a waste receptacle. The swiveling head on the sweeping tool permits using the leading edge to sweep hard-to-reach places, such as underneath cases and ledges.

## 642 Mechanized

Mechanized equipment, such as walk-behind and/or ride-on sweeper and scrubber/vacuums, is to be used as much as possible. Manually sweep congested areas, such as those around sorting cases and around fixed machinery, using fiber or straw brooms. Use a pedestrian-type power vacuum or rider-type power sweeper (refer to HBK MS-47) for exterior areas, such as sidewalks, driveways, and parking areas, where the size of the area justifies the use of mechanized equipment. Manually sweep all inaccessible areas and push sweepings to an area that is accessible to the power sweeper. Safety requirements are as follows (refer to HBK EL-803):

a. Be particularly alert to pedestrian and vehicular traffic when using power-driven equipment.

b. Do not leave equipment unattended while the motor is running.

c. If keyed, do not leave the key in the equipment while it is unattended.

d. Keep children away from equipment.

e. Only properly trained employees are permitted to operate powered equipment such as power vacuums and rider-type sweepers.

f. Employees who operate rider-type powered equipment must possess a valid OF-346, *U.S. Government Motor Vehicle Operator's* *Identification Card*, endorsed for each piece of equipment they are qualified to operate.

## 650 MOPPING

## 651 Damp

**651.1 Applications.** Use damp mopping when picking up of cleaning solution is not required and when dry maintenance does not produce the desired result. Also use damp mopping for policing areas where water accumulates during bad weather, around vending machines, and for cleaning areas where spills occur. Give special attention to areas around vending machines to keep vermin under control.

**651.2 Equipment and Products.** Equipment and products needed are as follows:

a. Wet-floor safety signs and rope

b. Putty knife

c. Treated sweeping mop and/or cloth with handle and frame

d. Toy broom

e. Pickup pan or dustpan

f. One mophead with handle for wet use

g. One mop bucket on wheels with wringer and cleaning solution

h. Work gloves

**651.3 Procedure.** Use the following procedure:

a. Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b. Use putty knife to remove gum and other substances stuck to the floor.

c. Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d. Following manufacturer's label instructions, fill bucket with a measured amount of water (gallon, half gallon, quart, etc.), add exactly the amount of cleaning solution per gallon, half gallon, quart, etc., as recommended by the manufacturer and place wringer on bucket.

e. Dip mop into prepared cleaning solution and wring the mop out until it is almost dry.

f.   Walking backward, damp mop the floor using a figure-eight motion, as shown in Figure 6-3. Turn the mop over every three or four strokes.



HS010-ZIA6A013

**Figure 6-3**
**Mop in Figure-Eight Motion**

g.   Return the mop to the cleaning solution frequently, wring it almost dry, and continue mopping until the entire work area is mopped.

h.   Change cleaning solution as needed to prevent streaking.

i.   Allow the floor surface to dry completely before removing the safety equipment.

**652 Wet**

**652.1 Applications.** Wet mop all floors except wood and cork.   Wet mopping is required when accumulated dirt must be loosened and removed by applying an appropriate soil-suspending solution. It is a two-step procedure where the cleaning solution is applied with a solution mop and then picked up with a rinse mop or wet pickup vacuum.   A wet pickup vacuum removes the cleaning solution more effectively than a mop and greatly reduces the floor surface drying time. The need for frequent wet mopping is reduced by a proper dry maintenance program.

**652.2 Equipment and Products.**   Equipment and products needed are as follows:

a.   Wet-floor safety signs and rope

b.   Putty knife

c.   Treated sweeping mop and/or cloth with handle and frame

d.   Toy broom

e.   Pickup pan or dustpan

f.   Two mopheads with handles for wet use

g.   One mop bucket on wheels with wringer and cleaning solution

h.   One mop bucket on wheels with wringer and rinse water

i.   Wet pickup vacuum

j.   Work gloves

**652.3 Procedure.**  Use the following procedure:

a.   Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b.   Use putty knife to remove gum and other substances stuck to the floor.

c.   Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d.   Following manufacturer's label instructions, fill one bucket with a measured amount of water (gallon, half gallon, quart, etc.), add exactly the amount of cleaning solution per gallon, half gallon, quart, etc. as recommended by the manufacturer, and place wringer on bucket.

e.   Fill second bucket half full with plain cold water for rinsing and place second wringer on it.

f.   Dip cleaning mop in prepared cleaning solution, wring out lightly so it remains wet, and moderately apply to the floor surface in a section approximately 8 by 8 feet.   Begin mopping by dragging the mop parallel to and 1 inch away from baseboards, forming wet parallel stripes on the floor (see Figure 6-4).   Then, walking backward, work in a figure-eight motion to the inner edges of the parallel stripes so as not to splash baseboards and walls.

Case 1:02-cv-00017   Document 34   Filed in TXSD on 04/16/2004   Page 97 of 325



**Figure 6-4**
Mop 1" Away and Parallel to Wall

g.  Use the wet pickup vacuum to remove the cleaning solution from the floor surface.

h.  Dip rinse mop in rinse water, wring out lightly so it remains wet, and apply the rinse water to the work area.

i.  Use the wet pickup vacuum to remove the rinse water from the floor surface.

j.  Allow the floor surface to dry completely before removing the safety equipment.

**NOTE**

Do not flood the floor with cleaning solution or rinse water. Remove cleaning solution (if any) from baseboards.

**660  SCRUBBING**

**661  Hand**

**661.1 Applications.** Hand scrubbing may be used for all floors except wood and cork. Use hand scrubbing ONLY when a floor machine is unavailable or in small areas where use of a machine is impractical.

**661.2 Equipment and Products.** Equipment and products needed include the following:

a.  Wet-floor safety signs and rope

b.  Putty knife

c.  Treated sweeping mop and/or cloth with handle and frame

d.  Toy broom

e.  Pickup pan or dustpan

f.  Cleaning cloths

g.  Walk-off mats

h.  Three mopheads with handles for wet use

i.  One mop bucket on wheels with wringer and cleaning solution

j.  One mop bucket on wheels with wringer and rinse water

k.  One mop bucket on wheels with wringer for wet pickup if wet pickup vacuum is unavailable

l.  One mop bucket on wheels with wringer containing final rinse solution

**NOTE**

The final rinse solution consists of tap water and a neutralizing product that ensures the floor surface is free of the cleaning solution.

m.  One deck scrub brush with handle

n.  Work gloves

**661.3 Procedure.** Use the following procedure for hand scrubbing:

a.  Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b.  Use putty knife to remove gum and other substances stuck to the floor.

c.  Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d.  Place dry cleaning cloths under the doorways and walk-off mats at entrances adjacent to the work area.

e.  Following manufacturer's label instructions, fill one mop bucket with a measured amount of



#1—POSTAL VEHICLE

#2—PRIVATE VEHICLE

INDICATE NORTH

INDICATE
Width of roadway
traffic flow,
parked vehicles,
traffic signs or
signals, etc.

OBTAIN ACCURATE
MEASUREMENTS FROM
FIXED OBJECTS

ALSO INDICATE
approach of vehicles,
point of impact and
place where vehicles
stopped after accident.

DEPOSITION
EXHIBIT
2
Olivarez    6/18/03

☆ U.S. GOVERNMENT PRINTING OFFICE: 1993 342-723/83785

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA L. GARCIA               *
aka Gloria Guzman              *
                               *
VS.                            *
                               *     C.A. B-02-017
UNITED STATES OF AMERICA       *
ET AL                          *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

GLORIA LONGORIA

NOVEMBER 10, 2003

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF GLORIA LONGORIA, produced as a

witness at the instance of the Government, and duly sworn,

was taken in the above-styled and numbered cause on the 10th

day of November, 2003, from 1:21 p.m. to 3:18 p.m., before

DIANA LEAL WEIBEL, Certified Shorthand Reporter, in and for

the State of Texas, reported by oral stenography, at the

United States Attorney's Office, U.S. Courthouse, 600 East

Harrison, Suite 201, Brownsville, Texas, 78520, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

*ORIGINAL*

2

A P P E A R A N C E S

FOR THE PLAINTIFF:

    Mr. Jason R. Mann
    J. Edward Mann, Jr. & Assoc.
    222 E. Van Buren, Suite 701
    Harlingen, TX  78551
    PH:  956/428-4114


FOR THE GOVERNMENT:

    Mr. Steven T. Schammel, AUSA
    U.S. Attorney's Office
    1701 W. Bus. 83, Suite 600
    McAllen, TX  78501
    PH:  956/618-8010


FOR DEFENDANT ELENA OLIVAREZ:

    Mr. Pablo J. Almaguer
    Texas Rural Legal Aid, Inc.
    316 S. Closner
    Edinburg, TX  78539
    PH:  956/381-8171


COURT REPORTER:    DIANA LEAL WEIBEL, C.S.R., #4192

* * * * * *

3

I N D E X

Page

Appearances ....................................... 2

Stipulations ...................................... 4

WITNESS EXAMINATION:              PAGE:     BEGIN TIME:

    BY MR. SCHAMMEL .................   7       1:21 p.m.

    BY MR. ALMAGUER .................  43       2:18 p.m.

    BY MR. SCHAMMEL .................  51       2:26 p.m.

    BY MR. ALMAGUER .................  69       2:52 p.m.

    BY MR. MANN .....................  74       2:59 p.m.

    BY MR. SCHAMMEL .................  77       3:04 p.m.

    BY MR. MANN .....................  81       3:08 p.m.

    BY MR. ALMAGUER .................  84       3:12 p.m.

    BY MR. MANN .....................  88       3:16 p.m.

    BY MR. SCHAMMEL .................  89       3:18 p.m.

Signature and Changes ........................... 91

Reporter's Certificate .......................... 93

**DIANA LEAL WEIBEL, C.S.R. #4192**
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

4

E X H I B I T S

| Number: | Description: | Page: |
|---------|-------------|-------|
| No. 1 | Diagram of U.S. Post Office | 13 |
| No. 2 | Valley Orthopedic Surgery Medical and Billing Records | 29 |
| No. 3 | Rio Grande Valley Imaging and Diagnostic Clinic - Medical and Billing Records | 30 |
| No. 4 | Texas Association of School Board Medical Records | 36 |
| No. 5 | Copies of photographs (2) | 57 |
| No. 6 | Copies of photographs (2) | 57 |
| No. 7 | San Benito Medical Associates Medical and Billing Records | 64 |

5

1    IT WAS AGREED that no objections shall be made by any

2    party at the time of taking of said deposition; except

3    objections as to the form of the question, including leading,

4    or the responsiveness of the answer, which if not made during

5    the deposition are waived; but if and when said deposition,

6    or any portion thereof, is offered in evidence at the trial

7    of this cause by any party thereto, it shall be subject to

8    any and all other legal objections, such objections to be

9    made at the time of the tender, the same as though the

10   witness were on the stand personally testifying.

11       IT WAS FURTHER AGREED that the witness must appear

12   before any Notary Public or official authorized to administer

13   oaths, and at such time the witness has the privilege of

14   reading over said deposition and making any corrections to

15   his answers he finds to be necessary, such corrections to be

16   made in accordance with the Federal Rules of Civil Procedure.

17       IT WAS FURTHER AGREED by and between Counsel that

18   Federal Civil Rule 30(b)(4) is hereby expressly waived.

19       IT WAS FURTHER AGREED by and between Counsel that

20   following delivery of the original deposition herein by the

21   officer to Counsel for deponent, Mr. Jason R. Mann, for the

22   purpose of signature by deponent, said original deposition

23   shall be returned directly to the court reporter, Diana Leal

24   Weibel, C.S.R., within thirty (30) days following receipt of

25   same, together with any corrections, additions or changes

6

1    thereto, at which time the reporter will prepare a Return

2    Certificate and deliver the signed original deposition to the

3    custodial attorney herein, Mr. Steven T. Schammel.

4        IT WAS AGREED that should the original deposition herein

5    fail to be returned, signed and notarized, ten (10) days

6    prior to the date of trial in this cause, or prior to any

7    appropriate hearing herein, a certified copy of same may be

8    used herein for all purposes, as though it were the signed

9    original, upon proper notice to opposing Counsel.

10        IT WAS FURTHER AGREED that after said deposition has

11    been returned in accordance with these stipulations and

12    agreements, it will be treated by the parties hereto and may

13    be used herein with the same force and effect as though all

14    statutes and rules relating to the taking and returning of

15    depositions had been fully complied with.

16                        *  *  *  *

17

18

19

20

21

22

23

24

25

7

1          THE REPORTER:  Today's date is November 10th,

2    2003.  The time is 1:21 p.m., and the deponent's name is Ms.

3    Gloria Longoria.

4                         - - -

5                    GLORIA LONGORIA

6    having been first duly sworn, testified as follows:

7                       EXAMINATION

8    BY MR. SCHAMMEL (1:21 p.m.):

9          Q    Ms. Longoria, my name is Steven Schammel.  I wasn't

10   here at the last set of depositions.  I'm an Assistant U.S.

11   Attorney, and I've taken over this case, and I'll be

12   representing the Government in this particular case.  If

13   there is something that I say that you don't understand or

14   you're not sure, please let me know.  For the sake of the

15   court reporter, if there is a yes or no answer, please say

16   "yes" or "no."  If you nod your head up and down, she's going

17   to have a hard time putting that into --

18         A    Right.

19         Q    -- into words.  Your name, please?

20         A    Gloria Longoria.

21         Q    And are you the same person who filed suit

22   initially as Gloria Garcia, also known as Gloria Guzman?

23         A    Yes, I am.

24         Q    And what is the effective date of your name change?

25         A    Effective date would be September of last year.

8

1    Q    September of 2002?

2    A    Yes.

3    Q    And your current address?

4    A    Post Office Box 1237, Santa Rosa, Texas, 78593.

5    Q    And what city do you live in?

6    A    Santa Rosa.

7    Q    Your age?

8    A    Fifty-two (52).

9    Q    Date of birth?

10    A    7/20/51.

11    Q    Prior to November of 1999 when you had the fall,

12    what was your occupation?

13    A    I worked for the School District in San Benito.

14    Q    And specifically, what did you do?

15    A    I did clerical work, payroll.

16    Q    And were you on salary or an hourly wage at that

17    point?

18    A    Salary.

19    Q    And what was your annual salary?

20    A    Gosh.  Seventeen hundred ($1,700) a month.

21    Q    Was that after taxes?

22    A    No.  It was before.

23        MR. MANN:  Could you read that question back,

24    or what was it?  Was that -- did you say yearly or monthly?

25        MR. SCHAMMEL:  I asked her what her yearly

9

1  wages --

2     A    I'm sorry.

3     Q    (Mr. Schammel)  That's okay.

4     A    I thought it was monthly.

5     Q    Seventeen hundred ($1,700) a month is fine.

6     A    Monthly.  I missed the question.

7     Q    And did you get paid -- was that seventeen hundred

8  ($1,700) for each of the twelve (12) months, or did you just

9  get paid during the school year?

10    A    It was twelve (12) annual.  Twelve (12) months.

11    Q    And at some point after that accident in November

12 of 1999, did you become unemployed?

13    A    Yes, I did.

14    Q    Do you remember approximately when that was?

15    A    When I started taking the physical therapy, and I

16 had the surgery.

17    Q    And what was your first job after -- have you

18 become employed since you left the school district?

19    A    Yes.

20    Q    And who are you employed for now?

21    A    Texas State Bank.

22    Q    And where is that location at?

23    A    115 East Van Buren in Harlingen.

24    Q    And how long have you been employed there?

25    A    Fifteen (15) months.

10

Q    And are you salary or hourly wage there?

A    Hourly.

Q    And what is your hourly wage?

A    I believe it's nine-fifty ($9.50) right now.

Q    And is that the same salary you've had for the entire period of time?

A    Uh-huh (moving head up and down).  Yes.

Q    And what's your average hours per week?

A    Forty (40).

Q    About how many months were you unemployed between when you left the School District and you started at Texas State Bank?

A    I was an employee for about a year and a half.

Q    And to date, have you provided all of your medical bills and all of -- have you provided all the medical bills and expenses related to your fall on November 17th of 1999?

A    Not all of them because I'm seeing the doctor still, and I report them to Jason as I get them.

MR. MANN:  Pursuant to your Request for Production, I have some additional discovery in addition to what we've provided in the response for Request for Productions.  And I believe there's going to be some more supplementation once they're received from this particular doctor or whatever entity he's with now.  He keeps changing.

MR. SCHAMMEL:  Okay.  If you can just keep us

11

1    updated so we have a running total?

2                    MR. MANN:   Will do.

3        Q    (Mr. Schammel)   And you have continued to see which

4    doctor concerning your injuries?

5        A    Doctor Clark.

6        Q    And have any new injuries come to your attention

7    since October of 2001, which is the last date that I have a

8    record for?

9        A    Injuries as far as falling or -- ?

10       Q    Any injuries related back to that original fall,

11   besides your knees that you had originally complained of?

12   Anything new, like shoulders, elbows, back, neck?

13       A    I -- I've been getting fluid in my knees.  That's

14   why I'm still continuing to see the doctor.

15       Q    So continuing trauma still related back to the same

16   knee injuries?

17       A    Yes.

18       Q    But nothing new?  Nothing like a newly discovered

19   injury to an arm or your neck or your back?

20       A    No.

21       Q    Have you visited a doctor related to any other

22   major medical condition during this period of time since

23   November 17th of '99 to the present?

24       A    No.

25       Q    On November 17th, 1999, what were you doing that

12

1 morning?

2    A    I was picking up my mail before I went to work.

3    Q    And that was at the School District in San Benito?

4    A    Yes.

5    Q    And how often did you pick up your mail?

6    A    Maybe three (3) times a week or so.

7    Q    Was it usually a particular time of day?

8    A    Either early in the morning or in the afternoon.

9    Q    When you went early in the morning, approximately

10 what time would you go?

11    A    Well, I'd go in at 7:30.  I was going in at 7:30 to

12 work, so it was around 7:15.

13    Q    And had you seen the cleaning woman in there any

14 other days when you had been there in the morning?

15    A    No.  No.  But I don't go there every morning.  I

16 just, you know...

17    Q    I understand you don't go there every morning.  But

18 the mornings that you had been there, had you ever seen her

19 prior?

20    A    No.

21    Q    Did you usually go Monday-Wednesday-Friday, or was

22 there any pattern to the dates that you would go?

23    A    No, no pattern.

24    Q    When you got to the Post Office, who was present?

25    A    No one.  I -- I heard someone, but I was busy

13

1    getting my mail.

2        Q    When you walked -- when you got to the Post Office,

3    was the front door open or closed?

4        A    It was open.

5        Q    And as you walked in, what did you see initially?

6        A    Actually, it was a little bit dark, and I just went

7    straight to my box.  The lights were out, and I just went and

8    opened my box.  I felt someone behind me, but I didn't know.

9    I thought it was somebody picking up the mail -- their mail.

10       Q    When you walked in, did you see any signs

11   concerning the floor?

12       A    No.

13       Q    In your original petition, you stated that the sign

14   wasn't present where you were at, which would lead me to

15   believe that there was a sign present but you didn't see

16   anything?

17       A    No, sir, not until she pointed it out to me.

18       Q    And who is "she?"

19       A    The custodian.

20            MR. SCHAMMEL:  If you could mark this as

21   Defendant's Exhibit Number One (1), please?

22            (Defendant's Exhibit Number 1 marked.)

23       Q    (Mr. Schammel)  Looking at Defendant's One (1), the

24   drawing that was created by, I believe it was your attorney

25   or somebody who worked for him.  Does that look familiar?

14

1    A    I'm sorry?

2    Q    Does it look familiar?

3    A    Yes.  The lobby.

4    Q    Is that basically the layout of the lobby?

5    A    Yes.

6    Q    Not that it's exactly to scale, but roughly the

7  same layout?

8    A    Yes.

9    Q    On there, it's indicated that there is a sign.  Did

10  you not see that sign as you walked in?

11    A    No, I didn't.

12    Q    How did you know to indicate the sign was there

13  when that document was prepared?

14    A    Well, when I fell, then she told me, "had I not

15  seen the sign?"  And I told her I hadn't seen the sign.  I

16  was over here (indicating).  The sign was way on the corner.

17    Q    And you didn't see her at any time as you walked

18  through the door?

19    A    I really wasn't paying attention.  I knew somebody

20  was there, but I thought they were checking their mail.  But

21  as I opened my box, looked at my mail, somebody was behind

22  me.

23    Q    How wide is the aisle where your mailbox is

24  located?

25    A    I'm not sure.

15

1      Q    If you stood up and put both arms out, could you

2  touch both sides --

3      A    No.

4      Q    -- or would it be a little bit wider than that?

5      A    No, it's wider.

6      Q    Enough for two (2) people to easily pass by without

7  --

8      A    Oh, yes.

9      Q    -- getting in the way?  Was there anything else,

10 tables, chairs, that were in that hallway?

11     A    No.

12     Q    There was previous testimony in the last deposition

13 and also in your Petition that the light in the hallway where

14 you were at was not functioning, but that the others seemed

15 to be functioning; is that correct?

16     A    That's correct.

17     Q    So there is -- up until you get to the hallway out

18 there, your testimony then is there is sufficient light to

19 see?  It's just once you turn --

20     A    By the door?

21     Q    By the door, in the other areas, except the

22 malfunction light was only in your hallway?

23     A    Yes, in this part (indicating).

24     Q    And just so that the court reporter can keep track,

25 that would be in the area that is indicated by an "X" that

16

1    says "Location of fall?"

2        A    Uh-huh (moving head up and down).  Yes.

3        Q    And the yellow sign that you say you later

4    discovered is also indicated on this diagram.  It, according

5    to you, is annotated by a circle with a line saying "Location

6    of wet floor sign," is that correct?

7        A    Yes.

8        Q    Do you still have the same Post Office box?

9        A    Yes, I do.

10       Q    And is that, I assume, your personal mailbox?  It's

11   not for business?

12       A    It's personal, yes.

13       Q    You didn't noticed the co-defendant in this case

14   mopping the floor?  You did not see her with a mop?  You

15   didn't see her bucket?

16       A    The bucket wasn't there in that area, so I didn't

17   see a bucket.

18       Q    And by "that area," you mean the area where you

19   fell?

20       A    Right.

21       Q    How long did you spend going through your mail?

22       A    I'm saying about a couple of minutes.

23       Q    Did you stop to read any of it, or did you just

24   collect it?

25       A    I just went through it, you know.

17

1    Q   Did you open anything while you were there?

2    A   No.

3    Q   And you arrived at approximately what time?

4    A   About 7:15 a.m.

5    Q   And approximately how long did you stay there

6 before you allege that you fell?

7    A   I'm saying about fifteen (15) minutes by the time I

8 left.

9    Q   So it was about 7:30 when you fell and then left?

10    A   Yes.

11    Q   At your office, do you have to -- at your prior

12 job, did you have to log in or out, punch in a time clock or

13 anything?

14    A   Yes.

15    Q   What method?  Time clock or --

16    A   On the computer.

17    Q   Approximately what time did you arrive at work that

18 day?

19    A   I went in late because I had to go home and change

20 my hose.  I called in that I was running late.

21    Q   What kind of shoes were you wearing that day?

22    A   The one-inch pump shoes that we wear for work.

23    Q   What kind of sole do they have?  Is it a rubber

24 sole, leather sole?

25    A   I'm not sure.

18

1    Q    Smooth bottom?  Did it have like a texture on it?

2    A    I don't remember.

3    Q    Do you remember the brand?

4    A    They were the Solo -- Solo, I think.

5    Q    That's okay.

6    A    They were from Dillard's.  A Dillard's brand.  I

7  don't remember.

8    Q    And you were aware that Mrs. Olivarez was there,

9  but you weren't really sure what she was doing?

10    A    I knew somebody was there, but I wasn't paying

11  attention until I saw her when I fell.

12    Q    What were you focused on at that particular time?

13    A    My box.

14    Q    And your mail?

15    A    And my mail.

16    Q    The sign that was in the entry area, had you ever

17  seen signs like that before, the "Wet Floor" sign?

18    A    There?

19    Q    Or in general.  Have you --

20    A    Yes.

21    Q    Similar to one that she was saying, like say at the

22  school where you work?

23    A    Yes.

24    Q    Now, you say that you were aware that Ms. Olivarez

25  was there.  Looking again at Defendant's Exhibit One (1),

19

1    were you facing your mailbox?

2        A    Yes.

3        Q    And according to that map, that would mean that you

4    were facing south; is that correct?

5        A    Yes.

6        Q    And to which side, either the left side or the

7    right side, did you know that she was present?

8        A    I -- after I fell, I turned around, and I thought

9    it was somebody getting -- like I said, getting their mail.

10   And I saw her standing there with a mop like this

11   (indicating).

12       Q    Was she towards where the windows are on the west

13   side, or was she --

14       A    On the very -- right here (indicating).

15       Q    So she was --

16       A    Like she had gone by mopping or something when I

17   was looking at my mail.  So she stood there looking at me

18   when I fell.

19       Q    She was at the closed end where the mailboxes are

20   --

21       A    Yes, she had already --

22       Q    -- on the east end of that hallway?

23       A    -- used the mop, uh-huh.

24       Q    Now, when you fell, how did you fall?  Did you fall

25   on your back?  Did you fall on your side?

20

1      A    I fell on my knees, and I kind of like split.  I
2  couldn't get up.
3      Q    And did you -- did you just fall to your knees?
4  Did you fall down on your hands and knees?  Did you end up
5  falling flat to the floor?
6      A    Just on my hands and my knees.
7      Q    How long did the light in that hallway not been
8  working?  Was it just something that just happened that day,
9  or was this a chronic problem?
10     A    No.  As a matter of fact, she said that that light
11 had been not working for a while.
12     Q    Had you noticed it working or not working?
13     A    No, I had not noticed.
14     Q    You have no personal knowledge as to whether it was
15 operating?
16     A    No.
17     Q    Prior to that date, what was the last date that you
18 were in that Post Office?
19     A    Probably on the weekend, in the morning.
20     Q    And during the weeks when you would come, you would
21 generally come about 7:15 in the morning?
22     A    Yes.
23     Q    Give or take a few minutes?
24     A    It was very rarely that I would go in the mornings.
25 I was expecting a piece of mail that morning from my son, so

21

1    I tried to check before I went to work.

2        Q    Just before you fell, what were you doing?  Were

3    you -- you were looking at your mail.  What happens next?

4        A    I'm looking at my mail, and I had my purse right

5    here.  And then I start walking, and that's when I slipped

6    right away.

7        Q    When you start walking, in which direction did you

8    head?

9        A    To my right.

10        Q    Which would be towards the windows?

11        A    Yes.

12        Q    Did you just basically turn towards the windows, or

13    did you turn around more toward the Post Offices boxes behind

14    you?  How far did you turn?

15        A    How far did I turn from -- ?

16        Q    Did you simply turn basically straight towards the

17    windows and go, or did you -- I mean, did you just turn that

18    ninety degrees to the right, or what did you do?

19        A    Oh, yes, I just started walking out.  I just turned

20    around and...

21        Q    Did you manage to take a step before you fell or

22    did you --

23        A    Yes.

24        Q    How far did you go before you fell?

25        A    Right there.  I just took about one step.

22

1    Q    And were you carrying your mail at that time in
2    your hands, was it in your purse?

3    A    In my hands.

4    Q    Do you wear eyeglasses or contacts?

5    A    No.  I have reading glasses just to read, but I
6    wasn't wearing them.

7    Q    You didn't need them to scan through the mail?

8    A    No.

9    Q    Do you commonly wear sunglasses?

10    A    Sometimes.

11    Q    Do you remember if you wore them that day?

12    A    No.  It was too early.

13    Q    How far was the sun up that morning?  Did you need
14    your headlights to drive, or was it fairly --

15    A    I usually do put my headlights at 7:00, around
16    7:00.

17    Q    As you're driving, was the sun above the horizon,
18    or is it still just barely breaking?

19    A    Barely breaking.

20    Q    When you saw the light was out, did that worry you
21    at all, or did you just think nothing of it?

22    A    I really didn't say anything.  She's the one that
23    told me that the lights were out.  They had been out for a
24    while.  And I looked up, and I go, "oh, so the -- "  I didn't
25    see the floor wet.

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

23

1    Q   So you didn't even notice the lights were out
2 really?
3    A   Well, I didn't pay attention because I was
4 concentrating on getting my mail and getting to work.
5    Q   So --
6    A   I'm not very observant.  When I go into get my --
7    Q   So the answer would be, "no, you didn't observe the
8 lights to be out until you were told," is that correct?
9    A   That's correct.
10   Q   By the time you left, was anybody else present?
11   A   No.
12   Q   Mrs. Olivarez said that later that day, somebody
13 came by to visit her -- I wouldn't say visit -- came by and
14 asked her questions about your fall that morning.  Do you
15 know who that person is?
16   A   No, I sure don't.
17   Q   Did any of your family or friends go by to check
18 the place out?
19   A   No.
20   Q   When is the next time that you went back to the
21 Post Office?
22   A   After the fall?
23   Q   Yes.
24   A   Gosh, I don't remember.
25   Q   A week?

24

1       A      Probably.

2       Q      Less than a week?

3       A      Probably a week.   Sometimes -- I didn't get very

4   much mail, you know.

5       Q      What is your physical address in Santa Rosa?

6       A      406 Los Fresnos Street.

7       Q      And do you still live there?

8       A      Yes.

9       Q      You mentioned earlier that you had gotten a

10  divorce.   The person you divorced, is that the person you

11  were married to at the time of this injury?

12      A      We weren't married yet when I fell.

13      Q      And who is the person that, for lack of a better

14  term, you were dating at that particular time?

15      A      Who is he?

16      Q      Yes.

17      A      Joaquin Garcia.

18      Q      And you later did marry him?

19      A      Yes.

20      Q      And do you remember what the wedding date was?

21      A      December of '99.

22      Q      Do you remember the day?

23      A      17th.

24      Q      Basically, a month later?

25      A      Uh-huh (moving head up and down).

25

1       Q      And when did you divorce him?  Or I'm not trying to

2   say who divorced whom, but when was the divorce?

3       A      September of 2002.

4       Q      And do you remember the day that it became

5   effective?

6       A      I don't remember the date.

7       Q      Did he ever -- did Joaquin Garcia ever go over to

8   investigate or look at the location to the best of your

9   knowledge?

10      A      No.  I know he went with me to pick up the mail.

11      Q      And when did you first seek medical treatment

12  concerning your fall?

13      A      That day, I called the Post Office, and they wanted

14  me to call Corpus and get a form for the accident.

15      Q      And when did you first go to the doctor?

16      A      Right after that.  Right after that, I mean...

17      Q      Was it the next day?  Was it a week later that you

18  went to see the doctor?

19      A      I was waiting for that form to be faxed to me, so

20  the Postmaster said she didn't have any forms for the

21  accident, that I would have to call Corpus.  And I was having

22  a problem trying to get somebody to help me in Corpus.

23      Q      Did you go to see the doctor on your own regard?

24      A      Yes, I went to Doctor Garza.

25      Q      And when was that?  Was that after you got this

26

1    form or before?

2        A    A couple of days.  I still didn't have the form.

3        Q    And Doctor Garza is Doctor Raul Garza?

4        A    Yes.

5        Q    And you've seen him for various different

6    treatments, or is it just all relating to this particular

7    incident?

8        A    Just to that particular injury.

9        Q    And he had some x-rays done on you later?

10       A    Yes.

11       Q    And do you remember -- do you know what the results

12   of those x-rays were?

13       A    I'm not sure.  I know that he referred me to the

14   orthopedic doctor.

15       Q    The x-rays came back as normal.  Did that surprise

16   you when they came back normal?

17       A    I don't remember because he referred me to Doctor

18   Clark because he said I needed an MRI.

19       Q    In January of -- on January 14th -- somewhere

20   between January 14th and January 16th, you had an x-ray done.

21   I believe the x-ray was actually done at the Dolly Vinsant

22   Memorial Hospital, and they x-rayed both your knees.  Do you

23   remember that --

24       A    Yes.

25       Q    -- prior to the MRI?

27

1     A    Yes.

2     Q    And that x-ray came back that there was no troubles

3  at that time?

4     A    (Moving head up and down.)

5     Q    When you saw Doctor Garza, did you give him a

6  medical history?

7     A    A medical history as far as before?

8     Q    Prior -- prior injuries or medical conditions,

9  allergic reactions to medications.  Did you tell him

10  everything that --

11     A    Yes.

12     Q    After the x-ray came back normal, what did you do?

13     A    He was treating me with muscle relaxers.  He gave

14  me some pain killers and...

15     Q    And what was the progress on your injury?

16     A    It kept hurting.

17     Q    And what did you do after that?

18     A    I went to see Doctor Clark, the one he referred me

19  to.

20     Q    Did he refer you to Doctor Clark, or did he refer

21  you to somebody different?

22     A    Doctor Clark.

23     Q    And what did Doctor Clark have you do?

24     A    He sent me to get an MRI, and then he got the

25  results from there.

28

1    Q   Were you aware that the MRIs also came back that

2 there was -- it characterizes it as very tiny and -- tiny and

3 very small injuries, that they were rather minor injuries?

4            MR. MANN:  Objection.  If you want to show her

5 the MRI that you're referring to and mark it as an exhibit?

6    Q   (Mr. Schammel)  Have you reviewed your medical

7 records?

8    A   Not lately.

9    Q   Have you talked to your doctor concerning your

10 medical records?

11    A   I'm still seeing Doctor Clark.

12    Q   Did Doctor Clark review the MRIs with you?

13    A   Yes.

14    Q   What was his recommendation after he reviewed the

15 MRIs with you?

16    A   He recommended surgery.  He said I had torn

17 ligaments, and he was going to have to look into my right

18 knee and see what was wrong with it.  And he found the

19 cartilage was not healed correctly or something.  He had to

20 shave it off.  (Brief pause.)  He also said that's why that

21 wouldn't show in an x-ray because the x-ray takes the bone, a

22 picture of the bone.  But my problem was the torn ligament

23 and the cartilage were damaged.

24            MR. SCHAMMEL:  I'd like to have this marked as

25 -- this page marked as Defendant's Two (2).  I'll go ahead

29

1    and at the end, we'll supplement with a photocopy, if that

2    would be okay?

3                    MR. MANN:   What is it?

4                    MR. SCHAMMEL:   A medical report.   It's her

5    medical records.

6                    MR. MANN:   (Reviews documents.)   Are you going

7    to have her authenticate these?

8                    MR. SCHAMMEL:   The affidavit is attached.

9                    MR. MANN:   Were they filed with the Court?

10                    MR. SCHAMMEL:   As far as I know, they were.

11                    MR. MANN:   No objection to the medical

12    records.

13                    (Defendant's Exhibit Number 2 marked.)

14        Q    (Mr. Schammel)   Let me show you what has been

15    stamped at the bottom as page two.   Have you reviewed these

16    medical records yourself?

17        A    No, sir.

18        Q    These were received from your doctor as a portion

19    of your discovery in this case.   At the top of the page, if

20    you'll please read to yourself, beginning with "On my

21    interpretation..."

22        A    (Witness reviews documents.)   This was in July of

23    2000.

24        Q    When was your MRI performed, if you know?

25        A    It was around January.   I had already been through

30

1  the physical therapy and everything, and I continued to have

2  problems.

3       Q    Do you remember who performed your MRI?

4       A    It was on Ed Carey Drive.  I don't remember the

5  name of it.

6       Q    Rio Grande Valley Imaging and Diagnostic Clinic.

7  Does that sound correct?

8       A    Probably so.  But this is in July already, months

9  after that, the physical therapy and the surgery and

10 everything.

11           MR. SCHAMMEL:  I'll tender this to plaintiff's

12 counsel.  I'll have the entire packet photocopied afterwards

13 and marked as Defendant Three (3).

14           MR. MANN:  (Reviews documents.)  No objection.

15           (Defendant's Exhibit Number 3 marked.)

16      Q    (Mr. Schammel)  I'm looking at the page marked as

17 page one in Defendant's Three (3).  Do you recall that

18 document to be an appointment sheet for your MRI?  And the

19 MRI is scheduled according to that appointment as for what

20 date?

21      A    1:45, July the 5th.

22      Q    It's been a while.  Could it be that your

23 recollection is off as to when the MRI was?

24      A    Pardon?

25      Q    It's been a while since the MRI.  Could it be that

31

1  your recollection is off as to when the MRI took place?  Did

2  you have more than one MRI in this particular injury?

3       A    I've had two (2) MRIs done.

4       Q    And the results of this MRI are indicated on

5  Defendant's Two (2) with the doctor stating that as a result

6  of that MRI that his interpretation of the MRI scan was, in

7  his opinion, it is, quote, unquote, "frankly normal,"

8  referring to your knees.

9            MR. MANN:  Could you read that entire -- are

10  you offering the entire medical records?

11           MR. SCHAMMEL:  We'll amend and ask that

12  Defendant's Two (2) be the entire packet.

13           MR. MANN:  Okay.  What about --

14           MR. SCHAMMEL:  And for Defendant's Three (3),

15  we'll go ahead and offer the --

16           MR. MANN:  The entire packet?

17           MR. SCHAMMEL:  -- the entire packet.  We'll

18  make copies of those at the end if you'd like to inspect

19  them.

20           MR. MANN:  Okay.

21       Q    (Mr. Schammel)  Did they also -- did Doctor Clark

22  also see you concerning an injury to your elbow around the

23  same time?

24       A    Yes.

25       Q    And was that related or unrelated to the alleged

32

1   fall?

2       A    It was because he gave me Celebrex, and I had like

3   a -- like a little -- some kind of -- something here in my

4   elbow, and he told me that that triggered -- the medication

5   triggered that, that it got so swollen that he had to go in

6   there and do surgery on my elbow.

7       Q    And that was a foreign object that had been

8   imbedded for about a year?

9       A    Uh-huh (moving head up and down).

10      Q    Do you know how that foreign object got into your

11  elbow?

12      A    It was from a grapefruit tree that I had it there

13  for a long time and it never bothered me.  When I started

14  taking the Celebrex, somehow all of a sudden it got infected

15  so bad, my elbow was huge.

16      Q    But the grapefruit tree, just for the purpose of

17  the record, was not located at the Post Office?

18      A    Oh, no.

19      Q    And it was not injured on that day?

20      A    He just said that with that medication, it was part

21  of something in the Celebrex that I was taking that triggered

22  any kind of little infection that you would have, so I had

23  surgery on my elbow.

