United States District Court
Southern District of Texas
FILED

APR 2 8 2004

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GLORIA L. GARCIA A/K/A | § | |
| GLORIA GUZMAN | § | |
| | § | |
| V. | § | CIVIL ACTION NO. B-02-017 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| YOLANDA PEREZ, as Postmaster, | § | |
| United States Post Office, Santa Rosa | § | |
| Texas, and ELENA OLIVAREZ, as | § | |
| an employee of the United States Post | § | |
| Office, Santa Rosa, Texas | § | |

### PLAINTIFF'S RESPONSE TO
### THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

Plaintiff asks the court to deny Defendant's motion for summary judgment, and support of said denial, offers this her response to Defendant, the United States, Motion for Summary Judgment.

### A. Introduction

1.    Plaintiff is GLORIA GARCIA; Defendant is UNITED STATES OF AMERICA, UNITED STATES POSTAL SERVICE, hereinafter referred to as "USA". Defendant, Elena Olivarez, was either an employee or independent contractor for the USA.

2.    Plaintiff sued Defendants for an injury received as a result of a slip and fall occurring in the United States Post Office, Santa Rosa, Texas on November 12, 1999.

3.    On April 22, 2002, Defendant, USA, filed its Answer to Plaintiff's Original Complaint listing the following Affirmative defenses:

       a.    Lack of jurisdiction under Federal Tort Claims Act, because the conduct at issue and alleged to be negligent was that of a contractor of Defendant

rather than an employee;

b.    Limited recovery in administrative claim filed with the United States Postal Service;

c.    Plaintiff's relief under the FTCA is limited to "money damages" only. Therefore, the court lacks jurisdiction to award any other type of relief in law or equity;

d.    Pre-judgment interest is not recoverable against the United States under the FTCA;

e.    The Plaintiff is not entitled to a trial by jury;

f.    Damages alleged by Plaintiff were proximately caused by Plaintiff's own negligence and not the acts or omissions of an employee or agent of Defendant;

g.    Plaintiff's recovery, is reduced and/or barred by the applicable Texas common or statutory law governing comparative negligence;

h.    To the extent that any of Plaintiff's injuries or damages alleged were proximately caused by a third party, Plaintiff's claim for recovery is reduced and/or barred accordingly;

i.    Defendant denies Plaintiff's injuries and/or damages were caused and/or contributed to by any fault attributable to it.  However, in the event the court does attribute such fault to Defendant, specifically pleads the applicability of superseding and /or intervening cause as a defense and a bar to recovery against Defendant;

j.     Any injuries and/or damages claimed by Plaintiff herein are the result of pre-existing condition rather than any fault of conduct of Defendant;

k.     Failure to properly serve the necessary parties to this action;

l.     Failure to properly serve the necessary parties of to this action.

4.     On April 14, 2004, Defendant, Elena Olivarez, filed her Summary Judgment alleging that she was actually an employee of the United States of America at the time of the incident complained of by plaintiff in this suit, and not an independent contractor, as alleged by the Defendant, the United States of the America (USA), because USA controlled all aspects of her duties to an extent she could no longer be considered an independent contract under existing law and precedent.

5.     On April 15, 2004, Defendant, USA, filed its Motion for Summary Judgment on Plaintiff's cause of action for injuries received as a result of a slip and fall occurring in the United States Post Office, Santa Rosa, Texas on November 12, 1999,and in said motion, alleged that Elena Olivarez was not under the control of USA at the time of the incident, and that there are no issues of fact as to any of the elements of plaintiff's cause of action of negligence based on premise liability.

6.     Summary Judgment in favor of USA is improper in this case because there are genuine issues of fact on the following elements of Plaintiff's cause of action for negligence based on premises liability:

(a)   Actual or constructive knowledge of some condition on the premises by the owner/operator;

(b)   That the condition posed an unreasonable risk of harm;

(c)   That the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and

(d)   That the owner/operator's failure to use such care proximately caused the plaintiff's injury.

## B. Statement of Issues

7.   Was there actual or constructive knowledge of the condition by the United States Postal Service?

8.   Did Defendant USA exercise reasonable care to reduce or eliminate risk?

9.   Did Defendant USA have a duty to exercise reasonable care and was it the proximate cause of Plaintiff's injuries?

10.   Was Elena Olivarez controlled by the USA to the extent she is considered an employee of Defendant USA?

## C. Statement of Facts

11.   Plaintiff arrived at the Santa Rosa Post Office at approximately 7:15 A.M., at which time there was a Caution-Wet Floor sign placed near the entrance that she did not see. (*Plaintiff's deposition*, p. 11:25-12:12, p. 13:2 - p. 14:6).  Plaintiff entered the Post office and went straight to her mailbox to retrieve her mail.  (*Plaintiff's deposition*, p. 16:21-17:10).  The floor was dry at the time she entered the building from the entrance to her Post Box. (*Plaintiff's deposition*, p. 74:8-10).  Plaintiff then retrieved her mail and began scanning it by her Post Box.  (*Plaintiff's deposition*, p. 16:10- p.17:10, p. 20:24 – p. 21:6).  This lasted about 15 minutes. (*id.).*  Apparently,

4

Elena Olivarez, who considered herself an employee of the United States Postal Service, despite its assertion that she was an independent contractor, was performing her morning mopping duties and was being delayed by Plaintiff's presence.    See Motion for Summary Judgment by Elena Olivarez, (*Plaintiff's deposition,* p. 19:8-23), (Elena Olivarez's *deposition,* p. 73:1-22).  Therefore, Elena Olivarez began to mop in the area where Plaintiff was reading her mail, and made repeated trips from the bucket at the other end of the building to the area where Plaintiff was located, with a damp mop, to complete mopping the area where Plaintiff was located.  (*Elena Olivarez's deposition,* p.70:9- p.71:6, p.73:1- p.74:14, p. 21:9- p.27:2).   Elena Olivarez knew Plaintiff was there, but Plaintiff did not know Elena Olivarez was there, as Plaintiff's back was facing Elena Olivarez, although Plaintiff did have a sense that a person was repeatedly passing behind her.  (*Elena Olivarez's deposition,* p.70:9- p.71:6, p.22:17-p.23:11), (*Plaintiff's deposition,* p. 18:8-11).  At this time, at least one group of lights in the immediate area was not functioning properly, a condition that the United States Postal Service was aware existed for quite some time.  (*Elena Olivarez's deposition,* p.17:14- p.18:14).  At the expiration of approximately 15 minutes from the time she arrived, Plaintiff turned to leave and slipped and fell on the wet floor that now existed right behind her due to Elena Olivarez's mopping chores being performed on behalf of the United States Postal Service.     (Plaintiff*'s deposition,* p.18:12- p.21:25), (*Elena Olivarez's deposition,* p.71:13-p.72:10).  In fact, other patrons who arrived witnessed a very wet floor exactly where Plaintiff fell and was still lying, and said witnesses conversed

with Elena Olivarez about said condition. (*id.*). Of course, this area was dry a mere 15 minutes before, when Plaintiff arrived, and little to no light existed to help Plaintiff see, or help illuminate, the freshly mopped area, as the United States Post Office had not repaired the lights. (*Plaintiff's deposition,* p.74:8-10), (*Elena Olivarez's deposition,* p.17:14- p.18:14). It should be noted that there were two windows that faced the West, but provided little or no illumination, as it was 7:30 AM, and just about everyone has accepted that the Sun rises in the East and wasn't providing much help, although Plaintiff did manage to scan her mail. (*Elena Olivarez's deposition,* p.68:11- p.69:11). Also, there was no "Wet-Floor" sign placed in the location of the Plaintiff's fall, although a "Wet floor" sign still remained near the entrance to the Post Office. (*Plaintiff's deposition,* p.13:10-12, p.14:9-11) Also, Elena Olivarez never told or audibly warned Plaintiff that she intended to mop in the area where Plaintiff was reading her mail. (*Elena Olivarez's deposition*, p.1.1-end). After Plaintiff's fall, Elena Olivarez noticed that Plaintiff had in fact fallen when she stumbled over or bumped into Plaintiff, who was on the wet floor. (*Elena Olivarez's deposition,* p.74:10-14). At this time, Elena Olivarez had the "smoking gun", or in this case, the wet mop, in hand. (*Elena Olivarez's deposition,* p.74:10-14, p.83:23- p.84:11). Elena Olivarez expressed her anger at Plaintiff for not seeing the "Wet Floor" warning sign placed near the front door of the post office. (*Plaintiff's deposition,* p.14:14-16). As a result of this fall, Plaintiff expressed to Elena Olivarez that her knees and other parts of her body were injured, and then Plaintiff subsequently limped out of the Post Office in pain. (*Plaintiff's deposition,* p.19:24-

p.20:5).   As a result of the injuries suffered by this slip and fall at the Post office, Plaintiff ultimately required an operation on her knee that proved little help to the pain that she will now likely experience for the remainder of her days.   (*Plaintiff's deposition,* p.25:17-p.28:23).  Plaintiff requested an accident report for her injuries the same day. (*Plaintiff's deposition,* p.25:13-14).

### D. Standard of Review

12.    Although summary judgment is proper in a case where there is no genuine issue of a material fact, this is not a case in which the court should grant summary judgment. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

13.    A defendant moving for summary judgment must demonstrate the absence of a genuine issue of material fact by either (1) negates the existence of a material element of plaintiff's case or (2) showing there is no evidence to support an essential element of plaintiff's claim.  *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.,* 477 U.S. at 322-23, 106 S.Ct. at 2552-53.   Defendant cannot rely on conclusory statements to establish that plaintiff has not presented evidence on an essential element of her claim.  Rather, defendant must demonstrate an absence of genuine factual dispute.  *See Celotex Corp,* 477 U.S. 327, 106 S.Ct. at 2555.  Only if defendant meets its burden is plaintiff required to respond by summary judgment proof to show a genuine issue of material fact.  Fed. R. Civ. P. 56(e).

14.    In determining whether there is a disputed issue of material fact that precludes

summary judgment, the court must consider all evidence in the light most favorable to plaintiff as the nonmovant. *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1236-37 (10th Cir. 2002).

### E. Argument & Authorities

15.   Plaintiff must prove the following essential elements to sustain a claim for negligence based on premises liability:

(a)    Actual or constructive knowledge of some condition on the premises by the owner/operator;

(b)    That the condition posed an unreasonable risk of harm;

(c)    That the owner/operator did not exercise reasonable care to reduce or eliminate the risk; and

(d)    That the owner/operator's failure to use such care proximately caused the plaintiff's injury.

Because there is a material fact issue as to each of these elements, defendant is not entitled to summary judgment in this case.

A.   THE POST OFFICE HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE CONDITION ON THE PREMISES

As the Defendant, USA, has correctly noted, Texas law regarding premise liability applies in this case. With that in mind, in the case of the "slip and fall" variety of case as exists here, plaintiff, who incidentally is considered an "invitee" for purpose of analysis of applicable Texas premise liability law, can prove actual or constructive knowledge by the USA in one of three ways: (1) with evidence the

8

possessor put the foreign substance on the floor; (2) with evidence the possessor knew the substance was on the floor and negligently failed to remove it; or (3) with evidence the substance was on the floor so long that, in the exercise of ordinary care, it should have been discovered and removed ("time-notice rule"). *See Wal-Mart Stores, Inc. v. Reece,* 81 S.W.3d at 812, 814 (Tex.2002); *Wal-Mart Stores v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998); *Keetch v. Kroger Co.,* 845 S.W.2d 262, 265 (Tex.1992); *McClure v. Rick,* 95 S.W.3d 620, 626 (Tex.App.—Dallas 2002, no pet.); *Brookshire Food Stores v. Allen,* 93 S.W.3d 897, 900 (Tex.App.—Texarkana 2002, no pet). Actual knowledge is what a person directly and clearly knows. *See Black's Law Dictionary* 876 (7th ed. 1999). An owner is charged with the knowledge of its employee when said employee has actual knowledge of the condition. *See Brookshire Food Stores v. Taylor,* 102 S.W.3d 816, 821 (Tex.App.—Texarkana 2003, *pet. filed 5-13-*2003)(defendant's employee knew that ice dropped from ice-machine onto floor causing hazard). To the extent the USA has offered case law inconsistent with the foregoing, such case law is inapplicable in this case, as the aforementioned holdings apply specifically to "slip and fall" type cases.

Applying the foregoing to this case, Elena Olivarez not only knew the condition existed, but she was intentionally creating the condition, or at least should have known that a wet mop will likely cause a floor to be wet, whether it be by an intentional stroke of the mop on the floor, or by water dripping from a mop placed in a mopped bucket that was ringed to damp. (*Elena Olivarez's deposition,* p.73:14-p.74:18). Elena Olivarez testified that she was mopping in the area, but that plaintiff

9

fell where it was dry. However, other witnesses and Plaintiff all say the floor was wet. (*Plaintiff's deposition,* p.74:1-13), (*Elena Olivarez's deposition,* p.71:13- p.72-16). Furthermore, plaintiff and Elena Olivarez both testified that Elena Olivarez tripped over Plaintiff after Plaintiff's fall, and that Elena Olivarez was holding a wet mop at the time. (*Plaintiff's deposition,* p.74:1-13), (*Elena Olivarez's deposition,* p.74:10-14). Plaintiff further testified that the floor was wet where she fell. (*Plaintiff's deposition,* p.74:11-13).

Finally, the USA has asserted that Elena Olivarez was an independent contractor, but it has also been held that a proprietor can be liable to a third party for an injury resulting from the work of an independent contract if the proprietor (1) controlled the independent contractor's work or (2) retained control of premises during the independent contractor's work. *See Koch Ref. Co. v. Chapa,* 11 S.W.3d 153, 155 (Tex.1999). In this case, it is even Elena Olivarez asserts that USA maintained control over her work and retained control of the premises. As such, there is indeed compelling evidence that USA, through either its employee or independent contractor, had actual knowledge or, at a minimum, constructive knowledge of the condition. Based on the case law presented, evidence exists that the USA put the foreign substance on the floor, so that "actual knowledge" is proven. As such, at a minimum, a fact issue exists as to this issue.

B. THE CONDITION POSED AN UNREASONABLE RISK OF HARM

A fact issue exists to whether the USA created a condition that posed an unreasonable risk of harm. Plaintiff unequivocally testified that the floor was dry

when she entered and wet when she slipped and fell 15 minutes later. (*Plaintiff's deposition,* p.74:1-11).  Given that Elena Olivarez testified that she was passing back and forth behind plaintiff with a damp mop, and in fact began mopping in the area Plaintiff was scanning her mail, but denies that the floor was wet where Plaintiff fell, a fact issue as to whether a condition that posed an unreasonable risk of harm certainly existed.  (*Elena Olivarez's deposition,* p.20:7-p.21-9, p.73:16-p.74-18). This is especially true given that other witnesses observed a very wet floor where Plaintiff fell. (*Elena Olivarez's deposition,* p.71:13- p.72-16).  Plaintiff could not anticipate or expect for the floor to be mopped behind her without someone from the USA giving her a warning, and certainly a "Wet-Floor" sign located by the front door for which she has already navigated the warned danger does nothing to warn Plaintiff of a new condition created long after she has passed the warning sign.  In fact, the idea of mopping behind someone without telling them, and knowing that they will have to turn around and walk over the area, without the benefit of knowing the condition exists, borderlines on a willful, wanton, or gross negligence, equivalent to throwing a box of marbles under a marching band at a parade.  The result, with almost certainty, is that someone will slip and fall.  Furthermore, the lights were not functioning properly, and even if Plaintiff had turned around and looked for a signs of a wet floor, she would not have seen it, as the USA had long ignored the malfunctioning lighting that could have illuminated or shined to reveal the presence of a liquid. (*Elena Olivarez's deposition,* p.17:4-18).

C. <u>DEFENDANT MOST CERTAINLY HAS THE DUTY TO EXERCISE REASONABLE CARE WHEN MOPPING THE FLOOR and MAINTAINING LIGHTING</u>

The USA's argument that it has no duty to exercise reasonable care when mopping the floor defies logic and just plain common sense. The act of mopping is, by definition, and act whereby one is intentionally creating a dangerous condition, thereby necessitating a warning to invitees. To suggest that the USA is given time to discover a condition it has created intentionally, as the USA has done in its Summary Judgment, is borderline frivolous, and certainly without merit. What the law actually is in Texas regarding this issue is that an owner of a premise has a duty to take whatever action is reasonably prudent under the circumstances to reduce or eliminate the unreasonable risk from the condition when it has actual or constructive knowledge of the condition, and this includes either warning or making the condition safe. *See State v. Williams,* 940 S.W.2d 583, 584 (Tex.1996)*; CMH Homes v. Daener,* 15 S.W.3d 97, 99 (Tex.2002).

In this case, there was no adequate warning, as Elena Olivarez did nothing to warn Plaintiff that the area behind Plaintiff was being mopped after she had walked to her Post Box on a dry floor. Elena Olivarez clearly indicated that she was tired of waiting for Plaintiff to leave the area and had begun to mop the area. (*Elena Olivarez's deposition,* p.69:1- p.75-14). Therefore, the "Wet Floor" sign was inadequately placed, as no reasonable person would expect or anticipate a dry floor that they had just navigated to be mopped-up behind them while they were not looking, and so such a warning does nothing to adequately warn Plaintiff of this new

danger.  All that was required was for Elena Olivarez to audibly inform Plaintiff that the area surrounding her was being mopped, or at a minimum to replace the "wet-floor" sign in a more appropriate location.  The USA could have "roped off" the mopped area instead to make it safe.  Finally, the lack of lighting, a condition the USA had sufficient time to repair and make safe, also contributed to this incident, and Plaintiff's injuries.  In other words, the mere plunking down of a "wet floor" sign and the entrance to the Post Office was not an action that a reasonably prudent person would take in the circumstances of this case.  Needless to say, to the extent the USA denies the foregoing, fact issues exist as to this element of Plaintiff's cause of action.  Otherwise, Plaintiff is entitled to a Summary Judgment instead of the USA.

D.  <u>PLAINTIFF'S INJURIES WERE PROXIMATELY CAUSED BY USA'S FAILURES TO USE ORDINARY CARE</u>

Although Defendant, USA does not address this issue in its motion for Summary Judgment, the evidence in this case exists to illustrate that the Plaintiff suffered physical injury as a proximate cause of this slip and fall and USA's failures to use ordinary care, and to the extent the USA denies the foregoing, a fact issue exists as to this final element. (Plaintiff's *deposition,* p.25:17-p.28:23).  Consequently, Summary Judgment is improper under the standards setout before herein.

### F.  Summary Judgment Evidence

12.   In support of her response, Plaintiff includes the following evidence in the attached appendix.

a.    <u>Deposition excerpts.</u>  The depositions of Plaintiff, Gloria Longoria, and Defendant, Elena Olivarez.

## G. Conclusion

13.    There is a factual dispute as to whether the floor Plaintiff slipped on was wet when she fell.  The USA, in a conclusory fashion, states that the floor must have been dry, because Elena Olivarez says so, and so it is entitled to a Summary Judgment. However, sufficient evidence in the form of Plaintiff's testimony and Elena Olivarez's testimony pertaining to conversations with other witnesses clearly indicate that the floor was wet.  Elena Olivarez's testimony also illustrates that she was holding a wet mop at the time she stumbled over the Plaintiff, and Elena Olivarez also admitted she was mopping the area where Plaintiff fell.  Elena Olivarez just refuses to admit the exact place Plaintiff fell was wet, although she admits she did not see Plaintiff fall.  It is easy to deduce that the floor was wet from the circumstances, and this is certainly a factual dispute.  With respect to the USA's argument that it is permitted time to discover this condition, the case law pertaining specifically to slip and fall cases, where the owner is intentionally creating the condition, reveals that the USA's argument is wrong, and that it is charged with actual knowledge of said condition, thereby giving a rise to a duty to warn and protect invitees such as Plaintiff.    This is, of course, why the USA had a "wet floor" sign in the first place. However, in this case, a fact issue exists as to whether the placement of the sign by the front entrance was sufficient to warn the Plaintiff of a condition that was created immediately behind her after she had navigated the condition before, i.e. walked on

a dry floor to her Post Box only to find it was wet when she turned around, causing her to slip and fall. Finally, Plaintiff has provided sufficient testimony detailing the injuries she sustained as a proximate cause of her slip and fall. For these reasons, Defendant asks the court to deny Defendant's motion for summary judgment.

Respectfully submitted,

J. EDWARD MANN, JR. & ASSOCIATES

Jason R. Mann
State Bar No. 24004793
Federal Bar No. 23543
222 E. Van Buren, Suite 701
P. O. Box 231
Harlingen, Texas 78551-0231
Telephone: 956/428-4114
Facsimile: 956/428-9494
Attorney for Gloria Garcia a/k/a Gloria Guzman

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this instrument has been forwarded to all parties and counsel of record on this the 28rd day of April, 2004.

Michael T. Shelby
United States Attorney

Steven T. Schammel
Assistant U.S. Attorney
Southern District of Texas
1701 W. Highway 83, Suite 600
Texas Commerce Bank - Bentsen Tower
McAllen, Texas 78501

Pablo J. Almiguer
Texas Rural Legal Aid, Inc.
316 S. Closner
Edinburg, TX 78539

Jason R. Mann

15

# APPENDIX

**ORAL DEPOSITION OF GLORIA LONGORIA**
**A/K/A GLORIA GARCIA**

**CONDENSED TRANSCRIPT OF GLORIA LONGORIA 11/10/03**
C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

---

PAGE 2

2

### A P P E A R A N C E S

FOR THE PLAINTIFF:

    Mr. Jason R. Mann
    J. Edward Mann, Jr. & Assoc.
    222 E. Van Buren, Suite 701
    Harlingen, TX 78551
    PH: 956/428-4114

FOR THE GOVERNMENT:

    Mr. Steven T. Schammel, AUSA
    U.S. Attorney's Office
    1701 W. Bus. 83, Suite 600
    McAllen, TX 78501
    PH: 956/618-8010

FOR DEFENDANT ELENA OLIVAREZ:

    Mr. Pablo J. Almaguer
    Texas Rural Legal Aid, Inc.
    316 S. Closner
    Edinburg, TX 78539
    PH: 956/381-8171

COURT REPORTER:   DIANA LEAL WEIBEL, C.S.R., #4192

* * * * * *

---

PAGE 4

4

### E X H I B I T S

| Number: | Description: | Page: |
|---|---|---|
| No. 1 | Diagram of U.S. Post Office | 13 |
| No. 2 | Valley Orthopedic Surgery Medical and Billing Records | 29 |
| No. 3 | Rio Grande Valley Imaging and Diagnostic Clinic - Medical and Billing Records | 30 |
| No. 4 | Texas Association of School Board Medical Records | 36 |
| No. 5 | Copies of photographs (2) | 57 |
| No. 6 | Copies of photographs (2) | 57 |
| No. 7 | San Benito Medical Associates Medical and Billing Records | 64 |

---

PAGE 3

3

### I N D E X

                                            Page

Appearances ........................................... 2

Stipulations ..................................... 4

WITNESS EXAMINATION:     PAGE:   BEGIN TIME:

    BY MR. SCHAMMEL ................. 7    1:21 p.m.

    BY MR. ALMAGUER ................. 43    2:18 p.m.

    BY MR. SCHAMMEL ................. 51    2:26 p.m.

    BY MR. ALMAGUER ................. 69    2:52 p.m.

    E . MR. MANN .................... 74    2:59 p.m.

    BY MR. SCHAMMEL ................. 77    3:04 p.m.

    BY MR. MANN .................... 81    3:08 p.m.

    BY MR. ALMAGUER ................. 84    3:12 p.m.

    BY MR. MANN .................... 88    3:16 p.m.

    BY MR. SCHAMMEL ................. 89    3:18 p.m.

