45

United States District Court
Southern District of Texas
FILED

APR 3 0 2004

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| GLORIA L. GARCIA a/k/a | § | |
| GLORIA GUZMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-017 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| YOLANDA PEREZ, as Postmaster, United | § | |
| States Post Office, Santa Rosa, Texas, and | § | |
| ELENA OLIVAREZ, as an employee of the | § | |
| United States Post Office, Santa Rosa, Texas, | § | |
| | § | |
| Defendants. | § | |
| | § | |

### DEFENDANT ELENA OLIVAREZ'S MEMORANDUM IN OPPOSITION
### TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT

Defendant United States of America ("USA") has moved for summary judgment based on the assertions that 1) the USA did not have actual or constructive knowledge of the condition created by the United States Postal Service leading to Plaintiff's alleged slip and fall; 2) the United States Postal Service exercised reasonable care to reduce or eliminate the risk alleged to be the cause of Plaintiff's slip and fall; and 3) the United States Postal Service had no duty to exercise reasonable care and was not the proximate cause of Plaintiff's alleged injuries.

In support of its argument that it did not have actual or constructive knowledge of the condition created by the United States Postal Service ("U.S. Postal Service"), USA argues that the only person who had knowledge of the condition was Defendant Elena Olivarez ("Olivarez") who the USA asserts was not an employee of the U.S. Postal Service at the time of the accident.

Page 1 of 5

In support of this conclusory allegation, USA points to Olivarez's answers to one short set of questions from her two and a half hour long deposition where she indicates she became an employee of the U.S. Postal Service after the date of Plaintiff's alleged fall. Without stating a position to USA's remaining argument in support of its Motion for Summary Judgment, Olivarez files this memorandum as a response to the assertion that she was not an employee of the U.S. Postal Service at the time of Plaintiff's alleged accident.

**DEFENDANT USA CANNOT SUPPORT ITS SUMMARY JUDGMENT MOTION WITH THE ASSERTION THAT OLIVAREZ WAS NOT AN EMPLOYEE OF THE U.S. POSTAL SERVICE BECAUSE THAT IS A GENUINE ISSUE OF MATERIAL FACT IN DISPUTE.**

Under Fed. R. Civ. Pro. 56, in order to prevail, a moving party must establish that there are no disputed issues of material fact. In making its assertions about the facts underlying its motion, USA accepts the fact that Olivarez was an employee of the U.S. Postal Service but alleges she became one after November 12, 1999. This assertion is controverted by most of the evidence and legal authority cited in Olivarez's Memorandum in support of her Summary Judgment and it is a change in the USA's original position concerning Olivarez's status.[1]

Throughout the deposition, Olivarez testified that she was an employee of the U.S. Postal Service before November 12, 1999. At the onset of her deposition, Olivarez explains that shortly after starting her custodial duties for the U.S. Postal Service she was paid directly by the federal agency and did not have to wait for the check to travel through the hands of a third party in Indiana.[2] Close to the conclusion of the deposition, Olivarez once again stated that she felt she

---

[1] USA's Answer 3, 7, 8; USA Resp. to Interrog. No. 12.

[2] Olivarez Depo. 6 and 7.

always worked for the U.S. Postal Service even when she was made to sign a contract with an Indiana entity.[3] She stated that nothing ever changed from the time she was indirectly paid by the U.S. Postal Service to the time she was directly paid by the agency.[4] Olivarez indicated that no one from Indiana ever traveled to the Santa Rosa, Texas, to check on her work performance.[5] The U.S. Postal Service was the only entity supervising and controlling her duties.[6]

Olivarez's testimony cited by USA in support of their argument at best creates a factual dispute. The questions and answers cited by the USA are as follows:

Q        When did you change to the post office?

A        *I don't remember. I don't remember.*

Q        Was it before [Plaintiff] fell or after?

A        After.

Q        Was it soon after or was it a long time after?

A        Long *before* - - long after that happened.

(emphasis added).[7]

Olivarez's testimony demonstrates confusion on her part when answering the questions. However, when the deposition is read in its entirety, the testimony consistently supports the fact that she always felt she was an employee of the U.S. Postal Service. Additionally, as discussed

---

[3] Olivarez Depo. 57 and 58.

[4] Olivarez Depo. 34.

[5] Olivarez Depo. 41.

[6] Olivarez Depo. 37 and 38.