24      Q    Did you ever refuse any types of treatment from the

25  doctor?

33

1    A    No.

2    Q    Did he ever offer you cortisone injections for your

3    knee?

4    A    Yes.

5    Q    Did you accept those cortisone injections?

6    A    Yes.  I've been taking those.

7    Q    And was that Doctor Clark, or was that Doctor --

8    what was -- Doctor Garcia that -- or Doctor Garza, rather?

9    A    Doctor Clark.

10   Q    And what was the result of the injections that you

11   had?

12   A    Swellingness, fluid.

13   Q    Had you ever injured your knees prior to that day

14   of November 17th, 1999?

15   A    One time that I fell, but --

16   Q    Where was that?

17   A    -- not severely.  It wasn't -- where was that?

18   Q    Yes.

19   A    It was about two (2) or three (3) years before this

20   fall.

21   Q    Two (2) or three (3) years before when?

22   A    Before this previous fall.

23   Q    And where did you fall at?

24   A    At the School District.

25   Q    And what was the nature of the injury at that time?

34

1    A    Waxed floor.  They had waxed the floor.

2    Q    And when you fell, how did you fall that time?

3    A    I fell on my side.

4    Q    Do you recall being injured on or about August 8th

5    -- or August 5th of 1999, specifically your knees?

6    A    I fell once before, but I don't remember the date.

7    Q    Well, the August 5th date that I'm quoting -- that

8    I'm mentioning to you is approximately three (3) months prior

9    to your fall in the Post Office.  Did you fall and injure

10   your knees at any other time prior to that?  You mentioned

11   one that was three (3) years earlier.

12   A    No.

13   Q    So the only other time was the time at the school?

14   A    Right.  I don't remember dates.

15   Q    Were you in the school for business at the time

16   that you fell?

17   A    Yes.

18   Q    And were you working at that same job at the time

19   you fell?

20   A    Yes.

21   Q    Do you remember the doctor that you saw for that

22   injury?

23   A    No, I don't.

24   Q    Did you see a doctor for that injury?

25   A    Yes.

35

1    Q    Did they prescribe any medication, any physical
2  therapy for you?
3    A    I went for about two (2) weeks, and that's it.  I
4  was still working.  I didn't take time off.
5    Q    What was your injury to at that particular time?
6  Did you injure your hip, your knee, your ankle, your elbows?
7  Do you recall what you injured?
8    A    They just wanted me to go for precautions, that I
9  wasn't --
10    Q    Who is "they?"
11    A    The School District.  They're very strict about
12  those things.  They send you right away, and I told them,
13  "I'm fine."  I was working still, but they still wanted me to
14  be fine so they sent me to physical therapy.
15    Q    Did you have --
16    A    I just went like two (2) weeks or so.
17    Q    -- much pain?
18    A    Not really.  I kept telling them that I was fine.
19  I said I was working and everything, but they just don't want
20  anything to come back to them, you know, afterwards.
21              MR. SCHAMMEL:  I'll tender Defendant's Four
22  (4) to plaintiff's counsel.
23              MR. MANN:  (Reviews documents.)  You're
24  offering it all?
25              MR. SCHAMMEL:  The entire document, yes.  And

36

1    we'll just substitute copies at the end.

2              MR. MANN:  Okay.  No objection.

3              MR. SCHAMMEL:  I'll also tender them to Mr.

4    Almaguer who is also --

5              MR. ALMAGUER:  No objection.

6              (Defendant's Exhibit Number 4 marked.)

7         Q    (Mr. Schammel)  You said you didn't have much pain?

8         A    No.  They told me they wanted to make sure that I

9    was fine.  That's what they recommended, and they made me go.

10        Q    The documents in your record indicate that your

11   pain in the right knee was a seven (7) on a scale of one (1)

12   to ten (10), and the pain in your left knee was a four (4) on

13   a scale of one (1) to ten (10) on just this specific date.

14   There were other days also.

15        A    The day that I go --

16        Q    Seven (7) -- this was during the course of your

17   physical therapy treatment.  Seven (7) would seem to be a bit

18   extreme.  It didn't bother you, though?

19        A    I had pain, but I was walking.

20        Q    How bad was the pain?  There, you say it was seven

21   (7) of ten (10).  How severe is seven (7) of ten (10)?

22        A    I don't know what they put down, but I just was

23   going, you know...

24        Q    This is records that were made according to your

25   medical treatments and the statements you gave receiving your

37

1    medical treatment.

2              MR. MANN:  Objection.  That calls for facts

3    not in evidence.  There is no evidence that this is

4    information she provided to them.  It's information that they

5    wrote down as part of their notes.

6       Q    (Mr. Schammel)  "Patient reports when the pain

7    increases, she needs pain meds.  Pain -- Rates pain as seven

8    (7) of ten (10)."  Seven (7) of ten (10) is fairly severe,

9    but you say a few minutes ago it didn't bother you.

10      A    I don't know what they put down, but I...

11      Q    And when you went to see both Doctor Clark and your

12   initial treating physician, neither one of those you

13   indicated you had ever fallen three (3) months prior to your

14   November fall in the Post Office; is that correct?

15      A    I don't know if they even asked me that.  The

16   doctor, you mean?

17      Q    Wouldn't you think that the fact that you had

18   fallen and injured yourself three (3) months prior and had

19   received medical treatment and rated the pain as seven (7) of

20   ten (10), don't you think that might help them in treating

21   you?

22      A    They didn't ask me anything.

23      Q    And you didn't feel it was necessary to tell them

24   anything about your medical condition?

25      A    Because I was fine.

38

1    Q    Even though you had continuing pain throughout the
2  entire course of treatment for that August fall in the
3  school?
4              MR. MANN:  Objection, asked and answered.
5    Q    (Mr. Schammel)  You can answer the question.
6    A    The Doctor Clark never asked me anything.  I was
7  fine.  I was treated for a little while.  I was walking fine,
8  so I didn't -- he didn't ask me anything.
9    Q    In each of the reports, and you're free to review
10  these, you say that your knees continue to hurt.  But it's
11  your testimony today that they really didn't bother you at
12  all?  Yes or no?
13    A    Which time are you talking about?
14    Q    The -- your fall in August on the school floors.
15    A    I was fine.  I never missed work.  I was there
16  every day.
17    Q    Did you make all of your appointments for your
18  treatment?
19    A    Not really because I didn't really want to go.
20    Q    Did you ever follow up with the doctor at the end
21  of the treatment?
22    A    No.  Risk Management is the one that made me go.
23    Q    Does it surprise you that according to your medical
24  records that the injuries are quite similar, if not almost
25  the same as you had later?

39

1          MR. MANN:  Objection.

2     A    No.

3     Q    (Mr. Schammel)  It doesn't surprise you?

4     A    It's not the same.

5     Q    How is it not the same?

6     A    Because I was walking.  I never missed work.  I

7  didn't have surgery.  I didn't have, you know, anything

8  severe.  I mean, anybody can slip and fall and keep walking.

9     Q    You mentioned earlier a form that the Post Office

10 was supposed to send to you.  Did they eventually send that

11 to you?

12    A    Yes, they did.

13    Q    And did you submit that to your medical providers?

14    A    No.  It was a form for them to file an accident

15 report.  That's what it was.

16    Q    What day did you retain counsel?

17    A    I don't remember.

18    Q    Do you remember the year and the month or the --

19 yes.  Do you remember the year and the month?

20    A    That I got the form?

21    Q    That you hired an attorney.

22    A    Oh.  I don't remember exactly the date.

23    Q    Do you know what year it was?

24    A    I don't remember.  It's been taking too long.  I

25 don't remember.

40

1      Q    How long after the injury?  A week?  A month?  Four

2  (4) months?  A year?  Your best estimate.

3      A    I can't think right now.  I'm not sure.

4      Q    When you fell in August, did they ever x-ray you,

5  do an MRI, ultrasound, anything?

6      A    No.

7      Q    Basically, if I understand you correctly, all that

8  happened in August was they looked at your knee and sent you

9  -- gave you some medicine and sent you off to physical

10  therapy?

11      A    Yes.

12      Q    You stated earlier you had two (2) MRIs.  One, we

13  know, according to your records, was in July.  When was the

14  other one?

15      A    I just took that one a few months ago.

16      Q    Since apparently -- since the time that we've

17  gotten these records, I assume?

18      A    Yes.

19      Q    Part of your continuing treatment?

20      A    Yes.

21           MR. SCHAMMEL:  Is that one of the additional

22  packages we'll be receiving?

23           MR. MANN:  Yes.

24           MR. SCHAMMEL:  Okay.  Thank you.

25      Q    (Mr. Schammel)  What was the doctor's -- in your

41

1  recollection, what was the doctor's position on surgery?  Was

2  it definitely needed?  Did he advise for it, against it?  Did

3  he simply say, "It's an option," and you made a selection?

4      A    He said with arthroscopic surgery or something,

5  that's the only way he could find out how my knees had been -

6  - because to him, it looked like the cartilage was damaged,

7  but he wanted to make sure.  And then he showed me a graph of

8  how it had put back together again, and he had to go in there

9  and shave it.  And my left knee had torn cartilage -- I mean,

10 ligaments.  He said some of those things don't even show up

11 in an MRI or an x-ray, so he recommended that arthroscopic

12 surgery.

13     Q    This is the same Doctor Clark who described your

14 knees as normal according to the report?

15     A    I guess, because I told him, "I'm in pain."

16     Q    You only saw one Doctor Clark; is that correct?

17     A    Yes.  That's the only doctor I've seen.  (Long

18 pause.)  (Inaudible.)

19     Q    Excuse me?

20     A    The after surgery results, I'm sure he has

21 something there too, what he found.

22     Q    How many times did you get steroid injections?

23     A    I don't remember.

24     Q    Do you know if it was once or more than once?

25     A    I don't remember.  Are you talking about cortisone?

42

1      Q    Yes.  You're not sure if it was more than once?

2      A    I got them once.  And he told me that if I

3   continued, to go back.  And sometimes they last six (6)

4   months, sometimes more, sometimes three (3).  It depends.

5      Q    It was just the one time that you got them before

6   the surgery?

7      A    That was after the surgery.  I kept having

8   problems.  When I climb stairs, my knees get real swollen.

9      Q    In Defendant's Two (2), it states that you did --

10  you were offered one, although the doctor doesn't state

11  whether or not he gave you one in August, August 7th of 2002.

12  You did not receive one on that date prior to having surgery?

13     A    I believe I did.  I'm not certain right now.

14     Q    Your husband was present at that time.  Do you

15  remember if that was the same day?

16     A    He went with me several times.

17     Q    Your pay now, are you making approximately the

18  same, or are you making less than what you made before?

19     A    My pain?

20     Q    Your pay, your salary.

21     A    Oh.  I'm making less now.  I had to start over.

22     Q    And what is your position at the bank?

23     A    Loan Operations.

24     Q    And since your divorce, have you remarried --

25     A    No.

43

1        Q    -- or are you still unmarried?

2        A    I'm still unmarried.

3             MR. SCHAMMEL:  Pass the witness.

4    BY MR. ALMAGUER (2:18 p.m.):

5        Q    Ms. Longoria, good afternoon.  My name is Pablo

6    Almaguer.

7        A    Good afternoon.

8        Q    I'm sorry I did not recognize your name initially,

9    but it's changed sometime here in the last -- I represent Ms.

10   Olivarez, Elena Olivarez.  Do you know who she is?

11       A    Yes.

12       Q    You were in fact present at the deposition that

13   they took of her; isn't that correct?

14       A    Yes.

15       Q    Let me ask you a few questions following up on what

16   Mr. Schammel here asked.  I'd ask you to speak loud enough so

17   that she can hear you.  If you don't understand the question,

18   let me know.

19       A    (Moving head up and down.)

20       Q    And please don't nod like you did right now.  Just

21   say "yes" or "no" --

22       A    Yes.

23       Q    -- please so that she can record it.  If you don't

24   understand a question, let me know.  I'll repeat it.  If you

25   can't hear it, let me know too.  You mentioned on the day of

44

1    the accident, November 12th, 1999, you noticed that it was
2    dark and maybe some lights were out; is that correct?

3        A    That's correct.

4        Q    Did you notice that when you went in to the Post
5    Office?

6        A    I said I didn't notice that at the time.

7        Q    When did you notice it?

8        A    When the lady told me, the custodian, when I fell.

9        Q    You also mentioned that you went and -- you went
10   over to the hallway, opened up the P.O. box, and you looked
11   through your mail.  Isn't that correct?

12       A    That's correct.

13       Q    How big, how -- what's the size of that Post Office
14   box door that you have there?  Is it a big one, a small one?

15       A    It's a small one.

16       Q    Is it a key or combination type?

17       A    Key.

18       Q    Did you have any problems putting that key into
19   that box?

20       A    No, sir.

21       Q    You were looking through your letters.  You were
22   looking to see who the letters were from or what they were?

23       A    Yes.

24       Q    So you had enough lighting to put the key into that
25   box.  You had enough lighting to look through your mail; is

45

1   that correct?

2       A    I was looking for a particular piece of mail, so I

3   just scanned through it.

4       Q    My question again was, you had enough light to put

5   that key in the box; right?

6       A    Yes.

7       Q    You had enough light to look through the mail too.

8   Isn't that correct, ma'am?

9       A    Yes.

10      Q    Okay.  Are there any windows at the Post Office

11  there, ma'am?

12      A    Yes.

13      Q    Let me show you again what has been marked as

14  Defendant's Exhibit Number One (1) here.  I'm showing it to

15  you with the west side being towards you so you can read it

16  from there.  Where exactly are the windows in this diagram?

17      A    Right here (indicating).

18      Q    Towards the wall on the west side?

19      A    On the west side.

20      Q    That's near the entrance; is that correct?

21      A    Yes.

22      Q    How big are those windows, if you remember?

23      A    They're big.

24      Q    So they let in a lot of light; is that correct?

25      A    They let it where you can read it.

46

1      Q    One of those windows in fact is right at the west

2   wall of where your box is at.  Isn't that correct?

3      A    Yes.

4      Q    You also mentioned that -- and correct me if I'm

5   wrong, you mentioned, "I wasn't paying too much attention"

6   when we asked -- when you were asked about seeing the signs

7   there.  Isn't that correct?

8      A    I didn't see the sign.

9      Q    But the question was, ma'am, again, you stated, "I

10  wasn't paying attention" when you were asked if you saw the

11  sign.  Is that a correct statement of what you said?

12     A    Yes.

13     Q    You also later on said that you're "not too

14  observant."  Isn't that correct?

15     A    I said I wasn't observant because I was wanting to

16  get my mail and get to work.

17          MR. ALMAGUER:  Objection, nonresponsive.

18     Q    (Mr. Almaguer)  Ma'am, I'm going to ask you a

19  question, I just want the answer back.  Okay?  If you want to

20  have it explained, I'm sure Mr. Mann can later on ask you and

21  you can explain that.

22     A    Okay.

23     Q    Okay?  So let me ask you again.  Isn't it correct

24  that you said, "I was not observant," when asked questions

25  earlier.  Isn't that correct?

47

1              MR. MANN:  Objection.  The question -- if we
2   could have the question and answer read from the depo?
3   Otherwise, it assumes facts not in evidence.
4              MR. ALMAGUER:  I won't spend any time on that.
5   We'll go on to the next question then at this point.
6       Q     (Mr. Almaguer)  You also mentioned you went home
7   and you changed after this accident.  Is that correct, ma'am?
8       A     Yes.
9       Q     Why was that, ma'am?
10      A     Because I tore my hose.
11      Q     Oh, okay.  I didn't know about that.  You also
12  mentioned when you walked in there, you didn't see a sign.
13  You also didn't see the mop bucket around there somewhere,
14  ma'am?
15      A     No.
16      Q     You also didn't see Ms. Olivarez until -- or after
17  you fell; is that correct?
18      A     I knew someone was there, but I didn't look.
19      Q     As soon as you turned --
20      A     Yes, when I fell.
21      Q     When you fell, you knew somebody was there; is that
22  correct?
23      A     Right.
24      Q     But not when you were walking in; is that correct?
25      A     No.

48

1    Q    But you're saying, and you earlier pointed to the

2    diagram, that Ms. Olivarez was mopping towards the east wall

3    of that corridor; is that correct?

4    A    Yes, because I felt somebody go by when I was

5    checking my mail, towards my back.

6    Q    Okay.  So you did notice her then?

7    A    I felt somebody go by, but I was looking at my

8    mail.  I didn't turn to look.  I thought it was somebody

9    checking their mail.

10   Q    And you didn't see Ms. Olivarez using the mop

11   bucket or putting the sign or at the entrance when you were

12   coming in?

13   A    No.

14   Q    Ma'am, do you mop at your house?

15   A    Yes.

16   Q    When you mop, do you mop forward, walking forward,

17   or do you mop walking backwards?

18   A    I don't have a certain way.

19   Q    Isn't true, ma'am, on this day when you fell down,

20   actually Ms. Olivarez was walking back and almost bumped into

21   you when you fell down?  Isn't that true?

22   A    No.

23   Q    Isn't it true, ma'am, that when you fell down, Ms.

24   Olivarez asked you, "Can I help you," or, "Do you need any

25   help getting up?"  Isn't that correct?

49

1       A    No.  She didn't offer.

2       Q    Isn't it true, ma'am, that when you got up, you

3  said, "This always happens to me?"  Isn't that true?

4       A    No, that's not true.

5       Q    After the accident, did you stop and talk to

6  anybody there, ma'am, immediately?

7       A    No.

8       Q    There weren't any individuals at the table at the

9  corner of the Post Office there?

10      A    No, nobody.

11      Q    Nobody?

12      A    Nobody.

13      Q    When you fell in August of '99, according to the

14  reports here, you fell on both of your knees; is that

15  correct?

16      A    In August?  No.

17      Q    Of '99?

18      A    No, not on my knees.  I fell to my side.

19      Q    On your side?

20      A    (Moving head up and down.)

21      Q    Did you hurt your left knee at that time?

22      A    No.

23      Q    What side did you fall to when you fell back in

24  August of '99, left or right side?

25      A    I just remember falling.  I can't remember where.

50

1    Q    You don't remember anything about August of '99?

2    A    I remember falling.

3    Q    You don't remember which side?

4    A    No.

5    Q    But you do remember the lights were out in

6    November, '99?

7    A    Yes.

8    Q    You remember that you were wearing -- you remember

9    other specifics in November, '99, but not of August, '99; is

10    that correct?

11    A    I don't understand what you mean.

12    Q    I'm saying that it's three (3) months apart, and

13    you're pretty specific in the facts of November of '99, so

14    your recollection at this point is clear as to the fall of

15    November of '99 than what your fall of August of '99; is that

16    correct?

17    A    By specifics, I know I fell.  But how I fell, I

18    don't remember how I fell.

19    Q    Why can't you remember the fall in August of '99,

20    ma'am?

21    A    Because I kept telling them, "I'm fine," you know.

22    I was okay.  I was hurting, yes, and everything.  But I knew

23    nothing was broken.  I picked up myself.

24    Q    So you thought nothing was wrong at that point?

25    A    It was hurting, but I told them I didn't want to go

51

1    to the doctor.   They made me go.

2        Q    Was it a Worker's Comp referral to the doctor?

3        A    Risk Management was the one that sent me.   I never

4    got Workman's Comp or anything.   I kept working.

5        Q    And this is the doctor they told you to go, not one

6    you chose; is that correct?

7        A    No, I didn't choose him.

8        Q    Okay.   In November of '99, November 12th of '99

9    when you fell down at the Post Office, did anybody help you

10   get up at that time?

11       A    The custodian did when I asked her if she could

12   please help me.

13       Q    Okay.   Did you tell her anything else when you fell

14   down at that time?

15       A    No.

16       Q    You didn't ask her if she had mopped there?

17       A    Well, I saw her with a mop.   And then she said,

18   "Well, didn't you see the floor was wet?"   And I said, "No, I

19   didn't."

20            MR. ALMAGUER:   No questions.   I'll pass the

21   witness.

22            MR. MANN:   Reserve all my questions for trial.

23   BY MR. SCHAMMEL (2:26 p.m.):

24       Q    Before, when Mr. Almaguer asked you to identify the

25   windows, are those the windows that are annotated on

52

1    Defendant's Exhibit Number One (1)?  Where it says "Windows,"
2    is that the approximate location?

3        A    Yes.

4        Q    And those are the ones that are written onto the
5    document, just so that we'll be sure for the purposes of the
6    record?

7        A    Yes.

8        Q    You stated that you knew somebody passed behind
9    you, but you didn't really see who they were?

10       A    No.

11       Q    So you just got that impression that somebody walks
12   by?

13       A    Yes.

14       Q    And that you could tell that they were doing
15   something down at the end of the --

16       A    Right.

17       Q    Could you tell she was mopping?

18       A    No, I didn't, because since I didn't turn --

19       Q    Could you tell if she was -- could you tell if she
20   had started right next to you and moved towards there, or
21   could you tell if she was farther away and started getting
22   closer?

23       A    I felt someone go by to that corner.

24       Q    Okay.  They go back to the corner?

25       A    Behind, yes.

53

1    Q    And according to Defendant's One (1), the corner

2  would be basically where it says, "Location of custodian?"

3    A    Yes.

4    Q    And once that person passes by you, how much longer

5  were you there?  A minute, two (2) minutes, maybe five (5) or

6  ten (10)?

7    A    No.  Probably a minute.

8    Q    You were almost done reading your mail by that

9  point?

10    A    Uh-huh (moving head up and down).

11    Q    And you turn and you fall, and that person is right

12  next to you?

13    A    Well, a little distance.

14    Q    A little distance.

15    A    About three (3) feet, maybe.  Maybe more.  I don't

16  know.  It's the very corner.

17    Q    Could you -- at that last minute you were standing

18  there, you couldn't tell -- you couldn't gather any movement

19  whether they were coming from those mailboxes at the very end

20  or towards those mailboxes and she started mopping back

21  towards you?

22    A    She was, I know, like going behind me.  She was

23  already mopping like that.  And she was waiting for me to get

24  out of my little spot probably to finish her mopping, because

25  she was standing like this with the mop (indicating).

54

1      Q    And when you turned, you basically just -- as you

2   stated earlier, you just turned to the right, and you started

3   walking towards those windows?

4      A    Yes.

5      Q    So if she walked behind you and was waiting for you

6   and she was mopping at that closed end, how did you fall on

7   the water where she hadn't mopped?

8      A    Where she hadn't mopped?  It was wet.  When I

9   turned, it was wet.

10     Q    But you never noticed her to your right?  You

11  noticed her to your left?

12     A    I didn't turn to the -- I didn't turn to look.  I

13  was looking at my mail.

14     Q    But you knew that she walked behind you?

15     A    Yes.

16     Q    And you knew that she was somewhere off to your

17  left, not exactly sure where, but she was somewhere to the

18  left?

19     A    Yes.

20     Q    You never noticed her to the right?

21     A    I knew someone was there.  I didn't know it was a

22  custodian.

23     Q    To your right, towards the windows.  Between you

24  and the windows, somebody was there?

25     A    Somebody went by.

55

1      Q    Okay.  Let's make sure just so we understand.
2  You're facing the mailbox on the south wall, and somebody
3  comes behind you?
4      A    Yes.
5      Q    And they come down to this end on the east wall?
6      A    Yes.
7      Q    You then turn, and you face the windows and you
8  start walking towards the west wall because you're going to
9  leave and go to work?
10     A    Yes.
11     Q    And as you turn to leave to go to work, you fall
12 down?
13     A    Yes.
14     Q    And when you fell down, the only people that you
15 saw in that Post Office were yourself and Mrs. Olivarez, the
16 cleaning lady?
17     A    Yes.
18     Q    And we already know that she was at the other end,
19 so there was nobody between you and the window; correct?
20     A    No, sir.
21     Q    And you had enough perception to realize she walked
22 behind you in what you said was a fairly wide hallway, but
23 you had no perception of anybody to your right, only to your
24 left?
25               MR. MANN:  Objection to the form of the

56

1  question.  It's a compound question.

2       Q    (Mr. Schammel)  Do you understand the question?

3       A    No.

4       Q    You said earlier the hallway was wide; correct?

5       A    It's not very wide, but not enough to --

6       Q    It was bigger than if you held out both your hands,

7  you said you couldn't touch both sides?

8       A    I would say maybe ten (10) feet.  I'm not sure.

9       Q    So in a ten (10) foot hallway, you're at the

10  mailbox.  Are you reaching into the mailbox?

11      A    Yes.

12      Q    So you're not too far from the wall; correct?

13      A    No.

14      Q    So that leaves, if it's about a ten (10) foot

15  hallway, you're a couple of feet from the mailbox?

16      A    I'm not sure how wide it is.  I didn't measure.

17      Q    Could somebody -- is there enough room for two (2)

18  people to walk next to each other?

19      A    Yes.

20      Q    Three (3) people?

21      A    I don't know about three (3) people, but...

22           MR. SCHAMMEL:  I'm going to tender to

23  plaintiff's counsel -- I think we're at Defendant's Five (5)

24  now.  If we can go ahead and have that marked?  And while

25  we're doing this, I'll go ahead and tender Defendant's Six

57

1   (6) also.

2                    (Defendant's Exhibit Numbers 5 and 6 marked.)

3        Q    (Mr. Schammel)  How many -- when you walk into the

4   Post Office, you step through the front door and you're in a

5   hallway.

6        A    Uh-huh (moving head up and down).

7        Q    Which way does that hallway go?  Does it go along

8   the front of the building, or does it go to the back of the

9   building?

10       A    It goes to the back.

11       Q    The -- looking at this diagram, Defendant's One

12  (1), you walk through the door.  Is this the main lobby area?

13       A    Yes.

14       Q    It runs north and south?  It parallels the front

15  wall of the building?

16       A    Yes.

17       Q    And there's two (2) hallways that come off of that;

18  correct?

19       A    Yes.

20       Q    Are both of those hallways identical, or is one

21  different from the other?

22       A    They're different.  This is very small.

23       Q    And the small hallway, if you look at Defendant's

24  Six (6), at the bottom of the page, there's a picture of the

25  front door.  And at the top of the page, there's a picture of

58

1  a small hallway with large boxes.  Is that --

2      A    Which is this one right here (indicating).

3      Q    The first one as you come in?

4      A    Yes.

5      Q    Which is not the hallway that you walked out?

6      A    No.

7      Q    If you look to Defendant's Five (5), we see a

8  longer hallway with lots of small boxes.  Is that the hallway

9  you were in?

10      A    Yes.

11      Q    In this picture right here, how many lights are on,

12  can you see on the ceiling?

13      A    Two (2).

14      Q    And is this a partial right there (indicating)?

15      A    I think so.

16      Q    Were all of those lights non-functioning?

17      A    They weren't functioning at all.

18      Q    But it was good enough that you could see to put

19  your key in the slot and good enough that you could at least

20  identify the particular letter you were looking for?

21      A    Oh, yes.  But, you know, it's on that far corner

22  over there, so...

23      Q    And at the very end of that picture on the bottom

24  of Defendant's Five (5), in the very back, that's where Ms.

25  Olivarez, the custodian, was?

59

1      A      Yes.

2      Q      And your Post Office box, is it about halfway down

3   that hallway or --

4      A      Further down.

5      Q      Further down?

6      A      Uh-huh (moving head up and down).  Yes.

7      Q      Now, you stated that after that fall in August, you

8   said you knew you were okay, nothing was broken?

9      A      Yes.

10      Q      As a result of the fall of November the 12th where

11   you sought medical attention five (5) days later on the 17th,

12   the reports indicate that there was a tear in the ligament,

13   but there's nothing broken there.  How did you know there was

14   a difference?

15      A      How did I know there was a difference?

16      Q      Well, you stated the reason you weren't concerned

17   the first time is because you knew nothing was broken.

18   Nothing was broken the second time either.

19      A      I was hurting very much.  I was swollen.  I was

20   very swollen.

21      Q      And in accordance with the statements you gave for

22   your medical treatment, you said you were receiving a pain

23   level of seven (7) out of ten (10) during that first fall in

24   August?

25      A      I was sore, yes.  They gave me pain killers, and I

60

1    was fine.

2        Q    In fact, the injury you received in the November

3    fall, they couldn't even detect anything until they did

4    surgery; is that correct?

5        A    (No response.)

6        Q    If you'd like, I can show you the medical records

7    that he use during your treatment or -- would you like to

8    look at those?

9        A    Yes.

10       Q    The first three paragraphs on this page

11   (indicating).  Take your time.

12       A    (Witness reviews documents.)

13           MR. MANN:  Are you asking her to read this

14   document --

15           MR. SCHAMMEL:  Just to --

16           MR. MANN:  -- to the record?

17           MR. SCHAMMEL:  No, just to refresh her own

18   memory.  She couldn't recall, so...

19           THE WITNESS:  (Witness reviewing documents.)

20           MR. MANN:  Do you understand the question?

21       Q    (Mr. Schammel)  Her doctor basically said he

22   couldn't see anything on the MRI.

23       A    Right.

24       Q    And that he thought if he did the arthroscopic

25   surgery, he might see something.

61

1      A    Right.

2      Q    But going back to that first fall in August, we

3   have no idea of what injuries occurred because they didn't

4   even do an x-ray, a sonogram or an MRI, let alone an invasive

5   procedure; correct?

6      A    All I had was physical therapy.

7      Q    So if you had an injury this time that the only way

8   they found it was doing surgery, how could you be sure you

9   weren't injured the first time?

10          MR. MANN:  Objection, it's argumentative.

11   Calls for an expert opinion.

12     Q    (Mr. Schammel)  Go ahead and answer the question.

13     A    What was the question?

14          MR. SCHAMMEL:  Could we have the question re-

15   read, please?

16          [Reporter's Note:  Requested portion was

17   read.]

18     Q    (Mr. Schammel)  If you know.

19     A    How could I be sure I was not injured the first

20   time?

21     Q    You're not a doctor; correct?

22     A    Because I felt fine.

23     Q    Even though you were receiving pain that you

24   described as above-average pain?

25     A    Well, at the time, yes.  I was in pain.  But I got

62

1  pain killers, and I was fine afterwards.  I kept telling

2  them, "I feel fine."

3      Q    And this was the same injury that you felt had no

4  relevance to your future treatment for the November accident?

5      A    (No response.)

6      Q    You felt that there was no reason at all to ever

7  tell anybody, "Hey, I've got a -- I fell.  I hurt myself.

8  You need to know that so you'll know what to do when you

9  treatment me."  You never told the doctors about it?

10     A    I felt fine.  That's why I -- I was fine.  He

11 didn't ask anything.  I never even thought about it, you

12 know.

13     Q    In your response to the discovery issued by Ms.

14 Nancy Masso, the attorney who handled my portion of the case

15 before I started on it, you mentioned doctors visits all the

16 way back to 1989, and some car accidents you had been into, I

17 believe in 1991.  But you never bothered to mention the

18 August of 1999 injury?

19     A    To whom?

20     Q    To my office as a response to the discovery that we

21 served upon you.

22     A    I didn't know what was going on --

23            MR. MANN:  Can you read the question and

24 answer on that?

25            MR. SCHAMMEL:  (Reviews documents.)  "Have you

63

1    ever been involved in an accident of any nature?  Please

2    state the date, the location, the names and the other parties

3    involved in each accident.  In addition, if you sustained

4    injuries as a result of an accident identified herein,

5    describe in detail the nature of said injuries."  Answer:  "I

6    was in an automobile accident in 1988 whereby I rear-ended a

7    car that had no tail lights.  I suffered a cracked sternum.

8    No claim was filed.  The other driver had no insurance.

9              Paragraph Two (2):  "I was in an automobile

10   collision in 1994-95 whereby I was rear-ended by Emilia

11   Montemayor.  I suffered from whiplash injuries for which I

12   received physical therapy.  A claim was filed against Mrs.

13   Montemayor's insurance company.  My attorney was Laura -- " I

14   believe it's "Mafrige."  And that was it.

15             Interrogatory Five (5):  "Prior to the

16   accident at issue, did you ever suffer any injury to your

17   body.  If so, please state, a., the nature of each injury and

18   the portion of the body injured, b., the date of injury, and

19   c., the name and address of attending or treating doctor in

20   each injury."  Answer:  "As I stated in the previous

21   interrogatory, I suffered a cracked sternum and whiplash.  I

22   do not recall the doctor who was seen for these injuries or

23   the exact date that they occurred."

24             MR. MANN:  We'll supplement our discovery.  I

25   think we included the doctors themselves and the treating

64

1   physicians.  We may have just left it off of that, those

2   requests.  We'll supplement our discovery responses.

3             MR. SCHAMMEL:  Thank you.

4       Q    (Mr. Schammel)  You, in that instance, you did list

5   the doctor, but you still -- and you never bothered to

6   mention that you had seen another doctor for an injury that

7   was similar?

8       A    Bothered to tell what?  I don't know what you mean.

9       Q    In November -- on November 17th of 1999, you knew

10  who the doctor was who treated you three (3) months earlier;

11  correct?

12      A    I don't remember who the doctor was.  I know it's a

13  physical therapy thing, but I didn't know -- I don't

14  remember.

15            MR. SCHAMMEL:  I'll tender Defendant's Seven

16  (7) to plaintiff's counsel for review and examination and

17  move that it be entered.  What we'll do is, once again, I'll

18  submit photocopies immediately hereafter.

19            MR. MANN:  You're offering the whole thing?

20            MR. SCHAMMEL:  I'm offering the whole thing.

21            MR. MANN:  (Reviews documents.)  No objection.

22            MR. ALMAGUER:  (Reviews documents.)  No

23  objection.

24            (Defendant's Exhibit Number 7 marked.)

25      Q    (Mr. Schammel)  The doctor you saw on that

65

1  particular time was a Doctor -- and forgive me if I

2  mispronounce his name -- Prasad Movva, M-o-v-v-a.  Do you

3  remember that doctor?

4       A    For what?

5       Q    For your injury that you suffered in August of

6  1999.

7       A    Is that a doctor?  I don't remember the name of

8  him.

9       Q    If you'll look at pages twenty-three (23) and

10  twenty-four (24), your treating physician?

11       A    (Witness reviews documents.)

12       Q    And in fact, in response to your interrogatories,

13  you didn't include his name.  Do you remember that doctor?

14            MR. MANN:  We did list San Benito Medical

15  Associates as the treating office.

16            MR. SCHAMMEL:  Okay.

17       A    (Witness reviews documents.)  I just had muscle

18  relaxers.  That's about it.

19       Q    (Mr. Schammel)  But you don't remember that doctor?

20       A    It sounds familiar.  I remember the name now.  But

21  at the time, I mean, like I said, he -- they were taking care

22  of all this.

23       Q    "They," being?

24       A    The School District.  But they're the ones who

25  referred me to go.

66

```
 1       Q    Do you recall as you're leaving where that yellow
 2   sign was?  Looking at the document that your attorney or
 3   someone in his office prepared, Defendant's Exhibit Number
 4   One (1), it indicates it was to the left as you came in the
 5   door.  However, looking at Defendant's Six (6), in both the
 6   pictures, you can see it not where it's located here, but by
 7   this other corner.  And I'll label the location of
 8   Defendant's Six (6).  (Counsel marks on Exhibit 1.)
 9                 MR. SCHAMMEL:  I'll ask to re-offer.
10                 MR. MANN:  No objection.  You're writing that
11   down as the location of the sign when the picture taken in
12   Defendant Exhibit Six (6) was taken?
13                 MR. SCHAMMEL:  Yes.
14                 MR. MANN:  When was taken?
15                 THE WITNESS:  That was taken later.
16       Q    (Mr. Schammel) But that's the same location --
17   that is the same location that was testified to by Ms.
18   Olivarez as having been the location placed?
19                 MR. MANN:  Objection, it assumes facts not in
20   evidence.  I don't think that's correct either.
21       A    It was right on the --
22                 MR. MANN:  I think Ms. Olivarez testified that
23   after this incident, she moved it and started placing it
24   there.
25       Q    (Mr. Schammel)  In accordance with Deposition
```

67

1   Exhibit Two (2), she listed the sign in her testimony as
2   having been placed in the same location as pictured in
3   Defendant's Six (6). If that is her testimony, which of
4   those two locations would be the correct location?
5        A    This one right here (indicating). The door -- it
6   was right by the door. You see over here the office.
7        Q    The one that is just to the left of the door as you
8   come in?
9        A    Yes.
10       Q    Not the one that we would see that is also
11  referenced is our Defendant's Six; is that correct?
12       A    That's correct.
13       Q    What time did you go to work this morning?
14       A    8:00 o'clock.
15       Q    And as you're driving to work, what path do you
16  take?
17       A    107 to Combes, and then Commerce.
18       Q    So you head east down 107 to Combes, and then down
19  to Commerce?
20       A    Yes.
21       Q    And as you're traveling on 107, you're traveling
22  east; correct?
23       A    Yes.
24       Q    Same direction the sun rises?
25       A    That's correct.

68

1    Q    How well were you able to see this morning?

2    A    Actually, it was foggy today.

3    Q    How about Friday?

4    A    Friday, sometimes the sun is bright.  Now with the

5    time change, of course...

6    Q    And we're almost four (4) years to the day of your

7    fall; is that correct?

8    A    Uh-huh (moving head up and down).

9    Q    But there was fairly ample light, given there is no

10   fog, at approximately 8:00 a.m. this morning?

11   A    (No response.)

12   Q    If there is no -- at 8:00 o'clock in the morning --

13   was there fog on the day that you went to the Post Office and

14   fell?

15   A    No.

16   Q    Friday, was there any fog as you drove into work?

17   A    Friday, I don't think so.  I don't think there was

18   fog.

19   Q    Was it fairly light when you were driving in?

20   A    Yes.

21   Q    The sun had been up for a while?

22   A    I go later now than before.  Before, I used to go

23   in at 7:30.

24   Q    But there was more than ample light this morning --

25   or excuse me, on Friday?

69

1      A      There was, yes.  I leave a quarter 'til 8:00.

2                  MR. SCHAMMEL:  Pass the witness.

3  BY MR. ALMAGUER (2:52 p.m.):

4      Q      Just a few follow-up questions, ma'am.  The

5  accident happened on November 12th of 1999, and you stated

6  earlier you were married about a month later; is that

7  correct?

8      A      Yes.

9      Q      That marriage, where did you have your ceremony or

10 where did you celebrate that marriage?

11                  THE WITNESS:  (To counsel.)  What does that

12 have to do with it?