Signature and Changes ............................. 91

Reporter's Certificate ............................. 93

---

PAGE 5

5

1      IT WAS AGREED that no objections shall be made by any
2  party at the time of taking of said deposition; except
3  objections as to the form of the question, including leading,
4  or the responsiveness of the answer, which if not made during
5  the deposition are waived; but if and when said deposition,
6  or any portion thereof, is offered in evidence at the trial
7  of this cause by any party thereto, it shall be subject to
8  any and all other legal objections, such objections to be
9  made at the time of the tender, the same as though the
10  witness wer · on the stand personally testifying.
11      IT WAS FURTHER AGREED that the · .ess must appear
12  before any Notary Public or official authorized to administer
13  oaths, and at such time the witness has the privilege of
14  reading over said deposition and making any corrections to
15  his answers as he finds to be necessary, such corrections to be
16  made in accordance with the Federal Rules of Civil Procedure.
17      IT WAS FURTHER AGREED by and between Counsel that
18  Federal Civil Rule 30(b)(4) is hereby expressly waived.
19      IT WAS FURTHER AGREED by and between Counsel that
20  following delivery of the original deposition herein by the
21  officer to Counsel for deponent, Mr. Jason R. Mann, for the
22  purpose of signature by deponent, said original deposition
23  shall be returned directly to the court reporter, Diana Leal
24  Weibel, C.S.R., within thirty (30) days following receipt of
25  same, together with any corrections, additions or changes

---

**DIANA LEAL WEIBEL, C.S.R. #4192, Box 608, Mission, TX 78573**
PH: 956/580-2778  Cell: 956/330-9180  Fax: 956/580-3148

Case 1:02-cv-00017   Document 1   Filed in TXSD on 04/21/10/03

PAGE 6

```
 6

 1   thereto, at which time the reporter will prepare a Return
 2   Certificate and deliver the signed original deposition to the
 3   custodial attorney herein, Mr. Steven T. Schammel.
 4       IT WAS AGREED that should the original deposition herein
 5   fail to be returned, signed and notarized, ten (10) days
 6   prior to the date of trial in this cause, or prior to any
 7   appropriate hearing herein, a certified copy of same may be
 8   used herein for all purposes, as though it were the signed
 9   original, upon proper notice to opposing Counsel.
10       IT WAS FURTHER AGREED that after said deposition has
11   been returned in accordance with these stipulations and
12   agreements, it will be treated by the parties hereto and may
13   be used herein with the same force and effect as though all
14   statutes and rules relating to the taking and returning of
15   depositions had been fully complied with.
16                       * * * *
17
18
19
20
21
22
23
24
25
```

PAGE 7

```
 7

 1       THE REPORTER:  Today's date is November 10th,
 2   2003. The time is 1:21 p.m., and the deponent's name is Ms.
 3   Gloria Longoria.
 4                       - - -
 5               GLORIA LONGORIA
 6   having been first duly sworn, testified as follows:
 7               EXAMINATION
 8   BY MR. SCHAMMEL (1:21 p.m.):
 9       Q   Ms. Longoria, my name is Steven Schammel. I wasn't
10   he_ _ .t the last set of depositions. I'm an Assistant U.S.
11   Attorney, and I've taken over this case, and I'll be
12   representing the Government in this particular case. If
13   there is something that I say that you don't understand or
14   you're not sure, please let me know. For the sake of the
15   court reporter, if there is a yes or no answer, please say
16   "yes" or "no." If you nod your head up and down, she's going
17   to have a hard time putting that into --
18       A   Right.
19       Q   -- into words. Your name, please?
20       A   Gloria Longoria.
21       Q   And are you the same person who filed suit
22   initially as Gloria Garcia, also known as Gloria Guzman?
23       A   Yes, I am.
24       Q   And what is the effective date of your name change?
25       A   Effective date would be September of last year.
```

PAGE 8

```
 8

 1       Q   September of 2002?
 2       A   Yes.
 3       Q   And your current address?
 4       A   Post Office Box 1237, Santa Rosa, Texas, 78593.
 5       Q   And what city do you live in?
 6       A   Santa Rosa.
 7       Q   Your age?
 8       A   Fifty-two (52).
 9       Q   Date of birth?
10       A   7/20/51.
11       Q   Prior to November of 1999 when you had the fall,
12   what was your occupation?
13       A   I worked for the School District in San Benito.
14       Q   And specifically, what did you do?
15       A   I did clerical work, payroll.
16       Q   And were you on salary or an hourly wage at that
17   point?
18       A   Salary.
19       Q   And what was your annual salary?
20       A   Gosh. Seventeen hundred ($1,700) a month.
21       Q   Was that after taxes?
22       A   No. It was before.
23           MR. MANN:  Could you read that question back,
24   or what was it?  Was that -- did you say yearly or monthly?
25           MR. SCHAMMEL:  I asked her what her yearly
```

PAGE 9

```
 9

 1   wages --
 2       A   I'm sorry.
 3       Q   (Mr. Schammel)  That's okay.
 4       A   I thought it was monthly.
 5       Q   Seventeen hundred ($1,700) a month is fine.
 6       A   Monthly. I missed the question.
 7       Q   And did you get paid -- was that seventeen hundred
 8   ($1,700) for each of the twelve (12) months, or did you just
 9   get paid during the school year?
10       A   '; :vas twelve (12) annual.  Twelve (12) months.
11       Q   And at some point after that ac .ivent in November
12   of 1999, did you become unemployed?
13       A   Yes, I did.
14       Q   Do you remember approximately when that was?
15       A   When I started taking the physical therapy, and I
16   had the surgery.
17       Q   And what was your first job after -- have you
18   become employed since you left the school district?
19       A   Yes.
20       Q   And who are you employed for now?
21       A   Texas State Bank.
22       Q   And where is that location at?
23       A   115 East Van Buren in Harlingen.
24       Q   And how long have you been employed there?
25       A   Fifteen (15) months.
```

**PAGE 10**

10

1    Q   And are you salary or hourly wage there?
2    A   Hourly.
3    Q   And what is your hourly wage?
4    A   I believe it's nine-fifty ($9.50) right now.
5    Q   And is that the same salary you've had for the
6   entire period of time?
7    A   Uh-huh (moving head up and down).  Yes.
8    Q   And what's your average hours per week?
9    A   Forty (40).
10   Q   About how many months were you unemployed between
11  when you left the School District and you started at Texas
12  State Bank?
13   A   I was an employee for about a year and a half.
14   Q   And to date, have you provided all of your medical
15  bills and all of -- have you provided all the medical bills
16  and expenses related to your fall on November 17th of 1999?
17   A   Not all of them because I'm seeing the doctor
18  still, and I report them to Jason as I get them.
19       MR. MANN:  Pursuant to your Request for
20  Production, I have some additional discovery in addition to
21  what we've provided in the response for Request for
22  Productions.  And I believe there's going to be some more
23  supplementation once they're received from this particular
24  doctor or whatever entity he's with now.  He keeps changing.
25       MR. SCHAMMEL:  Okay.  If you can just keep us

**PAGE 11**

11

1   updated so we have a running total?
2        MR. MANN:  Will do.
3    Q   (Mr. Schammel)  And you have continued to see which
4   doctor concerning your injuries?
5    A   Doctor Clark.
6    Q   Have any new injuries come to your attention
7   since October of 2001, which is the last date that I have a
8   record for?
9    A   Injuries as far as falling or -- ?
10   Q   Any injuries related back to that original fall,
11  besides your knees that you had originally complained of?
12  Anything new, like shoulders, elbows, back, neck?
13   A   I -- I've been getting fluid in my knees.  That's
14  why I'm still continuing to see the doctor.
15   Q   So continuing trauma still related back to the same
16  knee injuries?
17   A   Yes.
18   Q   But nothing new?  Nothing like a newly discovered
19  injury to an arm or your neck or your back?
20   A   No.
21   Q   Have you visited a doctor related to any other
22  major medical condition during this period of time since
23  November 17th of '99 to the present?
24   A   No.
25   Q   On November 17th, 1999, what were you doing that

**PAGE 12**

12

1   morning?
2    A   I was picking up my mail before I went to work.
3    Q   And that was at the School District in San Benito?
4    A   Yes.
5    Q   And how often did you pick up your mail?
6    A   Maybe three (3) times a week or so.
7    Q   Was it usually a particular time of day?
8    A   Either early in the morning or in the afternoon.
9    Q   When you went early in the morning, approximately
10  what time would you go?
11   A   Well, I'd go in at 7:30.  I was going in at 7:30 to
12  work, so it was around 7:15.
13   Q   And had you seen the cleaning woman in there any
14  other days when you had been there in the morning?
15   A   No.  No.  But I don't go there every morning.  I
16  just, you know...
17   Q   I understand you don't go there every morning.  But
18  the mornings that you had been there, had you ever seen her
19  prior?
20   A   No.
21   Q   Did you usually go Monday-Wednesday-Friday, or was
22  there any pattern to the dates that you would go?
23   A   No, no pattern.
24   Q   When you got to the Post Office, who was present?
25   A   No one.  I -- I heard someone, but I was busy

**PAGE 13**

13

1   getting my mail.
2    Q   When you walked -- when you got to the Post Office,
3   was the front door open or closed?
4    A   It was open.
5    Q   And as you walked in, what did you see initially?
6    A   Actually, it was a little bit dark, and I just went
7   straight to my box.  The lights were out, and I just went and
8   opened my box.  I felt someone behind me, but I didn't know.
9   I thought it was somebody picking up the mail -- their mail.
10   Q   When you walked in, did you see any signs
11  concerning the floor?
12   A   No.
13   Q   In your original petition, you stated that the sign
14  wasn't present where you were at, which would lead me to
15  believe that there was a sign present but you didn't see
16  anything?
17   A   No, sir, not until she pointed it out to me.
18   Q   And who is "she?"
19   A   The custodian.
20       MR. SCHAMMEL:  If you could mark this as
21  Defendant's Exhibit Number One (1), please?
22       (Defendant's Exhibit Number 1 marked.)
23   Q   (Mr. Schammel)  Looking at Defendant's One (1), the
24  drawing that was created by, I believe it was your attorney
25  or somebody who worked for him.  Does that look familiar?

CONDENSED TRANSCRIPT OF GLORIA L. GARCIA
C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 14

14

1   A   I'm sorry?
2   Q   Does it look familiar?
3   A   Yes. The lobby.
4   Q   Is that basically the layout of the lobby?
5   A   Yes.
6   Q   Not that it's exactly to scale. but roughly the
7   same layout?
8   A   Yes.
9   Q   On there. it's indicated that there is a sign. Did
10  you not see that sign as you walked in?
11  A   No, I didn't.
12  Q   How did you know to indicate the sign was there
13  when that document was prepared?
14  A   Well, when I fell, then she told me, "had I not
15  seen the sign?" And I told her I hadn't seen the sign. I
16  was over here (indicating). The sign was way on the corner.
17  Q   And you didn't see her at any time as you walked
18  through the door?
19  A   I really wasn't paying attention. I knew somebody
20  was there, but I thought they were checking their mail. But
21  as I opened my box, looked at my mail, somebody was behind
22  me.
23  Q   How wide is the aisle where your mailbox is
24  located?
25  A   I'm not sure.

PAGE 15

15

1   Q   If you stood up and put both arms out. could you
2   touch both sides --
3   A   No.
4   Q   -- or would it be a little bit wider than that?
5   A   No, it's wider.
6   Q   Enough for two (2) people to easily pass by without
7   --
8   A   Oh, yes.
9   Q   -- getting in the way? Was there anything else.
10  tables. chairs. that were in that hallway?
11  A   No.
12  Q   There was previous testimony in the last deposition
13  and also in your Petition that the light in the hallway where
14  you were at was not functioning, but that the others seemed
15  to be functioning; is that correct?
16  A   That's correct.
17  Q   So there is -- up until you get to the hallway out
18  there. your testimony then is there is sufficient light to
19  see? It's just once you turn --
20  A   By the door?
21  Q   By the door. in the other areas. except the
22  malfunction light was only in your hallway?
23  A   Yes, in this part (indicating).
24  Q   And just so that the court reporter can keep track,
25  that would be in the area that is indicated by an "X" that

PAGE 16

16

1   says "Location of fall?"
2   A   Uh-huh (moving head up and down). Yes.
3   Q   And the yellow sign that you say you later
4   discovered is also indicated on this diagram. It, according
5   to you. is annotated by a circle with a line saying "Location
6   of wet floor sign," is that correct?
7   A   Yes.
8   Q   Do you still have the same Post Office box?
9   A   Yes, I do.
10  Q   And is that, I assume. your personal mailbox? It's
11  not for business?
12  A   It's personal, yes.
13  Q   You didn't noticed the co-defendant in this case
14  mopping the floor? You did not see her with a mop? You
15  didn't see her bucket?
16  A   The bucket wasn't there in that area, so I didn't
17  see a bucket.
18  Q   And by "that area." you mean the area where you
19  fell?
20  A   Right.
21  Q   How long did you spend going through your mail?
22  A   I'm saying about a couple of minutes.
23  Q   Did you stop to read any of it, or did you just
24  collect it?
25  A   I just went through it, you know.

PAGE 17

17

1   Q   Did you open anything while you were there?
2   A   No.
3   Q   And you arrived at approximately what time?
4   A   About 7:15 a.m.
5   Q   And approximately how long did you stay there
6   before you allege that you fell?
7   A   I'm saying about fifteen (15) minutes by the time I
8   left.
9   Q   So it was about 7:30 when you fell and then left?
10  A   Yes.
11  Q   At your office. do you have to -- at your prior
12  job. did you have to log in or out. punch in a time clock or
13  anything?
14  A   Yes.
15  Q   What method? Time clock or --
16  A   On the computer.
17  Q   Approximately what time did you arrive at work that
18  day?
19  A   I went in late because I had to go home and change
20  my hose. I called in that I was running late.
21  Q   What kind of shoes were you wearing that day?
22  A   The one-inch pump shoes that we wear for work.
23  Q   What kind of sole do they have? Is it a rubber
24  sole. leather sole?
25  A   I'm not sure.

C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 18
18

1  Q  Smooth bottom?  Did it have like a texture on it?
2  A  I don't remember.
3  Q  Do you remember the brand?
4  A  They were the Solo -- Solo, I think.
5  Q  That's okay.
6  A  They were from Dillard's.  A Dillard's brand.  I
7  don't remember.
8  Q  And you were aware that Mrs. Olivarez was there,
9  but you weren't really sure what she was doing?
10  A  I knew somebody was there, but I wasn't paying
11  attention until I saw her when I fell.
12  Q  What were you focused on at that particular time?
13  A  My box.
14  Q  And your mail?
15  A  And my mail.
16  Q  The sign that was in the entry area, had you ever
17  seen signs like that before, the "Wet Floor" sign?
18  A  There?
19  Q  Or in general.  Have you --
20  A  Yes.
21  Q  Similar to one that she was saying, like say at the
22  school where you work?
23  A  Yes.
24  Q  Now, you say that you were aware that Ms. Olivarez
25  was there.  Looking again at Defendant's Exhibit One (1),

PAGE 19
19

1  were you facing your mailbox?
2  A  Yes.
3  Q  And according to that map, that would mean that you
4  were facing south; is that correct?
5  A  Yes.
6  Q  And to which side, either the left side or the
7  right side, did you know that she was present?
8  A  I -- after I fell, I turned around, and I thought
9  it was somebody getting -- like I said, getting their mail.
10  And I saw her standing the  with a mop like this
11  (indicating).
12  Q  Was she towards where the windows are on the west
13  side, or was she --
14  A  On the very -- right here (indicating).
15  Q  So she was --
16  A  Like she had gone by mopping or something when I
17  was looking at my mail.  So she stood there looking at me
18  when I fell.
19  Q  She was at the closed end where the mailboxes are
20  --
21  A  Yes, she had already --
22  Q  -- on the east end of that hallway?
23  A  -- used the mop, uh-huh.
24  Q  Now, when you fell, how did you fall?  Did you fall
25  on your back?  Did you fall on your side?

PAGE 20
20

1  A  I fell on my knees, and I kind of like split.  I
2  couldn't get up.
3  Q  And did you -- did you just fall to your knees?
4  Did you fall down on your hands and knees?  Did you end up
5  falling flat to the floor?
6  A  Just on my hands and my knees.
7  Q  How long did the light in that hallway not been
8  working?  Was it just something that just happened that day,
9  or was this a chronic problem?
10  A  No.  As a matter of fact, she said that that light
11  had been not working for a while.
12  Q  Had you noticed it working or not working?
13  A  No, I had not noticed.
14  Q  You have no personal knowledge as to whether it was
15  operating?
16  A  No.
17  Q  Prior to that date, what was the last date that you
18  were in that Post Office?
19  A  Probably on the weekend, in the morning.
20  Q  And during the weeks when you would come, you would
21  generally come about 7:15 in the morning?
22  A  Yes.
23  Q  Give or take a few minutes?
24  A  It was very rarely that I would go in the mornings.
25  I was expecting a piece of mail that morning from my son, so

PAGE 21
21

1  I tried to check before I went to work.
2  Q  Just before you fell, what were you doing?  Were
3  you -- you were looking at your mail.  What happens next?
4  A  I'm looking at my mail, and I had my purse right
5  here.  And then I start walking, and that's when I slipped
6  right away.
7  Q  When you start walking, in which direction did you
8  head?
9  A  To my right.
10  Q  Which would be towards the windows?
11  A  Yes.
12  Q  Did you just basically turn towards the windows, or
13  did you turn around more toward the Post Offices boxes behind
14  you?  How far did you turn?
15  A  How far did I turn from -- ?
16  Q  Did you simply turn basically straight towards the
17  windows and go, or did you -- I mean, did you just turn that
18  ninety degrees to the right, or what did you do?
19  A  Oh, yes, I just started walking out.  I just turned
20  around and...
21  Q  Did you manage to take a step before you fell or
22  did you --
23  A  Yes.
24  Q  How far did you go before you fell?
25  A  Right there.  I just took about one step.

**PAGE 22**

22

1   Q   And were you carrying your mail at that time in
2 your hands, was it in your purse?
3   A   In my hands.
4   Q   Do you wear eyeglasses or contacts?
5   A   No. I have reading glasses just to read, but I
6 wasn't wearing them.
7   Q   You didn't need them to scan through the mail?
8   A   No.
9   Q   Do you commonly wear sunglasses?
10   A   Sometimes.
11   Q   Do you remember if you wore them that day?
12   A   No. It was too early.
13   Q   How far was the sun up that morning? Did you need
14 your headlights to drive. or was it fairly --
15   A   I usually do put my headlights at 7:00, around
16 7:00.
17   Q   As you're driving, was the sun above the horizon,
18 or is it still just barely breaking?
19   A   Barely breaking.
20   Q   When you saw the light was out. did that worry you
21 at all. or did you just think nothing of it?
22   A   I really didn't say anything. She's the one that
23 told me that the lights were out. They had been out for a
24 while. And I looked up, and I go, "oh, so the -- " I didn't
25 see the floor wet.

**PAGE 23**

23

1   Q   So you didn't even notice the lights were out
2 really?
3   A   Well, I didn't pay attention because I was
4 concentrating on getting my mail and getting to work.
5   Q   So --
6   A   I'm not very observant. When I go into get my --
7   Q   So the answer would be. "no, you didn't observe the
8 lights to be out until you were told." is that correct?
9   A   That's correct.
10   Q   By the time y.. .ert. was anybody else present?
11   A   No.
12   Q   Mrs. Olivarez said that later that day, somebody
13 came by to visit her -- I wouldn't say visit -- came by and
14 asked her questions about your fall that morning. Do you
15 know who that person is?
16   A   No, I sure don't.
17   Q   Did any of your family or friends go by to check
18 the place out?
19   A   No.
20   Q   When is the next time that you went back to the
21 Post Office?
22   A   After the fall?
23   Q   Yes.
24   A   Gosh, I don't remember.
25   Q   A week?

**PAGE 24**

24

1   A   Probably.
2   Q   Less than a week?
3   A   Probably a week. Sometimes -- I didn't get very
4 much mail, you know.
5   Q   What is your physical address in Santa Rosa?
6   A   406 Los Fresnos Street.
7   Q   And do you still live there?
8   A   Yes.
9   Q   You mentioned earlier that you had gotten a
10 divorce. The person you divorced, is that the person you
11 were married to at the time of this injury?
12   A   We weren't married yet when I fell.
13   Q   And who is the person that, for lack of a better
14 term, you were dating at that particular time?
15   A   Who is he?
16   Q   Yes.
17   A   Joaquin Garcia.
18   Q   And you later did marry him?
19   A   Yes.
20   Q   And do you remember what the wedding date was?
21   A   December of `99.
22   Q   Do you remember the day?
23   A   17th.
24   Q   Basically, a month later?
25   A   Uh-huh (moving head up and down).

**PAGE 25**

25

1   Q   And when did you divorce him? Or I'm not trying to
2 say who divorced whom, but when was the divorce?
3   A   September of 2002.
4   Q   And do you remember the day that it became
5 effective?
6   A   I don't remember the date.
7   Q   Did he ever -- did Joaquin Garcia ever go over to
8 investigate or look at the location to the best of your
9 knowledge?
10   A   No. I know he went with me to pick up the mail.
11   Q   And when did you first seek medical treatment
12 concerning your fall?
13   A   That day, I called the Post Office, and they wanted
14 me to call Corpus and get a form for the accident.
15   Q   And when did you first go to the doctor?
16   A   Right after that. Right after that, I mean...
17   Q   Was it the next day? Was it a week later that you
18 went to see the doctor?
19   A   I was waiting for that form to be faxed to me, so
20 the Postmaster said she didn't have any forms for the
21 accident, that I would have to call Corpus. And I was having
22 a problem trying to get somebody to help me in Corpus.
23   Q   Did you go to see the doctor on your own regard?
24   A   Yes, I went to Doctor Garza.
25   Q   And when was that? Was that after you got this

**PAGE 26**

26

1  form or before?
2  A   A couple of days. I still didn't have the form.
3  Q   And Doctor Garza is Doctor Raul Garza?
4  A   Yes.
5  Q   And you've seen him for various different
6  treatments, or is it just all relating to this particular
7  incident?
8  A   Just to that particular injury.
9  Q   And he had some x-rays done on you later?
10  A   Yes.
11  Q   And do you remember -- do you know what the results
12  of those x-rays were?
13  A   I'm not sure. I know that he referred me to the
14  orthopedic doctor.
15  Q   The x-rays came back as normal. Did that surprise
16  you when they came back normal?
17  A   I don't remember because he referred me to Doctor
18  Clark because he said I needed an MRI.
19  Q   In January of -- on January 14th -- somewhere
20  between January 14th and January 16th, you had an x-ray done.
21  I believe the x-ray was actually done at the Dolly Vinsant
22  Memorial Hospital, and they x-rayed both your knees. Do you
23  remember that --
24  A   Yes.
25  Q   -- prior to the MRI?

**PAGE 27**

27

1  A   Yes.
2  Q   And that x-ray came back that there was no troubles
3  at that time?
4  A   (Moving head up and down.)
5  Q   When you saw Doctor Garza, did you give him a
6  medical history?
7  A   A medical history as far as before?
8  Q   Prior -- prior injuries or medical conditions,
9  allergic reactions to medications. Did you tell him
10  everything that --
11  A   Yes.
12  Q   After the x-ray came back normal, what did you do?
13  A   He was treating me with muscle relaxers. He gave
14  me some pain killers and...
15  Q   And what was the progress on your injury?
16  A   It kept hurting.
17  Q   And what did you do after that?
18  A   I went to see Doctor Clark, the one he referred me
19  to.
20  Q   Did he refer you to Doctor Clark, or did he refer
21  you to somebody different?
22  A   Doctor Clark.
23  Q   And what did Doctor Clark have you do?
24  A   He sent me to get an MRI, and then he got the
25  results from there.