[7] Olivarez Depo. 33.

in Olivarez's Memorandum in support of her Motion for Summary Judgment, the objective facts show that Olivarez was an employee of the U.S. Postal Service. Moreover, if USA asserts that Olivarez was an employee at the time she retired as custodian of the Santa Rosa Post Office, then she was an employee of U.S. Postal Service from the time she was placed under the agency's control and supervision. To leave it to the U.S. Postal Service's discretion to decide the status of an employee or contractor, as the USA argues, would ignore the statutory definition of "employee" found in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, and the case law interpreting the definition.

Since Olivarez was an employee of the U.S. Postal Service throughout the time she worked at the Santa Rosa Post Office, the USA can not support its summary judgment argument with the assertion that her status as an employee was established after November 12, 1999. The conflicting evidence presented by USA and Olivarez is material, and because of this, only summary judgment in favor of Olivarez is appropriate.

Respectfully submitted,

**TEXAS RIOGRANDE LEGAL AID, INC.**
316 S. Closner
Edinburg, Texas 78539
(956)383-5673 - Tel.
(956)383-4688 Fax

BY: _____
Pablo J. Almaguer
State Bar No. 24004523
S.D. Tex. No. 22597
Attorney-in-Charge for Defendant
Elena Olivarez

## CERTIFICATE OF SERVICE

I, Pablo J. Almaguer, hereby certify that a true and correct copy of the foregoing document has been served upon opposing counsel via facsimile and first class mail on this the 30th day of April, 2004, to:

Jason R. Mann
J. EDWARD MANN, JR. & ASSOCIATES
222 E. Van Buren, Suite 701
PO Box 231
Harlingen, TX 78551-0231
*Fax: (956) 428-9494*

Steven T. Schammel, Asst. U.S. Attorney
UNITED STATES ATTORNEY'S OFFICE
1701 W. Highway 83, Suite #600
McAllen, TX 78501
*Fax: (956) 618-8016*

_____
Pablo J. Almaguer



**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

|  |  |  |
|---|---|---|
| GLORIA L. GARCIA a/k/a | § | |
| GLORIA GUZMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-017 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| YOLANDA PEREZ, as Postmaster, United | § | |
| States Post Office, Santa Rosa, Texas, and | § | |
| ELENA OLIVAREZ, as an employee of the | § | |
| United States Post Office, Santa Rosa, Texas, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DECLARATION OF PABLO JAVIER ALMAGUER

I, Pablo Javier Almaguer, declare the following based on personal knowledge:

1.     My name is Pablo Javier Almaguer, and I reside in McAllen, Hidalgo County, Texas. I am over the age of eighteen years and am competent to testify to the facts contained in this declaration. I am an attorney of record for Defendant Elena Olivarez in the above-styled action.

2.     Attached as an exhibit to this declaration at Tab 1 is a true and correct copy of the USA's Answer filed in the above-styled action.

3.     Attached as an exhibit to this declaration at Tab 2 is a true and correct copy of USA's response to Plaintiff's Interrogatory Number 12.

4.     Attached as an exhibit to this declaration at Tab 3 is a true and correct copy of the select pages from the Oral Deposition of Elena Olivarez.

5.      Each of the foregoing exhibits were produced by the parties in the course of discovery in this litigation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Pablo Javier Almaguer

Executed on:  _____4-30-04_____

## TABLE OF EXHIBITS

| Tab | Document | Abbreviated Reference |
|-----|----------|----------------------|
| 1 | United States of America's Answer to Plaintiff's Original Complaint | USA's Answer [paragraph number] |
| 2 | Defendant USA's response to Plaintiff's Interrogatory Number 12 | USA Resp. to Interrog. No. 12 |
| 3 | Excerpts of Oral Deposition of Elena Olivarez | Olivarez Depo. [page number] |

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 2 2 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| GLORIA L. GARCIA A/K/A | * | |
| GLORIA GUZMAN, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. B-02-017 |
| | * | |
| UNITED STATES OF AMERICA, and | * | |
| YOLANDA PEREZ, as Postmaster, | * | |
| United States Post Office, Santa Rosa, | * | |
| TX, and ELENA OLIVAREZ, as an | * | |
| Employee of the United States Post | * | |
| Office, Santa Rosa, Texas, | * | |
| Defendants. | * | |

## UNITED STATES OF AMERICA'S ANSWER
## TO PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, defendant herein, by and through Michael T. Shelby, United States Attorney for the Southern District of Texas, hereby files its answer to Plaintiff's Original Complaint. The defendant answers the consecutively numbered paragraphs as follows:

### A. PARTIES

1. Defendant has insufficient information to admit or deny plaintiff's residency or citizenship as alleged in paragraph 1 of the complaint. To the extent an answer is required, the defendant denies the allegation in paragraph 1.