13     Q      (Mr. Almaguer)  Please answer the question, ma'am.

14     A      We got married in Las Vegas.

15     Q      Did you travel over there?

16     A      We flew.

17     Q      Okay.  Was it a flight or you drove?

18     A      A flight.

19     Q      I'm sorry.  It was a flight, yes.  How much time

20 did you spend over there?

21     A      About three (3) days.

22     Q      Was there any kind of pain involved when you

23 traveled over there, when you were over there?

24     A      Yes.

25     Q      But you got a chance to fly to Vegas and back --

70

1    A    It was a small wedding, yes.

2    Q    -- and be there for three (3) days.  Isn't that

3 correct, ma'am?

4    A    Uh-huh (moving head up and down).

5    Q    Is that a yes, ma'am?

6    A    Yes.

7    Q    This was a month after the accident happened; is

8 that correct?

9    A    Yes.

10   Q    Let me show you what has been previously marked as

11 Defendant's Exhibit Number Four (4) here, these medical

12 records.  Page -- bates stamp number twenty-four (24), can

13 you tell me what the title of that document is there?  Can

14 you read it out loud for the record, please?

15   A    "Notification Regarding Maximum Medical Improvement

16 Or Impairment Reading."

17   Q    Do you know what that is, ma'am, what that means at

18 all?

19   A    It's how well you're doing, how you're recovering.

20   Q    Okay.  So that was explained to you by someone?

21   A    No.

22   Q    And you see the address there that it was addressed

23 to you; isn't that correct?

24   A    Yes.

25   Q    Can you tell me the date there that is stated on

71

1   top of the Date of Notice?

2       A    11/8/99.

3       Q    That's the Monday before the accident.  Isn't that

4   correct, ma'am?

5       A    (No response.)

6       Q    Can you confirm that with me, ma'am?  November 8th

7   of 1999, is that the Monday or four (4) days before the

8   accident; is that correct?

9       A    I suppose so, yes.

10      Q    And that was mailed over to you according to that

11  document.  Isn't that correct, ma'am?

12      A    I probably -- it probably was.

13      Q    And it may be you got it the day before or the day

14  of the accident.  Isn't that correct, ma'am?

15      A    What was the date of the accident?

16      Q    The day of the accident was November 12th, 1999,

17  four (4) days after that.  Isn't it true you must have

18  received that notification the day before or the day of?  Can

19  you answer the question, ma'am?

20      A    Yes.

21      Q    Okay.

22      A    It's says "been assigned a whole body impairment

23  rating of zero percent."

24      Q    That's what you're reading now at this point;

25  right?

72

1      A    Yes.

2      Q    So it's indicating to you that you were at this

3   point, you needed no longer any more therapy.  Doesn't it

4   also indicate -- or you can read this one phrase here that's

5   marked off as an "X" in that paragraph.

6      A    This one (indicating)?

7      Q    No, no.  Let's me see.  I'm reading it upside down

8   here.  "Based on this report...," can you read that sentence

9   that reads like that?

10     A    "Based on this report, you are not eligible for

11  additional income payments of any type.  You continue to

12  remain and entitled to receive medical treatment related to

13  your injury."

14     Q    Okay.  So that indicates you can still get medical

15  treatment.  That doesn't mean you're going to get any more

16  income benefits, is that correct, according to what it says

17  there?  Isn't that correct?

18     A    "Income benefits of any type?"  I didn't have any

19  Workman's Comp at all.

20     Q    But you understand the maximum medical improvement

21  in this report of a treating doctor is based on Worker's Comp

22  coverage law?  Do you understand that, ma'am?

23     A    No.  What do you mean?

24     Q    Well, "maximum medical improvement" is a term used

25  in the Worker's Comp field.  You're saying that Human

73

1   Resources or Personnel sent you to this doctor; isn't that
2   correct?

3       A    That's correct.

4       Q    And they never explained to you this was actually
5   Worker's Comp they were sending you to?  Did they explain
6   that to you?

7       A    No, because I never received anything.

8       Q    According to this document here though, you did
9   receive that the week of, if not the day of the accident;
10  isn't that correct?

11      A    I received my regular paycheck because I never
12  missed work.

13      Q    That's not the question I'm asking you.  According
14  to that document there that's addressed to you on November
15  the 8th, 1999, you must have received that document if not
16  the day of, maybe the week of or the day before the day of
17  the accident.  Isn't that correct, ma'am?

18      A    Probably so.

19      Q    And it indicates there you're not going to get any
20  income benefits, but you will continue to get medical
21  benefits.  Isn't that correct, ma'am?  Isn't that what it
22  states in there?

23      A    Yes.

24              MR. ALMAGUER:  No further questions.

25              MR. MANN:  I have a brief number of questions,

74

1  and I'll reserve the majority of them.  I'm just going to ask

2  a few.

3  BY MR. MANN (2:59 p.m.):

4      Q    Defendant's Exhibit One (1), what was the condition

5  of the lobby area where the location of the fall is

6  identified when you were arriving to get your mail?

7      A    It was early in the morning, so --

8      Q    What was the condition of the floor?  Was it wet or

9  was it dry?

10     A    It was dry when I walked in.

11     Q    What was the condition of the floor when you turned

12 around and were leaving the lobby area?

13     A    It was wet.

14     Q    In your years of experience, which side does -- or

15 from what direction does the sun rise?

16     A    From the east.

17     Q    What are the directions of the location of the

18 windows as depicted in Defendant's Exhibit One (1)?

19     A    They're on the west side.

20     Q    What is your experience with a sun that is just

21 rising in relation to its introducing light into a window

22 that is located on the west side of a building?

23     A    Not much.

24     Q    And what time was this again were you there?

25     A    Around 7:15 a.m.

75

1     Q    And what was the approximate location of the sun

2  with respect to the horizon again at this time?

3     A    Not very much.  It was pretty low.

4     Q    I'd like for you to look at bates stamp twenty-four

5  (24) on Defendant's Exhibit Number Four (4).  Do you remember

6  ever receiving this document?

7     A    Yes, I did receive, but I probably didn't read it

8  all because I was already finished with the two (2) weeks

9  that they gave me for treatment.

10    Q    Did you know that according to this document that

11 you could have continued to get medical treatment for any

12 knee problem that you had for free?

13    A    Yes.

14    Q    Why didn't you do that?

15    A    I felt fine.

16    Q    You didn't feel the necessity of falling again in

17 order to get extra medical benefits?

18              MR. ALMAGUER:  Objection, leading.

19    A    No, sir.

20              MR. SCHAMMEL:  I'll join in the objection.

21    Q    (Mr. Mann)  What income benefits did you get in

22 addition to your normal wages as a result of the August fall,

23 that you remember?

24    A    None.  None.

25    Q    When Mrs. -- when the custodian pointed out the

76

1   "Caution-Wet Floor" sign to you, where did she indicate it

2   was located?

3       A    She said, "It's over there."

4       Q    And where was that, "Over there," if you'll point

5   to it on Defendant's Exhibit One (1)?

6       A    Over on this left-hand corner as you walk in

7   (indicating).

8            MR. MANN:  Let the record reflect she has

9   pointed to the location of, in quotes, "Caution-Wet Floor"

10  sign that is on the left -- it is the left circle inside the

11  lobby area.

12      Q    (Mr. Mann)  Did you read under number seventeen

13  (17), the date which you had --

14           MR. MANN:  Strike that.

15      Q    (Mr. Mann)  What is the date at which you received

16  maximum medical improvement according to document bates stamp

17  twenty-two (22) of Exhibit Four (4)?

18      A    It's marked, "Yes, I certify the above-named

19  employee has reached maximum medical improvement on -- "  The

20  date is --

21      Q    Can you not read that?

22      A    No.

23           MR. SCHAMMEL:  If counsel wants to read it, I

24  have no objection, if you can read it.

25      Q    (Mr. Mann)  9/20, 1999.

77

1    A    "This date may not be prospective."

2    Q    Can you make out the signature of the doctor?

3    A    No.

4    Q    When did he sign it?

5    A    10/18 of '99.

6    Q    Why did you decide to have the surgery to find out

7    what was wrong with your knee?

8    A    My knees were getting swollen all the time, and I

9    was in pain.

10    Q    Was this different than the condition that you were

11    experiencing from your fall at school?

12    A    Yes.

13    Q    After your fall in the Post Office, did you ever

14    seek any additional medical help from any sort of doctor or

15    treating physician as would have been permitted under bates

16    stamp number twenty-four (24) of Defendant's Exhibit Four

17    (4)?

18    A    No.

19        MR. MANN:    I'll reserve the rest of my

20    questions for trial.

21        MR. SCHAMMEL:    I just have one or two.

22    BY MR. SCHAMMEL (3:04 pm.):

23    Q    According to Defendant's Number Four (4), bates

24    stamp twenty-three (23), the last sentence in fact, the

25    doctor had to guess that you had reached the MMI level

78

1    because you never went in to see him to check out any

2    progress you made with regards to that injury; correct?

3                    MR. MANN:  Objection.  That calls for facts

4    not in evidence.  This document speaks for itself.  If you'd

5    like to read the document and have her answer whether that's

6    what it says or not?

7        Q    (Mr. Schammel)  The doctor says, according to this

8    letter, and I quote, "The patient was released to limited

9    work, but patient subsequently did not follow-up her office

10   visits.  I assume the patient has reached MMI by this time."

11   So you never went back for a final office visit with this

12   doctor; did you?

13       A    I kept telling them, "I'm fine."  They made me go.

14       Q    Even though your other -- your physical therapy

15   reports indicated you were still in pain, you didn't go back?

16       A    Because I was taking pain pills.  You know, I was

17   fine.

18       Q    When did you stop taking pain pills?

19       A    I took them for a couple of weeks or so, and that's

20   it.

21       Q    Were you taking any in October?

22       A    No.

23       Q    A few minutes ago, you stated that when you walked

24   in, the floor was dry.  When you walked out, it was wet, you

25   slipped and you fell.  Correct?

79

1    A    That's correct.

2    Q    Earlier you stated that you knew that someone

3 passed behind you and that they were off to your left, but

4 there was nobody to your right?

5              MR. MANN:  Objection, assumes facts not in

6 evidence.  It mischaracterizes her testimony.

7    Q    (Mr. Schammel)  Earlier, when I asked you the

8 question earlier, I asked you if you knew that somebody

9 passed behind you.  You said, "Yes," is that correct?

10    A    Yes.

11    Q    You said you knew she was down to the left, but you

12 really didn't know what she was doing?

13    A    No.

14    Q    But you also stated that there was nobody between

15 you and that window; correct?

16              MR. MANN:  Objection, that mischaracterizes

17 the evidence.

18    Q    (Mr. Schammel)  You stated there was nobody between

19 you and that window; correct?  Was there anybody else in that

20 building when you fell?

21    A    No one else.  Nobody else.

22    Q    So if that person was either behind you or to your

23 left, that person was not to your right; correct?

24    A    When?  When I started going back?

25    Q    When you were there reading through your mail to

80

1    find that one piece of mail you were looking for, --

2        A    Yes.

3        Q    -- you knew that there was somebody that moved

4    behind you?

5        A    Yes.

6        Q    You knew that person was doing something to your

7    left?

8        A    Yes.

9        Q    And there was nobody else there?  It was just the

10   two of you?

11       A    Nobody else was there.

12       Q    How did the water get immediately to your right?

13       A    She probably was mopping right behind me when I was

14   checking my mail.

15       Q    But you stated that you turned and went to your

16   right, towards that window, and you didn't go backwards, you

17   didn't left.  You went to the right, the place that you say

18   there was nobody at.  How did that floor get wet?

19            MR. MANN:  Objection, --

20       A    When I was getting the mail --

21            MR. MANN:  -- that mischaracterizes the

22   evidence.  She testified someone passed by her.  You have to

23   go past there to pass by her.

24       Q    (Mr. Schammel)  Did she pass behind you or did she

25   pass -- did she walk next to you, the right side of you?

81

1       A      I was bending down getting my mail when somebody
2    went behind me.

3       Q      Went behind you?

4       A      Yes.

5       Q      They didn't go to your right?  They went behind
6    you?

7       A      Yes.

8       Q      Who went to your right and put the water on the
9    floor; do you know?

10      A      The person with the mop.

11      Q      The one that was behind you and to your left?

12      A      Exactly.

13             MR. SCHAMMEL:  Thank you.

14             MR. MANN:  Any more questions?

15             MR. SCHAMMEL:  No further questions.

16             MR. MANN:   I do.  Just one re-direct.

17   BY MR. MANN (3:08 p.m.):

18      Q      How does someone pass behind you where the "X" is
19   located without going between you and the window?  Is that
20   physically possible?

21      A      You've got to go in between -- well, of course not.
22   They have to go between me and the window.

23      Q      So if you were to listen to the Government's
24   attorney's question which asks how water gets between you and
25   the window, would your answer be on how a person could be --

82

1              MR. SCHAMMEL:  Objection, leading.

2        Q    (Mr. Mann) -- on how a person could be between you

3   and the window, if such person had passed between you and the

4   window, --

5              MR. SCHAMMEL:  Objection to compound.

6   Objection to leading.

7              MR. ALMAGUER:  Join in the objections.

8        Q    (Mr. Mann)  Go ahead and answer the question.

9        A    If they passed right by me, I'm sure they passed by

10  the window while I headed back.

11       Q    Where was the custodian located throughout the

12  entire time you were in the Post Office?

13       A    She was --

14       Q    Was she in more than one spot?

15       A    When I saw her?  When I turned to see her?  She was

16  walking behind me when I was checking the mail.

17       Q    Was the custodian carrying a mop?

18       A    Yes.

19       Q    Do you remember approximately how long the mop

20  handle was?

21       A    Long.  It was a big mop.

22       Q    Do you feel it's possible that the custodian mopped

23  directly behind you and possibly, potentially a little bit to

24  your right?

25             MR. SCHAMMEL:  Objection, calls for

83

1    speculation.

2              MR. ALMAGUER:  And leading.

3       Q    (Mr. Mann)  Answer the question.

4       A    Yes.

5       Q    Can you tell the Court and the jury, if there is

6    one in this case, how you feel, based on the custodian

7    passing behind you, that the floor got wet where you fell?

8              MR. SCHAMMEL:  Calls for speculation.

9    Objection, form.

10      A    I feel she was not following whatever rules the

11   Post Office must have had because she didn't place the sign

12   on where she was mopping; otherwise, I would have seen it.

13      Q    (Mr. Mann)  Well, how do you feel about the floor

14   getting wet where you slipped?

15      A    I feel it's --

16             MR. SCHAMMEL:  I'll renew the objection.

17   Calls for speculation.

18      A    I just feel the Post Office was not following

19   procedures by not having the light primarily because --

20      Q    (Mr. Mann)  Do you remember if there was a leak in

21   the ceiling?

22      A    No.

23      Q    And you were the only person there with the

24   custodian?

25      A    Yes.

84

1       Q     And who was it that was the one who was holding the

2   mop?

3       A     The custodian.

4       Q     What was the condition of the floor when you fell?

5       A     It was wet.

6       Q     At any point in time, did you ever have an

7   opportunity to inspect the mop, the part that is used on the

8   floor?  Did you see the mop that was used on the floor?

9       A     Yes.  That's when I saw her with the mop.

10      Q     And what was the condition of the mop?

11      A     It was wet.  She was mopping.

12            MR. MANN:  I'll reserve the rest of my

13  questions for trial.

14            MR. SCHAMMEL:  Nothing from the Government.

15            MR. ALMAGUER:  A few questions to follow-up on

16  the questions Mr. Mann just asked right now.

17  BY MR. ALMAGUER (3:12 p.m.):

18      Q     You mentioned a minute ago, ma'am, that Ms.

19  Olivarez, the custodian, had a big mop; is that correct?

20      A     Uh-huh (moving head up and down).

21      Q     "Yes" or "no," ma'am?

22      A     Yes.  I'm sorry.

23      Q     About how tall is Ms. Olivarez, if you can

24  remember?

25      A     Not very tall.

85

1      Q    You mentioned earlier too that when you walked into

2  that building, you went to your Post Office P.O. box to check

3  it, you didn't notice a person there in the Post Office; is

4  that correct?

5      A    I noticed someone was there.  I didn't see.  I

6  didn't look to see who that person was.

7      Q    Where did you notice them?

8      A    It was someone.

9      Q    Where did you notice them?

10     A    On the first hallway, the little one.

11     Q    As soon as you walked into the building, or the one

12  towards --

13     A    This one right here (indicating).

14     Q    Okay.  As you walk in, the smaller one you

15  mentioned earlier?

16     A    Yes.  Someone was there.

17     Q    That's the one also I think depicted in one of the

18  exhibits here.  Let me see if I can find it.  In Defendant's

19  Exhibit Number Six (6), this is a little hallway, I guess at

20  the top of the page there?

21     A    Yes.  She must have been walking there, and she

22  went around where I was.

23     Q    Are you sure about this?  You saw them?

24     A    Yes.  Someone was there, so nobody else came.  The

25  door never -- you know, nobody else came.

86

1    Q    So you saw her mopping there?

2    A    I saw someone there, but I didn't look.

3    Q    How come you didn't look?

4    A    I was on my way to get my mail.

5    Q    And you mentioned she had like a large size or big

6 mop; is that correct?

7    A    Yes.  I saw it when I fell.

8    Q    And Ms. Olivarez is not that big of a person; is

9 that correct?

10    A    I mean, she's not tall, tall, tall, but --

11    Q    She's --

12    A    -- she's not short, short.

13    Q    Is she taller and bigger than you?

14    A    Average, probably.

15    Q    Is she taller or bigger than you?

16    A    No.

17    Q    You mentioned also as soon as you checked your

18 mail, you took a step and then slipped; is that correct?

19    A    Yes.

20    Q    You didn't take more than two (2) or three (3)

21 steps?

22    A    No.  I turned around and I took a step, and I fell.

23    Q    So that means, according to your testimony then,

24 that somebody must have mopped right next to you while you

25 were checking your mail.  Isn't that correct?

87

1    A    Probably, yes.

2    Q    So you're saying that a lady of average height,

3    maybe a small lady with a large mop mopped right next to you

4    a few inches over, and you didn't notice that?  Is that

5    correct?

6    A    I was bending down getting my mail.

7    Q    Is it a "yes" or "no," ma'am?

8    A    No.

9    Q    You didn't notice her?

10   A    I noticed her.  I felt someone behind me.  I did

11   notice her then.

12   Q    And that person being Ms. Olivarez with a large mop

13   might have mopped about six (6) inches away from you; is that

14   correct?  That's according to your testimony; isn't that

15   correct?

16   A    She was behind me.  I don't know.

17   Q    The question again is, ma'am, just to clarify this.

18   A    Yes.

19   Q    If Ms. Olivarez is mopping with a large mop, she

20   must have mopped really close to you, a few inches away, for

21   you to take one step and fall.  Isn't that correct?

22   A    Yes.

23   Q    Okay.  And you say you never noticed that mop until

24   after your fall; is that correct?

25   A    Yes.

88

1    Q    And Ms. Olivarez was helping you stand up; is that

2    correct?

3    A    Yes.

4         MR. ALMAGUER:  No further questions.

5         MR. MANN:  A few more.

6    BY MR. MANN (3:16 p.m.):

7    Q    How big are your feet?

8    A    Seven and a half (7-1/2).

9    Q    Do you -- in follow-up to custodian defendant

10   attorney's question, do you feel that potentially the floor

11   could have been wet at a little bit more than a few inches

12   and you still could have stepped on it with your first step

13   back?

14        MR. ALMAGUER:  Objection, speculation and

15   leading.

16        MR. SCHAMMEL:  I'll join.

17   Q    (Mr. Mann)  Can you answer the question?

18   A    Yes.

19        MR. SCHAMMEL:  Just to clarify.  Was that,

20   yes, you can answer the question, or yes to the question?

21   Q    (Mr. Mann)  Was that yes -- I'll do it again.  What

22   is your contention regarding how far away the wet floor was

23   from where you initially turned around and slipped?

24   A    Right behind me, when I closed the mailbox and

25   stepped away and turned around.

89

1      Q    On Exhibits Five -- Defendant's Exhibit Five (5),
2  there are some tiles.  In fact, there are -- well, can you
3  count the tiles that you can see on Exhibit Five (5)?
4      A    (Witness complies.)  Seven and a half, seven (7)
5  tiles.
6      Q    Can you state approximately which tile you were
7  standing on when you were checking your mail?
8      A    Probably the second one.
9      Q    And which tile would your first step have been on
10 when you stepped back and you slipped on the wet floor?
11     A    The third one, and then turned back.
12     Q    Did you ever expect anyone to mop directly behind
13 you?
14     A    No.
15              MR. MANN:  Reserve the remainder of my
16 questions for trial.
17 BY MR. SCHAMMEL (3:18 p.m.):
18     Q    Just for my clarification.  Earlier you stated you
19 went straight to the right.  Now you're saying that you
20 stepped backwards.  Which direction did you go?
21     A    When I closed the box, I stepped backwards, and
22 then I went straight to the right.
23     Q    And it's once you went to the right that you fell?
24     A    Yes.
25              MR. SCHAMMEL:  Okay.  Nothing further.

90

1          MR. ALMAGUER:  Nothing further.

2          MR. MANN:  Nothing further.

3          [Deposition concluded at 3:18 p.m.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

91

## CHANGES AND SIGNATURE

**NAME:  GLORIA LONGORIA**            **DEPOSITION DATE:   11/10/03**

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 45 | 25 | the windows let "some" light | (wrong verbiage) |
| 46 | 5 | I didn't observe the sign | " |
| 46 | 15,16 | had the sign been placed in the middle of the isle, I knew I would have seen it. | |

## ORIGINAL

**DIANA LEAL WEIBEL, C.S.R. #4192**
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

92

    I, GLORIA LONGORIA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_Gloria Longoria_
GLORIA LONGORIA

THE STATE OF _Texas_
COUNTY OF _Cameron_

    Before me, _Lorie M Sanders_, on this day personally appeared _Gloria Longoria_, known to me (or proved to me under oath or through I.D. (_____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _4th_ day of _January_, _2004_.

(SEAL)

_Lorie M Sanders_
NOTARY PUBLIC IN AND FOR
THE STATE OF _Texas_

## ORIGINAL

93

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA L. GARCIA            *
                           *
VS.                        *
                           *    C.A. B-02-017
UNITED STATES OF AMERICA    *
ET AL                      *

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF GLORIA LONGORIA
November 10, 2003

I, DIANA LEAL WEIBEL, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, GLORIA LONGORIA, was duly sworn by me and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on the 5th day of December, 2003, to Counsel for the Witness, Mr. Jason Mann, for examination, signature and return to me by the 4th of January, 2004;

That the amount of time used by each party at the deposition is as follows:

Mr. Jason R. Mann:           11 mins.

Mr. Steven Schammel:   1 hr., 27 mins.

Mr. Pablo Almaguer:          19 mins.

That $ 512.00 is the deposition officer's charges to Counsel for the Government for preparing the original deposition transcript and any copies of exhibits;

# ORIGINAL

**DIANA LEAL WEIBEL, C.S.R. #4192**
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

94

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Jason R. Mann, Counsel for Plaintiff
J. Edward Mann, Jr. & Assoc.
222 E. Van Buren, Suite 701, Harlingen, TX  78551

Mr. Steven Schammel, AUSA, Counsel for Government (CA)
U.S. Attorney's Office
1701 W. Bus. 83, Suite 600, McAllen, TX  78501

Mr. Pablo J. Almaguer, Counsel for Deft. Olivarez
Texas Rural Legal Aid, Inc.
316 S. Closner, Edinburg, TX  78539

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

CERTIFIED TO BY ME THIS 5TH DAY OF DECEMBER, 2003.

DIANA LEAL WEIBEL, TX CSR #4192
Expiration Date:  12/31/03
Notary Public-State of Texas
P.O. Box 608, Mission, TX 78573
PH:  956/580-2778·Cell 330-9180
Fax  956/580-3148

*ORIGINAL*

95

### RETURN CERTIFICATE

The original deposition (WAS) ~~WAS NOT~~ returned to the
deposition officer on _01/13/04_ ;

      If returned, the attached Changes and
Signature page contains any changes and the reasons therefor;

      If returned, the original deposition was
delivered to <u>Mr. Steven Schammel</u>, Custodial Attorney;

      That $ _512.00_ is the deposition officer's
charges to Counsel for the _Government_ for preparing the
original deposition transcript and any copies of exhibits;

      That a copy of this certificate was served on
all parties shown herein on.

CERTIFIED TO BY ME THIS _13th_ DAY OF _January_ , 2004.

DIANA LEAL WEIBEL, TX CSR #4192
Expiration Date: 12/31/03
Notary Public-State of Texas
P.O. Box 608, Mission, TX 78573
PH: 956/580-2778·Cell 330-9180
Fax 956/580-3148

## ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA L. GARCIA                    *
aka Gloria Guzman                   *
                                    *
VS.                                 *
                                    *   C.A. B-02-017
UNITED STATES OF AMERICA            *
ET AL                               *

**************************************************
ORAL DEPOSITION OF
GLORIA LONGORIA
NOVEMBER 10, 2003
**************************************************

[ E X H I B I T S ]

Number:    Description:

No. 1      Diagram of U.S. Post Office

No. 2      Valley Orthopedic Surgery
           Medical and Billing Records

No. 3      Rio Grande Valley Imaging and Diagnostic
           Clinic - Medical and Billing Records

No. 4      Texas Association of School Board
           Medical Records

No. 5      Copies of photographs (2)

No. 6      Copies of photographs (2)

No. 7      San Benito Medical Associates
           Medical and Billing Records

===============================================================
DIANA LEAL WEIBEL, C.S.R. #4192
P.O. Box 608, Mission, Texas  78573
PH:  (956) 580-2778 · Cell 330-9180 · Fax 580-3148
===============================================================

ORIGINAL



MAIN BUILDING

LOCATION OF "CAUTION WET FLOOR" SIGN

WET FLOOR Sign from DEP 6

LOBBY AREA

TABLE

WINDOW

TABLE

WINDOW

E

N          S

W

ENTRANCE

PARKING LOT

UNITED STATES POST OFFICE
SANTA ROSA, TEXAS
78593

Records Pertaining to:  **Gloria L. Garcia a/k/a Gloria Guzman**

Records From:  **VALLEY ORTHOPEDIC SURGERY**
**MEDICAL AND BILLING RECORDS**

Deliver to:  **Nancy L. Masso**
**UNITED STATES ATTORNEY'S OFFICE**
**600 EAST HARRISON ST #201**
**Brownsville, Texas  78522-**



# Records Retrieval • Document Imaging • Litigation Support

801 E. Nolana, Suite 10
McAllen, Texas 78504
(956) 668-7327
(956) 668-7328 fax
1-888-660-7327



1201 East Van Buren
Brownsville, Texas 78520
(956) 504-0444
(956) 504-0015 Fax
1-888-447-0444



Records Pertaining to: **Gloria L. Garcia a/k/a Gloria Guzman**

Records From: **VALLEY ORTHOPEDIC SURGERY**
**MEDICAL AND BILLING RECORDS**

Deliver to: **Nancy L. Masso**
**UNITED STATES ATTORNEY'S OFFICE**
**600 EAST HARRISON ST #201**
**Brownsville, Texas 78522-**

*Litigation Support Services Include:*

- *Courthouse Filings, Research, Retrieval & Copying*
- *Coordination of Document Productions & Express Delivery to Multiple Parties*
- *Document Numbering & Indexing*
- *Scanning onto Diskette*
- *File Duplication Including Indices, Tabs, Labels, Folders, Binders, etc.*
- *Creation of Brief Covers on Cardstock & Binding*
- *Volume Copying*

2984/R02090260

THE STATE OF TEXAS   §
                            §

COUNTY OF Cameron   §

## *AFFIDAVIT*

BEFORE ME, the undersigned authority, personally appeared *Roberta Reyes*_____, who, being by me duly sworn, deposed as follows:

My name is *Roberta Reyes*_____. I am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated:

"I am the custodian of Medical and Billing Records for VALLEY ORTHOPEDIC SURGERY, 1629 Treasure Hill Blvd. Ste. B1, Harlingen, Texas 78550. Attached hereto are Medical and Billing Records from VALLEY ORTHOPEDIC SURGERY pertaining to **Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51.** These said records are kept at the office of VALLEY ORTHOPEDIC SURGERY in the regular course of business, and it was in the regular course of business at the office of VALLEY ORTHOPEDIC SURGERY for an employee or representative with personal knowledge of the act, event, condition, opinion, or diagnosis recorded to make the memorandum or record or to transmit information thereof to be included in such memorandum or record; the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis recorded or reasonably soon thereafter; and the method of preparation of the records was trustworthy.

The records attached hereto are the original or exact duplicates of the original."

_____
Custodian of Medical and Billing Records for
VALLEY ORTHOPEDIC SURGERY

SWORN TO AND SUBSCRIBED before me the _3_ day of _October_____, 2002.

_____
NOTARY PUBLIC STATE OF TEXAS
MY COMMISSION EXPIRES: _____

ELIZABETH G. GUZMAN
MY COMMISSION EXPIRES
March 21, 2005

2984/R02090260

**Medical Records**

**BLISS W. CLARK, M.D., P.A.**
1801 TREASURE HILLS BOULEVARD
HARLINGEN, TEXAS 78550

DIPLOMATE, AMERICAN BOARD OF ORTHOPEDIC SURGERY

TEL. (210) 421-28xx
FAX (210) 421-24xx

July 5, 2000

Dr. Raul Garza
400 W. Hwy. 77
San Benito, TX 78586

RE: Gloria L. Garcia, DOB: 7-20-51

Dear Dr. Garza:

Thank you for referring this woman for evaluation of her knees     *BWC 8/7/00*

She fell at the post office approximately in November of 1999, and you have been following her since. She indicates that she recalls you stating that you thought she might have sustained ligamentous injury to the knees at that time. She has been on various anti-inflammatory and analgesic medications, and because of persistent pain in her knees you referred her here for my evaluation. She is a secretary for the school district, San Benito High School, and is currently out for the summer.

On exam today, bilateral findings are as follows: range of motion is 0-130°, no ligamentous instability, joint line tenderness medially and laterally, no obvious effusion, and nerve vascular exam is intact.

X-rays that she brought with her are normal.

**IMPRESSION:** This could just be a chronic posttraumatic synovitis type situation. There may be meniscal damage.

**PLAN:** I will get a MRI scan of both knees and see her back thereafter. I explained to her that if it is an inflammatory type problem there may not be much that I will be able to do for her, but we will certainly give her the benefit of an evaluation and carefully thought out opinion.

Thank you for the referral.

Very sincerely,

*Bliss W Clark*

BLISS W. CLARK, MD     Signature Stamped
                       Without Proofing

BWC/bl

 

**BLISS W. CLARK, M.D., P.A.**
DIPLOMATE, AMERICAN BOARD OF ORTHOPEDIC SURGERY
1601 TREASURE HILLS BLVD.
HARLINGEN, TEXAS 78550

TEL. (956) 421-2663
(956) 423-5220

COMPUTER # *GARGL003*

Name *Gloria Garcia* *7/20/51* *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* *F/49* *7/24/0*
First    Last    Birthdate    Social Security #    Sex    Date

*of both knees  BWC 8/7/00*

GARCIA, GLORIA            10860        JULY 24, 2000            This woman comes in for
re-evaluation after getting her MRI scan. This is interpreted by the radiologist as showing a grade II signal change in
the medial meniscus with an effusion in the knee that is slight. On my interpretation of the MRI scan and in my
opinion it is frankly normal. She continues to be symptomatic, and says that after periods of long sitting or driving
she gets swelling in the knee and medial pain.

I explained that at this point I do not have a good explanation for what appears to be a posttraumatic synovitis
picture. Obviously it is related to the trauma she had where she fell, but the question here is whether there is a
surgical lesion. I told her with the MRI scan being normal the chance of me finding a surgical lesion at the time of an
arthroscopic procedure is less than 20%. I would be willing to proceed with surgery, but it is important for her to
understand I may not find any obvious pathology that would explain her symptoms.

I did go over the risks of surgery including infection, nerve or vascular damage, anesthetic risk, and DVT. This
would need to be factored in to any decision making process in my opinion. I explained we could continue to pursue
a medical management approach with a corticosteroid injection and trial of Medrol. I went over the side effects of
that with her.

**PLAN:** She elected to take me up on my offer of Celebrex samples for a couple of weeks because it is not clear
whether she has taken Celebrex in the past. I will see her back in two weeks and see how she is coming along. She
can then decide how she would like to proceed at that juncture.
BWC/bl 07-24-2000//07-25-2000            BLISS W. CLARK, MD

*√ sent to Dr. Hamp — 7/31/2000 DLM*

GARCIA, GLORIA            10860        AUGUST 7, 2000            This woman comes
in for re-evaluation. She came with her husband today. Celebrex did not do that much for her. She continues to have
bilateral knee pain, left worse than right.

I went over options again, Medrol, and went over all the side effects with her. Her husband was there. I talked about
a corticosteroid injection. Her husband was concerned that this could mask a problem and that she could get further
damage in the knee, but this is very unlikely with the MRI scan being normal. I went over again surgery, and risks of
surgery including infection, nerve or vascular damage, anesthetic risk, and DVT. The chance is less than 5% she
would have more pain after surgery. Recovery is generally two weeks to two months. She may need therapy, and I
may not find anything at the time of surgery either with the MRI scans being normal.

After going over all of this again today with her husband present, she elected to go ahead and try the Medrol.

**PLAN:** I will see her back in about 10 days to see how she is responding to this.
BWC/bl 08-07-2000//08-08-2000            BLISS W. CLARK, MD

*Sent copie to Dr. Raul on 8-11-00    C.A.Z*

000002

 

**BLISS W. CLARK, M.D., P.A.**
DIPLOMATE, AMERICAN BOARD OF ORTHOPEDIC SURGERY
1601 TREASURE HILLS BLVD.
HARLINGEN, TEXAS 78550

TEL. (956) 421-2663
(956) 423-5220

COMPUTER # *GARGL003*

Name *Gloria Garcia* *7/20/51* *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*     *9/6/00*
First     Last     Birthdate     Social Security #     Sex     Date

GARCIA, GLORIA          10860          SEPTEMBER 6, 2000          This woman comes in for re-evaluation of her knees. As it turns out, she had a chronic thorn present in the right elbow olecranon bursa area from about a year ago. She never mentioned this to me. In any event, she developed redness and swelling in the right elbow. She apparently saw a doctor in Santa Rosa who started her on antibiotics, and told her she would need to have this area explored and the thorn removed several days after the infection settled down.

On exam today, there is substantial resolution of erythema by history, and the erythema is now concentrated around the olecranon area, and the area of swelling essentially where this thorn is located is noted. There is no obvious fluctuance. There were two areas where apparently pus was aspirated.

**IMPRESSION:** Retained foreign body. Probably became exacerbated and led to infection because of her being on the Medrol which she has been taken off of.

**PLAN:** I think it would be prudent to get this removed and explained that to her. I think the best thing would be to do this under a general anesthetic tourniquet control. I would leave the area open and then plan on doing a delayed closure, probably 10-14 days later. She is still having problems with her knees, and this will have to be addressed, but we need to get her taken care of vis-à-vis this elbow problem.

This is how she wished to proceed. The H&P is performed and the paperwork filled out for this to be done as a day surgery procedure at the Ambulatory Surgery Center.
BWC/bl 09-06-2000//09-07-2000          BLISS W. CLARK, MD

√ Sent to Dr. Garza 9/11/00 RR

GARCIA, GLORIA          10860          SEPTEMBER 18, 2000          This woman comes in for re-evaluation of her right elbow. Everything is healing very nicely, and there is no evidence of any infection whatsoever.

**PLAN:** I will see her back in a week and get her stitches out at that time. Then, we can get back to addressing her knee problems.
BWC/bl 09-18-2000//09-19-2000          BLISS W. CLARK, MD

√ Sent to Dr. Garza 9/23/00 RR          left     BWC 11/8/00

GARCIA, GLORIA          10860          SEPTEMBER 25, 2000          This woman comes in for re-evaluation. Her elbow is healed at this point and looks very good. I talked to her and her husband about knee surgery. She is inclined to wish to proceed with a ~~lateral~~ knee arthroscopy understanding that there are certainly no guarantees or promises that I will improve her situation, but we will certainly get more information, and if any pathology is noted it will be taken care of at the time of surgery.

**PLAN:** She is inclined to want to do this at VBMC, which is fine, and I would see her back the day before and take are of her paperwork at that time.
BWC/bl 09-25-2000//09-26-2000          BLISS W. CLARK, MD

√ Sent to Dr. Garza 10/7/00 RR          000003



**BLISS W. CLARK, M.D., P.A.**
DIPLOMATE, AMERICAN BOARD OF ORTHOPEDIC SURGERY
1601 TREASURE HILLS BLVD.
HARLINGEN, TEXAS 78550

TEL. (956) 421-2663
(956) 423-5220

COMPUTER # GARCGL 003

Name  Gloria  Garcia   7/30/51   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   F/49   11/8/00
First      Last        Birthdate   Social Security #   Sex   Date

GARCIA, GLORIA          10860     NOVEMBER 8, 2000        This woman comes in for
her preoperative H&P. She wants to proceed with arthroscopy in both knees, which is reasonable under a single
anesthetic.

**PLAN:** The H&P is performed and the paperwork filled out for surgery. Again, I reaffirmed there is no guarantees
we will find anything, but we will certainly look and hopefully there will be a lesion that is treatable that is
accounting for her pain. Her husband was with her today.
BWC/bl 11-08-2000//11-09-2000                    BLISS W. CLARK, MD

√ Sent to Dr. Garza 11/11/00 RR

GARCIA, GLORIA          10860     NOVEMBER 27, 2000        This woman comes in for
her first postoperative visit. Everything is well healed. She is getting a little more pain on the right than the left, but
we did more surgery on the right than the left.

**PLAN:** I will wait a couple of weeks and then get her started in therapy. She does not need additional pain
medication at this time. She had an allergic reaction to the Ultram, but is tolerating the Celebrex and will continue
with this. I will see her in two weeks.
BWC/bl 11-27-2000//11-28-2000                    BLISS W. CLARK, MD

√ Sent to Dr Garza 12/9/00 RR

GARCIA, GLORIA          10860     DECEMBER 11, 2000        This woman comes in for
re-evaluation. She is doing reasonably well taking Celebrex on a fairly regular basis and takes Tylenol as well.