**PAGE 28**

28

1  Q   Were you aware that the MRIs also came back that
2  there was -- it characterizes it as very tiny and -- tiny and
3  very small injuries, that they were rather minor injuries?
4  MR. MANN: Objection. If you want to show her
5  the MRI that you're referring to and mark it as an exhibit?
6  Q   (Mr. Schammel) Have you reviewed your medical
7  records?
8  A   Not lately.
9  Q   Have you talked to your doctor concerning your
10  medical records?
11  A   I'm still seeing Doctor Clark.
12  Q   Did Doctor Clark review the MRIs with you?
13  A   Yes.
14  Q   What was his recommendation after he reviewed the
15  MRIs with you?
16  A   He recommended surgery. He said I had torn
17  ligaments, and he was going to have to look into my right
18  knee and see what was wrong with it. And he found the
19  cartilage was not healed correctly or something. He had to
20  shave it off. (Brief pause.) He also said that's why that
21  wouldn't show in an x-ray because the x-ray takes the bone, a
22  picture of the bone. But my problem was the torn ligament
23  and the cartilage were damaged.
24  MR. SCHAMMEL: I'd like to have this marked as
25  -- this page marked as Defendant's Two (2). I'll go ahead

**PAGE 29**

29

1  and at the end, we'll supplement with a photocopy, if that
2  would be okay?
3  MR. MANN: What is it?
4  MR. SCHAMMEL: A medical report. It's her
5  medical records.
6  MR. MANN: (Reviews documents.) Are you going
7  to have her authenticate these?
8  MR. SCHAMMEL: The affidavit is attached.
9  MR. MANN: Were they filed with the Court?
10  MR. SCHAMMEL: As far as I know, they were.
11  MR. MANN: No objection to the medical
12  records.
13  (Defendant's Exhibit Number 2 marked.)
14  Q   (Mr. Schammel) Let me show you what has been
15  stamped at the bottom as page two. Have you reviewed these
16  medical records yourself?
17  A   No, sir.
18  Q   These were received from your doctor as a portion
19  of your discovery in this case. At the top of the page, if
20  you'll please read to yourself, beginning with "On my
21  interpretation..."
22  A   (Witness reviews documents.) This was in July of
23  2000.
24  Q   When was your MRI performed, if you know?
25  A   It was around January. I had already been through

PAGE 30

30

1  the physical therapy and everything, and I continued to have
2  problems.
3     Q   Do you remember who performed your MRI?
4     A   It was on Ed Carey Drive. I don't remember the
5  name of it.
6     Q   Rio Grande Valley Imaging and Diagnostic Clinic.
7  Does that sound correct?
8     A   Probably so. But this is in July already, months
9  after that, the physical therapy and the surgery and
10 everything.
11    MR. SCHAMMEL: I'll tender this to plaintiff's
12 counsel. I'll have the entire packet photocopied afterwards
13 and marked as Defendant Three (3).
14    MR. MANN: (Reviews documents.) No objection.
15    (Defendant's Exhibit Number 3 marked.)
16    Q   (Mr. Schammel) I'm looking at the page marked as
17 page one in Defendant's Three (3). Do you recall that
18 document to be an appointment sheet for your MRI? And the
19 MRI is scheduled according to that appointment as for what
20 date?
21    A   1:45, July the 5th.
22    Q   It's been a while. Could it be that your
23 recollection is off as to when the MRI was?
24    A   Pardon?
25    Q   It's been a while since the MRI. Could it be that

PAGE 31

31

1  your recollection is off as to when the MRI took place? Did
2  you have more than one MRI in this particular injury?
3     A   I've had two (2) MRIs done.
4     Q   And the results of this MRI are indicated on
5  Defendant's Two (2) with the doctor stating that as a result
6  of that MRI that his interpretation of the MRI scan was, in
7  his opinion, it is, quote, unquote, "frankly normal,"
8  referring to your knees.
9     MR. MANN: Could you read that entire -- are
10 you off ; : g the entire medical records?
11    MR. SCHAMMEL: We'll amend and ask that
12 Defendant's Two (2) be the entire packet.
13    MR. MANN: Okay. What about --
14    MR. SCHAMMEL: And for Defendant's Three (3),
15 we'll go ahead and offer the --
16    MR. MANN: The entire packet?
17    MR. SCHAMMEL: -- the entire packet. We'll
18 make copies of those at the end if you'd like to inspect
19 them.
20    MR. MANN: Okay.
21    Q   (Mr. Schammel) Did they also -- did Doctor Clark
22 also see you concerning an injury to your elbow around the
23 same time?
24    A   Yes.
25    Q   And was that related or unrelated to the alleged

PAGE 32

32

1  fall?
2     A   It was because he gave me Celebrex, and I had like
3  a -- like a little -- some kind of -- something here in my
4  elbow, and he told me that that triggered -- the medication
5  triggered that, that it got so swollen that he had to go in
6  there and do surgery on my elbow.
7     Q   And that was a foreign object that had been
8  imbedded for about a year?
9     A   Uh-huh (moving head up and down).
10    Q   Do you know how that foreign object got into your
11 elbow?
12    A   It was from a grapefruit tree that I had it there
13 for a long time and it never bothered me. When I started
14 taking the Celebrex, somehow all of a sudden it got infected
15 so bad, my elbow was huge.
16    Q   But the grapefruit tree, just for the purpose of
17 the record, was not located at the Post Office?
18    A   Oh, no.
19    Q   And it was not injured on that day?
20    A   He just said that with that medication, it was part
21 of something in the Celebrex that I was taking that triggered
22 any kind of little infection that you would have, so I had
23 surgery on my elbow.
24    Q   Did you ever refuse any types of treatment from the
25 doctor?

PAGE 33

33

1     A   No.
2     Q   Did he ever offer you cortisone injections for your
3  knee?
4     A   Yes.
5     Q   Did you accept those cortisone injections?
6     A   Yes. I've been taking them.
7     Q   And was that Doctor Clark, or was that Doctor --
8  what was -- Doctor Garcia that -- or Doctor Garza, rather?
9     A   Doctor Clark.
10    Q   And what was the result of the injections that you
11 had?
12    A   Swellingness, fluid.
13    Q   Had you ever injured your knees prior to that day
14 of November 17th, 1999?
15    A   One time that I fell, but --
16    Q   Where was that?
17    A   -- not severely. It wasn't -- where was that?
18    Q   Yes.
19    A   It was about two (2) or three (3) years before this
20 fall.
21    Q   Two (2) or three (3) years before when?
22    A   Before this previous fall.
23    Q   And where did you fall at?
24    A   At the School District.
25    Q   And what was the nature of the injury at that time?

PAGE 34

34

1    A   Waxed floor.  They had waxed the floor.
2    Q   And when you fell, how did you fall that time?
3    A   I fell on my side.
4    Q   Do you recall being injured on or about August 8th
5  -- or August 5th of 1999, specifically your knees?
6    A   I fell once before, but I don't remember the date.
7    Q   Well, the August 5th date that I'm quoting -- that
8  I'm mentioning to you is approximately three (3) months prior
9  to your fall in the Post Office.  Did you fall and injure
10 your knees at any other time prior to that?  You mentioned
11 one that was three (3) years earlier.
12   A   No.
13   Q   So the only other time was the time at the school?
14   A   Right.  I don't remember dates.
15   Q   Were you in the school for business at the time
16 that you fell?
17   A   Yes.
18   Q   And were you working at that same job at the time
19 you fell?
20   A   Yes.
21   Q   Do you remember the doctor that you saw for that
22 injury?
23   A   No, I don't.
24   Q   Did you see a doctor for that injury?
25   A   Yes.

PAGE 35

35

1    Q   Did they prescribe any medication, any physical
2  therapy for you?
3    A   I went for about two (2) weeks, and that's it.  I
4  was still working.  I didn't take time off.
5    Q   What was your injury to at that particular time?
6  Did you injure your hip, your knee, your ankle, your elbows?
7  Do you recall what you injured?
8    A   They just wanted me to go for precautions, that I
9  wasn't --
10   Q   Who is "they?"
11   A   The School District.  They're very strict about
12 those things.  They send you right away, and I told them,
13 "I'm fine."  I was working still, but they still wanted me to
14 be fine so they sent me to physical therapy.
15   Q   Did you have --
16   A   I just went like two (2) weeks or so.
17   Q   -- much pain?
18   A   Not really.  I kept telling them that I was fine.
19 I said I was working and everything, but they just don't want
20 anything to come back to them, you know, afterwards.
21        MR. SCHAMMEL: I'll tender Defendant's Four
22 (4) to plaintiff's counsel.
23        MR. MANN: (Reviews documents.)  You're
24 offering it all?
25        MR. SCHAMMEL: The entire document, yes.  And

PAGE 36

36

1  we'll just substitute copies at the end.
2        MR. MANN: Okay.  No objection.
3        MR. SCHAMMEL: I'll also tender them to Mr.
4  Almaguer who is also --
5        MR. ALMAGUER: No objection.
6        (Defendant's Exhibit Number 4 marked.)
7    Q   (Mr. Schammel) You said you didn't have much pain?
8    A   No.  They told me they wanted to make sure that I
9  was fine.  That's what they recommended, and they made me go.
10   Q   The documents in your record indicate that your
11 pain in the right knee was a seven (7) on a scale of one (1)
12 to ten (10), and the pain in your left knee was a four (4) on
13 a scale of one (1) to ten (10) on just this specific date.
14 There were other days also.
15   A   The day that I go --
16   Q   Seven (7) -- this was during the course of your
17 physical therapy treatment.  Seven (7) would seem to be a bit
18 extreme.  It didn't bother you, though?
19   A   I had pain, but I was walking.
20   Q   How bad was the pain?  There, you say it was seven
21 (7) of ten (10).  How severe is seven (7) of ten (10)?
22   A   I don't know what they put down, but I just was
23 going, you know...
24   Q   This is records that were made according to your
25 medical treatments and the statements you gave receiving your

PAGE 37

37

1  medical treatment.
2        MR. MANN: Objection.  That calls for facts
3  not in evidence.  There is no evidence that this is
4  information she provided to them.  It's information that they
5  wrote down as part of their notes.
6    Q   (Mr. Schammel) "Patient reports when the pain
7  increases, she needs pain meds.  Pain -- Rates pain as seven
8  (7) of ten (10)."  Seven (7) of ten (10) is fairly severe.
9  but you say a few minutes ago it didn't bother you.
10   A   I don't know what they put down, but I...
11   Q   And when you went to see both Doctor Clark your
12 initial treating physician, neither one of those you
13 indicated you had ever fallen three (3) months prior to your
14 November fall in the Post Office; is that correct?
15   A   I don't know if they even asked me that.  The
16 doctor, you mean?
17   Q   Wouldn't you think that the fact that you had
18 fallen and injured yourself three (3) months prior and had
19 received medical treatment and rated the pain as seven (7) of
20 ten (10), don't you think that might help them in treating
21 you?
22   A   They didn't ask me anything.
23   Q   And you didn't feel it was necessary to tell them
24 anything about your medical condition?
25   A   Because I was fine.

PAGE 38
38

1   Q   Even though you had continuing pain throughout the
2   entire course of treatment for that August fall in the
3   school?
4           MR. MANN: Objection. asked and answered.
5   Q   (Mr. Schammel) You can answer the question.
6   A   The Doctor Clark never asked me anything. I was
7   fine. I was treated for a little while. I was walking fine,
8   so I didn't -- he didn't ask me anything.
9   Q   In each of the reports, and you're free to review
10  these, you say that your knees continue to hurt. But it's
11  your testimony today that they really didn't bother you at
12  all? Yes or no?
13  A   Which time are you talking about?
14  Q   The -- your fall in August on the school floors.
15  A   I was fine. I never missed work. I was there
16  every day.
17  Q   Did you make all of your appointments for your
18  treatment?
19  A   Not really because I didn't really want to go.
20  Q   Did you ever follow up with the doctor at the end
21  of the treatment?
22  A   No. Risk Management is the one that made me go.
23  Q   Does it surprise you that according to your medical
24  records that the injuries are quite similar, if not almost
25  the same as you had later?

PAGE 39
39

1           MR. MANN: Objection.
2   A   No.
3   Q   (Mr. Schammel) It doesn't surprise you?
4   A   It's not the same.
5   Q   How is it not the same?
6   A   Because I was walking. I never missed work. I
7   didn't have surgery. I didn't have, you know, anything
8   severe. I mean, anybody can slip and fall and keep walking.
9   Q   You mentioned earlier a form that the Post Office
10  was supposed to send to you. Did they eventually send that
11  to you?
12  A   Yes, they did.
13  Q   And did you submit that to your medical providers?
14  A   No. It was a form for them to file an accident
15  report. That's what it was.
16  Q   What day did you retain counsel?
17  A   I don't remember.
18  Q   Do you remember the year and the month or the --
19  yes. Do you remember the year and the month?
20  A   That I got the form?
21  Q   That you hired an attorney.
22  A   Oh. I don't remember exactly the date.
23  Q   Do you know what year it was?
24  A   I don't remember. It's been taking too long. I
25  don't remember.

PAGE 40
40

1   Q   How long after the injury? A week? A month? Four
2   (4) months? A year? Your best estimate.
3   A   I can't think right now. I'm not sure.
4   Q   When you fell in August, did they ever x-ray you.
5   do an MRI, ultrasound, anything?
6   A   No.
7   Q   Basically, if I understand you correctly, all that
8   happened in August was they looked at your knee and sent you
9   -- gave you some medicine and sent you off to physical
10  therapy?
11  A   Yes.
12  Q   You stated earlier you had two (2) MRIs. One, we
13  know, according to your records, was in July. When was the
14  other one?
15  A   I just took that one a few months ago.
16  Q   Since apparently -- since the time that we've
17  gotten these records, I assume?
18  A   Yes.
19  Q   Part of your continuing treatment?
20  A   Yes.
21          MR. SCHAMMEL: Is that one of the additional
22  packages we'll be receiving?
23          MR. MANN: Yes.
24          MR. SCHAMMEL: Okay. Thank you.
25  Q   (Mr. Schammel) What was the doctor's -- in your

PAGE 41
41

1   recollection. what was the doctor's position on surgery? Was
2   it definitely needed? Did he advise for it, against it? Did
3   he simply say. "It's an option." and you made a selection?
4   A   He said with arthroscopic surgery or something,
5   that's the only way he could find out how my knees had been -
6   - because to him, it looked like the cartilage was damaged,
7   but he wanted to make sure. And then he showed me a graph of
8   how it had put back together again, and he had to go in there
9   and shave it. And my left knee had torn cartilage -- I mean,
10  ligaments. He said some of those things don't even show up
11  in an MRI or an x-ray, so he recommended that arthroscopic
12  surgery.
13  Q   This is the same Doctor Clark who described your
14  knees as normal according to the report?
15  A   I guess, because I told him, "I'm in pain."
16  Q   You only saw one Doctor Clark; is that correct?
17  A   Yes. That's the only doctor I've seen. (Long
18  pause.) (Inaudible.)
19  Q   Excuse me?
20  A   The after surgery results, I'm sure he has
21  something there too, what he found.
22  Q   How many times did you get steroid injections?
23  A   I don't remember.
24  Q   Do you know if it was once or more than once?
25  A   I don't remember. Are you talking about cortisone?

C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 42

42

1    Q    Yes. You're not sure if it was more than once?
2    A    I got them once. And he told me that if I
3    continued, to go back. And sometimes they last six (6)
4    months, sometimes more, sometimes three (3). It depends.
5    Q    It was just the one time that you got them before
6    the surgery?
7    A    That was after the surgery. I kept having
8    problems. When I climb stairs, my knees get real swollen.
9    Q    In Defendant's Two (2), it states that you did --
10   you were offered one, although the doctor doesn't state
11   whether or not he gave you one in August, August 7th of 2002.
12   You did not receive one on that date prior to having surgery?
13   A    I believe I did. I'm not certain right now.
14   Q    Your husband was present at that time. Do you
15   remember if that was the same day?
16   A    He went with me several times.
17   Q    Your pay now, are you making approximately the
18   same. or are you making less than what you made before?
19   A    My pain?
20   Q    Your pay, your salary.
21   A    Oh. I'm making less now. I had to start over.
22   Q    And what is your position at the bank?
23   A    Loan Operations.
24   Q    And since your divorce, have you remarried --
25   A    No.

PAGE 43

43

1    Q    -- or are you still unmarried?
2    A    I'm still unmarried.
3         MR. SCHAMMEL: Pass the witness.
4    BY MR. ALMAGUER (2:18 p.m.):
5    Q    Ms. Longoria, good afternoon. My name is Pablo
6    Almaguer.
7    A    Good afternoon.
8    Q    I'm sorry I did not recognize your name initially,
9    but it's changed sometime here in the last -- I represent Ms.
10   Olivarez, Elena Olivarez. Do you know who she is?
11   A    Yes.
12   Q    You were in fact present at the deposition that
13   they took of her; isn't that correct?
14   A    Yes.
15   Q    Let me ask you a few questions following up on what
16   Mr. Schammel here asked. I'd ask you to speak loud enough so
17   that she can hear you. If you don't understand the question,
18   let me know.
19   A    (Moving head up and down.)
20   Q    And please don't nod like you did right now. Just
21   say "yes" or "no" --
22   A    Yes.
23   Q    -- please so that she can record it. If you don't
24   understand a question, let me know. I'll repeat it. If you
25   can't hear it, let me know too. You mentioned on the day of

PAGE 44

44

1    the accident, November 12th, 1999, you noticed that it was
2    dark and maybe some lights were out; is that correct?
3    A    That's correct.
4    Q    Did you notice that when you went in to the Post
5    Office?
6    A    I said I didn't notice that at the time.
7    Q    When did you notice it?
8    A    When the lady told me, the custodian, when I fell.
9    Q    You also mentioned that you went and -- you went
10   over to the hallway, opened up the P.O. box, and you looked
11   through your mail. Isn't that correct?
12   A    That's correct.
13   Q    How big, how -- what's the size of that Post Office
14   box door that you have there? Is it a big one, a small one?
15   A    It's a small one.
16   Q    Is it a key or combination type?
17   A    Key.
18   Q    Did you have any problems putting that key into
19   that box?
20   A    No, sir.
21   Q    You were looking through your letters. You were
22   looking to see who the letters were from or what they were?
23   A    Yes.
24   Q    So you had enough lighting to put the key into that
25   box. You had enough lighting to look through your mail; is

PAGE 45

45

1    that correct?
2    A    I was looking for a particular piece of mail, so I
3    just scanned through it.
4    Q    My question again was, you had enough light to put
5    that key in the box; right?
6    A    Yes.
7    Q    You had enough light to look through the mail too.
8    Isn't that correct, ma'am?
9    A    Yes.
10   Q    Okay. Are there any windows at the Post Office
11   there, ma'am?
12   A    Yes.
13   Q    Let me show you again what has been marked as
14   Defendant's Exhibit Number One (1) here. I'm showing it to
15   you with the west side being towards you so you can read it
16   from there. Where exactly are the windows in this diagram?
17   A    Right here (indicating).
18   Q    Towards the wall on the west side?
19   A    On the west side.
20   Q    That's near the entrance; is that correct?
21   A    Yes.
22   Q    How big are those windows, if you remember?
23   A    They're big.
24   Q    So they let in a lot of light; is that correct?
25   A    They let it where you can read it.

DIANA LEAL WEIBEL, C.S.R. #4192, Box 608, Mission, TX 78573
PH: 956/580-2778  Cell: 956/330-9180  Fax: 956/580-3148

PAGE 46
46

1　Q　One of those windows in fact is right at the west
2　wall of where your box is at. Isn't that correct?
3　A　Yes.
4　Q　You also mentioned that -- and correct me if I'm
5　wrong, you mentioned, "I wasn't paying too much attention"
6　when we asked -- when you were asked about seeing the signs
7　there. Isn't that correct?
8　A　I didn't see the sign.
9　Q　But the question was. ma'am, again, you stated, "I
10　wasn't paying attention" when you were asked if you saw the
11　sign. Is that a correct statement of what you said?
12　A　Yes.
13　Q　You also later on said that you're "not too
14　observant." Isn't that correct?
15　A　I said I wasn't observant because I was wanting to
16　get my mail and get to work.
17　　　　MR. ALMAGUER: Objection, nonresponsive.
18　Q　(Mr. Almaguer) Ma'am, I'm going to ask you a
19　question, I just want the answer back. Okay? If you want to
20　have it explained. I'm sure Mr. Mann can later on ask you and
21　you can explain that.
22　A　Okay.
23　Q　Okay? So let me ask you again. Isn't it correct
24　that you said, "I was not observant." when asked questions
25　earlier. Isn't that correct?

PAGE 47
47

1　　　　MR. MANN: Objection. The question -- if we
2　could have the question and answer read from the depo?
3　Otherwise. it assumes facts not in evidence.
4　　　　MR. ALMAGUER: I won't spend any time on that.
5　We'll go on to the next question then at this point.
6　Q　(Mr. Almaguer) You also mentioned you went home
7　and you changed after this accident. Is that correct, ma'am?
8　A　Yes.
9　Q　Why was that. ma'am?
10　A　Because I tor・, ・ nose.
11　Q　Oh, okay. I didn't know about that. You also
12　mentioned when you walked in there. you didn't see a sign.
13　You also didn't see the mop bucket around there somewhere.
14　ma'am?
15　A　No.
16　Q　You also didn't see Ms. Olivarez until -- or after
17　you fell; is that correct?
18　A　I knew someone was there, but I didn't look.
19　Q　As soon as you turned --
20　A　Yes, when I fell.
21　Q　When you fell. you knew somebody was there; is that
22　correct?
23　A　Right.
24　Q　But not when you were walking in; is that correct?
25　A　No.

PAGE 48
48

1　Q　But you're saying, and you earlier pointed to the
2　diagram, that Ms. Olivarez was mopping towards the east wall
3　of that corridor; is that correct?
4　A　Yes, because I felt somebody go by when I was
5　checking my mail, towards my back.
6　Q　Okay. So you did notice her then?
7　A　I felt somebody go by, but I was looking at my
8　mail. I didn't turn to look. I thought it was somebody
9　checking their mail.
10　Q　And you didn't see Ms. Olivarez using the mop
11　bucket or putting the sign or at the entrance when you were
12　coming in?
13　A　No.
14　Q　Ma'am, do you mop at your house?
15　A　Yes.
16　Q　When you mop, do you mop forward, walking forward,
17　or do you mop walking backwards?
18　A　I don't have a certain way.
19　Q　Isn't true, ma'am, on this day when you fell down,
20　actually Ms. Olivarez was walking back and almost bumped into
21　you when you fell down? Isn't that true?
22　A　No.
23　Q　Isn't it true, ma'am, that when you fell down, Ms.
24　Olivarez asked you, "Can I help you," or, "Do you need any
25　help getting up?" Isn't that correct?

PAGE 49
49

1　A　No. She didn't offer.
2　Q　Isn't it true, ma'am, that when you got up, you
3　said, "This always happens to me?" Isn't that true?
4　A　No, that's not true.
5　Q　After the accident, did you stop and talk to
6　anybody there, ma'am, immediately?
7　A　No.
8　Q　There weren't any individuals at the table at the
9　corner of the Post Office there?
10　A　No, nobody.
11　Q　Nobody?
12　A　Nobody.
13　Q　When you fell in August of '99, according to the
14　reports here, you fell on both of your knees; is that
15　correct?
16　A　In August? No.
17　Q　Of '99?
18　A　No, not on my knees. I fell to my side.
19　Q　On your side?
20　A　(Moving head up and down.)
21　Q　Did you hurt your left knee at that time?
22　A　No.
23　Q　What side did you fall to when you fell back in
24　August of '99, left or right side?
25　A　I just remember falling. I can't remember where.

PAGE 50

50

1  Q  You don't remember anything about August of '99?
2  A  I remember falling.
3  Q  You don't remember which side?
4  A  No.
5  Q  But you do remember the lights were out in
6  November, '99?
7  A  Yes.
8  Q  You remember that you were wearing -- you remember
9  other specifics in November, '99, but not of August, '99; is
10 that correct?
11 A  I don't understand what you mean.
12 Q  I'm saying that it's three (3) months apart, and
13 you're pretty specific in the facts of November of '99, so
14 your recollection at this point is clear as to the fall of
15 November of '99 than what your fall of August of '99; is that
16 correct?
17 A  By specifics, I know I fell. But how I fell, I
18 don't remember how I fell.
19 Q  Why can't you remember the fall in August of '99,
20 ma'am?
21 A  Because I kept telling them, "I'm fine," you know.
22 I was okay. I was hurting, yes, and everything. But I knew
23 nothing was broken. I picked up myself.
24 Q  So you thought nothing was wrong at that point?
25 A  It was hurting, but I told them I didn't want to go

PAGE 51

51

1  to the doctor. They made me go.
2  Q  Was it a Worker's Comp referral to the doctor?
3  A  Risk Management was the one that sent me. I never
4  got Workman's Comp or anything. I kept working.
5  Q  And this is the doctor they told you to go, not one
6  you chose; is that correct?
7  A  No, I didn't choose him.
8  Q  Okay. In November of '99, November 12th of '99
9  when you fell down at the Post Office, did anybody help you
10 get up at '. time?
11 A  The custodian did when I asked her if she could
12 please help me.
13 Q  Okay. Did you tell her anything else when you fell
14 down at that time?
15 A  No.
16 Q  You didn't ask her if she had mopped there?
17 A  Well, I saw her with a mop. And then she said,
18 "Well, didn't you see the floor was wet?" And I said, "No, I
19 didn't."
20    MR. ALMAGUER:  No questions. I'll pass the
21 witness.
22    MR. MANN:  Reserve all my questions for trial.
23 BY MR. SCHAMMEL (2:26 p.m.):
24 Q  Before. when Mr. Almaguer asked you to identify the
25 windows. are those the windows that are annotated on

PAGE 52

52

1  Defendant's Exhibit Number One (1)? Where it says "Windows."
2  is that the approximate location?
3  A  Yes.
4  Q  And those are the ones that are written onto the
5  document. just so that we'll be sure for the purposes of the
6  record?
7  A  Yes.
8  Q  You stated that you knew somebody passed behind
9  you, but you didn't really see who they were?
10 A  No.
11 Q  So you just got that impression that somebody walks
12 by?
13 A  Yes.
14 Q  And that you could tell that they were doing
15 something down at the end of the --
16 A  Right.
17 Q  Could you tell she was mopping?
18 A  No, I didn't, because since I didn't turn --
19 Q  Could you tell if she was -- could you tell if she
20 had started right next to you and moved towards there, or
21 could you tell if she was farther away and started getting
22 closer?
23 A  I felt someone go by to that corner.
24 Q  Okay.  They go back to the corner?
25 A  Behind, yes.

PAGE 53

53

1  Q  And according to Defendant's One (1), the corner
2  would be basically where it says, "Location of custodian?"
3  A  Yes.
4  Q  And once that person passes by you, how much longer
5  were you there? A minute, two (2) minutes, maybe five (5) or
6  ten (10)?
7  A  No.  Probably a minute.
8  Q  You were almost done reading your mail by that
9  point?
10 A  Uh-huh (moving head up and down).
11 Q  And you turn and you fall, and that person is right
12 next to you?
13 A  Well, a little distance.
14 Q  A little distance.
15 A  About three (3) feet, maybe. Maybe more. I don't
16 know. It's the very corner.
17 Q  Could you -- at that last minute you were standing
18 there. you couldn't tell -- you couldn't gather any movement
19 whether they were coming from those mailboxes at the very end
20 or towards those mailboxes and she started mopping back
21 towards you?
22 A  She was, I know, like going behind me. She was
23 already mopping like that. And she was waiting for me to get
24 out of my little spot probably to finish her mopping, because
25 she was standing like this with the mop (indicating).