2. The allegations in paragraph 2 of the complaint constitute plaintiff's allegations regarding service on the United States of America, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 2 may be construed as containing allegations of fact, they are denied.

3. The allegations in paragraph 3 of the complaint constitute plaintiff's allegations regarding service on Yolanda Perez, Postmaster of the United States Post Office, Santa Rosa, Texas, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 3 may be construed as containing allegations of fact, they are denied. Moreover, defendant avers that Yolanda Perez is not a proper party defendant in this case.

4. The allegations in paragraph 4 of the complaint constitute plaintiff's allegations regarding service on Elena Olivarez, a named defendant in this case, which is a conclusion of law to which no response is required. To the extent the allegations in paragraph 4 may be construed as containing allegations of fact, they are denied. Defendant denies that Elena Olivarez is an employee of the United States Postal Service as alleged in paragraph 4 of the complaint.

## B. JURISDICTION

5. The allegations in paragraph 5 of the complaint set forth plaintiff's allegations of jurisdiction to which no response is required. To the extent the Court requires a response, the allegations are denied.

## C. CONDITIONS PRECEDENT

6. The allegations in the first sentence of paragraph 6 of the complaint constitute plaintiff's allegations regarding the timeliness of the filing of her administrative claim, which is a conclusion of law to which no response is required. To the extent the allegations in the first sentence of paragraph 6 may be construed as containing allegations of fact, they are denied. Defendant admits the second sentence of paragraph 6.

2

## D. FACTS

7. Defendant admits the first sentence of paragraph 7 of the complaint. Defendant admits the allegations in the second sentence of paragraph 7 of the complaint that custodian Elena Olivarez was mopping the floor near plaintiff as plaintiff collected her mail but denies that Ms. Olivarez was an employee of the Postal Service as alleged in the second sentence of paragraph 7. Defendant has insufficient evidence to admit or deny the allegations contained in the third sentence of paragraph 7 of the complaint and, therefore, denies same. Defendant denies the allegations in the fourth sentence of paragraph 7 of the complaint. Defendant admits that plaintiff alleges injuries to both her left and right knees and admits further that plaintiff had surgery on her knees as alleged in the fifth sentence of paragraph 7 of the complaint, but defendant is without sufficient information to admit or deny the remaining allegations in the fifth sentence of paragraph 7 and, therefore, denies same. Defendant denies the allegations in the sixth sentence of paragraph 7 of the complaint.

## E. COUNT 1 - FEDERAL TORT CLAIMS ACT

8. Defendant denies the allegations in the first sentence of paragraph 8 of the complaint. Defendant admits that Postmaster Yolanda Perez was acting within the course and scope of her employment at all relevant times as alleged in the second sentence of paragraph 8. The remaining allegations in the second sentence of paragraph 8 constitute conclusions of law to which no response is required; if a response is required, however, defendant denies same. Defendant avers that Elena Olivarez was a contractor custodian and denies that Ms. Olivarez was an employee of the Postal Service as alleged in the third sentence of paragraph 8. The remaining allegations in the third sentence of paragraph 8

3

constitute conclusions of law to which no response is required; if a response is required, however, defendant denies same. The allegations in the fourth sentence of paragraph 8 constitution conclusions of law to which no response is required. To the extent the Court requires a response, however, defendant denies the allegations in the fifth sentence of paragraph 8.

9.  Defendant denies the allegations in paragraph 9 of the complaint.

### F. PRAYER

10.  No answer is required to the allegations in paragraph 10 of the complaint because the allegations are in the nature of a prayer for relief. To the extent that an answer is deemed necessary, however, defendant denies the allegations contained in this paragraph.