**PLAN:** I told her she can increase her Celebrex intake to 800 mg p.o. q.d. as necessary. We will get her started in
therapy. The overall appearance of her knees is pretty much the same as before. She still has a little increased
amount of fluid on the right compared to the left. I will see her back in a month.
BWC/bl 12-11-2000//12-12-2000                    BLISS W. CLARK, MD

√ Sent to Dr. Garza 12/14/00 RR

GARCIA, GLORIA          10860     JANUARY 8, 2001        This woman comes in for
re-evaluation. She is doing better vis-à-vis her left knee. She is still having problems on the right and would like to
continue to pursue another month of therapy, which we will do.

**PLAN:** We will keep her out of work for another month. We should be able to let her go back to work at that time.
She did not need additional medication at this time.
BWC/bl 01-08-2001//01-09-2001                    BLISS W. CLARK, MD  Sent 3-13-01
                                                                           smg

000004



*108460*

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX.   78550   MR#00153244

NAME: GARCIA, GLORIA      AGE:      ROOM:       ACCOUNT #984798579

ADMITTED:          DISCHARGED:   11/9   DR: B. CLARK     FORM: OP

---

DATE OF OPERATION:                November 09, 2000

PREOPERATIVE DIAGNOSIS:           Bilateral knee pain.

POSTOPERATIVE DIAGNOSIS:          Right knee discoid lateral meniscus,
                                  left knee lateral meniscal tear.

OPERATION:                        Excision lateral meniscal tear left
                                  knee, and excision discoid portion
                                  lateral meniscus right knee.

SURGEON: BLISS W. CLARK, M.D.

INDICATIONS:  Bilateral knee pain post traumatic, chronic.
ASSISTANT:  Dan Cavazos, CSD

FINDINGS:   Basically she had the above findings. There were minimal
medial plica findings. The plicas were excised. All chondral surfaces
were pristine. Medial menisci were intact. The anterior cruciates
were intact. These were bilateral findings. The only abnormalities
where as pertained to the lateral menisci was noted above.

PROCEDURE:  The patient was prepped and draped in the usual fashion.
A two port arthroscopy was performed through a set of anterior
parapatellar port holes; one medial and one lateral. This was done
for both knees. Both knees were evaluated with complete arthroscopic
evaluation with the only pathology noted being the lateral meniscal
tear central portion on the left knee. This was excised with a shaver
down to stable lateral meniscal tissue without having to remove any
significant amount of lateral meniscal tissue. It really looked like
this was a minor variant of a discoid situation with some excessive
anterior lateral meniscal tissue that had torn, and this was again
trimmed down to stable meniscal tissue with what appeared to be a
normal contour to the meniscus after this was excised. On the right
knee, the discoid lateral meniscus was identified and hand held
biters and a shaver were used to remove a central portion of the
lateral meniscus to create again a normal contouring lateral meniscus
with a normal shape after removal of this tissue. Both lateral
menisci were checked for stability to ensure there was not posterior
lateral instability which is often seen with the discoid lateral
meniscal situation and no posterior lateral instability was noted. At
the end of the case both knees were infiltrated with morphine,
lidocaine and Marcaine.

000005

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX.  78550  MR#00153244

NAME: GARCIA, GLORIA        AGE:        ROOM:        ACCOUNT #984798579

ADMITTED:                   DISCHARGED:             DR: B. CLARK    FORM:  OP

PAGE 2

Both knees lateral extracapsular soft tissue were infiltrated with
lidocaine, Marcaine and Celestone. The port holes were closed with
nylon. Dressings were applied. She returned to the recovery room in
stable condition.


BWC/efd20
00/11/09/11/09                  BLISS W. CLARK, M.D.
J0M14580.OP

000006



### BLISS W. CLARK, M.D., P.A.
DIPLOMATE, AMERICAN BOARD OF ORTHOPEDIC SURGERY
1601 TREASURE HILLS BLVD.
HARLINGEN, TEXAS 78550

TEL. (956) 421-2663
(956) 423-6220

COMPUTER # *GARGLO 3*

Name *GlORIA    GarciA    7-20-51    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    7/49    3-13-0*
First    Last    Birthdate    Social Security #    Sex    Date

GARCIA, GLORIA                10860         MARCH 7, 2001         This woman comes in for re-evaluation.  She had missed a prior appointment because her son had major surgery and either her daughter or daughter-in-law was having a baby.  She is finally able to come in to see me today, and she missed therapy because of this.  She says she is doing better and is ready to go back to work, and she wanted a release to go back to work, which I gave her.

**PLAN:** At this juncture, there is little more to offer her.  She will probably have to learn to live with some residual discomfort, but she has improved since the surgery.  I would like to continue her on Celebrex; apparently her insurance company is refusing to pay for this.  This seems to be the only thing that is working for her.  I will give her some samples, and she may have to get this in Mexico.  The other anti-inflammatory that they gave her is not helping.  I will see her on a p.r.n. basis at this juncture.
BWC/bl  03-07-2001//03-08-2001                        BLISS W. CLARK, MD *sent 3-13-01 sms*

000007

Billing Records

Bliss W. Clark, M.D., P.A.
P. O. Box 2213
Harlingen, TX 78551-2213
(956)421-2663

| Statement Date |
|---|
| 10/2/2002 |

| Page |
|---|
| 1 |

Gloria L. Garcia
PO Box 1237
Santa Rosa, TX 78593

| Chart Number |
|---|
| GARGL003 |

| Date | Document | Description | Case Number | Amount |
|---|---|---|---|---|
| Date of Last Payment: 9/5/2002 | | Amount: -35.09 | Previous Balance: | 5,055.00 |
| Patient: Gloria L. Garcia | | Chart #: GARGL003 | Case Description: new patient | |
| 1/25/2001 | 0101250000 | Insurance Payment | 2607 | -1,476.88 |
| 1/25/2001 | 0101250000 | Insurance Adjustment | 2607 | -2,353.90 |
| 2/13/2001 | 0102130000 | Insurance Payment | 2607 | -311.22 |
| 2/13/2001 | 0102130000 | Insurance Adjustment | 2607 | -360.98 |
| 2/13/2001 | 0102130000 | Insurance Payment | 2607 | -15.83 |
| 2/13/2001 | 0102130000 | Insurance Adjustment | 2607 | -4.17 |
| 2/27/2001 | 0102270000 | Insurance Payment | 2607 | -50.71 |
| 2/27/2001 | 0102270000 | Insurance Adjustment | 2607 | -14.29 |
| 2/27/2001 | 0102270000 | Insurance Payment | 2607 | -15.83 |
| 2/27/2001 | 0102270000 | Insurance Adjustment | 2607 | -4.17 |
| 3/7/2001 | 0103070000 | Office/OutPt, Est Pt, Low Complexity | 2607 | 55.00 |
| 4/25/2001 | 0104250000 | Insurance rejected | 2607 | 0.00 |
| 12/20/2001 | 0009150000 | insurance payment | 2607 | -26.65 |
| 9/5/2002 | 0209100000 | Insurance Payment | 2607 | -35.09 |
| 9/5/2002 | 0209100000 | MCAID REISSUE | 2607 | 0.00 |

000008

| Total Charges | Total Payments | Total Adjustments | Balance Due |
|---|---|---|---|
| $55.00 | -$1932.21 | -$2737.51 | 440.28 |



Records Pertaining to:  **Gloria L. Garcia a/k/a Gloria Guzman**

Records From: **RIO GRANDE VALLEY IMAGING &
DIAGNOSTIC CLINIC
MEDICAL AND BILLING RECORDS**

Deliver to:       **Nancy L. Masso
UNITED STATES ATTORNEY'S OFFICE
600 EAST HARRISON ST #201
Brownsville, Texas  78522-**



# Records Retrieval • Document Imaging • Litigation Support

801 E. Nolana, Suite 10
McAllen, Texas 78504
(956) 668-7327
(956) 668-7328 fax
1-888-660-7327



DEFT'S
EXHIBIT NO. **3**
*11/70-03*
D. WEIBEL

1201 East Van Buren
Brownsville, Texas 78520
(956) 504-0444
(956) 504-0015 Fax
1-888-447-0444



Records Pertaining to: **Gloria L. Garcia a/k/a Gloria Guzman**

Records From: **RIO GRANDE VALLEY IMAGING &
DIAGNOSTIC CLINIC
MEDICAL AND BILLING RECORDS**

Deliver to: **Nancy L. Masso
UNITED STATES ATTORNEY'S OFFICE
600 EAST HARRISON ST #201
Brownsville, Texas 78522-**

*Litigation Support Services Include:*

- *Courthouse Filings, Research, Retrieval & Copying*
- *Coordination of Document Productions & Express
  Delivery to Multiple Parties*
- *Document Numbering & Indexing*
- *Scanning onto Diskette*
- *File Duplication Including Indices, Tabs, Labels,
  Folders, Binders, etc.*
- *Creation of Brief Covers on Cardstock & Binding*
- *Volume Copying*

THE STATE OF TEXAS     §
                       §
COUNTY OF Cameron      §

## *AFFIDAVIT*

BEFORE ME, the undersigned authority, personally appeared Cristina Melendet who, being by me duly sworn, deposed as follows:

My name is Cristina Melendet _____. I am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated:

"I am the custodian of Medical and Billing Records for RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CLINIC, 501- B North Ed Carey Drive, HARLINGEN, Texas 78550. Attached hereto are Medical and Billing Records from RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CLINIC pertaining to **Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51**. These said records are kept at the office of RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CLINIC in the regular course of business, and it was in the regular course of business at the office of RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CLINIC for an employee or representative with personal knowledge of the act, event, condition, opinion, or diagnosis recorded to make the memorandum or record or to transmit information thereof to be included in such memorandum or record; the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis recorded or reasonably soon thereafter; and the method of preparation of the records was trustworthy.

The records attached hereto are the original or exact duplicates of the original."



Custodian of Medical and Billing Records for
RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CLINIC

SWORN TO AND SUBSCRIBED before me the _____ day of October _____, 2002.

NOTARY PUBLIC STATE OF TEXAS
MY COMMISSION EXPIRES:

2984/R02090265

AGNES TENOPALA
Notary Public
STATE OF TEXAS
My Comm. Exp. 07-03-2006



# OPEN MRI

# Rio Grande Valley Imaging and Diagnostic Center

**PATIENT INFORMATION**

Patient: *Garcia*          *Gloria*          *L.*
Last                        First              MI

Appointment: *July 5*          *1:45 pm*
Date                           Time

DIAGNOSIS: *Both Knees; meniscal tears*

### MRI Magnetic Resonance Imaging**

| | | | |
|---|---|---|---|
| Cervical Spine ___ | Shoulder R or L ___ | Ankle R or L ___ | IAC ___ |
| Thoracic Spine ___ | Wrist R or L ___ | Foot R or L ___ | TMJ ___ |
| Lumbar Spine ___ | (Knee R or L) ___ | Brain ___ | MRA ___ |
| Kinematics ___ | Hips R or L ___ | Pelvis M/F ___ | Head ___ |

**MYELOGRAM STUDY:** ☐ With     ☐ Without

**CONTRAST STUDY:** ☐ With     ☑ Without

MRI preparations: Please advise patient to remove all traces of hairspray, hair gel, deodorant, perfumes, heavy facial or body makeup, glitter, body oils or lotions prior to MRI examination.

**Contraindications to MRI are: Pacemakers, aneurysm clips, heart valves, neurostimulators, or cochlear implants.

### Bone Densitometry (DEXA)

___ AP Spine     ___ Dual Femur     ___ Femur R or L     ___ Total Body

Bone Densitometry preparations: None

### Impairment Rating/Second Opinion Consultation

☐ **Impairment Rating**
☐ **Second Opinion**
Call 440-8900 or 1-800-460-4721 for an appointment.

# RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CENTER
## 501 B Ed Carey Drive, Harlingen, Texas 78550

CHART # _2990_   APPT DATE _7-5-00_   TIME _1.45 P.M._

PATIENT NAME _GUZMAN, GLORIA_   SS# _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_

ADDRESS _P.O. Box 1237_   CITY _Santa Rosa_ STATE _Tx._ ZIP _78593_

PHONE _6369061._   DOB _7.20.51_ SEX _F_ HEIGHT _5'4 1/2_ WEIGHT _146_ AGE _48._

WK PH _3616100._ EMPLOYER _S. Benito C.I.S.D_ ADDRESS _240 N. Crockett_
_S. Benito Tx 78516_

Appt called in by _ELIZABETH._

Referring Physician _BLISS CLARK_   Degree _M D_

Address _____ City _HARL_ State _Tx_ Zip _78550_ Phone _4212663_ Fax _4212248._

Type of exam requested _BI-LATERAL KNEES MRI_

Diagnosis: _BOTH KNEES, MENISCAL TEAR._

SPOUSE NAME_____SS#_____DOB_____
EMPLOYER_____ADDRESS_____PHONE_____

**Personal Insurance(PI)**

PRIMARY INSURED_____
INS. CO._____
ADDRESS_____
CITY_____ST____ZIP_____
PHONE_____GRP#_____
GRP NAME_____CERT#_____
ID#_____

**WORKERS COMPENSATION**

PRIMARY INSURED_____
INS CO_____
ADDRESS_____
CITY_____ST____ZIP_____
PHONE_____CLAIM#_____
ADJUSTER_____
TWCC#_____
DATE OF ACCIDENT_____

**LOP**

ATTORNEY_____
ADDRESS_____
CITY_____ST____ZIP_____
PHONE_____
FAX_____
DATE OF ACCIDENT_____
TYPE OF ACCIDENT_____

**THIRD PARTY**

PRIMARY INSURED_____
ADDRESS_____
PHONE_____
SS#_____DOB_____
ID#_____
INS CO_____
ADDRESS_____
PHONE_____

**MEDICARE/MEDICAID**

PRIMARY INSURED _____
ID#_____

VERIFIED?_____DATE____INITIALS_____

000002

PATIENT NOTES

#2990

| DATE | |
|------|--|
| 7.5.00 | GOZMAH, GLORIA |
| | pt c/o bil - knee pain. |
| | - neg. X-ray results. |
| | - slipped on wet floor. (Post office) |



PAIN          NUMBNESS          TINGLING

000004



Rio Grande Valley
Imaging & Diagnostic Center

| | |
|---|---|
| PATIENT: | GLORIA GUZMAN |
| CHART #: | 2990 |
| DATE: | 7-5-00 |
| DOB: | 7-20-51 |
| REFERRING PHYSICIAN: | DR. BLISS CLARK |

**MRI OF THE RIGHT KNEE**

**IMAGING PARAMETERS**

T1, proton density and T2 weighted sagittal images were acquired with T1 and STIR coronal images. Fast Spin echo T2 weighted axial images were also obtained. There are 96 images for anatomic evaluation.

**FINDINGS**

There is a tiny joint effusion. There are no plica or synechiae seen within the joint space. There is no other abnormal loculated fluid collection in the surrounding soft tissues.

There is no knee fracture or dislocation.

The anterior and posterior cruciate ligaments as well as the medial and lateral collateral ligamentous complexes are normal. The quadriceps and patellar tendons are of normal size and signal and the flexor retinacula unremarkable.

The articulating surfaces are unremarkable.

There is grade II linear signal within both menisci. There is no signal abnormality in either meniscus which extends fully to an articular surface.

**IMPRESSION**

1.    TINY RIGHT KNEE JOINT EFFUSION.

*Dee L. Martinez MD*
_____
DEE L. MARTINEZ, M.D., DABR
BOARD CERTIFIED RADIOLOGIST

DLM/dek

Rio Grande Valley
Imaging & Diagnostic Center

PATIENT:                        GLORIA GUZMAN
CHART #:                        2990
DATE:                           7-5-00
DOB:                            7-20-51
REFERRING PHYSICIAN:            DR. BLISS CLARK

**MRI OF THE LEFT KNEE**

IMAGING PARAMETERS

T1, proton density and T2 weighted sagittal images were acquired with T1 and STIR coronal images. Fast Spin echo T2 weighted axial images were also obtained. There are 96 images for anatomic evaluation.

FINDINGS

There is no knee fracture or dislocation. The marrow signal is normal 5 cm above and below the joint line. There is no subchondral contusion or evidence of knee bone neoplasm.

The anterior and posterior cruciate ligaments are intact. The medial and lateral collateral ligamentous complexes are normal. The quadriceps and patellar tendons are of normal size and signal and the flexor retinacula unremarkable.

There is a tiny joint effusion. There are no plica or synechiae seen within the joint space and the surrounding soft tissues are unremarkable.

There is grade II linear signal located within both menisci. There is no signal in either meniscus which extends fully to an articular surface.

IMPRESSION

1.      VERY SMALL LEFT KNEE JOINT EFFUSION.

*Dee L. Martinez MD*

DEE L. MARTINEZ, M.D., DABR
BOARD CERTIFIED RADIOLOGIST

DLM/dek

# RADIOLOGY
## SPECIAL PROCEDURES

GUZMAN, GLORIA
#2990

| | PCART | STRETCHER | WHEELCHAIR | PRE-OP | | |
|---|---|---|---|---|---|---|

☐ STAT

DIAGNOSIS

RADIOLOGY NO.

CLINICAL INFORMATION                         ATTENDING PHYSICIAN

| DATE | UNIT CK BY | DATE TO BE DONE | TECH |
|---|---|---|---|

SPECIAL INSTRUCTIONS                 FAMILY PHYSICIAN

| QTY | CODE | DESCRIPTION | QTY | CODE | DESCRIPTION | QTY | CODE | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|
| | | **UPPER EXTREMITIES** | | | **ABDOMEN** | | | **ULTRASOUND** |
| R | | HAND | ☐ | | ABDOMEN 1 VIEW | ☐ | | THYROID SONO |
| | | WRIST | ☐ | | ABDOMEN 2 VIEW | ☐ | | SUPERFICIAL MASS SONO |
| | | NAVICULAR | ☐ | | ABDOMEN 3 VIEW | | | **MISCELLANEOUS** |
| | | FOREARM | | | **URINARY TRACT** | ☐ | | PORTABLE |
| | | ELBOW | ☐ | | PYELOGRAM IV | ☐ | | FLUOROSCOPY |
| | | HUMERUS | ☐ | | PYELOGRAM RETROGRADE | ☐ | | TOMOGRAMS |
| | | A C. JOINTS | ☐ | | NEPHROTONGRAM | ☐ | | ADDITIONAL VIEW |
| | | SHOULDER | ☐ | | CYSTOURETHROGRAM VOIDING | ☐ | | C-ARM FLUORO 30 MINUTES |
| | | CLAVICAL | ☐ | | CONTRAST IONEXOL | ☐ | | C-ARM ADDITIONAL 30 MINUTES |
| | | **LOWER EXTREMITIES** | | | **BILIARY TRACT** | ☐ | | FACET INJECTION |
| R | | FOOT | ☐ | | GALL BLADDER ORAL | ☐ | | DISCOGRAM |
| | | ANKLE | ☐ | | CHOLANGIOGRAM OPERATIVE | ☐ | | MYELOGRAM |
| | | TIBIA FIBULA | ☐ | | T-TUBE CHOLANGIOGRAM | ☐ | | MYELOGRAM CONTRAST IONEXOL |
| | | KNEE | | | **NUCLEAR MEDICINE** | ☐ | | NEW LIFE INTERP |
| | | FEMUR | ☐ | | BRAIN FLOW/PERF. IMAGES | ☐ | | MAMMOGRAM |
| | | HIP JOINT | ☐ | | BONE FLOW/W B IMAGES | ☐ | | CALLBACK |
| | | **SPINE** | ☐ | | HEPATOBILIARY IMAGES | | | **CT** |
| | | CERVICAL COMPLETE | ☐ | | LUNG/FLOW/PERF. IMAGES | ☐ | | HEAD WITHOUT CONTRAST |
| | | CERVICAL DAVIS SERIES | ☐ | | LUNG VENTILATION IMAGES | ☐ | | HEAD WITH CONTRAST |
| | | DORSAL | ☐ | | LIVER SPLEEN FLOW & IMAGES | ☐ | | HEAD WITH/WITHOUT CONTRAST |
| | | LUMBAR COMPLETE | ☐ | | RENAL FLOW & IMAGES | ☐ | | CHEST WITHOUT CONTRAST |
| | | PELVIS | ☐ | | THYROID FLOW & IMAGES | ☐ | | CHEST WITH CONTRAST |
| | | SACROILIAC JOINTS | ☐ | | THYROID UPTAKE | ☐ | | CHEST WITH/WITHOUT CONTRAST |
| | | SACRUM | ☐ | | MYOCARDIAL FLOW IMAGES | ☐ | | ABD WITHOUT CONTRAST |
| | | COCCYX | | | **SKULL/FACE** | ☐ | | ABD WITH CONTRAST |
| | | **CHEST** | ☐ | | SKULL COMPLETE | ☐ | | ABD WITH/WITHOUT CONTRAST |
| | | CHEST PA & LAT. | ☐ | | SINUSES | ☐ | | PELVIS WITHOUT CONTRAST |
| | | CHEST 1 VIEW | ☐ | | FACIAL BONES | ☐ | | PELVIS WITH CONTRAST |
| | | CHEST LAT. DECUB. | ☐ | | ORBITS | ☐ | | PELVIS WITH/WITHOUT CONTRAST |
| | | RIBS  RIGHT  LEFT | ☐ | | NASAL BONES | ☐ | | CT LUMBAR |
| | | RIBS BILATERAL | ☐ | | MANDIBLE | ☐ | | CT CERVICAL |
| | | STERNUM | ☐ | | MASTOIDS | ☐ | | CT THORACIC |
| | | **GI TRACT** | | | **ULTRASOUND** | ☐ | | CT RECONSTRUCTION |
| ☐ | | UPPER GI | ☐ | | ABD SONO | | | **ADDITIONAL SLICES** |
| ☐ | | SMALL BOWEL | ☐ | | PELVIC SONO | ☐ | | 1-4 |
| ☐ | | COLON-BARIUM ENEMA | ☐ | | OB SONO | ☐ | | 5-9 |
| ☐ | | BARIUM SWALLOW | ☐ | | RENAL SONO | ☐ | | 10-15 |
| | | | | | | ☐ | | 16 + |

| QTY. | CODE | DESCRIPTION |
|---|---|---|
| | | **OTHER** |
| (1) 7/05/00 | 73721 | MRI ® Knee    N-S# 60/10 add. |
| (1) 7/05/00 | 73721 | MRI Ⓛ Knee    N-S# 60/10 add. |

000005

APPROVED OMB-0938-0008

CARRIER

# HEALTH INSURANCE CLAIM FORM  #2990

PICA

| ~RE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a INSURED'S I D NUMBER | (FOR P ROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| re #) | (Medicaid #) | (Sponsor s SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | | |

2 T S NAME (Last Name. First Name. Middle Initial)
GUZMAN, GLORIA

3 PATIENT'S BIRTH DATE  MM  DD  YY    SEX  M  F

4 INSURED'S NAME (Last Name. First Name. Middle Initial)

T S ADDRESS (No . Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☐  Spouse ☐  Child ☐  Other ☐

7 INSURED'S ADDRESS (No , Street)

STATE

8 PATIENT STATUS
Single ☐  Married ☐  Other ☐
Employed ☐  Full-Time Student ☐  Part-Time Student ☐

CITY

STATE

E

TELEPHONE (Include Area Code)
(    )

ZIP CODE

TELEPHONE (INCLUDE AREA CODE)
(    )

9 INSURED'S NAME (Last Name First Name Middle Initial)

10 IS PATIENT'S CONDITION RELATED TO

11. INSURED'S POLICY GROUP OR FECA NUMBER

ER INSURED S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)
☐ YES  ☐ NO

a INSURED'S DATE OF BIRTH  MM  DD  YY    SEX  M ☐  F ☐

ER INSURED'S DATE OF BIRTH  DD  YY    SEX  M ☐  F ☐

b. AUTO ACCIDENT?    PLACE (State)
☐ YES  ☐ NO

b EMPLOYER'S NAME OR SCHOOL NAME

LOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?
☐ YES  ☐ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

URANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
☐ YES  ☐ NO    If yes return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12 PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  Gloria L Garcia    DATE  7-5-00

13 INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  Gloria L Garcia

14 DATE OF CURRENT  MM  DD  YY  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

15 IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS GIVE FIRST DATE  MM  DD  YY

16 DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  MM  DD  YY    MM  DD  YY
FROM    TO

17 NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18 HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  MM  DD  YY    MM  DD  YY
FROM    TO

19 RESERVED FOR LOCAL USE

20 OUTSIDE LAB?  ☐ YES  ☐ NO    $ CHARGES

21 DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. ⌐    3. ⌐
2. ⌐    4. ⌐

22 MEDICAID RESUBMISSION CODE    ORIGINAL REF NO.

23. PRIOR AUTHORIZATION NUMBER

| 24 A DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT HCPCS  MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| 25 FEDERAL TAX I D NUMBER  SSN EIN ☐ ☐ | 26 PATIENT'S ACCOUNT NO. | 27 ACCEPT ASSIGNMENT? (For govt claims, see back) ☐ YES  ☐ NO | 28 TOTAL CHARGE $ | 29 AMOUNT PAID $ | 30 BALANCE DUE $ |
|---|---|---|---|---|---|

31 SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof )
SIGNED    DATE

32 NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33 PHYSICIAN'S, SUPPLIER S BILLING NAME ADDRESS, ZIP CODE & PHONE #

PIN#    GRP#

000008

PLEASE PRINT OR TYPE

FORM HCFA-1500  (12-90)
FORM OWCP 1500-    FORM RRB-15

PATIENT AND INSURED INFORMATION

# RIO GRANDE VALLEY IMAGING & DIAGNOSTIC CENTER

### PATIENT AUTHORIZATION RECORD

*GOZMIN, GLORIA*
*#2990.*

### AUTHORIZATION FOR CARE

grant permission to the employees of Rio Grande Valley Imaging to render outpatient diagnostic service to me during my diagnostic testing and to carry out the orders of my attending physician, including consultants, associates and assistants of is choice.

### RELEASE OF INFORMATION

authorize Rio Grande Valley Imaging to release any medical information requested by representatives of local, state, federal agencies, insurance companies, or other organizations or entities as may be required by said representatives for payment of claims arising out of diagnostic testing as are due Rio Grande Valley Imaging.

### VALUABLES

I agree to assume personal responsibility for all jewelry, money or other valuables brought into **Rio Grande Valley Imaging** during scheduled testing periods. This responsibility includes dentures, eye glasses, contact lens, pillows and any other personal items.

### FINANCIAL RESPONSIBILITY

I understand that regardless of my assigned insurance benefits, I am responsible for the total charges for services rendered, and I further agree that all amounts are due upon request and are payable to Rio Grande Valley Imaging at Cameron County, Texas.

I further understand that should this account become delinquent and it becomes necessary for the amount to be referred to an attorney or collection agency for collection or suit, I, as designated responsible party, shall pay the reasonable attorney fees or collection expense, and that a statutory lien will be filed against me.

### INSURANCE COVERAGE

_____I certify that I have no insurance which will pay benefits for this diagnostic testing; or
_____I certify that the insurance reported to **Rio Grande Valley Imaging** for this admission are a complete listing.

### INSURANCE ASSIGNMENT

In consideration of services to be rendered, I hereby assign and transfer to Rio Grande Valley Imaging any benefits payable to or for my benefit under hospitalization, sickness or accident insurance, and any other insurance, to include major medical or P.I.P., for the payment of such services rendered. I agree to cooperate, aid and assist **Rio Grande Valley Imaging** in processing all possible insurance benefits including initiation and fulfillment of all policy provisions such insurance companies may require for payment. I further assign and transfer to Rio Grande Valley Imaging an interest in any cause action I may have arising out of injuries directly or indirectly resulting in this diagnostic testing. This assignment includes insurance benefits accruing to me under uninsured motorist coverage.

**THIS ASSIGNMENT EXTENDS TO THE TOTAL AMOUNT OWED** Rio Grande Valley Imaging **AND ALSO AUTHORIZES APPLICABLE HEALTH CARE BENEFITS, IF ANY, TO BE PAID THE PHYSICIAN**-specialists in the field of radiology or any other licensed physicians who perform services at **Rio Grande Valley Imaging**.

If a Medicare or Medicaid patient, I certify that the information given by me in applying for payment under title XVIII of the Social Security Act is correct. I request that payment of aurthorized benefits be made in my behalf.

_Gloria L. Garcia_                              7-5-00
Patient Signature                              Date


Signature of Responsible Party                 Relationship to Patient

                                               7-5-00        00000
Witness                                        Date

 RIO GRANDE VALLEY IMG. CENTER 
## Patient Day Sheet
### Ending 9/30/2002

| Entry | Date | Document | POS | Description | Provider | Code | Amount |
|-------|------|----------|-----|-------------|----------|------|--------|
| **GUZGL000** | | **Gloria Guzman/Garcia** | | | | | |
| 3182 | 7/5/2000 | 0007050000 | 11 | | R | 73721 | 1,400.00 |
| 3183 | 7/5/2000 | 0007050000 | 11 | 10 additonals | R | 72142 | 266.00 |
| 3184 | 7/5/2000 | 0007050000 | 11 | | R | 73721 | 1,400.00 |
| 3185 | 7/5/2000 | 0007050000 | 11 | 10 additionals | R | 72142 | 266.00 |
| 9670 | 2/23/2001 | 0102230000 | | | R | INS ADJ | -986.40 |
| 9669 | 2/23/2001 | 0102230000 | | | R | INS PAY | -2,345.60 |

| Patient's Charges | Patient's Receipts | Adjustments | Patient Balance |
|-------------------|--------------------|-------------|-----------------|
| $3,332.00 | -$2,345.60 | -$986.40 | $0.00 |

000010

RIO GRANDE VALLEY IMG. CENTER

# Patient Day Sheet

Ending 9/30/2002



| | |
|---|---:|
| Total # Patients | 1 |
| Total # Procedures | 4 |
| Total Procedure Charges | $3,332.00 |
| Total Product Charges | $0.00 |
| Total Inside Lab Charges | $0.00 |
| Total Outside Lab Charges | $0.00 |
| Total Billing Charges | $0.00 |
| Total Tax Charges | $0.00 |
| Total Charges | $3,332.00 |
| | |
| Total Insurance Payments | -$2,345.60 |
| Total Cash Copayments | $0.00 |
| Total Check Copayments | $0.00 |
| Total Credit Card Copayments | $0.00 |
| Total Patient Cash Payments | $0.00 |
| Total Patient Check Payments | $0.00 |
| Total Credit Card Payments | $0.00 |
| Total Receipts | -$2,345.60 |
| | |
| Total Credit Adjustments | $0.00 |
| Total Debit Adjustments | $0.00 |
| Total Insurance Debit Adjustments | $0.00 |
| Total Insurance Credit Adjustments | -$986.40 |
| Total Insurance Withholds | $0.00 |
| Total Adjustments | -$986.40 |
| | |
| Net Effect on Accounts Receivable | $0.00 |

000011



MAR 5 2003

Records Pertaining to: **Gloria L. Garcia a/k/a Gloria Guzman**

Records From: **TEXAS ASSOCIATION OF SCHOOL BOARD MEDICAL RECORDS**

Cause No.: **B-02-017; *GLORIA L. GARCIA A/K/A GLORIA GUZMAN v. UNITED STATES OF AMERICA, ET AL***

Deliver to: **Nancy L. Masso**
**UNITED STATES ATTORNEY'S OFFICE**
**600 EAST HARRISON ST #201**
**Brownsville. Texas  78522-**



# Records Retrieval • Document Imaging • Litigation Support

801 E. Nolana, Suite 10
McAllen, Texas 78504
(956) 668-7327
(956) 668-7328 fax
1-888-660-7327



DEFT'S
EXHIBIT NO. 4
11-10-03
D. WEIBEL

1201 East Van Buren
Brownsville, Texas 78520
(956) 504-0444
(956) 504-0015 fax
1-888-447-0444

Records Pertaining to:  **Gloria L. Garcia a/k/a Gloria Guzman**

Records From:  **TEXAS ASSOCIATION OF SCHOOL BOARD MEDICAL RECORDS**

Cause No.:  **B-02-017;** *GLORIA L. GARCIA A/K/A GLORIA GUZMAN v. UNITED STATES OF AMERICA, ET AL*

Deliver to:  **Nancy L. Masso**
**UNITED STATES ATTORNEY'S OFFICE**
**600 EAST HARRISON ST #201**
**Brownsville, Texas  78522-**

*Litigation Support Services Include:*

- *Courthouse Filings, Research, Retrieval & Copying*
- *Coordination of Document Productions & Express Delivery to Multiple Parties*
- *Document  Numbering & Indexing*
- *Scanning onto Diskette*
- *File Duplication Including Indices, Tabs, Labels, Folders, Binders, etc.*
- *Creation of Brief Covers on Cardstock & Binding*
- *Volume Copying*

2984/R03010161

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA L. GARCIA A/K/A GLORIA GUZMAN
    PLAINTIFF,

    V.                                    CIVIL ACTION NUMBER B-02-017

UNITED STATES OF AMERICA, ET AL
    DEFENDANTS

NOTICE OF INTENTION TO TAKE
DEPOSITION ON WRITTEN QUESTIONS

TO:    Plaintiff by and through her attorney of record:

(956)428-9494
Jason R. Mann, Esq.
ATTORNEY AT LAW
222 E. Van Buren, Ste. 701
P.O. Box 231
Harlingen, Tx 78550

PLEASE TAKE NOTICE that after fourteen (14) days from the service of a copy hereof with attached questions, a deposition by written questions will be taken of the CUSTODIAN OF RECORDS OR OTHER QUALIFIED WITNESS for:

R03010161       TEXAS ASSOCIATION OF SCHOOL BOARD
               CUSTODIAN OF RECORD
               P.O. BOX 2010
               Austin, Texas 78768
               any and all health care information, medical records, correspondence, and any other tangible documents including, but not limited to the entire contents of your file, autopsy reports, tissue samples, slides, photographs, memos, notes, outside lab reports, medical records, inpatient information sheets, medical files, summaries and handwritten notes, nurses' notes, tests, test results, diagnoses, prognoses, insurance claims, treatment notes, prescriptions, narrative reports, rehabilitation or therapy records, office notes and clinic notes, histories, physical examinations, physicians orders, progress notes, discharge summaries, laboratory reports, blood gas analyses, transfusion reports, consent forms, radiology reports, anesthesia records, operative reports, graphic sheets, vital sign charts, blood pressure records, record of intake and output, electrocardiogram sheets, photographs, imaging modalities, memoranda, incident reports and any other record which relates to the history, diagnosis, treatment, or prognosis of the patient **pertaining to Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51**

R03010162       INDUSTRIAL MOBILITY REHABILITATION CENTER
               CUSTODIAN OF RECORD
               998 S. 77 SUNSHINE STRIP
               HARLINGEN, Texas 78550
               any and all health care information, medical records, correspondence, and any other tangible documents including, but not limited to the entire contents of your file, autopsy reports, tissue samples, slides, photographs, memos, notes, outside lab reports, medical records, inpatient information sheets, medical files, summaries and handwritten notes, nurses' notes, tests, test results, diagnoses, prognoses, insurance claims, treatment notes, prescriptions, narrative reports, rehabilitation or therapy records, office notes and clinic notes, histories, physical examinations, physicians orders, progress notes, discharge summaries, laboratory reports, blood gas analyses, transfusion reports, consent forms, radiology reports, anesthesia records, operative reports, graphic sheets, vital sign charts, blood pressure records, record of intake and output, electrocardiogram sheets, photographs, imaging modalities, memoranda, incident reports and any other record which relates to the history, diagnosis, treatment, or prognosis of the patient pertaining to **Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51**

before a Notary Public for APEX ... UMENT MANAGEMENT, P. O. Box 720186, ... .an, Texas 78504 (956) 668-7327 or their designated agent.  Which deposition with attached questions may be used in evidence upon the trial of the above styled and numbered cause pending in the above named Court.

Notice is further given that request is here made as authorized under   RULE 45 OF THE FEDERAL RULES OF CIVIL PROCEDURE, to the officer authorized to take this deposition to issue a subpoena duces tecum and cause it to be served on the witness to produce for inspection and photocopying those records which are more particularly described above and which are in the possession, custody or control of the said witness, and every such record to which the witness may have access and to turn all such records over to the officer authorized to take this deposition so that photostatic copies may be made of same and attached to said deposition.

Respectfully submitted,

Nancy L. Masso
State Bar No. 90800490
UNITED STATES ATTORNEY'S OFFICE
600 EAST HARRISON ST #201
Brownsville, Texas  78522
Attorney for the Defense

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing Notice of Intention to Take Deposition by Written Questions was delivered to the following via certified mail, return receipt requested, telefax, or messenger.

(956)428-9494
Jason R. Mann, Esq.
LAW OFFICE OF JASON R. MANN
222 E. Van Buren, Ste. 701
P.O. Box 231
Harlingen, Tx  78550

Dated: 1/15/2003                                            BY:

APEX DOCUMENT MANAGEMENT, INC.
P. O. Box 720186
McAllen, Texas 78504
(956) 668-7327
(956) 668-7328 FAX
Order records @ www.Apexdocument.com

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
SOUTHERN                                          TEXAS
### DISTRICT OF
BROWNSVILLE DIVISION

GLORIA L. GARCIA A/K/A GLORIA GUZMAN

## SUBPOENA IN A CIVIL CASE

V.

UNITED STATES OF AMERICA, ET AL

CASE NUMBER:

**B-02-017**

TO:
R03010161
Custodian of Medical Records
TEXAS ASSOCIATION OF SCHOOL BOARD
P.O. BOX 2010
Austin, Texas 78768

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

A represenative of Apex Document Managemen, any and all records, documents and/or tangible things identified in the attached Exhibit "A" incorporated herein

| PLACE | DATE AND TIME |
|---|---|
| AT THE OFFICES OF THE SUMMONED WITNESS | INSTANTER |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Nancy L. Masso  /y. D. | 1/15/2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Nancy L. Masso, 600 EAST HARRISON ST #201, Brownsville, Texas 78522-
(Attorney for Defense)

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

If action is pending in district other than district of issuance, state district under case number.