PAGE 54

54

1 Q And when you turned, you basically just -- as you
2 stated earlier, you just turned to the right, and you started
3 walking towards those windows?
4 A Yes.
5 Q So if she walked behind you and was waiting for you
6 and she was mopping at that closed end, how did you fall on
7 the water where she hadn't mopped?
8 A Where she hadn't mopped? It was wet. When I
9 turned, it was wet.
10 Q But you never noticed her to your right? You
11 noticed her to your left?
12 A I didn't turn to the -- I didn't turn to look. I
13 was looking at my mail.
14 Q But you knew that she walked behind you?
15 A Yes.
16 Q And you knew that she was somewhere off to your
17 left, not exactly sure where, but she was somewhere to the
18 left?
19 A Yes.
20 Q You never noticed her to the right?
21 A I knew someone was there. I didn't know it was a
22 custodian.
23 Q To your right, towards the windows. Between you
24 and the windows, somebody was there?
25 A Somebody went by.

PAGE 55

55

1 Q Okay. Let's make sure just so we understand.
2 You're facing the mailbox on the south wall, and somebody
3 comes behind you?
4 A Yes.
5 Q And they come down to this end on the east wall?
6 A Yes.
7 Q You then turn, and you face the windows and you
8 start walking towards the west wall because you're going to
9 leave and go to work?
10 A Yes.
11 Q And as you turn to leave to go to work, you fall
12 down?
13 A Yes.
14 Q And when you fell down, the only people that you
15 saw in that Post Office were yourself and Mrs. Olivarez, the
16 cleaning lady?
17 A Yes.
18 Q And we already know that she was at the other end,
19 so there was nobody between you and the window; correct?
20 A No, sir.
21 Q And you had enough perception to realize she walked
22 behind you in what you said was a fairly wide hallway, but
23 you had no perception of anybody to your right, only to your
24 left?
25 MR. MANN: Objection to the form of the

PAGE 56

56

1 question. It's a compound question.
2 Q (Mr. Schammel) Do you understand the question?
3 A No.
4 Q You said earlier the hallway was wide; correct?
5 A It's not very wide, but not enough to --
6 Q It was bigger than if you held out both your hands,
7 you said you couldn't touch both sides?
8 A I would say maybe ten (10) feet. I'm not sure.
9 Q So in a ten (10) foot hallway, you're at the
10 mailbox. Are you reaching into the mailbox?
11 A Yes.
12 Q So you're not too far from the wall; correct?
13 A No.
14 Q So that leaves, if it's about a ten (10) foot
15 hallway, you're a couple of feet from the mailbox?
16 A I'm not sure how wide it is. I didn't measure.
17 Q Could somebody -- is there enough room for two (2)
18 people to walk next to each other?
19 A Yes.
20 Q Three (3) people?
21 A I don't know about three (3) people, but...
22 MR. SCHAMMEL: I'm going to tender to
23 plaintiff's counsel -- I think we're at Defendant's Five (5)
24 now. If we can go ahead and have that marked? And while
25 we're doing this, I'll go ahead and tender Defendant's Six

PAGE 57

57

1 (6) also.
2 (Defendant's Exhibit Numbers 5 and 6 marked.)
3 Q (Mr. Schammel) How many -- when you walk into the
4 Post Office, you step through the front door and you're in a
5 hallway.
6 A Uh-huh (moving head up and down).
7 Q Which way does that hallway go? Does it go along
8 the front of the building, or does it go to the back of the
9 building?
10 A It goes to the back.
11 Q The -- looking at this diagram, Defendant's One
12 (1), you walk through the door. Is this the main lobby area?
13 A Yes.
14 Q It runs north and south? It parallels the front
15 wall of the building?
16 A Yes.
17 Q And there's two (2) hallways that come off of that;
18 correct?
19 A Yes.
20 Q Are both of those hallways identical, or is one
21 different from the other?
22 A They're different. This is very small.
23 Q And the small hallway, if you look at Defendant's
24 Six (6), at the bottom of the page, there's a picture of the
25 front door. And at the top of the page, there's a picture of

PAGE 58

58

1  a small hallway with large boxes. Is that --
2      A   Which is this one right here (indicating).
3      Q   The first one as you come in?
4      A   Yes.
5      Q   Which is not the hallway that you walked out?
6      A   No.
7      Q   If you look to Defendant's Five (5), we see a
8  longer hallway with lots of small boxes. Is that the hallway
9  you were in?
10     A   Yes.
11     Q   In this picture right here, how many lights are on,
12 can you see on the ceiling?
13     A   Two (2).
14     Q   And is this a partial right there (indicating)?
15     A   I think so.
16     Q   Were all of those lights non-functioning?
17     A   They weren't functioning at all.
18     Q   But it was good enough that you could see to put
19 your key in the slot and good enough that you could at least
20 identify the particular letter you were looking for?
21     A   Oh, yes. But, you know, it's on that far corner
22 over there, so...
23     Q   And at the very end of that picture on the bottom
24 of Defendant's Five (5), in the very back, that's where Ms.
25 Olivarez, the custodian, was?

PAGE 59

59

1      A   Yes.
2      Q   And your Post Office box, is it about halfway down
3  that hallway or --
4      A   Further down.
5      Q   Further down?
6      A   Uh-huh (moving head up and down). Yes.
7      Q   Now, you stated that after that fall in August, you
8  said you knew you were okay, nothing was broken?
9      A   Yes.
10     Q   As a result of the fall of November the 12th where
11 you sought medical attention five (5) days later on the 17th,
12 the reports indicate that there was a tear in the ligament,
13 but there's nothing broken there. How did you know there was
14 a difference?
15     A   How did I know there was a difference?
16     Q   Well, you stated the reason you weren't concerned
17 the first time is because you knew nothing was broken.
18 Nothing was broken the second time either.
19     A   I was hurting very much. I was swollen. I was
20 very swollen.
21     Q   And in accordance with the statements you gave for
22 your medical treatment, you said you were receiving a pain
23 level of seven (7) out of ten (10) during that first fall in
24 August?
25     A   I was sore, yes. They gave me pain killers, and I

PAGE 60

60

1  was fine.
2      Q   In fact, the injury you received in the November
3  fall, they couldn't even detect anything until they did
4  surgery; is that correct?
5      A   (No response.)
6      Q   If you'd like, I can show you the medical records
7  that he use during your treatment or -- would you like to
8  look at those?
9      A   Yes.
10     Q   The first three paragraphs on this page
11 (indicating). Take your time.
12     A   (Witness reviews documents.)
13         MR. MANN:  Are you asking her to read this
14 document --
15         MR. SCHAMMEL:  Just to --
16         MR. MANN:  -- to the record?
17         MR. SCHAMMEL:  No, just to refresh her own
18 memory. She couldn't recall, so...
19         THE WITNESS:  (Witness reviewing documents.)
20         MR. MANN:  Do you understand the question?
21     Q   (Mr. Schammel)  Her doctor basically said he
22 couldn't see anything on the MRI.
23     A   Right.
24     Q   And that he thought if he did the arthroscopic
25 surgery, he might see something.

PAGE 61

61

1      A   Right.
2      Q   But going back to that first fall in August, we
3  have no idea of what injuries occurred because they didn't
4  even do an x-ray, a sonogram or an MRI, let alone an invasive
5  procedure; correct?
6      A   All I had was physical therapy.
7      Q   So if you had an injury this time that the only way
8  they found it was doing surgery, how could you be sure you
9  weren't injured the first time?
10         MR. MANN:  Objection, it's argumentative.
11 Calls for an expert opinion.
12     Q   (Mr. Schammel)  Go ahead and answer the question.
13     A   What was the question?
14         MR. SCHAMMEL:  Could we have the question re-
15 read, please?
16         [Reporter's Note:  Requested portion was
17 read.]
18     Q   (Mr. Schammel)  If you know.
19     A   How could I be sure I was not injured the first
20 time?
21     Q   You're not a doctor; correct?
22     A   Because I felt fine.
23     Q   Even though you were receiving pain that you
24 described as above-average pain?
25     A   Well, at the time, yes. I was in pain. But I got

C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 62

62

1 pain killers, and I was fine afterwards. I kept telling
2 them, "I feel fine."
3    Q    And this was the same injury that you felt had no
4 relevance to your future treatment for the November accident?
5    A    (No response.)
6    Q    You felt that there was no reason at all to ever
7 tell anybody, "Hey, I've got a -- I fell. I hurt myself.
8 You need to know that so you'll know what to do when you
9 treatment me." You never told the doctors about it?
10    A    I felt fine. That's why I -- I was fine. He
11 didn't ask anything. I never even thought about it, you
12 know.
13    Q    In your response to the discovery issued by Ms.
14 Nancy Masso, the attorney who handled my portion of the case
15 before I started on it, you mentioned doctors visits all the
16 way back to 1989, and some car accidents you had been into, I
17 believe in 1991. But you never bothered to mention the
18 August of 1999 injury?
19    A    To whom?
20    Q    To my office as a response to the discovery that we
21 served upon you.
22    A    I didn't know what was going on --
23           MR. MANN:  Can you read the question and
24 answer on that?
25           MR. SCHAMMEL:  (Reviews documents.)  "Have you

PAGE 63

63

1 ever been involved in an accident of any nature?  Please
2 state the date, the location, the names and the other parties
3 involved in each accident.  In addition, if you sustained
4 injuries as a result of an accident identified herein,
5 describe in detail the nature of said injuries."  Answer:  "I
6 was in an automobile accident in 1988 whereby I rear-ended a
7 car that had no tail lights.  I suffered a cracked sternum.
8 No claim was filed.  The other driver had no insurance.
9           Paragraph Two (2):  "I was in an automobile
10 collision in 1994-95 whereby I was rear-ended by Emilia
11 Montemayor.  I suffered from whiplash injuries for which I
12 received physical therapy.  A claim was filed against Mrs.
13 Montemayor's insurance company.  My attorney was Laura -- "I
14 believe it's "Mafrige."  And that was it.
15           Interrogatory Five (5):  "Prior to the
16 accident at issue, did you ever suffer any injury to your
17 body.  If so, please state.. a. the nature of each injury and
18 the portion of the body injured, b., the date of injury, and
19 c., the name and address of attending or treating doctor in
20 each injury."  Answer:  "As I stated in the previous
21 interrogatory, I suffered a cracked sternum and whiplash.  I
22 do not recall the doctor who was seen for these injuries or
23 the exact date that they occurred."
24           MR. MANN:  We'll supplement our discovery.  I
25 think we included the doctors themselves and the treating

PAGE 64

64

1 physicians.  We may have just left it off of that, those
2 requests.  We'll supplement our discovery responses.
3           MR. SCHAMMEL:  Thank you.
4    Q    (Mr. Schammel)  You, in that instance, you did list
5 the doctor, but you still -- and you never bothered to
6 mention that you had seen another doctor for an injury that
7 was similar?
8    A    Bothered to tell what?  I don't know what you mean.
9    Q    In November -- on November 17th of 1999, you knew
10 who the doctor was who treated you three (3) months earlier;
11 correct?
12    A    I don't remember who the doctor was.  I know it's a
13 physical therapy thing, but I didn't know -- I don't
14 remember.
15           MR. SCHAMMEL:  I'll tender Defendant's Seven
16 (7) to plaintiff's counsel for review and examination and
17 move that it be entered.  What we'll do is, once again, I'll
18 submit photocopies immediately hereafter.
19           MR. MANN:  You're offering the whole thing?
20           MR. SCHAMMEL:  I'm offering the whole thing.
21           MR. MANN:  (Reviews documents.)  No objection.
22           MR. ALMAGUER:  (Reviews documents.)  No
23 objection.
24           (Defendant's Exhibit Number 7 marked.)
25    Q    (Mr. Schammel)  The doctor you saw on that

PAGE 65

65

1 particular time was a Doctor -- and forgive me if I
2 mispronounce his name -- Prasad Movva, M-o-v-v-a.  Do you
3 remember that doctor?
4    A    For what?
5    Q    For your injury that you suffered in August of
6 1999.
7    A    Is that a doctor?  I don't remember the name of
8 him.
9    Q    If you'll look at pages twenty-three (23) and
10 twenty-four (24), your treating physician?
11    A    (Witness reviews documents.)
12    Q    And in fact, in response to your interrogatories,
13 you didn't include his name.  Do you remember that doctor?
14           MR. MANN:  We did list San Benito Medical
15 Associates as the treating office.
16           MR. SCHAMMEL:  Okay.
17    A    (Witness reviews documents.)  I just had muscle
18 relaxers.  That's about it.
19    Q    (Mr. Schammel)  But you don't remember that doctor?
20    A    It sounds familiar.  I remember the name now.  But
21 at the time, I mean, like I said, he -- they were taking care
22 of all this.
23    Q    "They," being?
24    A    The School District.  But they're the ones who
25 referred me to go.

PAGE 66

66

1   Q   Do you recall as you're leaving where that yellow
2   sign was?  Looking at the document that your attorney or
3   someone in his office prepared, Defendant's Exhibit Number
4   One (1), it indicates it was to the left as you came in the
5   door.  However, looking at Defendant's Six (6), in both the
6   pictures, you can see it not where it's located here, but by
7   this other corner.  And I'll label the location of
8   Defendant's Six (6).  (Counsel marks on Exhibit 1.)
9            MR. SCHAMMEL:  I'll ask to re-offer.
10           MR. MANN:  No objection.  You're writing that
11  down as the location of the sign when the picture taken in
12  Defendant Exhibit Six (6) was taken?
13           MR. SCHAMMEL:  Yes.
14           MR. MANN:  When was taken?
15           THE WITNESS:  That was taken later.
16   Q   (Mr. Schammel) But that's the same location --
17  that is the same location that was testified to by Ms.
18  Olivarez as having been the location placed?
19           MR. MANN:  Objection, it assumes facts not in
20  evidence.  I don't think that's correct either.
21   A   It was right on the --
22           MR. MANN:  I think Ms. Olivarez testified that
23  after this incident, she moved it and started placing it
24  there.
25   Q   (Mr. Schammel)  In accordance with Deposition

PAGE 67

67

1   Exhibit Two (2), she listed the sign in her testimony as
2   having been placed in the same location as pictured in
3   Defendant's Six (6).  If that is her testimony, which of
4   those two locations would be the correct location?
5    A   This one right here (indicating).  The door -- it
6   was right by the door.  You see over here the office.
7    Q   The one that is just to the left of the door as you
8   come in?
9    A   Yes.
10   Q   Not the one that we would see that is also
11  referenced is our Defendant's Six; is that correct?
12   A   That's correct.
13   Q   What time did you go to work this morning?
14   A   8:00 o'clock.
15   Q   And as you're driving to work, what path do you
16  take?
17   A   107 to Combes, and then Commerce.
18   Q   So you head down east down 107 to Combes, and then down
19  to Commerce?
20   A   Yes.
21   Q   And as you're traveling on 107, you're traveling
22  east; correct?
23   A   Yes.
24   Q   Same direction the sun rises?
25   A   That's correct.

PAGE 68

68

1    Q   How well were you able to see this morning?
2    A   Actually, it was foggy today.
3    Q   How about Friday?
4    A   Friday, sometimes the sun is bright.  Now with the
5   time change, of course...
6    Q   And we're almost four (4) years to the day of your
7   fall; is that correct?
8    A   Uh-huh (moving head up and down).
9    Q   But there was fairly ample light, given there is no
10  fog, at approximately 8:00 a.m. this morning?
11   A   (No response.)
12   Q   If there is no -- at 8:00 o'clock in the morning --
13  was there fog on the day that you went to the Post Office and
14  fell?
15   A   No.
16   Q   Friday, was there any fog as you drove into work?
17   A   Friday, I don't think so.  I don't think there was
18  fog.
19   Q   Was it fairly light when you were driving in?
20   A   Yes.
21   Q   The sun had been up for a while?
22   A   I go later now than before.  Before, I used to go
23  in at 7:30.
24   Q   But there was more than ample light this morning --
25  or excuse me, on Friday?

PAGE 69

69

1    A   There was, yes.  I leave a quarter 'til 8:00.
2            MR. SCHAMMEL:  Pass the witness.
3   BY MR. ALMAGUER (2:52 p.m.):
4    Q   Just a few follow-up questions, ma'am.  The
5   accident happened on November 12th of 1999, and you stated
6   earlier you were married about a month later; is that
7   correct?
8    A   Yes.
9    Q   That marriage, where did you have your ceremony or
10  where did you celebrate that marriage?
11           THE WITNESS:  (To counsel.)  What does that
12  have to do with it?
13   Q   (Mr. Almaguer)  Please answer the question, ma'am.
14   A   We got married in Las Vegas.
15   Q   Did you travel over there?
16   A   We flew.
17   Q   Okay.  Was it a flight or you drove?
18   A   A flight.
19   Q   I'm sorry.  It was a flight, yes.  How much time
20  did you spend over there?
21   A   About three (3) days.
22   Q   Was there any kind of pain involved when you
23  traveled over there, when you were over there?
24   A   Yes.
25   Q   But you got a chance to fly to Vegas and back --

PAGE 70

70

1   A   It was a small wedding, yes.
2   Q   -- and be there for three (3) days. Isn't that
3   correct, ma'am?
4   A   Uh-huh (moving head up and down).
5   Q   Is that a yes, ma'am?
6   A   Yes.
7   Q   This was a month after the accident happened; is
8   that correct?
9   A   Yes.
10   Q   Let me show you what has been previously marked as
11   Defendant's Exhibit Number Four (4) here, these medical
12   records. Page -- bates stamp number twenty-four (24), can
13   you tell me what the title of that document is there? Can
14   you read it out loud for the record, please?
15   A   "Notification Regarding Maximum Medical Improvement
16   Or Impairment Reading."
17   Q   Do you know what that is, ma'am, what that means at
18   all?
19   A   It's how well you're doing, how you're recovering.
20   Q   Okay. So that was explained to you by someone?
21   A   No.
22   Q   And you see the address there that it was addressed
23   to you; isn't that correct?
24   A   Yes.
25   Q   Can you tell me the date there that is stated on

PAGE 71

71

1   top of the Date of Notice?
2   A   11/8/99.
3   Q   That's the Monday before the accident. Isn't that
4   correct, ma'am?
5   A   (No response.)
6   Q   Can you confirm that with me, ma'am? November 8th
7   of 1999, is that the Monday or four (4) days before the
8   accident; is that correct?
9   A   I suppose so, yes.
10   Q   And that was mailed over to you according to that
11   document. Isn't that correct, ma'am?
12   A   I probably -- it probably was.
13   Q   And it may be you got it the day before or the day
14   of the accident. Isn't that correct, ma'am?
15   A   What was the date of the accident?
16   Q   The day of the accident was November 12th, 1999,
17   four (4) days after that. Isn't it true you must have
18   received that notification the day before or the day of? Can
19   you answer the question, ma'am?
20   A   Yes.
21   Q   Okay.
22   A   It's says "been assigned a whole body impairment
23   rating of zero percent."
24   Q   That's what you're reading now at this point;
25   right?

PAGE 72

72

1   A   Yes.
2   Q   So it's indicating to you that you were at this
3   point, you needed no longer any more therapy. Doesn't it
4   also indicate -- or you can read this one phrase here that's
5   marked off as an "X" in that paragraph.
6   A   This one (indicating)?
7   Q   No, no. Let's see. I'm reading it upside down
8   here. "Based on this report...," can you read that sentence
9   that reads like that?
10   A   "Based on this report, you are not eligible for
11   additional income payments of any type. You continue to
12   remain and entitled to receive medical treatment related to
13   your injury."
14   Q   Okay. So that indicates you can still get medical
15   treatment. That doesn't mean you're going to get any more
16   income benefits, is that correct, according to what it says
17   there? Isn't that correct?
18   A   "Income benefits of any type?" I didn't have any
19   Workman's Comp at all.
20   Q   But you understand the maximum medical improvement
21   in this report of a treating doctor is based on Worker's Comp
22   coverage law? Do you understand that, ma'am?
23   A   No. What do you mean?
24   Q   Well, "maximum medical improvement" is a term used
25   in the Worker's Comp field. You're saying that Human

PAGE 73

73

1   Resources or Personnel sent you to this doctor; isn't that
2   correct?
3   A   That's correct.
4   Q   And they never explained to you this was actually
5   Worker's Comp they were sending you to? Did they explain
6   that to you?
7   A   No, because I never received anything.
8   Q   According to this document here though, you did
9   receive that the week of, if not the day of the accident;
10   isn't that correct?
11   A   I received my regular paycheck because I never
12   missed work.
13   Q   That's not the question I'm asking you. According
14   to that document there that's addressed to you on November
15   the 8th, 1999, you must have received that document if not
16   the day of, maybe the week of or the day before the day of
17   the accident. Isn't that correct, ma'am?
18   A   Probably so.
19   Q   And it indicates there you're not going to get any
20   income benefits, but you will continue to get medical
21   benefits. Isn't that correct, ma'am? Isn't that what it
22   states in there?
23   A   Yes.
24   MR. ALMAGUER: No further questions.
25   MR. MANN: I have a brief number of questions,

PAGE 74

74

1  and I'll reserve the majority of them. I'm just going to ask
2  a few.
3  BY MR. MANN (2:59 p.m.):
4  Q  Defendant's Exhibit One (1), what was the condition
5  of the lobby area where the location of the fall is
6  identified when you were arriving to get your mail?
7  A  It was early in the morning, so --
8  Q  What was the condition of the floor? Was it wet or
9  was it dry?
10  A  It was dry when I walked in.
11  Q  What was the condition of the floor when you turned
12  around and were leaving the lobby area?
13  A  It was wet.
14  Q  In your years of experience, which side does -- or
15  from what direction does the sun rise?
16  A  From the east.
17  Q  What are the directions of the location of the
18  windows as depicted in Defendant's Exhibit One (1)?
19  A  They're on the west side.
20  Q  What is your experience with a sun that is just
21  rising in relation to its introducing light into a window
22  that is located on the west side of a building?
23  A  Not much.
24  Q  And what time was this again were you there?
25  A  Around 7:15 a.m.

PAGE 75

75

1  Q  And what was the approximate location of the sun
2  with respect to the horizon again at this time?
3  A  Not very much. It was pretty low.
4  Q  I'd like for you to look at bates stamp twenty-four
5  (24) on Defendant's Exhibit Number Four (4). Do you remember
6  ever receiving this document?
7  A  Yes, I did receive, but I probably didn't read it
8  all because I was already finished with the two (2) weeks
9  that they gave me for treatment.
10  Q  Did you know that according to this document that
11  you could have continued to get medical treatment for any
12  knee problem that you had for free?
13  A  Yes.
14  Q  Why didn't you do that?
15  A  I felt fine.
16  Q  You didn't feel the necessity of falling again in
17  order to get extra medical benefits?
18  MR. ALMAGUER: Objection, leading.
19  A  No, sir.
20  MR. SCHAMMEL: I'll join in the objection.
21  Q  (Mr. Mann) What income benefits did you get in
22  addition to your normal wages as a result of the August fall.
23  that you remember?
24  A  None. None.
25  Q  When Mrs. -- when the custodian pointed out the

PAGE 76

76

1  "Caution-Wet Floor" sign to you, where did she indicate it
2  was located?
3  A  She said, "It's over there."
4  Q  And where was that, "Over there," if you'll point
5  to it on Defendant's Exhibit One (1)?
6  A  Over on this left-hand corner as you walk in
7  (indicating).
8  MR. MANN: Let the record reflect she has
9  pointed to the location of, in quotes, "Caution-Wet Floor"
10  sign that is on the left -- it is the left circle inside the
11  lobby area.
12  Q  (Mr. Mann) Did you read under number seventeen
13  (17), the date which you had --
14  MR. MANN: Strike that.
15  Q  (Mr. Mann) What is the date at which you received
16  maximum medical improvement according to document bates stamp
17  twenty-two (22) of Exhibit Four (4)?
18  A  It's marked, "Yes, I certify the above-named
19  employee has reached maximum medical improvement on -- " The
20  date is --
21  Q  Can you not read that?
22  A  No.
23  MR. SCHAMMEL: If counsel wants to read it, I
24  have no objection, if you can read it.
25  Q  (Mr. Mann) 9/20, 1999.