### AFFIRMATIVE DEFENSES

In accordance with Rule 8(c) of the Federal Rules of Civil Procedure, defendant hereby asserts the following affirmative defenses:

### FIRST AFFIRMATIVE DEFENSE

The Court lacks jurisdiction over any claims asserted herein against the United States Postal Service under the Federal Tort Claims Act (FTCA) because the conduct at issue and alleged to be negligent was that of a contractor of the United States of America rather than an employee. 28 U.S.C. §2671. As such, the United States of America is not responsible for the alleged acts or omissions, and has not waived its sovereign immunity for such claims.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's recovery is limited to the amount claimed administratively in plaintiff's administrative claim filed with the United States Postal Service. 28 U.S.C. §2675(b).

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's relief under the FTCA is limited to "money damages" only.  See 28 U.S.C. §1346(b).  Accordingly, this Court lacks jurisdiction to award any other type of relief in law or equity.

## FOURTH AFFIRMATIVE DEFENSE

Pre-judgment interest is not recoverable against the United States under the FTCA. See 28 U.S.C. §2674.

## FIFTH AFFIRMATIVE DEFENSE

Under the FTCA, the Plaintiff is not entitled to a trial by jury.  This case shall be tried by the Court without a jury.  28 U.S.C. §2402.

## SIXTH AFFIRMATIVE DEFENSE

The damages alleged in plaintiff's complaint were proximately caused by plaintiff's own negligence and not the acts or omissions of an employee or agent of the defendant.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's recovery, if any, is reduced and/or barred by the applicable Texas common or statutory law governing comparative negligence.

## EIGHTH AFFIRMATIVE DEFENSE

To the extent that any of plaintiff's injuries or damages alleged in her complaint were proximately and/or solely caused by a third party, and not the United States, plaintiff's claim for recovery is, therefore, reduced and/or barred accordingly.

## NINTH AFFIRMATIVE DEFENSE

Defendant denies plaintiff's injuries and/or damages were caused and/or contributed to by any fault attributable to it, but, in the event this Court does attribute such fault to the United States of America, then, in the alternative, the United States specifically pleads the

applicability of s...arse...and/or intervening cause...a de...y and a bar to recovery against the United States by plaintiff.

## TENTH AFFIRMATIVE DEFENSE

Any injuries and/or damages claimed by plaintiff herein are the result of pre-existing condition rather than any fault or conduct of defendant.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to properly serve the necessary parties to this action.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff has named improper party defendants in this action.

WHEREFORE, defendant requests that Plaintiff's Original Complaint be dismissed with prejudice, and that all relief requested be denied. Defendant requests all other relief, both law and equity, to which it is entitled.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

NANCY L. MASSO
Assistant U.S. Attorney
600 E. Harrison, #201
Brownsville, TX 78520
(956) 548-2554 Fax (956) 548-2549
Texas State Bar No. 00800490
Federal I.D. No. 10263

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing United States of America's Answer To Plaintiff's Original Complaint was mailed on this the 22nd day of April, 2002 via Certified Mail, Return Receipt Requested to Jason R. Mann, Attorney at Law, 222 E. Van Buren, Suite #701, P.O. Box 231, Harlingen, TX 78551-0231.

NANCY L. MASSO
Assistant U.S. Attorney

one example, in the Santa Rosa Post Office, the custodian would mop only one side of a hallway or corridor at a time. Since only one side was mopped at a time, employees and customers would have a dry area on which to walk.

**INTERROGATORY NO. 11:** When was the floor at the Santa Rosa Post Office last stripped, refinished and / or spray buffed prior to Plaintiff's fall accident.

**RESPONSE TO INTERROGATORY NO. 11:**

The last time the Santa Rosa Post Office floors were stripped, refinished and / or spray buffed was likely July 1996. The floors have not been stripped, waxed or buffed since the present Postmaster began in that position in May 1998.

**INTERROGATORY NO. 12:** Please indicate the company(ies) and / or individual(s) outside the Defendant's own organization that performed actual repairs and maintenance of the Santa Rosa Post Office. Name the person(s) and / or organization(s) and the actual employees thereof who performed the actual floor and building maintenance work.

**RESPONSE TO INTERROGATORY NO. 12:** Until approximately October 2000, Defendant and the Landlord of the post office building operated (mistakenly) as if building repairs were the responsibility of the Landlord. The Landlord therefore has the names of companies performing actual repairs of the building through most of that period. Otherwise, Defendant responds as follows:

Ms. Elena Olivarez
C/o Pablo Javier Almaguer
Texas Rural Legal Aid Inc.
316 South Closner
Edinburg, TX 78531
(Ms. Olivarez was the custodian at the Santa Rosa Post Office pursuant to a contract

with the Postal Service.  She performed routine, daily cleaning and maintenance at the Post Office.)