AO 88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 01/15/03 | Mail |

SERVED ON (PRINT NAME) Dubravka Romano

MANNER OF SERVICE

---

SERVED BY (PRINT NAME)

TITLE

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on  01/20/03
DATE

SIGNATURE OF SERVER   Urma A Spencer

ADDRESS OF SERVER  801 E. Nolana, Ste 10
McAllen, Tx 78404

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT "A"

## SUBPOENA IN A CIVIL CASE

R03010161    TEXAS ASSOCIATION OF SCHOOL BOARD
CUSTODIAN OF RECORD
P.O. BOX 2010
Austin, Texas 78768

Produce for inspection and copying any and all health care information, medical records, correspondence, and any other tangible documents including, but not limited to the entire contents of your file, autopsy reports, tissue samples, slides, photographs, memos, notes, outside lab reports, medical records, inpatient information sheets, medical files, summaries and handwritten notes, nurses' notes, tests, test results, diagnoses, prognoses, insurance claims, treatment notes, prescriptions, narrative reports, rehabilitation or therapy records, office notes and clinic notes, histories, physical examinations, physicians orders, progress notes, discharge summaries, laboratory reports, blood gas analyses, transfusion reports, consent forms, radiology reports, anesthesia records, operative reports, graphic sheets, vital sign charts, blood pressure records, record of intake and output, electrocardiogram sheets, photographs, imaging modalities, memoranda, incident reports and any other record which relates to the history, diagnosis, treatment, or prognosis of the patient pertaining to Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51

RECEIVED

JAN 2 0 2003

TASB Austin

**Addendum**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GLORIA L. GARCIA A/K/A | § | |
| GLORIA GUZMAN | § | |
|     PLAINTIFF, | § | |
| | § | CIVIL ACTION NUMBER B-02-017 |
|     V | § | |
| | § | |
| UNITES STATES OF AMERICA, ET AL | § | |
|     DEFENDANTS | § | |

Texas Association of School Boards Custodian of Records
Response to Written Questions:

**Answer to #1:**   My name is Dubravka Romano.  I am the Associate Executive Director for Risk Management Services for the Texas Association of School Boards, Inc. (TASB, Inc.).

**Answer to #2**   Yes, I am a designee of the custodian, James B. Crow.

**Answer to #3**   Yes

**Answer to #4**   All records have been copied and are attached hereto

**Answer to #5**   Yes

**Answer to #6**   Yes

**Answer to #7**   Yes

**Answer to #8**   Yes

**Answer to #9**   Yes

**Answer to #10**   Yes

**Answer to #11**   Yes

**Answer to #12**   No

**Answer to #13**   All records have been copied and are attached hereto


DUBRAVKA ROMANO
WITNESS, CUSTODIAN


I, Martha L. Jones                , a Notary Public in the State of Texas, do hereby certify that the foregoing answers of the witness, the Custodian of Records, were by the said witness made before and sworn to and subscribed before me by the said witness.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON THIS THE ___13th___ DAY OF _February_____, 2002.



MARTHA JONES
Notary Public, State of Texas
My Commission Expires
OCT. 9, 2004

NOTARY PUBLIC FOR THE STATE OF TEXAS

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

GLORIA L. GARCIA A/K/A GLORIA GUZMAN
    PLAINTIFF ,

V.

                                 CIVIL ACTION NUMBER B-02-017

UNITED STATES OF AMERICA, ET AL
    DEFENDANTS

### Direct Questions To Be Propounded To The
### Custodian Of Medical Records Or Other Qualified Witness For
### TEXAS ASSOCIATION OF SCHOOL BOARD

1. State your full name, occupation and official title.

ANSWER: _____

2. Are you the custodian of Medical Records or other qualified witness for TEXAS ASSOCIATION OF SCHOOL BOARD?

ANSWER: _____

**3.** Did you or an authorized representative receive a subpoena to produce for inspection and photocopying any and all health care information, medical records, correspondence, and any other tangible documents including, but not limited to the entire contents of your file, autopsy reports, tissue samples, slides, photographs, memos, notes, outside lab reports, medical records, inpatient information sheets, medical files, summaries and handwritten notes, nurses' notes, tests, test results, diagnoses, prognoses, insurance claims, treatment notes, prescriptions, narrative reports, rehabilitation or therapy records, office notes and clinic notes, histories, physical examinations, physicians orders, progress notes, discharge summaries, laboratory reports, blood gas analyses, transfusion reports, consent forms, radiology reports, anesthesia records, operative reports, graphic sheets, vital sign charts, blood pressure records, record of intake and output, electrocardiogram sheets, photographs, imaging modalities, memoranda, incident reports and any other record which relates to the history, diagnosis, treatment, or prognosis of the patient pertaining to **Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51?**

ANSWER: _____

4. Please hand to the Notary Public taking your answers to these questions a true, correct and complete copy of the original records   identified in the preceding question pertaining to Gloria L. Garcia a/k/a Gloria Guzman and confirm that a copy of such original records   has been attached to the deposition at the time it is presented to you for signing. Have you done so? If not, why not?

ANSWER: _____

5. As part of your duties as official custodian of records or other qualified witness, are you among those who have possession, custody, control or access to any and all records of TEXAS ASSOCIATION OF SCHOOL BOARD?

ANSWER: _____

RECEIVED

JAN 2 0 2003

TASB Austin

6. Are the reports of TEXAS ASSOCIATION OF SCHOOL BOARD made and kept under your care, supervision, direction, custody and/or control in the regular course of business of TEXAS ASSOCIATION OF SCHOOL BOARD?

ANSWER: _____

7. Is it in the regular course of business of TEXAS ASSOCIATION OF SCHOOL BOARD for a person with knowledge of the acts, events, status, condition or diagnosis recorded to make the records or to transmit information thereof to be included in such records of TEXAS ASSOCIATION OF SCHOOL BOARD?

ANSWER: _____

8. Are the memoranda or documents that are transmitted to your files original entries on the part of the Custodian or other employee or member of the staff of TEXAS ASSOCIATION OF SCHOOL BOARD, he or she being a person with knowledge of the acts, events, status, condition or diagnosis therein recorded?

ANSWER: _____

9. Are the records of TEXAS ASSOCIATION OF SCHOOL BOARD made at the time of the acts, events, status, condition or diagnosis or very soon thereafter?

ANSWER: _____

10. Are the records of TEXAS ASSOCIATION OF SCHOOL BOARD kept as described in the preceding questions?

ANSWER: _____

11. Does the source of the information and the method and circumstances of the preparation of the records of TEXAS ASSOCIATION OF SCHOOL BOARD establish the trustworthiness of the records?

ANSWER: _____

12. Are there any other files, documents, or information maintained by you as described in question number 3 above or in the subpoena previously served, in your possession, custody or control that you have not attached to this deposition?

ANSWER: _____

13. If your answer to the above question is YES, please describe each such file, document, or information, its location and your reason for not producing same.

ANSWER: _____

_____

_____

RECEIVED

JAN 2 0 2003

TASB Austin

14. Are you aware that it may be necessary to subpoena you or your employer to a court at the time of the trial of this case, and/or to appear in person to turn over such documents or for the taking of an oral deposition prior to the time of trial of this case, if you have not provided to the Notary Public taking your deposition, all papers, documents, records,   correspondence, or tangible matters of any kind as described in question number 3 above or in the subpoena previously served?

ANSWER: _____

I, _____, do swear or affirm that my answers to the above questions are the truth, the whole truth, and nothing but the truth, so help me, God.

_____
Signature Of Custodian Of Medical Records Or Other Qualified Witness For TEXAS ASSOCIATION OF SCHOOL BOARD

I, the undersigned Notary Public in and for the State of **Texas**, do hereby certify that the facts as stated in the caption hereto are true, that the foregoing answers of the witness were the said witness', made before me and were sworn to and subscribed before me by the witness.  The records attached hereto are the originals or exact duplicates of the original records.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this the _____ day of _____, 2003.

_____
Notary Public, State of Texas
My Commission Expires: _____

RECEIVED

JAN 2 0 2003

TASB Austin



Send to:
Workers' Compensation Insurance Carrier (Block #17)
and the Injured Employee (Block #1)

TWCC __
Carrier's Claim #  _____

# INITIAL MEDICAL REPORT - WORKERS' COMPENSATION INSURANCE

| 1. Injured Employee's Name (Last, First, M.I.) | 2. Date of Birth | 8. Date of Injury | 4. Social Security Number |
|---|---|---|---|

3. Employee's Mailing Address (Street or P.O. Box) — PO Box 1234
City: Santa Rosa  State: Tx  Zip Code: 78593  Phone No

10. Employer's Name
11. Employer's Mailing Address (Street or P.O. Box)

4. Date of Visit: 9-3-99
5. Doctor's Name and Title
6. Federal Tax I.D. No
7. Professional License No
12. Workers' Compensation Insurance Carrier

**NOTICE TO INJURED EMPLOYEE:** You are required to report the injury to your employer within 30 days if your employer elects to provide workers' compensation insurance coverage. You have the right to free assistance from the Texas Workers' Compensation Commission. You may be entitled to certain benefits for medical care and disability. For further information call your nearest Texas Workers' Compensation Commission Field Office or 1 (800) 252-7031.

**NOTIFICACIÓN AL TRABAJADOR LESIONADO:** Usted debe reportar la lesión a su empresario en 30 días si su empresario elige tener seguro de compensación para trabajadores. Usted tiene derecho a asistencia gratis por parte de la Comisión Tejana de Compensación para Trabajadores. Puede que usted tenga derecho a ciertos beneficios médicos y de desabilidad. Para mayor información llame a la oficina local de la Comisión Tejana de Compensación de Trabajadores más cercana o llame al 1 (800) 252-7031.

13. Diagnosis: 844.9  R. Sprain Knee
14. Treatment at this Visit: 73560  X-Ray L-Knee

16. ANTICIPATED Dates the Injured Employee May
c) Return to Full-time Work 9-3-99

**MAY ATTACH TEST RESULTS OR FURTHER WRITTEN INFORMATION**

17. History
18. Significant Past Medical History: NIL
19. Clinical Assessment Findings
20. Laboratory, Radiographic and/or Imaging Tests Ordered and Results
21. Treatment Plan: Examination, medication, may return to Reg Duty today.
22. Referral / Change of Treating Doctor

**RECEIVED**

23. Medications: Relafen 500mg, Skelaxin 400mg
SEP 16 1999
TASB AUSTIN

24. Prognosis: Follow-up 9-10-99

26. Doctor's Name (Printed):
Address: 351 N Sam Houston St, San Benito, Tx 78586
Date: 9-3-99
26. Date Report Mailed to Employee: 9-3-99
27. Date Report Mailed to Workers' Compensation Insurance Carrier: 9-3-99

TWCC 61 (Rev. 7/99)    Rule 133.101

000001

TEXAS WORKERS' COMPENSATION COMMISSION

Mail this form to the WORKERS' COMPENSATION INSURANCE CARRIER

TWCC#
Carrier's Claim #

**MEDICAL REVIEW**

## SPECIFIC AND SUBSEQUENT MEDICAL REPORT

| 1 Injured Employee's Name (Last, First, MI) | 2 Date of Birth | 8 Date of Injury | 9 Social Security Number |
|---|---|---|---|

| 3 Employee's Mailing Address (Street or P.O. Box) | | | 10 Employer's Name |
|---|---|---|---|

| City | State | Zip Code | Phone No | 11 Employer's Mailing Address (Street or P.O. Box) |
|---|---|---|---|---|

| 4 Date of Visit | 5 Doctor's Name and Title | | City | State | Zip Code |
|---|---|---|---|---|---|

| 6 Federal Tax I.D. No | 7 Professional License No. | 12 Insurance Carrier |
|---|---|---|

**13 Diagnosis (ICD-9 Codes and Descriptions)** (Relate Diagnosis to Procedure by Reference to Letters a, b, c.)
a)
b)
c)

| 14. ☐ Treatment at this Visit or ☐ Procedure Performed in Hospital (CPT Code and Modifiers, if Necessary, and Description) | DO NOT INCLUDE OFFICE VISIT | 15 |
|---|---|---|

**16. ANTICIPATED Dates the Injured Employee May:** (p=ease Complete All Dates)
a) Return to Limited Type of Work:      b) Achieve Maximum Medical Improvement:      c) Return to Full time Work:

**17. Reason for Report**
☐ Subsequent Medical Report (due every 60 days after initial medical report)
☑ Released to Return to Work:   ☐ Limited Activity   ☑ Normal Activity     Date 9-20-99
☐ Changing Treating Doctors:   Name of New Doctor
                                Address
                                Professional License #
☐ Discharge from:   Name of Hospital                    Discharge Date

**18. Changes in Injured Employee's Condition, including Clinical Assessment and Test Results**

**19. Treatment Plan**

**20. Referrals**

**21. Medications or Durable Medical Equipment**
Keflex 500mg, Relafen 500mg

**22. Prognosis**
follow-up 9-27-99.

**23. Compliance by Employee with Recommended Treatment**
Good

| 24. Signature of Doctor: | Date |
|---|---|
| Address: 351 N Sam Houston | RECEIVED SEP 30 1999 |

*Note if no additional treatment is necessary, physical therapy orders must be included in specific treatments to be performed, the frequency of treatments; and if necessary for continued therapy past 30 days, a re-evaluation by the treating doctor.

**MAY ATTACH TEST RESULTS OR FURTHER WRITTEN INFORMATION**

TWCC - 64 (4/92)            [ MMBW Rev 3/96 ]            Rule 133.102 and 133.103

Form Report Attached-MPC

000002

September 22, 1999

Stacy Gant
T.A.S.B.
P.O. Box 2010
Austin, TX  78768

Re:  Gloria Guzman

Dear Ms. Gant,

Gloria Guzman has been referred by Movva, MD. for physical therapy for treatment of L. Back Knee
Sprain.

An initial evaluation was performed on Wednesday, September 22, 1999. I recommend PT for 3 times per
week for 3 weeks with a reevaluation scheduled in 3 weeks. The rehabilitation potential for this case is
good.

A summary of the initial evaluation is as follows:

• Strain Thigh and knee
   Decrease muscle strain
   Facilitate healing
• Decreased muscle strength of Knee
   Independent with home program
   Increase functional muscle strength
• Visual Analog Test today: 4/10, most: 7/10 B knee
   Decrease pain to 2/10 in three weeks.
   Independent in pain relief techniques

The enclosed Initial Evaluation Summary outlines the patient's physical findings, as well as the current
problems, goals, and treatment plan.

Please contact our office at your earliest convenience regarding the treatment for this patient.

RECEIVED

SEP 2 8 1999

000003    TASB - AUSTIN

# Initial Evaluation Summary

**Patient: Gloria Guzman**   *26/923927*   *TAD O*
*GAS*

**Evaluation Date:** 09/22/99   *8·5·99*

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD.<br>351 N. Sam Houston St<br>San Benito, TX 78586<br>956-2443 | **Primary Insurer:** | T A S B<br>P O Box 2010<br>Austin, TX 78768 |
| **Employer:** | San Benito I.S.D.<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6188 | | |

**Pertinent Medical History:**

- Age: 48

**Patient History:**

- Chief complaint: Bilateral knee pain
- Onset of injury: 5 weeks ago
- Course of injury: Mrs. Guzman slipped on a newly waxed floor at work and fell to her knees. Since that time she has had pain in both knees with some shooting pain and soreness throughout her thighs.

**Objective Findings:**

- Moderate Tenderness of B Lateral femorotibial joint line Joint.
- Strain of Soft Tissue in Thigh and knee. On palpation, moderate tenderness found.
- AROM B knee: No problem found.
- Muscle Strength

| | LEFT | RIGHT |
|---|---|---|
| Knee Flexion | 4/5 w/Pain | 4/5 w/Pain |
| Knee Extension | 4/5 w/Pain | 4/5 w/Pain |

- B knee Pain found. Visual Analog Test today: 4/10, most: 7/10.
- Knee Tests: Valgus stress (MCL): L(-) R(-), Varus stress (LCL)  L(-) R(-), Anterior drawer (knee): L(-) R(-), Posterior drawer (knee): L(-) R(-).

**Impressions:**

- Patient has lateral collateral ligament strain of bilateral knees with some muscle strain of bilateral quads and hamstrings.

**Problems:**

- Strain Thigh and knee
- Decreased muscle strength of Knee
- Visual Analog Test today: 4/10, most: 7/10 B knee

**Goals:**

- Decrease muscle strain
- Facilitate healing
- Independent with home program
- Increase functional muscle strength
- Decrease pain to 2/10 in three weeks.
- Independent in pain relief techniques

RECEIVED

SEP 2 0 1999

000004   TASB - AUSTIN

# *Initial Evaluation Summary*

**Patient: Gloria Guzman**

**Evaluation Date:** 09/22/99

**Treatment Plan:**

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Moist heat
- Electric stimulation
- Ultrasound (US)
- Initial Evaluation - Performed today
- Reevaluation

**Rehabilitation Potential:**

- Good

**Plan:**

- PT 3 times per week for 3 weeks
- Reevaluate in 3 weeks

**Therapist**

RECEIVED

SEP 2 9 1999

000005   TASB - AUSTIN

# Industrial Mobility
## Rehabilitation Center, Inc.

105 E. Expwy 83, Ste. F          998 South Sunshine Strip          5444 W. Jefferson, Ste. A
Pharr, TX 78577                  Harlingen, TX 78550              Brownsville, TX 78521
(956) 702-7800 • Fax (956) 702-4164    (956) 504-0810 • Fax (956) 504-0825    440-9675

PATIENT'S NAME: Gloria Guzman                     AGE: _____

DIAGNOSIS: R Knee Sprain

PRECAUTIONS: _____

☑ CONSULT: EVALUATE & TREAT

| | | |
|---|---|---|
| ❑ Therapeutic Exercise | ❑ Ultrasound | ❑ F.C.E. |
| ❑ Passive ROM | ❑ Ionto-Phonophoresis | ❑ Work Hardening |
| ❑ Gait Training | ❑ Ice Pack/Moist Heat | ❑ Work Conditioning |
| ❑ Hand Therapy | ❑ Electric Stimulation | ❑ Back School |
| ❑ Joint Mobilization | ❑ Whirlpool | ❑ Job Site Analysis |
| ❑ Traction | ❑ Modalities as needed | ❑ Other _____ |

COMMENTS: _____

FREQUENCY:  ❑ 5 x week   ☑ 3 x week   ❑ 2 x week   ❑ 1 x wk

DURATION:   ❑ 1 week   ❑ 2 weeks   ☑ 3 weeks   ❑ 4 weeks

GOALS:  ❑ Increase ROM       ❑ Decrease Pain      ❑ Establish HEP
        ❑ Increase Strength   ❑ Decrease Edema     ❑ Improve Function
        ❑ Increase Endurance  ❑ Return to Work     ❑ Other_____

*I certify that therapy services for the above named patient are required, medically necessary, and authorized by me.*

Next Appointment with Physician: 9-30-99

Date: _____

Original Physician Signature

## Physical Therapy • Occupational Therapy • Sports Medicine
## Industrial Rehab • Functional Capacities Evals • Back School

000006

RECEIVED
SEP 2 9 1999
TASB · AUSTIN

# Industrial Mobility

## Rehabilitation Center Inc.

998 S. 77 Sunshine Strip, Harlingen TX 78550
(956) 440-9675/ FAX (956) 440-8963

**Patient's Name:** Gloria Guzman

**Date:** 9/28/99

S: Pt reports pain in left knee as 6/10. and right knee as 3/10. Pt also states sitting for long periods of time. Pain (B) Knees ↑ c̄ Left knee more.

O: Pt rec'd moist heat × 20 mins to (B) Knees.

A: Pt wearing dress and unable to perform ther-ex program. tolerated treatment well.

P: Cont c̄ plan of care.

Martin P. Longoria PTA
Sup: Britt Tice PT

RECEIVED
OCT 0 8 1999
TASB - AUSTIN

000007

## *Daily Note*

**Patient: Gloria Guzman**

**Date: 09/30/99**

---

| | | | |
|---|---|---|---|
| Referring Physician: | Morva, MD.<br>351 N. Sam Houston St.<br>San Benito, TX 78586<br>956-2443 | Primary Insurer: | T.A.S.B.<br>P.O. Box 2010<br>Austin, TX 78768 |
| Employer: | San Benito I.S.D.<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6150 | | |

---

**Subjective Notes:**

**Objective Findings:**
- Pt reports at night is when the pain increases and she needs pain meds. Pt rates pain as 7/10 in the right knee and 4/10 in the left.

**Today's Treatments:**
- Note: Pt initiated session with 15mins pre warm-up exercise followed by therapeutic exercises for b/lt knees. Pt concluded endeavors with modalities. Reference flow sheet.

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Moist heat
- Electric stimulation

**Assessment:**

**Plan:**
- Tolerated treatment well

- Continue present program
- Continue to gradually increase activity according to treatment plan

*[signature]* Martin P. Longoria, PTp
Brett Teie PT
Therapist

RECEIVED
OCT 0 8 1999
TASR · AUSTIN

000008

# *Daily Note*

**Patient: Gloria Guzman**

Date:  10/01/99

| Referring Physician: | Movva, MD.<br>351 N. Sam Houston St.<br>San Benito, TX  78586<br>956-2443 | Primary Insurer: | T A S.B<br>P O  Box 2010<br>Austin, TX  78768 |
|---|---|---|---|
| Employer: | San Benito I.S.D<br>240 N. Crockett<br>San Benito, TX  78586<br>(956) 361-6188 | | |

**Subjective Notes:**

- Patient ad no new complaints.

**Objective Findings:**

- Note: Patient began treatment with warm-up followed by stretching, strengthening, and modalities as detailed on the daily flow sheet.

**Today's Treatments:**

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Moist heat
- Electric stimulation

**Assessment:**

- Making steady progress
- Tolerated treatment well

**Plan:**

- Continue present program
- Continue to gradually increase activity according to treatment plan

_____

**Therapist**

RECEIVED
OCT 0 8 1999
TASB - AUSTIN

000009

Last: **Guzman**   First: **Gloria**

## Knee Flow Sheet

| | DATE: | 9-22-99 | 9-28-99 | | 9-30-99 | 10-1-99 |
|---|---|---|---|---|---|---|
| **Warm Up:** | | | | | | |
| Bike (15 min) | | | | | 15 mins | 15 min |
| Treadmill | | | | | | |
| **Modalities:** | | | | | | |
| Hot Pack / E-stim | | | 20 min ITB/ULY | | 20 min ITB Es @ knee | |
| Ultrasound | | | | | | |
| Myofascial Release | | | | | | |
| **Range Of Motion:** | | | | | | |
| Gastroc / Soleus Stretch | | | | | 3 x 30 se | 3 x 30 sec |
| Hamstring Stretch | | | | | 3 x 30 sec | 3 x 30 sec |
| Quad Stretch | | | | | 3 x 30 sec | 3 x 30 sec |
| ITB Stretch | | | | | | |
| Adductor Stretch | | | | | | |
| Patellar Mobs | | | | | | |
| **Strengthening:** | | | | | | |
| Heel Slides | | | | | | |
| Quad Set | | | | | | |
| Hamstring Set | | | | | | |
| Short Arc Quad | | | | | | |
| Long Arc Quad | | | | | | |
| Straight Leg Raise | | | | | | |
| Hip Abduction   univsal Gy | | | | | 3x8 B | 2 x15 20lbs |
| Hip Extension | | | | | | |
| Hip Adduction | | | | | | 3x15 20/lbs |
| Heel Raises | | | | | | |
| Wall Squats / Ball on Total Gym | | | | | 3x8 L4 | 3x10 C7 |
| Stork Balance | | | | | | |
| Bops Board | | | | | | |
| Lunges | | | | | | |
| Step ups / side | | | | | 25 each RE | 25 sp C |
| Jumps | | | | | | OCT 08 1999 |
| Stool Burners | | | | | | |
| Universal Flex / Ext | | | | | — | |
| **Miscellaneous:** | | | | | 7/10 R knee | 7/10 R knee |
| Pain Scale | | | | | 4/10 R knee | 4/10 R knee |
| **SIGNATURE:** | | | Wfmy | | nfmy | |

000010

# Daily Note

**Patient: Gloria Guzman**

Date:  10/04/99

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD.<br>351 N. Sam Houston St<br>San Benito, TX  78586<br>956-2443 | **Primary Insurer:** | T A S B<br>P O. Box 2010<br>Austin, TX  78768 |
| **Employer:** | San Benito I S.D<br>240 N. Crockett<br>San Benito, TX  78586<br>(956) 361-6186 | | |

**Subjective Notes:**

- Patient came in 20 minutes late.  States that her left knee is hurting worse than her right knee.

**Objective Findings:**

- Note: Patient began with warm-up followed by strengthening and stretching as detailed on the daily flow sheet.

**Today's Treatments:**

- Stretching ex
- Therapeutic ex
- Moist heat
- Electric stimulation

**Assessment:**

- Making steady progress
- Tolerated treatment well

**Plan:**

- Continue present program
- Continue to gradually increase activity according to treatment plan

Therapist _____

RECEIVED
OCT 18 1999
TASB - AUSTIN

000011

10/10/2000 13:52  1 956 412 7708          1 21 1086 0124 06              Page 1

## *Daily Note*

**Patient: Gloria Guzman**

**Date:** 10/04/00

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD.<br>351 N Sam Houston St.<br>San Benito, TX 78586<br>956-2443 | **Primary Insurer:** | T A S B<br>P O Box J010<br>Austin, TX 78/68 |
| **Employer:** | San Benito I S.D.<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6188 | | |

**Subjective Notes:**

- Patient came in 20 minutes late   States that her left knee is hurting worse than her right knee.

**Objective Findings:**

- Note: Patient began with warm-up followed by strengthening and stretching as detailed on the daily flow sheet

**Today's Treatments:**

- Stretching ex
- Therapeutic ex
- Moist heat
- Electric stimulation

**Assessment:**

- Making steady progress
- Tolerated treatment well

**Plan:**

- Continue present program
- Continue to gradually increase activity according to treatment plan

**Therapist** *Brett Tull*

Page 1

000012

Last: Guzman — First: Gloria

## Knee Flow Sheet

| | DATE: | 10-4-99 | 10-5-99 | 10-6-99 | 10-7-99 | 10-8-99 |
|---|---|---|---|---|---|---|
| **Warm Up:** | | | | | | |
| Bike (15 min) | | 15 min. | 15 min | | 15 min | |
| Treadmill | | | | | | |
| **Modalities** | | | | | | |
| Hot Pack / E-stim | 15' | Ultra 20m | | | | |
| Ultrasound | | | | | | |
| Myofascial Release | | | | | | |
| **Range Of Motion:** | | | | | | |
| Gastroc / Soleus Stretch | | 3 x 30 sec | 3 x 30 sec | | 3 x 30 sec | |
| Hamstring Stretch | | 3 x 30 sec | 3 x 30 sec | | 3 x 30 sec. | |
| Quad Stretch | | 3 x 30 sec | 3 x 30 sec | | 3 x 30 sec. | |
| ITB Stretch | | | | | | |
| Adductor Stretch | | | | NO SHOW | | NO SHOW |
| Patellar Mobs | | | | | | |
| **Strengthening:** | | | | | | |
| Heel Slides | | | | | | |
| Quad Set | | | | | | |
| Hamstring Set | | | | | | |
| Short Arc Quad | | | | | | |
| Long Arc Quad | | | | | | |
| Straight Leg Raise | | | | | | |
| Hip Abduction | Universal Gym | 2 x 15 20# | 2 x 15 20# | NO CALL / | 2 x 15 20# | NO CALL / |
| Hip Extension | | | | | | |
| Hip Adduction | | 2 x 15 20# | 2 x 15 20# | | 2 x 15 20# | |
| Heel Raises | | | | | | |
| Wall Squats / Ball | On Total Gym | 3 x 10 L 7 | 3 x 10 L 7 | | 3 x 10 L 7 | |
| Stork Balance | | | | | | |
| Baps Board | | | | | | |
| Lunges | | | | | | |
| Step ups / side | | — | 25 step each | | | |
| Jumps | | | | | | |
| Stool Burners | | | | | | |
| Universal Flex / Ext | | — | — | | | |
| **Miscellaneous:** | | 0/10 Rt Knee; 5/10 Rt Knee | 0/10 Rt Knee; 3/10 Rt Knee. | | 0/10 Rt Knee; 2/10 Rt Knee. | |
| Pain Scale | | | | | | |
| **SIGNATURE:** | | 3 N T | 3 N T | | | |

RECEIVED
OCT 18 1999
NASB - AUST

000016

FILE No.246 10-11 '99 16:48  ID:CRC              FAX:1 956 44               PAGE  1  5

Last: __Guzman__     First: __Gloria__

## Knee Flow Sheet

| | DATE: | 10.4.99 | 10.5.99 | 10.6.99 | 10.7.99 | 10.8.99 |
|---|---|---|---|---|---|---|
| **Warm Up:** | | | | | | |
| Bike (15 min) | | 15 min | 15 min | | 15 min | |
| Treadmill | | | | | | |
| **Modalities:** | | | | | | |
| Hot Pack / E-stim | 25c | after 20m | | | | |
| Ultrasound | | | | | | |
| Myofascial Release | | | | | | |
| **Range Of Motion:** | | | | | | |
| Gastroc / Soleus Stretch | | 3x30sec | 3x30sec | | 1x1 sec | |
| Hamstring Stretch | | 3x30sec | 3x30sec | | 3x50 off | |
| Quad Stretch | | 3x30sec | 3x30sec | NO CALL / NO SHOW | 3x 20sec | NO CALL / NO SHOW |
| ITB Stretch | | | | | | |
| Adductor Stretch | | | | | | |
| Patellar Mobs | | | | | | |
| **Strengthening:** | | | | | | |
| Heel Slides | | | | | | |
| Quad Set | | | | | | |
| Hamstring Set | | | | | | |
| Short Arc Quad | | | | | | |
| Long Arc Quad | | | | | | |
| Straight Leg Raise | | | | | | |
| Hip Abduction Universal Gym | | 2x15 20# | 2x15 20# | | 2x15 20# | |
| Hip Extension | | | | | | |
| Hip Adduction | | 2x15 20# | 2x15 20# | NO CALL / NO SHOW | 2x15 20# | NO CALL / NO SHOW |
| Heel Raises | | | | | | |
| Wall Squats / Ball Univ Gym | | 3x10 L7 | 3x10 L7 | | 3x10 L7 | |
| Stork Balance | | | | | | |
| Baps Board | | | | | | |
| Lunges | | | | | | |
| Step ups / side | | — | 25 step ach | | | |
| Jumps | | | | | | |
| Stool Burners | | | | | | |
| Universal Flex / Ext | | — | — | | | |
| Miscellaneous: | | 0/10 Rt Knee 5/10 Rt Knee | 0/10 Rt Knee 5/10 Rt Knee | | RECEIVED 0/10 Rt Knee 5/10 Rt Knee OCT 18 1999 TASB - AUSTIN | |
| Pain Scale | | | | | | |
| **SIGNATURE:** | | [signature] | [signature] | | [signature] | |

RECEIVED
OCT 18 1999
TASB - AUSTIN

000014

# *Daily Note*

**Patient: Gloria Guzman**

**Date:** 10/05/99

---

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD.<br>351 N. Sam Houston St<br>San Benito, TX 78586<br>956-2443 | **Primary Insurer:** | T.A.S.B<br>P.O. Box 2010<br>Austin, TX 78768 |
| **Employer:** | San Benito I.S.D.<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6188 | | |

---

**Subjective Notes:**

- Pt with no new complaints.

**Objective Findings:**

- Note: Pt initiated session with 15mins pre warm-up exercises followed by therapeutic exercises for both knees.Reference flow sheet for specific details

**Today's Treatments:**

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Therapeutic ex as per flow sheet

**Assessment:**

- Making steady progress

**Plan:**

- Continue present program

_____
**Therapist**

RECEIVED

OCT 18 1999

TASB - AUSTIN

000015

# Daily Note

**Patient: Gloria Guzman**

**Date:** 10/07/99

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD<br>351 N. Sam Houston St<br>San Benito, TX 78586<br>956-2443 | **Primary Insurer:** | TASB<br>P O Box 2010<br>Austin, TX 78768 |
| **Employer:** | San Benito I.S.D<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6188 | | |

**Subjective Notes:**

- Pt with no complaints.

**Objective Findings:**

- Note: Pt initiated session with 15mins pre warm-up exercises followed by therapuetic exercises for both knees. Pt concluded endeavors with modalities. Reference flow sheet for specific detailes.

**Today's Treatments:**

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Therapeutic ex as per flow sheet
- Moist heat
- Electric stimulation

**Assessment:**

- Making steady progress

**Plan:**

- Continue present program

*Martin P. Longoria PTA*

**Therapist** *Brett Tice PT*

RECEIVED

OCT 18 1999

TASB - AUSTIN

000016

10/15/99  11:17  FAX 956 361 6107         RISK MANAGEMENT                    @01

RISK MANAGEMENT
DEPT
240 North Crockett St
(956) 361 6108
Fax (956) 361 6107

# Fax

| To: | TASB W/C DIVISION | | From: | Gracie Carpio |
|-----|------------------|---|-------|---------------|
| Fax: | 1-800-580-6720 | | Pages: | 2 |
| Phone: | 1-800-580-8282 | | Date: | OCTOBER 15, 1999 |
| Re: | THERAPY -PTA | | CC: | Stacy Gant |
| ☐Urgent | ☐For Review | ☐ Please Comment | | ☐ Please Reply |

### THERAPY – PTA  ON GLORIA GUZMAN

000017

10/13/98  11:17  FAX 956 361 9167          RISK MANAGEMENT

# Industrial Mobility

### Rehabilitation Center Inc.
998 S. 77 Sunshine Strip, Harlingen TX 78330
(956) 440-9675/ FAX (956) 440-8965

DATE: 10/12/99

This is to certify that Ms. Gloria Guzman attended Physical Therapy today.

My patient is able to return to (work)/school on 10/13/99

Remarks: Ms. Guzman attended the following dates:
10-4/10-5/10-7/10-12

Sincerely,

Martin P. Longoria PTA
Therapist

RECEIVED
OCT 13 1999
RISK MANAGEMENT

000018

October 12, 1999

Stacy Gant
T.A.S.B.
P.O. Box 2010
Austin, TX 78768

Re: Gloria Guzman

Dear Ms. Gant,

Gloria Guzman has been receiving physical therapy for treatment of L. Back Knee Sprain. To date, the patient has completed 12 sessions and has made good progress.

At this time my recommendations and assessments are:

• D/C patient today

Please refer to the enclosed Discharge Summary for physical findings.

Regards,

Therapist

RECEIVED
OCT 22 1999
TASB - AUSTIN

000019

# *Discharge Note*

**Patient: Gloria Guzman**

**Evaluation Date:** 10/12/99

| | | | |
|---|---|---|---|
| **Referring Physician:** | Movva, MD.<br>351 N. Sam Houston St.<br>San Benito, TX 78586<br>956-2443 | **Primary Insurer:** | T A S B<br>P O Box 2010<br>Austin, TX 78768 |
| **Employer:** | San Benito I.S.D<br>240 N. Crockett<br>San Benito, TX 78586<br>(956) 361-6186 | | |

**Subjective Notes:**

- Pt reports good progress and rates pain as 0/10 in the right knee and 3/10 in the left.Pt also stated feels min discomfort during walking for any long periods of time.

**Objective Findings:**

- Mild Tenderness of B Lateral femorotibial joint line joint improved from Moderate
- Mild Tenderness of Thigh and knee improved from Moderate
- Range of Motion: Gross measurements of AROM in B knee unchanged
- Knee Flexion: 4+/5 L, 4+/5 R improved from 4/5 w/Pain L, 4/5 w/Pain R
- Knee Extension: 4+/5 L, 4+/5 R improved from 4/5 w/Pain L, 4/5 w/Pain R
- Visual Analog Test today: 3/10. least: 0/10, most: 0/10 in B knee changed from Visual Analog Test today: 4/10, most: 7/10
- Special Tests of B knee unchanged

**Goals:**

- Decrease muscle strain: Goal met as of 10/12/99
- Facilitate healing: Goal met as of 10/12/99
- Independent with home program: Achieving goal as of 10/12/99
- Increase functional muscle strength: Achieving goal as of 10/12/99
- Decrease pain to 2/10 in three weeks.. Achieving goal as of 10/12/99
- Independent in pain relief techniques: Goal met as of 10/12/99

**Today's Treatments:**

- Dynamic stabilization
- Stretching ex
- Therapeutic ex
- Therapeutic ex as per flow sheet
- Reevaluation

**Assessment:**

- Making steady progress

**Plan:**

- D/C patient today

RECEIVED

OCT 22 1999

TASB - AUST

000020

*Page 1*

# Discharge Note

**Patient: Gloria Guzman**

**Evaluation Date:  10/12/99**

2 9 0 0 9 1 1 9 0 2

_Therapist_

RECEIVED

OCT 22 1999

TASB - AUSTIN

000021

Send to TWCC FIELD OFFICE Handling Claim, if known, or
TEXAS WORKERS' COMPENSATION COMMISSION
4000 South IH-35, Southfield Building
Austin, Texas 78704

TWCC# _____
Carrier's Claim # _____

# REPORT OF MEDICAL EVALUATION

| 1. Injured Employee's Name (Last, First, M.I.) | 2. Social Security Number | 3. Date of Injury |
|---|---|---|
| HICMAN, JUANITA | | |

| 4. Injured Employee's Mailing Address (Street or P.O. Box)   City | State   ZIP Code | 5. Phone Number |
|---|---|---|
| P.O. Box 1239   Santa Rosa | TX   78513 | |

| 6. Employer's Business Name | 7. Workers' Compensation Insurance Carrier |
|---|---|
| San Benito - ISD | TX ASSOCIATION OF SCHOOL   P.O. Box 3010   Austin TX 78768-3010 |

| 8. Employer's Mailing Address (Street or P.O. Box)   City | State   ZIP Code |
|---|---|
| 240 N CROCKETT ST   SAN BENITO TX 78586 | |

| 9. Doctor's Name, Title and Specialty | 10. Date of This Visit |
|---|---|
| MEYVA, MD, PRASAD | |

| 11. Doctor's Mailing Address (Street or P.O. Box )   City | State   ZIP Code | 12. Phone Number |
|---|---|---|
| 151 N SAM HOUSTON   SAN BENITO, TX 78586 | | |

| 13. Professional License Number | 14. Diagnosis (ICD-9 Codes) | |
|---|---|---|
| K-6169 | (1) 844.9 | (2) |
| **15. Federal Tax Identification Number** | (3) | (4) |
| 742222891 | | |

16. Please attach a narrative history of the employee's medical condition(s) including but not limited to
   a) onset and course of employee's medical condition(s), and
   b) findings of previous examinations, treatments, and responses to treatments
      not previously reported to the insurance carrier and the Commission by the doctor making this report
   c) a description of the results of the most recent clinical evaluation of the employee.