PAGE 77

77

1  A  "This date may not be prospective."
2  Q  Can you make out the signature of the doctor?
3  A  No.
4  Q  When did he sign it?
5  A  10/18 of '99.
6  Q  Why did you decide to have the surgery to find out
7  what was wrong with your knee?
8  A  My knees were getting swollen all the time, and I
9  was in pain.
10  Q  Was this different than the condition that you were
11  experiencing from your fall at school?
12  A  Yes.
13  Q  After your fall in the Post Office, did you ever
14  seek any additional medical help from any sort of doctor or
15  treating physician as would have been permitted under bates
16  stamp number twenty-four (24) of Defendant's Exhibit Four
17  (4)?
18  A  No.
19  MR. MANN: I'll reserve the rest of my
20  questions for trial.
21  MR. SCHAMMEL: I just have one or two.
22  BY MR. SCHAMMEL (3:04 pm.):
23  Q  According to Defendant's Number Four (4), bates
24  stamp twenty-three (23), the last sentence in fact, the
25  doctor had to guess that you had reached the MMI level

C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 78

78

1  because you never went in to see him to check out any
2  progress you made with regards to that injury; correct?
3        MR. MANN: Objection. That calls for facts
4  not in evidence. This document speaks for itself. If you'd
5  like to read the document and have her answer whether that's
6  what it says or not?
7    Q  (Mr. Schammel) The doctor says, according to this
8  letter, and I quote, "The patient was released to limited
9  work, but patient subsequently did not follow-up her office
10  visits. I assume the patient has reached MMI by this time."
11  So you never went back for a final office visit with this
12  doctor; did you?
13    A  I kept telling them, "I'm fine." They made me go.
14    Q  Even though your other -- your physical therapy
15  reports indicated you were still in pain, you didn't go back?
16    A  Because I was taking pain pills. You know, I was
17  fine.
18    Q  When did you stop taking pain pills?
19    A  I took them for a couple of weeks or so, and that's
20  it.
21    Q  Were you taking any in October?
22    A  No.
23    Q  A few minutes ago, you stated that when you walked
24  in, the floor was dry. When you walked out, it was wet, you
25  slipped and you fell. Correct?

PAGE 79

79

1    A  That's correct.
2    Q  Earlier you stated that you knew that someone
3  passed behind you and that they were off to your left, but
4  there was nobody to your right?
5        MR. MANN: Objection, assumes facts not in
6  evidence. It mischaracterizes her testimony.
7    Q  (Mr. Schammel) Earlier, when I asked you the
8  question earlier, I asked you if you knew that somebody
9  passed behind you. You said, "Yes," is that correct?
10    A  Y.
11    Q  You said you knew she was down to the left, but you
12  really didn't know what she was doing?
13    A  No.
14    Q  But you also stated that there was nobody between
15  you and that window; correct?
16        MR. MANN: Objection, that mischaracterizes
17  the evidence.
18    Q  (Mr. Schammel) You stated there was nobody between
19  you and that window; correct? Was there anybody else in that
20  building when you fell?
21    A  No one else. Nobody else.
22    Q  So if that person was either behind you or to your
23  left, that person was not to your right; correct?
24    A  When? When I started going back?
25    Q  When you were there reading through your mail to

PAGE 80

80

1  find that one piece of mail you were looking for, --
2    A  Yes.
3    Q  -- you knew that there was somebody that moved
4  behind you?
5    A  Yes.
6    Q  You knew that person was doing something to your
7  left?
8    A  Yes.
9    Q  And there was nobody else there? It was just the
10  two of you?
11    A  Nobody else was there.
12    Q  How did the water get immediately to your right?
13    A  She probably was mopping right behind me when I was
14  checking my mail.
15    Q  But you stated that you turned and went to your
16  right, towards that window, and you didn't go backwards, you
17  didn't left. You went to the right, the place that you say
18  there was nobody at. How did that floor get wet?
19        MR. MANN: Objection, --
20    A  When I was getting the mail --
21        MR. MANN: -- that mischaracterizes the
22  evidence. She testified someone passed by her. You have to
23  go past there to pass by her.
24    Q  (Mr. Schammel) Did she pass behind you or did she
25  pass -- did she walk next to you, the right side of you?

PAGE 81

81

1    A  I was bending down getting my mail when somebody
2  went behind me.
3    Q  Went behind you?
4    A  Yes.
5    Q  They didn't go to your right? They went behind
6  you?
7    A  Yes.
8    Q  Who went to your right and put the water on the
9  floor; do you know?
10    A  The person with the mop.
11    Q  The one that was behind you and to your left?
12    A  Exactly.
13        MR. SCHAMMEL: Thank you.
14        MR. MANN: Any more questions?
15        MR. SCHAMMEL: No further questions.
16        MR. MANN: I do. Just one re-direct.
17  BY MR. MANN (3:08 p.m.):
18    Q  How does someone pass behind you where the "X" is
19  located without going between you and the window? Is that
20  physically possible?
21    A  You've got to go in between -- well, of course not.
22  They have to go between me and the window.
23    Q  So if you were to listen to the Government's
24  attorney's question which asks how water gets between you and
25  the window, would your answer be on how a person could be --

PAGE 82
82

1      MR. SCHAMMEL: Objection, leading.
2    Q  (Mr. Mann) -- on how a person could be between you
3  and the window, if such person had passed between you and the
4  window, --
5      MR. SCHAMMEL: Objection to compound.
6  Objection to leading.
7      MR. ALMAGUER: Join in the objections.
8    Q  (Mr. Mann) Go ahead and answer the question.
9    A  If they passed right by me, I'm sure they passed by
10  the window while I headed back.
11    Q  Where was the custodian located throughout the
12  entire time you were in the Post Office?
13    A  She was --
14    Q  Was she in more than one spot?
15    A  When I saw her? When I turned to see her? She was
16  walking behind me when I was checking the mail.
17    Q  Was the custodian carrying a mop?
18    A  Yes.
19    Q  Do you remember approximately how long the mop
20  handle was?
21    A  Long. It was a big mop.
22    Q  Do you feel it's possible that the custodian mopped
23  directly behind you and possibly, potentially a little bit to
24  your right?
25      MR. SCHAMMEL: Objection, calls for

PAGE 83
83

1  speculation.
2      MR. ALMAGUER: And leading.
3    Q  (Mr. Mann) Answer the question.
4    A  Yes.
5    Q  Can you tell the Court and the jury, if there is
6  one in this case, how you feel, based on the custodian
7  passing behind you, that the floor got wet where you fell?
8      MR. SCHAMMEL: Calls for speculation.
9  Objection, form.
10    A  I feel she was not following whatever rules the
11  Post Office must have had because she didn't place the sign
12  on where she was mopping; otherwise, I would have seen it.
13    Q  (Mr. Mann) Well, how do you feel about the floor
14  getting wet where you slipped?
15    A  I feel it's --
16      MR. SCHAMMEL: I'll renew the objection.
17  Calls for speculation.
18    A  I just feel the Post Office was not following
19  procedures by not having the light primarily because --
20    Q  (Mr. Mann) Do you remember if there was a leak in
21  the ceiling?
22    A  No.
23    Q  And you were the only person there with the
24  custodian?
25    A  Yes.

PAGE 84
84

1    Q  And who was it that was the one who was holding the
2  mop?
3    A  The custodian.
4    Q  What was the condition of the floor when you fell?
5    A  It was wet.
6    Q  At any point in time, did you ever have an
7  opportunity to inspect the mop, the part that is used on the
8  floor? Did you see the mop that was used on the floor?
9    A  Yes. That's when I saw her with the mop.
10    Q  And what was the condition of the mop?
11    A  It was wet. She was mopping.
12      MR. MANN: I'll reserve the rest of my
13  questions for trial.
14      MR. SCHAMMEL: Nothing from the Government.
15      MR. ALMAGUER: A few questions to follow-up on
16  the questions Mr. Mann just asked right now.
17  BY MR. ALMAGUER (3:12 p.m.):
18    Q  You mentioned a minute ago, ma'am, that Ms.
19  Olivarez, the custodian, had a big mop; is that correct?
20    A  Uh-huh (moving head up and down).
21    Q  "Yes" or "no," ma'am?
22    A  Yes. I'm sorry.
23    Q  About how tall is Ms. Olivarez, if you can
24  remember?
25    A  Not very tall.

PAGE 85
85

1    Q  You mentioned earlier too that when you walked into
2  that building, you went to your Post Office P.O. box to check
3  it, you didn't notice a person there in the Post Office: is
4  that correct?
5    A  I noticed someone was there. I didn't see. I
6  didn't look to see who that person was.
7    Q  Where did you notice them?
8    A  It was someone.
9    Q  Where did you notice them?
10    A  On the first hallway, the little one.
11    Q  As soon as you walked into the building, or the one
12  towards --
13    A  This one right here (indicating).
14    Q  Okay. As you walk in, the smaller one you
15  mentioned earlier?
16    A  Yes. Someone was there.
17    Q  That's the one also I think depicted in one of the
18  exhibits here. Let me see if I can find it. In Defendant's
19  Exhibit Number Six (6), this is a little hallway, I guess at
20  the top of the page there?
21    A  Yes. She must have been walking there, and she
22  went around where I was.
23    Q  Are you sure about this? You saw them?
24    A  Yes. Someone was there, so nobody else came. The
25  door never -- you know, nobody else came.

PAGE 86

86

1   Q   So you saw her mopping there?
2   A   I saw someone there, but I didn't look.
3   Q   How come you didn't look?
4   A   I was on my way to get my mail.
5   Q   And you mentioned she had like a large size or big
6   mop; is that correct?
7   A   Yes. I saw it when I fell.
8   Q   And Ms. Olivarez is not that big of a person; is
9   that correct?
10  A   I mean, she's not tall, tall, tall, but –
11  Q   She's –
12  A   – she's not short, short.
13  Q   Is she taller and bigger than you?
14  A   Average, probably.
15  Q   Is she taller or bigger than you?
16  A   No.
17  Q   You mentioned also as soon as you checked your
18  mail, you took a step and then slipped; is that correct?
19  A   Yes.
20  Q   You didn't take more than two (2) or three (3)
21  steps?
22  A   No. I turned around and I took a step, and I fell.
23  Q   So that means. according to your testimony then,
24  that somebody must have mopped right next to you while you
25  were checking your mail.  Isn't that correct?

PAGE 87

87

1   A   Probably, yes.
2   Q   So you're saying that a lady of average height,
3   maybe a small lady with a large mop mopped right next to you
4   a few inches over. and you didn't notice that?  Is that
5   correct?
6   A   I was bending down getting my mail.
7   Q   Is it a "yes" or "no," ma'am?
8   A   No.
9   Q   You didn't notice her?
10  A   I noticed her. I felt someone behind me.  I did
11  notice her then.
12  Q   And that person being Ms. Olivarez with a large mop
13  might have mopped about six (6) inches away from you; is that
14  correct?  That's according to your testimony; isn't that
15  correct?
16  A   She was behind me.  I don't know.
17  Q   The question again is, ma'am, just to clarify this.
18  A   Yes.
19  Q   If Ms. Olivarez is mopping with a large mop, she
20  must have mopped really close to you, a few inches away, for
21  you to take one step and fall.  Isn't that correct?
22  A   Yes.
23  Q   Okay.  And you say you never noticed that mop until
24  after your fall; is that correct?
25  A   Yes.

PAGE 88

88

1   Q   And Ms. Olivarez was helping you stand up; is that
2   correct?
3   A   Yes.
4       MR. ALMAGUER:  No further questions.
5       MR. MANN:  A few more.
6   BY MR. MANN (3:16 p.m.):
7   Q   How big are your feet?
8   A   Seven and a half (7-1/2).
9   Q   Do you – in follow-up to custodian defendant
10  attorney's question, do you feel that potentially the floor
11  could have been wet at a little bit more than a few inches
12  and you still could have stepped on it with your first step
13  back?
14      MR. ALMAGUER:  Objection, speculation and
15  leading.
16      MR. SCHAMMEL:  I'll join.
17  Q   (Mr. Mann) Can you answer the question?
18  A   Yes.
19      MR. SCHAMMEL:  Just to clarify.  Was that,
20  yes, you can answer the question, or yes to the question?
21  Q   (Mr. Mann)  Was that yes – I'll do it again.  What
22  is your contention regarding how far away the wet floor was
23  from where you initially turned around and slipped?
24  A   Right behind me, when I closed the mailbox and
25  stepped away and turned around.

PAGE 89

89

1   Q   On Exhibits Five – Defendant's Exhibit Five (5),
2   there are some tiles.  In fact, there are – well, can you
3   count the tiles that you can see on Exhibit Five (5)?
4   A   (Witness complies.)  Seven and a half, seven (7)
5   tiles.
6   Q   Can you state approximately which tile you were
7   standing on when you were checking your mail?
8   A   Probably the second one.
9   Q   And which tile would your first step have been on
10  when you stepped back and you slipped on the wet floor?
11  A   The third one, and then turned back.
12  Q   Did you ever expect anyone to mop directly behind
13  you?
14  A   No.
15      MR. MANN:  Reserve the remainder of my
16  questions for trial.
17  BY MR. SCHAMMEL (3:18 p.m.):
18  Q   Just for my clarification.  Earlier you stated you
19  went straight to the right.  Now you're saying that you
20  stepped backwards.  Which direction did you go?
21  A   When I closed the box, I stepped backwards, and
22  then I went straight to the right.
23  Q   And it's once you went to the right that you fell?
24  A   Yes.
25      MR. SCHAMMEL:  Okay.  Nothing further.

# CONDENSED TRANSCRIPT OF GLORIA LONGORIA
C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

PAGE 90

90

```
1    MR. ALMAGUER: Nothing further.
2    MR. MANN: Nothing further.
3    [Deposition concluded at 3:18 p.m.]
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

PAGE 91

91

### CHANGES AND SIGNATURE

NAME: GLORIA LONGORIA      DEPOSITION DATE: 11/10/03

PAGE   LINE   CHANGE                    REASON

PAGE 92

92

I, GLORIA LONGORIA, have read the foregoing deposition

and hereby affix my signature that same is true and correct,

except as noted above.

_____

GLORIA LONGORIA

THE STATE OF _____

COUNTY OF _____

    Before me, _____, on this day

personally appeared _____, known to me (or

proved to me under oath or through I.D. (_____) to

be the person whose name is subscribed to the foregoing

instrument and acknowledged to me that they executed the same

for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _____ day

of _____, _____.

_____

(SEAL)           NOTARY PUBLIC IN AND FOR

                 THE STATE OF _____

PAGE 93

93

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

GLORIA L. GARCIA

VS.                           C.A. B-02-017

UNITED STATES OF AMERICA
ET AL

#### REPORTER'S CERTIFICATION
#### ORAL DEPOSITION OF GLORIA LONGORIA
#### November 10, 2003

    I, DIANA LEAL WEIBEL, Certified Shorthand Reporter in

and for the State of Texas, hereby certify to the following:

    That the witness, GLORIA LONGORIA, was duly sworn by me

and that the transcript of the oral deposition is a true

record of the testimony given by the witness;

    That the deposition transcript was submitted on the 5th

day of December, 2003, to Counsel for the Witness, Mr. Jason

Mann, for examination, signature and return to me by the 4th

of January, 2004;

    That the amount of time used by each party at the

deposition is as follows:

    Mr. Jason R. Mann:     11 mins.

    Mr. Steven Schammel:  1 hr., 27 mins.

    Mr. Pablo Almaguer:    19 mins.

    That $ 512.00 is the deposition officer's charges to

Counsel for the Government for preparing the original

deposition transcript and any copies of exhibits;

**DIANA LEAL WEIBEL, C.S.R. #4192, Box 608, Mission, TX 78573**
PH: 956/580-2778   Cell: 956/330-9180   Fax: 956/580-3148

# CONDENSED TRANSCRIPT OF GLORIA LONGORIA

C.A. B-02-017 / U.S. District Court / SD/TX-Brownsville Division
Gloria L. Garcia v. U.S.A., Et Al

---

PAGE 94

94

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Jason R. Mann, Counsel for Plaintiff
J. Edward Mann, Jr. & Assoc.
322 E. Van Buren, Suite 701, Harlingen, TX 78551

Mr. Steven Schammel, AUSA, Counsel for Government (CA)
U.S. Attorney's Office
1701 W. Bus. 83, Suite 600, McAllen, TX 78501

Mr. Pablo J. Almaguer, Counsel for Deft. Olivarez
Texas Rural Legal Aid, Inc.
316 S. Closner, Edinburg, TX 78539

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

CERTIFIED TO BY ME THIS 5TH DAY OF DECEMBER, 2003.

DIANA LEAL WEIBEL, TX CSR #4192
Expiration Date: 12/31/03
Notary Public-State of Texas
P.O. Box 608, Mission, TX 78573
PH: 956/580-2778 Cell 330-9180
Fax 956/580-3148

---

PAGE 96

THE STATE OF TEXAS    *   CAUSE NO. C.A. B-02-017
                *   U.S. DISTRICT COURT
COUNTY OF HIDALGO   *   SD/TX-BROWNSVILLE DIVISION

I, DIANA LEAL WEIBEL, Texas Certified Shorthand Reporter #4192, do hereby certify that the foregoing copy of the deposition of GLORIA LONGORIA, reported in the foregoing numbered and styled cause by me, is a true and correct copy of the original deposition herein as duly certified and delivered by me.

CERTIFIED TO BY ME THIS 5TH DAY OF DECEMBER, 2003.

DIANA LEAL WEIBEL, TX CSR #4192
Expiration Date: 12/31/03
Notary Public-State of Texas
P.O. Box 608, Mission, TX 78573
PH: 956/580-2778 Cell 330-9180
Fax 956/580-3148

---

PAGE 95

95

## RETURN CERTIFICATE

The original deposition WAS/WAS NOT returned to the deposition officer on     ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Steven Schammel, Custodial Attorney;

That $ 512.00 is the deposition officer's charges to Counsel for the Government for preparing the original deposition transcript and any copies of exhibits;

That a copy of this certificate was served on all parties shown herein on.

CERTIFIED TO BY ME THIS    DAY OF     , 2004.

DIANA LEAL WEIBEL, TX CSR #4192
Expiration Date: 12/31/03
Notary Public-State of Texas
P.O. Box 608, Mission, TX 78573
PH: 956/580-2778 Cell 330-9180
Fax 956/580-3148

---

**DIANA LEAL WEIBEL, C.S.R. #4192, Box 608, Mission, TX 78573**
PH: 956/580-2778  Cell: 956/330-9180  Fax: 956/580-3148

**ORAL DEPOSITION OF ELENA OLIVAREZ**

**Page 1**

```
1                 IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                      BROWNSVILLE DIVISION

3  GLORIA L. GARCIA a/k/a     )
   GLORIA GUZMAN,             )
4        Plaintiff            )
                             )
5                            )
   VS.                       )      CIVIL ACTION NO. B-02-017
6                            )
                             )
7  UNITED STATES OF AMERICA, )
   and YOLANDA PEREZ, as     )
8  Postmaster, UNITED STATES )
   POST OFFICE, SANTA ROSA,  )
9  TEXAS, and ELENA OLIVAREZ,)
   as an employee of the     )
10 UNITED STATES POST OFFICE,)
   SANTA ROSA, TEXAS         )
11       Defendants.         )

12

13 ****************************************************

14                   ORAL DEPOSITION OF

15                    ELENA OLIVAREZ

16                     June 18, 2003

17 ****************************************************

17      ORAL DEPOSITION OF ELENA OLIVAREZ, produced as a

18 witness at the instance of the Plaintiff, and duly sworn,

19 was taken in the above-styled and numbered cause on the

20 18th of June, 2003, from 9:08 a.m. to 11:32 a.m., before

21 Heather Hall, CSR in and for the State of Texas, reported

22 by machine shorthand, at the Law Offices of J. Edward Mann

23 & Associates, 222 East Van Buren, Suite 701, Harlingen,

24 Texas, pursuant to the Federal Rules of Civil Procedure

25 and the provisions attached hereto.
```

**Page 2**

```
1                   A P P E A R A N C E S

2  FOR THE PLAINTIFF:

3     Mr. Jason R. Mann
      LAW OFFICES OF J. EDWARD MANN, JR. & ASSOCIATES
4     222 East Van Buren, Suite 701
      Harlingen, Texas  78550

5  FOR THE DEFENDANT THE UNITED STATES OF AMERICA:

6     Ms. Nancy L. Masso
      UNITED STATES ATTORNEY'S OFFICE
7     SOUTHERN DISTRICT OF TEXAS
      600 East Harrison, Suite 201
8     Brownsville, Texas  78520

9  FOR THE DEFENDANT ELENA OLIVAREZ:

10    Mr. Pablo J. Almaguer
      LAW OFFICES OF TEXAS RURAL LEGAL AID
11    316 Closner
      Edinburg, Texas  78539

12

13 ALSO PRESENT:

14    Ms. Cecilia Turrent, Interpreter
      Ms. Gloria Guzman, Plaintiff
15    Mr. Juan Olivarez, Defendant's husband
```

**Page 3**

```
1

2  Job No. 2003-203

3        STIPULATIONS FOR THE DEPOSITION OF
                   ELENA OLIVAREZ
4
   Taken on: 06/18/03          Deposition Location:
5  Beginning: 9:08 a.m.        J. Edward Mann, Jr.
   Finish: 11:32 a.m.          222 East Van Buren
6  Pursuant to: Rules          Harlingen, Texas

7  SIGNATURE OF WITNESS:

8     1. ( ) Is waived.
      2. (X) The witness shall read and sign this
9  deposition before any notary by:
         (X) reading the original transcript sent to
10 his/her attorney.  Attorney: Mr. Pablo Almaguer
         ( ) reading the original transcript sent to
11 witness.
         ( ) coming to the reporter's office.
12    3. (X) If the original deposition is released from
   the reporter's possession and is not returned for timely
13 filing with the custodial attorney, a copy may be filed,
   unsigned and uncorrected.
14      It is also understood that the court reporter
   assumes no responsibility for filing when the attorneys
15 agree to release the original deposition.

16

17 OBJECTIONS:

      1. (X) All objections will be made in accordance with
18 the Federal Rules.
      2. ( ) All objections will be made in accordance with
19 the Texas Rules.