Paul Camacho
1306 E. Clifton
Weslaco, TX  78546
(Mr. Camacho stripped, waxed and sealed the Post Office floors in July 1996.)

Lara's Pest Control
1005 E. Washington
Harlingen, TX  78550
(Company performed pest control services to the Post Office in 1999.)

Villarreal, Inc.
__?_ East Hidalgo Avenue
Raymondville, TX  78580
(Company performed electrical repairs at Post Office.)

**INTERROGATORY NO. 13:**  Please indicate whether all of the interior lights in the Santa Rosa Post Office were operational at the time of Plaintiff's injury.

**RESPONSE TO INTERROGATORY NO. 13**:

Unknown.  The workroom lights are turned on and off by employees and were operational.  Employees do not activate the lobby lights; rather, the lights go on when activated by a motion sensor.  The postal employees do not remember at this time whether the sensor was working the lights properly at the time of Plaintiff's claimed injury.

**INTERROGATORY NO. 14:** Did you or any employee of the Santa Rosa Post Office or the United States of America receive any complaint, warning or other notice concerning a dangerous or defective condition existing at the Santa Rosa Post Office prior to the Plaintiff's accident subject to this lawsuit?

**RESPONSE TO INTERROGATORY NO. 14**:

09:10    1      A      My name is Elena Olivarez.

09:10    2      Q      And where do you live?

09:10    3      A      Santa Rosa.

09:10    4      Q      How close do you live to the post office in

09:10    5   Santa Rosa?

09:10    6      A      I don't know very well in measurements, but it

09:10    7   must be about a mile -- less than a mile.

09:10    8      Q      When did you first start working at the post

09:10    9   office in Santa Rosa?

09:10   10      A      I think it was in the '90s,-but I'm not sure

09:11   11   exactly if it was in the '90s or a couple of years later.

09:11   12   I had been working there for about nine years --

09:11   13      Q      Okay.

09:11   14      A      -- or something like that.

09:11   15      Q      Do you currently work there?

09:11   16      A      I don't work anymore now.

09:11   17      Q      Okay.  What is your understanding of how you were

09:11   18   employed by the United States Postal Service the first

09:11   19   year that you worked there?

09:11   20      A      I had a contract the first years, and then

09:12   21   shortly after that, the post office started to pay me.

09:12   22      Q      Do you remember how you were being paid November

09:12   23   12th, 1999, at the post office?

09:12   24      A      I was still receiving checks by that contract --

09:12   25   excuse me.  No, it wasn't that way.  I think I was already

09:12  1    being paid by the post office.

09:12  2         Q    Did you file tax returns for that year?

09:12  3         A    Yes.

09:12  4         Q    Okay.  Would you make those tax returns available

09:12  5    for my inspection?

09:12  6         A    I don't have them right now with me.

09:13  7         Q    If I give you a form that will enable me to get

09:13  8    them, will you sign it so that I can get them?

09:13  9         A    Yes.

09:13  10        Q    What is your social security number?

09:13  11        A    Can I take it from my purse?

09:13  12        Q    Sure.

09:13  13        A    The thing is that I don't like to be untrue in

09:13  14   relation to the number.  It's 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.

09:14  15        Q    Thank you.  Who told you when and where to be

09:14  16   with respect to your job at the United States Post Office

09:14  17   in Santa Rosa?

09:14  18        A    When I got the job?

09:14  19        Q    Start off there and go all the way through the

09:14  20   end of your employment.

09:15  21        A    I worked there -- when I started working there, I

09:15  22   worked there very well at the time, ever since that

09:15  23   accident happened.

09:15  24        Q    Was someone from the U.S. Postal Service the one

09:15  25   that set your schedule and told you what to do?

10:04  1      Q    (BY MR. MANN)  I'm not concerned about who paid

10:04  2  your taxes or if you got a refund.

10:04  3      A    Yes.  Yes, I understand.  My husband would pay

10:04  4  for the taxes.

10:04  5      Q    What I'm asking is what your working relationship

10:04  6  was with the Indianapolis company versus if you worked

10:04  7  directly at any point in time for the United States Posta.

10:05  8  Service?

10:05  9      A    Every year they would give me a raise, $.25 every

10:05  10  year.  It would depend, yes.  That's the way they would

10:05  11  send me things.  Something like that, you mean?