**MAXIMUM MEDICAL IMPROVEMENT**

17. Has employee reached maximum medical improvement as defined on the reverse side? Please check the appropriate box and complete the remainder of the form.

☐ No, the employee has not reached maximum medical improvement. Give the estimated date on which the employee is expected to reach maximum medical improvement. _____

☒ Yes, I certify the above-named employee has reached maximum medical improvement on __09/20/1999__. This date may not be prospective.

**IMPAIRMENT RATING**

18. I certify the above-named employee has a whole body impairment rating of __0__%. (Please attach worksheets used to determine the whole body impairment.)

Objective clinical or laboratory finding means a medical finding of impairment resulting from a compensable injury, based on competent objective medical evidence that is independently confirmable by a doctor, including a designated doctor, without reliance on the subjective symptoms perceived by the employee. This impairment rating shall be based on the compensable alone.

To determine the existence and degree of the employee's impairment, a doctor must use the "Guides to the Evaluation of Permanent Impairment," third edition, second printing, February 1989 published by the American Medical Association.

**IMPORTANT NOTICE TO THE INJURED EMPLOYEE AND THE INSURANCE CARRIER: THE FIRST IMPAIRMENT RATING ASSIGNED BY A DOCTOR IS CONSIDERED FINAL IF THE RATING IS NOT DISPUTED WITHIN 90 DAYS FROM RECEIVING NOTICE OF THE RATING. CONTACT THE FIELD OFFICE HANDLING THE CLAIM FOR FURTHER INFORMATION.**

| 19. Doctor Type: (Check appropriate block) | Required Medical Examination Doctor |
|---|---|
| ☒ Treating   ☐ Other   ☐ Designated | ☐ Carrier Selected   ☐ Commission Selected |

20. Signature of Doctor _____   21. Date of this Report __10-18-99__

22. A doctor, other than the treating doctor or designated doctor, who certifies maximum medical improvement must send this Report of Medical Evaluation (TWCC-69) to the treating doctor no later than 7 days after the examination. The treating doctor, in turn, must mail this Report of Medical Evaluation to the commission field office handling the employer's claim within 7 days. This will serve as the treating doctor's agreement or disagreement with certification of maximum medical improvement and/or with the assigned impairment rating.

Treating Doctor's Review of Certification of Maximum Medical Improvement and Assigned Impairment Rating (see reverse side for instructions)

NOV 01 1999

TASB AUSTIN

| ☐ I AGREE with the above doctor's certification of maximum medical improvement. | ☐ I DISAGREE with the above doctor's certification of maximum medical improvement. |
|---|---|
| ☐ I AGREE with the above doctor's assigned impairment rating. | ☐ I DISAGREE with the above doctor's assigned impairment rating. |

23. Signature of Treating Doctor _____

Printed Name of Treating Doctor _____   24. Date Signed _____

000022

**ADDITIONAL INFORMATION ON REVERSE SIDE**

TWCC-69 (Rev. 3/93)   Rule 130.1



**San Benito Medical Associates, Inc.**

351 N. Sam Houston • San Benito, Texas 78586 • (956) 399-2443
721 W. Harrison • Harlingen, Texas 78550 • (956) 440-8470

FAMILY PRACTICE
Errol E. Cummins, M D, P A
William H. Hanna, M D, P A
Eduardo Alvarado, M D
Timothy C. Trottman, M D
Roland Lopez, M D
Norma Scharbert, D O
Ann L. Kannan, D O
Juan H. Gonzalez, M D
Petros K. Chaparos, M D
Raquel Bolado, D O
Prasad V. Movva, M D
Ray F. Smith, M D

GENERAL SURGERY
Lonnie D Stanton, M D

PHYSICIANS ASSISTANT
Michelle Erdley, P A

October 18, 1999

TASB
P.O. Box 2010
Austin, Texas 78768

RE:    Gloria Guzman
DOB:  7-20-51
DOI:   8-5-99

TO WHOM IT MAY CONCERN:

Date of initial visit was 9-3-99.

HISTORY OF PRESENT ILLNESS AND COMPLAINT:  The patient states that while walking down a hallway slipped and fell forward on both knees. She was complaining of pain to both knees, left knee pain is worse than the right knee pain. On physical exam of the knee, no swelling, tender medial collateral ligament region on the left side. On the right knee lateral collateral ligament pain and tenderness, drawer sign is negative. Left tibial condyle tenderness. Ankles within normal limits, hip within normal limits. She was diagnosed with bilateral knee sprain. X-rays were within normal limits. Patient was subsequently seen on 9-20-99 with no swelling of the knees and mild tenderness over the medial collateral ligament of the left knee. The right knee had tibial condyle tenderness and ankles within normal limits and patient was referred to the physical therapy 3 times a week for two weeks. The patient has to continue the Skelaxin and Relafen. The patient was released to limited work but patient subsequently did not follow-up on her office visits and I assume that the patient has reached MMI by this time.

Thank you,

Prasad V. Movva, M.D.
pvm/js

REC'
NOV 0   1999
TASB-AUSTIN

000023

```
TWGC No.:          Not Assigned
Carrier Claim No.: 1-98-1770613
Date of Accident:  8/05/1999
Date of Notice:    11/08/99
Social Security No.: 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
```

## NOTIFICATION REGARDING MAXIMUM MEDICAL IMPROVEMENT AND/OR IMPAIRMENT RATING

To: GLORIA GUZMAN
    PO BOX 1237
    SANTA ROSA, TX 78593

Entitlement to impairment income benefits begins the day after the date you have been certified as having reached maximum medical improvement. Benefits are payable at 70% of your average weekly wage, not to exceed the state average weekly wage, and are paid for a period of three weeks for each percentage point of impairment.

__X__ Texas Association of School Boards, Inc. has received a report from PRASAD MOVVA, MD (copy attached) stating that you have reached maximum medical improvement and have been assigned a whole body impairment rating of 0%. Based on this report, you are not eligible for additional income payments of any type. You continue to remain entitled to receive medical treatment related to you injury. To dispute this finding, contact the TWCC field office handling your claim or call 1-800-252-7031.

____ Texas Association of School Boards, Inc. has received a report from Dr. _____ (copy attached) stating that you have reached maximum medical improvement and have been assigned a whole body impairment rating of ____%. Based on this report, you will not receive additional payments of temporary income benefits. You will receive ____ weeks of impairment income benefits at the rate of $____.__ per week unless you or the insurance carrier dispute the impairment rating. Enclosed is your first payment of impairment income benefits. These benefits will end approximately _____. You continue to remain entitled to received medical treatment related to your injury. To dispute this finding, contact the TWCC field office handling your claim or call 1-800-252-7031.

____ Texas Association of School Boards, Inc. is disputing the doctor's impairment rating and has made a reasonable assessment of ____% impairment. Enclosed is your first payment of impairment income benefits. Based on the carrier's assessment, the carrier will pay impairment income benefits for ____ weeks pending resolution of the impairment rating dispute.

IF YOU DO NOT AGREE WITH THE FINDING OF MAXIMUM MEDICAL IMPROVEMENT OR WITH THE PERCENTAGE OF IMPAIRMENT ASSIGNED BY THE DOCTOR, YOU MAY DISPUTE THE RATING BY CONTACTING THE TEXAS WORKERS' COMPENSATION COMMISSION WITHIN 90 DAYS FROM RECEIVING NOTICE OF THE DOCTOR'S RATING. FOR ASSISTANCE, CONTACT THE COMMISSION FIELD OFFICE HANDLING YOUR CLAIM OR CALL 1-800-252-7031.

```
FROM: Adjuster's Name:             Marian Mathews
      Adjuster's Phone No.:        1-800-482-7276, ext. 7261
      Claims Administrator Name:   Texas Association of School Boards, Inc.
      Claims Administrator Address: P.O. Box 2010
                                    Austin, TX  78768-2010
```

TWCC-28 (9/93)

02/15/01  15:19  FAX   361 6187    RISK MANAGEMENT    @001

File original with employer's carrier                        CARRIER'S CLAIM #
File copy with injured employee                              TWCC #

## SUPPLEMENTAL REPORT OF INJURY

### DO NOT SEND THIS FORM TO TEXAS WORKERS' COMPENSATION COMMISSION UNLESS REQUESTED

**WHEN AND WHERE TO FILE** *For all injuries occurring January 1, 1991 or after that require a TWCC-1 Employer's First Report of Injury, to be filed, the employer must file by first class mail or personal delivery a Supplemental Report of Injury (TWCC-6) with the employer's workers' compensation carrier and the injured employee:* 1) within 3 days after the injured employee returns to work, 2) within 3 days when the employee, after returning to work, has an additional day or days of disability because of the injury; 3) within 10 days after the end of each pay period in which the employee has an increase or decrease of earnings during the time the employee is entitled to temporary income benefits; 4) within 10 days after the employee resigns or is terminated  If the injured employee is no longer employed by the employer, the employee is responsible for providing information to the carrier about amounts of earnings of offers of employment.  The employee may use a TWCC-6, Employer's Supplemental Report of Injury for this purpose  An employee has disability if he/she is unable to work as a result of the injury or has returned to work earning less than pre-injury wages because of the injury.

### EMPLOYEE INFORMATION

| | | |
|---|---|---|
| 1. Employee's Name (Last, First M.I.) and Telephone No.  Garcia, Gloria Guzman | 2. Social Security No.  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 | 3. Date of Injury (m-d-  8-5-99 |

4. Employee's Mailing Address (Street or P.O. Box)
   P.O. Box 1237

| City  Santa Rosa, | State  Texas | Zip Code  78593 |
|---|---|---|

| Employee returned to work  Complete Block 5a or 5b  Complete Blocks 6 and 7 | additional day(s) of disability  Complete Block 5b  Complete Block 7 | | change in weekly earnings  after injury  Complete Block 5a or 5b  Complete Blocks 7 and 8 | X | employee terminated/resigned  Complete Block 5a or 5b  Complete Block 7  Complete Block 9 |
|---|---|---|---|---|---|

| 5. a) If initial filing of TWCC-6, first day of disability due to injury (m-d-y) | 5. b) If second or subsequent filing of TWCC-6, give first day of disability due to injury for this period only (m-d-y) |
|---|---|

| 6. Date of Return to Work  (Check box)  Full Duty, Full Pay  Limited Duty, Full Pay            Reduced Pay | 7. Weekly and Hourly Earnings at Time of This Report  8.  Weekly  (Check box)  Same as Preinjury Wages  $  □ Increase from Preinjury Wages  Decrease from Preinjury Wages |
|---|---|

| 8. No. of Hours Working Weekly at Time of This Report _____  (Check box)  □ Increase from Preinjury Hours Worked Weekly  □ Same as Preinjury  Decrease from Preinjury Hours Worked Weekly | 9. If the employee resigns or is terminated, fill in the appropriate section.  Date of Resignation (m-d-y)  Date of Termination (m-d-y)  2-15-2001 Inactive Status |
|---|---|

| 10. If applicable, eighth days of disability began on (m-d-y) (see above Definition of disability) | 9a. Reason for Resignation or Termination  unknown |
|---|---|

| 11. Has injured employee died? If so, give date of death (m-d-y) | 12. Was employee on limited duty at time of termination?  □ Yes  x  No |
|---|---|

| 13. Employer's Business Name  San Benito CISD | 14. Telephone No.  (956)-361-6188 |
|---|---|

15. Employer's Business Mailing Address (Street or P.O. Box)
   240 N. Crockett

| City  San Benito | State  Tx | Zip Code  78586 |
|---|---|---|

16. Name of Workers' Compensation Carrier for Above Injury
   Texas Workers Compensation Insurance Fund

17. The information provided in this report is accurate to the best of my knowledge.  It may be relied upon for evaluation of the above employee's disability for benefits.

Gracie Carpio      W/C Secretary          8/15/2001

Signature and Title of Person Completing Form    □ Employer    ☒ Employee    Date

TWCC-6 (Rev. 7/93)
Julie 128.3, 129.4

000025

FEB 15 '01  15:04                              956 361 6187    PAGE.001

2 8 0 0 0 1 7 0 0 0 0

# Worker's Compensation Claims

### Closed LT and Med only Claims That Have Had No Payments In 2 Yrs. Or DARTS Remarks In the Last 3 Mos.

## Fund #  001

**Name** Guzman, Gloria

**SSN** 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

**DOI** 8-5-99

**CLAIM #** 1770613

08/01/02

000026

[MPC Fax Postmaster - 7087F810.DC]

98 1770613   (PIF)

06/05/99  16 54  FAX 956 361 6107   RISK MANAGEMENT

GAS/TAD

R

## WORKERS' COMPENSATION - FIRST REPORT OF INJURY OR ILLNESS

TASB RECORD ONLY

**GENERAL**
Employer Name: San Benito I.S.D.
Mail Address: 240 N Crockett
City: San Benito
State: TX   Zip Code: 78586
SIC: 8211   Employer FEIN: 74-6002224

**CARRIER/ADMINISTRATOR**
Texas Association of School Boards
Risk Management Fund
P.O. Box 2010
Austin, TX 78768-2010

Claim Administrator (Name, Address, Phone No.):
Texas Association of School Boards, Inc.
P.O. Box 2010
Austin, TX 78768-2010

Check if Appropriate: ☐ Self Insurance

Carrier FEIN: 74-3499130
Administrator FEIN: 74 2375810

**EMPLOYEE**
Name (Last, First, Middle): Guzman, Gloria
Date of Birth: 7-28-51
Social Security No.: 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
Date Hired: 9-27-96
State of Hire: TX
Address (incl ZIP): P.O. Box 1237, Santa Rosa, TX. 78593
☑ Male / ☐ Female
Occupation/Job Title: Payroll Clerk
Employment Status: Full-time

**OCCURRENCE**
Wage: 81694.27
# of Days Worked/Week: 5
Time Employee Began Work: 7:30
Date of Injury/Illness: 8/5/99
Time of Occurrence: 2:40 PM
Last Work Date: 8/5/99
Contact Name/Phone Number: ( 956 ) 361- 6100
Type of Injury/Illness: Slip and Fall
Part of Body Injured: Left knee and Left Foot

Did injury/illness exposure occur on employer's premises? Yes
Department or location where accident or illness exposure occurred: Hallway to front reception area

Describe the sequence of events and include any objects or substances that directly injured the employee or made the employee ill: Was taking mail to front desk and slipped on the hallway between the door of operations and front desk. Checked to see if something had been spilled but believe was wax build-up.

Date Returned to Work: ___

**TREATMENT**
Physician/Health Care Provider (Name & Address): ___
Hospital (Name & Address): ___

Initial Treatment:
☐ No Medical Treatment
☐ Minor by Employer
☐ Minor Clinic/Hosp
☐ Emergency Care
☐ Hospitalized > 24 Hrs
☐ Future Major Medical/Lost Time expected

**OTHER**
Witness (Name & Phone #): ___
Date Administrator Notified: 8/5/99
Date Prepared: 8/5/99
Preparer's Name & Title: Mary Garcia, Senior Secretary
Phone Number: ( 956 )- 361 -6188

FORM LC-1
AIC-0943

000027

```
1/30/03                  DATABASE AND REMARKS TRACKING SYSTEM           8:44:47
SC710R                            REMARKS LISTING                       PAGE:   1
```

Co: 025 Fnd: 001 Fyr: 098 Claim: 1770613
GUZMAN, GLORIA

```
REMARK    REMARK                          REMARK
  DATE     TYPE
```

8/06/99   CLIA1
               GAS Stacy Gant                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                          SANTA ROSA                   ACCIDENT DATE: 08/05/99
                                                       USER NAME: Kathryn Stanfield

8/06/99   CLAMG
               AMS FIRST NOTICE OF IA1/FROI
               DIARY COMPLETED BY: NICHOKAT    DIARY DT: 08/06/99 DIARY COMPLETION:08/06/99

8/06/99   CLADJ
               ASSIGNMENT OF NEW LOSS
               DIARY COMPLETED BY: GANTXSTA    DIARY DT: 08/06/99 DIARY COMPLETION:08/10/99

8/06/99   CLNEW
               NEW CLAIM NOTIFICATION LETTER

                                                         CLNEWCL

8/06/99   CLAMD
                                          1. Address SOC
                                              2. If investigation required upgrad
               e to medical - perform standard investigationKnichols
               DIARY COMPLETED BY: GANTXSTA    DIARY DT: 08/06/99 DIARY COMPLETION:08/11/99

8/10/99   CLSOC
                                              48yr old Payroll clerk was t
               aking mail to front desk and slipped in the hallway between the door of ope
               rations and front desk, clmt tripped on wax build up.  Compensability is to
                    the lt knee and foot.  No medical trx was sought.
               Record Only......Sgant

8/10/99   CLSUB
                                              It appears there is no possibl
               e subro.  IW injured her lt knee and foot when she slipped on a floor with
               wax build up....Sgant

9/22/99   CLTC
               Melissa calls with Ind. Mobility   Dr Prafad Movva   351 N Sam Houston San
               Benito, TX 78586 ph 956-399-2443        has ordered pt 3 x 3 r an n.   gh
               ugh
               DIARY COMPLETED BY: PDSHOLD1    DIARY DT: 09/22/99 DIARY COMPLETION:09/22/99

9/22/99   CLRO
               Reopen file cmt begining pt.    ghugh for sgant
               DIARY COMPLETED BY: NICHOKAT    DIARY DT: 09/22/99 DIARY COMPLETION:09/22/99

9/22/99   CLTC
               see previous note. ghugh                          000028

```
1/30/03                    DATABASE AND REMARKS TRACKING SYSTEM                8:44:47
SC710R                            REMARKS LISTING                            PAGE:   2

Co: 025 Fnd: 001 Fyr: 098 Claim: 1770613
GUZMAN, GLORIA

REMARK    REMARK                         REMARK
 DATE      TYPE

 9/22/99   CLTC
                DIARY COMPLETED BY: GANTXSTA   DIARY DT: 09/22/99 DIARY COMPLETION:09/28/99

 9/22/99   CLUDT
                                        Upgrade and reopened due to medical trea
                tment. Please f/up with medical and     continue to monitor. Knichols
                DIARY COMPLETED BY: GANTXSTA   DIARY DT: 09/22/99 DIARY COMPLETION:09/30/99

10/22/99   CLCRD
                                        Status of physical therapy
                DIARY COMPLETED BY: ANWARREN   DIARY DT: 10/22/99 DIARY COMPLETION:11/10/99

10/01/99   CLXXX
                $$ 742222891-011   PRASAD V MOVVA MD
                DIARY COMPLETED BY: GANTXSTA   DIARY DT: 10/01/99 DIARY COMPLETION:10/04/99

10/01/99   CLXXX
                $$ 953382819-001   MEDCHECK

10/05/99   CLMD
                                        Rec'd 9/30/99 from Dr. Prasad
                 Movva, M.D.  OV 9/20/99.  RRTW 9/20/99.  Pt has cont w/pain & soreness to
                b-knees.  Knee-swelling, mild tenderness, medial collateral ligament rt kne
                 e.  tibial condule tender mild ankle-wnl.  Exam, m
                edication, regular duty, restricted bending, no climbing overhead work.  In
                dustrial mobility 9/22/99.  Skelaxin 400mg & Refafen 500.  Fu on 9/27/99...
                ....Sgant

10/08/99   CLMD
                                        Rec'd 9/16/99 from Dr. Prasad
                 Movva, M.D. ov 9/3/99.  RTW 9/3/99.  Pt states was walking down hallway, w
                hen she slipped and fell forward on b-knees. c/o pain to b-knees.  Knee swe
                 lling, tender medial collateral ligament lt knee,
                rt knee, lateral collateral leg & pain drawer sign-negative lt tibial condu
                le, tender ankle wnl hip.  X-ray lt knee.  Exam meds, may return to reg, du
                ty today.  FU 9/10/99.....Sgant

10/08/99   CLXXX
                $$ 741940911-005  BRUCE M BERBERIAN MD
                DIARY COMPLETED BY: GANTXSTA   DIARY DT: 10/08/99 DIARY COMPLETION:10/11/99

10/08/99   CLXXX
                $$ 742770561-002  BRETT ALLAN TICE LPT

10/12/99   CLXXX
                $$ 742222891-011   PRASAD V MOVVA MD
```

000029

<pre>
1/30/03                    DATABASE AND REMARKS TRACKING SYSTEM              8:44:47
SC710R                            REMARKS LISTING                        PAGE:    3
</pre>

Co: 025 Fnd: 001 Fyr: 098 Claim: 1770613
GUZMAN, GLORIA

<pre>
REMARK    REMARK                        REMARK
 DATE      TYPE
</pre>

10/12/99   CLXXX
           DIARY COMPLETED BY: GANTXSTA    DIARY DT: 10/12/99 DIARY COMPLETION:10/13/99

10/12/99   CLXXX
           $$ 953382819-001   MEDCHECK

10/16/99   CLXXX
           $$ 742770561-002  BRETT ALLAN TICE LPT
           DIARY COMPLETED BY: GANTXSTA    DIARY DT: 10/16/99 DIARY COMPLETION:10/19/99

10/16/99   CLXXX
           $$ 742770561-002  BRETT ALLAN TICE LPT

10/16/99   CLXXX
           $$ 742770561-002  BRETT ALLAN TICE LPT

11/03/99   CLRA
           GAS Stacy Gant              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA          ACCIDENT DATE: 08/05/99
                                                USER NAME:

11/03/99   CLIA1
           MAI Marian Mathews          CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA          ACCIDENT DATE: 08/05/99
                                                USER NAME:

11/05/99   CLRA
           MAI Marian Mathews          CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA          ACCIDENT DATE: 08/05/99
                                                USER NAME:

11/05/99   CLIA1
           GAS Stacy Gant              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA          ACCIDENT DATE: 08/05/99
                                                USER NAME:

11/05/99   CLT69
                                                             Received
           TWCC-69 on this date w/a 0% i/r given    by treating Dr.Movva, M.D. MMI da
           te 09/20/99...ESoliz
           DIARY COMPLETED BY: MATHEMAR    DIARY DT: 11/05/99 DIARY COMPLETION:11/08/99

11/08/99   CLCS1
                                       Please file a T28 with the iw: The iw
           has reached mmi 9/20/99 w/a 0% i/r.  Tx Dr is Prasad Movva.  Send T28 & cop
           y of T69 to iw.  Pif original.  M. Mathews
</pre>

000030

```
 1/30/03                 DATABASE AND REMARKS TRACKING SYSTEM              8:44:47
 SC710R                          REMARKS LISTING                        PAGE:    4

 Co: 025 Fnd: 001 Fyr: 098 Claim: 1770613
 GUZMAN, GLORIA

 REMARK    REMARK                      REMARK
  DATE      TYPE

 11/08/99   CLCS1
            DIARY COMPLETED BY: HAASXSTA   DIARY DT: 11/08/99 DIARY COMPLETION:11/08/99

 11/08/99   CLRA
            GAS Stacy Gant               CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:

 11/08/99   CLIA1
            MAI Marian Mathews           CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:

 11/08/99   CLLTR
            NOTIFICATION OF MMI AND 0% IMPAIRMENT
                                              TWCC-28.0%

 11/08/99   CLT28
                                         Sent IW T28/T69 regular mail on
                this date./shaas

 11/10/99   CLCLS
                                          Please close file, as the c
                laimant have areceived a 0% rating as ofseptember. EDI updated. ranwar
                DIARY COMPLETED BY: NICHOKAT   DIARY DT: 11/10/99 DIARY COMPLETION:11/10/99

  7/12/00   CLRA
            MAI Marian Mathews           CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:

  7/12/00   CLIA1
            BEM Marian Bell              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:

  8/29/00   CLRA
            BEM Marian Bell              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:

  8/29/00   CLIA1
            PH3 PDSHOLD3                 CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA             ACCIDENT DATE: 08/05/99
                                                   USER NAME:
```

000031

```
1/30/03                    DATABASE AND REMARKS TRACKING SYSTEM              8:44:47
SC710R                            REMARKS LISTING                      PAGE:    5

Co: 025 Fnd: 001 Fyr: 098 Claim: 1770613
GUZMAN, GLORIA


 REMARK   REMARK                          REMARK
  DATE     TYPE


10/03/00   CLRA
             PH3 Gay Hugh                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME:


10/03/00   CLIA1
             HUG Gay Hugh                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME:


12/27/00   CLRA
             HUG Gay Hugh                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME:


12/27/00   CLIA1
             PH3 PDSHOLD3                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME:


 1/22/03   CLRA
             RES Sylvia Rendon              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME: Sylvia Rendon


 1/22/03   CLIA1
             HUG Gay Hugh                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME: Sylvia Rendon


 1/24/03   CLRA
             HUG Gay Hugh                    CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME: Sylvia Rendon


 1/24/03   CLIA1
             RES Sylvia Rendon              CLAIMANT NAME & CITY: GUZMAN, GLORIA
                        SANTA ROSA               ACCIDENT DATE: 08/05/99
                                                    USER NAME: Sylvia Rendon
```

000032

# PHOTOGRAPHIC INFORMATION SHEET
## U.S. POSTAL SERVICE CASE #: _780 00 0062A_

LOCATION OF INCIDENT: _Customer lobby at Santa Rosa, TX MPO_
DATE OF INCIDENT: _11-12-99_                    TIME OF INCIDENT: _7:40A_
PHOTOGRAPHER/TITLE: _Yolanda Perez, PM_



PHOTOGRAPH #: _2 O_
DESCRIPTION: _View of_
_corridor wh_
_customers ps_
_is located._
_____
_____
_____
_____

PHOTOGRAPHIC [

DATE OF PHOTO: _____
TIME OF PHOTO: _____
DIRECTION: _____
DIST. TO SUBJECT: ____
OTHER DATA: _____



PHOTOGRAPH #: _0 O_
DESCRIPTION: _____
_Corridor at_
_____ L_
_direction_
_____
_____
_____
_____

PHOTOGRAPHIC [

DATE OF PHOTO: _____
TIME OF PHOTO: _____
DIRECTION: _____
DIST. TO SUBJECT: ___
OTHER DATA: _____

DEFF'S
EXHIBIT NO. _5_
D. WEIBEL 1-10-03

# PHOTOGRAPHIC INFORMATION SHEET
## U.S. POSTAL SERVICE CASE #: _780 00 0060A_

LOCATION OF INCIDENT: _Customer lobby at Santa Rosa mpo_
DATE OF INCIDENT: _11-12-99_                  TIME OF INCIDENT: _7:40 Am_
PHOTOGRAPHER/TITLE: _Yolanda Perez, Pm_



PHOTOGRAPH #: _5_ OF
DESCRIPTION:
_View of_
_from entrance_
_door._

PHOTOGRAPHIC D

DATE OF PHOTO: _____
TIME OF PHOTO: _____
DIRECTION: _____
DIST. TO SUBJECT: ___
OTHER DATA: _____



PHOTOGRAPH #: _____ OF
DESCRIPTION:
_Visible sign_
_from outside_
_entrance door._

PHOTOGRAPHIC D.

DATE OF PHOTO: _____
TIME OF PHOTO: _____
DIRECTION: _____
DIST. TO SUBJECT: ___
OTHER DATA: _____

DEFT'S
EXHIBIT NO. _6_
D. WEIBEL  _11-10-03_



Records Pertaining to:  **Gloria L. Garcia a/k/a Gloria Guzman**

Records From:  **SAN BENITO MEDICAL ASSOCIATES
MEDICAL AND BILLING RECORDS**

Deliver to:        **Nancy L. Masso
UNITED STATES ATTORNEY'S OFFICE
600 EAST HARRISON ST #201
Brownsville, Texas  78522-**



# Records Retrieval • Document Imaging • Litigation Support

| | |
|---|---|
| 801 E. Nolana, Suite 10<br>McAllen, Texas 78504<br>(956) 668-7327<br>(956) 668-7328 fax<br>1-888-660-7327 | 1201 East Van Buren<br>Brownsville, Texas 78520<br>(956) 504-0444<br>(956) 504-0015 fax<br>1-888-447-0444 |



DEFT.'S
EXHIBIT NO. 7
11-10-03
D. WEIBEL



Records Pertaining to:  **Gloria L. Garcia a/k/a Gloria Guzman**

Records From:  **SAN BENITO MEDICAL ASSOCIATES**
**MEDICAL AND BILLING RECORDS**

Deliver to:      **Nancy L. Masso**
**UNITED STATES ATTORNEY'S OFFICE**
**600 EAST HARRISON ST #201**
**Brownsville, Texas  78522-**

*Litigation Support Services Include:*

- *Courthouse Filings, Research, Retrieval & Copying*
- *Coordination of Document Productions & Express Delivery to Multiple Parties*
- *Document  Numbering & Indexing*
- *Scanning onto Diskette*
- *File Duplication Including Indices, Tabs, Labels, Folders, Binders, etc.*
- *Creation of Brief Covers on Cardstock & Binding*
- *Volume Copying*

2984/R02090257

Affidavit

THE STATE OF TEXAS    §
                      §
COUNTY OF CAMERON     §

## *AFFIDAVIT*

BEFORE ME, the undersigned authority, personally appeared ___Thomas La Motte___, who, being by me duly sworn, deposed as follows:

My name is ___Thomas La Motte___.  I am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated:

"I am the custodian of Medical and Billing Records for SAN BENITO MEDICAL ASSOCIATES, 351 N. SAM HOUSTON, SAN BENITO, Texas 78586.  Attached hereto are Medical and Billing Records from SAN BENITO MEDICAL ASSOCIATES pertaining to **Gloria L. Garcia a/k/a Gloria Guzman, social security number 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, date of birth 07/20/51**.  These said records are kept at the office of SAN BENITO MEDICAL ASSOCIATES in the regular course of business, and it was in the regular course of business at the office of SAN BENITO MEDICAL ASSOCIATES for an employee or representative with personal knowledge of the act, event, condition, opinion, or diagnosis recorded to make the memorandum or record or to transmit information thereof to be included in such memorandum or record; the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis recorded or reasonably soon thereafter; and the method of preparation of the records was trustworthy.

The records attached hereto are the original or exact duplicates of the original."

_____
Custodian of Medical and Billing Records for
SAN BENITO MEDICAL ASSOCIATES

SWORN TO AND SUBSCRIBED before me the __24th__ day of _____September_____, 2002.

_____
NOTARY PUBLIC STATE OF TEXAS
MY COMMISSION EXPIRES: 4-12-2004

KERRY R. REEVES
Notary Public
STATE OF TEXAS
My Comm. Exp. 04-12-2004

2984/R02090257

Billing records have beeb destroyed.

**Medical Records**

| Name | _Lyman_ | Age | _24_ | Phone No. | _7402_ | Date | _3/1/55_ |

| Addre. | _598 S. Adam_ | S M W D | Occupation | Ref. By |

HISTORY PRESENT: C. C.   _S B_   _Rosario_   _housewife_

_July 20-51_

PAST; Med.

Surg.                              Venereal                                    Habits

Menstrual and  Marital

FAMILY

| EXAMINATION: | Temp. | Pulse | Resp. | B. P. _110/80_ | Height | Weight _154_ |

Head

Neck                                         Glands

Chest

Abdomen

Genitalia                    Rectum                                    Herniae

Extremities                                 Reflexes

LABORATORY                                              _missed 2 periods_

REMARKS                                                   _abd pain_

DIAGNOSIS

MEDICO STATIONERY SERVICE, NEW YORK, N. Y.      FORM 108

000001

Patient *Wigman, Gloria*    Sex *fe*    Age *2 f*    Date *12-1-75*

*Dr. Ross*

Specific Gravity _____    Reaction _____

Ketones _____
Blood _____
Albumin _____
Glucose _____
Bile _____

**Microscopic**

Rbc-hpf _____
Wbc-hpf _____
Casts/hpf _____
Amorph. Sed. _____
Crystals _____
Gravindex    *Prognosis - Negative*
Other _____

**URINE**

000002

MAR 10 1976  Wt 156½ BP 120/80

Trouble c menstrual periods

$T_2, T_3$    Vit $\frac{to}{c}$ Dr. [illegible]

MAR 17 1976  Wt 157  BP 110/70    Imp. 12-11-75

Ovulation BBt

Prevue

Clomid

NAME  Ilona

| NAME | AGE | PHONE NO. | DATE |
|------|-----|-----------|------|
| ADDRESS | SMWD | OCCUPATION | REF. BY |

MAY 4 1976    Wt 159½    $\frac{108}{58}$    follow-up

Cont. BBt.

Prevue

Clomid - 50 mg b.i.d

NOV 14 1978  157½    $\frac{112}{74}$    "Loose stool"
last night,
abd cramps

Whole family got diarrhea after cookout.
Working [illegible] P/G

000003

MEDICO STATIONERY SERVICE, NEW YORK, N.Y.    FORM 120

PATIENT _Gloria Guzman_     PHYSICIAN _Ross._

LOCATION _____     DATE _3/10/76_



**TRI-TAB**
**T3**
**% Uptake**

**FTI NOMOGRAM**
**FTI**
**(Free Thyroxine Index)**

**TETRA-TAB**
**T4**
**µg%**

To derive the FTI place a straightedge on the T3 and T4 values and read the corresponding FTI value from the center scale

$$FTI = \frac{T3}{100} \times T4$$

**Suggested Normal range**

Total thyroxine 100 ml   7.2   4.5 – 11.5

T3 (percent uptake)   38.4   25 – 45

FTI (free thyroxine index)   2.76   1.58 – 5.18

* For discussion and references relating to FTI see TRI-TAB and TETRA-TAB package inserts

NUCLEAR-MEDICAL LABORATORIES INC
P.O. Box 47864 • Dallas Texas 75247 • Telex 73-0242
Telephone 214 638-0130

Revised February, 1975

000004

Chart #

Patient _Gloria Guzman_ Sex _____   Age _____   Date 3/10/7c

| | | |
|---|---|---|
| Hemotocrit 39.0 | Male - 40-54 / Female - 37-47 | |
| Hemoglobin 14.5 | Male - 12.5-17.5 / Female - 11.5-15.5 | |
| Rbc/cm 4.80 | 4.0 - 6.0 | |
| Wbc/cm 6,310 | 5,000 - 10,000 | |

**Differential**

Segs _52_ _____ 50 - 65
Stabs _2_ _____ 1 - 5
Juveniles _____ 0
Lymphocytes _45_ / _____ 25-40
Monocytes _____ 0-8
Eosinophiles _1_ _____ 0-4
Basophiles _____ 0-1
Morphology _____
_____
_____

MCH _____ 27-31
MCHC _____ 32-40
MCV _____ 82-92
C.I. _____ 0.85-1.15
S.I. _____ 0.85-1.15
V.I. _____ 0.85-1.15
Sed. Rate _____
Reticulocytes _____ 0.1-1.5%
Platelets _____ 150,000-400,000
L.E. Cells _____
Malaria _____

**HEMATOLOGY**

Chart # 7-20-51
Patient _Gloria Couzman_ Date 11-03-84

Specific Gravity _____   Reaction _____

Ketones _____
Blood _____
Albumin _____
Glucose _____
Bile _____

**Microscopic**

Rbc-hpf _____
Wbc-hpf _____
Casts/hpf _____
Amorph. Sed _____
Crystals _____
Pregnosis _Positive_
Other _____

DR. Heins

**URINE**

Chart # 7/20/51
Patient _Gloria Guzman_ Sex _____   Age _____   Date 7/20/51

Dr. Coffey

Typhoid "O" _____
Typhoid "H" _____
Paratyphoid A _____
Paratyphoid B _____
Proteus Xig _____
B. Abortus _____
Blood Group _____
Rh Factor _Positive_
V.D.R.L. _____
Monospot _____
RA _____
ASO _____

0001005

**SEROLOGY**

SAN BENITO MEDICAL ASSOCIATES, INC.

351 N. Sam Houston                    399-2443                    San Benito, Texas 78586

## PROGRESS NOTES

7/20/57

| DATE | PATIENT NAME | | | PAGE |
|------|------|------|------|------|
| NOV 3 1984 | Gloria Guzman | | | 1 |

| TEMP: | B.P. 110/70 | WEIGHT: 140 | HGT: | HEAD SIZE | OTHER: |
|------|------|------|------|------|------|

talk re: period

listed 7 wks last month —

prev. reg x 2 yrs,

exp swing (cysa) — Fla

w/ BCP ...

Grew dry — (+) ⇒ ... proven of deworm

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|------|------|------|------|------|------|

32 y/o G3P2. LMP 9/mid/84,

10 - 12 wk IUP

considering TOP

| DATE 11-7-84 | TEMP. | B.P. 113/70 | WEIGHT 136 | HEIGHT | HEAD SIZE |
|------|------|------|------|------|------|

NKA

get Rh (+)

( laminaria x 2 inserted )

| DATE 11-7-84 | TEMP. | B.P. 100/60 | WEIGHT 36 | HEIGHT | HEAD SIZE |
|------|------|------|------|------|------|

Nubain 15mg

Phenergan 25mg

Valium 10mg

( laminaria x 2 removed )

Suct AB = comp.

000006

SAN BENITO MEDICAL ASSOCIATES, INC.