20

21 EXHIBITS:

22    Exhibit Nos. 1 and 2.

23

24          ---oo0oo---

25
```

**Page 4**

```
1                      INDEX

2  Appearances ........................................  2

3  Stipulations .......................................  3

4  ELENA OLIVAREZ

5     Examination by Mr. Mann ......................   5
      Examination by Ms. Masso .....................  42
6     Examination by Mr. Almaguer ..................  50
      Examination by Mr. Mann ......................  68
7     Examination by Mr. Almaguer ..................  74
      Examination by Mr. Mann ......................  76
8
   Signature and Changes ..........................  78

9  Reporter's Certificate .........................  80

10

11                   EXHIBITS

12 NO.  DESCRIPTION                              PAGE

13 1    Copy of maintenance handbook ..............  11

14 2    Drawing of Santa Rosa Post Office .........  14
```

```
                                          5
 1            (Interpreter sworn.)
 2              ELENA OLIVAREZ,
 3 having been first duly sworn, testified through the duly
 4 sworn interpreter as follows:
 5              EXAMINATION
 6 BY MR. MANN:
 7    Q    Good morning.  My name is Jason Mann --
 8    A    Good morning.
 9    Q    -- and I represent Gloria Guzman in reference to
10 a November 12th, 1999 incident where she slipped and fell
11 at the post office.
12    A    Yes.
13    Q    I am going to be asking you a series of questions
14 regarding many things regarding your background, and I am
15 going to ask you questions regarding your particular
16 employment or your relationship with the United States
17 Postal Service and some questions regarding the specific
18 instances of the November 12th, 1999 fall.
19    A    Yes.  It's okay.
20    Q    If ever you don't understand a question that I
21 have asked, then ask that I rephrase it or ask it again so
22 that you can understand it.
23    A    It's okay.
24    Q    Thank you.  Please state your name for the
25 record
```

```
                                          6
 1    A    My name is Elena Olivarez.
 2    Q    And where do you live?
 3    A    Santa Rosa.
 4    Q    How close do you live to the post office in
 5 Santa Rosa?
 6    A    I don't know very well in measurements, but it
 7 must be about a mile -- less than a mile.
 8    Q    When did you first start working at the post
 9 office in Santa Rosa?
10    A    I think it was in the '90s, but I'm not sure
11 exactly if it was in the '90s or a couple of years later.
12 I had been working there for about nine years --
13    Q    Okay.
14    A    -- or something like that.
15    Q    Do you currently work there?
16    A    I don't work anymore now.
17    Q    Okay.  What is your understanding of how you were
18 employed by the United States Postal Service the first
19 year that you worked there?
20    A    I had a contract the first years, and then
21 shortly after that, the post office started to pay me.
22    Q    Do you remember how you were being paid November
23 12th, 1999, at the post office?
24    A    I was still receiving checks by that contract --
25 excuse me.  No, it wasn't that way.  I think I was already
```

```
                                          7
 1 being paid by the post office.
 2    Q    Did you file tax returns for that year?
 3    A    Yes.
 4    Q    Okay.  Would you make those tax returns available
 5 for my inspection?
 6    A    I don't have them right now with me.
 7    Q    If I give you a form that will enable me to get
 8 them, will you sign it so that I can get them?
 9    A    Yes
10    Q    What is your social security number?
11    A    Can I take it from my purse?
12    Q    Sure
13    A    The thing is that I don't like to be untrue in
14 relation to the number.  It's 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.
15    Q    Thank you.  Who told you when and where to be
16 with respect to your job at the United States Post Office
17 in Santa Rosa?
18    A    When I got the job?
19    Q    Start off there and go all the way through the
20 end of your employment
21    A    I worked there -- when I started working there, I
22 worked there very well at the time, ever since that
23 accident happened
24    Q    Was someone from the U.S. Postal Service the one
25 that set your schedule and told you what to do?
```

```
                                          8
 1    A    When I started to work there, yes, I was told --
 2 they told me what I had to do and everything.
 3    Q    What was your normal working schedule November
 4 12th, 1999?
 5    A    I would sweep.  I would mop.  I would also dust.
 6 I would also dust the tables.  I would clean the windows
 7 and the doors and the bathrooms, and I would also do
 8 things like cleaning the floors.  And what else?  Well,
 9 little things that I had to do.  I would sweep.  I would
10 mop.  I would dust.  I would clean outside as well.
11    Q    Did you receive any instruction from anyone on
12 how to do these tasks?
13    A    Yes.
14    Q    Who did you receive the instructions from?
15    A    Through the agreement when I had the contract.
16 The agreement.
17    Q    Did -- isn't it true that the U.S. Postal Service
18 provided you with particular ways to do things such as
19 mopping?
20    A    Yes, but they didn't have a hard time with me
21 because I have -- I had been doing that type of work for
22 years.
23         MR. MANN:  Objection, nonresponsive to
24 everything after yes.
25    A    Yes.
```

9

1  Q   (BY MR. MANN)  Isn't it true that the U.S.
2  Postal Service also told you specifically how to place
3  a warning wet signs when you were mopping?
4  A   Yes, they would tell me, and -- and when it would
5  rain, I was also asked to put them.  I was told to put
6  them because it was very wet.
7  Q   Isn't it true that the U.S. Postal Service
8  provided you all of the mops and equipment necessary to do
9  your job?
10  A   What do you mean?  Like when I needed a new mop,
11  for example, yes, they would give me everything.
12  Q   And a bucket?
13  A   Everything.
14  Q   Everything?
15  A   They would give me everything.
16  Q   Isn't it true that the United States Postal
17  Service wanted you to do things a particular way?
18  A   Can you explain it to me again, please?
19  Q   They wanted you to -- the United States Postal
20  Service wanted you to mop a certain way?
21  A   No, they never told me so.  Since I knew how to
22  do my work, I haven't -- I worked there for many years.  I
23  knew how to deal with my work, and they would tell me that
24  they did not have any problem with me and they were very,
25  very happy with my job.

10

1          MR. MANN:  Objection, nonresponsive.
2  Q   (BY MR. MANN)  They did -- the United States
3  Postal Service did provide the initial training?
4  A   Yes, and they would give me cassettes to look at.
5  They would give me time to watch them.
6  Q   Who would oversee your work on a daily basis?
7  Q   Who would oversee?  What do you mean?
8  Q   Who would supervise your work?
9  A   Ms. Perez and the other lady, Lydia.
10  Q   On a normal day, what sort of requests would
11  Ms. Perez have for you to do certain tasks?
12  A   She would almost never ask me to do a certain
13  type of work.  Once in a while when I would forget to do
14  something, but it wasn't something normal.
15  Q   Did you ever receive any manuals from the United
16  States Postal Service?
17  A   From the post office -- from the United States.
18  You mean from the post office?
19  Q   Yes.
20  A   No, I don't remember.  I don't remember, but all
21  those papers on how to manage my work, I would read them,
22  whatever was sent to me with a contract.
23  Q   Can you read English fairly well?
24  A   Yes, I know how to read well, and I understand
25  it.  There are certain words that I don't understand and

11

1  then I have to ask questions.
2          (Exhibit No. 1 marked.)
3  Q   (BY MR. MANN)  Okay.  I'm going to show you what
4  has been marked as Plaintiff's Deposition Exhibit 1, which
5  was produced by the United States Postal Service, and ask
6  if you recognize it?
7  A   Do I have to read it all?
8  Q   No, just do you recognize it?
9  A   It's like a handbook.
10  Q   Were you provided this handbook?
11  A   Not from the post office.
12  Q   Who provided this to you?
13  A   When I signed my agreement.  When I did the
14  agreement, I was given one, but not from the post office,
15  with the contract.  When I signed my contract, they gave
16  it to me, but it was not this document, but it does say
17  similar things almost, things that I cannot lift like
18  heavy things and -- and almost everything that it says,
19  it's the same.
20  Q   Do you still maintain a copy of what was given to
21  you when you signed your contract with the post office?
22  A   Well, yes, but I don't remember where I have them
23  now.  I don't remember where.
24  Q   Do you think you could find them?
25  A   Well, maybe I will be able to find them in case I

12

1  still have them at home.
2  Q   Let's look at this Exhibit 1, and I would like
3  for you to look at page 6-4.  Do you see a picture of
4  someone mopping?
5  A   Yes.  This one, this is the wrong way.  I don't
6  mop like this.
7  Q   Did the manual that you received when you signed
8  your contract have something similar to this in it?
9  A   No.
10  Q   Did it have anything regarding how you are
11  supposed to mop?
12  A   Yes, I had to read the papers, and it's -- that's
13  the way I use my mop.  That's the way I mop, the way it
14  says on the paper.
15  Q   Okay.  And the paper was provided from the United
16  States Postal Service?
17  A   No, no.  I wasn't with the post office.
18  Q   I'm sorry.  Maybe you misunderstood my question.
19  A   What do you mean?
20  Q   What I asked was:  Was that the manual that you
21  had from the Postal Service?
22  A   No.
23  Q   Not who did you get it from, but was the manual
24  created by the Postal Service?
25  A   From the post office, I did not receive any

**13**

1  paper.  They didn't give me anything.

2  Q  Who did give you something?

3  A  Through the contract that I got from Indiana.

4       THE INTERPRETER:  Indiana?

5       MR. ALMAGUER:  Indianapolis.

6  Q  (BY MR. MANN)  What company is it in Indianapolis

7  that you worked for?

8  A  I don't remember the name, but I have the papers.

9  Those contracts, I have them kept, I think so.  I think I

10  do have them.

11  Q  And it's your understanding that this company

12  from Indiana was hired by the U.S. Postal Service, and

13  then subsequently hired you to perform these sort of

14  maintenance services?

15  A  I think they did because there at the post office

16  I signed a document.

17  Q  Okay.  Did you ever meet anyone from

18  Indianapolis?

19  A  No.

20  Q  You just signed a paper that said you worked for

21  someone from Indianapolis?

22  A  Yes.

23  Q  Do you know if the Postal Service provided the

24  manual that you received from the Indianapolis people from

25  the post office?

**14**

1  A  That if I knew?

2  Q  Yes.

3  A  No, I didn't know.  I didn't know.

4  Q  You were given instructions on where to place

5  signs, weren't you?

6  A  Oh, yes.

7  Q  And you were given instructions on where to rope

8  off areas if necessary, weren't you?

9  A  On where to put the signs or what do you mean?

10  Q  Did you ever rope off an area that was wet?

11  A  I had a sign that they gave me -- or that reads

12  "Wet Floor."

13       MR. MANN:  Objection, nonresponsive.

14  Q  (BY MR. MANN)  Did you ever rope off an area?

15  A  No.

16       MR. MANN:  Can I have an exhibit sticker?

17       (Tendering exhibit labels.)

18       MR. MANN:  Thank you.

19       (Exhibit No. 2 marked.)

20  Q  (BY MR. MANN)  I am going to show you what I have

21  marked as Deposition Exhibit No. 2, which was also

22  provided by the United States Postal Service to me, and

23  ask if you recognize that as a depiction of the post

24  office in Santa Rosa?

25  A  This is the entrance, isn't it?

**15**

1  Q  Yeah.

2  A  Here there were letters in all this area.

3  Q  Would you mark on here the different places that

4  you would place a wet sign when you were mopping?

5  A  First of all, I mop here -- here on the window,

6  and then I continue here, and I would have a sign here

7  when I would be mopping.  And I would place it here, and I

8  would place a bucket here.  Then, I would mop all the way

9  here, and the sign was turned around here.

10  Q  Go ahead -- would you go ahead and mark that with

11  the pen, please?

12  A  The wet floor sign?

13  Q  Yes

14  A  It was here (drawing).

15  Q  Did you ever place it anywhere else in the

16  building when you were mopping?

17  A  It would be here so people will know, when they

18  go in, for them to know that it's wet.

19  Q  Okay.  Would it be possible to rope off the area

20  that is on the right side of the post office where the

21  P.O. box's are?

22  A  I would put them here where I would think it was

23  correct because the people that would pass by would trip

24  with the buckets.

25  Q  Okay.

**16**

1  A  And I thought it was dangerous to put them here,

2  so I thought it was better to put them here since there

3  were less P.O. boxes in this area.  Most of the time,

4  people come to this area.

5  Q  At what time did you normally mop that area?

6  A  I would start working at 6:00 so that by 7:45

7  everything would be clean here.  And I would go to the

8  window so that before Ms. Perez would be there, I would

9  have enough time to clean all this area here.  Then I

10  would go here.  I would mop this area, and then I would

11  mop all this area from here to here.

12       I would mop everything in front before people

13  would arrive.  All this side, I would mop first.  And then

14  I would finish, and then I would be mopping all the

15  edges -- all the edges, and then I would use my mop again

16  to mop.

17  Q  Okay.  Wasn't it part of your instruction to mop

18  small areas at a time?

19  A  That is the way I would mop.  I would mop here

20  first because if I would mop here first, then I would be

21  close to the areas where they would open here, and I

22  wanted to leave this area free.  How can I explain it to

23  you?  Here -- because it's very small here, and then

24  people would start coming in, and then I would have had a

25  hard time to be mopping here.  I would always finish

17

1 mopping 15 minutes before 8:00 so that I would have 15
2 minutes to clean this area here in the window to have it
3 ready for Ms. Perez to arrive.
4    Q    So your answer is that you did it your way and
5 not necessarily the way that maintenance handled -- told
6 you to do it?
7    A    They never told me what to do first.  I would do
8 it the way that I would think it was easier to do.
9    Q    Okay.  And when you are talking about 6:15 to
10 8:00, you are talking about in the morning, a.m.?
11    A    Yes, because it would take me about one hour --
12 one hour to finish all this front part, the lobby here --
13 the lobby where the people would go in.
14    Q    Do you remember there ever being a problem with
15 the lights in this post office box area?
16    A    Well, we were having problems -- electric
17 problems with that light because the people from -- the
18 electricians had already arrived, but they were having
19 problems.
20    Q    And this was on the day that Ms. Gloria Guzman
21 fell, isn't it?
22    A    Yes, before she was here -- before she fell, as
23 she said, the electricians had -- had been here, but they
24 hadn't been able to fix the problem yet.
25    Q    So would you agree with me that it was darker

18

1 than normal in that area?
2    A    I don't think it was too dark.
3              MR. MANN:  Objection, nonresponsive.
4    Q    (BY MR. MANN)  I didn't ask you if it was too
5 dark.  I asked you if it was darker than it normally was.
6    A    Just a little bit.  Almost nothing.
7    Q    How many more lights were working there?
8    A    All the lights were working except the one that
9 was here -- back here.
10    Q    So except for the one in the area where she fell,
11 the rest of the lights were on?
12    A    All the lights were on except for that one,
13 except for one bulb.  There was one light not working.
14    Q    What kind of lights are these?
15    A    Those long ones.  The one was off, and the other
16 one wasn't.
17    Q    Okay.
18    A    But the light, anyway, was there.
19    Q    When you mop, do you mop with a wet mop or a
20 wrung-out damp mop?
21    A    It's -- the mop is not too wet when I mop.  I
22 don't leave -- I don't leave the area too wet, kind of
23 just damp.  More dry than wet.
24    Q    Does the sun in the daytime help illuminate the
25 hall area where the post office boxes are?

19

1    A    Yes.
2    Q    So visibility is better in the day than it is in
3 the morning?
4              THE INTERPRETER:  In the day --
5              MR. MANN:  Than in the morning.
6    A    In the morning you can see the same way as in the
7 daytime because there is a lot of light.
8    Q    (BY MR. MANN)  So it's easier to see a wet floor
9 in the morning -- I mean in the day than it is in the
10 morning?
11              MS. MASSO:  I will object to the form of the
12 question.  I don't think that's what she testified to at
13 all.
14    A    What do you mean?
15    Q    (BY MR. MANN)  Would you agree with me that when
16 you have more light, it's easier to see a wet, just mopped
17 floor?
18    A    I don't see a difference, if it's more wet or
19 less wet, if you can see better during daytime or
20 nighttime.  It's the same to me.  It's the same.
21    Q    So if it's pitch dark, you can see a wet floor as
22 good as you can if it's light out?
23    A    When it's dark, it's not the same, but it wasn't
24 dark.
25              MR. MANN:  Objection, nonresponsive.

20

1    Q    (BY MR. MANN)  You obviously remember a lot about
2 when Ms. Guzman fell, so let's get to that.  Did you see
3 her fall?
4    A    No, I didn't see her.
5    Q    Where -- do you remember where you were when she
6 fell?
7    A    I was right here (indicating).  I was right here
8 in the hall in the lobby.  She was around here, and I was
9 here on the last P.O. boxes, and I was mopping.
10    Q    So after she was there, you mopped?
11    A    The floor was not wet where she fell because I
12 hadn't started to mop yet.
13              MR. MANN:  Objection, nonresponsive.
14    Q    (BY MR. MANN)  You just said that you were
15 mopping.  Now you're saying that you were not mopping?
16    A    Well, yes, I was mopping here.  I mopped all this
17 part here and the tables.  When this lady arrived, when
18 she was there, I hadn't mopped there.  The first thing
19 that I mopped was only an edge -- the edges here, but on
20 this side, on this side.  And when I started to mop, when
21 I turned facing towards the P.O. boxes, I was walking,
22 mopping backwards, and she was here.  I realized that she
23 was sitting down on the floor, but I didn't see her and I
24 didn't see anything.  I didn't hear anything either, so I
25 had just started mopping, but it was dry in this area.

**Wilson Reporting Services**

21

1 Where she was sitting down, I hadn't mopped yet.  I mopped
2 a little bit here, and I realized that she was sitting
3 there on the floor, that's when I saw her because I
4 tripped a little bit with her.  That's when I realized she
5 was there.
6    Q    You didn't really see where she fell, you just
7 knew that she fell?
8    A    I knew that she fell because I tripped with her
9 with the mop.
10    Q    Okay.  But you were close to where she was, and
11 you stated you began mopping this area?
12    A    I didn't continue.  When she fell, I didn't
13 continue mopping.
14    Q    But before she fell, you had mopped something in
15 that area?
16    A    Nothing.  Nothing.  There where she was standing,
17 I hadn't done anything.
18         MR. MANN:  Objection, nonresponsive.
19    Q    BY MR. MANN:  In the post office box area, after
20 Ms. Guzman was already in the area, you continued to mop
21 certain sections, correct?
22    A    No, I hadn't mopped.
23    Q    Mind you, you are under oath.
24    A    Here where she was -- I'm not lying to you.
25 Where she fell, the floor was not wet.  I can swear that

22

1 the floor was not wet.
2    Q    But you don't know where she fell, do you?
3    A    What do you mean by that?  I don't know where she
4 fell.
5    Q    You don't know where she slipped?  You don't know
6 where she fell on the ground?
7    A    I didn't see anything.  I didn't see anything.
8 When she fell, I didn't know.  I didn't hear.  I didn't
9 feel.  I didn't know anything.
10    Q    Had you mopped any part of this post office box
11 area within five minutes of Ms. Guzman's presence in that
12 area?
13    A    I did realize when she arrived -- but all this
14 area was already dry.  I had already mopped this part
15 here, and it was already wet --
16         THE INTERPRETER:  Sorry.  It was already dry.
17    A    It was already dry.  But when she arrived here, I
18 didn't know what time she arrived, but she was here.  She
19 was here standing for a long time.  I didn't mop.  I
20 didn't mop because she was here, so I started to dust some
21 tables that were here in front, but the floor in the area
22 where she fell was not wet.  I can swear that it was not
23 wet.
24    Q    (BY MR. MANN)  How do you know that that is the
25 area she slipped on?

23

1         THE INTERPRETER:  I'm sorry?
2    Q    (BY MR. MANN)  How do you know that's the area
3 she slipped on?
4    A    Because when I was mopping back, I mopped with
5 her -- I tripped with her.
6    Q    Were you facing backwards to her?
7    A    I was facing here, and she was behind me.
8    Q    Okay.
9    A    That's why I didn't see her, and I didn't know
10 what happened.
11    Q    Okay.  Did you go behind her out to the front of
12 the post office at any time while she was present in the
13 post office at her post office box?
14    A    What do you mean?  I'm sorry.
15    Q    The entire time Ms. Guzman was at her post office
16 box, were you in the same or similar location or did you
17 pass by her in two different areas of the post office?
18    A    I don't understand you.
19    Q    I'm going to point at Deposition Exhibit 2.  You
20 say that you were here when Ms. Guzman was in the
21 building while she was here where you've written where
22 she was, did you go anywhere else in the building or were
23 you always here?
24    A    As I said, I stayed here.  I didn't leave or go
25 to another area, and I did not start to mop until she -- I

24

1 didn't mop, not here in the front, while she was on the
2 floor.  Everything was dry.
3         MR. MANN:  Objection, nonresponsive.
4    A    I had to wait because she was there.  She
5 remained there for a big while.  I was in a rush because I
6 wanted to finish because it was about a quarter to 8:00,
7 and I had to finish cleaning in the area where Ms. Perez
8 comes.  So, anyway, I waited, and then when I saw that a
9 long time had passed, I started to mop, but in front of
10 her here -- here in the back part because I didn't mop in
11 this area until she passed -- she passed by.  The floor
12 was not wet when she fell there.
13    Q    You never saw her slip?
14    A    No, I didn't see her.
15    Q    So you don't know where she slipped, then, do
16 you?
17    A    No, I don't know how or where.
18    Q    But you do admit that while Ms. Guzman was there,
19 you did actually mop some of the floor somewhere in the
20 building?
21    A    Not in the area where she was standing.
22         MR. MANN:  Objection, nonresponsive.
23    A    It was not wet.
24    Q    (BY MR. MANN)  Just answer the question that is
25 asked.  While Ms. Guzman was in the building, you did mop?

**25**

```
 1    A    When she lifted up from here, she came here to
 2 the front where it was already mopped.  But it was dry
 3 here already, and here, when she came to this area, I
 4 started to mop here, but she didn't go back anymore.  She
 5 left and she went -- she went to her home.  She went.
 6         MR. MANN:  Objection, nonresponsive.
 7    Q    (BY MR. MANN)  While Ms. Guzman was in the
 8 building at the post office in Santa Rosa, did you mop?
 9    A    Where?  Where?
10    Q    It does not matter.  Anywhere.  Did you mop?
11    A    I didn't start to mop until she moved from this
12 place and she left.  Then I started to mop here.
13    Q    So your testimony is that you were not mopping
14 the floor at any time while Ms. Guzman was in the
15 building?
16         MR. ALMAGUER:  Objection as to the form of
17 the question.  It's a misstatement of the evidence as to
18 what she testified.
19         MS. MASSO:  I join in that objection.
20    Q    (BY MR. MANN)  You can go ahead and answer the
21 question.
22    A    What do you mean?  I don't understand what -- I
23 don't understand you.  I don't understand what you are
24 trying to tell me.  I did not mop -- when she was here, I
25 did not mop.  I did not mop anything here.  I did not mop
```

**26**

```
 1 until she left this place because this is the area that
 2 was not mopped yet.
 3    Q    Do you remember what time this was?
 4    A    When she came here it was already quarter to
 5 7:00.  That's when she stood up from here, and that time I
 6 don't forget because that's the time that I had to come to
 7 this place and sign.  I lost time here in this area
 8 because she remained there for a while.
 9    Q    So you're saying you lost time because you were
10 supposed to have that area mopped and then moved on to
11 cleaning the windows, correct?
12    A    Yes, I had some time here -- about losing time
13 because I didn't want to mop this side because she was
14 here.
15    Q    And you stated earlier, I believe, that you
16 mopped the window counter section first, and then you went
17 to this P.O. box area next?
18    A    I mopped all this area here.  At 6:00 I start to
19 clean and mop because it almost takes me an hour to mop
20 all this here.
21    Q    Okay.
22    A    And it was a quarter to -- 15 minutes were
23 missing.  It was already 15 minutes late.  It was time for
24 me to be here because I was waiting for her to move.
25    Q    What happened once you bumped into her?
```

**27**

```
 1    A    I asked her what had happened to her and why she
 2 was there.  That's when she told me that she had fallen.
 3    Q    Did anyone else from the United States Postal
 4 Service come to that area?
 5    A    There was nobody, just us -- she and I.
 6    Q    Why didn't you place a wet sign in this area if
 7 you had already mopped in this area and this area was
 8 already dried?
 9    A    Because I hadn't started mopping here.
10    Q    Were you going to move the sign over here when
11 you started mopping?
12    A    I placed it -- when I placed the sign, I put it
13 turned like this because I am not allowed to put it here
14 because people can trip with the sign.
15    Q    So you were expressly told not to put the sign in
16 this area?
17    A    Well, I was told not to put here the bucket nor
18 the sign because people that come here can trip or
19 something.
20    Q    Well, who told you that?
21    A    At the post office.  I was told that it was not
22 okay for me to put the bucket here, and if I would put it
23 here, I had to turn it so that people would notice that
24 the floor was wet on this side.
25    Q    Okay.  I got it about this part.  I'm just trying
```

**28**