10:05  12      Q    No.  What I'm asking is:  Were you always working

10:05  13  under this contract from Indianapolis or was there ever a

10:05  14  different situation?

10:05  15      A    It was the same thing.  The problem is that they

10:05  16  stopped sending me my check for almost one month, and

10:05  17  that's the reason why I changed to the post office.

10:06  18      Q    When did you change to the post office?

10:06  19      A    I don't remember.  I don't remember.

10:06  20      Q    Was it before Ms. Guzman fell or after?

10:06  21      A    After.

10:06  22      Q    Was it soon after or was it a long time after?

10:06  23      A    Long before -- long after that happened.

10:06  24      Q    Did you get any benefits that you didn't

10:06  25  previously receive once you switched directly with the

| | | |
|---|---|---|
| 10:06 | 1 | United States Postal Service? |
| 10:06 | 2 | A    Benefits like what? |
| 10:07 | 3 | Q    I'm just asking the question.   Medical? |
| 10:07 | 4 | A    No, they didn't give me anything like that.   They |
| 10:07 | 5 | didn't give me any benefits. |
| 10:07 | 6 | Q    Were -- once you switched to being directly |
| 10:07 | 7 | employed by the United States Postal Service, were you |
| 10:07 | 8 | ever told to mop the floor and do all of your maintenance |
| 10:07 | 9 | items any different than you had previously done? |
| 10:07 | 10 | A    They didn't tell me anything. |
| 10:07 | 11 | Q    Okay. |
| 10:07 | 12 | A    Everything continued the same way. |
| 10:07 | 13 | Q    Everything regarding your contact with the United |
| 10:07 | 14 | States Postal Service employees on-site was the same as |
| 10:08 | 15 | before? |
| 10:08 | 16 | A    Everything was the same as always. |
| 10:08 | 17 | Q    You didn't get a new manual from the United |
| 10:08 | 18 | States Postal Service? |
| 10:08 | 19 | A    No. |
| 10:08 | 20 | Q    Have you talked to anyone besides your attorney |
| 10:09 | 21 | about this accident that occurred November 12th, 1999? |
| 10:09 | 22 | A    No, only with my husband.   I spoke with him, and |
| 10:09 | 23 | I told him what had happened. |
| 10:09 | 24 | Q    What did you tell him? |
| 10:09 | 25 | A    That the lady -- well, according to her, she said |

10:13    1    you not to put the sign in this area here because people

10:13    2    would trip?

10:13    3            MS. MASSO:  I object to the form of that

10:13    4    question.  We believe that she changed her answer to that

10:13    5    earlier, and now you are changing the testimony in the

10:13    6    form of that question.

10:13    7            MR. MANN:  I don't think there's a proper

10:13    8    objection there, but --

10:13    9            MS. MASSO:  Well --

10:13   10       Q    (BY MR. MANN)  Please go ahead and answer the

10:13   11    question.

10:13   12       A    Ask me again, please.

10:13   13       Q    So Ms. Perez was probably the person, if there

10:13   14    was a person, that told you to put -- to not put a sign in

10:13   15    this area because people would trip?

10:13   16            MS. MASSO:  I still object to the form of the

10:13   17    question.

10:13   18       A    I don't remember who was the one who told me, but

10:14   19    when I started working at first, when I would work, she

10:14   20    would put it there, and that's where I would put it as

10:14   21    well.

10:14   22       Q    Well, there wasn't anyone from Indianapolis in

10:14   23    Santa Rosa, was there?

10:14   24       A    No, nobody came.

10:14   25       Q    So no one from Indianapolis told you anything

10:14   1   about where to put signs or how to mop?

10:14   2       A    They never came.  They never came.  They never

10:14   3   told me anything.

10:14   4       Q    So if anyone told you anything, it would have had

10:14   5   to be a U.S. Postal Service employee?

10:14   6       A    They told me that I could put the wet sign floor

10:14   7   here when I would mop here so that people would understand

10:14   8   that I was mopping here.  I was -- that I was working.

10:14   9       Q    I understand that, and I believe you when you say

10:14  10   that.  I'm just trying to find out if the person that told

10:15  11   you that worked for the U.S. Postal Service.

10:15  12       A    No, it wasn't her.  They didn't tell me.  It was

10:15  13   not them who told me.

10:15  14       Q    It was someone from Indianapolis, then?