351 N. Sam Houston                                399-2443                          San Benito, Texas 785

### PROGRESS NOTES

7-20-51

| DATE 11-24-84 | PATIENT NAME | *Gloria Guzman* | | | | PAGE 2 |
|---|---|---|---|---|---|---|
| TEMP: | B.P.: 100/60 | WEIGHT: 134 | HGT: | HEAD SIZE | OTHER: | |

*FUPS post AB*

*Pelv —*
*z Wishes IUD*

| 12/15/84 | *Ortho 1/17-28 s Medico 5-* | | | | |
|---|---|---|---|---|---|
| DATE 1/26/85 | TEMP. Phone | B.P. | WEIGHT | HEIGHT | HEAD SIZE |

*Spotting on ON 7/7/7-28*

*△ to ON 1+35-28*

*N 1+50-28   Medico/S.B*

| DATE TUESDAY MAY 14 1985 | TEMP. | B.P. 116/70 | WEIGHT 131 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

| DATE THURSDAY JUN 11 1987 | TEMP. | B.P. 110/70 | WEIGHT 125½ | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*follow on Ua flestin Vaginal dis*
*Bing, itch on voiding. yellow dis        X / day*
*Trich*
*Flagyl appoint*

000007

Chart #. _____
Patient _____ Date 5-14-
Specific Gravity 1.015   Reaction 8.5

| | |
|---|---|
| Ketones | 0 |
| Blood | 4+ |
| Albumin | 2+ |
| Glucose | 0 |
| Bile | |

Dr. Tucke

**Microscopic**

| | |
|---|---|
| Rbc-hpf | 50-75 c̄ small clump s |
| Wbc-hpf | 18-20 |
| Casts/hpf | |
| Amorph. Sed. | |
| Crystals | |
| Pregnosis | 0 |
| Other | |

**URINE**

---

Chart # 7-20-51
Patient Gloria Guzman   Date 6/11/85
Specific Gravity 1.003   Reaction 7.0

| | |
|---|---|
| Ketones | 0 |
| Blood | 0 |
| Albumin | 0 |
| Glucose | 0 |
| Bile | |

Dr. Coffey
Maynard

**Microscopic**

| | |
|---|---|
| Rbc-hpf | 0 |
| Wbc-hpf | 4-6 |
| Casts/hpf | |
| Amorph. Sed. | |
| Crystals | |
| Pregnosis | |
| Other | Epit. Cells        2+ |

**URINE** Trichomonas c̄ many.

---

Chart- 7-20-51
Patient Gloria Guzman   Date 4-30-86
DR. Tucker

| | | | |
|---|---|---|---|
| GLU | 0 | Rbc-hpf | 0 |
| BIL | 0 | Wbc-hpf | 0 |
| KET | 0 | Casts-hpf | |
| SG | 1.025 | Amorph. Sed | |
| BLD | 0 | Crystals | |
| PH | 7.0 | Bacteria | |
| PRO | 0 | Epit. Cells | 3+ |
| URO | 0.2 Eu | Mucus Thds. | |
| NIT | 0 | Stools O.C. & P. | |
| LEUKOCYTES | 0 | Stool Occult Blood | |
| GRAVINDEX | | | |
| Wet Mount | | DC | |

000008

URINALYSIS - SAN BENITO MEDICAL ASSOC., INC. • 351 N. Sam Houston • San Benito, TX 78586

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                          399-2443                          San Benito, Texas 785[?]

## PROGRESS NOTES

7/20/8[?]

| SATURDAY JUN 15 19[?] PATIENT NAME | Gloria Guzman | | | | PAGE 3 |
|---|---|---|---|---|---|
| TEMP: | B.P.: 110/70 | WEIGHT: 129. | HGT: | HEAD SIZE | OTHER: |

F.U. blisters to vaginal area

Condyloma acuminata to podophyllin
RTC [?]

Rx AVC cream

| DATE 6-20-85 | TEMP. | B.P. 100/60 | WEIGHT 130 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

follow-up check

abraded / open areas to AgNo₃
then Cga lot cream.
RTC [?]

DNA

| DATE 6-25-85 | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|
| 6-27-85 | | 110/70 | 130 | | |

followup — condyacuminata on cx
post vag[?] histortm
painted c podophyllin

| DATE 7-9-85 | TEMP. | B.P. 110/70 | WEIGHT 126½ | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

followup

Podophyllin

Monilia Mycelysoa
Betadine Betadine                          000009

**SAN BENITO MEDICAL ASSOCIATES**

399-2443

361 N. Sam Houston

San Benito, Texas 78586

**PROGRESS NOTES**

7-20-51

| DATE 8-3-85 | PATIENT NAME Gloria Guzman | | | | PAGE 4 |
|---|---|---|---|---|---|
| TEMP: | B.P.: 110/70 | WEIGHT: 372 | HGT: | HEAD SIZE | OTHER: |

follow up check condyloma?

painted c podophyllin

Condylomata @ introitus + intravaginal

mm

| DATE 8-10-85 | TEMP. XXX | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

8-13-85          110/70          127 1/2

follow up

Podophyllin

| DATE 9-17-85 | TEMP. | B.P. 110/70 | WEIGHT 28 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

Condylomas?

Podophyllin

Plan - Cryo-

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

please look c magnifying glass

000010

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston     399-2443     San Benito, Texas 785[ ]

PROGRESS NOTES     7/20/5-1

| DATE 7/21/85 | PATIENT NAME Gloria Guzman | | | | PAGE 5 |
| TEMP: | B.P.: 100/60 | WEIGHT: 124 | HGT: | HEAD SIZE | OTHER: |

3 small condyloma tx podophyllin

| DATE 1-26-85 | TEMP: DKA | B.P. | WEIGHT | HEIGHT | HEAD SIZE |

12-27-85     150/60   126½

Pap smear — done
pelvic WNL

Rx ON 1450-28.

| DATE MONDAY APR TEMP 987 100. | B.P. 110/70 | WEIGHT 128½ | HEIGHT | HEAD SIZE |

| DATE SATURDAY AUG 8 1987 | TEMP: | B.P. | WEIGHT 132 | HEIGHT | HEAD SIZE |

Referred from V.D. clinic...

000011



SAN BENITO MEDICAL ASSOCIATES

361 N. Sam Houston                399-2443                San Benito, Texas 78

7-20-8

**PROGRESS NOTES**

| DATE FRIDAY JUN 2 1988 | PATIENT NAME Eloisa Guzman | | PAGE 6 |
|---|---|---|---|
| TEMP: | B.P. 110/70 | WEIGHT: 135 | HGT: | HEAD SIZE | OTHER: |

In car accident — cracked
sternum — Seen in ER —

Told had Fx of sternum / cervical
strain — Now doing well but
still c pain in sternum — Deep

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

breathing chest pain — cyanosis

tenderness of ant. chest wall

x-ray (1) Non-displaced sternal fx

at VBH (2) central space hazy neg

Dx 1) cervical strain

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

2) sternal fx — tenderness

Rx 1) Tolectin 600 mg

2) Flexeril 10 mg

See in 1 wk

| DATE FRIDAY JUN 10 1988 | | B.P. 110/70 | WEIGHT 138 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

f.u. much improved

Now OK — See in future

000012

## SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                399-2443                San Benito, Texas 78586

7-30-51

### PROGRESS NOTES

| DATE THURSDAY JUN 23 1988 | PATIENT NAME *Gloria Guzman* | | | PAGE 7 |
|---|---|---|---|---|
| TEMP: | B.P.: 120/74 | WEIGHT: 133. | HGT: | HEAD SIZE | OTHER: |

*f.u. - started having more*
*pain in sternal area.*
*Closing car door / washing selin*
*to bad pretty severe but worse*
*Deep breath OK*
*Avoid stretch ( sternal area*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*Ibuprofen 800 TID,*

*See in 2 wks p*

| DATE MONDAY OCT 31 1988 | TEMP. 98 | B.P. 110/70 | WEIGHT 138 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*Stomach ache, chills*
*congestion - protest ... Friday*
*and headache - Diarrhea - Nausea has*
*slowed down*
*f.u. - Bactrim 800*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

000013

## SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                     399-2443                     San Benito, Texas 78586

### PROGRESS NOTES

7/20/51

**MONDAY JAN 16 1989**   PATIENT NAME: Gloria Guzman   PAGE: 8

| TEMP: 99.4 | B.P.: 130/70 | WEIGHT: 147 | HGT: | HEAD SIZE: | OTHER: |

stomachache, chills *[illegible handwriting]*

*[illegible handwriting]* R.U.Q. to Cx *[illegible]*

*[illegible handwriting]* No *[illegible]* infection *[illegible]*

*[illegible]*

*[illegible]* July 1/19/89 10 *[illegible]*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|------|-------|------|--------|--------|-----------|

R 10 6 3 R25 *[illegible]*

*[illegible handwriting]*

| DATE **TUESDAY JAN 17 1989** | TEMP. | B.P. 120/60 | WEIGHT 142 | HEIGHT | HEAD SIZE |
|------|-------|------|--------|--------|-----------|

Re. X-ray

*[illegible handwriting]*

no loose tooth *[illegible]* change *[illegible]* Color

*[illegible]* normal

Chills past 5 *[illegible]*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|------|-------|------|--------|--------|-----------|

*[illegible handwriting]*

No attorney *[illegible]*

*[illegible handwriting]*

*[illegible handwriting]* car accident

May 31 - 1988 *[illegible]*

*[illegible signature]*

000014

## SAN BENITO MEDICAL ASSOCIATES

951 N. Sam Houston                    399-2443                    San Benito, Texas 78586

### PROGRESS NOTES

7-20-5?

| DATE MONDAY APR 1991 | PATIENT NAME *Gloria Guzman* | | | | | PAGE 9 |
|---|---|---|---|---|---|---|
| TEMP: | B.P. 140/80 | WEIGHT: 139 | HGT: | HEAD SIZE | | OTHER: |

fell yesterday, *illegible* and *illegible*

pain *illegible* arm elbow to wrist area

*illegible handwritten notes*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

Dr. Keillor

May 3 — April 17

8:30 AM   1:30 pm

X-rays c̄ pt.

| DATE WEDNESDAY JUN 17 1992 | TEMP. 98° | B.P. 102/70 | WEIGHT 143½ | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

c̄ pain on epigastric area X 3 da.

Nauseated

HEENT

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*illegible handwritten notes*

LFT's

000015

## SAN BENITO MEDICAL ASSOCIATES, INC.

### X-RAY RECORD

| | | | | | | |
|---|---|---|---|---|---|---|
| Name | GUZMAN, GLORIA | X-RAY No. 45667 | Age 39 | Chart No. | DOB: 7-20-51 | |

Doctor ___ TUCKER ___ Date ___ 4-15-91 ___

Anatomical Region ___ LEFT ELBOW & LEFT FOREARM ___

### R O E N T G E N O L O G I C A L   F I N D I N G S

X RAYS WITH PATIENT TO DR. KEILLOR.

000016

## SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                     399-2443                     San Benito, Texas 785£

### PROGRESS NOTES

7-20-5

| DATE | PATIENT NAME | | PAGE 10 |
|---|---|---|---|

| TEMP: | B.P.: | WEIGHT: | HGT: | HEAD SIZE | OTHER: |
|---|---|---|---|---|---|

pt. _____ sonogram – neg    6/18/92

upper G.I.  Dr. T    6/22/92   9:00 a.m.

| DATE MONDAY JUN 1992 | TEMP | B.P. | WEIGHT 148# | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

Results of UGI. ← normal

_____ Gastritis

Tagam _____ / month

| DATE THURSDAY APR 22 1993 | TEMP | B.P. 120/800 | WEIGHT 155 | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

c/o sore throat, cough,

hoarseness, chest pain

Pharyngitis   Bronchitis

Robitussin AC.

Ceclor 250 tid.

LMP – 16± (reg)

| DATE WEDNESDAY JUN 02 1993 | TEMP 99.6 | B.P. 110/70 | WEIGHT 157½ | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

alle 80    MA c Tygra / Rizzn    no refer re

c/o pain on epig. area    re UGI 4/92

Abd. distended – A lot of

Gas

"dieff."

000017

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston 399-2443 San Benito, Texas 7858

7-20-51

PROGRESS NOTES

| DATE | PATIENT NAME | | | | PAGE |
|---|---|---|---|---|---|
| THURSDAY JUN 10 1993 | Florin Guzman | | | | 11 |
| TEMP: 99^0 | B.P.: 110/80 | WEIGHT: 156 | HGT: 0 | HEAD SIZE | OTHER: |

[illegible]

| DATE | TEMP. | B.P | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|
| | | | | | |

[illegible]

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|
| FRI DEC 1 6 1994 | | 114/84 | 157 | | |

MVA - this P.M. 12:30 . Vehicle - Hyundai - [illegible]

C/O "neck - head pain" No visible damage to

Shoulder pain, took [illegible] aspirin either car. drove home

Pt's car hit from behind at stoplight, wearing seatbelt, driver

neck pain + headache, ↑ since accident

Did not loose consciousness Ø direct blow to head or neck

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|
| | | | | | |

Ø blurry vision,

PMH: 12 y. ago ovarian cysts removed Headache - [illegible]

NKDA Ø smoker [illegible] area & [illegible]

Ø meds. Social ETOH [illegible] area.

SHx: clerk at bank, single

000018

over

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                          399-2443                          San Benito, Texas 785£

## PROGRESS NOTES

| DATE 12-16-94 | PATIENT NAME | | | | PAGE |
|---|---|---|---|---|---|
| TEMP: | B.P.: | WEIGHT: | HGT: | HEAD SIZE | OTHER: |

O/ HEENT  unremarkable.

Resp : chest clean

MSK ; Tender post neck, (L) > (R) ∅ obvious deformities

↓ ROM neck, particularly ext.

ROM lower back (N)

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

X-ray C-spine. (N) except some straightening.

A/ muscle sprain after whiplash inj.

P/ Motrin + Soma.  F/U in 3d. if not better
        800mg        Q6°
                                    Fausto M Ruscius c

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

000019

SAN BENITO MEDICAL ASSOCIATES
351 E SAM HOUSTON
SAN BENITO, TEXAS 78586

Name: Guzman, Gloria          Ray No. 45667
Doctor: Schacherl            Date: 12-16-94
Anatomical Region: Cervical Spine
------------------------------------------------
D.O.B.: 7-20-51

HISTORY:                                    12/20/94

CERVICAL SPINE:

AP odontoid lateral and right oblique cervical spine radiographs.

A pair of attempts to obtain a left oblique study are not successful. Cervical elements and interspaces appear well maintained, as visualized C1-C2 relationship normal. No malalignment or precervical swelling. T1 spinous process appears to be bifid.

IMPRESSION:
1. No fracture of dislocation of the cervical spine is detected. T1 spinous process appears to be bifid, presumably reflects developmental variation rather than fracture.

M. Feigen, M.D./js

12-19-94

000020

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                                399-2443                        San Benito, Texas 78586

## PROGRESS NOTES                                                   7-20-51

| DATE DEC 28 1994 | PATIENT NAME *Gloria Guzman* | | | | PAGE 12 |
| TEMP: | B.P.: | WEIGHT: | HGT: | HEAD SIZE | OTHER: |

*Called X 4   no answer          CR*

| DATE DEC 29 1994 | TEMP. | B.P. 100/20 | WEIGHT 142½ | HEIGHT | HEAD SIZE |

c/o Pain to Back + Shoulders          ↓ 8½ # in 2wks
Pt. feels tingling to hands + feet    not to the
arm + legs.   Unable to sleep, not comfortable
in any position.   Motor & Sens. Same
as last visit.   Working - clinical labs & computer

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |

12-28-94 appt for Physical therapy, they will call pt.
for appt for ms       C-spine-   palp tender thruout, it now
                        2° + pain.   Sensory intact
                   Shoulder & palp tender bilat.  Full ROM
                        Sens + Motor intact
                   A/ C-spine & Shoulder strain

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |

P/  Schedule PT.
    Cont & meds
    RTC PRN
                                    [signature]

000021

## SAN BENITO MEDICAL ASSOCIATES

151 N. Sam Houston                    399-2443                    San Benito, Texas 78586

7-20-57

### PROGRESS NOTES

| DATE FRI JAN 13 1995 | PATIENT NAME _Gloria Bezqner_ | | | | | PAGE 13 |
|---|---|---|---|---|---|---|
| TEMP: | B.P.: 124/80 | WEIGHT: 151 | HGT: | HEAD SIZE | | OTHER: |

Med. refill — Begin therapy c Insports Inc.
        TIS

    Pain to back no change
    Lumque is involved.
    C-spine — palp tenderness, ↓ rom 2°
        pain. + spasms.

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

    Shoulder — tender to lgt palpation.
    T-spine — 1 spasms
    A/    Back c spin c shoulder strain
    P    Motrin # 8 sig tab 06°h    N×#20
        Skelaxin # 12 sig tab 06°h    N×#20
        Motrin 800 # 90 TIS c fer

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

        Prescription given, pt aware

                    Michael ...

1/31/95    -

    Allied Rehab O.D × 2 wks
    out of work for 2 wks.

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

    To park and relax y insp to
    get a tx plan for Allied Rehab

000022

## SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston                                     399-2443                                     San Benito, Texas 78586

### PROGRESS NOTES    7-20-[?]

| DATE JAN 0 5 1996 | PATIENT NAME | JoJo Guzman | | | | | PAGE |
|---|---|---|---|---|---|---|---|
| TEMP: 98.² | B.P.: 110/70 | WEIGHT: 153¼ | HGT: | | HEAD SIZE | | OTHER |

c/o _cough_
a cold   Not FM   NKDA   [?]
Ⓢ — FM UPX   Ⓣ DM

Ⓞ   erythm Tm throat                              1997
                                                    05  152

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

Lg Clr
Sx NM
Abd Stbl

Ⓐ   V/[L]

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

Possible DM

Ⓟ   Rocephn 1 IM   Hlzbag UC
                        Gluct

→ F BS

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

pt will cone   late   ml
pt explns   of DM risks   CRF
                            stroke

JG

000023

1/3/96   As per Dr. Lopez ok Phenergan VC 1-2 tsp Q4-6° called
    to this                                                          Ⓐ

SAN BENITO MEDICAL ASSOCIATES

351 N. Sam Houston

399-2443

San Benito, Texas 78586

## PROGRESS NOTES

| DATE APR 30 1996 | PATIENT NAME | Gloria Guzman | | | | PAGE |
|---|---|---|---|---|---|---|
| TEMP. 99⁴ | B.P.: 116/88 | WEIGHT: 153 | HGT: | HEAD SIZE | | OTHER: |

*(handwritten clinical notes — illegible)*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*(handwritten clinical notes — illegible)*

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*(handwritten clinical notes — illegible)*

5-02-96
9¹⁹

| DATE THU MAY 02 1996 | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

*(handwritten clinical notes — illegible)*

000024

## SAN BENITO MEDICAL ASSOCIATES
### 399-2443

351 N. Sam Houston                                                      San Benito, Texas 78586

### PROGRESS NOTES

| DATE | PATIENT NAME | Gloria Guzman | | | PAGE |
|------|--------------|---------------|--|--|------|
| MON FEB 2 4 1997 | | | | | |
| TEMP: | B.P.: | WEIGHT: | HGT: | HEAD SIZE | OTHER: |

| DATE OCT 08 1997 | TEMP. 974 | B.P. 130/80 | WEIGHT 158 | HEIGHT | HEAD SIZE |
|------|------|------|--------|--------|-----------|

headache
nausea
body aches

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|------|-------|------|--------|--------|-----------|

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD/SIZE |
|------|-------|------|--------|--------|-----------|

000025

SAN BENITO MEDICAL ASSOCIATES, INC.

SAN BENITO CLINIC
(956) 399-2443
351 N. Sam Houston
San Benito, TX 78586

HARLINGEN CLINIC
(956) 440-8470
721 W. Harrison
Harlingen, TX 78550

# PROGRESS NOTES

7-20-51

| DATE AUG 17 1998 | PATIENT NAME Gloria Guzman | | | | PAGE |
|---|---|---|---|---|---|
| TEMP: 98.8 | B.P.: 104/68 | WEIGHT: 160 | HGT. | HEAD SIZE 97 | OTHER: 78 |

CC ① N+V ② diarrhea ③ abd in tender
④ h/a ⑤ bodyaches ⑥ post nasal drip x wk N/C/A
[illegible]
[illegible]
[illegible]

Ex: [illegible]

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

[illegible]

① Post nasal [illegible]

② AGE: [illegible]

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|

[illegible]

③ [illegible]

| DATE | TEMP. | B.P. | WEIGHT | HEIGHT | HEAD SIZE |
|---|---|---|---|---|---|



# San Benito Medical Associates, Inc.

| SAN BENITO CLINIC | HARLINGEN CLINIC |
|---|---|
| (956) 399-2443 | (956) 440-8470 |
| 351 N. Sam Houston | 721 W. Harrison |
| San Benito, TX 78586 | Harlingen, TX 78550 |

## PATIENT INFORMATION FORM

In order to serve you properly, we need the following information.
Please print.

Marital Status: ☐ Single  ☐ Married  ☐ Divorced  ☐ Widowed  ☐ Separated

**PATIENT**

Today's Date _9/3/99_

Last Name _Guzman_    First Name _Gloria_    Middle _____

Street Address _P O Box 1237_    Apt. _____

City _Santa Rosa_    State _TX_    Zip _78593_

Home Phone _636-2361_    Work Phone _____    SS # _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_

Date of Birth _7/20/51_    Age _____

Employer _SB ISD_    Work # _____

Work Address _____ _San Benito,_    State _Texas_

Employer _____    Address _____    Phone # _____

Friend of Relative _Sally Riza_    Relationship _____
(Not Living With You)
Phone # _36a-0054_    Address _____

### HEAD OF HOUSEHOLD INFORMATION

Name _____    Address _____

City _____    State _____    Zip _____    Phone _____

Home Phone # _____    Relationship to Patient _____    Occupation _____

Employer _____    Employer's Address _____

City _____    State _____    Zip _____    Bus. Phone _____

Payment is required at the time of service unless prior arrangements have been made. Please indicate preferred method of payment. _____ Cash _____ Check

Your signature below indicates your consent for treatment of/as patient and responsibility for paying the bill. Thank you.

I hereby authorize the release of any information acquired in the course of my examination or treatment to my insurance company.

000027

Signature _____

Treating Dr. _Inoua_

Patient Name _Gloria Guzman_

Date Of Birth _7-20 51_

Date Of Injury _8-5 79_

Date Of Service _9-3-9°_

Any Prior Inj. to Lower Part of Body _No_

Home # _956-636-2361_

Work # _361-6176_

Patient Signature _Gloria Guzman_



BACK

Left          Right

FRONT

Right          Left

000028

**S.B.M.A. INC.**
**WORKERS COMPENSATION**      Date: _____      E R I SEP 03 1999

Injured Employees Name _Gloria Guzman_____ D.O.B. _7-20-51_
Date Of Injury _8-5-99_ Wt _164½_ Ht _____ B/P _110/80_ Temp _98⁶_ Allergies _Ø_

Description of Injury or Illness _Patient states - was walking down_
_hallway - when she slipped and fell forward_
_on both knees. C/o pain to both knees_
_(L) knee pain is worse then the (R)_

Work Status: ____ Normal Duty      ____ Limited Duty  ____ Modified Duty  ____ No Work

____ Taking Medication ____ No Medication ____ Medication As Needed ____ Finished Med.
Patient initial if above statements is correct _GG_ _____

Clinical Findings _____                          _Med. Tplal_
_____ Knee - ↓ swelly _____
_____ Tender medial collateral lig anect → (L) knee_
_VMP→ 3 wk Afp_    _(R) knee - called_  _collatil lig anct fx_
_Rot # ↑_ _rgft-wnl_  _Drawyers Sgn - nfgat._ _(L) Tibial condyle Tend_
_(clensal)_      _Ankle - wnl    Hip wnl_

Diagnosis _____ _Bilateral knee sprain_ _____

Treatment Plan, Medication, Durable Medical Equipment:
_____ _Relafen 500mg Po sig #30_ _____
_____ _Knee stabilizer  Glelasim 400 (L) et Hy_ _____
_____ _nol exercise  for 1 week_ _#30_ _____
_____

Estimated Dates The Injured May - Please Complete All Dates
Return To Limited Work _____ Modified Duty _____ Regular Duty _✓_ _____

Has Patient Reached Maximal Medical Improvement?   Yes   Or  (No)        **000029**

Referred To _____ _____ Appointment Date _1 wk GG_
Referral was approved by _____

Patient Changed Treating Physician To _N Ralef_ _____

SAN BENITO MEDICAL ASSOCIATES 351 N. SAM HOUSTON SAN BENITO

PATIENTS NAME:   Guzman, Gloria
ORDERING DOCTOR:  Movva                    DATE: 9-3-99
DATE OF BIRTH: 7-20-51                      X-RAY NO:45667

HISTORY:   Fall.


TWO VIEWS BOTH KNEES:

No prior studies.  The study demonstrates no acute bone, joint or soft
tissue abnormality.

IMPRESSION:
1.  Normal.




Bruce Berberian, M.D./js

9-6-99

000 30

## San Benito Medical Associates, Inc.

| SAN BENITO CLINIC | HARLINGEN CLINIC |
|---|---|
| (956) 399-2443 | (956) 440-8470 |
| 351 N. Sam Houston | 721 W. Harrison |
| San Benito, TX 78586 | Harlingen, TX 78550 |

**FAMILY PRACTICE**

Cecil R. Simmons, M.D., P.A.    Rafael Lopez, M.D.    Petros K. Chapanos, M.D.
William H. Heins, M.D., P.A.    Norma Schacherl, D.O.    Raquel Bolado, D.O.
Eduardo Atkinson, M.D.    Ann C. Kannan, D.O.    Prasad V. Movva, M.D.
Timothy C. Bothwell, M.D.    Juan H. Gonzalez, M.D.    Ray F. Smith, M.D.

**GENERAL SURGERY**          **PHYSICIAN ASSISTANT**
Lonnie D. Stanton M.D.          Michelle Erdley, P.A.

NAME _GLORIA   GOZMAN_ AGE _2/20/1?_

ADDRESS _____ DATE _9/3/99_

1  Knee Stabilizer  -(R)-(L)

2) Relafen 500y 1 tab 10 (# 30)

3) Skelaxin 400 mg 1 al bedtime
   Carlin   Ibuprofen   #:20

☐ LABEL REFILL          TIMES _____ M.D

_____ M.D          _____ M.D
Dispense As Written          Production Selection Permitted

000031

**S.B.M.A. INC.**
**WORKERS COMPENSATION**          Date: MON SEP 20 1999

Injured Employees Name _Gloria Guzman_ _ D.O.B. 7-20-51_

Date Of Injury _8-5-99_ Wt ___ Ht ___ B/P _110/72_ Temp ___ Allergies _0_

Description of Injury or Illness _Patient has moderate pain + soreness_
_follow up_
_to Both Knees. has completed medication_

_____

_____

_____

Work Status: ___ Normal Duty ✓ Limited Duty ___ Modified Duty ___ No Work

___ Taking Medication ____ No Medication ___ Medication As Needed ___ Finished Med.

Patient initial if above statements is correct _GG_

Clinical Findings
_Knee - ⊖ swelling_
_Mild tender medial collated ligament_
_(Rt) knee: Tibial condyle tender, Mld_
_ankle - ut_

Diagnosis _bilateral knee sprain_

Treatment Plan, Medication, Durable Medical Equipment:
_P.T. 3x/wk 1wk_

_Skelaxin 400mg ᶦ qf#30_
_Relafen 500g PO 1-3/A #30_

Estimated Dates The Injured May - Please Complete All Dates
Return To Limited Work ✓ Modified Duty ___ Regular Duty
_10/18/99_ _Pt. reached mmi on 9/20/99 with 0%_
Has Patient Reached Maximal Medical Improvement? Yes Or (No)    000032

Referred To _Industrial Mobility_ Appointment Date _1wk 9.22.99_
Referral was approved by _____  _2:00pm_

Patient Changed Treating Physician To _____

## San Benito Medical Associates, Inc.

| SAN BENITO CLINIC | HARLINGEN CLINIC |
|---|---|
| (956) 399-2443 | (956) 440-8470 |
| 351 N. Sam Houston | 721 W. Harrison |
| San Benito, TX 78586 | Harlingen, TX 78550 |

### FAMILY PRACTICE

| | | |
|---|---|---|
| Cecil R. Simmons, M.D., P.A. | Rafael Lopez, M.D. | Petros K. Chapanos, M.D. |
| William H. Heins, M D , P A | Norma Schacherl, D.O. | Raquel Bolado, D.O. |
| Eduardo Atkinson, M.D. | Ann C Kanaan, D.O. | Prasad V. Moyya, M.D. |
| Timothy C. Bothwell, M.D | Juan H Gonzalez, M D | Ray F. Smith, M.D |

| GENERAL SURGERY | PHYSICIAN ASSISTANT |
|---|---|
| Lonnie D. Stanton M.D. | Michelle Erdley, P.A. |

NAME _Guzman   Gloria_   AGE _7/20/17_

ADDRESS _____   DATE _9/20/0_

1    Skelaxin 400mg 11 QHy
                        #30

2   Relafen 500mg PO 15)0 #30

☐ LABEL REFILL _____ TIMES _____ M.D.

_____ M.D.

Dispense As Written       Production Selection Permitted _____ M.D.

000033

San Benito Medical Associates
351 N. Sam Houston
San Benito, TX 78586

**Benito Medical Associates,**
**MASTER LABORATORY SHEET**

Gloria Guzman

CHART # 07-20-5?

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DOCTOR | Tuck | | | | | | | | | | |
| DATE | 5/1/96 | | | | | | | | | | |
| 4.0 - 6.0 RBC x 10⁶ | 4.47 | | | | | | | | | | |
| M 42 - 53 HCT F 37 - 47 | 38.6 | | | | | | | | | | |
| 82 - 92 MCV | 86 | | | | | | | | | | |
| 27 - 31 MCH | 29.1 | | | | | | | | | | |
| 32 - 40 MCHC | 33.7 | | | | | | | | | | |
| M 13 - 18 HGB F 12 - 18 | 13.0 | | | | | | | | | | |
| 5.0 - 10.0 WBC X 10³ | 5.5 | | | | | | | | | | |
| 50-65 / 1-5 SEGS / BANDS | 57 | | | | | | | | | | |
| 25 - 40 LYMPH. | 37 | | | | | | | | | | |
| 0 - 8 MONOCYTES | | | | | | | | | | | |
| 0 - 4 EOS. | | | | | | | | | | | |
| 0 - 1 BASO. | | | | | | | | | | | |
| Mixed | 6 | | | | | | | | | | |
| M 0 - 9 ESR F 0 - 20 | | | | | | | | | | | |
| 150 - 400 PLAT. 150 - 400 | 178 | | | | | | | | | | |
| 0.1 - 1.5 RETIC. | Dc | | | | | | | | | | |
| PROTHROMBIN | | | | | | | | | | | |
| SP. GRAV. | | | | | | | | | | | |
| pH | | | | | | | | | | | |
| PROTEIN | | | | | | | | | | | |
| GLUCOSE | | | | | | | | | | | |
| KETONE | | | | | | | | | | | |
| BLOOD | | | | | | | | | | | |
| BILI. | | | | | | | | | | | |
| 0.2 - 1.0 URO | | | | | | | | | | | |
| NIT | | | | | | | | | | | |
| RBC - H.P.F. | | | | | | | | | | | |
| WBC - H.P.F. | | | | | | | | | | | |
| CASTS | | | | | | | | | | | |
| CRYSTALS | | | | | | | | | | | |
| AMORPH. SED | | | | | | | | | | | |
| EPIT. CELLS MUCUS THD | | | | | | | | | | | |
| BACTERIA | | | | | | | | | | | |
| TRICHOMONAS YEASTS | | | | | | | | | | | |

HEMATOLOGY (vertical label)

URINALYSIS (vertical label)

000034

**San Benito Medical Associates**
**351 N. Sam Houston**
**San Benito, TX 78586**

Sima, Juck

| | DATE | 4/18/2? | 5/1/96 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **THYROID** | 4.5 - 11.5 T4 UG/DL | | | | | | | | | | | |
| | 25 - 35 T3 | | | | | | | | | | | |
| | 2.0 - 4.5 FTI | | | | | | | | | | | |
| | 0.4 - 7.0 TSH | | | | | | | | | | | |
| **CHEMISTRY** | 33 - 192 CPK | | | | | | | | | | | |
| | 13 - 108 IU AMYL | 42 | 18 | | | | | | | | | |
| | 0 - 38 SGOT | 20 | 14 | | | | | | | | | |
| | 0 - 38 SGPT | 26 | 12 | | | | | | | | | |
| | 80 - 285 SLDH | 189 | 116 | | | | | | | | | |
| | 25 - 123 ALK. PHOS. | 56 | 32 | | | | | | | | | |
| | 0.2 - 1.2 T. BILI. MG/DL | H 1.4 | 0.7 | | | | | | | | | |
| | 6.3 - 8.5 T. PROT. | 6.7 | 6.6 | | | | | | | | | |
| | 3.5 - 5.5 ALB | 3.6 | 3.9 | | | | | | | | | |
| | 60 - 115 GLUC | H 152 | 94 | | | | | | | | | |
| | 8.5 - 10.5 CA ++ | | 8.1 | | | | | | | | | |
| | 2.3 - 5.3 I. PHOS. | | 3.1 | | | | | | | | | |
| | 2 - 7 URIC A MG/DL | | 2.2 | | | | | | | | | |
| | 7 - 20 BUN MG/DL | | 9 | | | | | | | | | |
| | 0.5 - 1.5 CREAT | | 0.6 | | | | | | | | | |
| | 130 - 200 CHOL. | | H 211 | | | | | | | | | |
| | 35 - 165 TRIGLY MG/DL | | 94 | | | | | | | | | |
| | 30 - 70 HDL MG/DL | | | | | | | | | | | |
| | 40 - 129 LDL | | | | | | | | | | | |
| | 20 - 40 VLDL | | | | | | | | | | | |
| | LESS THAN 3.55 CORONARY RISK | | | | | | | | | | | |
| **LYTES** | 90 - 110 CHLORIDE | | 110 | | | | | | | | | |
| | 135 - 149 SODIUM MEQ/L | | 146 | | | | | | | | | |
| | 3.3 - 5.5 MEQ/L POTASSIUM | | 3.5 | | | | | | | | | |
| **T. DRUGS** | 0.5 - 1.5 DIGOXIN | | | | | | | | | | | |
| | 10 - 20 DILANTIN UG/ML | | | | | | | | | | | |
| | 10 - 30 PHENOB. UG/ML | | = | | | | | | | | | |
| | 10 - 20 UG/ML THEOPHYLLINE | | | | | | | | | | | |
| | 2 - 10 UG/ML TEGRETOL | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | 000035 |
| | | | DC | | | | | | | | | |

**Please Bill: Texas Association of School Boards  Attn.  W/C Division**
**P.O. Box 2010 Austin, TX .  78768-2010  1-800-580-8272**

## SAN BENITO C.I.S.D.-RISK MANAGEMENT DEPARTMENT
### 240 NORTH CROCKETT
### SAN BENITO, TEXAS  78586
### (210)361-6188

PHYSICIAN: _____ SBMA _____

ADDRESS: _____ 351 N. Sam Houston _____

MEDICAL AUTHORIZATION FOR:  _Guzman____ _Gloria_____
                             (LAST NAME)      (FIRST)      (MI)

I hereby authorize this individual to receive <u>reasonable and necessary medical treatment</u>
as a result of an on-the job injury (or occupational disease):

DATE OF INJURY: ___8-5-99____

NATURE OF INJURY/ILLNESS: __Slipped & fell, minor low pain to__
_left knee & right knee._

_Gracie Carpio - Risk Mgmt. Secretary_  _8/31_  _4:00 pm_
AUTHORIZED SIGNATURE          TITLE          DATE/TIME

TO THE ATTENDING PHYSICIAN:  PLEASE NOTE DIAGNOSIS AND TREATMENT

____✓___ RETURN TO REGULAR WORK TODAY.

_____ INJURY WILL RESULT IN LOST TIME.  WHEN CAN EMPLOYEE RETURN?
          DATE:_____.

_____ RETURN TO MODIFIED WORK.
          TYPE:_____

_____ REQUIRES RETURN VISIT AND IS SCHEDULED FOR:
          DATE:_____    TIME:_____    DOCTOR:_____

REMARKS:_____

          _____
          DATE/TIME TREATMENT COMPLETED

          _____
          PHYSICIAN'S SIGNATURE

                                        000036

**To Employee:  Please return this form to Risk Management Dept. after initial medical treatment**
**and before returning to work.**

Other Healthcare
Providers

# LABORATORY REPORT

Medical Laboratory License # 42-1067
Identification # 00458271
Medicaid Identification # 204562715

PHONE 512/690-1220
1-800-292-7296

| | |
|---|---|
| **DATE REPORTED** 13-Nov-84 | **DATE RECEIVED** 9-Nov-84 |

**PATIENT NAME/ID** GUZMAN, GLORIA

**ACCESSION NO.** 016233-8

**CLIENT NAME**
SAN BENITO MED. ASSOC.
351 N SAM HOUSTON
SAN BENITO, TX. 78586

**CLIENT NO.** 31900-72
13-1

**TEST REQUESTED** SPECIAL TISSUE

**AGE**

**SEX**

**PHYSICIAN** M. COFFEY

**REMARKS-SPECIMEN** S84-4946

**SPECIAL TISSUE**

## CHEMISTRY (SMAC)

| GLUC 85-115 mg/dl | BUN 9-28 mg/dl | CREAT 0.5-1.7 mg/dl | BUN/CREAT 6.0-20.0 | URIC A 2.7-8.0 mg/dl | Na+ 135-149 meq/L | K+ 3.5-5.5 meq/L | Cl- 95-110 meq/L | CO₂ 22-30 meq/L | ELECTROLYTE BALANCE | T. BILI 0.2-1.5 mg/dl | GGTP 0-65 mg/dl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| ALK PHOS 30-125 U/L | SGOT 0-41 U/L | SGPT 0-46 U/L | LDH 80-260 U/L | T. PROTEIN 6.0-8.5 g/dl | ALB 3.0-5.5 g/dl | GLOB 1.8-3.2 g/dl | A/G 1.3-2.7 | Ca++ 8.5-11.0 mg/dl | PHOS 2.2-4.7 mg/dl | CHOL 150-260 mg/dl | TRIG 30-175 mg/dl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## CHEMISTRY

| GLUC 85-115 mg/dl | CPK M 7-193 U/L F 5-127 U/L | HDL M 36-85mg/dl F 40-95 mg/dl | LITHIUM Therapeutic 0.5-1.5 meq/L | PHENOBARB Therapeutic 10-25 mg/dl | DILANTIN Therapeutic 10-20 mg/dl | DIGOXIN Therapeutic 0.8-2.1 ng/ml |
|---|---|---|---|---|---|---|
| | | | | | | |

## THYROID

| T₃ UP 25-35% | T₄ (RIA) 4.5-12.5 mcg/dl | T₇ 1.0-4.2 Units | TSH 0-12 mu/ml | T₃ (RIA) 65-220 ng/dl |
|---|---|---|---|---|
| | | | | |

## HEMATOLOGY

| WBC 4.8-10.8 x 10³ | RBC M 4.7-6.1 x 10⁶ F 4.2-5.4 x 10⁶ | HGB M 14.0-18.0 g/dl F 12.0-16.0 g/dl | HCT M 42-52% F 37-47% | MCV M 80-94 μm³ F 81-99 μm³ | MCH 27-33 μμ g | MCHC 32-37 % | PLATELETS | BLOOD GROUP | Rh TYPE | ANTIBODY SCREEN | SYPHILIS SEROLOGY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| SEG | BAND | LYMPH | ATL | MONO | EOS | BASO | RBC MORPHOLOGY | RUBELLA INDEX | PREGNANCY | TOXO | ANA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## URINALYSIS

| COLOR YELLOW | APPEAR CLEAR | SP GRAV 1.003-1.030 | pH 5.0-7.5 | PROTEIN neg | GLUCOSE neg | KETONES neg | BLOOD neg | LUEKOCYTE ESTERASE neg | NITRITE neg | UR. CREAT 1-2 G/Day | CREAT CLEAR M 85-125 mls/min F 75-115 mls/min |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## COMMENTS/OTHER TEST RESULTS

T.F. as a result indicates results TO FOLLOW.