```
 1 to find out who told you at the post office, "Don't put
 2 the sign here and don't put the mop here."
 3    A    No, no one told me.
 4    Q    Well, how did you know not to put it there, then?
 5    A    Only because I thought that if I would put it
 6 here, people -- people would turn here and trip with the
 7 bucket or with the sign.
 8         MR. MANN:  Can you read back some of her
 9 deposition, a few questions ago, where she responded,
10 "They told me not to put the mop and sign in that area
11 because someone would trip."  Would you read it back for
12 her please?
13         THE REPORTER:  Question:  "So you were
14 expressly told not to put the sign in this area?"
15         Answer:  "Well, I was told not to put here
16 the bucket nor the sign because people that come here can
17 trip or something."
18         Question:  "Well, who told you that?"
19         Answer:  "At the post office.  I was told
20 that it was not okay for me to put the bucket here, and if
21 I would put it here, I had to turn it so that people would
22 notice that the floor was wet on this side."
23    Q    (BY MR. MANN)  Do you now want to change your
24 answer to the last response?
25    A    Yes.  Yes.
```

**29**

1  Q   It's okay to go ahead and tell me who told you
2  that.
3  A   I was wrong with that question. I was wrong. On
4  my own, I would think that -- that I should not put the
5  bucket nor the sign here because when people turn, people
6  would trip or would get hurt.
7  Q   So no one told you, then, and the last response
8  was incorrect?
9  A   No. Yes, it was incorrect.
10  Q   Is there anything else in the deposition so far
11  that is incorrect that you need to fix?
12  A   No, everything is correct because the most
13  important thing is that where the lady was, the floor was
14  not wet when she fell.
15        MR. MANN:  Objection, nonresponsive.
16  Q   (BY MR. MANN)  Where were the supplies and
17  buckets located when you started in the morning?
18  A   I would put them here. I would put the bucket
19  here and here the sign.
20  Q   I'm starting a little bit before you -- where is
21  the closet that they were located in?
22  A   I would keep them in a closet that they have,
23  like a utility place there. I had space to take the water
24  and all that.
25  Q   And you had a key to this closet?

**30**

1  A   They would not lock this closet because -- so I
2  would come in, and I would take my things out of there. I
3  would keep the keys only from the main door, and when I
4  was going to clean this area where the windows are, and to
5  enter inside, which is the same key.
6  Q   So you're saying that you could enter into the
7  back of the post office without a key?
8  A   No. No, I can't enter from the back part. I
9  can't.
10  Q   How did you get to the utility area again?
11  A   I would enter from the front door, and then I
12  would enter through here to go to the office.
13  Q   And the office was unlocked at all times?
14  A   She would lock them all the time.
15  Q   Who is "she"?
16  A   Ms. Perez or the person who would remain there at
17  the end.
18  Q   Was Ms. Perez there every morning that you
19  started or at least some other person?
20  A   No, I would start, and then Lydia would come in.
21  We would start together, and Ms. Perez would arrive at
22  8:00.
23  Q   Who is Lydia?
24  A   She is one of the workers that she has there, a
25  person that works for her all the time.

**31**

1  Q   And she had the key to the office so that you
2  could get in the back?
3  A   Yes, she was inside -- no. No, wait. She didn't
4  have any way to go to the back. The only way we were
5  able to leave that area was to -- we were able to go out
6  from the inside, but we are unable to go back.
7  Q   Maybe you're missing my question. I'm just
8  trying to find out who opens the door for you at 6:00 if
9  the person who, with the keys, didn't get there until
10  8:00?
11  A   They gave me keys for me to go in.
12  Q   Oka.
13  A   I have keys to go in because I would start -- I
14  would enter there half an hour before them.
15        MR. VASSO:  I think she said that the
16  Postmaster locked everything up at night. She didn't say
17  anything about her having the only keys so --
18        MR. MANN:  I asked her if she had a key to
19  get in, and she said, no, she didn't have any keys, but
20  now she says she has keys. That's fine. It took a long
21  time to get here
22  A   They would give me keys for me to go in because
23  they asked me to get there at 6:00, and then they changed
24  it to 6:30.
25  Q   (BY MR. MANN)  Okay. Were you ever a regular

**32**

1  employee with the United States Postal Service?
2        MR. ALMAGUER:  Objection to the form of the
3  question. That's asking for a legal conclusion.
4  Q   (BY MR. MANN)  Go ahead and answer the question.
5  A   Can you ask me again, please?
6  Q   Were you ever a regular employee of the United
7  States Postal Service?
8        MR. ALMAGUER:  Same objection.
9  A   Besides this job?
10  Q   (BY MR. MANN)  No, what I'm asking is:  Did you
11  ever get a W-2 from the United States Postal Service
12  directly? A W-2 is an IRS form.
13  A   What for, to file?
14  Q   To file taxes.
15  A   Yes, they would send me something.
16  Q   The United States Postal Service would?
17  A   I don't remember, but I would get some forms --
18  that form to file my income.
19  Q   Did you get any benefits from the United States
20  Postal Service directly?
21  A   Not directly. I had to file every year to get it
22  with my husband, and then I would have to pay my interest.
23  Isn't it correct?
24        MR. OLIVAREZ:  Sir, I pay her taxes.
25        MR. ALMAGUER:  No.

33

1    Q    (BY MR. MANN)  I'm not concerned about who paid
2   your taxes or if you got a refund.
3    A    Yes.  Yes, I understand.  My husband would pay
4   for the taxes.
5    Q    What I'm asking is what your working relationship
6   was with the Indianapolis company versus if you worked
7   directly at any point in time for the United States Postal
8   Service?
9    A    Every year they would give me a raise, $.25 every
10  year.  It would depend, yes.  That's the way they would
11  send me things.  Something like that, you mean?
12   Q    No.  What I'm asking is:  Were you always working
13  under this contract from Indianapolis or was there ever a
14  different situation?
15   A    It was the same thing.  The problem is that they
16  stopped sending me my check for almost one month, and
17  that's the reason why I changed to the post office.
18   Q    When did you change to the post office?
19   A    I don't remember.  I don't remember.
20   Q    Was it before Ms. Guzman fell or after?
21   A    After.
22   Q    Was it soon after or was it a long time after?
23   A    Long before -- long after that happened.
24   Q    Did you get any benefits that you didn't
25  previously receive once you switched directly with the

34

1   United States Postal Service?
2    A    Benefits like what?
3    Q    I'm just asking the question.  Medical?
4    A    No, they didn't give me anything like that.  They
5   didn't give me any benefits.
6    Q    Were -- once you switched to being directly
7   employed by the United States Postal Service, were you
8   ever told to mop the floor and do all of your maintenance
9   items any different than you had previously done?
10   A    They didn't tell me anything.
11   Q    Okay.
12   A    Everything continued the same way.
13   Q    Everything regarding your contact with the United
14  States Postal Service employees on-site was the same as
15  before?
16   A    Everything was the same as always.
17   Q    You didn't get a new manual from the United
18  States Postal Service?
19   A    No.
20   Q    Have you talked to anyone besides your attorney
21  about this accident that occurred November 12th, 1999?
22   A    No, only with my husband.  I spoke with him, and
23  I told him what had happened.
24   Q    What did you tell him?
25   A    That the lady -- well, according to her, she said

35

1   that she had slipped because I didn't see her.
2    Q    Okay.
3    A    That she had fallen.
4    Q    Did you ever sign any written statements?
5    A    Such as a letter or something like that?
6    Q    Yes.
7    A    That if I signed?
8    Q    Or wrote a letter.
9    A    I wrote a letter.
10   Q    You never spoke with anyone at the post office
11  about this fall?
12   A    I spoke with Lydia Mendoza.  She's the one who
13  told me -- she's the one who asked me what had happened
14  because she heard that we were talking there with her.  So
15  I told her that this lady had fallen, but that I hadn't
16  seen her.  That I didn't see her fall or what happened.
17        MR. MANN:  I will object to the hearsay
18  regarding Lydia.
19   A    I asked Lydia when she -- when I -- when she --
20  well, when I got in, I told her only that the lady had
21  said that she had fallen, but that I hadn't seen her.
22   Q    (BY MR. MANN)  Did you say the lady had fallen?
23   A    That lady, Gloria.
24   Q    Okay.  What was Lydia's responsibility, the best
25  you know, at the post office there in Santa Rosa?

36

1    A    I don't know.  I cannot tell you.  I don't know.
2    Q    Did you deal with her on a daily basis?
3    A    What kind of contact do you mean?
4    Q    Well, you testified a while ago that she was in
5   that utility area with you when you got the mops?
6    A    She would not get with me here.  She would not go
7   in with me here where I would come and pick up my buckets
8   or anything.
9    Q    Who would you tell when you needed a new mop
10  bucket?
11   A    Ms. Perez.
12   Q    So any time you needed some supplies or had
13  questions regarding your job duties, you would ask
14  Ms. Perez?
15   A    Everything.  Everything to Ms. Perez.  She's the
16  one who would bring me anything that I would need.  She
17  would bring it to me.
18   Q    Ms. Perez never told you where to put signs or
19  where not to put signs?
20   A    When I started to work, she told me, "You put
21  this here," because I didn't know where to put it, you
22  see.  And she told me, and there I would put them.  That
23  was the safest place to put them so people that would come
24  in would not trip.
25   Q    Okay.  So Ms. Perez is probably the one that told

37

1  you not to put the sign in this area here because people
2  would trip?
3          MS. MASSO:  I object to the form of that
4  question.  We believe that she changed her answer to that
5  earlier, and now you are changing the testimony in the
6  form of that question.
7          MR. MANN:  I don't think there's a proper
8  objection there, but --
9          MS. MASSO:  Well --
10  Q   (BY MR. MANN)  Please go ahead and answer the
11  question.
12  A   Ask me again, please.
13  Q   So Ms. Perez was probably the person, if there
14  was a person, that told you to put -- to not put a sign in
15  this area because people would trip?
16          MS. MASSO:  I still object to the form of the
17  question.
18  A   I don't remember who was the one who told me, but
19  when I started working at first, when I would work, she
20  would put it there, and that's where I would put it as
21  well.
22  Q   Well, there wasn't anyone from Indianapolis in
23  Santa Rosa, was there?
24  A   No, nobody came.
25  Q   So no one from Indianapolis told you anything

38

1  about where to put signs or how to mop?
2  A   They never came.  They never came.  They never
3  told me anything.
4  Q   So if anyone told you anything, it would have had
5  to be a U.S. Postal Service employee?
6  A   They told me that I could put the wet sign floor
7  here when I would mop here so that people would understand
8  that I was mopping here.  I was -- that I was working.
9  Q   I understand that, and I believe you when you say
10  that.  I'm just trying to find out if the person that told
11  you that worked for the U.S. Postal Service.
12  A   No, it wasn't her.  They didn't tell me.  It was
13  not them who told me.
14  Q   It was someone from Indianapolis, then?
15  A   No.  The person that would work there before I
16  worked were the people who told me that they would put --
17  that I could put the bucket there and the sign here.
18  Q   Oh, okay.  Who was that person; do you remember?
19  A   No, I don't remember.  I don't remember.
20  Q   Did they work for the Indianapolis company before
21  you?
22  A   No, because this young lady -- or lady did not
23  last too long at work.
24  Q   So she was still working there when they hired
25  you?

39

1  A   Yes, I went with her so she could tell me what to
2  do and how I needed to start doing the job and
3  everything -- the work and everything.
4  Q   And then they fired her?
5  A   She -- she couldn't work anymore because she
6  already had another job.
7  Q   Okay.  So she quit?
8  A   Yes.
9  Q   Okay.  Is it your understanding that the United
10  States Postal Service retained the power -- the authority
11  to tell you whether, where, how, and why to mop?
12          MS. MASSO:  And what?  What was the --
13          MR. MANN:  And why.
14  A   Why to mop?  I'm sorry.
15  Q   (BY MR. MANN)  For what reason.  Let me restate
16  the question.
17  A   To teach me
18  Q   Is it your understanding that the United States
19  Postal Service could tell you whether to mop, where to
20  mop, how to mop, and for whatever purpose that mopping was
21  required?
22          MR. ALMAGUER:  Objection to the form of the
23  question.  It's a compound question.
24  Q   (BY MR. MANN)  I'll rephrase it.  Did the United
25  States -- is it your understanding that the United States

40

1  Postal Service had the power and control to tell you
2  whether to mop?
3  A   Yes.  Yes, I understand that.  They can tell me
4  what.
5  Q   And they can tell you where to mop?
6  A   That they can tell me, like Ms. Perez or
7  something like that?
8  Q   Yes.
9  A   I don't know that.  I would mop my way on the
10  jobs that I have always done.  Everybody was satisfied the
11  way I would do my work.  Still they were very happy.  They
12  were very satisfied with the work that I was doing, the
13  way I was doing it.
14  Q   My question is:  Do you feel or understand that
15  the Postal Service could tell you, "Mop that area there"?
16  A   Yes, they can tell me, but it all depends.
17          MR. MANN:  Objection to the second part of
18  the question.
19  Q   (BY MR. MANN)  And they could -- you said the
20  Postal Service could tell you how to mop?
21  A   That, I don't know.  I'm not sure about it.
22  Q   Well, they could tell you where to place the
23  signs, couldn't they?
24  A   Oh, yes, of course.  Yes, they can tell me where
25  to mop, then.

41

1  Q   Okay.  It wasn't anyone from Indianapolis that
2  called and told you where to place the signs or where to
3  mop or how to mop?
4  A   Not with the contract, nobody told me.  They
5  never went there.  They would just call and ask how I
6  was doing my job, and they would give good references
7  about me.  Every year they would check on me.
8  Q   Okay.  And until they missed the checks and
9  didn't pay you, you were fine with them?
10 A   Then that's when I called.  I called them and the
11 same lady told me if I wanted to -- because sometimes I
12 needed money for important things that I needed, and I
13 needed that -- at that time I needed the money.  That's
14 when they asked me that -- she said that if I wanted, they
15 could pay me from the post office money so I wouldn't have
16 a hard time with the checks.  That's when I switched, but
17 that was when I was ready to leave the job.
18 Q   Okay.  Do you know if anyone else ever fell in
19 the post office?
20 A   This is the first time that this happened, but I
21 don't know if nobody else had fallen.
22 Q   Okay.  Did you do anything different after she
23 fell?
24 A   No, everything continued the same way as the way
25 I would do it.  It's the same way I would always do it,

42

1  yes.
2  Q   Did you ever talk to anyone from the Indianapolis
3  contracting company after the fall regarding anything
4  other than your paycheck and your yearly check-ins?
5  A   No, I never called.
6  Q   Okay.
7       MR. MANN:  I'll pass the witness.
8                  EXAMINATION
9  BY MS. MASSO:
10 Q   Ms. Olivarez, my name is Nancy Masso.  I
11 represent the United States in this lawsuit, and I'll try
12 to be more brief than Mr. Mann.  I'm going to ask you a
13 little bit about the nature of your work with the post
14 office, and a little bit about the incident that happened
15 involving Ms. Guzman -- or Mrs. Guzman.  You had mentioned
16 that you had other jobs; is that right?
17 A   Yes, in hospitals and nursing homes.
18 Q   And were all these jobs the type where you would
19 be mopping or cleaning or dusting?
20 A   Yes, the same way like here at the post office.
21 Q   Did you have any of these jobs at the same time
22 that you were working at the post office?
23 A   No, I only worked here at the post office.
24 Q   Okay.  And when you said that you stopped working
25 at the post office, was that because you quit or you

43

1  retired?
2  A   I stopped working because I was feeling tired and
3  ill.  I wasn't feeling well.
4  Q   During the time that you were working at the post
5  office, was -- did anybody at the post office tell you,
6  "You cannot go and mop offices at the Sheriff's Department
7  or the hospital"?
8       MR. MANN:  Objection, form.
9  A   No.  Can you ask me again?
10 Q   (BY MS. MASSO)  Well, did anybody tell you that
11 you couldn't mop the floor somewhere else in addition to
12 mopping the floors at the post office?
13      MR. MANN:  Objection, hearsay.
14 A   No, nobody did.
15 Q   (BY MS. MASSO)  Nobody told you that you couldn't
16 go?
17      MR. ALMAGUER:  Objection to the form of the
18 question.
19 A   Nobody told me not to do it.
20 Q   (BY MS. MASSO)  And did you feel that you -- if
21 you wanted to go and mop floors at the Sheriff's Office
22 for an hour, let's say, would there be anything that --
23 from the post office that would stop you from seeking that
24 job?
25      MR. ALMAGUER:  Objection to the form,

44

1  argumentative also.
2       MR. MANN:  Objection, form.
3  A   I don't know.  I don't know.
4  Q   (BY MS. MASSO)  The job that you had at the post
5  office, how long were you actually on the premises of the
6  post office to complete your job?
7  A   In this post office how long?
8  Q   Yes.
9  A   How long at work there?
10 Q   Right.  Did you go in five days a week?
11 A   Monday through Friday.
12 Q   And on average, how long would you be there on a
13 daily basis?
14 A   One hour or 45 minutes.  One hour and 45 minutes.
15 That's what I would work there.
16 Q   And then you were free to go --
17 A   Yes.
18 Q   -- and spend the day as you pleased?
19 A   Yes.
20 Q   And you could even have gotten another job during
21 the same day?
22      MR. ALMAGUER:  Objection as to form,
23 speculative.
24 A   No, I wasn't working, only here at the post
25 office.

**Wilson Reporting Services**

45

1    Q    (BY MS. MASSO)  I know, but -- and I understand
2 that, but did Ms. Perez ever say to you, "I don't want you
3 to get another job"?
4    A    No, she never told me anything.
5    Q    Okay.  In terms of your work there at the post
6 office, you were never asked to sort mail or receive mail?
7    A    From the post office boxes?
8    Q    Yes.
9    A    Like mail for me or --
10   Q    No, I'm just saying did they ever ask you to go
11 and do anything other than mop the floors and dust?
12   A    No.
13   Q    May I see Exhibit 2?  I'm pointing to this large
14 rectangle, which to me is on the left side of the diagram.
15 It says P.O. boxes and P.O. boxes here, and there are P.O.
16 boxes on this side as well, aren't there?
17   A    Yes.
18   Q    Okay.  Are there any windows located down this
19 wall?
20   A    Here in this hall there is a big window.
21   Q    Could you -- I see that you're trying to put a
22 mark there.  Could you put a mark where that window is?
23 You can but a big "W" if you want to.
24   A    (Witness complies.)
25   Q    Okay.

46

1    A    From here to here there is a window.
2    Q    Okay.  And you have made a mark here.  It kind of
3 looks like a "Y" from my angle, and was there -- on the
4 day that Ms. Guzman apparently fell, was that window --
5 were there any blinds on that window?
6    A    No, it didn't have anything.
7    Q    Was there light showing through that window?
8    A    Yes, a lot of light would come in and off.
9    Q    Uh-huh.  And it wasn't raining that morning, was
10 it?
11   A    No, it wasn't raining.
12   Q    And if I remember -- if I understood your
13 testimony correctly, you said that Ms. Guzman entered and
14 apparently went to her post office box.  Is her post
15 office box located here?
16   A    On this side where she was standing, yes, there
17 are.
18   Q    Was this the first time you had ever seen
19 Ms. Guzman in the post office?
20   A    To be quite honest, I don't know her.
21   Q    Okay.  And you said she spent quite a bit of time
22 there?
23   A    In her lawsuit that she -- when she filed, that
24 around 7:00 or 7:15 she was there.  She was there quite a
25 bit of time because when I finished, it was already a

47

1 quarter to 8:00, so when she lifted herself up and stopped
2 doing what she was doing, it was already late for me
3 because I should have been there before.
4    Q    But did you actually observe Ms. Guzman standing
5 in this corridor by her post office box?
6    A    She was standing there.  That's the reason why I
7 couldn't mop because she was there.
8    Q    And if I understood your testimony earlier, you
9 mentioned that you were doing -- dusting some tables or
10 something over here waiting for Ms. Guzman to leave the
11 area?
12   A    Yes
13   Q    And she was taking quite a while?
14   A    To me, it took her some time because when she
15 fell, it was time for me to have already finished mopping
16 here and to enter this area.
17   Q    Okay.  And did you have an opportunity to observe
18 Ms. Guzman while she was standing here, what was taking
19 her so long?
20   A    She was looking at some letters.
21   Q    Did she seem distressed or concerned at all?
22   A    To me, she was there for a while before she fell.
23 She was there for a while.
24   Q    But did you -- did you take note of anything of
25 her demeanor before she fell?

48

1    A    When I realized that she had fallen, I asked her
2 what had happened to her.  She said that she had fallen,
3 so I asked her how she had fallen because I hadn't seen
4 her or I hadn't heard anything because I was here, and
5 she -- in the front, and she was here behind me so I
6 didn't see her.  When she slipped, I didn't see her.  When
7 she slipped or if she would have fallen, whatever.
8    Q    Did you notice her mood at all, what it was like
9 before she fell?
10   A    She was okay.
11   Q    Okay.
12   A    I think I didn't feel anything that like she had
13 problems.
14   Q    Now, what kind of footwear was Ms. Guzman wearing
15 that day?
16   A    I don't remember very well, but --
17        THE INTERPRETER:  Can I ask what she means by
18 (speaking Spanish)?
19        MS. MASSO:  I don't have a problem with that.
20        MR. MANN:  I don't have a problem with that.
21   A    Like shoes with a high heel.
22   Q    (BY MS. MASSO)  Do you know how high the heel
23 was?
24   A    No, I don't remember.  But they were shoes with
25 high heels, but I don't know how the shoes were.

49

```
1    Q    Were the heels like the narrow pointed ones or
2 were they the wide ones?
3    A    I think they were thin ones, pointed ones, but
4 I'm not sure.
5    Q    I'm sorry?
6    A    Thin, but I'm not quite sure.
7    Q    And if I also -- if I understood your testimony
8 correctly, you decided to start your mopping at the end of
9 this hallway, right, behind Ms. Guzman?
10    A    At the same time that I started to mop, I took
11 time to mop slowly so she would have time, and I wanted to
12 see if she would move.
13    Q    Okay.  So you didn't mop any of this area in that
14 side?
15    A    It wasn't wet here.  It wasn't wet here.  When
16 she fell, it was dry here because I was just going to
17 start mopping here.
18    Q    Okay.  Put this area from, let's say the window
19 all the way to her, you hadn't mopped except for this part
20 here?
21    A    All this had already been mopped and dried when
22 she went in.  It was already dry.
23    Q    Okay.
24         MS. MASSO:  I'll pass the witness.
25         MR. ALMAGUER:  Do you mind if we take a quick
```

50

```
1 break?  I just want her to take a quick break.  I only
2 have a few questions.
3         MR. MANN:  All right.  No problem.
4         (Brief recess.)
5                EXAMINATION
6 BY MR. ALMAGUER:
7    Q    Ms. Olivarez, my name is Pablo Almaguer.  You
8 know me.  I'm going to ask you a few questions to follow
9 up with the questions the attorneys here asked you, and
10 excuse me if I repeat some questions to clarify some
11 stuff --
12    A    Yes.
13    Q    -- but we're almost done here, I hope.
14    A    It's okay.  Hopefully.
15    Q    And before we begin -- before we begin our
16 questions here, I want to take a careful, closer look at
17 Deposition Exhibit No. 2.  Would you agree with me that
18 it's labeled as Deposition Exhibit No. 2 at the bottom of
19 the page?  Let me point, ma'am, at the bottom here.  It
20 says Deposition Exhibit No. 2.
21    A    Oh, Deposition No. 2, correct.
22    Q    Okay.  And you have been looking at this page and
23 answering the questions concerning this diagram.  You have
24 actually turned it upside down; isn't that correct?
25    A    Yes, because that's -- otherwise, I don't
```

51

```
1 understand.
2    Q    Why is it that you understand it this way?
3    A    It was far away there, and I left it like that.
4    Q    Okay.
5    A    But I do understand.
6    Q    That's fine.  I just wanted to know.  Where is
7 the entrance to the post office according to this diagram?
8    A    From the outside to the inside?
9    Q    Yes.
10    A    Here.
11    Q    Okay.  And that's labeled already as entrance.
12 You can read that word there?
13    A    I don't -- I cannot see well.  Yes, but I do
14 understand.
15    Q    Tell me what -- tell me where the utility closet
16 is at again.
17    A    I have to go inside from here and go this way
18 back behind and pick up -- or, well, rather from here it's
19 closer.  It's easier, and we get in through here.  Here
20 are the bathrooms, and here there's a utility closet.
21    Q    Okay.  And can you point with the pen to the
22 entrance to that area from the lobby?
23    A    Here.  Here is the lobby.
24    Q    That's fine.
25    A    And here's the entrance to go inside.
```

52