10:15  15       A    No.  The person that would work there before I

10:15  16   worked were the people who told me that they would put --

10:15  17   that I could put the bucket there and the sign here.

10:15  18       Q    Oh, okay.  Who was that person; do you remember?

10:15  19       A    No, I don't remember.  I don't remember.

10:15  20       Q    Did they work for the Indianapolis company before

10:15  21   you?

10:15  22       A    No, because this young lady -- or lady did not

10:15  23   last too long at work.

10:15  24       Q    So she was still working there when they hired

10:15  25   you?

10:20    1    Q    Okay.  It wasn't anyone from Indianapolis that

10:20    2    called and told you where to place the signs or where to

10:20    3    mop or how to mop?

10:20    4    A    Not with the contract, nobody told me.  They

10:20    5    never went there.  They would just call and ask me how I

10:20    6    was doing my job, and they would give good references

10:20    7    about me.  Every year they would check on me.

10:20    8    Q    Okay.  And until they missed the checks and

10:20    9    didn't pay you, you were fine with them?

10:20    10    A    Then that's when I called.  I called them and the

10:21    11    same lady told me if I wanted to -- because sometimes I

10:21    12    needed money for important things that I needed, and I

10:21    13    needed that -- at that time I needed the money.  That's

10:21    14    when they asked me that -- she said that if I wanted, they

10:21    15    could pay me from the post office money so I wouldn't have

10:21    16    a hard time with the checks.  That's when I switched, but

10:21    17    that was when I was ready to leave the job.

10:22    18    Q    Okay.  Do you know if anyone else ever fell in

10:22    19    the post office?

10:22    20    A    This is the first time that this happened, but I

10:22    21    don't know if nobody else had fallen.

10:22    22    Q    Okay.  Did you do anything different after she

10:22    23    fell?

10:22    24    A    No, everything continued the same way as the way

10:22    25    I would do it.  It's the same way I would always do it,

```
10:56   1    Ms. Perez?
10:56   2        A    No, she didn't talk to anybody.  She left.
10:56   3        Q    Okay.  Did you ever -- did you see her when she
10:56   4    was walking out of the post office -- when she was walkin
10:56   5    out?
10:56   6        A    I saw her when she got up from here.  I saw to
10:56   7    check if she was limping or something, but she was walking
10:56   8    well.
10:56   9        Q    Okay.
10:57  10        A    But when she went out, I did not pay attention if
10:57  11    she was limping or if she was hurting.
10:57  12        Q    That's fine.
10:57  13        A    I'm sorry.  Can I tell you -- when she was
10:57  14    halfway up, I felt bad, and I tried to help her to get up
10:57  15    because I thought that she was going to have problems in
10:57  16    getting up, but she didn't.  She was very light.  She was
10:57  17    very light to me.  She didn't force herself to get up at
10:57  18    all.
10:58  19        Q    Okay.  Let me ask you about the issue of this
10:58  20    contract that you mentioned you had with these people --
10:59  21    or a company -- a person or company in Indianapolis.  When
10:58  22    you had that contract -- or under that contract, who did
10:58  23    you think you worked for?
10:58  24        A    I thought that with the contract that I was
10:58  25    working there because I signed those documents.
```

10:58   1        Q    Who did you feel you were working for at that

10:58   2   time?

10:58   3        A    For the post office because I was at the post

10:58   4   office.

10:58   5        Q    Okay.  After the contract was done away with, who

10:59   6   did you feel you worked for then?

10:59   7        A    With the post office.

10:59   8        Q    At all times you felt that you were working for

10:59   9   them?

10:59  10        A    Yes.

10:59  11        Q    Did the post office do or say anything to make

10:59  12   you feel otherwise?

10:59  13        A    No, they always treated me well, and they were

10:59  14   very happy with my job.

10:59  15        Q    In fact, you mentioned that you would get a

10:59  16   raise; is that correct?

10:59  17        A    Oh, yes, when I was with the contract, they gave

10:59  18   me a raise.  They would give me a raise every year.

10:59  19        Q    How much?

10:59  20        A    $.25 -- or it would depend, $.25.  $.25 every

10:59  21   year they would give me.

10:59  22        Q    Did they continue doing that or did the post

11:00  23   office do that after the contract was terminated?

11:00  24        A    No, it remained as it was with the contract, but

11:30  25   they didn't give me a raise there.