DIAGNOSIS 1
PRODUCTS OF CONCEPTION (PLACENTAL TISSUE)
COMPLETED PATHOLOGICAL REPORT TO FOLLOW UNDER SEPARATE COVER.

000037



FINAL LAB REPORT



**National Health Laboratories**
INCORPORATED

379? ?AC??MA • HOUSTON, TEXAS 77092 • 713/681-8477

P.O. BOX ?67 • LAFAYETTE, LOUISIANA 70502 • 318/234-6366

762? ?OUR? ?ASTE?? ?R. • SAN ANTONIO, TEXAS 78229 • 512/690-1220

# S U R G I C A L   P A T H O L O G Y   R E P O R T

NAME     GUZMAN, Gloria                          AGE          NO. S84-4946
                                                                016233-8
ADDRESS  351 N. Sam Houston                       DATE
         San Benito, Texas 78586                  Taken:   11/8/84
PHYSICIAN San Benito Med. Assoc.
         Dr. M. Coffey                            Date
TISSUE                                            Recvd:   11/9/84

---

**CLINICAL IMPRESSION**

Specimen is labeled "special tissue" and consists of 50 grams of fragments of soft brown tissue mixed with blood clot. Placental fragments and decidua are seen. Portions of a fetus are not grossly identified.  Representative sections are submitted for microscopic study.

**MICROSCOPIC:**

The section shows placental tissue with immature chorionic villi and sheets of decidua. No fetal tissue is seen.

**DIAGNOSIS:**  Products of Conception (Placental Tissue).

000038

PATHOLOGIST



**National Health Laboratories**
INCORPORATED

# LABORATORY REPORT

7622 Louis Pasteur Dr.
San Antonio, TX 78229

PHONE: 512/690-1220
1-800-292-7286

W. al Laboratory License # 42-1067
lca... tification # 00458271
Medicaid identification # Z04582715

| DATE REPORTED | DATE RECEIVED | PATIENT NAME/ID | ACCESSION NO. |
|---|---|---|---|
| 01-Jan-86 | 30-Dec-85 | GUZMON, GLORIA | 535114-8 |

| CLIENT NAME | CLIENT NO. | TEST REQUESTED | AGE |
|---|---|---|---|
| SAN BENITO MED. ASSOC. | 31900-72 | PAP SMEAR | |
| 351 N SAM HOUSTON | | | |
| SAN BENITO, TX.  78586 | 01-2 | | SEX |

| PHYSICIAN | REMARKS-SPECIMEN | | |
|---|---|---|---|
| COFFEY | C85-100536 CX | DOB - 7/20/51 | |

## CHEMISTRY (SMAC) *

| GLUC 65-115 mg/dl | BUN 9-26 mg/dl | CREAT 0.5-1.7 mg/dl | BUN/CREAT 6.0-20.0 | URIC A 2.7-8 0 mg/dl | NA+ 135-149 meq/L | K+ 3.5-5 5 meq/L | CL- 95-110 meq/L | CO2 22-30 meq/L | OSMO (CALC) 278-305 | T.BILI 0.2-1.5 mg/dl | GGTP 0-65 mg/dl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| ALK. PHOS 30-125 U/L | SGOT 0-41 U/L | SGPT 0-46 U/L | LDH 80-250 U/L | T.PROTEIN 6.0-8.5 g/dl | ALB 3 0-5.5 g/dl | GLOB 1.8-3 2 g/dl | A/G 1.3-2 7 | CA++ 8 5-11 0 mg/dl | PHOS 2.2-4.7 mg/dl | CHOL 150-250 mg/dl | TRIG 30-175 mg/dl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## SMAC PLUS

| T. IRON M 55-175 F 40-175 | CPK M 7-183 U/L F 5-127 U/L |
|---|---|
| | |

## THYROID

| T3 UP 25-35% | T4 (RIA) 4.5-12 5 mcg/dl | T7 1 0-4 2 units | TSH 2 - 7 mu/ml | T3 (RIA) 65-220 ng/dl |
|---|---|---|---|---|
| | | | | |

## THERAPEUTIC DRUGS

| DILANTIN Therapeutic 10-20 mcg/ml | PHENO Therapeutic 10-30 mcg/ml | DIGOXIN Therapeutic 0.8-2.1 ng/ml | THEOPHYL Therapeutic 10-20 mcg/ml | LITHIUM Therapeutic 0.5-1.5 meq/L |
|---|---|---|---|---|
| | | | | |

## CBC *

| WBC 4.5-10.5x10³ | RBC M 4.7-6.1x10⁶ F 4.2-5.4x10⁶ | HGB M 14.0-18.0 g/dl F 12.0-16.0 g/dl | HCT M 42-52% F 37-49% | MCV M 80-94 μm³ F 81-99 μm³ | MCH 27-33 pg | MCHC 32-37% |
|---|---|---|---|---|---|---|
| | | | | | | |

## PRENATAL/SEROLOGY

| BLOOD GROUP | Rh TYPE | ANTIBODY SCREEN | SYPHILIS SEROLOGY | RUBELLA INDEX |
|---|---|---|---|---|
| | | | | |

## DIFFERENTIAL *

| NEUT | LYMPH | MONO | EOS | BASO | PLATELETS | SED RATE M 0-9 F 0-20 |
|---|---|---|---|---|---|---|
| | | | | | | |

| PREGNANCY | MONO SPOT NEG | RA LATEX NEG | LE LATEX NEG | CRP NEG |
|---|---|---|---|---|
| | | | | |

## URINALYSIS

| COLOR yellow | APPEAR clear | S. GRAV. 1.003-1 030 | pH 5.0-7 5 | PROTEIN neg | GLUCOSE neg | KETONES neg | BLOOD neg | LEUCOCYTE ESTERASE neg | NITRITE neg | UR. CREAT 1-2 G/Day | CREAT CLEAR M 85-125 mls/min F 75-115 mls/min |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

## COMMENTS/OTHER TEST RESULTS                                    * PEDIATRIC NORMALS SEE REVERSE SIDE

CYTOLOGY-DIAGNOSIS

NEGATIVE-NO MALIGNANT TUMOR CELLS IDENTIFIED.                    CLASS I

RECOMMEND FOLLOW-UP AS CLINICALLY INDICATED.

SMEAR COMPOSITION

SLIGHT ESTROGEN EFFECT.

BACTERIA PRESENT, UNIDENTIFIED TYPE.

BACKGROUND INFLAMMATION PRESENT.

CELLULAR INFLAMMATORY CHANGES PRESENT.

SCREENED BY:

TECH INITIAL: MEL    PATHOLOGIST:  RAYMOND S. BENNETT, JR., M.D.

000039

FINAL LAB REPORT

*Please Keep this copy for your Records.*

1/19/95

# INSPORTS PHYSICAL THERAPY
## PHYSICAL THERAPY EVALUATION AND PLAN OF CARE

DATE_____1/10/95_____

___X___ Initial    ___ Re-eval

Patient's Name_____Gloria L. Guzman_____    Sex M (F)  Date of Birth____7/20/51____
Medicare/SSN_____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_____    Physician_____Norma Schacherl, M.D._____
Diagnosis____Cervical, Thoracic, & Shoulder Strains____  Date of Onset ____12/16/94____
Surgery _____N/A_____    Date of Surgery_____N/A_____

**Rehab. Potential:**    POOR    FAIR    GOOD  (EXCELLENT)

**Mental Status:**
        Orientation to person, place, and time:_____X 3_____
        Can the Patient:
                Hear the therapist's question's?        (Y) N
                Understand and follow directions?      (Y)/ N
                Vocally respond to the therapist?       (Y) N

**This Patient Requires The Skills Of A Licensed Professional Because:**
____Physical Therapy is required to assess the pt's condition secondary to the medical diagnosis.____
____Physical Therapy is required to assess and progress the pt through a skilled PT program.____
____Treatment is medically necessary and significant progress is expected in a reasonable length of____
____time____

Frequency __3x/wk__    Duration _____4 wks_____    Re-evaluation____30 days____
Area of Body Treated __Cervical, thoracic, and shoulder areas.__
Extent to which patient is aware of the diagnosis/ prognosis____Fully Aware____
Contraindications/ Precautions _No hot packs or massage in seated position.__

**Physical Therapist Signature**_____

**PHYSICIAN CERTIFICATION: PLEASE SIGN & RETURN TO OUR OFFICE WITHIN 14 DAYS.**
THANK YOU.
I have seen this patient and certify that the above named patient is in my care, is in need of physical therapy, that this treatment plan has been established, and this program will be reviewed monthly.

Contraindications/ Precautions: _____

Please mark one of the following:        ____ Patient requires Social Adjustment Services
                                          _X_ Patient does not require Social Adjustment Services

**Physician Signature** _____

Date ____1/19/95____    000040

JAN 19 1995



# Industrial Mobility
### Rehabilitation Center, Inc.

105 E. Expwy. 83, Ste F                              W. Jefferson, Ste. A
Pharr, TX 78577                                     Brownsville, TX 78521
(956) 702-7800 • Fax (956) 702-4164         (956) 504-0810 • Fax (956) 504-0825

PATIENT'S NAME: Gloria Cruz Indra        AGE: 50/5

DIAGNOSIS: B-Knee Dislo P

PRECAUTIONS:

☐ CONSULT: EVALUATE & TREAT

☐ Therapeutic Exercise    ☐ Ultrasound            ☐ FCE
☐ Passive ROM            ☐ Ionto/Phonophoresis   ☐ Work Hardening
☐ Gait Training          ☐ Ice Pack/Moist Heat   ☐ Work Conditioning
☐ Hand Therapy           ☐ Electric Stimulation  ☐ BTE School
☐ Joint Mobilization     ☐ Whirlpool             ☐ Job Site Analysis
☐ Traction               ☐ Modalities as needed  ☐ Other

COMMENTS:

FREQUENCY: ☐ 5 x week  ☐ 3 x week  ☐ 2 x week  ☐ 1 x wk

DURATION: ☐ 1 week  ☐ 2 weeks  ☐ 3 weeks  ☐ 4 weeks

GOALS: ☐ Increase ROM       ☐ Decrease Pain    ☐ Establish HEP
       ☐ Increase Strength  ☐ Decrease Edema   ☐ Improve Function
       ☐ Increase Endurance ☐ Return to Work   ☐ Other

I certify that therapy services for the above named patient are required, medically necessary, and authorized by me.

Next Appointment with Physician

Date:

_____
Original Physician Signature

**Physical Therapy • Occupational Therapy • Sports Medicine
Industrial Rehab • Functional Capacities Eval. • Back School**

000041

NCS DOCUSCAN

G: SAN BENITO SCHOOLS, WORKMENS ...  ID: GLORO751.  W/C F/U.

SAN BENIT. .DICAL ASSOC., .N.. 
351 N SAM HOUSTON
SAN BENITO, TX 78586

PAT: #9259.4 GUZMAN, GLORIA
240 N CROCKETT, WORKMENS COMP I 8/9
SAN BENITO, TX 78586
(956) 361-6188  07/20/1951  F48
PRI: (Y) TX ASSOCIATION OF SCHOOL

SEC:

DOCTOR: 12 PRASAD V. NOVVA,MD
ROOM:
APPTLOC:
APPTCD:
REASON:
LAST DX: 844.9 SPRAIN,KNEE AND LEG
SSN/STA: 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, 1 Active
OVERLAY: 5 WORKERS COMP

APPT DATE: 09/20/99
APPT TIME:
APPT LEN:
DEPT/LOC: 0, SBMA
DSET/PRT: 1, 9
ACCT BAL:   614.50
PAT DUE:      0.00
VOUCHER:  172836

### OFFICE SERVICES
- 99202 NEW PT LIMITED
- 99203 NEW PT INTER
- 99204 NEW PT EXTENDED
- 99205 NEW PT COMP
- 99213 EST PT LIMITED
- 99214 EST PT EXTENDED
- 99215 EST PT COMP
- 99243 OFFICE CONSULT DETAILE
- 99244 OFFICE CONSULT COMPREH
- 99245 OFFICE CONSULT COMPREH

### PROCEDURES
- 12041 SUTURES

### X-RAYS
- 74000 ABDOMEN  1 VIEW
- 73610 ANKLE  3 VIEWS
- 72050 CERVICAL SPINE,MIN FOU
- 73650 HEEL  2 VIEWS
- 71020 CHEST PA & LATERAL
- 71010 CHEST SINGLE PA
- 73080 CLAVICLE 3 VIEWS
- 73080 ELBOW  3 VIEWS
- 70150 NASAL BONES MINIMUM 3
- 73550 FEMUR  2 VIEWS
- 73140 FINGER 2 VIEWS
- 73630 FOOT MINIMUM 3 VIEWS
- 73090 FOREARM  2 VIEWS
- 74290 GALL BLADDER
- 73130 HAND  3 VIEWS
- 73510 HIP MINIMUM TWO VIEWS
- 73060 HUMERUS
- 73560 KNEE
- 72110 LUMBAR SPINE WITH OBLI
- 72170 PELVIS
- 71101 RIBS 3 VIEWS
- 72220 SACRUM
- 73030 SCAPULA 2 VIEWS AP,OBL
- 73030 SHOULDER  2 VIEWS
- 70220 SINUSES COMPLETE MIN 3
- 70260 SKULL COMPLETE
- 73590 LEG 2 VIEWS
- 72072 THORACIC SPINE
- 73660 TOE 3 VIEWS
- 73110 WRIST MINIMUM 3 VIEWS
- 99455 COPY OF X-RAYS
- 99455 MMI INTERP OF OTHER PD
- 99361 W/C CASE CONFERENCE TO

### SUPPLIES
- 99070, ANKLE BRACE/AIR SPLINT
- 99070, SLING
- 99070, C SPLINT
- 99070, CATHETER EQUIPMENT
- 99070, DRESSING CHANGE
- 99070, FINGER GUARD
- 99070, ELBOW BRACE
- 99070, EYE PATCH
- 99070, KNEE SUPPORT
- 99070, RIB BELT
- 99070, REMOVAL OF STITCHES
- 99070, EYE WASH

### INJECTIONS
- 90782 ARISTOCORT INJ W/C
- J1710 ARISTOCORT MEDICATION

- 90749. LIDOCAINE
- 90749. ROCEPHINE
- 90749, TB TEST
- 90703 TETANUS TOXOID
- 20550 TRIGGER INJECTION,TEND

### WORK STATUS:
- RESTRICTED LIFTING, PUSHING, PULLING
- NO LIFTING, PUSHING, PULLIN
- NO BENDING
- TO KEEP WOUND CLEAN & DRY
- NO CLIMBING OR OVERHEAD WOR
- NO OPERATION OF MOVING EQUI OR VEHICLE
- STANDING FOR SHORT PERIOD O
- RETURN TO WORK-REGULAR DUTY
- OTHER

MAXIMUM WEIGHT IN POUNDS
- 10 _ 30 _ 40 _ 50 _ 60
- MAXIMUM NO TIMER PER HOUR
- 0-2 _ 2-6 _ 6-10 _ 10-20

- RIGHT HAND WORK ONLY
- LEFT HAND WORK ONLY
- SITTING JOB ONLY

MAY WORK
- HRS_2-4 HRS_4-6 HRS_6-8 HR
- DEGREE OF BEND
- 10-20 _ 20-45 _ FULL

NO REPETITIVE MOTIONS
1. HAND GRASP
2. WRIST MOTION
3. ELBOW FLEXION
4. FOOT CONTROLS
5. OTHER

### TREATMENT PLAN:
- EXERCISE
- REST
- MEDICATIONS
- EXAMINATIONS
- SPLINT
- PHYSICAL THERAPY

### REFERRED:

*Physical Therapy*

### COMMENTS

*Flu in 1 wk*

DATE OF INJURY: *8-5-99*

*WAS PT REACHED MMI? YES/NO*

*Flu 1 wk*

Fold Here Only

### DIAGNOSIS
- 995.3 ALLERGY, UNSPECIFIED
- 719.49 ARTHRALGIA,MULTIPLE
- 719.40 ARTHRALGIA,SITE UNSP
- 719.40 ARTHRALGIA,SITE UNSP
- 682.9 SITE,INFECT,NONVENOM
- 949.0 BURN,UNSPECIFIED SIT
- 946.0 BURNS OF MULTIPLE DIS
- 726.10 BURSAE & TENDON DISO
- 354.0 CARPAL TUNNEL SYNDRO
- 682.9 CELLULITIS & ABSCESS
- 723.4 CERVICAL RADICULITIS
- 850.9 CONCUSSION, UNSP
- 372.30 CONJUNCTIVITIS, ACUT
- 934.9 CONTUSION UNSP SITE
- 722.90 DISC DISORDER, UNSPE
- 780. DIZZINESS
- 786.00 DYSPNEA,RESPIRATORY
- 362.12 EPICONDYLITIS, LATERA
- V01.7 EXPOSURE ,OTHER VIRA
- 930.9 FOREIGN BODY, EXTERNA
- 816.00 FRACTURE PHALANX ONE
- 805.00 FRACTURE, CERVICAL S
- 823.81 FRACTURE, FIBULA UNS
- 823.92 FRACTURE, FIBULA WIT
- 807.00 FRACTURE, RIB(S), UN
- 824.8 FRACTURE, ANKLE CLOSE
- 810.00 FRACTURE, CLAVICLE CL
- 825.20 FRACTURE, FOOT BONES
- 805.40 FRACTURE, LUMBAR SPIN
- 815.00 FRACTURE, METACARPAL
- 826.0 FRACTURE, PHALANGES O
- 813.42 FRACTURE, RADIUS, DIST
- 805.6 FRACTURE, SACRUM & CO
- 807.00 FRACTURE, THORACIC SP
- 814.00 FRACTURE, WRIST
- 727.42 GANGLION, OTHER SITES
- 784.0 HEADACHE
- 992.5 HEAT EXHAUSTION
- 553.20 HERNIA, VENTRAL, OTHER
- 686.9 INFECTED SKIN & SUBC
- 959.8 INJURY, OTHER SPECIF
- 959.9 INJURY, UNSPECIFIED
- 927.9 INJURY, CRUSHING OF L
- 927.9 INJURY, CRUSHING OF L
- 836.2 KNEE, TORN CARTILAGE
- 780.7 MALAISE & FATIGUE
- 239.9 NEOPLASM OF UNCERTAI
- 729.2 NEURALGIA, NEURITIS
- 724.4 NEURITIS, THORACIC, LU
- 724.2 PAIN, BACK UNSPECIFIE
- 782.1 RASH, NON-SPECIFIED
- 720.2 SACROILIITIS
- 724.3 SCIATICA
- 845.00 SPRAIN, ANKLE UNSP
- 845.10 SPRAIN, FOOT
- 842.10 SPRAIN, HAND UNSP
- 842.00 SPRAIN, WRIST UNSP
- 847.9 SPRAIN, BACK UNSP
- 842.13 SPRAIN, ELBOW & FOREA
- 842.12 SPRAIN, FINGER
- 843.9 SPRAIN, HIP & THIGH
- 847.2 SPRAIN, KNEE AND LEG
- 847.2 SPRAIN, LUMBAR
- 846.0 SPRAIN, LUMBOSACRAL
- 848.9 SPRAIN, MUSCLE
- 847.0 SPRAIN, NECK
- 848.8 SPRAIN, OTHER SPECIF
- 847.3 SPRAIN, SACRUM
- 840.9 SPRAIN, SHOULDER & UP
- 847.1 SPRAIN, THORACIC
- 845.12 SPRAIN, TOE(S)
- 727.00 SYNOVITIS AND TENOS
- 726. TENDINITIS
- 879.8 WOUND OPEN UNSPECIF
- 879.9 WOUND OPEN UNSPECIF

AILMENTS
W/C 08/05/99 FRI )

SAN BENITO MEDICAL
WIGHT CLINIC

NEXT APPOINTMENT:
- DATE
- WEEKS
- MONTHS

NO CHARGE TO

PROCEDURE LOCATION
HARLINGEN CLINIC

NCS DOCUSCAN

G: SAN BENITO SCHOOLS, WORKMEN'S C.   ID: GLORO751.  W/C NEW INJURY.
SAN BENIT. MEDICAL ASSOC., INC.
351 N SAM HOUSTON
SAN BENITO, TX 78586

PAT: 89259.4 GUZMAN, GLORIA
240 N CROCKET, WORKMENS COMP I 8/9
SAN BENITO, TX  78586
(956) 361-6198  07/20/1951  F48
PRI: (Y) TX ASSOCIATION OF SCHOOL

SEC:

DOCTOR: 12 PRASAD V. MOVVA, MD
ROOM:
APPTLOC:
APPTCD:
REASON:
LAST DX:
SSN/STA: 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, 1 Active
OV  WAY: 5 WORKERS COMP

APPT DATE: 09/03/99
APPT TIME:
APPT LEN:
DEPT/LOC: 0, SBMA
DSET/PRT:  1, 19
ACCT BAL:   294.00
PAT DUE:    0.00
VOUCHER: 167582

**OFFICE SERVICES**
99202  NEW PT LIMITED
99203  NEW PT INTER.
99204  NEW PT EXTENDED
99205  NEW PT COMP
99213  EST PT LIMITED
99214  EST PT EXTENDED
99215  EST PT COMP
99243  OFFICE CONSULT DETAILE
99244  OFFICE CONSULT COMPREH
99245  OFFICE CONSULT COMPREH

**PROCEDURES**
12041  SUTURES

**X-RAYS**
74000  ABDOMEN 1 VIEW
73610  ANKLE 3 VIEWS
72050  CERVICAL SPINE MIN FOU
73650  HEEL 2 VIEWS
71020  CHEST PA & LATERAL
71010  CHEST SINGLE PA
73000  CLAVICLE 3 VIEWS
73080  ELBOW 3 VIEWS
70150  NASAL BONES MINIMUM 1
73550  FEMUR 2 VIEWS
73140  FINGER 2 VIEWS
73630  FOOT MINIMUM 3 VIEWS
71090  FORFARM 2 VIEWS
74290  GALL BLADDER
73130  HAND 3 VIEWS
73510  HIP MINIMUM TWO VIEWS
73060  HUMERUS
73560  KNEE
72110  LUMBAR SPINE WITH OBLI
72170  PELVIS
71101  RIBS 3 VIEWS
72220  SACRUM
73010  SCAPULA 3 VIEWS AP-OBL
73030  SHOULDER 2 VIEWS
70220  SINUSES COMPLETE MIN 3
70250  SKULL COMPLETE
73590  LEG 2 VIEWS
72072  THORACIC SPINE
73660  TOE 3 VIEWS
73110  WRIST MINIMUM 3 VIEWS
74499  COPY OF X RAYS
99455  MMI INTERP OF OTHER DR
99361  W/C CASE CONFERENCE FO

**SUPPLIES**
99070  ANKLE BRACE/AIR SPLINT
99070  SLING
99070  C SPLINT
99070  CATHETER SUPPLY
99070  DRESSING CHANGE
99070  FINGER GUARD
99070  ELBOW BRACE
99070  EYE PATCH
99070  KNEE SUPPORT
99070  RIB BELT
99070  REMOVAL OF STITCHES
99070  EYE WASH

**INJECTIONS**
90782  ARISTOCORT INJ W/C
J1710  ARISTOCORT MEDICATION

90749  LIDOCAINE
90749  ROCEPHINE
90749  TB TEST
90703  TETANUS TOXOID
20550  TRIGGER INJECTION,TEND

**WORK STATUS:**
RESTRICTED LIFTING, PUSHING,
  PULLING
NO LIFTING, PUSHING, PULLIN
RESTRICTION BENDING
NO BENDING

TO KEEP WOUND CLEAN & DRY
NO CLIMBING OR OVERHEAD WOR
NO OPERATION OF MOVING EQUI
  OR VEHICLE
WORKING FOR SHORT PERIOD O
  OTHER
RETURN TO WORK-REGULAR DUTY

MAXIMUM WEIGHT IN POUNTS
  10   20   30   40   50   80
MAXIMUM NO TIMES PER HOUR
  0-2   2-6   6-10   10 20
RIGHT HAND WORK ONLY
LEFT HAND WORK ONLY
SITTING JOB ONLY

MAY WORK
  HRS_2 4 HRS_4 6 HRS_6-8 HR
  TYPES OF WORK
  10 20     20-45     FULL

NO REPETITIVE MOTIONS
  1 HAND GRASP
  2 WRIST MOTION
  3 ELBOW FLEXION
  4 FOOT CONTROLS
  5 OTHER

**TREATMENT PLAN:**
  EXERCISE
  REST
  MEDICATIONS
  EXAMINATIONS
  SPLINT
  PHYSICAL THERAPY

**REFERRED:**

**COMMENTS**

DATE OF INJURY: 8/5/99

HAS PT REACHED MMI YES/NO

**DIAGNOSIS**
995.1  ALLERGY, UNSPECIFIED
719 49  ARTHRALGIA, MULTIPLE
713.40  ARTHRALGIA,SITE UNSP
719.44  ARTHRALGIA,SITE UNSP
919 4  BITE, INSECT,NONVENOM
949.0  BURN,UNSPECIFIED SIT
786.0  BURNS OF MULTIPLE RE
726.10  BURSAE & TENDON DIRO
354.0  CARPAL TUNNEL SYNDRO
682.9  CELLULITIS & ABSCESS
723.4  CERVICAL RADICULITIS
850.9  CONCUSSION, UNSP
372.00  CONJUNCTIVITIS, ACUT
924.9  CONTUSION UNSP SITE
780.4  DIZZINESS
786.00  DYSPNEA,RESPIRATORY
726.32  EPICONDYLITIS, LATERA
991.7  EXPOSURE ,OTHER VISA
830.9  FOREIGN BODY,EXTERNA
816.00  FRACTURE PHALANX OR
805.00  FRACTURE, CERVICAL S
823.91  FRACTURE, FIBULA UNS
823.91  FRACTURE, FIBULA WIT
807.00  FRACTURE, RIB(S), UN
824.8  FRACTURE,ANKLE CLOSE
810.00  FRACTURE,CLAVICLE CL
825.20  FRACTURE, FOOT BONES,
805 4  FRACTURE,LUMBAR SPIN
817.0  FRACTURE,METACARPAL
826.0  FRACTURE, PHALANGES O
813 42  FRACTURE, RADIUS,DIST
805.6  FRACTURE, SACRUM & CO
805.2  FRACTURE, THORACIC SP
814.00  FRACTURE, WRIST
727 41  GANGLION,UNSPECIFIED
784.0  HEADACHE
780.7  HEAT EXHAUSTION
553.20  HERNIA,VENTRAL,OTHER
686.9  INFECTED SKIN & SUBC
959.8  INJURY, OTHER SPECIF
959.9  INJURY, UNSPECIFIED
928.9  INJURY, CRUSHING OF L
927.9  INJURY, CRUSHING OF U
836.9  KNEE,TORN CARTILAGE
780.7  MALAISE & FATIGUE
238.8  NEOPLASM OF UNCERTA
729.2  NEURALGIA, NEURITIS
729.1  NEURITIS,THORACIC,LU
724.5  PAIN,BACK UNSPECIFIE
782.1  RASH,NON-SPECIFIED
720.2  SACROILITIS
724.3  SCIATICA
845.00  SPRAIN, ANKLE UNSP
845.10  SPRAIN, FOOT
842.10  SPRAIN, HAND UNSP
842.00  SPRAIN, WRIST UNSP
847.9  SPRAIN,BACK UNSP
841.9  SPRAIN,ELBOW & FOREA
842.12  SPRAIN,FINGER
843.9  SPRAIN,HIP & THIGH U
844.9  SPRAIN,KNEE AND LEG
847.2  SPRAIN,LUMBAR
846.0  SPRAIN,LUMBOSACRAL
848.9  SPRAIN,MUSCLE
847.0  SPRAIN,NECK
848.8  SPRAIN,OTHER SPECIFI
847.3  SPRAIN,SACRUM
840.9  SPRAIN,SHOULDER & UP
841.1  SPRAIN,TOE(S)
845.12  SPRAIN,TOE(S)
727.00  SYNOVITIS AND TENOSY
726.90  TENDINITIS
879.8  WOUND OPEN UNSPECIFI
879.9  WOUND OPEN UNSPECIFI

ALLERGIES 8/5/99

SAN BENITO MEDICAL
NIGHT CLINIC

PROCEDURE LOCATION
HARLINGEN CLINIC

NEXT APPOINTMENT
  DATE
  WEEKS
  MONTHS
9-10-99

NO CHARGE TO

000043

Mark Reflex® by NCS MM1104042-4   954   Printed in U S A   Copyright 1995, 1996 Harvard Computer Systems, Inc. All rights reserved.

## DOCTOR'S COMMENTS

Rt Knee '735.60  Ab 36.50

Bilateral Knee Spasm

PHYSICIAN'S SIGNATURE

POLICY HOLDER'S SIGNATURE

**Memo**

000044

Memo

Send to TWCC FIELD OFFICE Handling Claim, if known, or
**TEXAS WORKERS' COMPENSATION COMMISSION**
4000 South IH-35, Southfield Building
Austin, Texas 78704

TWCC#: _____
Carrier's Claim #: _____

# REPORT OF MEDICAL EVALUATION

| 1. Injured Employee's Name (Last, First, M.I.)<br>GUZMAN, GLORIA | 2. Social Security Number<br>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 | 3. Date of Injury<br>08/05/1999 |
|---|---|---|

| 4. Injured Employee's Mailing Address (Street or P.O. Box)<br>P.O. BOX 1237 | City<br>Santa Rosa | State<br>TX. | ZIP Code<br>78593 | 5. Phone Number<br>(956) 361-6188 |
|---|---|---|---|---|

| 6. Employer's Business Name<br>San Benito - ISD | 7. Workers' Compensation Insurance Carrier<br>TX ASSOCIATION OF SCHOOL<br>P.O. BOX 2010<br>Austin, TX 78768-2010 |
|---|---|

| 8. Employer's Mailing Address (Street or P.O. Box)<br>240 N CROCKETT ST | City<br>SAN BENITO | State<br>TX | ZIP Code<br>78586 |
|---|---|---|---|

| 9. Doctor's Name, Title and Specialty<br>NOVVA, MD, PRASAD | 10. Date of This Visit<br>09/20/1999 |
|---|---|

| 11. Doctor's Mailing Address (Street or P.O. Box)<br>351 N SAM HOUSTON | City<br>SAN BENITO, TX | State<br>TX | ZIP Code<br>78586 | 12. Phone Number<br>(956) 399-2442 |
|---|---|---|---|---|

| 13. Professional License Number<br>K-6169 | 14. Diagnosis (ICD-9 Codes)<br>(1) 844.9    (2) |
|---|---|

| 15. Federal Tax Identification Number<br>742222891 | (3)    (4) |
|---|---|

16. Please attach a narrative history of the employee's medical condition(s) including but not limited to:
   a) onset and course of employee's medical condition(s); and
   b) findings of previous examinations, treatments, and responses to treatments
      not previously reported to the insurance carrier and the Commission by the doctor making this report.
   c) a description of the results of the most recent clinical evaluation of the employee.

**MAXIMUM MEDICAL IMPROVEMENT**

17. Has employee reached maximum medical improvement as defined on the reverse side? Please check the appropriate box and complete the remainder of the form.

☐ No, the employee has not reached maximum medical improvement. Give the estimated date on which the employee is expected to reach maximum medical improvement _____

☒ Yes, I certify the above-named employee has reached maximum medical improvement on  09/20/1999 . This date may not be prospective.

**IMPAIRMENT RATING**

18. I certify the above-named employee has a whole body impairment rating of  0  %. (Please attach worksheets used to determine the whole body impairment.)

Objective clinical or laboratory finding means a medical finding of impairment resulting from a compensable injury, based on competent objective medical evidence that is independently confirmable by a doctor, including a designated doctor, without reliance on the subjective symptoms perceived by the employee. The impairment rating shall be based on the compensable alone.

To determine the existence and degree of the employee's impairment, a doctor must use the "Guides to the Evaluation of Permanent Impairment," third edition, second printing, February 1989 published by the American Medical Association.

**IMPORTANT NOTICE TO THE INJURED EMPLOYEE AND THE INSURANCE CARRIER: THE FIRST IMPAIRMENT RATING ASSIGNED BY A DOCTOR IS CONSIDERED FINAL IF THE RATING IS NOT DISPUTED WITHIN 90 DAYS FROM RECEIVING NOTICE OF THE RATING. CONTACT THE FIELD OFFICE HANDLING THE CLAIM FOR FURTHER INFORMATION.**

19. Doctor Type: (check appropriate block)    Required Medical Examination Doctor
☒ Treating    ☐ Other    ☐ Designated        ☐ Carrier Selected    ☐ Commission Selected

| 20. Signature of Doctor  *Prasad* | 21. Date of this Report  10-18-99 |
|---|---|

22. A doctor, other than the treating doctor or designated doctor, who certifies maximum medical improvement must send this Report of Medical Evaluation (TWCC-69) to the treating doctor no later than 7 days after the examination. The treating doctor, in turn, must mail this Report of Medical Evaluation to the commission field office handling the employee's claim within 7 days. This will serve as the treating doctor's agreement or disagreement with certification of maximum medical improvement and/or with the assigned impairment rating.

Treating Doctor's Review of Certification of Maximum Medical Improvement and Assigned Impairment Rating (see reverse side for instructions).

☐ I AGREE with the above doctor's certification of maximum medical improvement.      ☐ I DISAGREE with the above doctor's certification of maximum medical improvement.

☐ I AGREE with the above doctor's assigned impairment rating.      ☐ I DISAGREE with the above doctor's assigned impairment rating.

23. Signature of Treating Doctor _____

Printed Name of Treating Doctor _____    24. Date Signed _____

000045

SEE ON REVERSE SIDE



**San Benito Medical Associates, Inc.**

351 N. Sam Houston • San Benito, Texas 78586 • (956) 399-2443
721 W. Harrison • Harlingen, Texas 78550 • (956) 440-8470

**FAMILY PRACTICE**
Cecil R. Simmons, M.D., P.A.
William H. Heins, M.D., P.A.
Eduardo Atkinson, M.D.
Timothy C. Bothwell, M.D
Rafael Lopez, M.D.
Norma Schacherl, D.O.
Ann C. Kanaan, D.O.
Juan H. Gonzalez, M.D.
Petros K. Chapanos, M.D.
Raquel Bolado, D.O.
Prasad V. Movva, M.D.
Ray F. Smith, M.D.

**GENERAL SURGERY**
Lonnie D. Stanton, M.D.

**PHYSICIANS ASSISTANT**
Michelle Erdley, P.A.

October 18, 1999

TASB
P.O. Box 2010
Austin, Texas 78768

RE:   Gloria Guzman
DOB:  7-20-51
DOI:  8-5-99

TO WHOM IT MAY CONCERN:

Date of initial visit was 9-3-99.

HISTORY OF PRESENT ILLNESS AND COMPLAINT:  The patient states that while walking down a hallway slipped and fell forward on both knees. She was complaining of pain to both knees, left knee pain is worse than the right knee pain. On physical exam of the knee, no swelling, tender medial collateral ligament region on the left side. On the right knee lateral collateral ligament pain and tenderness, drawer sign is negative. Left tibial condyle tenderness. Ankles within normal limits, hip within normal limits. She was diagnosed with bilateral knee sprain. X-rays were within normal limits. Patient was subsequently seen on 9-20-99 with no swelling of the knees and mild tenderness over the medial collateral ligament of the left knee. The right knee had tibial condyle tenderness and ankles within normal limits and patient was referred to the physical therapy 3 times a week for two weeks. The patient has to continue the Skelaxin and Relafen. The patient was released to limited work but patient subsequently did not follow-up on her office visits and I assume that the patient has reached MMI by this time.

Thank you,

Prasad V. Movva, M.D.
pvm/js

000046

Date: 10-13-99

Dr: Mouro                    Gloria Guzman

Please dictate in a narrative history report if in your opinion
the patient has met maximum medical improvement for the date of
injury 8|5|99.  If patient has met maximum medical improvement
I need to know on what date and what the impairment rating is,
or if the patient hasn't met maximum medical improvement, when do
you feel patient will reach maximum medical medical improvement.

Thank you,                        T.A.5.B
                                  P.O.Box 2010
                                  Austin, Tx. 78768-

In accordance with Rule 130.4 of the Texas Worker's Compensation
Act, A DOCTOR REQUIRED TO SUBMIT A REPORT UNDER THE CHAPTER SHALL
SUBMIT SUPPLEMENTARY AND EXPLANATORY REPORTS AND INFORMATION AS
REQUESTED BY THE COMMISSION OR THE CARRIER.

We request that you certify if Maximum Medical Improvement has or
or has not been reached and whether this employee has impairment
and if so the employee's impairment rating as required on this
report.

In accordance with Rule 130.2 on the TWCC Act A TREATING DOCTOR
WHO CERTIFIES THAT THE EMPLOYEE HAS REACHED MAXIMUM MEDICAL
IMPROVEMENT SHALL ASSIGN IMPAIRMENT RATING AND SHALL:

000047

1.   COMPLETE THE REPORT BY SECTION 130.1

2.   SEND IT NO LATER THAN 7 DAYS AFTER THE
     EXAMINATION TO THE COMMISSION, THE EMPLOYER
     REPRESENTATIVE IF ANY, AND THE INS. CARRIER.



RECEIVED
OCT 8 2002
U.S. ATTORNEYS OFFICE
BROWNSVILLE, TX
78520