```
1    Q    Right there where your pen is indicating, can you
2 indicate that with a letter "A"?
3    A    Yes.  (Witness complies.)
4    Q    Okay.  You did it upside down.  Do it the way
5 you're looking at it, though.
6    A    I'm sorry.  (Witness complies.)
7    Q    Okay.  And then you mentioned where you put the
8 sign the day of the accident.
9    A    Yes, I go out and I put the sign here.
10    Q    With -- where do the post office boxes start on
11 that wall there?
12    A    They start here, but it's just -- it's a short
13 lobby.
14    Q    Okay.
15    A    And all the way here, there are post office
16 boxes, and all this -- all this area, there are post
17 office boxes.
18    Q    And would you mention that -- I'm sorry.  Where
19 you mentioned that the post office boxes start, can you
20 mark that with a letter "B"?
21    A    With a letter?
22    Q    Yes.
23    A    Yes.  (Witness complies.)
24    Q    Letter "B."  That's fine.
25    A    Here and here.
```

**Wilson Reporting Services**

53

1    Q    Okay.  Now, hold on.  We've got a "B" and a "1";
2  isn't that correct?
3    A    I was going to write another letter "B".
4    Q    Okay.  Stop there.  You don't want to write on it
5  too much, here.  Can you please scratch one out?  You put
6  another "B" over here on the side; is that correct?
7    A    (Witness nods head.)
8    Q    Why did you put that "B" over there on the side?
9    A    Because there are P.O. boxes here.
10   Q    Well, can you mark this other section with a "C,"
11  then, over here on the side?
12   A    Where?
13   Q    The one mentioned here, the second "B."
14   A    (Witness complies.)
15   Q    Okay.  Let me get this correct.  According to the
16  testimony, you put the sign, on November 19th [sic], the
17  day of the accident, by the letter "B," is that correct?
18   A    Yes.
19   Q    Okay.  And you mopped from that area over by the
20  area where the letter "C" is at; is that correct?
21   A    I mopped all this -- all this lobby up to here.
22   Q    Where the letter "B" is at?
23   A    Yes, because this is where the P.O. boxes are.  I
24  had already mopped all this area, and all this up to here
25  only.

54

1    Q    And then you went up to the letter -- well, which
2  side of the hallway there did you keep on mopping before
3  you realized that Ms. Gloria had fallen down?
4    A    Where did I start first?
5    Q    Which side did you mop in that hallway there?
6    A    She fell down here, and I was just going to start
7  mopping here.
8    Q    Had you marked the area by the letter "C" -- had
9  you already mopped the area by the letter "C"?
10   A    Only on just the edges.
11   Q    Okay.  Where were you, again, when you said
12  that you saw Ms. Guzman trip?
13   A    When I bumped with her?
14   Q    Yeah.  Where were you mopping at this time, yes?
15   A    I was just going to start mopping here.
16   Q    Outside of that diagram, then, can you mark that
17  with a letter "D" so we'll know which area you were
18  talking about?
19   A    Here?
20   Q    On top of it.  Outside of it.  Around here, ma'am
21  (indicating.)
22   A    (Witness complies.)
23   Q    So right by that letter "D" -- the wall by the
24  letter "D," you were mopping at that time?
25   A    Yes, here.

55

1    Q    Okay.  And you were going backwards?
2    A    Yes, I was going backwards.
3    Q    Now, with a letter "E," outside of this diagram
4  here, where is more or less, Ms. Gloria Guzman's post
5  office box as far as you know?
6    A    I don't know more or less where.  I don't know
7  more or less where it was.
8    Q    Okay.  Can you mark with a letter "E", though,
9  that wall where she fell?
10   A    Here.  (Witness complies.)
11   Q    Yes.  Okay.  That "E" is facing you.  That's
12  fine.  That's fine.  I just wanted to clarify that because
13  there is no video here and we're pointing back and forth,
14  and she's only recording this.
15   A    It's okay.
16   Q    Okay.  Apart from the window there you marked
17  earlier when Ms. Masso asked you to do that, is there
18  another window in that area?
19   A    Yes, there's another one here on this side.
20   Q    Can you mark it the same way you did the first
21  window?
22   A    (Witness complies.)
23   Q    Okay.  When you noticed Ms. Guzman fell down, did
24  you hear anything right before that?
25   A    No, I didn't hear anything.

56

1    Q    No one screamed?  No one said anything?  No one
2  asked for your help?
3    A    No, nothing.
4    Q    You noticed she was -- did she ask you for help?
5    A    No, she didn't ask me for help.
6    Q    How did she get up?
7    A    She was getting up by herself.  She was getting
8  up, and when I noticed that she was there because I bumped
9  with her, that's when I turned that I saw her.  She
10  remained there sitting down for sometime.  I asked her
11  what had happened to her and why she was there, and she
12  said that she had fallen.
13   Q    When she got up, did she grab her ankle or her
14  knee or her leg?
15   A    She didn't grab anything.
16   Q    Did she grab onto the post office box or to the
17  wall when she got up?
18   A    No, she got up with her hands on the floor.
19   Q    About how long did you say, again, in minutes
20  that she was standing there before she left?
21   A    I don't know exactly because when she got up from
22  here, she came here, and then I started to mop.  But I did
23  not pay any attention to everything else because it was
24  already late for me to finish doing the job there.
25   Q    She didn't stop to talk any with Ms. Lydia or

57

1 Ms. Perez?

2   A   No, she didn't talk to anybody.  She left.

3   Q   Okay.  Did you ever -- did you see her when she
4 was walking out of the post office -- when she was walking
5 out?

6   A   I saw her when she got up from here.  I saw to
7 check if she was limping or something, but she was walking
8 well.

9   Q   Okay.

10   A   But when she went out, I did not pay attention if
11 she was limping or if she was hurting.

12   Q   That's fine.

13   A   I'm sorry.  Can I tell you -- when she was
14 halfway up, I felt bad, and I tried to help her to get up
15 because I thought that she was going to have problems in
16 getting up, but she didn't.  She was very light.  She was
17 very light to me.  She didn't force herself to get up at
18 all.

19   Q   Okay.  Let me ask you about the issue of this
20 contract that you mentioned you had with these people --
21 or a company -- a person or company in Indianapolis.  When
22 you had that contract -- or under that contract, who did
23 you think you worked for?

24   A   I thought that with the contract that I was
25 working there because I signed those documents.

58

1   Q   Who did you feel you were working for at that
2 time?

3   A   For the post office because I was at the post
4 office.

5   Q   Okay.  After the contract was done away with, who
6 did you feel you worked for then?

7   A   With the post office.

8   Q   At all times you felt that you were working for
9 them?

10   A   Yes.

11   Q   Did the post office do or say anything to make
12 you feel otherwise?

13   A   No, they always treated me well, and they were
14 very happy with my job.

15   Q   In fact, you mentioned that you would get a
16 raise; is that correct?

17   A   Oh, yes, when I was with the contract, they gave
18 me a raise.  They would give me a raise every year.

19   Q   How much?

20   A   $.25 -- or it would depend, $.25.  $.25 every
21 year they would give me.

22   Q   Did they continue doing that or did the post
23 office do that after the contract was terminated?

24   A   No, it remained as it was with the contract, but
25 they didn't give me a raise there.

59

1   Q   The post office didn't give you a raise after the
2 contract terminated?

3   A   No.

4   Q   You also mentioned that you were the first one to
5 get there at the post office; is that correct?

6   A   Yes.

7   Q   About what time did you get there?

8   A   I don't remember if it was the year in which I
9 would start working at 6:00 or 6:30, but I would get there
10 first.

11   Q   Who told you to get there at 6:00?

12   A   I would not get in by myself.  Lydia and I and
13 another young fellow that would work there, a student.

14   Q   I appreciate the answer.  Just listen to my
15 question carefully.  At what time did you start again?

16   A   At 6:00.

17   Q   Who told you to show up at 6:00?

18   A   We would all start working at the same time at
19 that time.

20   Q   Okay.  Did you decide you wanted to show up at
21 6:00 or did somebody tell you to show up at 6:00?

22   A   No, nobody told me.  We would all start working
23 at the same time.  That's when we started at first to
24 work.  Later on we started to work at 6:30 like at this
25 time when she fell.

60

1   Q   Who told you to start at 6:30 instead of 6:00?

2   A   I was told that there had been changes, that they
3 had been -- that they had changed the working hours there
4 at the post office because we were starting to work very
5 early.

6   Q   You and the other employees were too early?

7   A   Yes.  Later on they switched us to start working
8 at 6:30.

9   Q   So you, just like every other employee, were
10 changed to go in at 6:30?

11   A   Yes, at the time that they were told to start
12 working at 6:30, they told me the same as well.

13   Q   So you just -- it wasn't up to you to show up at
14 another time like 8:00, 9:00 or 10:00?

15   A   No.

16   Q   You show up whenever they told you?

17   A   Yes.

18   Q   How long were you supposed to take to clean that
19 area, ma'am?  This includes the mopping, the sweeping, the
20 dusting you said earlier.

21   A   An hour and 45 minutes, I guess I had.

22   Q   Is that how long you would take to do all that?

23   A   Yes, but sometimes I would take half an hour
24 more.

25   Q   Okay.  Who told you that you needed to take an

61

1 hour and 45 minutes?

2    A    There I was told -- I don't remember who.  I was

3 told that I had an hour and 45 minutes.

4    Q    And what days of the week did you show up for

5 work.  Was it Monday through Friday or did you alternate?

6    A    Monday through Friday.

7    Q    Every day?

8    A    Yes.

9    Q    You didn't skip any days?

10    A    When I had important things to do like, for

11 example, taking my grandchildren to the doctor, I would

12 take them to the doctor.

13    Q    Okay.

14    A    Or if I wasn't too busy or if I had things to do

15 on my own, I would ask for a day off, but I would tell

16 them -- I would tell them, "I cannot start working in the

17 morning, but I will come in the afternoon," and I would do

18 it like that.  But I would never miss a day.

19    Q    Who did you tell this to?

20    A    To Ms. Perez.  I would ask Ms. Perez if it was

21 okay, if she would need me.

22    Q    Okay.  So you would get permission from her?

23    A    Yes, I would ask them for permission when I could

24 go in the morning and when I couldn't.

25    Q    Okay   Are you telling me that if you started at

62

1 6:30 -- I'm going to go back to the previous testimony --

2 and you would take about an hour and 45 minutes, maybe two

3 hours to finish --

4    A    More or less two hours.

5    Q    -- around what time would you leave?

6    A    Around 8:00 or quarter to 8:00 because it was an

7 hour and 45 minutes to do the job.

8    Q    Okay.  And after 8:15 or 8:30, when you left,

9 were you ever called back to work?

10    A    You mean the years that I worked there?

11    Q    (Nods head.)

12    A    They only called me on one occasion.

13    Q    Who called you?

14    A    At that time it was Mr. Aldape.

15    Q    Was he there before Ms. Perez or something?

16    A    Oh, yes.

17    Q    Was he the Postmaster?

18    A    Yes.

19    Q    When was it that he called you, like what time,

20 what month, year?  What do you remember?

21    A    I don't remember, but he called me once for me to

22 go and clean there so I -- because another person went

23 there, I think.  He -- that person had problems with his

24 stomach, and that person had an accident, and he had --

25 that person had an accident, so I was called to clean

63

1 there.

2    Q    What time was that, more or less, in the day?

3    A    It was around -- I don't remember very well, but

4 it was after noontime.

5    Q    Okay

6    A    But I went anyway.  I was there.

7    Q    And it was long past after 8:30, 9:00 in the

8 morning?

9    A    It was after noontime.  That's what I remember.

10    Q    Okay.  So it was your understanding that if

11 Ms. Perez was to call you in, you would have to go in to

12 work?

13    A    I know, but they would pay me for it.

14    Q    Okay   Let me ask you again, ma'am.  If, like

15 Mr. Aldape, Ms. Perez would call you to come into work

16 after noon, would you have to come into work?

17    A    Yes, if I wanted to go, I could go, but when

18 Mr. Aldape called me, he told me that he needed me

19 urgently

20    Q    Okay

21    A    Because he couldn't do the work, but they would

22 pay me for it   I wouldn't go there for free.

23    Q    Okay   You mentioned earlier when you saw the

24 diagram in the previous exhibit that you don't mop the

25 way the diagram was drawn; is that correct?

64

1    A    Can I look at it?

2    Q    Yes.

3    A    I don't mop like this.

4    Q    In what way do you mop, ma'am?

5    A    Well, let me show you.  I need a mop.  The way I

6 mop, it's like this.  I go back, back, back (motioning).

7 I mop.

8    Q    Okay.  So you are indicating -- for the jury,

9 you're going left to right?

10    A    Yes.

11    Q    Is that correct?

12    A    Yes, left, right.

13    Q    Okay.

14    A    Not like that.

15    Q    Did Ms. Perez or Ms. Mendoza ever see you mop

16 that way?

17    A    Yes, because I mop in the area where they work as

18 well.

19    Q    Did they ever tell you to change that type of

20 mop?

21    A    No.

22    Q    Okay.  You also mentioned that you were the first

23 one to get there and you put the sign there by the

24 entrance by the letter "B"; is that correct?

25    A    Yes.

65

1  Q    So that sign would be there by the time
2 Ms. Mendoza and Ms. Perez would walk in, correct?
3  A    They were here inside.
4  Q    But how did they get in through the building in
5 the beginning of the day?
6  A    Through here, through the entrance.
7  Q    Would they both see the sign there when they came
8 in the morning?
9  A    No, because the sign was not here when they
10 arrived.  The sign is not there when they arrive.
11  Q    I mean, it was there by the time they got there?
12  A    When Ms. Perez came in, the sign was already
13 there.  She starts working there at a quarter to 8:00.
14  Q    And when Ms. Mendoza came in, was the sign also
15 there?
16  A    Yes.
17  Q    Did they ever tell you to change that sign?
18  A    No, I was never told.  They never told me
19 anything.
20  Q    Is there any other entrance to the post office
21 for the public apart from that entrance?
22  A    Only this one.
23  Q    So everyone that goes in sees this sign?
24  A    To me, I think they do.  You can see it well
25 there.

66

1  Q    You also mentioned earlier in your testimony that
2 they were happy with your work; is that correct?
3  A    Oh, yes.
4  Q    Who is "they"?
5  A    We never had problems.  Ms. Perez and Lydia.
6 When Mr. Aldape would work there, he was as well.
7  Q    Were you concerned that they would be happy with
8 your work?
9  A    Yes, because I wouldn't have liked somebody
10 telling me that they didn't like the work or something,
11 and I was very happy with them as well, and I worked very
12 well.
13  Q    Did you feel that if you didn't meet up to their
14 standards, they could fire you?
15  A    I would feel that I was working very happy with
16 them.  I never felt that they were able to fire me.
17  Q    Because you were doing a good job?
18  A    They liked my job.  They liked my work.
19  Q    Did you mop every day of the week that you worked
20 there?
21  A    No.
22  Q    When did you mop Monday through Friday?
23  A    Monday, Wednesday, and Friday.
24  Q    Okay.  Did you do everything else that you
25 mentioned earlier, dust and sweep, every day of the week

67

1 also?
2  A    When it was time to sweep, to sweep only.  Like
3 on Tuesday and Thursday, I would only sweep and dust.
4  Q    Were you ever asked to do anything outside of the
5 building?
6  A    I had to sweep -- wait.  What was I doing?  I
7 would sweep.  I would clean the parking lot that is in
8 front.  I would sweep in here in the parking lot in front
9 of the post office, that's what I would do.
10  Q    What's to the side of the post office?
11  A    The yard.
12  Q    Grass?
13  A    I also had to mow the lawn.
14  Q    Outside of the post office?
15  A    Yes.
16  Q    Who asked you to do that?
17  A    They did because they would say that I was
18 together with the contract.
19  Q    After the contract was done with and you worked
20 for the post office, they still asked you to do that?
21  A    I still continued to mow the lawn.
22  Q    No one else would do it while you were working
23 there?
24  A    No, only me.
25  Q    And what days of the week did you do that?

68

1  A    When it needed to be mowed, I would do it any
2 day.
3  Q    So when they told you to do it?
4  A    They never told me that I needed to mow the lawn.
5 I would mow it when I would see that it needed to be
6 mowed.
7  Q    Okay.  Thank you, ma'am.
8        MR. ALMAGUER:  I'll pass the witness.
9                  EXAMINATION
10 BY MR. MANN:
11  Q    I have some more questions for you, ma'am.  You
12 drew a picture on this Deposition Exhibit 2, which is this
13 picture, and labeled it as the window in front of the P.O.
14 boxes where the fall occurred.  Do you know what direction
15 that window faces?
16  A    To the west -- to the west side.
17  Q    Where does the sun rise?
18  A    Oh, wait.  Wait just a minute.  Yes, east side
19 where the sun rises.  It's on the east side.
20  Q    You're saying that the front of this building is
21 east?
22  A    No, no, no.  This is west.
23  Q    So early in the morning, when the sun was coming
24 up November 12th, 1999, the sun would not have been
25 shining in this window, would it have been?

69

1        MS. MASSO: Objection to the form of the
2 question. I don't believe there is any evidence
3 indicating what time the sun rose that morning.
4    A    Well, when the lady fell, it was almost daytime.
5    Q    (BY MR. MANN) Okay.
6    A    It was almost daytime. As I said, it was only a
7 quarter -- only 15 minutes were -- it was only 15 minutes
8 to 8:00 when Ms. Perez arrived.
9    Q    But you would agree with me that the sun does
10 rise in the east and set in the west?
11   A    Yes.
12   Q    Okay. You mentioned that while Ms. Guzman was at
13 her post office box, you were dusting in this main entry
14 hall?
15   A    Yes, because I was giving her time to move from
16 there so I could start mopping here.
17   Q    And I think you testified -- and I'll ask you if
18 this is correct -- that at some point in time, she was
19 taking too long, so you went ahead and came in here to
20 the -- passed her in the post office box area hall with a
21 mop and bucket?
22        MR. ALMAGUER: Objection to the form,
23 misstatement as to evidence.
24   A    I had the mop -- the mop and the bucket and the
25 sign. I had them here. Here.

70

1    Q    (BY MR. MANN) Okay, but you were dusting for a
2 while when Ms. Guzman was here, correct?
3    A    Yes, I was mopping. I was mopping for a while
4 some small tables that are here to give her time to move.
5    Q    And then at some point in time, while she was
6 still here at what's marked closest to the "E," you came
7 and you were standing closest to where the "D" is,
8 correct?
9    A    When I passed by, she was still standing here,
10 and I was mopping here very slowly to see if she would --
11 sorry, to get up -- sorry, to move.
12   Q    So at that point in time there was a mop and a
13 bucket in this area?
14   A    No bucket.
15   Q    Just the mop?
16   A    I only had the mop. I only had the mop in my
17 hand.
18   Q    So what would you do when the mop was dirty and
19 you needed to clean it and wring it out so that it was
20 damp?
21   A    I would come back and I would rinse it here.
22   Q    Did you have anything to prevent droplets of
23 water from falling off the mop while you were going back
24 to where the bucket was?
25   A    I think that there were -- there was no way for

71

1 the mop to be dripping water because the mop -- how can I
2 explain it to you? The place where I would squeeze the
3 mop -- where I would squeeze the mop was okay, and the
4 mop -- and I had enough strength to squeeze it well in a
5 way that it would not leak water to the floor. I would
6 leave it more dry than wet.
7    Q    Why did you tell Ms. Guzman, when you were trying
8 to help her up, "Didn't you see the wet floor sign"?
9    A    I didn't tell her anything because the floor was
10 not wet.
11   Q    So you never told her there, "Didn't you see the
12 wet floor sign over there"?
13   A    Wait a minute. Well, when she remained there for
14 a long time, and at that time some women arrived. Some
15 women arrived, and they asked -- they told me if the floor
16 is also wet, but the floor wasn't wet. I said, "The floor
17 wasn't wet when she fell." I had just mopped the floor
18 right now because she just got up from the floor. Excuse
19 me, but it's not -- a small spot, not too wet.
20   Q    So some other people came up to this area after
21 she fell?
22   A    Yes, when I finished mopping here, they started
23 to get in, and they would be telling me that the floor is
24 very wet -- very wet, and I said "She fell, but that
25 was -- it was -- When she fell down, the floor was not

72

1 wet," I told them. And then she said, "Yes, look how you
2 have it." And I said, "Yes, but she was already here.
3 She was already here in front." That's when I had the
4 time to mop, when she moved from here.
5    Q    Do you know who those ladies are that you spoke
6 with after this about this wet floor?
7    A    I didn't pay attention to them since I didn't
8 even know that lady who fell down. I don't know them. I
9 don't know them, but I'm sure that the floor was not wet
10 when she fell.
11        MR. MANN: Objection, nonresponsive. No
12 question.
13   Q    (BY MR. MANN) Was it Ms. Guzman who was making
14 you behind schedule this day?
15   A    Yes, because she was standing here. She was very
16 close to the area where I was.
17   Q    Why didn't you wait until she left the building
18 before you mopped the area where she was?
19        MR. ALMAGUER: I think you asked two
20 questions because the translator didn't say, "until she
21 left the building." That's what you're saying, right? I
22 don't think the interpretation was complete.
23        MR. MANN: Let me reask the question.
24        THE INTERPRETER: I think I agree. It wasn't
25 complete.

Wilson Reporting Services

73

1    Q    (BY MR. MANN)  Why did you not wait until
2  Ms. Guzman left the area where her post office box was
3  located before you moved in with the mop to begin mopping
4  the area?
5    A    I didn't mop -- well, I started to mop, but as I
6  said, I thought she was going to go because she stood
7  there for a long period of time, and I thought that she
8  was preparing herself to leave or something when I just
9  realized she was already sitting down there.
10   Q    Okay.  So would it be safe to say that you were
11 trying your best to get the work done on time despite the
12 fact that she was still next to her post office box?
13        MR. ALMAGUER:  Objection as to form,
14 argumentative, and a misstatement of the evidence.
15   A    I don't know.
16   Q    (BY MR. MANN)  But you didn't want to be late
17 with your completion of your work?
18   A    No, but anyway, I took time -- I gave her time
19 for her to move from there, but I didn't mop where she
20 was.  I hadn't gotten to that place, but at the same time,
21 since I was mopping and walking slowly at the same time, I
22 felt that something was against me.
23   Q    How big is this area where the post office boxes
24 are?  Is it four feet wide, five feet wide?
25   A    I couldn't tell you because I don't know how big.

74

1    Q    Would you say it was a large room or a small
2  room?
3    A    It's long.
4    Q    Is it skinny?
5    A    No, it's a regular type of lobby so people can go
6  in and out of there.  It's not too reduced.
7    Q    Did you ever look back when you started mopping
8  to see if Ms. Guzman was still there?
9    A    No, I didn't see.
10   Q    So you wouldn't know if you had passed her up
11 with the mop until you stumbled over her?
12   A    No, I just stumbled because I didn't see
13 her.  I didn't know that she was there on the floor.
14   Q    Okay.
15        MR. MANN:  No further questions.
16        MR. ALMAGUER:  Just two quick questions here,
17 then I'm done.
18              EXAMINATION
19 BY MR. ALMAGUER:
20   Q    Can you please -- you have already indicated here
21 where there are a couple of tables there in the post
22 office by the windows.  Just to clarify with an "X," can
23 you mark where the windows are?
24   A    (Witness complies.)  And here there's another
25 one.

75

1    Q    Can you mark it with an "X"?
2    A    (Witness complies.)
3    Q    Okay.
4    Q    And here there are some long tables -- small
5  tables, trash cans, and here is another trash can.
6    Q    Okay.  For the record, you have indicated the
7  trash cans with a small circle.  You also mentioned, of
8  course, you had supplies.  Can you tell me what supplies
9  you had in that utility room?
10   A    Things that I used to clean the bathrooms.
11   Q    Can you name and list them, please?
12   A    Lysol, Windex for the windows -- to clean the
13 windows, paper towels, and things that I use when I'm
14 ready to go.  That's what I had.
15   Q    Was there a mop there, too?
16   A    In the utility room there I have a mop.  I had it
17 there all the time in the utility room.
18   Q    Was there a broom there?
19   A    Yes, I use a broom sometimes.
20   Q    Was the bucket and the sign there, too?
21   A    Where?
22   Q    In the utility room or in the post office?
23   A    Yes, when I would finish using them.  When I
24 would finish using them, I go and place them in the
25 utility room.

76

1    Q    Any of these things we just mentioned, did you
2  ever have to buy any of them?
3    A    I never bought anything.
4    Q    So who would provide all of that for you?
5    A    The post office.
6    Q    Okay.
7        MR. ALMAGUER:  No further questions.  Pass
8  the witness.
9        MS. MASSO:  No questions.
10              EXAMINATION
11 BY MR. MANN:
12   Q    I've got one question.
13   A    Yes.
14   Q    Did Ms. Perez or anyone else in the post office
15 ever see you mop where you didn't have the bucket in the
16 close proximity to where you were mopping?
17        MR. ALMAGUER:  Objection to the form of the
18 question, speculation.  She wouldn't know what they saw or
19 didn't.
20   A    I don't know.  I don't know.  I don't know what
21 to tell you.
22   Q    (BY MR. MANN)  Okay.  Did any -- did Ms. Perez or
23 anyone from the post office ever tell you to keep the mop
24 bucket close to the mop when you were mopping the floors?
25   A    On one occasion I asked her if the bucket was

77

1  okay there, and she said it was okay unless I would put it
2  in the middle -- no -- but not to put it in the middle of
3  the lobby, that she would think that this was the safest
4  place to put it because if I would put it here people
5  would fall down or something to trip.
6      Q   Okay.  So these types of things would be
7  questions that you would take to Ms. Perez at the post
8  office?
9      A   I would ask her things to be sure.
10     Q   Okay.
11             MR. MANN:  No further questions.
12             (Proceedings concluded at 11:32 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

78

1             CHANGES AND SIGNATURE
2  PAGE        LINE      CHANGE               REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

79

1         I, ELENA OLIVAREZ, have read the foregoing
2  deposition and hereby affix by signature that same is true
   and correct, except as noted above.
3
4             _____
              ELENA OLIVAREZ
5
   THE STATE OF TEXAS )
6  COUNTY OF _____ )
7         Before me, _____, on this
8  day personally appeared ELENA OLIVAREZ, known to me (or
   proved to me under oath or through _____)
   (description of identity card or other document) to be the
9  person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
10 same for the purposes and consideration therein expressed.
11        Given under my hand and seal of office this
12 _____ day of _____, 2003.
13
              _____
14            NOTARY PUBLIC IN AND FOR
              THE STATE OF TEXAS
15
16
17
18
19
20
21
22
23
24
25

80

1           IN THE UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF TEXAS
              BROWNSVILLE DIVISION
3  GLORIA L. GARCIA a/k/a    )
   GLORIA GUZMAN,            )
4          Plaintiff         )
5                            )
   VS.                       )    CIVIL ACTION NO. B-02-017
6                            )
7  UNITED STATES OF AMERICA, )
   and YOLANDA PEREZ, as     )
8  Postmaster, UNITED STATES )
   POST OFFICE, SANTA ROSA,  )
9  TEXAS, and ELENA OLIVAREZ,)
   as an employee of the     )
10 UNITED STATES POST OFFICE,)
   SANTA ROSA, TEXAS         )
11        Defendants.        )
12
           REPORTER'S CERTIFICATION
13         DEPOSITION OF ELENA OLIVAREZ
              June 18, 2003
14
15     I, Heather Hall, Certified Shorthand Reporter in and
16 for the State of Texas, hereby certify to the following:
17     That the witness, ELENA OLIVAREZ, was duly sworn by
18 the officer and that the transcript of the oral deposition
19 is a true record of the testimony given by the witness;
20     That the deposition transcript was submitted on
21 _____ to the witness or to the
22 attorney for the witness for examination, signature, and
23 return to me by _____;
24     That the amount of time used by each party at the
25 deposition is as follows:

81

1    Mr. Jason R. Mann - 1 hour, 27 minutes
     Ms. Nancy L. Masso - 0 hours, 14 minutes
2    Mr. Pablo J. Almaguer - 0 hours, 33 minutes

3

4    That pursuant to information given to the deposition

5 officer at the time said testimony was taken, the

6 following includes all parties of record:

7

8    Mr. Jason R. Mann, Attorney for Plaintiffs
     Ms. Nancy L. Masso, Attorney for Defendant
        United States of America
9    Mr. Pablo J. Almaguer, Attorney for Defendant
        Elena Olivarez

10

11    I further certify that I am neither counsel for,

12 related to, nor employed by any of the parties in the

13 action in which this proceeding was taken, and further

14 that I am not financially or otherwise interested in the

15 outcome of the action.

16    Certified to me this _____ day of

17 _____, 2003.

18

19

20               HEATHER HALL, Texas CSR 7871
                Expiration Date: 12/31/04
21             WILSON REPORTING SERVICES
                P. O. Box 532003
22             Harlingen, Texas  78553
                (956) 412-5700
23             (956) 412-5771 Fax

24

25