United States District Court
Southern District of Texas
FILED

MAY 0 7 2004

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA GARCIA. A/K/A §
GLORIA GUZMAN §
      Plaintiff, §
§
vs. §
§    CIVIL ACTION NO. B-02-017
§
UNITED STATES OF AMERICA, and §
YOLANDA PEREZ, as Postmaster, §
United States Post Office, Santa Rosa, §
Texas, and ELENA OLIVAREZ, as an §
Employee of the United States Post Office, §
Santa Rosa, Texas §
      Defendants. §

**THE UNITED STATES'**
**RESPONSE IN OPPOSITION TO DEFENDANT ELENA OLIVAREZ'S**
**MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant United States of America by and through Michael Shelby, United

States Attorney for the Southern District of Texas, and respectfully moves this Court, to deny

Defendant Elena Olivarez's Motion for Summary Judgment pursuant to Fed. R. Civ. P 56, stating

the following in support.

**I. Defendant Elena Olivarez's Claims and Allegations**

This action is brought by Plaintiff Gloria Garcia a/k/a Gloria Guzman (Plaintiff) under the

Federal Tort Claims Act (FTCA) for alleged injuries that Plaintiff claimed to have received in the

United States Post Office in Santa Rosa (Santa Rosa Post Office), Texas on November 12, 1999.

The Court granted an unopposed motion to substitute the United States of America for Postmaster

Yolanda Perez on May 16, 2003.  The only remaining defendants are the United States and Elena

Olivarez.

Defendant Olivarez contends that she is the employee of the United States Postal Service and not an independent contractor, and therefore not a proper defendant under the FTCA. As such she argues that her Motion for Summary Judgment should be granted. Specifically, Defendant Olivarez alleges that:

1.  USA exercised exhaustive control over Olivarez's employment by providing detailed and extensive instructions concerning her duties as a custodian at the U.S. Postal Office in Santa Rosa, Texas and such control belies the USA's claim that she was an independent contractor;

2.  Along with USA's control over Olivarez's detailed physical performance, the law of agency establishes that Olivarez was an employee of the USA and not an independent contractor; and

3.  Olivarez was acting within the course and scope of her employment when the common law tort allegations alleged by Plaintiff were committed.

(*Defendant Elena Olivarez's Motion for Summary Judgment*, p. 2-3).

## II. Statement of the Issues

1.  The United States did not exercise exhaustive control over Defendant Olivarez's employment at the Santa Rosa Post Office.

2.  The law of agency does establishes that Defendant Olivarez was (at the time of the alleged fall) an independent contractor and not an employee of the United States Postal Service.

3.    Since Defendant Olivarez was an independent contractor at the time of
Plaintiff's alleged fall, she was not acting within the course and scope of an
employee.

## III. Statement of Facts

The Plaintiff contends that on November 12, 1999, at 7:10 AM, she entered the Santa Rosa Post Office to collect her mail and while in the process of doing so, Plaintiff allegedly slipped and fell (*Plaintiff's Original Complaint*). At the same time Elena Olivarez, an independent contractor custodian, was in the Santa Rosa Post Office  cleaning (*Olivarez Deposition,* p. 12:25-13:22).[1] Defendant Olivarez contends, however, that she was an employee of the United States Postal Service at the time of the alleged fall.

On the date in question, Plaintiff contends that the floor near her post office box near where Defendant Olivarez had been mopping was wet (*Plaintiff's Original Complaint*, p.7). Defendant Olivarez first noticed Plaintiff on the ground when she bumped into Plaintiff (*Olivarez Deposition*, p. 21:1-5; p. 55:23-25). Plaintiff filed this action on February 1, 2002 (*Plaintiff's Original Complaint*).

## IV. Standard of Review Fed. R. Civ. P. 56

Rule 56 of the Federal Rules of Civil Procedure mandates that summary judgment be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[1]The deposition of Elena Olivarez is attached hereto and incorporated into the Motion for Summary Judgment as *Exhibit A*.

with affidavits, if any, show that there is no genuine issue of material fact and that the moving party

is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.; *see Little v. Liquid Air Corp.*,

37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (*per curiam*). The moving party bears the initial burden

of informing the court of the basis for its motion, and of identifying those portions of the record

which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986). The movant who is a defendant may discharge its burden by pointing out an

absence of proof on any one of the essential elements of the plaintiff's claim. *Celotex*, 477 U.S. at

325. The moving party, however, need not negate the elements of the nonmovant's case. *Wallace*

*v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996).

Once a proper motion has been made, the nonmoving party may not rest upon mere

allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific

facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322-23.

Moreover, disputes over irrelevant facts will not preclude summary judgment. Only material facts -

those capable of affecting the outcome under existing law - infringe upon the summary judgment

analysis. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also*, *Hanchey v.*

*Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990) (fact issue must be "outcome determinative"). The

nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory

allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual

dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075. However, all evidence must be

viewed in a light most favorable to the motion's opponent. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 106 S.Ct. 2505, 2513-14 (1986).

(7)    the method of time, whether by time or by the job;

(8)    whether or not the work is a part of the regular business of the employer;

(9)    whether or not the parties believe they are creating the relationship of master and servant; and

(10)   whether or not the principle is or is not in business.

*Linkous*, 142 F.3d at 276; *Rodriguez v. Sarabyn*, 129 F.3d 760, 765 (5th Cir. 1997); *Restatement (Second) of Agency* § 220.[2] An examination of the evidence shows that almost every factor proves that Defendant Olivarez was an independent contractor.

## 1.    The United States did not exercise exhaustive control over Defendant Olivarez's employment at the Santa Rosa Post Office.

Defendant Olivarez was an independent contractor because she exercised ultimate control over her actions. Defendant Olivarez signed a written contract with the United States Postal Service on April 1, 1994 (*Olivarez Deposition*, p. 6: 20).[3]    In completing the written contract with the United States Postal Service, Defendant Olivarez checked off the box stating that she, "is" a self-employed contractor.[4] Two pages later Defendant Olivarez admitted, by checking off the boxes, that she was not an employee of the United States Postal Service nor was her employment organization owned or substantially controlled by a Postal Service employee or by a member of their family.[5]

---

[2]Attached hereto as *Exhibit B*.

[3] *Exhibit C1*, p. 2.

[4]  *Exhibit C1*, p. 20.

[5]  *Exhibit C1*, p. 23.

This contract contained all the terms of her employment. The length of time for her to complete the required job is estimated by the contract as 21 hours every two weeks.[6]

When questioned during her deposition as to who she received her instructions from, Defendant Olivarez admitted, "Through the agreement when I had the contract. The agreement," (*Olivarez Deposition*, p. 8:14-15). When further questioned by Plaintiff, if the people at the Santa Rosa Post Office asked her, Defendant Olivarez, to do things (i.e. mop) in a specific way, Defendant Olivarez admitted, "They never told me to do so," (*Id.*, p. 9:16-21). The documentation on how to conduct her job was provided to Defendant Olivarez by the contract (*Id.*, p. 10: 15-22; p. 12:25-13:3). The Contract that Defendant Olivarez signed contains 31 pages of requirements and specifications for successful completion of the contract.[7] The contract states that the supplies are to be provided by the United States Postal Service and delineates the scope of the work that she is being contracted to provide.[8] Defendant Olivarez's term of her employment was set at two (2) years.[9] The contract further requires the contractor to comply with applicable OSHA regulations; federal, state, and local regulations for workplace safety, and compliance with the United States Postal Service Handbook MS-10 (Floors, Care and Maintenance).[10]

Defendant Olivarez arrived at work at 6:00 am (*Id.* p. 59:22). When asked who directed her

---

[6] *Exhibit C1*, p. 2.

[7] *Exhibit C1*, p. 2.

[8] *Exhibit C1*, p. 4-9.

[9] *Exhibit C1*, p. 10. This contract could be extended for no more than four (4) additional two year terms. *Id.*, p. 2; *See also Exhibit C2 and C3*.

[10] *Exhibit C1*, p. 10, 12.

to do so she admitted, "No, nobody told me," (*Id.* p. 59:22). In fact, by the terms of her contract, it is the contract that so instructed her as to her hours, specifically between 8:00 am and 4:30 pm so long as it does not interfere with the movement of the mail.[11] She did not have to work a required number of hours, rather she worked until the job was done. In the contract, the United States estimated the amount of time to be approximately 21 hours every two weeks.[12] In the execution of the day to day duties, Defendant Olivarez admitted that she did not necessarily follow the maintenance manual, and she was not specifically instructed on how to proceed (*Id.*, p. 17:7-8). In fact, Defendant Olivarez was provided with a key to the front door and the postal employee area so as to permit her to clean all areas as she deemed fit (*Id.*, 30:1:5). The only guidance that she received form the United States Postal Service was the contract, its attachments, and the contacting officer's representative (the Postal Service point of contact with the contractor on all routine matters).[13] In the placement of safety equipment, Defendant Olivarez had the manuals provided pursuant to the contract.[14] When Defendant Olivarez was asked if she would return to work if called by the Post Office, she admitted, "Yes, if I wanted to go, I could go," (*Id.*, p. 63:17). She clearly understood that she had the option and could say no since it would be outside of her normal hours. Defendant Olivarez exercised ultimate control over her actions and when she appeared for work.

The only exercise of control by the United States Post Office was to guarantee performance

---

[11] *Exhibit C1*, p. 4.

[12] *Exhibit C1*, p. 3.

[13] *Exhibit C1*, p. 11.

[14] *Exhibit C1*, p. 10. Defendant Olivarez stated that she received the Post Office Manuals from her contractor in Indiana and that she was instructed by the person whose place she took (*Olivarez Deposition.* p. 38:15-17).

of the contract pursuant to Section E.[15]  However, broad supervisory control, even on a daily basis, does not suffice to demonstrate control over the physical performance of the contractor. *Macharia v. U.S.*, D.D.C.2002, 238 F.Supp.2d 13, *affirmed* 334 F.3d 61, 357 U.S.App.D.C. 223. By the admission of Defendant Olivarez, the majority of the control was provided through the contract itself and through her own decision making.  When examined in a light most favorable to the United States, the opponent of the motion for summary judgment, the Court must find that the United States did not exercise exhaustive control over Defendant Olivarez, therefore the United States Postal Service was not her employer. *Anderson*, 477 U.S. at 255 106 S.Ct. at 2513-14.

**2.    Defendant Olivarez was (at the time of the alleged fall) an independent contractor and not an employee of the United States Postal Service.**

In addition to the fact that the contract, not the United States Postal Service as an employer, controlled most of the details of the work, the Defendant Olivarez did not meet most of the other factors relevant in determining if she was an employee of the United States.

Defendant Olivarez was engaged in a distinct occupation or business, that of custodian (*Olivarez Deposition*, p. 8:5-10).[16]  This occupation is not part of the regular business of the United States Postal Service which is the delivery of mail.  The method of time by which Defendant Olivarez was paid was set by the  contract.[17]  She was paid on a bi-weekly basis.[18]  This was a flat

---

[15] *Exhibit C1*, p. 11.

[16] *Exhibit C1*, p. 1; Exhibit *C1*, p. 2.

[17] *Exhibit C1*, p. 2; *Exhibit C2*, p. 1; and *Exhibit C3*, p. 1.

[18] *Exhibit C1*, p. 3.

rate regardless of the number of hours worked. The contract stated that it was anticipated that Defendant Olivarez would spend approximately 21 hours every two weeks to accomplish her contractual obligations.[19] Defendant Olivarez was under contract for an initial period of two years with the option of being extended for up to four (4) additional two (2) year periods.[20] Ultimately, Defendant Olivarez's contract was extended twice, for two years each time.[21]

Another factor is whether, in the locality, the custodial work is usually done under the direction of the employer or by a specialist without supervision. *Restatement (Second) of Agency* § 220 (2)(c). There is, however, an exception to the general rule. *Id.*, Comment i. "If, however, one furnishes unskilled workmen to do work for another, it is not abnormal to find that the workmen remain the servants of the one supplying them. *See* § 227." *Id.* In this particular instance Defendant Olivarez stated that she thought she was employed by a contractor in Indiana, and that they in turn furnished her as an unskilled custodial worker to the United States Postal Service (Olivarez Deposition, p 13:11-16).[22] The reality is that the United States Postal Service contracts for cleaning services throughout Texas and the Postal Service's entire Southwest Area - the contracting of

---

[19] *Exhibit C1*, p. 3.

[20] *Exhibit C1*, p. 2.

[21] *Exhibit C2*, p. 1; and *Exhibit C3*, p. 1. Defendant Olivarez contends that she was later hired by the United States Postal Service long after Plaintiff's fall (*Olivarez Deposition*, p. 33:18-23). However, Defendant Olivarez's last contract extended beyond the date of the fall. *Exhibit C3*, p. 1.

[22] Yet another factor to consider is the skill level required. *Restatement (Second) of Agency* § 220 (2)(d). Defendant Olivarez admits in her Memorandum and Authorities in Support of Defendant Elena Olivarez's Motion for Summary Judgment that her duties did not require skill or education.

custodial workers is common place.[23]

The instrumentalities (i.e. the mop, broom and cleaning products) were supplied to Defendant Olivarez by the United States pursuant to the contract; but they were of inconsequential value (*Olivarez Deposition*, p. 75:12-76:5).[24] Since these were of minimal value, their relevance is likewise inconsequential. *Restatement (Second) of Agency* § 220, Comment k. Likewise it is not determinative if the Defendant Olivarez believed they had a master and servant relationship. *Restatement (Second) of Agency* § 220, Comment m. Defendant Olivarez admitted that she was a contract employee (*Olivarez Deposition*, p. 6:20). Furthermore, Defendant Olivarez stated that she thought she was employed by a contractor in Indiana, thus she not only knew that she was not an employee of the United States Postal Service, but she thought she was the employee of a company in Indiana (*Olivarez Deposition*, p. 13:11-16).

Defendant Olivarez fails to meet most, if any, of the law of agency guidelines that establish her as an employee. Viewed in a light most favorable to the motion's opponent, Defendant Olivarez must be deemed an independent contractor. *Anderson*, 477 U.S. at 255 106 S.Ct. at 2513-14.

3.     **Since Defendant Olivarez was a independent contractor at the time of Plaintiff's alleged fall, she was not acting within the course and scope of an employee.**

Defendant Olivarez knowingly entered into a contract and exercised a great deal of control as previously stated. When compared with the relevant elements delineated in *Linkous, Rodriguez*, and the *Restatement (Second) of Agency* § 220, Defendant Olivarez meets almost none of the criteria

---

[23] *Exhibit C*, p. 1.

[24] *Exhibit C1*, p. 2.

in order to be deemed an employee. *Linkous*, 142 F.3d at 276; *Rodriguez*, 129 F.3d at 765; *Restatement (Second) of Agency* § 220. When viewed in the totality, especially in light of Defendant Olivarez's own admissions that she was under contract as a custodian (not to mention that she erroneously believed that she was under contract with an independent third party) along with the three signed contacts, there con be no finding other than that Defendant Olivarez was an independent contractor.

## VI. Conclusions

For the foregoing reasons, Defendants' respectfully prays that the Court deny Defendant Elena Olivarez's Motion for Summary Judgment because Defendant Olivarez cannot prove, as a matter of law, that the United States exercised exhaustive control over her employment at the Santa Rosa Post Office or that the law of agency establishes that she was (at the time of the alleged fall) an employee of the United States Postal Service.

Respectfully submitted,

MICHAEL SHELBY
UNITED STATES ATTORNEY

_____, AUSA,

For: STEVEN T. SCHAMMEL
Assistant U. S. Attorney
1701 W. Highway 83, Suite #600
McAllen, Texas 78501
(956) 618-8010
(956) 618-8016 (fax)
State Bar No. 24007990

Exhibits:

  A. Olivarez Deposition
  B. *Restatement (Second) of Agency* § 220
  C. Contracts of Defendant Elena Olivarez and Declaration of Steven R. Carpenter
    1. Cleaning Services Payment Authorization and Cleaning Service: Offer and Award (4-1-1994)
    2. Contract/Order Modification (3-15-1996)
    3. Contract/Order Modification (4-15-1998)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the true and foregoing the United States' Response to Defendant Elena Olivarez's Motion for Summary Judgment was mailed via First-Class Mail to the following:


Jason R. Mann
J. EDWARD MANN, JR. & ASSOCIATES
222 E. Van Buren, Suite 701
PO Box 231
Harlingen, TX 78551-0231

Attorney for Plaintiff

Pablo J. Almaguer
TEXAS RURAL LEGAL AID, INC.
316 S. Closner
Edinburg, Texas 78539

Attorney for Elena Olivarez

on this the _____ day of _____, 2004.

Steven T. Schammel
Assistant U. S. Attorney

14 of 15

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GLORIA GARCIA. A/K/A | § | |
| GLORIA GUZMAN | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. B-02-017 |
| | § | |
| UNITED STATES OF AMERICA, and | § | |
| YOLANDA PEREZ, as Postmaster, | § | |
| United States Post Office, Santa Rosa, | § | |
| Texas, and ELENA OLIVAREZ, as an | § | |
| Employee of the United States Post Office, | § | |
| Santa Rosa, Texas | § | |
|     Defendants. | § | |

## ORDER DENYING
## DEFENDANT ELENA OLIVAREZ'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

The Court denies Defendant Elena Olivarez's Motion for Summary Judgment.

_____
Andrew S. Hanen
United States District Judge

1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3   GLORIA L. GARCIA a/k/a      )
    GLORIA GUZMAN,              )
4          Plaintiff            )
                                )
5                               )
    VS.                         )    CIVIL ACTION NO. B-02-017
6                               )
                                )
7   UNITED STATES OF AMERICA,   )
    and YOLANDA PEREZ, as       )
8   Postmaster, UNITED STATES   )
    POST OFFICE, SANTA ROSA,    )
9   TEXAS, and ELENA OLIVAREZ,  )
    as an employee of the       )
10  UNITED STATES POST OFFICE,  )
    SANTA ROSA, TEXAS           )
11         Defendants.          )

12

    ************************************************************
13

14              ORAL DEPOSITION OF

15              ELENA OLIVAREZ

16              June 18, 2003

    ************************************************************
17     ORAL DEPOSITION OF ELENA OLIVAREZ, produced as a

18  witness at the instance of the Plaintiff, and duly sworn,

19  was taken in the above-styled and numbered cause on the

20  18th of June, 2003, from 9:08 a.m. to 11:32 a.m., before

21  Heather Hall, CSR in and for the State of Texas, reported

22  by machine shorthand, at the Law Offices of J. Edward Mann

23  & Associates, 222 East Van Buren, Suite 701, Harlingen,

24  Texas, pursuant to the Federal Rules of Civil Procedure

25  and the provisions attached hereto.



```
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3        Mr. Jason R. Mann
         LAW OFFICES OF J. EDWARD MANN, JR. & ASSOCIATES
4        222 East Van Buren, Suite 701
         Harlingen, Texas  78550
5
     FOR THE DEFENDANT THE UNITED STATES OF AMERICA:
6
         Ms. Nancy L. Masso
7        UNITED STATES ATTORNEY'S OFFICE
         SOUTHERN DISTRICT OF TEXAS
8        600 East Harrison, Suite 201
         Brownsville, Texas  78520
9
     FOR THE DEFENDANT ELENA OLIVAREZ:
10
         Mr. Pablo J. Almaguer
11       LAW OFFICES OF TEXAS RURAL LEGAL AID
         316 Closner
12       Edinburg, Texas  78539

13   ALSO PRESENT:

14       Ms. Cecilia Turrent, Interpreter
         Ms. Gloria Guzman, Plaintiff
15       Mr. Juan Olivarez, Defendant's husband

16

17

18

19

20

21

22

23

24

25
```

```
1

2   Job No. 2003-203

3           STIPULATIONS FOR THE DEPOSITION OF
                     ELENA OLIVAREZ
4
    Taken on:  06/18/03           Deposition Location:
5   Beginning: 9:08 a.m.          J. Edward Mann, Jr.
    Finish:    11:32 a.m.         222 East Van Buren
6   Pursuant to: Rules            Harlingen, Texas

7   SIGNATURE OF WITNESS:

8       1.  ( ) Is waived.
        2.  (X) The witness shall read and sign this
9   deposition before any notary by:
            (X) reading the original transcript sent to
10  his/her attorney.  Attorney: Mr. Pablo Almaguer
            ( ) reading the original transcript sent to
11  witness.
            ( ) coming to the reporter's office.
12      3.  (X) If the original deposition is released from
    the reporter's possession and is not returned for timely
13  filing with the custodial attorney, a copy may be filed,
    unsigned and uncorrected.
14          It is also understood that the court reporter
    assumes no responsibility for filing when the attorneys
15  agree to release the original deposition.

16

17  OBJECTIONS:

18      1.  (X) All objections will be made in accordance with
    the Federal Rules.
        2.  ( ) All objections will be made in accordance with
19  the Texas Rules.

20

21  EXHIBITS:

22      Exhibit Nos. 1 and 2.

23

24              ---ooOoo---

25
```

1                              INDEX

2    Appearances ........................................    2

3    Stipulations .......................................    3

4    ELENA OLIVAREZ

5        Examination by Mr. Mann ......................    5
         Examination by Ms. Masso .....................   42
6        Examination by Mr. Almaguer ..................   50
         Examination by Mr. Mann ......................   68
7        Examination by Mr. Almaguer ..................   74
         Examination by Mr. Mann ......................   76
8
     Signature and Changes .............................   78
9
     Reporter's Certificate ............................   80
10

11                            EXHIBITS

12   NO.  DESCRIPTION                                   PAGE

13   1    Copy of maintenance handbook .................   11

14   2    Drawing of Santa Rosa Post Office ............   14

15

16

17

18

19

20

21

22

23

24

25

1          (Interpreter sworn.)

2                    ELENA OLIVAREZ,

3    having been first duly sworn, testified through the duly

4    sworn interpreter as follows:

5                         EXAMINATION

6    BY MR. MANN:

09:08    7        Q     Good morning.  My name is Jason Mann --

09:08    8        A     Good morning.

09:08    9        Q     -- and I represent Gloria Guzman in reference to

09:08   10    a November 12th, 1999 incident where she slipped and fell

09:08   11    at the post office.

09:08   12        A     Yes.

09:08   13        Q     I am going to be asking you a series of questions

09:09   14    regarding many things regarding your background, and I am

09:09   15    going to ask you questions regarding your particular

09:09   16    employment or your relationship with the United States

09:09   17    Postal Service and some questions regarding the specific

09:09   18    instances of the November 12th, 1999 fall.

09:09   19        A     Yes.  It's okay.

09:09   20        Q     If ever you don't understand a question that I

09:09   21    have asked, then ask that I rephrase it or ask it again so

09:09   22    that you can understand it.

09:09   23        A     It's okay.

09:09   24        Q     Thank you.  Please state your name for the

09:09   25    record.

09:10    1      A    My name is Elena Olivarez.

09:10    2      Q    And where do you live?

09:10    3      A    Santa Rosa.

09:10    4      Q    How close do you live to the post office in

09:10    5    Santa Rosa?

09:10    6      A    I don't know very well in measurements, but it

09:10    7    must be about a mile -- less than a mile.

09:10    8      Q    When did you first start working at the post

09:10    9    office in Santa Rosa?

09:10    10     A    I think it was in the '90s, but I'm not sure

09:11    11    exactly if it was in the '90s or a couple of years later.

09:11    12    I had been working there for about nine years --

09:11    13     Q    Okay.

09:11    14     A    -- or something like that.

09:11    15     Q    Do you currently work there?

09:11    16     A    I don't work anymore now.

09:11    17     Q    Okay.  What is your understanding of how you were

09:11    18    employed by the United States Postal Service the first

09:11    19    year that you worked there?

09:11    20     A    I had a contract the first years, and then

09:12    21    shortly after that, the post office started to pay me.

09:12    22     Q    Do you remember how you were being paid November

09:12    23    12th, 1999, at the post office?

09:12    24     A    I was still receiving checks by that contract --

09:12    25    excuse me.  No, it wasn't that way.  I think I was already

1    being paid by the post office.

2        Q    Did you file tax returns for that year?

3        A    Yes.

4        Q    Okay.  Would you make those tax returns available

5    for my inspection?

6        A    I don't have them right now with me.

7        Q    If I give you a form that will enable me to get

8    them, will you sign it so that I can get them?

9        A    Yes.

10       Q    What is your social security number?

11       A    Can I take it from my purse?

12       Q    Sure.

13       A    The thing is that I don't like to be untrue in

14   relation to the number.  It's 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.

15       Q    Thank you.  Who told you when and where to be

16   with respect to your job at the United States Post Office

17   in Santa Rosa?

18       A    When I got the job?

19       Q    Start off there and go all the way through the

20   end of your employment.

21       A    I worked there -- when I started working there, I

22   worked there very well at the time, ever since that

23   accident happened.

24       Q    Was someone from the U.S. Postal Service the one

25   that set your schedule and told you what to do?

```
09:15   1      A    When I started to work there, yes, I was told --
09:15   2    they told me what I had to do and everything.
09:15   3      Q    What was your normal working schedule November
09:15   4    12th, 1999?
09:16   5      A    I would sweep.  I would mop.  I would also dust.
09:16   6    I would also dust the tables.  I would clean the windows
09:16   7    and the doors and the bathrooms, and I would also do
09:16   8    things like cleaning the floors.  And what else?  Well,
09:16   9    little things that I had to do.  I would sweep.  I would
09:16  10    mop.  I would dust.  I would clean outside as well.
09:16  11      Q    Did you receive any instruction from anyone on
09:16  12    how to do these tasks?
09:16  13      A    Yes.
09:17  14      Q    Who did you receive the instructions from?
09:17  15      A    Through the agreement when I had the contract.
09:17  16    The agreement.
09:17  17      Q    Did -- isn't it true that the U.S. Postal Service
09:17  18    provided you with particular ways to do things such as
09:17  19    mopping?
09:17  20      A    Yes, but they didn't have a hard time with me
09:17  21    because I have -- I had been doing that type of work for
09:17  22    years.
09:17  23           MR. MANN:  Objection, nonresponsive to
09:17  24    everything after yes.
09:17  25      A    Yes.
```

09:17  1    Q    (BY MR. MANN)  Isn't it true that the U.S.
09:17  2  Postal Service also told you specifically how to place
09:17  3  warning wet signs when you were mopping?
09:18  4    A    Yes, they would tell me, and -- and when it would
09:18  5  rain, I was also asked to put them.  I was told to put
09:18  6  them because it was very wet.
09:18  7    Q    Isn't it true that the U.S. Postal Service
09:18  8  provided you all of the mops and equipment necessary to do
09:18  9  your job?
09:18  10   A    What do you mean?  Like when I needed a new mop,
09:18  11  for example, yes, they would give me everything.
09:18  12   Q    And a bucket?
09:18  13   A    Everything.
09:18  14   Q    Everything?
09:18  15   A    They would give me everything.
09:18  16   Q    Isn't it true that the United States Postal
09:19  17  Service wanted you to do things a particular way?
09:19  18   A    Can you explain it to me again, please?
09:19  19   Q    They wanted you to -- the United States Postal
09:19  20  Service wanted you to mop a certain way?
09:19  21   A    No, they never told me so.  Since I knew how to
09:19  22  do my work, I haven't -- I worked there for many years.  I
09:19  23  knew how to deal with my work, and they would tell me that
09:19  24  they did not have any problem with me and they were very,
09:19  25  very happy with my job.

09:19    1              MR. MANN:   Objection, nonresponsive.

09:19    2         Q    (BY MR. MANN)   They did -- the United States

09:19    3    Postal Service did provide the initial training?

09:20    4         A    Yes, and they would give me cassettes to look at.

09:20    5    They would give me time to watch them.

09:20    6         Q    Who would oversee your work on a daily basis?

09:20    7         A    Who would oversee?  What do you mean?

09:20    8         Q    Who would supervise your work?

09:20    9         A    Ms. Perez and the other lady, Lydia.

09:20    10        Q    On a normal day, what sort of requests would

09:20    11   Ms. Perez have for you to do certain tasks?

09:20    12        A    She would almost never ask me to do a certain

09:20    13   type of work.  Once in a while when I would forget to do

09:21    14   something, but it wasn't something normal.

09:21    15        Q    Did you ever receive any manuals from the United

09:21    16   States Postal Service?

09:21    17        A    From the post office -- from the United States.

09:21    18   You mean from the post office?

09:21    19        Q    Yes.

09:21    20        A    No, I don't remember.  I don't remember, but all

09:21    21   those papers on how to manage my work, I would read them,

09:21    22   whatever was sent to me with a contract.

09:21    23        Q    Can you read English fairly well?

09:21    24        A    Yes, I know how to read well, and I understand

09:22    25   it.  There are certain words that I don't understand and

09:22   1    then I have to ask questions.

09:22   2                  (Exhibit No. 1 marked.)

09:22   3        Q    (BY MR. MANN)   Okay.   I'm going to show you what

09:22   4    has been marked as Plaintiff's Deposition Exhibit 1, which

09:22   5    was produced by the United States Postal Service, and ask

09:22   6    if you recognize it?

09:22   7        A    Do I have to read it all?

09:22   8        Q    No, just do you recognize it?

09:22   9        A    It's like a handbook.

09:22   10       Q    Were you provided this handbook?

09:22   11       A    Not from the post office.

09:22   12       Q    Who provided this to you?

09:22   13       A    When I signed my agreement.   When I did the

09:23   14   agreement, I was given one, but not from the post office,

09:23   15   with the contract.   When I signed my contract, they gave

09:23   16   it to me, but it was not this document, but it does say

09:23   17   similar things almost, things that I cannot lift like

09:23   18   heavy things and -- and almost everything that it says,

09:23   19   it's the same.

09:23   20       Q    Do you still maintain a copy of what was given to

09:23   21   you when you signed your contract with the post office?

09:23   22       A    Well, yes, but I don't remember where I have them

09:23   23   now.   I don't remember where.

09:23   24       Q    Do you think you could find them?

09:24   25       A    Well, maybe I will be able to find them in case I

1    still have them at home.

2        Q    Let's look at this Exhibit 1, and I would like

3    for you to look at page 6-4.  Do you see a picture of

4    someone mopping?

5        A    Yes.  This one, this is the wrong way.  I don't

6    mop like this.

7        Q    Did the manual that you received when you signed

8    your contract have something similar to this in it?

9        A    No.

10        Q    Did it have anything regarding how you are

11    supposed to mop?

12        A    Yes, I had to read the papers, and it's -- that's

13    the way I use my mop.  That's the way I mop, the way it

14    says on the paper.

15        Q    Okay.  And the paper was provided from the United

16    States Postal Service?

17        A    No, no.  I wasn't with the post office.

18        Q    I'm sorry.  Maybe you misunderstood my question.

19        A    What do you mean?

20        Q    What I asked was:  Was that the manual that you

21    had from the Postal Service?

22        A    No.

23        Q    Not who did you get it from, but was the manual

24    created by the Postal Service?

25        A    From the post office, I did not receive any

09:25  1    paper.   They didn't give me anything.

09:26  2         Q    Who did give you something?

09:26  3         A    Through the contract that I got from Indiana.

09:26  4              THE INTERPRETER:   Indiana?

09:26  5              MR. ALMAGUER:   Indianapolis.

09:26  6         Q    (BY MR. MANN)   What company is it in Indianapolis

09:26  7    that you worked for?

09:26  8         A    I don't remember the name, but I have the papers.

09:26  9    Those contracts, I have them kept, I think so.   I think I

09:26  10   do have them.

09:26  11        Q    And it's your understanding that this company

09:26  12   from Indiana was hired by the U.S. Postal Service, and

09:26  13   then subsequently hired you to perform these sort of

09:26  14   maintenance services?

09:27  15        A    I think they did because there at the post office

09:27  16   I signed a document.

09:27  17        Q    Okay.   Did you ever meet anyone from

09:27  18   Indianapolis?

09:27  19        A    No.

09:27  20        Q    You just signed a paper that said you worked for

09:27  21   someone from Indianapolis?

09:27  22        A    Yes.

09:27  23        Q    Do you know if the Postal Service provided the

09:27  24   manual that you received from the Indianapolis people from

09:27  25   the post office?

09:27  1      A    That if I knew?

09:27  2      Q    Yes.

09:28  3      A    No, I didn't know.  I didn't know.

09:28  4      Q    You were given instructions on where to place

09:28  5  signs, weren't you?

09:28  6      A    Oh, yes.

09:28  7      Q    And you were given instructions on where to rope

09:28  8  off areas if necessary, weren't you?

09:28  9      A    On where to put the signs or what do you mean?

09:28  10     Q    Did you ever rope off an area that was wet?

09:28  11     A    I had a sign that they gave me -- or that reads

09:28  12  "Wet Floor."

09:28  13          MR. MANN:  Objection, nonresponsive.

09:28  14     Q    (BY MR. MANN)  Did you ever rope off an area?

09:29  15     A    No.

09:29  16          MR. MANN:  Can I have an exhibit sticker?

09:29  17          (Tendering exhibit labels.)

09:29  18          MR. MANN:  Thank you.

09:29  19          (Exhibit No. 2 marked.)

09:29  20     Q    (BY MR. MANN)  I am going to show you what I have

09:29  21  marked as Deposition Exhibit No. 2, which was also

09:29  22  provided by the United States Postal Service to me, and

09:29  23  ask if you recognize that as a depiction of the post

09:29  24  office in Santa Rosa?

09:29  25     A    This is the entrance, isn't it?

09:29  1    Q    Yeah.

09:29  2    A    Here there were letters in all this area.

09:29  3    Q    Would you mark on here the different places that

09:30  4  you would place a wet sign when you were mopping?

09:30  5    A    First of all, I mop here -- here on the window,

09:30  6  and then I continue here, and I would have a sign here

09:30  7  when I would be mopping.  And I would place it here, and I

09:30  8  would place a bucket here.  Then, I would mop all the way

09:30  9  here, and the sign was turned around here.

09:30  10   Q    Go ahead -- would you go ahead and mark that with

09:30  11  the pen, please?

09:30  12   A    The wet floor sign?

09:30  13   Q    Yes.

09:30  14   A    It was here (drawing).

09:30  15   Q    Did you ever place it anywhere else in the

09:30  16  building when you were mopping?

09:30  17   A    It would be here so people will know, when they

09:31  18  go in, for them to know that it's wet.

09:31  19   Q    Okay.  Would it be possible to rope off the area

09:31  20  that is on the right side of the post office where the

09:31  21  P.O. box's are?

09:31  22   A    I would put them here where I would think it was

09:31  23  correct because the people that would pass by would trip

09:31  24  with the buckets.

09:31  25   Q    Okay.

09:31  1    A    And I thought it was dangerous to put them here,

09:31  2  so I thought it was better to put them here since there

09:31  3  were less P.O. boxes in this area.  Most of the time,

09:31  4  people come to this area.

09:31  5    Q    At what time did you normally mop that area?

09:32  6    A    I would start working at 6:00 so that by 7:45

09:32  7  everything would be clean here.  And I would go to the

09:32  8  window so that before Ms. Perez would be there, I would

09:32  9  have enough time to clean all this area here.  Then I

09:32 10  would go here.  I would mop this area, and then I would

09:32 11  mop all this area from here to here.

09:32 12           I would mop everything in front before people

09:32 13  would arrive.  All this side, I would mop first.  And then

09:32 14  I would finish, and then I would be mopping all the

09:32 15  edges -- all the edges, and then I would use my mop again

09:33 16  to mop.

09:33 17    Q    Okay.  Wasn't it part of your instruction to mop

09:33 18  small areas at a time?

09:33 19    A    That is the way I would mop.  I would mop here

09:33 20  first because if I would mop here first, then I would be

09:33 21  close to the areas where they would open here, and I

09:33 22  wanted to leave this area free.  How can I explain it to

09:33 23  you?  Here -- because it's very small here, and then

09:33 24  people would start coming in, and then I would have had a

09:33 25  hard time to be mopping here.  I would always finish

09:34   1   mopping 15 minutes before 8:00 so that I would have 15

09:34   2   minutes to clean this area here in the window to have it

09:34   3   ready for Ms. Perez to arrive.

09:34   4       Q    So your answer is that you did it your way and

09:34   5   not necessarily the way that maintenance handled -- told

09:34   6   you to do it?

09:34   7       A    They never told me what to do first.  I would do

09:34   8   it the way that I would think it was easier to do.

09:34   9       Q    Okay.  And when you are talking about 6:15 to

09:34   10  8:00, you are talking about in the morning, a.m.?

09:34   11      A    Yes, because it would take me about one hour --

09:35   12  one hour to finish all this front part, the lobby here --

09:35   13  the lobby where the people would go in.

09:35   14      Q    Do you remember there ever being a problem with

09:35   15  the lights in this post office box area?

09:35   16      A    Well, we were having problems -- electric

09:35   17  problems with that light because the people from -- the

09:35   18  electricians had already arrived, but they were having

09:35   19  problems.

09:35   20      Q    And this was on the day that Ms. Gloria Guzman

09:35   21  fell, isn't it?

09:35   22      A    Yes, before she was here -- before she fell, as

09:36   23  she said, the electricians had -- had been here, but they

09:36   24  hadn't been able to fix the problem yet.

09:36   25      Q    So would you agree with me that it was darker

09:36   1   than normal in that area?

09:36   2        A    I don't think it was too dark.

09:36   3             MR. MANN:   Objection, nonresponsive.

09:36   4        Q    (BY MR. MANN)   I didn't ask you if it was too

09:36   5   dark.   I asked you if it was darker than it normally was.

09:36   6        A    Just a little bit.   Almost nothing.

09:36   7        Q    How many more lights were working there?

09:36   8        A    All the lights were working except the one that

09:36   9   was here -- back here.

09:36   10       Q    So except for the one in the area where she fell,

09:36   11   the rest of the lights were on?

09:36   12       A    All the lights were on except for that one,

09:37   13   except for one bulb.   There was one light not working.

09:37   14       Q    What kind of lights are these?

09:37   15       A    Those long ones.   The one was off, and the other

09:37   16   one wasn't.

09:37   17       Q    Okay.

09:37   18       A    But the light, anyway, was there.

09:37   19       Q    When you mop, do you mop with a wet mop or a

09:37   20   wrung-out damp mop?

09:37   21       A    It's -- the mop is not too wet when I mop.   I

09:37   22   don't leave -- I don't leave the area too wet, kind of

09:38   23   just damp.   More dry than wet.

09:38   24       Q    Does the sun in the daytime help illuminate the

09:38   25   hall area where the post office boxes are?

09:38   1      A    Yes.

09:38   2      Q    So visibility is better in the day than it is in

09:38   3  the morning?

09:38   4            THE INTERPRETER:  In the day --

09:38   5            MR. MANN:  Than in the morning.

09:38   6      A    In the morning you can see the same way as in the

09:38   7  daytime because there is a lot of light.

09:38   8      Q    (BY MR. MANN)  So it's easier to see a wet floor

09:38   9  in the morning -- I mean in the day than it is in the

09:38  10  morning?

09:38  11            MS. MASSO:  I will object to the form of the

09:38  12  question.  I don't think that's what she testified to at

09:39  13  all.

09:39  14      A    What do you mean?

09:39  15      Q    (BY MR. MANN)  Would you agree with me that when

09:39  16  you have more light, it's easier to see a wet, just mopped

09:39  17  floor?

09:39  18      A    I don't see a difference, if it's more wet or

09:39  19  less wet, if you can see better during daytime or

09:39  20  nighttime.  It's the same to me.  It's the same.

09:39  21      Q    So if it's pitch dark, you can see a wet floor as

09:39  22  good as you can if it's light out?

09:39  23      A    When it's dark, it's not the same, but it wasn't

09:39  24  dark.

09:39  25            MR. MANN:  Objection, nonresponsive.

09:40   1      Q    (BY MR. MANN)  You obviously remember a lot about

09:40   2   when Ms. Guzman fell, so let's get to that.  Did you see

09:40   3   her fall?

09:40   4      A    No, I didn't see her.

09:40   5      Q    Where -- do you remember where you were when she

09:40   6   fell?

09:40   7      A    I was right here (indicating).  I was right here

09:40   8   in the hall in the lobby.  She was around here, and I was

09:40   9   here on the last P.O. boxes, and I was mopping.

09:40  10      Q    So after she was there, you mopped?

09:40  11      A    The floor was not wet where she fell because I

09:40  12   hadn't started to mop yet.

09:41  13           MR. MANN:  Objection, nonresponsive.

09:41  14      Q    (BY MR. MANN)  You just said that you were

09:41  15   mopping.  Now you're saying that you were not mopping?

09:41  16      A    Well, yes, I was mopping here.  I mopped all this

09:41  17   part here and the tables.  When this lady arrived, when

09:41  18   she was there, I hadn't mopped there.  The first thing

09:41  19   that I mopped was only an edge -- the edges here, but on

09:41  20   this side, on this side.  And when I started to mop, when

09:41  21   I turned facing towards the P.O. boxes, I was walking,

09:41  22   mopping backwards, and she was here.  I realized that she

09:41  23   was sitting down on the floor, but I didn't see her and I

09:42  24   didn't see anything.  I didn't hear anything either, so I

09:42  25   had just started mopping, but it was dry in this area.

09:42  1    Where she was sitting down, I hadn't mopped yet.  I mopped

09:42  2    a little bit here, and I realized that she was sitting

09:42  3    there on the floor, that's when I saw her because I

09:42  4    tripped a little bit with her.  That's when I realized she

09:42  5    was there.

09:42  6        Q    You didn't really see where she fell, you just

09:42  7    knew that she fell?

09:42  8        A    I knew that she fell because I tripped with her

09:42  9    with the mop.

09:42  10       Q    Okay.  But you were close to where she was, and

09:42  11   you stated you began mopping this area?

09:42  12       A    I didn't continue.  When she fell, I didn't

09:42  13   continue mopping.

09:42  14       Q    But before she fell, you had mopped something in

09:43  15   that area?

09:43  16       A    Nothing.  Nothing.  There where she was standing,

09:43  17   I hadn't done anything.

09:43  18            MR. MANN:  Objection, nonresponsive.

09:43  19       Q    (BY MR. MANN)  In the post office box area, after

09:43  20   Ms. Guzman was already in the area, you continued to mop

09:43  21   certain sections, correct?

09:43  22       A    No, I hadn't mopped.

09:43  23       Q    Mind you, you are under oath.

09:43  24       A    Here where she was -- I'm not lying to you.

09:43  25   Where she fell, the floor was not wet.  I can swear that

09:43  1    the floor was not wet.

09:43  2        Q    But you don't know where she fell, do you?

09:43  3        A    What do you mean by that?  I don't know where she

09:43  4    fell.

09:43  5        Q    You don't know where she slipped?  You don't know

09:43  6    where she fell on the ground?

09:43  7        A    I didn't see anything.  I didn't see anything.

09:44  8    When she fell, I didn't know.  I didn't hear.  I didn't

09:44  9    feel.  I didn't know anything.

09:44  10       Q    Had you mopped any part of this post office box

09:44  11   area within five minutes of Ms. Guzman's presence in that

09:44  12   area?

09:44  13       A    I did realize when she arrived -- but all this

09:44  14   area was already dry.  I had already mopped this part

09:44  15   here, and it was already wet --

09:44  16            THE INTERPRETER:  Sorry.  It was already dry.

09:44  17       A    It was already dry.  But when she arrived here, I

09:44  18   didn't know what time she arrived, but she was here.  She

09:44  19   was here standing for a long time.  I didn't mop.  I

09:44  20   didn't mop because she was here, so I started to dust some

09:45  21   tables that were here in front, but the floor in the area

09:45  22   where she fell was not wet.  I can swear that it was not

09:45  23   wet.

09:45  24       Q    (BY MR. MANN)  How do you know that that is the

09:45  25   area she slipped on?

```
09:45    1              THE INTERPRETER:  I'm sorry?

09:45    2        Q    (BY MR. MANN)  How do you know that's the area

09:45    3   she slipped on?

09:45    4        A    Because when I was mopping back, I mopped with

09:45    5   her -- I tripped with her.

09:45    6        Q    Were you facing backwards to her?

09:45    7        A    I was facing here, and she was behind me.

09:45    8        Q    Okay.

09:45    9        A    That's why I didn't see her, and I didn't know

09:45   10   what happened.

09:45   11        Q    Okay.  Did you go behind her out to the front of

09:46   12   the post office at any time while she was present in the

09:46   13   post office at her post office box?

09:46   14        A    What do you mean?  I'm sorry.

09:46   15        Q    The entire time Ms. Guzman was at her post office

09:46   16   box, were you in the same or similar location or did you

09:46   17   pass by her in two different areas of the post office?

09:46   18        A    I don't understand you.

09:46   19        Q    I'm going to point at Deposition Exhibit 2.  You

09:46   20   say that you were here when Ms. Guzman was in the

09:46   21   building.  While she was here where you've written where

09:46   22   she was, did you go anywhere else in the building or were

09:47   23   you always here?

09:47   24        A    As I said, I stayed here.  I didn't leave or go

09:47   25   to another area, and I did not start to mop until she -- I
```

09:47   1   didn't mop, not here in the front, while she was on the

09:47   2   floor.  Everything was dry.

09:47   3                  MR. MANN:  Objection, nonresponsive.

09:47   4       A    I had to wait because she was there.  She

09:47   5   remained there for a big while.  I was in a rush because I

09:47   6   wanted to finish because it was about a quarter to 8:00,

09:47   7   and I had to finish cleaning in the area where Ms. Perez

09:47   8   comes.  So, anyway, I waited, and then when I saw that a

09:47   9   long time had passed, I started to mop, but in front of

09:48   10  her here -- here in the back part because I didn't mop in

09:48   11  this area until she passed -- she passed by.  The floor

09:48   12  was not wet when she fell there.

09:48   13      Q    You never saw her slip?

09:48   14      A    No, I didn't see her.

09:48   15      Q    So you don't know where she slipped, then, do

09:48   16  you?

09:48   17      A    No, I don't know how or where.

09:48   18      Q    But you do admit that while Ms. Guzman was there,

09:48   19  you did actually mop some of the floor somewhere in the

09:48   20  building?

09:48   21      A    Not in the area where she was standing.

09:48   22                  MR. MANN:  Objection, nonresponsive.

09:48   23      A    It was not wet.

09:48   24      Q    (BY MR. MANN)  Just answer the question that is

09:49   25  asked.  While Ms. Guzman was in the building, you did mop?

09:49  1    A    When she lifted up from here, she came here to

09:49  2    the front where it was already mopped.  But it was dry

09:49  3    here already, and here, when she came to this area, I

09:49  4    started to mop here, but she didn't go back anymore.  She

09:49  5    left and she went -- she went to her home.  She went.

09:49  6                   MR. MANN:  Objection, nonresponsive.

09:49  7    Q    (BY MR. MANN)  While Ms. Guzman was in the

09:49  8    building at the post office in Santa Rosa, did you mop?

09:49  9    A    Where?  Where?

09:49  10   Q    It does not matter.  Anywhere.  Did you mop?

09:50  11   A    I didn't start to mop until she moved from this

09:50  12   place and she left.  Then I started to mop here.

09:50  13   Q    So your testimony is that you were not mopping

09:50  14   the floor at any time while Ms. Guzman was in the

09:50  15   building?

09:50  16                   MR. ALMAGUER:  Objection as to the form of

09:50  17   the question.  It's a misstatement of the evidence as to

09:50  18   what she testified.

09:50  19                   MS. MASSO:  I join in that objection.

09:50  20   Q    (BY MR. MANN)  You can go ahead and answer the

09:50  21   question.

09:50  22   A    What do you mean?  I don't understand what -- I

09:50  23   don't understand you.  I don't understand what you are

09:50  24   trying to tell me.  I did not mop -- when she was here, I

09:50  25   did not mop.  I did not mop anything here.  I did not mop

09:50   1   until she left this place because this is the area that

09:51   2   was not mopped yet.

09:51   3       Q    Do you remember what time this was?

09:51   4       A    When she came here it was already quarter to

09:51   5   7:00.  That's when she stood up from here, and that time I

09:51   6   don't forget because that's the time that I had to come to

09:51   7   this place and sign.  I lost time here in this area

09:51   8   because she remained there for a while.

09:51   9       Q    So you're saying you lost time because you were

09:51   10  supposed to have that area mopped and then moved on to

09:51   11  cleaning the windows, correct?

09:51   12      A    Yes, I had some time here -- about losing time

09:51   13  because I didn't want to mop this side because she was

09:51   14  here.

09:51   15      Q    And you stated earlier, I believe, that you

09:52   16  mopped the window counter section first, and then you went

09:52   17  to this P.O. box area next?

09:52   18      A    I mopped all this area here.  At 6:00 I start to

09:52   19  clean and mop because it almost takes me an hour to mop

09:52   20  all this here.

09:52   21      Q    Okay.

09:52   22      A    And it was a quarter to -- 15 minutes were

09:52   23  missing.  It was already 15 minutes late.  It was time for

09:52   24  me to be here because I was waiting for her to move.

09:52   25      Q    What happened once you bumped into her?

09:52  1    A    I asked her what had happened to her and why she
09:52  2  was there.  That's when she told me that she had fallen.
09:53  3    Q    Did anyone else from the United States Postal
09:53  4  Service come to that area?
09:53  5    A    There was nobody, just us -- she and I.
09:53  6    Q    Why didn't you place a wet sign in this area if
09:53  7  you had already mopped in this area and this area was
09:53  8  already dried?
09:53  9    A    Because I hadn't started mopping here.
09:53  10   Q    Were you going to move the sign over here when
09:53  11 you started mopping?
09:53  12   A    I placed it -- when I placed the sign, I put it
09:53  13 turned like this because I am not allowed to put it here
09:53  14 because people can trip with the sign.
09:54  15   Q    So you were expressly told not to put the sign in
09:54  16 this area?
09:54  17   A    Well, I was told not to put here the bucket nor
09:54  18 the sign because people that come here can trip or
09:54  19 something.
09:54  20   Q    Well, who told you that?
09:54  21   A    At the post office.  I was told that it was not
09:54  22 okay for me to put the bucket here, and if I would put it
09:54  23 here, I had to turn it so that people would notice that
09:54  24 the floor was wet on this side.
09:54  25   Q    Okay.  I got it about this part.  I'm just trying

1    to find out who told you at the post office, "Don't put

2    the sign here and don't put the mop here."

3        A    No, no one told me.

4        Q    Well, how did you know not to put it there, then?

5        A    Only because I thought that if I would put it

6    here, people -- people would turn here and trip with the

7    bucket or with the sign.

8             MR. MANN:  Can you read back some of her

9    deposition, a few questions ago, where she responded,

10   "They told me not to put the mop and sign in that area

11   because someone would trip."  Would you read it back for

12   her please?

13            THE REPORTER:  Question:  "So you were

14   expressly told not to put the sign in this area?"

15            Answer:  "Well, I was told not to put here

16   the bucket nor the sign because people that come here can

17   trip or something."

18            Question:  "Well, who told you that?"

19            Answer:  "At the post office.  I was told

20   that it was not okay for me to put the bucket here, and if

21   I would put it here, I had to turn it so that people would

22   notice that the floor was wet on this side."

23        Q    (BY MR. MANN)  Do you now want to change your

24   answer to the last response?

25        A    Yes.  Yes.

09:56  1    Q    It's okay to go ahead and tell me who told you
09:56  2    that.
09:56  3    A    I was wrong with that question.  I was wrong.  On
09:56  4    my own, I would think that -- that I should not put the
09:56  5    bucket nor the sign here because when people turn, people
09:57  6    would trip or would get hurt.
09:57  7    Q    So no one told you, then, and the last response
09:57  8    was incorrect?
09:57  9    A    No.  Yes, it was incorrect.
09:57 10    Q    Is there anything else in the deposition so far
09:57 11    that is incorrect that you need to fix?
09:57 12    A    No, everything is correct because the most
09:57 13    important thing is that where the lady was, the floor was
09:57 14    not wet when she fell.
09:57 15         MR. MANN:   Objection, nonresponsive.
09:57 16    Q    (BY MR. MANN)  Where were the supplies and
09:57 17    buckets located when you started in the morning?
09:58 18    A    I would put them here.  I would put the bucket
09:58 19    here and here the sign.
09:58 20    Q    I'm starting a little bit before you -- where is
09:58 21    the closet that they were located in?
09:58 22    A    I would keep them in a closet that they have,
09:58 23    like a utility place there.  I had space to take the water
09:58 24    and all that.
09:58 25    Q    And you had a key to this closet?

```
09:58   1      A    They would not lock this closet because -- so I
09:58   2   would come in, and I would take my things out of there.  I
09:58   3   would keep the keys only from the main door, and when I
09:58   4   was going to clean this area where the windows are, and to
09:59   5   enter inside, which is the same key.
09:59   6      Q    So you're saying that you could enter into the
09:59   7   back of the post office without a key?
09:59   8      A    No.  No, I can't enter from the back part.  I
09:59   9   can't.
09:59  10      Q    How did you get to the utility area again?
09:59  11      A    I would enter from the front door, and then I
09:59  12   would enter through here to go to the office.
09:59  13      Q    And the office was unlocked at all times?
09:59  14      A    She would lock them all the time.
09:59  15      Q    Who is "she"?
09:59  16      A    Ms. Perez or the person who would remain there at
09:59  17   the end.
09:59  18      Q    Was Ms. Perez there every morning that you
10:00  19   started or at least some other person?
10:00  20      A    No, I would start, and then Lydia would come in.
10:00  21   We would start together, and Ms. Perez would arrive at
10:00  22   8:00.
10:00  23      Q    Who is Lydia?
10:00  24      A    She is one of the workers that she has there, a
10:00  25   person that works for her all the time.
```

10:00  1    Q    And she had the key to the office so that you

10:00  2  could get to the back?

10:00  3    A    Yes, she was inside -- no.  No, wait.  She didn't

10:00  4  have any keys to go to the back.  The only way we were

10:01  5  able to leave that area was to -- we were able to go out

10:01  6  from the inside, but we are unable to go back.

10:01  7    Q    Maybe you're missing my question.  I'm just

10:01  8  trying to find out who opens the door for you at 6:00 if

10:01  9  the person who, with the keys, didn't get there until

10:01  10  8:00?

10:01  11    A    They gave me keys for me to go in.

10:01  12    Q    Okay.

10:01  13    A    I have keys to go in because I would start -- I

10:01  14  would enter there half an hour before them.

10:01  15          MS. MASSO:  I think she said that the

10:02  16  Postmaster locked everything up at night.  She didn't say

10:02  17  anything about her having the only keys so --

10:02  18          MR. MANN:  I asked her if she had a key to

10:02  19  get in, and she said, no, she didn't have any keys, but

10:02  20  now she said she has keys.  That's fine.  It took a long

10:02  21  time to get there.

10:02  22    A    They would give me keys for me to go in because

10:02  23  they asked me to get there at 6:00, and then they changed

10:02  24  it to 6:30.

10:02  25    Q    (BY MR. MANN)  Okay.  Were you ever a regular

10:02  1   employee with the United States Postal Service?

10:02  2            MR. ALMAGUER:  Objection to the form of the

10:02  3   question.  That's asking for a legal conclusion.

10:02  4        Q   (BY MR. MANN)  Go ahead and answer the question.

10:02  5        A   Can you ask me again, please?

10:02  6        Q   Were you ever a regular employee of the United

10:03  7   States Postal Service?

10:03  8            MR. ALMAGUER:  Same objection.

10:03  9        A   Besides this job?

10:03  10       Q   (BY MR. MANN)  No, what I'm asking is:  Did you

10:03  11  ever get a W-2 from the United States Postal Service

10:03  12  directly?  A W-2 is an IRS form.

10:03  13       A   What for, to file?

10:03  14       Q   To file taxes.

10:03  15       A   Yes, they would send me something.

10:03  16       Q   The United States Postal Service would?

10:03  17       A   I don't remember, but I would get some forms --

10:03  18  that form to file my income.

10:03  19       Q   Did you get any benefits from the United States

10:03  20  Postal Service directly?

10:04  21       A   Not directly.  I had to file every year to get it

10:04  22  with my husband, and then I would have to pay my interest.

10:04  23  Isn't it correct?

10:04  24            MR. OLIVAREZ:  Sir, I pay her taxes.

10:04  25            MR. ALMAGUER:  No.

10:04  1      Q    (BY MR. MANN)   I'm not concerned about who paid

10:04  2    your taxes or if you got a refund.

10:04  3      A    Yes.   Yes, I understand.   My husband would pay

10:04  4    for the taxes.

10:04  5      Q    What I'm asking is what your working relationship

10:04  6    was with the Indianapolis company versus if you worked

10:04  7    directly at any point in time for the United States Postal

10:05  8    Service?

10:05  9      A    Every year they would give me a raise, $.25 every

10:05  10   year.   It would depend, yes.   That's the way they would

10:05  11   send me things.   Something like that, you mean?

10:05  12     Q    No.   What I'm asking is:   Were you always working

10:05  13   under this contract from Indianapolis or was there ever a

10:05  14   different situation?

10:05  15     A    It was the same thing.   The problem is that they

10:05  16   stopped sending me my check for almost one month, and

10:05  17   that's the reason why I changed to the post office.

10:06  18     Q    When did you change to the post office?

10:06  19     A    I don't remember.   I don't remember.

10:06  20     Q    Was it before Ms. Guzman fell or after?

10:06  21     A    After.

10:06  22     Q    Was it soon after or was it a long time after?

10:06  23     A    Long before -- long after that happened.

10:06  24     Q    Did you get any benefits that you didn't

10:06  25   previously receive once you switched directly with the

10:06   1    United States Postal Service?

10:06   2        A    Benefits like what?

10:07   3        Q    I'm just asking the question.  Medical?

10:07   4        A    No, they didn't give me anything like that.  They

10:07   5    didn't give me any benefits.

10:07   6        Q    Were -- once you switched to being directly

10:07   7    employed by the United States Postal Service, were you

10:07   8    ever told to mop the floor and do all of your maintenance

10:07   9    items any different than you had previously done?

10:07   10       A    They didn't tell me anything.

10:07   11       Q    Okay.

10:07   12       A    Everything continued the same way.

10:07   13       Q    Everything regarding your contact with the United

10:07   14   States Postal Service employees on-site was the same as

10:08   15   before?

10:08   16       A    Everything was the same as always.

10:08   17       Q    You didn't get a new manual from the United

10:08   18   States Postal Service?

10:08   19       A    No.

10:08   20       Q    Have you talked to anyone besides your attorney

10:09   21   about this accident that occurred November 12th, 1999?

10:09   22       A    No, only with my husband.  I spoke with him, and

10:09   23   I told him what had happened.

10:09   24       Q    What did you tell him?

10:09   25       A    That the lady -- well, according to her, she said

1  that she had slipped because I didn't see her.

2     Q    Okay.

3     A    That she had fallen.

4     Q    Did you ever sign any written statements?

5     A    Such as a letter or something like that?

6     Q    Yes.

7     A    That if I signed?

8     Q    Or wrote a letter.

9     A    I wrote a letter.

10     Q    You never spoke with anyone at the post office

11  about this fall?

12     A    I spoke with Lydia Mendoza.  She's the one who

13  told me -- she's the one who asked me what had happened

14  because she heard that we were talking there with her.  So

15  I told her that this lady had fallen, but that I hadn't

16  seen her.  That I didn't see her fall or what happened.

17        MR. MANN:  I will object to the hearsay

18  regarding Lydia.

19     A    I asked Lydia when she -- when I -- when she --

20  well, when I got in, I told her only that the lady had

21  said that she had fallen, but that I hadn't seen her.

22     Q    (BY MR. MANN)  Did you say the lady had fallen?

23     A    That lady, Gloria.

24     Q    Okay.  What was Lydia's responsibility, the best

25  you know, at the post office there in Santa Rosa?

```
10:11   1      A    I don't know.  I cannot tell you.  I don't know.
10:11   2      Q    Did you deal with her on a daily basis?
10:11   3      A    What kind of contact do you mean?
10:11   4      Q    Well, you testified a while ago that she was in
10:11   5   that utility area with you when you got the mops?
10:11   6      A    She would not get with me here.  She would not go
10:11   7   in with me here where I would come and pick up my buckets
10:12   8   or anything.
10:12   9      Q    Who would you tell when you needed a new mop
10:12  10   bucket?
10:12  11      A    Ms. Perez.
10:12  12      Q    So any time you needed some supplies or had
10:12  13   questions regarding your job duties, you would ask
10:12  14   Ms. Perez?
10:12  15      A    Everything.  Everything to Ms. Perez.  She's the
10:12  16   one who would bring me anything that I would need.  She
10:12  17   would bring it to me.
10:12  18      Q    Ms. Perez never told you where to put signs or
10:12  19   where not to put signs?
10:12  20      A    When I started to work, she told me, "You put
10:12  21   this here," because I didn't know where to put it, you
10:12  22   see.  And she told me, and there I would put them.  That
10:12  23   was the safest place to put them so people that would come
10:12  24   in would not trip.
10:13  25      Q    Okay.  So Ms. Perez is probably the one that told
```

10:13  1    you not to put the sign in this area here because people

10:13  2    would trip?

10:13  3                MS. MASSO:  I object to the form of that

10:13  4    question.  We believe that she changed her answer to that

10:13  5    earlier, and now you are changing the testimony in the

10:13  6    form of that question.

10:13  7                MR. MANN:  I don't think there's a proper

10:13  8    objection there, but --

10:13  9                MS. MASSO:  Well --

10:13  10   Q    (BY MR. MANN)  Please go ahead and answer the

10:13  11   question.

10:13  12   A    Ask me again, please.

10:13  13   Q    So Ms. Perez was probably the person, if there

10:13  14   was a person, that told you to put -- to not put a sign in

10:13  15   this area because people would trip?

10:13  16                MS. MASSO:  I still object to the form of the

10:13  17   question.

10:13  18   A    I don't remember who was the one who told me, but

10:14  19   when I started working at first, when I would work, she

10:14  20   would put it there, and that's where I would put it as

10:14  21   well.

10:14  22   Q    Well, there wasn't anyone from Indianapolis in

10:14  23   Santa Rosa, was there?

10:14  24   A    No, nobody came.

10:14  25   Q    So no one from Indianapolis told you anything

10:14  1    about where to put signs or how to mop?

10:14  2        A    They never came.  They never came.  They never

10:14  3    told me anything.

10:14  4        Q    So if anyone told you anything, it would have had

10:14  5    to be a U.S. Postal Service employee?

10:14  6        A    They told me that I could put the wet sign floor

10:14  7    here when I would mop here so that people would understand

10:14  8    that I was mopping here.  I was -- that I was working.

10:14  9        Q    I understand that, and I believe you when you say

10:14  10   that.  I'm just trying to find out if the person that told

10:15  11   you that worked for the U.S. Postal Service.

10:15  12       A    No, it wasn't her.  They didn't tell me.  It was

10:15  13   not them who told me.

10:15  14       Q    It was someone from Indianapolis, then?

10:15  15       A    No.  The person that would work there before I

10:15  16   worked were the people who told me that they would put --

10:15  17   that I could put the bucket there and the sign here.

10:15  18       Q    Oh, okay.  Who was that person; do you remember?

10:15  19       A    No, I don't remember.  I don't remember.

10:15  20       Q    Did they work for the Indianapolis company before

10:15  21   you?

10:15  22       A    No, because this young lady -- or lady did not

10:15  23   last too long at work.

10:15  24       Q    So she was still working there when they hired

10:15  25   you?

10:16   1    A    Yes, I went with her so she could tell me what to

10:16   2    do and how I needed to start doing the job and

10:16   3    everything -- the work and everything.

10:16   4    Q    And then they fired her?

10:16   5    A    She -- she couldn't work anymore because she

10:16   6    already had another job.

10:16   7    Q    Okay.  So she quit?

10:16   8    A    Yes.

10:16   9    Q    Okay.  Is it your understanding that the United

10:17   10   States Postal Service retained the power -- the authority

10:17   11   to tell you whether, where, how, and why to mop?

10:17   12              MS. MASSO:  And what?  What was the --

10:17   13              MR. MANN:  And why.

10:17   14   A    Why to mop?  I'm sorry.

10:17   15   Q    (BY MR. MANN)  For what reason.  Let me restate

10:17   16   the question.

10:17   17   A    To teach me.

10:17   18   Q    Is it your understanding that the United States

10:17   19   Postal Service could tell you whether to mop, where to

10:17   20   mop, how to mop, and for whatever purpose that mopping was

10:17   21   required?

10:17   22              MR. ALMAGUER:  Objection to the form of the

10:18   23   question.  It's a compound question.

10:18   24   Q    (BY MR. MANN)  I'll rephrase it.  Did the United

10:18   25   States -- is it your understanding that the United States

10:18  1    Postal Service had the power and control to tell you

10:18  2    whether to mop?

10:18  3        A    Yes.  Yes, I understand that.  They can tell me

10:18  4    what.

10:18  5        Q    And they can tell you where to mop?

10:18  6        A    That they can tell me, like Ms. Perez or

10:18  7    something like that?

10:18  8        Q    Yes.

10:18  9        A    I don't know that.  I would mop my way on the

10:19  10   jobs that I have always done.  Everybody was satisfied the

10:19  11   way I would do my work.  Still they were very happy.  They

10:19  12   were very satisfied with the work that I was doing, the

10:19  13   way I was doing it.

10:19  14       Q    My question is:  Do you feel or understand that

10:19  15   the Postal Service could tell you, "Mop that area there"?

10:19  16       A    Yes, they can tell me, but it all depends.

10:19  17            MR. MANN:  Objection to the second part of

10:19  18   the question.

10:19  19       Q    (BY MR. MANN)  And they could -- you said the

10:19  20   Postal Service could tell you how to mop?

10:19  21       A    That, I don't know.  I'm not sure about it.

10:19  22       Q    Well, they could tell you where to place the

10:19  23   signs, couldn't they?

10:20  24       A    Oh, yes, of course.  Yes, they can tell me where

10:20  25   to mop, then.

| | |
|---|---|
| 10:20 | 1 |
| 10:20 | 2 |
| 10:20 | 3 |

Q    Okay.  It wasn't anyone from Indianapolis that
called and told you where to place the signs or where to
mop or how to mop?

A    Not with the contract, nobody told me.  They
never went there.  They would just call and ask me how I
was doing my job, and they would give good references
about me.  Every year they would check on me.

Q    Okay.  And until they missed the checks and
didn't pay you, you were fine with them?

A    Then that's when I called.  I called them and the
same lady told me if I wanted to -- because sometimes I
needed money for important things that I needed, and I
needed that -- at that time I needed the money.  That's
when they asked me that -- she said that if I wanted, they
could pay me from the post office money so I wouldn't have
a hard time with the checks.  That's when I switched, but
that was when I was ready to leave the job.

Q    Okay.  Do you know if anyone else ever fell in
the post office?

A    This is the first time that this happened, but I
don't know if nobody else had fallen.

Q    Okay.  Did you do anything different after she
fell?

A    No, everything continued the same way as the way
I would do it.  It's the same way I would always do it,

10:22  1    yes.

10:22  2        Q    Did you ever talk to anyone from the Indianapolis

10:22  3    contracting company after the fall regarding anything

10:22  4    other than your paycheck and your yearly check-ins?

10:22  5        A    No, I never called.

10:23  6        Q    Okay.

10:23  7             MR. MANN:  I'll pass the witness.

10:23  8                    EXAMINATION

10:23  9    BY MS. MASSO:

10:23  10       Q    Ms. Olivarez, my name is Nancy Masso.  I

10:23  11   represent the United States in this lawsuit, and I'll try

10:23  12   to be more brief than Mr. Mann.  I'm going to ask you a

10:23  13   little bit about the nature of your work with the post

10:23  14   office, and a little bit about the incident that happened

10:23  15   involving Ms. Guzman -- or Mrs. Guzman.  You had mentioned

10:23  16   that you had other jobs; is that right?

10:24  17       A    Yes, in hospitals and nursing homes.

10:24  18       Q    And were all these jobs the type where you would

10:24  19   be mopping or cleaning or dusting?

10:24  20       A    Yes, the same way like here at the post office.

10:24  21       Q    Did you have any of these jobs at the same time

10:24  22   that you were working at the post office?

10:24  23       A    No, I only worked here at the post office.

10:24  24       Q    Okay.  And when you said that you stopped working

10:24  25   at the post office, was that because you quit or you

10:24  1   retired?

10:24  2      A   I stopped working because I was feeling tired and

10:24  3   ill. I wasn't feeling well.

10:24  4      Q   During the time that you were working at the post

10:25  5   office, was -- did anybody at the post office tell you,

10:25  6   "You cannot go and mop offices at the Sheriff's Department

10:25  7   or the hospital"?

10:25  8           MR. MANN:  Objection, form.

10:25  9      A   No.  Can you ask me again?

10:25  10     Q   (BY MS. MASSO)  Well, did anybody tell you that

10:25  11  you couldn't mop the floor somewhere else in addition to

10:25  12  mopping the floors at the post office?

10:25  13          MR. MANN:  Objection, hearsay.

10:25  14     A   No, nobody did.

10:25  15     Q   (BY MS. MASSO)  Nobody told you that you couldn't

10:25  16  go?

10:25  17          MR. ALMAGUER:  Objection to the form of the

10:25  18  question.

10:25  19     A   Nobody told me not to do it.

10:25  20     Q   (BY MS. MASSO)  And did you feel that you -- if

10:25  21  you wanted to go and mop floors at the Sheriff's Office

10:26  22  for an hour, let's say, would there be anything that --

10:26  23  from the post office that would stop you from seeking that

10:26  24  job?

10:26  25          MR. ALMAGUER:  Objection to the form,

10:26  1   argumentative also.

10:26  2              MR. MANN:  Objection, form.

10:26  3       A   I don't know.  I don't know.

10:26  4       Q   (BY MS. MASSO)  The job that you had at the post

10:26  5   office, how long were you actually on the premises of the

10:26  6   post office to complete your job?

10:26  7       A   In this post office how long?

10:26  8       Q   Yes.

10:26  9       A   How long at work there?

10:26  10      Q   Right.  Did you go in five days a week?

10:26  11      A   Monday through Friday.

10:27  12      Q   And on average, how long would you be there on a

10:27  13  daily basis?

10:27  14      A   One hour or 45 minutes.  One hour and 45 minutes.

10:27  15  That's what I would work there.

10:27  16      Q   And then you were free to go --

10:27  17      A   Yes.

10:27  18      Q   -- and spend the day as you pleased?

10:27  19      A   Yes.

10:27  20      Q   And you could even have gotten another job during

10:27  21  the same day?

10:27  22              MR. ALMAGUER:  Objection as to form,

10:27  23  speculative.

10:27  24      A   No, I wasn't working, only here at the post

10:27  25  office.

10:27   1     Q    (BY MS. MASSO)   I know, but -- and I understand

10:27   2   that, but did Ms. Perez ever say to you, "I don't want you

10:28   3   to get another job"?

10:28   4     A    No, she never told me anything.

10:28   5     Q    Okay.   In terms of your work there at the post

10:28   6   office, you were never asked to sort mail or receive mail?

10:28   7     A    From the post office boxes?

10:28   8     Q    Yes.

10:28   9     A    Like mail for me or --

10:28   10     Q    No, I'm just saying did they ever ask you to go

10:28   11   and do anything other than mop the floors and dust?

10:28   12     A    No.

10:29   13     Q    May I see Exhibit 2?   I'm pointing to this large

10:29   14   rectangle, which to me is on the left side of the diagram.

10:29   15   It says P.O. boxes and P.O. boxes here, and there are P.O.

10:29   16   boxes on this side as well, aren't there?

10:29   17     A    Yes.

10:29   18     Q    Okay.   Are there any windows located down this

10:29   19   wall?

10:29   20     A    Here in this hall there is a big window.

10:29   21     Q    Could you -- I see that you're trying to put a

10:29   22   mark there.   Could you put a mark where that window is?

10:29   23   You can but a big "W" if you want to.

10:29   24     A    (Witness complies.)

10:29   25     Q    Okay.

A    From here to here there is a window.

Q    Okay.  And you have made a mark here.  It kind of looks like a "Y" from my angle, and was there -- on the day that Ms. Guzman apparently fell, was that window -- were there any blinds on that window?

A    No, it didn't have anything.

Q    Was there light showing through that window?

A    Yes, a lot of light would come in and off.

Q    Uh-huh.  And it wasn't raining that morning, was it?

A    No, it wasn't raining.

Q    And if I remember -- if I understood your testimony correctly, you said that Ms. Guzman entered and apparently went to her post office box.  Is her post office box located here?

A    On this side where she was standing, yes, there are.

Q    Was this the first time you had ever seen Ms. Guzman in the post office?

A    To be quite honest, I don't know her.

Q    Okay.  And you said she spent quite a bit of time there?

A    In her lawsuit that she -- when she filed, that around 7:00 or 7:15 she was there.  She was there quite a bit of time because when I finished, it was already a

10:31   1   quarter to 8:00, so when she lifted herself up and stopped

10:32   2   doing what she was doing, it was already late for me

10:32   3   because I should have been there before.

10:32   4        Q    But did you actually observe Ms. Guzman standing

10:32   5   in this corridor by her post office box?

10:32   6        A    She was standing there.  That's the reason why I

10:32   7   couldn't mop because she was there.

10:32   8        Q    And if I understood your testimony earlier, you

10:32   9   mentioned that you were doing -- dusting some tables or

10:32   10  something over here waiting for Ms. Guzman to leave the

10:32   11  area?

10:32   12       A    Yes.

10:32   13       Q    And she was taking quite a while?

10:32   14       A    To me, it took her some time because when she

10:33   15  fell, it was time for me to have already finished mopping

10:33   16  here and to enter this area.

10:33   17       Q    Okay.  And did you have an opportunity to observe

10:33   18  Ms. Guzman while she was standing here, what was taking

10:33   19  her so long?

10:33   20       A    She was looking at some letters.

10:33   21       Q    Did she seem distressed or concerned at all?

10:33   22       A    To me, she was there for a while before she fell.

10:33   23  She was there for a while.

10:33   24       Q    But did you -- did you take note of anything of

10:33   25  her demeanor before she fell?

10:33  1    A    When I realized that she had fallen, I asked her

10:34  2  what had happened to her.  She said that she had fallen,

10:34  3  so I asked her how she had fallen because I hadn't seen

10:34  4  her or I hadn't heard anything because I was here, and

10:34  5  she -- in the front, and she was here behind me so I

10:34  6  didn't see her.  When she slipped, I didn't see her.  When

10:34  7  she slipped or if she would have fallen, whatever.

10:34  8    Q    Did you notice her mood at all, what it was like

10:34  9  before she fell?

10:34  10    A    She was okay.

10:34  11    Q    Okay.

10:34  12    A    I think I didn't feel anything that like she had

10:34  13  problems.

10:34  14    Q    Now, what kind of footwear was Ms. Guzman wearing

10:34  15  that day?

10:35  16    A    I don't remember very well, but --

10:35  17         THE INTERPRETER:  Can I ask what she means by

10:35  18  (speaking Spanish)?

10:35  19         MS. MASSO:  I don't have a problem with that.

10:35  20         MR. MANN:  I don't have a problem with that.

10:35  21    A    Like shoes with a high heel.

10:35  22    Q    (BY MS. MASSO)  Do you know how high the heel

10:35  23  was?

10:35  24    A    No, I don't remember.  But they were shoes with

10:35  25  high heels, but I don't know how the shoes were.

| | | |
|---|---|---|
| 10:35 | 1 | Q    Were the heels like the narrow pointed ones or |
| 10:35 | 2 | were they the wide ones? |
| 10:35 | 3 | A    I think they were thin ones, pointed ones, but |
| 10:35 | 4 | I'm not sure. |
| 10:35 | 5 | Q    I'm sorry? |
| 10:35 | 6 | A    Thin, but I'm not quite sure. |
| 10:35 | 7 | Q    And if I also -- if I understood your testimony |
| 10:36 | 8 | correctly, you decided to start your mopping at the end of |
| 10:36 | 9 | this hallway, right, behind Ms. Guzman? |
| 10:36 | 10 | A    At the same time that I started to mop, I took |
| 10:36 | 11 | time to mop slowly so she would have time, and I wanted to |
| 10:36 | 12 | see if she would move. |
| 10:36 | 13 | Q    Okay.  So you didn't mop any of this area in that |
| 10:36 | 14 | side? |
| 10:36 | 15 | A    It wasn't wet here.  It wasn't wet here.  When |
| 10:36 | 16 | she fell, it was dry here because I was just going to |
| 10:36 | 17 | start mopping there. |
| 10:36 | 18 | Q    Okay.  Put this area from, let's say the window |
| 10:36 | 19 | all the way to her, you hadn't mopped except for this part |
| 10:37 | 20 | here? |
| 10:37 | 21 | A    All this had already been mopped and dried when |
| 10:37 | 22 | she went in.  It was already dry. |
| 10:37 | 23 | Q    Okay. |
| 10:37 | 24 |         MS. MASSO:  I'll pass the witness. |
| 10:37 | 25 |         MR. ALMAGUER:  Do you mind if we take a quick |

10:37  1    break?  I just want her to take a quick break.  I only

10:37  2    have a few questions.

10:37  3                    MR. MANN:  All right.  No problem.

10:37  4                    (Brief recess.)

10:44  5                         EXAMINATION

10:44  6    BY MR. ALMAGUER:

10:44  7        Q    Ms. Olivarez, my name is Pablo Almaguer.  You

10:44  8    know me.  I'm going to ask you a few questions to follow

10:44  9    up with the questions the attorneys here asked you, and

10:44  10   excuse me if I repeat some questions to clarify some

10:45  11   stuff --

10:45  12       A    Yes.

10:45  13       Q    -- but we're almost done here, I hope.

10:45  14       A    It's okay.  Hopefully.

10:45  15       Q    And before we begin -- before we begin our

10:45  16   questions here, I want to take a careful, closer look at

10:45  17   Deposition Exhibit No. 2.  Would you agree with me that

10:45  18   it's labeled as Deposition Exhibit No. 2 at the bottom of

10:45  19   the page?  Let me point, ma'am, at the bottom here.  It

10:45  20   says Deposition Exhibit No. 2.

10:45  21       A    Oh, Deposition No. 2, correct.

10:45  22       Q    Okay.  And you have been looking at this page and

10:46  23   answering the questions concerning this diagram.  You have

10:46  24   actually turned it upside down; isn't that correct?

10:46  25       A    Yes, because that's -- otherwise, I don't

1    understand.

2         Q    Why is it that you understand it this way?

3         A    It was far away there, and I left it like that.

4         Q    Okay.

5         A    But I do understand.

6         Q    That's fine.  I just wanted to know.  Where is

7    the entrance to the post office according to this diagram?

8         A    From the outside to the inside?

9         Q    Yes.

10        A    Here.

11        Q    Okay.  And that's labeled already as entrance.

12   You can read that word there?

13        A    I don't -- I cannot see well.  Yes, but I do

14   understand.

15        Q    Tell me what -- tell me where the utility closet

16   is at again.

17        A    I have to go inside from here and go this way

18   back behind and pick up -- or, well, rather from here it's

19   closer.  It's easier, and we get in through here.  Here

20   are the bathrooms, and here there's a utility closet.

21        Q    Okay.  And can you point with the pen to the

22   entrance to that area from the lobby?

23        A    Here.  Here is the lobby.

24        Q    That's fine.

25        A    And here's the entrance to go inside.

10:47  1    Q    Right there where your pen is indicating, can you

10:47  2    indicate that with a letter "A"?

10:47  3    A    Yes.  (Witness complies.)

10:48  4    Q    Okay.  You did it upside down.  Do it the way

10:48  5    you're looking at it, though.

10:48  6    A    I'm sorry.  (Witness complies.)

10:48  7    Q    Okay.  And then you mentioned where you put the

10:48  8    sign the day of the accident.

10:48  9    A    Yes, I go out and I put the sign here.

10:48  10   Q    With -- where do the post office boxes start on

10:48  11   that wall there?

10:48  12   A    They start here, but it's just -- it's a short

10:48  13   lobby.

10:48  14   Q    Okay.

10:48  15   A    And all the way here, there are post office

10:48  16   boxes, and all this -- all this area, there are post

10:48  17   office boxes.

10:48  18   Q    And would you mention that -- I'm sorry.  Where

10:48  19   you mentioned that the post office boxes start, can you

10:49  20   mark that with a letter "B"?

10:49  21   A    With a letter?

10:49  22   Q    Yes.

10:49  23   A    Yes.  (Witness complies.)

10:49  24   Q    Letter "B."  That's fine.

10:49  25   A    Here and here.

10:49  1      Q    Okay.  Now, hold on.  We've got a "B" and a "1";

10:49  2  isn't that correct?

10:49  3      A    I was going to write another letter "B".

10:49  4      Q    Okay.  Stop there.  You don't want to write on it

10:49  5  too much, here.  Can you please scratch one out?  You put

10:49  6  another "B" over here on the side; is that correct?

10:49  7      A    (Witness nods head.)

10:49  8      Q    Why did you put that "B" over there on the side?

10:49  9      A    Because there are P.O. boxes here.

10:49  10     Q    Well, can you mark this other section with a "C,"

10:49  11  then, over here on the side?

10:49  12     A    Where?

10:49  13     Q    The one you mentioned here, the second "B."

10:49  14     A    (Witness complies.)

10:49  15     Q    Okay.  Let me get this correct.  According to the

10:50  16  testimony, you put the sign, on November 19th [sic], the

10:50  17  day of the accident, by the letter "B," is that correct?

10:50  18     A    Yes.

10:50  19     Q    Okay.  And you mopped from that area over by the

10:50  20  area where the letter "C" is at; is that correct?

10:50  21     A    I mopped all this -- all this lobby up to here.

10:50  22     Q    Where the letter "B" is at?

10:50  23     A    Yes, because this is where the P.O. boxes are.  I

10:50  24  had already mopped all this area, and all this up to here

10:50  25  only.

10:50    1      Q    And then you went up to the letter -- well, which

10:50    2   side of the hallway there did you keep on mopping before

10:51    3   you realized that Ms. Gloria had fallen down?

10:51    4      A    Where did I start first?

10:51    5      Q    Which side did you mop in that hallway there?

10:51    6      A    She fell down here, and I was just going to start

10:51    7   mopping here.

10:51    8      Q    Had you marked the area by the letter "C" -- had

10:51    9   you already mopped the area by the letter "C"?

10:51   10      A    Only on just the edges.

10:51   11      Q    Okay. And where were you, again, when you said

10:51   12   that you saw Ms. Guzman trip?

10:51   13      A    When I bumped with her? ·

10:51   14      Q    Yeah. Where were you mopping at this time, yes?

10:51   15      A    I was just going to start mopping here.

10:51   16      Q    Outside of that diagram, then, can you mark that

10:51   17   with a letter "D" so we'll know which area you were

10:52   18   talking about?

10:52   19      A    Here?

10:52   20      Q    On top of it. Outside of it. Around here, ma'am

10:52   21   (indicating.)

10:52   22      A    (Witness complies.)

10:52   23      Q    So right by that letter "D" -- the wall by the

10:52   24   letter "D," you were mopping at that time?

10:52   25      A    Yes, here.

10:52  1      Q    Okay.  And you were going backwards?

10:52  2      A    Yes, I was going backwards.

10:52  3      Q    Now, with a letter "E," outside of this diagram

10:52  4   here, where is more or less, Ms. Gloria Guzman's post

10:52  5   office box as far as you know?

10:52  6      A    I don't know more or less where.  I don't know

10:52  7   more or less where it was.

10:52  8      Q    Okay.  Can you mark with a letter "E", though,

10:52  9   that wall where she fell?

10:52  10     A    Here.  (Witness complies.)

10:53  11     Q    Yes.  Okay.  That "E" is facing you.  That's

10:53  12  fine.  That's fine.  I just wanted to clarify that because

10:53  13  there is no video here and we're pointing back and forth,

10:53  14  and she's only recording this.

10:53  15     A    It's okay.

10:53  16     Q    Okay.  Apart from the window there you marked

10:53  17  earlier when Ms. Masso asked you to do that, is there

10:53  18  another window in that area?

10:53  19     A    Yes, there's another one here on this side.

10:53  20     Q    Can you mark it the same way you did the first

10:53  21  window?

10:53  22     A    (Witness complies.)

10:54  23     Q    Okay.  When you noticed Ms. Guzman fell down, did

10:54  24  you hear anything right before that?

10:54  25     A    No, I didn't hear anything.

1    Q    No one screamed?  No one said anything?  No one

2    asked for your help?

3    A    No, nothing.

4    Q    You noticed she was -- did she ask you for help?

5    A    No, she didn't ask me for help.

6    Q    How did she get up?

7    A    She was getting up by herself.  She was getting

8    up, and when I noticed that she was there because I bumped

9    with her, that's when I turned that I saw her.  She

10   remained there sitting down for sometime.  I asked her

11   what had happened to her and why she was there, and she

12   said that she had fallen.

13   Q    When she got up, did she grab her ankle or her

14   knee or her leg?

15   A    She didn't grab anything.

16   Q    Did she grab onto the post office box or to the

17   wall when she got up?

18   A    No, she got up with her hands on the floor.

19   Q    About how long did you say, again, in minutes

20   that she was standing there before she left?

21   A    I don't know exactly because when she got up from

22   here, she came here, and then I started to mop.  But I did

23   not pay any attention to everything else because it was

24   already late for me to finish doing the job there.

25   Q    She didn't stop to talk any with Ms. Lydia or

```
10:56   1   Ms. Perez?
10:56   2       A    No, she didn't talk to anybody.  She left.
10:56   3       Q    Okay.  Did you ever -- did you see her when she
10:56   4   was walking out of the post office -- when she was walking
10:56   5   out?
10:56   6       A    I saw her when she got up from here.  I saw to
10:56   7   check if she was limping or something, but she was walking
10:56   8   well.
10:56   9       Q    Okay.
10:57  10       A    But when she went out, I did not pay attention if
10:57  11   she was limping or if she was hurting.
10:57  12       Q    That's fine.
10:57  13       A    I'm sorry.  Can I tell you -- when she was
10:57  14   halfway up, I felt bad, and I tried to help her to get up
10:57  15   because I thought that she was going to have problems in
10:57  16   getting up, but she didn't.  She was very light.  She was
10:57  17   very light to me.  She didn't force herself to get up at
10:57  18   all.
10:58  19       Q    Okay.  Let me ask you about the issue of this
10:58  20   contract that you mentioned you had with these people --
10:58  21   or a company -- a person or company in Indianapolis.  When
10:58  22   you had that contract -- or under that contract, who did
10:58  23   you think you worked for?
10:58  24       A    I thought that with the contract that I was
10:58  25   working there because I signed those documents.
```

10:58   1      Q      Who did you feel you were working for at that

10:58   2   time?

10:58   3      A      For the post office because I was at the post

10:58   4   office.

10:58   5      Q      Okay.  After the contract was done away with, who

10:59   6   did you feel you worked for then?

10:59   7      A      With the post office.

10:59   8      Q      At all times you felt that you were working for

10:59   9   them?

10:59   10     A      Yes.

10:59   11     Q      Did the post office do or say anything to make

10:59   12  you feel otherwise?

10:59   13     A      No, they always treated me well, and they were

10:59   14  very happy with my job.

10:59   15     Q      In fact, you mentioned that you would get a

10:59   16  raise; is that correct?

10:59   17     A      Oh, yes, when I was with the contract, they gave

10:59   18  me a raise.  They would give me a raise every year.

10:59   19     Q      How much?

10:59   20     A      $.25 -- or it would depend, $.25.  $.25 every

10:59   21  year they would give me.

10:59   22     Q      Did they continue doing that or did the post

11:00   23  office do that after the contract was terminated?

11:00   24     A      No, it remained as it was with the contract, but

11:00   25  they didn't give me a raise there.

11:00   1    Q    The post office didn't give you a raise after the

11:00   2    contract terminated?

11:00   3    A    No.

11:00   4    Q    You also mentioned that you were the first one to

11:00   5    get there at the post office; is that correct?

11:00   6    A    Yes.

11:00   7    Q    About what time did you get there?

11:00   8    A    I don't remember if it was the year in which I

11:00   9    would start working at 6:00 or 6:30, but I would get there

11:00   10   first.

11:00   11   Q    Who told you to get there at 6:00?

11:00   12   A    I would not get in by myself.  Lydia and I and

11:01   13   another young fellow that would work there, a student.

11:01   14   Q    I appreciate the answer.  Just listen to my

11:01   15   question carefully.  At what time did you start again?

11:01   16   A    At 6:00.

11:01   17   Q    Who told you to show up at 6:00?

11:01   18   A    We would all start working at the same time at

11:01   19   that time.

11:01   20   Q    Okay.  Did you decide you wanted to show up at

11:01   21   6:00 or did somebody tell you to show up at 6:00?

11:01   22   A    No, nobody told me.  We would all start working

11:01   23   at the same time.  That's when we started at first to

11:01   24   work.  Later on we started to work at 6:30 like at this

11:01   25   time when she fell.

```
11:02    1        Q    Who told you to start at 6:30 instead of 6:00?

11:02    2        A    I was told that there had been changes, that they

11:02    3   had been -- that they had changed the working hours there

11:02    4   at the post office because we were starting to work very

11:02    5   early.

11:02    6        Q    You and the other employees were too early?

11:02    7        A    Yes.  Later on they switched us to start working

11:02    8   at 6:30.

11:02    9        Q    So you, just like every other employee, were

11:02   10   changed to go in at 6:30?

11:02   11        A    Yes, at the time that they were told to start

11:02   12   working at 6:30, they told me the same as well.

11:02   13        Q    So you just -- it wasn't up to you to show up at

11:02   14   another time like 8:00, 9:00 or 10:00?

11:02   15        A    No.

11:02   16        Q    You show up whenever they told you?

11:02   17        A    Yes.

11:02   18        Q    How long were you supposed to take to clean that

11:03   19   area, ma'am?  This includes the mopping, the sweeping, the

11:03   20   dusting you said earlier.

11:03   21        A    An hour and 45 minutes, I guess I had.

11:03   22        Q    Is that how long you would take to do all that?

11:03   23        A    Yes, but sometimes I would take half an hour

11:03   24   more.

11:03   25        Q    Okay.  Who told you that you needed to take an
```

1    hour and 45 minutes?

2        A    There I was told -- I don't remember who.  I was

3    told that I had an hour and 45 minutes.

4        Q    And what days of the week did you show up for

5    work.  Was it Monday through Friday or did you alternate?

6        A    Monday through Friday.

7        Q    Every day?

8        A    Yes.

9        Q    You didn't skip any days?

10       A    When I had important things to do like, for

11   example, taking my grandchildren to the doctor, I would

12   take them to the doctor.

13       Q    Okay.

14       A    Or if I wasn't too busy or if I had things to do

15   on my own, I would ask for a day off, but I would tell

16   them -- I would tell them, "I cannot start working in the

17   morning, but I will come in the afternoon," and I would do

18   it like that.  But I would never miss a day.

19       Q    Who did you tell this to?

20       A    To Ms. Perez.  I would ask Ms. Perez if it was

21   okay, if she would need me.

22       Q    Okay.  So you would get permission from her?

23       A    Yes, I would ask them for permission when I could

24   go in the morning and when I couldn't.

25       Q    Okay.  Are you telling me that if you started at

11:05    1    6:30 -- I'm going to go back to the previous testimony --

11:05    2    and you would take about an hour and 45 minutes, maybe two

11:05    3    hours to finish --

11:05    4        A    More or less two hours.

11:05    5        Q    -- around what time would you leave?

11:05    6        A    Around 8:00 or quarter to 8:00 because it was an

11:05    7    hour and 45 minutes to do the job.

11:05    8        Q    Okay.  And after 8:15 or 8:30, when you left,

11:05    9    were you ever called back to work?

11:05    10       A    You mean the years that I worked there?

11:05    11       Q    (Nods head.)

11:06    12       A    They only called me on one occasion.

11:06    13       Q    Who called you?

11:06    14       A    At that time it was Mr. Aldape.

11:06    15       Q    Was he there before Ms. Perez or something?

11:06    16       A    Oh, yes.

11:06    17       Q    Was he the Postmaster?

11:06    18       A    Yes.

11:06    19       Q    When was it that he called you, like what time,

11:06    20    what month, year?  What do you remember?

11:06    21       A    I don't remember, but he called me once for me to

11:06    22    go and clean there so I -- because another person went

11:06    23    there, I think.  He -- that person had problems with his

11:06    24    stomach, and that person had an accident, and he had --

11:06    25    that person had an accident, so I was called to clean

| | | |
|---|---|---|
| 11:06 | 1 | there. |
| 11:07 | 2 | Q    What time was that, more or less, in the day? |
| 11:07 | 3 | A    It was around -- I don't remember very well, but |
| 11:07 | 4 | it was after noontime. |
| 11:07 | 5 | Q    Okay. |
| 11:07 | 6 | A    But I went anyway.  I was there. |
| 11:07 | 7 | Q    And it was long past after 8:30, 9:00 in the |
| 11:07 | 8 | morning? |
| 11:07 | 9 | A    It was after noontime.  That's what I remember. |
| 11:07 | 10 | Q    Okay.  So it was your understanding that if |
| 11:07 | 11 | Ms. Perez was to call you in, you would have to go in to |
| 11:07 | 12 | work? |
| 11:07 | 13 | A    I know, but they would pay me for it. |
| 11:07 | 14 | Q    Okay.  Let me ask you again, ma'am.  If, like |
| 11:07 | 15 | Mr. Aldape, Ms. Perez would call you to come into work |
| 11:07 | 16 | after noon, would you have to come into work? |
| 11:07 | 17 | A    Yes, if I wanted to go, I could go, but when |
| 11:08 | 18 | Mr. Aldape called me, he told me that he needed me |
| 11:08 | 19 | urgently. |
| 11:08 | 20 | Q    Okay. |
| 11:08 | 21 | A    Because he couldn't do the work, but they would |
| 11:08 | 22 | pay me for it.  I wouldn't go there for free. |
| 11:08 | 23 | Q    Okay.  You mentioned earlier when you saw the |
| 11:08 | 24 | diagram and the previous exhibit that you don't mop the |
| 11:08 | 25 | way the diagram was drawn; is that correct? |

| | | |
|---|---|---|
| 11:08 | 1 | A    Can I look at it? |
| 11:08 | 2 | Q    Yes. |
| 11:08 | 3 | A    I don't mop like this. |
| 11:08 | 4 | Q    In what way do you mop, ma'am? |
| 11:09 | 5 | A    Well, let me show you.  I need a mop.  The way I |
| 11:09 | 6 | mop, it's like this.  I go back, back, back (motioning). |
| 11:09 | 7 | I mop. |
| 11:09 | 8 | Q    Okay.  So you are indicating -- for the jury, |
| 11:09 | 9 | you're going left to right? |
| 11:09 | 10 | A    Yes. |
| 11:09 | 11 | Q    Is that correct? |
| 11:09 | 12 | A    Yes, left, right. |
| 11:09 | 13 | Q    Okay. |
| 11:09 | 14 | A    Not like that. |
| 11:09 | 15 | Q    Did Ms. Perez or Ms. Mendoza ever see you mop |
| 11:09 | 16 | that way? |
| 11:09 | 17 | A    Yes, because I mop in the area where they work as |
| 11:09 | 18 | well. |
| 11:09 | 19 | Q    Did they ever tell you to change that type of |
| 11:09 | 20 | mop? |
| 11:09 | 21 | A    No. |
| 11:09 | 22 | Q    Okay.  You also mentioned that you were the first |
| 11:09 | 23 | one to get there and you put the sign there by the |
| 11:09 | 24 | entrance by the letter "B"; is that correct? |
| 11:09 | 25 | A    Yes. |

11:09   1      Q    So that sign would be there by the time

11:09   2   Ms. Mendoza and Ms. Perez would walk in, correct?

11:10   3      A    They were here inside.

11:10   4      Q    But how did they get in through the building in

11:10   5   the beginning of the day?

11:10   6      A    Through here, through the entrance.

11:10   7      Q    Would they both see the sign there when they came

11:10   8   in the morning?

11:10   9      A    No, because the sign was not here when they

11:10  10   arrived.  The sign is not there when they arrive.

11:10  11      Q    I mean, it was there by the time they got there?

11:10  12      A    When Ms. Perez came in, the sign was already

11:10  13   there.  She starts working there at a quarter to 8:00.

11:10  14      Q    And when Ms. Mendoza came in, was the sign also

11:10  15   there?

11:10  16      A    Yes.

11:10  17      Q    Did they ever tell you to change that sign?

11:10  18      A    No, I was never told.  They never told me

11:10  19   anything.

11:10  20      Q    Is there any other entrance to the post office

11:11  21   for the public apart from that entrance?

11:11  22      A    Only this one.

11:11  23      Q    So everyone that goes in sees this sign?

11:11  24      A    To me, I think they do.  You can see it well

11:11  25   there.

11:11  1    Q    You also mentioned earlier in your testimony that

11:11  2    they were happy with your work; is that correct?

11:11  3    A    Oh, yes.

11:11  4    Q    Who is "they"?

11:11  5    A    We never had problems.  Ms. Perez and Lydia.

11:11  6    When Mr. Aldape would work there, he was as well.

11:11  7    Q    Were you concerned that they would be happy with

11:11  8    your work?

11:11  9    A    Yes, because I wouldn't have liked somebody

11:12  10   telling me that they didn't like the work or something,

11:12  11   and I was very happy with them as well, and I worked very

11:12  12   well.

11:12  13   Q    Did you feel that if you didn't meet up to their

11:12  14   standards, they could fire you?

11:12  15   A    I would feel that I was working very happy with

11:12  16   them.  I never felt that they were able to fire me.

11:12  17   Q    Because you were doing a good job?

11:12  18   A    They liked my job.  They liked my work.

11:12  19   Q    Did you mop every day of the week that you worked

11:13  20   there?

11:13  21   A    No.

11:13  22   Q    When did you mop Monday through Friday?

11:13  23   A    Monday, Wednesday, and Friday.

11:13  24   Q    Okay.  Did you do everything else that you

11:13  25   mentioned earlier, dust and sweep, every day of the week

1    also?

2    A    When it was time to sweep, to sweep only.  Like

3    on Tuesday and Thursday, I would only sweep and dust.

4    Q    Were you ever asked to do anything outside of the

5    building?

6    A    I had to sweep -- wait.  What was I doing?  I

7    would sweep.  I would clean the parking lot that is in

8    front.  I would sweep in here in the parking lot in front

9    of the post office, that's what I would do.

10    Q    What's to the side of the post office?

11    A    The yard.

12    Q    Grass?

13    A    I also had to mow the lawn.

14    Q    Outside of the post office?

15    A    Yes.

16    Q    Who asked you to do that?

17    A    They did because they would say that I was

18    together with the contract.

19    Q    After the contract was done with and you worked

20    for the post office, they still asked you to do that?

21    A    I still continued to mow the lawn.

22    Q    No one else would do it while you were working

23    there?

24    A    No, only me.

25    Q    And what days of the week did you do that?

1    A    When it needed to be mowed, I would do it any

2    day.

3    Q    So when they told you to do it?

4    A    They never told me that I needed to mow the lawn.

5    I would mow it when I would see that it needed to be

6    mowed.

7    Q    Okay.  Thank you, ma'am.

8         MR. ALMAGUER:  I'll pass the witness.

9                        EXAMINATION

10   BY MR. MANN:

11   Q    I have some more questions for you, ma'am.  You

12   drew a picture on this Deposition Exhibit 2, which is this

13   picture, and labeled it as the window in front of the P.O.

14   boxes where the fall occurred.  Do you know what direction

15   that window faces?

16   A    To the west -- to the west side.

17   Q    Where does the sun rise?

18   A    Oh, wait.  Wait just a minute.  Yes, east side

19   where the sun rises.  It's on the east side.

20   Q    You're saying that the front of this building is

21   east?

22   A    No, no, no.  This is west.

23   Q    So early in the morning, when the sun was coming

24   up November 12th, 1999, the sun would not have been

25   shining in this window, would it have been?

```
11:17   1           MS. MASSO:  Objection to the form of the
11:17   2   question.  I don't believe there is any evidence
11:17   3   indicating what time the sun rose that morning.
11:17   4        A    Well, when the lady fell, it was almost daytime.
11:17   5        Q    (BY MR. MANN)  Okay.
11:17   6        A    It was almost daytime.  As I said, it was only a
11:17   7   quarter -- only 15 minutes were -- it was only 15 minutes
11:17   8   to 8:00 when Ms. Perez arrived.
11:17   9        Q    But you would agree with me that the sun does
11:17  10   rise in the east and set in the west?
11:17  11        A    Yes.
11:18  12        Q    Okay.  You mentioned that while Ms. Guzman was at
11:18  13   her post office box, you were dusting in this main entry
11:18  14   hall?
11:18  15        A    Yes, because I was giving her time to move from
11:18  16   there so I could start mopping here.
11:18  17        Q    And I think you testified -- and I'll ask you if
11:18  18   this is correct -- that at some point in time, she was
11:18  19   taking too long, so you went ahead and came in here to
11:18  20   the -- passed her in the post office box area hall with a
11:18  21   mop and bucket?
11:18  22           MR. ALMAGUER:  Objection to the form,
11:18  23   misstatement as to evidence.
11:18  24        A    I had the mop -- the mop and the bucket and the
11:19  25   sign.  I had them here.  Here.
```

11:19  1    Q    (BY MR. MANN)   Okay, but you were dusting for a

11:19  2  while when Ms. Guzman was here, correct?

11:19  3    A    Yes, I was mopping.  I was mopping for a while

11:19  4  some small tables that are here to give her time to move.

11:19  5    Q    And then at some point in time, while she was

11:19  6  still here at what's marked closest to the "E," you came

11:19  7  and you were standing closest to where the "D" is,

11:19  8  correct?

11:19  9    A    When I passed by, she was still standing here,

11:19  10  and I was mopping here very slowly to see if she would --

11:19  11  sorry, to get up -- sorry, to move.

11:19  12    Q    So at that point in time there was a mop and a

11:19  13  bucket in this area?

11:19  14    A    No bucket.

11:19  15    Q    Just the mop?

11:20  16    A    I only had the mop.  I only had the mop in my

11:20  17  hand.

11:20  18    Q    So what would you do when the mop was dirty and

11:20  19  you needed to clean it and wring it out so that it was

11:20  20  damp?

11:20  21    A    I would come back and I would rinse it here.

11:20  22    Q    Did you have anything to prevent droplets of

11:20  23  water from falling off the mop while you were going back

11:20  24  to where the bucket was?

11:20  25    A    I think that there were -- there was no way for

the mop to be dripping water because the mop -- how can I

explain it to you?  The place where I would squeeze the

mop -- where I would squeeze the mop was okay, and the

mop -- and I had enough strength to squeeze it well in a

way that it would not leak water to the floor.  I would

leave it more dry than wet.

    Q    Why did you tell Ms. Guzman, when you were trying

to help her up, "Didn't you see the wet floor sign"?

    A    I didn't tell her anything because the floor was

not wet.

    Q    So you never told her there, "Didn't you see the

wet floor sign over there"?

    A    Wait a minute.  Well, when she remained there for

a long time, and at that time some women arrived.  Some

women arrived, and they asked -- they told me if the floor

is also wet, but the floor wasn't wet.  I said, "The floor

wasn't wet when she fell."  I had just mopped the floor

right now because she just got up from the floor.  Excuse

me, but it's not -- a small spot, not too wet.

    Q    So some other people came up to this area after

she fell?

    A    Yes, when I finished mopping here, they started

to get in, and they would be telling me that the floor is

very wet -- very wet, and I said "She fell, but that

was -- it's over.  When she fell down, the floor was not

```
11:23    1   wet," I told them.  And then she said, "Yes, look how you
11:23    2   have it."  And I said, "Yes, but she was already here.
11:23    3   She was already here in front."  That's when I had the
11:23    4   time to mop, when she moved from here.
11:23    5       Q   Do you know who those ladies are that you spoke
11:23    6   with after this about this wet floor?
11:23    7       A   I didn't pay attention to them since I didn't
11:23    8   even know that lady who fell down.  I don't know them.  I
11:23    9   don't know them, but I'm sure that the floor was not wet
11:23   10   when she fell.
11:23   11           MR. MANN:  Objection, nonresponsive.  No
11:23   12   question.
11:24   13       Q   (BY MR. MANN)  Was it Ms. Guzman who was making
11:24   14   you behind schedule this day?
11:24   15       A   Yes, because she was standing here.  She was very
11:24   16   close to the area where I was.
11:24   17       Q   Why didn't you wait until she left the building
11:24   18   before you mopped the area where she was?
11:24   19           MR. ALMAGUER:  I think you asked two
11:24   20   questions because the translator didn't say, "until she
11:24   21   left the building."  That's what you're saying, right?  I
11:24   22   don't think the interpretation was complete.
11:24   23           MR. MANN:  Let me reask the question.
11:24   24           THE INTERPRETER:  I think I agree.  It wasn't
11:24   25   complete.
```

11:24  1      Q    (BY MR. MANN)  Why did you not wait until
11:24  2  Ms. Guzman left the area where her post office box was
11:24  3  located before you moved in with the mop to begin mopping
11:25  4  the area?
11:25  5      A    I didn't mop -- well, I started to mop, but as I
11:25  6  said, I thought she was going to go because she stood
11:25  7  there for a long period of time, and I thought that she
11:25  8  was preparing herself to leave or something when I just
11:25  9  realized she was already sitting down there.
11:25  10     Q    Okay.  So would it be safe to say that you were
11:26  11  trying your best to get the work done on time despite the
11:26  12  fact that she was still next to her post office box?
11:26  13             MR. ALMAGUER:  Objection as to form,
11:26  14  argumentative, and a misstatement of the evidence.
11:26  15     A    I don't know.
11:26  16     Q    (BY MR. MANN)  But you didn't want to be late
11:26  17  with your completion of your work?
11:26  18     A    No, but anyway, I took time -- I gave her time
11:26  19  for her to move from there, but I didn't mop where she
11:26  20  was.  I hadn't gotten to that place, but at the same time,
11:26  21  since I was mopping and walking slowly at the same time, I
11:26  22  felt that something was against me.
11:27  23     Q    How big is this area where the post office boxes
11:27  24  are?  Is it four feet wide, five feet wide?
11:27  25     A    I couldn't tell you because I don't know how big.

11:27   1      Q    Would you say it was a large room or a small

11:27   2   room?

11:27   3      A    It's long.

11:27   4      Q    Is it skinny?

11:27   5      A    No, it's a regular type of lobby so people can go

11:27   6   in and out of there.  It's not too reduced.

11:27   7      Q    Did you ever look back when you started mopping

11:27   8   to see if Ms. Guzman was still there?

11:28   9      A    No, I didn't see.

11:28   10     Q    So you wouldn't know if you had passed her up

11:28   11  with the mop until you stumbled over her?

11:28   12     A    No.  No, I just stumbled because I didn't see

11:28   13  her.  I didn't know that she was there on the floor.

11:28   14     Q    Okay.

11:28   15          MR. MANN:  No further questions.

11:28   16          MR. ALMAGUER:  Just two quick questions here,

11:28   17  then I'm done.

11:28   18                    EXAMINATION

11:28   19  BY MR. ALMAGUER:

11:28   20     Q    Can you please -- you have already indicated here

11:28   21  where there are a couple of tables there in the post

11:28   22  office by the windows.  Just to clarify with an "X," can

11:28   23  you mark where the windows are?

11:28   24     A    (Witness complies.)  And here there's another

11:28   25  one.

11:28  1      Q    Can you mark it with an "X"?

11:28  2      A    (Witness complies.)

11:28  3      Q    Okay.

11:28  4      A    And here there are some long tables -- small

11:29  5 tables, trash cans, and here is another trash can.

11:29  6      Q    Okay.  For the record, you have indicated the

11:29  7 trash cans with a small circle.  You also mentioned, of

11:29  8 course, you had supplies.  Can you tell me what supplies

11:29  9 you had in that utility room?

11:29 10      A    Things that I used to clean the bathrooms.

11:29 11      Q    Can you name and list them, please?

11:29 12      A    Lysol, Windex for the windows -- to clean the

11:29 13 windows, paper towels, and things that I use when I'm

11:29 14 ready to go.  That's what I had.

11:29 15      Q    Was there a mop there, too?

11:30 16      A    In the utility room there I have a mop.  I had it

11:30 17 there all the time in the utility room.

11:30 18      Q    Was there a broom there?

11:30 19      A    Yes, I use a broom sometimes.

11:30 20      Q    Was the bucket and the sign there, too?

11:30 21      A    Where?

11:30 22      Q    In the utility room or in the post office?

11:30 23      A    Yes, when I would finish using them.  When I

11:30 24 would finish using them, I go and place them in the

11:30 25 utility room.

11:30   1      Q     Any of these things we just mentioned, did you

11:30   2    ever have to buy any of them?

11:30   3      A     I never bought anything.

11:30   4      Q     So who would provide all of that for you?

11:30   5      A     The post office.

11:30   6      Q     Okay.

11:30   7            MR. ALMAGUER:  No further questions.  Pass

11:30   8    the witness.

11:30   9            MS. MASSO:  No questions.

11:30   10                         EXAMINATION

11:30   11   BY MR. MANN:

11:30   12     Q     I've got one question.

11:30   13     A     Yes.

11:31   14     Q     Did Ms. Perez or anyone else in the post office

11:31   15   ever see you mop where you didn't have the bucket in the

11:31   16   close proximity to where you were mopping?

11:31   17            MR. ALMAGUER:  Objection to the form of the

11:31   18   question, speculation.  She wouldn't know what they saw or

11:31   19   didn't.

11:31   20     A     I don't know.  I don't know.  I don't know what

11:31   21   to tell you.

11:31   22     Q     (BY MR. MANN)  Okay.  Did any -- did Ms. Perez or

11:31   23   anyone from the post office ever tell you to keep the mop

11:31   24   bucket close to the mop when you were mopping the floors?

11:31   25     A     On one occasion I asked her if the bucket was

1    okay there, and she said it was okay unless I would put it

2    in the middle -- no -- but not to put it in the middle of

3    the lobby, that she would think that this was the safest

4    place to put it because if I would put it here people

5    would fall down or something to trip.

6    Q    Okay.  So these types of things would be

7    questions that you would take to Ms. Perez at the post

8    office?

9    A    I would ask her things to be sure.

10    Q    Okay.

11             MR. MANN:  No further questions.

12             (Proceedings concluded at 11:32 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CHANGES AND SIGNATURE

 2   PAGE            LINE     CHANGE               REASON

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

1          I, ELENA OLIVAREZ, have read the foregoing
deposition and hereby affix by signature that same is true
2    and correct, except as noted above.

3                              _____
                              ELENA OLIVAREZ
4
THE STATE OF TEXAS )
5
6    COUNTY OF _____ )

7          Before me, _____, on this
day personally appeared ELENA OLIVAREZ, known to me (or
8    proved to me under oath or through _____)
(description of identity card or other document) to be the
9    person whose name is subscribed to the foregoing
instrument and acknowledged to me that they executed the
10   same for the purposes and consideration therein expressed.

11         Given under my hand and seal of office this
_____ day of _____, 2003.
12

13                              _____
                              NOTARY PUBLIC IN AND FOR
14                             THE STATE OF TEXAS

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   GLORIA L. GARCIA a/k/a        )
     GLORIA GUZMAN,                )
 4          Plaintiff             )
                                   )
 5                                 )
     VS.                           )     CIVIL ACTION NO. B-02-017
 6                                 )
                                   )
 7   UNITED STATES OF AMERICA,     )
     and YOLANDA PEREZ, as         )
 8   Postmaster, UNITED STATES     )
     POST OFFICE, SANTA ROSA,      )
 9   TEXAS, and ELENA OLIVAREZ,    )
     as an employee of the         )
10   UNITED STATES POST OFFICE,    )
     SANTA ROSA, TEXAS             )
11          Defendants.           )

12
                     REPORTER'S CERTIFICATION
13               DEPOSITION OF ELENA OLIVAREZ
                        June 18, 2003
14

15       I, Heather Hall, Certified Shorthand Reporter in and

16   for the State of Texas, hereby certify to the following:

17       That the witness, ELENA OLIVAREZ, was duly sworn by

18   the officer and that the transcript of the oral deposition

19   is a true record of the testimony given by the witness;

20       That the deposition transcript was submitted on

21   ____July 2, 2003____ to the witness or to the

22   attorney for the witness for examination, signature, and

23   return to me by ___August 4, 2003___;

24       That the amount of time used by each party at the

25   deposition is as follows:
```

Wilson Reporting Services
1-866-899-6894

1    Mr. Jason R. Mann - 1 hour, 27 minutes
     Ms. Nancy L. Masso - 0 hours, 14 minutes
2    Mr. Pablo J. Almaguer - 0 hours, 33 minutes

3

4        That pursuant to information given to the deposition

5    officer at the time said testimony was taken, the

6    following includes all parties of record:

7

8        Mr. Jason R. Mann, Attorney for Plaintiffs
         Ms. Nancy L. Masso, Attorney for Defendant
             United States of America
9        Mr. Pablo J. Almaguer, Attorney for Defendant
             Elena Olivarez
10

11       I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties in the

13   action in which this proceeding was taken, and further

14   that I am not financially or otherwise interested in the

15   outcome of the action.

16       Certified to by me this _2ᴺᴰ_ day of

17   _____ Juy _____, 2003.

18

19                    _Heather Hall_

20       HEATHER HALL, Texas CSR 7971
         Expiration Date: 12/31/04
21       WILSON REPORTING SERVICES
         P. O. Box 532003
22       Harlingen, Texas 78553
         (956) 412-5700
23       (956) 412-5771 Fax

24

25

**maintenance
handbook**



**Floors, Care and Maintenance**

Maintenance Series Handbook MS-10

TL-1, 5-15-88


PRM-GB-Reynoso, N.J.
DEPOSITION
EXHIBIT
Olivarez   6/18/03

# PREFACE

This handbook on floor care and maintenance applies to all facilities occupied by the U. S. Postal Service where the Service is responsible for cleaning and maintenance.

This handbook is for guidance of postmasters, maintenance managers, building superintendents, and others directly involved in the care and maintenance of floors and grounds.

All employees engaged in the maintenance or cleaning of floors and grounds must be provided with a copy and are required to be familiar with the contents.

These procedures must be followed in order to prolong the life and preserve the beauty of our floors while obtaining the required level of appearance without waste of workhours.

Case 1:02-cv-00017     Document 53     Filed in TXSD on 05/07/2004     Page 98 of 153

e.  Bend knees and keep back straight.

f.  Wear hand protection if needed.

g.  Get a good grip on the load.

h.  Hold load close to body with chin tucked in.

i.  Do not twist the torso or fight a "lost load."

j.  Never lift objects in crowded areas.  Clear the area to make lifting safer and easier.



Figure 2-6
Proper and Improper Methods of Lifting

**260  REPORTING UNSAFE CONDITIONS OR NEEDED REPAIRS**

Each Building Services employee should carry a supply of note paper and pencil to report conditions that they are not qualified to correct; for example: broken light switch, broken window, plumbing problem.

**270  WET FLOORS**

In order to avoid serious injuries caused by slips and falls on wet floors, use the following guidelines:

a.  Use Wet Floor signs freely and place them in high visibility areas to alert employees and/or customers.

b.  When possible, close off the area by barricading it with safety rope.

c.  During rainy or snowy weather, place safety matting in employee/customer entrances, such as lobbies and vestibules.

d.  Repeatedly mop up water that has been tracked in.

e.  When mopping or scrubbing floors, complete work in one small section at a time.

f.  After scrubbing or wet mopping the floor, check it for a slippery film.  If a film is present, rescrub or mop the floor using a neutralizer to remove the film.

**CLEANING METHODS**                                                   **651.3**

b. Use the proper equipment for the particular size and condition of the floor surface. For general use, use the 24-inch treated mophead with the 24-inch frame size. For large aisles and open areas, use the 36-inch mophead with the 36-inch frame size. For stairs or tight areas, use the 18-inch mophead with the 18-inch frame size.

c. Keep the treated mophead or treated cloth flush (even) with the floor at all times.

d. Sweep with a figure-eight motion. Walking forwards, use the lower wrist to pivot the sweeping mophead at the completion of each side stroke, so as to keep the same edge leading (leading edge) in the sweeping direction.

e. By using the leading edge, small objects may be carried along while sweeping. When objects accumulated at the leading edge become unmanageable, temporarily push them to one side and continue sweeping.

f. Pick up the accumulated objects in a dustpan and place them in a waste receptacle. The swiveling head on the sweeping tool permits using the leading edge to sweep hard-to-reach places, such as underneath cases and ledges.

**642 Mechanized**

Mechanized equipment, such as walk-behind and/or ride-on sweeper and scrubber/vacuums, is to be used as much as possible. Manually sweep congested areas, such as those around sorting cases and around fixed machinery, using fiber or straw brooms. Use a pedestrian-type power vacuum or rider-type power sweeper (refer to HBK MS-47) for exterior areas, such as sidewalks, driveways, and parking areas, where the size of the area justifies the use of mechanized equipment. Manually sweep all inaccessible areas and push sweepings to an area that is accessible to the power sweeper. Safety requirements are as follows (refer to HBK EL-803):

a. Be particularly alert to pedestrian and vehicular traffic when using power-driven equipment.

b. Do not leave equipment unattended while the motor is running.

c. If keyed, do not leave the key in the equipment while it is unattended.

d. Keep children away from equipment.

e. Only properly trained employees are permitted to operate powered equipment such as power vacuums and rider-type sweepers.

f. Employees who operate rider-type powered equipment must possess a valid OF-346, *U.S. Government Motor Vehicle Operator's Identification Card*, endorsed for each piece of equipment they are qualified to operate.

**650 MOPPING**

**651 Damp**

**651.1 Applications.** Use damp mopping when picking up of cleaning solution is not required and when dry maintenance does not produce the desired result. Also use damp mopping for policing areas where water accumulates during bad weather, around vending machines, and for cleaning areas where spills occur. Give special attention to areas around vending machines to keep vermin under control.

**651.2 Equipment and Products.** Equipment and products needed are as follows:

a. Wet-floor safety signs and rope

b. Putty knife

c. Treated sweeping mop and/or cloth with handle and frame

d. Toy broom

e. Pickup pan or dustpan

f. One mophead with handle for wet use

g. One mop bucket on wheels with wringer and cleaning solution

h. Work gloves

**651.3 Procedure.** Use the following procedure:

a. Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b. Use putty knife to remove gum and other substances stuck to the floor.

c. Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d. Following manufacturer's label instructions, fill bucket with a measured amount of water (gallon, half gallon, quart, etc.), add exactly the amount of cleaning solution per gallon, half gallon, quart, etc., as recommended by the manufacturer and place wringer on bucket.

e. Dip mop into prepared cleaning solution and wring the mop out until it is almost dry.

f.    Walking backward, damp mop the floor using a figure-eight motion, as shown in Figure 6-3. Turn the mop over every three or four strokes.



Figure 6-3
Mop in Figure-Eight Motion

g.    Return the mop to the cleaning solution frequently, wring it almost dry, and continue mopping until the entire work area is mopped.

h.    Change cleaning solution as needed to prevent streaking.

i.    Allow the floor surface to dry completely before removing the safety equipment.

**652  Wet**

**652.1  Applications.**  Wet mop all floors except wood and cork.    Wet mopping is required when accumulated dirt must be loosened and removed by applying an appropriate soil-suspending solution. It is a two-step procedure where the cleaning solution is applied with a solution mop and then picked up with a rinse mop or wet pickup vacuum.  A wet pickup vacuum removes the cleaning solution more effectively than a mop and greatly reduces the floor surface drying time.  The need for frequent wet mopping is reduced by a proper dry maintenance program.

**652.2  Equipment and Products.**    Equipment and products needed are as follows:

a.    Wet-floor safety signs and rope

b.    Putty knife

c.    Treated sweeping mop and/or cloth with handle and frame

d.    Toy broom

e.    Pickup pan or dustpan

f.    Two mopheads with handles for wet use

g.    One mop bucket on wheels with wringer and cleaning solution

h.    One mop bucket on wheels with wringer and rinse water

i.    Wet pickup vacuum

j.    Work gloves

**652.3  Procedure.**  Use the following procedure:

a.    Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b.    Use putty knife to remove gum and other substances stuck to the floor.

c.    Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d.    Following manufacturer's label instructions, fill one bucket with a measured amount of water (gallon, half gallon, quart, etc.), add exactly the amount of cleaning solution per gallon, half gallon, quart, etc. as recommended by the manufacturer, and place wringer on bucket.

e.    Fill second bucket half full with plain cold water for rinsing and place second wringer on it.

f.    Dip cleaning mop in prepared cleaning solution, wring out lightly so it remains wet, and moderately apply to the floor surface in a section approximately 8 by 8 feet.  Begin mopping by dragging the mop parallel to and 1 inch away from baseboards, forming wet parallel stripes on the floor (see Figure 6-4).  Then, walking backward, work in a figure-eight motion to the inner edges of the parallel stripes so as not to splash baseboards and walls.



**Figure 6-4**
**Mop 1" Away and Parallel to Wall**

g.  Use the wet pickup vacuum to remove the cleaning solution from the floor surface.

h.  Dip rinse mop in rinse water, wring out lightly so it remains wet, and apply the rinse water to the work area.

i.  Use the wet pickup vacuum to remove the rinse water from the floor surface.

j.  Allow the floor surface to dry completely before removing the safety equipment.

**NOTE**

Do not flood the floor with cleaning solution or rinse water. Remove cleaning solution (if any) from baseboards.

## 660 SCRUBBING

### 661 Hand

**661.1 Applications.** Hand scrubbing may be used for all floors except wood and cork. Use hand scrubbing ONLY when a floor machine is unavailable or in small areas where use of a machine is impractical.

**661.2 Equipment and Products.** Equipment and products needed include the following:

a.  Wet-floor safety signs and rope

b.  Putty knife

c.  Treated sweeping mop and/or cloth with handle and frame

d.  Toy broom

e.  Pickup pan or dustpan

f.  Cleaning cloths

g.  Walk-off mats

h.  Three mopheads with handles for wet use

i.  One mop bucket on wheels with wringer and cleaning solution

j.  One mop bucket on wheels with wringer and rinse water

k.  One mop bucket on wheels with wringer for wet pickup if wet pickup vacuum is unavailable

l.  One mop bucket on wheels with wringer containing final rinse solution

**NOTE**

The final rinse solution consists of tap water and a neutralizing product that ensures the floor surface is free of the cleaning solution.

m.  One deck scrub brush with handle

n.  Work gloves

**661.3 Procedure.** Use the following procedure for hand scrubbing:

a.  Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.

b.  Use putty knife to remove gum and other substances stuck to the floor.

c.  Sweep the area with treated sweeping mop and/or cloth and pick up the sweepings with toy broom and dustpan.

d.  Place dry cleaning cloths under the doorways and walk-off mats at entrances adjacent to the work area.

e.  Following manufacturer's label instructions, fill one mop bucket with a measured amount of

/1—POSTAL VEHICLE

#2—PRIVATE VEHICLE



INDICATE NORTH

INDICATE
Width of roadway
traffic flow,
parked vehicles,
traffic signs or
signals, etc.

OBTAIN ACCURATE
MEASUREMENTS FROM
FIXED OBJECTS

DEPOSITION
EXHIBIT
2
Olivarez    6/18/03

ALSO INDICATE
approach of vehicles,
point of impact and
place where vehicles
stopped after accident.

PS Form 1700, December 1991 (Page 4 of 4)

☆ U.S. GOVERNMENT PRINTING OFFICE: 1993 342-723/83785



REST 2d AGEN § 220                                                                                     Page 1
Restatement (Second) of Agency § 220 (1958)
(Publication page references are not available for this document.)

Restatement of the Law — Agency
Restatement (Second) of Agency
Current through June 2003

Copyright © 1958-2004 by the American Law Institute

**Chapter 7. Liability Of Principal To Third Person; Torts**
**Topic 2. Liability For Authorized Conduct Or Conduct Incidental Thereto**
**Title B. Torts Of Servants**
**Who Is A Servant**

§ 220. Definition Of Servant

<u>Link to Case Citations</u>

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

Comment on Subsection (1):

a. Servants not performing manual labor. The word "servant" does not exclusively connote a person rendering manual labor, but one who performs continuous service for another and who, as to his physical movements, is subject to the control or to the right to control of the other as to the manner of performing the service. The word indicates the closeness of the relation between the one giving and the one receiving the service rather than the nature of the service or the importance of the one giving it. Thus, ship captains and managers of great corporations are normally superior servants, differing only in the dignity and importance of their positions from those working under them. The rules for determining the liability of the employer for the conduct of both superior servants and the humblest employees are the same; the application differs with the extent and nature of their duties.

b. Non-contractual employment. The word "employed" as used in this Section is not intended to connote a contractual or business relation between the parties. In fact, as pointed out in Section 225, the relation may rest upon the most informal basis, as where the owner of a car invites a guest to drive the car temporarily in his presence or to assist him in making minor repairs.

c. Generality of definition. The relation of master and servant is one not capable of exact definition. It is an important relation in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law; the relation may prevent liability, as in the case of the fellow servant rule.

Copr. © 2002 The American Law Institute.





Restatement (Second) of Agency § 220 (1958)
**(Publication page references are not available for this document.)**

It cannot, however, be defined in general terms with substantial accuracy. The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation. See Comment g. If the inference is clear that there is, or is not, a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered.

*d. Control or right to control.* Although control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated. In some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control. Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking. In other types of situations where an emergency creates peril to human lives, as in the case of a ship in a storm, a servant--in this case the captain--might properly refuse to be controlled by the ship owner and still cause his master to be liable for his negligence or other faulty conduct.

When two persons are engaged in a common undertaking, it may be understood that there is to be joint control, as where two men hire an automobile for a vacation trip, alternating in driving. On the other hand, two servants, directed to drive on their master's business and alternating in driving, do not agree to joint control, and one of them would not be liable to a person hurt by the negligent driving of the other.

Where the owner of a vehicle driven by a guest is in the vehicle, there is ordinarily an inference that he is in control, rebuttable only if he agrees with the guest to surrender complete control to him.

*e. Independent contractors.* It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not a servant. See § 250. One who is employed to make contracts may, however, be a servant. Thus, a shop girl is, and a traveling salesman may be, a servant and cause the employer to be liable for negligent injuries to a customer or for negligent driving while traveling to visit prospective customers. The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both "independent contractors" and do not cause the person for whom the enterprise is undertaken to be responsible, under the rule stated in Section 219.

**Illustrations:**

1. P employs A as a broker to sell Blackacre. A, while driving T, a prospective customer, to inspect the premises, negligently injures him. P is not liable to T. 2. The salesman of a real estate broker, while driving T, a prospective customer, to view a house, negligently injures him. The broker, but not the broker's principal, is subject to liability to T.

*f. Subservants.* A subservant is a servant of the servant who employed him and also of the master for the conduct of whose affairs he was employed. See § 5(2).

**Comment on Subsection (1), continued:**

*g. Statutory interpretation.* The word servant has retained its early significance in cases involving the liability of the master to third persons and the common law liability of master and servant. However, in statutes dealing with various aspects of the relation between the two parties, the word "employee" has largely displaced "servant". In general, this word is synonymous with servant. Under the usual Employers' Liability Acts and the Workmen's Compensation Acts the tests given in this Section for the existence of the relation of master and servant are valid. Beyond this there is little uniformity of decision. Under the existing regulations and decisions involving the Federal Labor Relations Act, there is little, if any,

Copr. © 2002 The American Law Institute.



REST 2d AGEN § 220                                                                                      Page 3
Restatement (Second) of Agency § 220 (1958)
**(Publication page references are not available for this document.)**

distinction between employee and servant as here used. Under the federal and state wages and hours acts, the purpose of which is to raise wages and working conditions, persons working at home at piece rates and choosing their own time for work have been held to be employees, although clearly not servants as the word is herein used.

**Comment on Subsection (2):**

*h. Factors indicating the relation of master and servant.* The relation of master and servant is indicated by the following factors: an agreement for close supervision or de facto close supervision of the servant's work; work which does not require the services of one highly educated or skilled; the supplying of tools by the employer; payment by hour or month; employment over a considerable period of time with regular hours; full time employment by one employer; employment in a specific area or over a fixed route; the fact that the work is part of the regular business of the employer; the fact that the community regards those doing such work as servants; the belief by the parties that there is a master and servant relation; an agreement that the work cannot be delegated.

*i. Effect of custom.* The custom of the community as to the control ordinarily exercised in a particular occupation is of importance. This, together with the skill which is required in the occupation, is often of almost conclusive weight. Unskilled labor is usually performed by those customarily regarded as servants, and a laborer is almost always a servant in spite of the fact that he may nominally contract to do a specified job for a specified price. If, however, one furnishes unskilled workmen to do work for another, it is not abnormal to find that the workmen remain the servants of the one supplying them. See § 227. Even where skill is required, if the occupation is one which ordinarily is considered as a function of the regular members of the household staff or an incident of the business establishment of the employer, there is an inference that the actor is a servant. Thus, highly skilled cooks or gardeners, who resent and even contract against interference, are normally servants if regularly employed. So too, the skilled artisans employed by a manufacturing establishment, many of whom are specialists, with whose method of accomplishing results the employer has neither the knowledge nor the desire to interfere, are servants. On the other hand, the question of the degree of skill requisite for the job is often determinative where the actor is employed temporarily to enter the household or establishment and render incidental assistance. Thus, one employing a laborer for a specific job is normally, as stated above, his master; whereas one engaging a plumber to repair a boiler is not, in the absence of a special arrangement for supervision. The fact that the state regulates the conduct of an employee through the operation of statutes requiring licenses or specific acts to be done or not to be done does not prevent the employer from having such control over the employee as to constitute him a servant.

**Illustrations:**

3. P, who knows little of social affairs, employs A as a social secretary to instruct P in her own deportment and the conduct of all social events, it being agreed that A is to live at P's home and to have complete management within her sphere. P is subject to liability for A's conduct within the scope of employment.

4. P employs a woman to open his summer house. It is agreed that she is to come just before his arrival to clean it and put it in order. For this she is to receive thirty dollars. During her presence in the house, she is P's servant.

**Comment on Subsection (2), continued:**

*j. Period of employment and method of payment.* The time of employment and the method of payment are important. If the time of employment is short, the worker is less apt to subject himself to control as to details and the job is more likely to be considered his job than the job of the one employing him. This is especially true if payment is to be made by the job and not by the hour. If, however, the work is not skilled, or if the employer supplies the instrumentalities, the workman may be found to be a servant.

*k. Ownership of instrumentalities.* The ownership of the instrumentalities and tools used in the work is of importance. The fact that a worker supplies his own tools is some evidence that he is not a servant. On the other hand, if the worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use, and this indicates that the owner is a master. This fact is, however, only of evidential value.

**Illustrations:**

Copr. © 2002 The American Law Institute.



REST 2d AGEN § 220                                                                     Page 4
Restatement (Second) of Agency § 220 (1958)
**(Publication page references are not available for this document.)**

5. P employs A to drive him around town in A's automobile at $4.00 per hour. The inference is that A is not P's servant. If P supplies the automobile, the inference is that A is P's servant for whose conduct within the scope of employment P is responsible.

6. P employs a salesman who agrees to give substantially his full time to the employment and who is furnished a car by the employer. On these facts it is inferred that he is a servant.

7. P employs a salesman who agrees to give full time to the work but furnishes his own car, is paid by commission and can call on those whom he pleases. It is inferred that the salesman is not P's servant.

**Comment on Subsection (2), continued:**

*l. Control of the premises.* If the work is done upon the premises of the employer with his machinery by workmen who agree to obey general rules for the regulation of the conduct of employees, the inference is strong that such workmen are the servants of the owner, and this inference is not necessarily rebutted by the fact that the workmen are paid by the amount of work performed or by the fact that they supply in part their own tools or even their assistants. If, however, the rules are made only for the general policing of the premises, as where a number of separate groups of workmen are employed in erecting a building, mere conformity to such regulations does not indicate that the workmen are servants of the person making the rules.

**Illustrations:**

8. P conducts a manufacturing establishment for the manufacture of woolen goods. Certain factory employees normally arrive at eight in the morning and leave at five in the afternoon, but are not required to work a fixed number of hours or during specified periods, provided they accomplish a specified amount of work during the week, for each unit of which they receive compensation. Such employees are servants.

9. P is the owner of a coal mine employing miners. He provides them with the larger units of machinery and the means of ingress and egress. The miners supply their own implements, the powder necessary, and their own helpers, being paid for each ton mined and brought to the surface. The miners, including the assistants, are the servants of the mine owner. The assistants are servants of the miners and subservants of the owner.

**Comment on Subsection (2), continued:**

*m. Belief as to existence of relation.* It is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other. However, community custom in thinking that a kind of service, such as household service, is rendered by servants, is of importance.

**Illustrations:**

10. A, employed by a taxi company, is sent by P, his employer, to drive B from X to Y, and it is agreed between A, P, and B that for the purposes of the trip A is to be B's servant, although B is to exercise no more control over A's conduct than is normal in the ordinary case of passengers in taxicabs. A is not B's servant.

11. A is employed by P as resident cook for his household under an agreement in which P promises that he will in no way interfere with A's conduct in preparing the food. A is P's servant.

**Case Citations**

Reporter's Notes and Cross References Through May 1954

Case Citations January 1954 -- June 1983

Case Citations July 1983 -- June 1992

Case Citations July 1992 -- June 1999

Case Citations July 1999 -- June 2003

Copr. © 2002 The American Law Institute.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GLORIA L. GARCIA A/K/A          )
GLORIA GUZMAN                    )
      Plaintiff,            )
                                )
vs.                              )          Case No. B-02-017
                                )
UNITED STATES OF AMERICA, and   )
YOLANDA PEREZ, as Postmaster,   )
United States Post Office, Santa Rosa TX, )
And ELENA OLIVAREZ, as an       )
Employee of the United States Post )
Office, Santa Rosa, Texas.      )
      Defendants.           )

## DECLARATION OF STEVEN R. CARPENTER

    I, Steven R. Carpenter, make the following declaration in lieu of an affidavit, as permitted by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed with the United States District Court for the Southern District of Texas and that it is the legal equivalent of a statement under oath.

1.    I am a contracting officer with the United States Postal Service Category Management Center located in Dallas, Texas. Before changing its name and focus in 2002, the Dallas office was known as the Dallas Purchasing and Materials Service Center ("P&MSC"). As a P&MSC, this office entered into, among other things, contracts for cleaning services throughout the Postal Service's Southwest Area, which includes the entire State of Texas.

2.    I share access to and custody of the contract files concerning Elena Olivarez, who entered into certain cleaning services contracts with the Postal Service. These files are contemporaneously created records originated by individuals with knowledge or from

1



information transmitted by persons with knowledge at or near the time the contract was entered into by the Postal Service. It is the regular practice of the Postal Service to create such records, and these records were created as part of that practice and have been and continue to be maintained in the normal course of business.

3.     My files contain records of the cleaning services contract (No. 483083-94-X-1333) entered into between Elena Olivarez and the Postal Service on or about April 7, 1994. The Postal Service subsequently elected to exercise two (2) two-year renewal options: the first, on or about March 12, 1996, and the second, on or about April 20, 1998. The second option period expired on April 28, 2000. I am attaching copies of the 1994 contract, the 1996 renewal contract and the 1998 renewal contract. The attached copies are true and correct copies of the original contract documents for Elena Olivarez, which were maintained in the regular course of business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the ___3__ᴿᴰ day of May, 2004.

Steven R. Carpenter, Declarant

## CLEANING SERVICES PAYMENT AUTHORIZATION

1. CONTRACT NUMBER:  483083-94-X-1333          2. AWARD DATE: 03/28/94

3. a.  ISSUED BY:
   Purchasing Service Center          b. ACO CODE: 320
   P. O. Box 667190                   c. FOR INFORMATION CALL:
   Dallas TX  75266-7190                 John W. Shafer
                                         (214) 819-7120

4. PERFORMANCE REQUIREMENTS:
   a. Address:                         b. COR Name:
   U. S. POST OFFICE                      RAMIRO ALDAPE
                                       c. Telephone:  (512) 636-1333
   216 MAIN STREET
   SANTA ROSA TX  78593-9998

5. ACCOUNTS PAYABLE INFORMATION (PDC USE ONLY):
   a. Contractor Number:              b. Account Number:   52311
   c. Finance Number:  488105         d. Interior Sq. Ft.: 2,160.0
   e. Contractor Name:                f. So/Ec Code:  E
      ELENA OLIVAREZ                   h. Est. Work Hrs (Bi-Weekly):
   g. Tax ID Number(TIN): 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    21 Hours
   i. Payment Amount (Bi-Weekly): $147.00
   ----------------------------------------------------------------
   j. Remittance Address:
      ELENA OLIVAREZ                   k. Annual Rate: $3,822.00
                                       l. Hourly Rate: $7.00
      P O BOX 785
      SANTA ROSA TX 78593-0785
   ----------------------------------------------------------------
   m. Contract Begin Date: 04/16/94   n. Days in Week Work Performed:
   o. Contract End Date: 04/12/96         S S M T W T F
   p. Days in Tour: 10                      X X X X X
   q. Contract Number: 483083-94-X-1333
   r. City Tax Code:
   s. State Tax Code:

   t. Remarks:

6.  SIGNATURE OF U.S. POSTAL SERVICE CONTRACTING OFFICER:

   *David Reidling*
   _____        DAVID REIDLING              04/07/94
      Signature             Name                   Date Submitted

   This document must be issued at time of award to inform the PDC when services
will start.  The original must be mailed to: ST. LOUIS ACCOUNTING SERVICE CENTER,
CONTRACTUAL SERVICES SECTION, CONTRACT CLEANERS UNIT, 1720 MARKET STREET, ST. LOUIS
MO 63180-9184.  Copies must be placed in the contract file and mailed to the COR.

Distribution:  Original - STLPDC;  Copy - Contract File, COR

EXHIBIT
_1_

U.S. POSTAL SER    E: OFFER AND AWARD (CLEANING SF    ﹍ES)
1. CONTRACT NUMBER: 483u83-94-X-1333 2. SOLICITATION NUMbﹶR:
3. REQUEST NUMBER : 94-02939        4. SOC/EC: E        5. COMMODITY: S206

| 6. a. ISSUED BY:      ACO CODE: 320 | b. FOR INFORMATION CALL: |
|---|---|
| Purchasing Service Center<br>P. O. Box 667190<br>Dallas TX  75266-7190 | Name:  John W. Shafer<br>Title: Purchasing Specialist<br>Tel:   (214) 819-7120<br>(No Collect Calls) |

| 7. a. OFFEROR/CONTRACTOR | |
|---|---|
| ELENA OLIVAREZ | b. Contact Name:<br>c. Telephone No: (210) 636-2262 |
| P O BOX 785<br>SANTA ROSA TX  78593-0785 | d. TIN/SSN:      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<br>e. Parent TIN:<br>TIN=Taxpayer Identification Number |
| f. Remittance Name and/or Address: (If different from above) | |

8. DELIVERY/PERFORMANCE REQUIREMENTS:
   a. Address:                          b. Contact:    RAMIRO ALDAPE
   U. S. POST OFFICE                    c. Telephone:  (512) 636-1333
                                        d. Start Date: 04/16/94
   216 MAIN STREET                      e. End Date:   04/12/96
   SANTA ROSA TX 78593-9998
Performance is for a term, not more than two years, beginning on the above date or
within fourteen days after contract award (whichever is later). The Postal Service
may extend the agreement for up to four additional two-year terms.

9. ITEMS & PRICES/GENERAL DESCRIPTION OF REQUIREMENT:

The contractor agrees to provide cleaning services subject to the representations,
certifications, specifications, and contract clauses which follow or which are
incorporated by reference.

The Postal Service estimates that it will take an average of 21 hours every two
weeks to complete the work satisfactorily.

10. ANNUAL AMOUNT: (Completed by USPS)

   a. Annual Amount:$3,822.00        b. Normal Biweekly Payment:$147.00

11. SIGNATURE: OFFEROR/CONTRACTOR        U.S. POSTAL SERVICE

*Elena Olivarez*    4/11/94    *David Reidling*
    Signature            Date        Signature        Award Date

   ELENA OLIVAREZ                       DAVID REIDLING
Typed or Printed Name and Title     Name of Contracting Officer
of Person Authorized to Sign Offer

Distribution: Original - File; Copy - Contractor, COR, Installation Head, MSC or
Division Maintenance Office

PART 1 - SCHEDULE

SECTION A - ITEMS AND PRICES

A.1   ACKNOWLEDGMENT OF AMENDMENTS (Clause OB-199) (August 1988)

   The offeror acknowledges receipt of amendments to the solicitation numbered
and dated as follows:

| Amendment Number | Date | Amendment Number | Date |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

A.2   CLEANING SERVICES PERFORMANCE (Clause OB-435)
      (December 1990)

   The contractor agrees to perform, in accordance with Attachment 2 (Frequency of
Performance Chart), all required cleaning services for the initial contract
period (generally two years) as identified by the start and end dates in block 8
of page 1, for the amount indicated below:

|  | #Bi-weekly Periods | #Bi-weekly Price | ##Total Amount |
|---|---|---|---|
| Cleaning Services | 52 | $147.00 | $7,644.00 |

NOTE: #  Bi-weekly = 2 weeks

      ## Bi-weekly periods  X  Bi-weekly Price = Total Amount

   This solicitation requires the contractor to have their main office no more
than fifty (50) miles away from the facility to be cleaned.  If the main office
address is not inserted below, the location will be assumed the same as the
address entered in block 7 on page 1.

                  Main Office Location:

                  _____
                  (Street Address)

                  _____
                  (City, State and ZIP + 4)

A.3   ESTIMATED HOURS (Clause OB-570) (June 1988)

   The Postal Service estimates that it will take an average of 21 hours every two
weeks to complete the work satisfactorily. This is only an estimate.

Page 2 of 22

SECTION B - SPECIFICATIONS/STATEMENT OF WORK

B.1    REQUIRED DAYS AND TIME (Clause OB-571) (November 1989)

Services must be performed when Postal Service employees are on official duty, and in a manner and time that will not interfere with the movement of the mail. When services are required less than five days a week (i.e., Mon-Wed-Fri), and a normal service day falls on a Federal holiday, the contractor must provide the required services on the next Postal business day. No additional compensation will be provided for this service.  Services must be performed between the hours and on the days indicated below:

| Day | Hours |
| --- | --- |
| Monday | BETWEEN THE HOURS OF 8:00 AM AND 4:30 PM |
| Tuesday | BETWEEN THE HOURS OF 8:00 AM AND 4:30 PM |
| Wednesday | BETWEEN THE HOURS OF 8:00 AM AND 4:30 PM |
| Thursday | BETWEEN THE HOURS OF 8:00 AM AND 4:30 PM |
| Friday | BETWEEN THE HOURS OF 8:00 AM AND 4:30 PM |

Do not clean on Federal Holidays.

B.2    EQUIPMENT AND SUPPLIES (Clause OB-573) (June 1988)

The Postal Service will provide all equipment and supplies necessary in the performance of this contract.

B.3    SQUARE FOOTAGE (Clause OB-574) (December 1990)

A detailed site description is given in Attachment 1, Facility Inventory, which includes the square footage of the facility and surrounding areas.

B.4    SCOPE OF WORK (CLEANING SERVICES) (SOW SS-001)
       (February 1991)

The cleaning and policing of the facility must be to acceptable standards and must be performed in accordance with the following specifications, as applicable.

a.  Workroom Toilets:

    1.  Police:

        (a)  Pick up all loose paper and trash.
        (b)  Refill tissue, towels, seat protectors, and soap dispensers.
        (c)  Check plumbing and flushing of water closets and urinals.
        (d)  Damp wipe water closets, lavatories, and multiple wash sinks.
        (e)  Sweep floor; damp mop as needed.
        (f)  Empty trash receptacles; insert new liners and take trash to
             pick-up point.

Page 3 of 22

B.4    (Continued)

    2.  Clean:

        (a)  Sweep floor, picking up loose paper and trash.  Remove gum spots with putty knife.
        (b)  Scrub interior and exterior surfaces (including underside of lips) of commodes, urinals, and sinks.
        (c)  Spot clean toilet stalls, restroom doors, and restroom walls with cleaner to remove fingerprints and writing.
        (d)  Wash mirrors, ledges, chrome, and receptacles using cleaner.
        (e)  Dust stall tops, high ledges, and window sills and vents.
        (f)  Refill toilet tissue, paper towel, toilet seat protector, and soap dispensers.
        (g)  Empty trash receptacles; insert new liners and take trash to pick-up point.
        (h)  Wet mop and rinse floors using disinfectant detergent solution, mixed per manufacturer's recommendations.

  b.  Office Toilets (clean only):  See paragraph a.2, above.

  c.  Lunch/Swing Rooms:

    1.  Police:

        (a)  Remove all debris from tables and damp wipe with disinfectant detergent solution, mixed per manufacturer's recommendations.
        (b)  Empty trash receptacles; insert new liners and take trash to pick-up point.
        (c)  Damp mop spills.
        (d)  Damp wipe drinking fountain.

    2.  Clean:

        (a)  Remove all debris from tables and damp wipe with disinfectant detergent solution, mixed per manufacturer's recommendations.
        (b)  Empty trash receptacles; insert new liners and take trash to pick-up point.
        (c)  Dust horizontal surfaces from floor level, including tops of lockers and vending machines.
        (d)  Sweep floor.
        (e)  Clean and disinfect drinking fountains.
        (f)  In combination lunch and locker rooms, dust locker and cabinet tops.
        (g)  On other than wood floors, damp mop entire floor.

  d.  Locker Rooms:

    1.  Police:

        (a)  Sweep open areas and aisles.
        (b)  Empty trash receptacles; insert new liners and take trash to pick-up point.
        (c)  Damp mop spills.
        (d)  Damp wipe drinking fountain.

    2.  Clean:

B.4    (Continued)

        (a)  Sweep floor with treated mop or treated dust cloth.
        (b)  Empty trash receptacles; insert new liners and take trash to
            pick-up point.
        (c)  Dust all horizontal surfaces from floor level, including tops of
            lockers.
        (d)  Damp wipe vertical surfaces of one-fifth of lockers.
        (e)  On other than wood floors, damp mop entire floor.

e.  Workrooms:

   1.  Police:

        (a)  Spot sweep floors to pick up all litter.
        (b)  Pick up large pieces of trash and boxes and take to pick-up
            point.
        (c)  Empty trash receptacles; insert new liners and take trash to
            pick-up point.
        (d)  Damp wipe drinking fountains.

   2.  Clean:

        (a)  Wash and disinfect drinking fountains.
        (b)  Dust window sills, radiators, horizontal surfaces of sorting
            cases, tables, filing cabinets, etc.
        (c)  Empty trash receptacles; insert new liners and take trash to
            pick-up point.
        (d)  Sweep floor with treated mop or treated dust cloth.
        (e)  Damp wipe fingerprints and smudges from walls and doors.

f.  Office Spaces (clean only):

   1.  Empty trash receptacles; insert new liners and take trash to pick-up
      point.
   2.  Dust horizontal surfaces of all furniture and equipment.
   3.  Dust completely all furniture in 1/5 of offices each cleaning.
   4.  Sweep floors with treated mop or treated dust cloth.
   5.  Vacuum rugs and carpets.
   6.  Wash and disinfect sinks and water coolers.
   7.  Spot clean smudges and fingerprints on glass surfaces, walls, and
      doors.
   8.  Spot shampoo carpets and rugs, as needed.

g.  Active Storage Areas (clean only):

   1.  Shop Areas and Supply Rooms:

        (a)  Dust horizontal surfaces.
        (b)  Sweep floors with treated mop or treated dust cloth.
        (c)  Empty trash receptacles; insert new liners and take trash to
            pick-up point.

   2.  Janitor Closets:

        (a)  Keep supplies and equipment in orderly manner.

B.4    (Continued)

          (b)  Damp mop floor.
          (c)  Dust shelves.
          (d)  Scrub interior of sink; damp wipe exterior.

h.  Inactive Storage Areas (Includes boiler and storage rooms) (clean only):

    1.  Dust horizontal surfaces.
    2.  Sweep floors with treated mop or treated dust cloth.

i.  Service/Box Lobby:

    1.  Police:

          (a)  Arrange desk or table items.
          (b)  Pick up loose trash; empty trash receptacles, insert new liners, and take trash to pick-up point.
          (c)  Spot sweep floor with treated mop or treated dust cloth.
          (d)  Damp mop floor during wet weather.

    2.  Clean:

          (a)  Arrange customer desk supplies.
          (b)  Dust desks, tables, screenlines, etc.
          (c)  Damp wipe desktops, countertops, and bulletin board glass with cleaner.
          (d)  Empty trash receptacles; insert new liners and take trash to pick-up point.
          (e)  Sweep floor with treated mop or treated dust cloth.
          (f)  Wash lobby door glass.
          (g)  Polish metal surfaces as needed.
          (h)  Spot clean smudges from walls, doors, and counter fronts.

j.  Corridor:

    1.  Police:

          (a)  Pick up loose trash; empty trash receptacles, insert new liners, and take trash to pick-up point.
          (b)  Spot sweep with treated mop or treated dust cloth, or vacuum carpets, as needed.

    2.  Clean:

          (a)  Pick up loose trash; empty trash receptacles, insert new liners, and take trash to pick-up point.
          (b)  Spot clean smudges from walls and doors.
          (c)  Sweep floor with treated mop or treated dust cloth.

k.  Stairways (floor to floor):

    1.  Police:

          (a)  Pick up loose trash and take to pick-up point.
          (b)  Spot sweep with treated mop or treated dust cloth, as needed.

B.4   (Continued)

    2.  Clean:

        (a)  Sweep with treated mop or treated dust cloth.
        (b)  Dust handrails.
        (c)  Spot clean smudges from walls and doors.

l.  Freight Elevators (police only):

    1.  Sweep floor with treated mop or dust cloth.
    2.  Dust walls and doors.

m.  Passenger Elevators (clean only):

    1.  Remove gum spots from floor.
    2.  Sweep floor with treated mop or treated dust cloth or vacuum carpet.
    3.  Damp mop floor or spot shampoo carpet, as necessary.
    4.  Damp wipe walls, trim, and doors.
    5.  Clean smudges, heel marks, and fingerprints on walls and doors.

n.  Platforms (docks):

    1.  Police:

        (a)  Spot sweep.
        (b)  Pick up loose trash; empty trash receptacles and take to pick-up
             point.

    2.  Clean:

        (a)  Sweep with broom or power vacuum sweeper.
        (b)  Dust wipe vestibule doors and door glass.
        (c)  Empty trash receptacles and take trash to pick-up point.

o.  Lookout Gallery (clean only):

    1.  Sweep floors with treated mop or treated dust cloth.
    2.  Dust walls and lookout slots.
    3.  Damp wipe lookout glass.
    4.  Dust ladder rungs, guard rails, and arm ledges.

p.  Light Fixtures:

    1.  Dust or wash, as required.
    2.  Replace burned-out lamps, as necessary.

q.  Venetian Blinds:  Dust or wash, as required.

r.  Lobby and Exterior/Interior Glass:

    1.  Wash with cleaning solution and squeegee dry both sides of glass.
    2.  Wipe squeegee blade dry with cloth after each stroke.
    3.  Wipe corners and framework of window panes.
    4.  Prevent runoff of water onto framework.

s.  Pipes/Ducts:  Dust all surfaces of pipes and ducts.

B.4   (Continued)

t.  Carrier and Other Cases:  Vacuum or dust separations with treated dust cloth.

u.  Post Office Boxes:

1.  Dust inside the box with a treated dust cloth.
2.  Damp wipe window glass.

v.  Lawn:

1.  Mow - as needed during growing season.
2.  Water - set sprinkler 45 minutes or as needed per sprinkler area.
3.  Edge - as needed.

w.  Hedge:

1.  Trim - as needed during growing season.
2.  Water - set sprinkler 45 minutes or as needed per sprinkler area.

x.  Snow and Ice Removal:

1.  Spread melting flakes or pellets evenly using a scoop or shovel.
2.  When snow and ice melt sufficiently, remove promptly to prevent refreezing.  This is particularly important where there is pedestrian traffic, especially on steps and ramps.
3.  Salt deposits are easily tracked onto floors. Perform damp-mopping operation to pick up as much of the tracked salt as possible. Then perform a wet-mopping operation to remove the residue.

y.  Exterior Paved Area:  Sweep sidewalks, parking areas, driveway, maneuvering area, etc.

z.  Exterior Areas (police only):  Pick up litter (e.g. papers, cans, bottles, etc.), and take to pick-up point.

B.5   MOPPING REQUIREMENTS (SOW SS-002) (February 1991)

a.  Damp Mopping:  Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.  Using a putty knife, remove gum and other substances stuck to the floor.  Sweep the area with treated sweeping mop and/or cloth and pickup the sweepings with broom and dustpan.  Following the manufacturer's label instructions, add measured amounts of cleaning solution and water to a mop bucket.  Place the wringer on bucket and dip a clean mop into the prepared cleaning solution.  Wring the mop out until it is almost dry and walking backward, damp mop the floor using a figure-8 motion.  Turn the mop over every three or four strokes.  Return the mop to the cleaning solution frequently, wring it almost dry, and continue mopping until the entire floor has been damp mopped.  Allow the floor surface to dry completely before removing the safety equipment.

b.  Wet Mopping:  Place safety signs and, when needed, rope in the work area to alert others to use caution on wet floors.  Using a putty knife, remove gum and other substances stuck to the floor.  Sweep the area with

B.5   (Continued)

treated sweeping mop and/or cloth and pickup the sweepings with broom and dustpan. Following the manufacturer's label instructions, add measured amounts of cleaning solution and water to a mop bucket and place a wringer on bucket. Fill a second bucket half full with cold rinse water and place a wringer on it. Dip a cleaning mop in the cleaning solution and wring it out lightly so it remains wet. Moderately apply the cleaning solution to the floor with the mop in approximately 8 by 8 foot sections. Begin mopping by dragging the mop parallel to and 1 inch away from the baseboards, forming wet parallel strips on the floor. Then, walking backward, work in a figure-8 motion to the inner edges of the parallel strips so as not to splash baseboards and walls. Remove any cleaning solution from baseboards. Using a wet pick-up vacuum to remove the cleaning solution from the floor. Dip a clean rinse mop in the rinse water and wring it out lightly so it remains wet. Apply the rinse water to the floor and remove with a wet pick-up vacuum. Allow the floor surface to dry completely before removing the safety equipment.

B.6   FLOOR MAINTENANCE (SOW SS-003) (March 1992)

Floors must be maintained in accordance with Handbook MS-10, Floors, Care and Maintenance, a copy of which may be obtained from the appointed contracting officer's representative (COR). This handbook may also be reviewed at the facility to be cleaned or at the purchasing office.

## SECTION C - DELIVERY/PERFORMANCE

C.1   TERM OF CONTRACT (Clause OB-515) (February 1990)

The initial term of the contract will not be more than two years, with options to renew the contract for four (4) additional two-year terms up to a total of 10 years. If the Postal Service elects to renew the contract, the contracting officer will give the contractor 60 days' written notice. New wage and fringe benefits will apply, as required by the Service Contract Act, and any unit pricing will be renegotiated.

C.2   REPORTING (CLEANING SERVICES) (Clause OB-590)
      (January 1992)

All contractors will be required to check in with the contracting officer's representative (COR) at the beginning of each work day and to again check out with the COR at the completion of the day's work. This process will require entries into a daily work log which will be maintained at the facility where the services are performed.

See Attachment 3.

## SECTION D - PACKAGING AND MARKING

[For this document, there is no text in this section]


## SECTION E - INSPECTION AND ACCEPTANCE


E.1    CONTRACTING OFFICER'S REPRESENTATIVE
       (Clause OB-547) (June 1988)

       The contracting officer will appoint a contracting officer's representative
(COR), responsible for the day-to-day administration of the contract, to serve as
the Postal Service point of contact with the contractor on all routine matters.
A copy of the notice of appointment defining the COR's authority will be
furnished to the contractor upon award.

E.2    INSPECTION OF WORK (Clause OB-579) (June 1988)

       The contracting officer's representative (COR) will be responsible for
inspecting the cleaning service being performed to ensure that it is in
accordance with contract requirements.  The COR will immediately bring to the
attention of the contractor all unsatisfactory service.  If the contractor
continues to perform unsatisfactorily, the contracting officer will formally
notify the contractor in writing of the deficiencies.  Continued unsatisfactory
performance may be cause for termination of the contract.

E.3    FAILURE TO PERFORM WORK (Clause OB-580) (June 1988)

       The contractor has agreed to perform the cleaning services at the Postal
Service facility designated, during the hours and for the days specified.  If the
contractor fails to perform the required cleaning services during any day such
services are required at the installation, payment will be reduced by an amount
equal to either 1/260 of the annual amount, if the cleaning service is required
five days, or 1/312 of the annual amount if six days a week.  If the cleaning
service is required for fewer than five days a week, the reduction will be
determined using the following formula:

       Reduction Amount = Annual Price divided by the product of (52 weeks x the
number of days per week service is to be performed.)

       Continued failure to perform may be cause for termination of the contract.


## SECTION F - PAYMENT AND FUNDING

F.1    CLAUSES INCORPORATED BY REFERENCE

    The following clauses are incorporated by reference as if set forth in full text. The full text versions of these clauses are available upon request. Procurement Manual (USPS Publication 41) references are shown in parentheses.

    CLAUSE
    NUMBER    DATE                TITLE

    B-22  December 1989    INTEREST (PM B.2.1)

F.2    PAYMENT (CLEANING SERVICES) (Clause OB-495) (December 1990)

    a.  Billing.  Payment will be made, without billing, in 26 equal installments each year (that is, every two weeks) by the ST. LOUIS ACCOUNTING SERVICE CENTER, CONTRACTUAL SERVICES SECTION, CONTRACT CLEANERS UNIT, 1720 MARKET ST., ST. LOUIS MO 63180-9184.

    b.  Electronic Funds Transfer.  If the contractor desires to have payment electronically transferred to an account in a financial institution, they should submit a completed Treasury Department Form 1199-A to the contracting officer for forwarding to the St. Louis Accounting Service Center.  This form or an acceptable facsimile may be obtained from the contractor's servicing financial institution.

SECTION G - SPECIAL CLAUSES
―――――――――――――――

G.1    CONTRACT TYPE (Clause B-3) (February 1991)

    This is a Firm Fixed Price contract.

G.2    PERFORMANCE AT OCCUPIED POSTAL PREMISES (Clause B-27)
       (October 1987)

    a.  In performing this contract, the contractor must -

    1.  Comply with applicable Occupational Safety and Health Standards (29 CFR 1910) promulgated pursuant to the authority of the Occupational Safety and Health Act of 1970;

    2.  Comply with any other applicable Federal, State, or local regulations governing workplace safety to the extent they do not conflict with a.1 above; and

    3.  Take all other proper precautions to protect the safety and health of the contractor's employees, Postal Service employees, and the public.

    b.  The contractor must coordinate its use of the premises with the installation head or other representative designated by the contracting officer. Subjects of this coordination include the designation of work and storage areas; the extent, if any, of use by the contractor of Postal Service tools and equipment; the furnishing by the contractor of appropriate signs and barricades

Page 11 of 22

G.2    (Continued)

> to exclude unauthorized personnel from the work areas and to call attention to hazards and dangers; and other matters relating to the protection of Postal Service employees and property.

G.3    ORDER OF PRECEDENCE (Clause B-29) (February 1991)

> Any inconsistency in the provisions of this solicitation, the contract awarded under this solicitation, or a contract awarded without the issuance of a written solicitation will be resolved by giving precedence in the following order:

> a.  The Schedule.

> b.  The solicitation provisions and instructions.

> c.  Special clauses and general clauses.

> d.  Provisions contained in attachments or incorporated by reference.

G.4    WAGE DETERMINATION (Clause OB-121) (July 1991)

> This agreement is subject to the provisions of the Service Contract Act of 1965, which is incorporated by reference. Wage Determination No. 74-0777 (REV. 21) dated 08/07/92 is applicable.

G.5    CONTRACTS WITH SELF-EMPLOYED CONTRACTORS (Clause OB-576) (December 1990)

> a. Minimum Wage.  Self-employed contractors must receive not less than the minimum wage prescribed by the Fair Labor Standards Act (FLSA).  For self-employed contractors, the Postal Service will only accept offers that at least meet the current FLSA specified minimum wage.  A self-employed offeror can determine if its offer complies by dividing the annual price by 26 and then dividing the quotient by the estimated number of hours the Postal Service believes are necessary to perform the service. The resulting amount must meet or exceed the current FLSA specified minimum wage.

> b. Status.  Social Security, Federal, State and local taxes are NOT withheld by the Postal Service.  The Postal Service bears no responsibility for making the self-employed contractor's required payment to these funds.  The self-employed contractor is not a Postal Service employee and is not subject to Postal Service employment benefits or retirement.

G.6    CONTRACTS WITH OTHER THAN SELF-EMPLOYED CONTRACTORS (Clause OB-577) (June 1988)

> Contractors who are not classified as "self-employed" are not held to a specific number of workhours.  The contract provides for specific cleaning tasks that must be performed to acceptable standards regardless of the amount of time.

G.7   TERMINATION ON NOTICE (Clause OB-581) (June 1988)

      This contract may be terminated, in whole or in part, by either party upon 30
days written notice.  In the event of such termination, neither party will be
liable for any costs, except for payment in accordance with the payment
provisions of the contract for the actual services rendered prior to the
effective date of the termination. When, in the contracting officer's judgment,
the interests of the Postal Service require such action, the contract may be
terminated by the contracting officer, giving the contractor one day's notice in
writing.

G.8   CONTRACTOR EMPLOYEES (Clause OB-582) (February 1990)

      The contracting officer may require dismissal from work under this contract any
contractor employee who is deemed incompetent, careless, insubordinate,
unsuitable, or otherwise objectionable, or whose continued employment is deemed
contrary to public interest or inconsistent with the best interest of the Postal
Service.

G.9   ACCESS CONTROL OF CONTRACTOR PERSONNEL (Clause OB-583)
      (December 1990)

      While on Postal Service property, contractor personnel must follow the
established procedures for gaining access to and departing from the premises.
The contractor must fill out, and have each of its employees on the contract fill
out and submit to the contracting officer any required forms for security or
other reasons.  Upon request of the contracting officer, the contractor and the
contractor's employees may be fingerprinted by the Postal Service.

PART 2 - CLAUSES AND ATTACHMENTS

SECTION H - GENERAL CLAUSES

H.1    CLAUSES INCORPORATED BY REFERENCE

The following clauses are incorporated by reference as if set forth in full text. The full text versions of these clauses are available upon request. Procurement Manual (USPS Publication 41) references are shown in parentheses.

| CLAUSE NUMBER | DATE | TITLE |
|---|---|---|
| B-2 | October 1987 | CHANGES (PM B.2.1) |
| B-9 | June 1988 | CLAIMS AND DISPUTES (PM B.2.1) |
| B-25 | June 1988 | ADVERTISING OF CONTRACT AWARDS (PM B.2.1) |
| B-26 | October 1987 | PROTECTION OF POSTAL SERVICE BUILDINGS EQUIPMENT, AND VEGETATION (PM B.2.1) |
| B-30 | April 1993 | PERMITS AND RESPONSIBILITIES (SERVICES) (PM B.2.1) |
| 1-4 | October 1987 | OFFICIALS NOT TO BENEFIT (PM 1.7.6) |
| 1-5 | April 1993 | GRATUITIES OR GIFTS (PM 1.7.8) |
| 1-6 | October 1987 | CONTINGENT FEES |
| 2-12 | October 1987 | POSTAL SERVICE PROPERTY--SHORT FORM (PM 2.2.7) |
| 2-20 | October 1987 | OPTION TO EXTEND THE TERM OF THE CONTRACT (PM 2.2.8) |
| 10-1 | December 1989 | PARTICIPATION OF SMALL, MINORITY-OWNED, AND WOMAN-OWNED BUSINESSES (PM 10.1.5) |
| 10-3 | October 1987 | CONVICT LABOR (PM 10.2.2) |
| 10-4 | April 1989 | CONTRACT WORK HOURS AND SAFETY STANDARDS ACT--OVERTIME COMPENSATION (PM 10.2.3) |
| 10-9 | October 1987 | EQUAL OPPORTUNITY (PM 10.2.7) |
| 10-12 | April 1989 | SERVICE CONTRACT ACT (PM 10.2.10) |
| 10-14 | October 1987 | FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT-PRICE ADJUSTMENT (PM 10.2.10) |
| 10-15 | October 1987 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS (PM 10.2.11) |
| 10-16 | October 1987 | AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA (PM 10.2.12) |
| 10-20 | December 1989 | DRUG-FREE WORKPLACE (PM 10.5.4) |

H.2    FEDERAL, STATE, AND LOCAL TAXES (SHORT FORM) (Clause 7-7) (June 1988)

Except as this contract may otherwise provide, the contract price includes all applicable Federal, State, and local taxes and duties in effect on the contract date but does not include any taxes from which the Postal Service, the contractor, or this transaction is exempt. Upon request of the contractor, the Postal Service must furnish a tax exemption certificate or similar evidence of exemption from any tax not included in the contract price. "Contract date" means the date of the contractor's proposal or quotation or, if no proposal or

Page 14 of 22

H.2     (Continued)

        quotation, the date of this purchase order.

H.3     ASSIGNMENT OF CLAIMS (SHORT FORM) (Clause OB-132)
        (June 1988)

        If this contract provides for payments aggregating $10,000 or more, claims for monies due or to become due thereunder may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency.  Except as herein provided, assignment of this contract or any interest therein will be grounds for annulment of this contract at the option of the Postal Service.

H.4     LAWS AND ORDINANCES (Clause OB-585) (June 1988)

        The contractor must comply with all applicable Federal laws, ordinances, and regulations in the course of performance under this contract.

H.5     DEFINITIONS (CLEANING SERVICES) (Clause OB-703)
        (December 1990)

        As used in this contract, the following terms mean:

        a.  "Contracting Officer" means the person signing this contract for the Postal Service or any other properly designated contracting officer; the term includes the authorized representative of the contracting officer acting within the limits of their specified authority.

        b.  "Subcontracts" includes purchase orders.

        c.  "Contracting officer's representative" (COR) means a Postal Service employee designated in writing by the contracting officer as their authorized representative. The COR may be given the authority to inspect and accept work performed under the contract.  However, in no event, can the COR change, modify, terminate, or direct activities outside the scope of the contract.

## SECTION I - LIST OF ATTACHMENTS

| ATTACHMENT NO. | TITLE | NO OF PAGES |
|:---:|:---:|:---:|
| 1 | FACILITY INVENTORY | 1 |
| 2 | FREQUENCY OF PERFORMANCE SCHEDULE | 3 |
| 3 | CLEANING SERVICES DAILY WORK LOG | 1 |
| 4 | WAGE DETERMINATION | 4 |

PART 3 - SOLICITATION PROVISIONS
_____

SECTION J - INSTRUCTIONS TO OFFERORS
_____

J.1    TYPE OF CONTRACT (Provision 5-1) (October 1987)

The Postal Service plans to award a Firm Fixed Price type of contract under this solicitation, and all proposals must be submitted on this basis. Alternate proposals based on other contract types [_] will [X] will not be considered.

SECTION K - SOLICITATION NOTICES AND PROVISIONS
_____

K.1    PROVISIONS INCORPORATED BY REFERENCE

The following provisions are incorporated by reference as if set forth in full text. The full text of these provisions is available from the contracting officer upon request.  Procurement Manual (USPS Publication 41) references are shown in parentheses.

| PROVISION NUMBER | DATE | TITLE |
|---|---|---|
| A-2 | October 1987 | SUBMISSION OF PROPOSALS (PM A.2.3) |
| A-3 | October 1987 | MODIFICATION OR WITHDRAWAL OF PROPOSALS (PM A.2.3) |
| A-4 | October 1987 | LATE SUBMISSIONS AND MODIFICATIONS OF PROPOSALS (PM A.2.3) |
| A-5 | October 1987 | ACKNOWLEDGEMENT OF SOLICITATION AMENDMENTS (PM A.2.3) |
| A-6 | October 1987 | EXPLANATION TO PROSPECTIVE OFFERORS (PM A.2.3) |
| A-7 | June 1988 | RESTRICTION AND USE OF DATA (PM A.2.3) |
| A-9 | October 1987 | AWARD WITHOUT DISCUSSIONS (PM A.2.3) |
| A-14 | October 1987 | FAILURE TO SUBMIT PROPOSAL (PM A.2.3) |
| A-15 | October 1987 | PROTESTS (PM A.2.3) |

K.2    PREPARATION OF PROPOSALS (Provision A-1)
       Alternate I (June 1988)

a. Each offeror must furnish the information required by the solicitation. The offeror must sign the proposal and print or type its name on the proposal and each continuation sheet on which it makes an entry. Erasures or other changes must be initialed by the person signing the proposal.

b. In case of discrepancy between a unit price/cost and an extended price/cost, the unit price/cost will be presumed to be correct, subject, however, to correction to the same extent and in the same manner as any other mistake.

**Page 16 of 22**

K.3   LABOR INFORMATION  (Provision A-13) (October 1987)

      General information regarding the requirements of the Walsh-Healey Public
Contracts Act (41 U.S.C. 35-45), the Contract Work Hours and Safety Standards Act
(40 U.S.C. 327-333), and the Service Contract Act of 1965 (41 U.S.C. 351 et seq.)
may be obtained from the Department of Labor, 200 Constitution Avenue, N.W.,
Washington, DC 20210-0999, or from any regional office of that agency.

K.4   NOTICE OF INTENT TO AWARD WITHOUT DISCUSSIONS
      (Provision A-19) (October 1987)

      The Postal Service intends to make award on the basis of initial proposals
received, without discussions, as permitted by the "Award Without Discussion"
provision of this solicitation.

K.5   POSTAWARD ORIENTATION CONFERENCE (Provision OA-5)
      (June 1988)

      The Postal Service may require the successful offeror to attend a post-award
conference.  If required, it will be scheduled and held prior to the start of
contract performance.  The conference will be held at:

      U S POST OFFICE
      216 N MAIN
      SANTA ROSA, TX 78593


                     SECTION L - REPRESENTATIONS AND CERTIFICATIONS


L.1   TYPE OF BUSINESS ORGANIZATION (Provision A-20)
      (December 1989)

      The offeror, by checking the applicable blocks, represents that it:

      a. Operates as [  ] a corporation incorporated under the laws of the State of
_____, [✓] an individual, [__] a partnership, [__] a joint venture, [__] a
nonprofit organization, [__] or an educational institution; and

      b. Is a [__] small business concern, [__] minority-owned business, [__]
woman-owned business, [__] labor-surplus area concern, [__] educational or other
non-profit organization, or [✓] none of the above entities.

      c. SMALL BUSINESS CONCERN.  A small business concern for the purposes of
Postal Service procurement means a business, including an affiliate, that is
independently owned and operated, is not dominant in producing or performing the
supplies or services being purchased, and has no more than 500 employees, unless
a different size standard has been established by the Small Business
Administration (see 13 CFR 121, particularly for different size standards for
airline, railroad, and construction companies).  For subcontracts of $50,000 or
less, a subcontractor having no more than 500 employees qualifies as a small
business without regard to other factors.

L.1    (Continued)

    d. MINORITY-OWNED BUSINESS.  A minority-owned business is a concern that is at least 51 percent owned by, and whose management and daily business operations are controlled by, one or more members of a socially and economically disadvantaged minority group, namely U.S. citizens who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, or Asian-Indian Americans.  (Native Americans are American Indians, Eskimos, Aleuts, and Native Hawaiians. Asian-Pacific Americans are U.S. citizens whose origins are Japanese, Chinese, Filipino, Vietnamese, Korean, Samoan, Laotian, Cambodian, Taiwanese or in the U.S. Trust Territories of the Pacific Islands.  Asian-Indian Americans are U.S. citizens whose origins are in the Indian subcontinent.)

    e. WOMAN-OWNED BUSINESS.  A woman-owned business is a concern at least 51 percent of which is owned by a woman (or women) who is a U.S. citizen, controls the firm by exercising the power to make policy decisions, and operates the business by being actively involved in day-to-day management.

    f. LABOR SURPLUS AREA.  A geographical area which at the time of award is either a section of concentrated unemployment or underemployment, a persistent labor surplus area, or a substantial labor surplus area, as defined in this paragraph.

        1.  Section of concentrated unemployment or underemployment means appropriate sections of States or labor areas so classified by the Secretary of Labor.

        2.  Persistent labor surplus area means an area which is classified by the Department of Labor as an area of substantial and persistent labor surplus (also called Area of Substantial and Persistent Unemployment) and is listed as such by that Department in conjunction with its publication, Area Trends in Employment and Unemployment.

        3.  Substantial labor surplus area means an area which is classified by the Department of Labor as an area of substantial labor surplus (also called Area of Substantial Unemployment) and which is listed as such by that Department in conjunction with its publication Area Trends in Employment and Unemployment.

    g. LABOR SURPLUS AREA CONCERN.  A firm which will perform or cause to be performed a substantial proportion of a contract in a labor surplus area.

    h. EDUCATIONAL OR OTHER NON-PROFIT ORGANIZATION.  Any corporation, foundation, trust, or other institution operated for scientific or educational purposes, not organized for profit, no part of the net earnings of which inures to the profits of any private shareholder or individual.

L.2    PARENT COMPANY AND TAXPAYER IDENTIFICATION NUMBER
    (Provision A-21) (October 1987)

    a.  A parent company is one that owns or controls the basic business policies of an offeror. To own means to own more than 50 percent of the voting rights in the offeror. To control means to be able to formulate, determine, or veto basic business policy decisions of the offeror. A parent company need not own the offeror to control it; it may exercise control through the use of dominant

L.2    (Continued)

minority voting rights, proxy voting, contractual arrangements, or otherwise.

   b.  Enter the offeror's Taxpayer Identification Number (TIN) in the space
provided. The TIN is the offeror's Social Security Number or other Employee
Identification Number used on the offeror's Quarterly Federal Tax Return, U.S.
Treasury Form 941.

       Offeror's TIN:  _____              .

   c.  [___] Check this block if the offeror is owned or controlled by a parent
company.

   d.  If the block above is checked, provide the following information about the
parent company:

       Parent Company's Name: _____
       Parent Company's Main Office Address: _____
       No. and Street: _____
       City: _____    State: _____    Zip Code: _____
       Parent Company's TIN:  _____

   e.  If the offeror is a member of an affiliated group that files its federal
income tax return on a consolidated basis (whether or not the offeror is owned or
controlled by a parent company, as provided above) provide the name and TIN of
the common parent of the affiliated group:

       Name of Common Parent: _____
       Common Parent's TIN:  _____

L.3    CERTIFICATE OF INDEPENDENT PRICE DETERMINATION
       (Provision 1-1) (October 1987)

   a.  By submitting this proposal, the offeror certifies, and in the case of a
joint proposal each party to it certifies as to its own organization, that in
connection with this solicitation--

   1.  The prices proposed have been arrived at independently, without
consultation, communication, or agreement, for the purpose of restricting
competition, as to any matter relating to the prices with any other offeror or
with any competitor;

   2.  Unless otherwise required by law, the prices proposed have not been and
will not be knowingly disclosed by the offeror before award of a contract,
directly or indirectly to any other offeror or to any competitor; and

   3.  No attempt has been made or will be made by the offeror to induce any
other person or firm to submit or not submit a proposal for the purpose of
restricting competition.

   b.  Each person signing this proposal certifies that--

   1.  He or she is the person in the offeror's organization responsible for the
decision as to the prices being offered herein and that he or she has not
participated, and will not participate, in any action contrary to paragraph a

Page 19 of 22

L.3   (Continued)

above; or

2. He or she is not the person in the offeror's organization responsible for the decision as to the prices being offered but that he or she has been authorized in writing to act as agent for the persons responsible in certifying that they have not participated, and will not participate, in any action contrary to paragraph a above, and as their agent does hereby so certify; and he or she has not participated, and will not participate, in any action contrary to paragraph a above.

c. Modification or deletion of any provision in this certificate may result in the disregarding of the proposal as unacceptable. Any modification or deletion should be accompanied by a signed statement explaining the reasons and describing in detail any disclosure or communication.

L.4   CONTINGENT FEE REPRESENTATION (Provision 1-2) (October 1987)

a. The offeror must complete the following representations:

1. The offeror [ __ ] has [✓] has not employed or retained any company or person (other than a full-time bona fide employee working solely for the offeror) to solicit or secure this contract.

2. The offeror [ __ ] has [✓] has not paid or agreed to pay any company or person (other than a full-time bona fide employee working solely for the offeror) any fee, commission, percentage, or brokerage fee, contingent upon or resulting from the award of this contract.

b. If either representation is in the affirmative, or upon request of the contracting officer, the offeror must furnish, in duplicate, a completed Form 7319, "Contractor's Statement of Contingent or Other Fees", and any other information requested by the contracting officer. If the offeror has previously furnished a completed Form 7319 to the office issuing this solicitation, it may accompany its proposal with a signed statement--

1. Indicating when the completed form was previously furnished;

2. Identifying the number of the previous solicitation or contract, if any, in connection with which the form was submitted; and

3. Representing that the statement on the form is applicable to this proposal.

L.5   SELF-EMPLOYED CONTRACTORS (Provision OA-501) (June 1988)

(TO BE COMPLETED BY ALL OFFERORS)

The offeror, by checking the applicable block, represents that he/she/they

/✓/ Is                    /__/ Is Not

a self-employed contractor (that is, performs 51% or more of the work except for vacations and emergencies).

Page 20 of 22

## L.6   REFERENCES (Provision OA-502) (January 1991)

The offeror submits the following references who can confirm its ability and qualifications.  (List name of company or organization, person to contact, title, address including ZIP code, and telephone number.  Any information furnished by references will be held in strict confidence by the Postal Service).

1. Company/Organization: _Texas Visiting Nurse Service_

   Person to Contact: _____   Title: _____

   Street Address: _1406 E. Harrison St._

   City: _Harlingen,_   State _TX_   ZIP Code _78550_

   Telephone Number: _(210) 412 - 1401_ (including area code)

2. Company/Organization: _____

   Person to Contact: _____   Title: _____

   Street Address: _____

   City: _____   State ___   ZIP Code _____

   Telephone Number: _____(including area code)

3. Company/Organization: _____

   Person to Contact: _____   Title: _____

   Street Address: _____

   City: _____   State ___   ZIP Code _____

   Telephone Number: _____ (including area code)

## L.7   PERSONS PERFORMING THE WORK (Provision OA-503) (December 1990)

If the cleaning services will be performed by someone other than the offeror, enter the name of that individual.  This may be a present employee, an individual with which the offeror has a tentative agreement, or a family member.  The offeror may be required to provide references for this individual.

Name: _____

Address: _____

City/state/ZIP+4: _____

Telephone number: (____)_____

Percentage of work to be performed by above individual: _____%

Page 21 of 22

L.7    (Continued)

      Relationship (employee, tentative agreement, family):  _____

_____

L.8    CONTRACTS BETWEEN THE POSTAL SERVICE AND ITS EMPLOYEES
      OR BUSINESS ORGANIZATIONS SUBSTANTIALLY OWNED OR CONTROLLED
      BY POSTAL SERVICE EMPLOYEES (Provision OA-701) (June 1990)

    Generally, the Postal Service does not enter into contracts with its employees,
their immediate families, or business organizations substantially owned or
controlled by Postal Service employees or their immediate families. "Immediate
family" means spouse, minor child or children, and individuals related to the
employee by blood who are residents of the employee's household.

    a.  Is the offeror an employee of the Postal Service or a member of the
immediate family of a Postal Service employee?

            (___)  Yes             (✓)  No

    b.  Is the offeror's business organization (partnership, corporation, joint
venture) substantially owned or controlled by a Postal Service employee or a
member of his or her immediate family?

            (___)  Yes             (✓)  No

SECTION M - EVALUATION AND AWARD FACTORS
_____

M.1    CONTRACT AWARD (Provision A-8) Alternate I (February 1992)

    The Postal Service intends to award a contract to the responsible offeror whose
proposal conforming to the solicitation offers the best value to the Postal
Service, considering price, price-related factors, and/or other evaluation
factors specified elsewhere in this solicitation.

Facility Inventory

Facility/Location  SANTA ROSA TX 78593

### Interior Requirements

| Area of Performance | Type | Floor Sq. Ft. | Toilet Fixtures Qty | Light Fixtures Type/Qty | Vene-tian Blinds | Glass Int. Sq. Ft. | Glass Ext. Sq. Ft. | Cases Carr-ier | Other |
|---|---|---|---|---|---|---|---|---|---|
| Workroom Toilet | R | 130 | 5 | F 2 | | | | | |
| Workroom | R | 1,341 | | F 19 | 1 | 22 | 18 | 2 | 5 |
| Serv./Box Lobby | R | 578 | | F 9 | | | | | |
| Platform (Dock) | CON | 151 | | F 9 | | | | | |
| Active Storage (cont.) | R | 59 | | F 1 | | | | | |
| | | | | I 1 | | | | | |
| Janitor Closet | CON | 52 | | F 1 | | | | | |
| TOTALS | | 2,311 | 5 | 42 | 1 | 22 | 18 | 2 | 5 |

PO Boxes (QTY)   1,500 ea.

---

| TYPES OF FLOORS | TYPES OF LIGHT FIXTURES |
|---|---|

CPT = Carpet
CON = Concrete
W   = Wood/Cork
R   = Resilient (asphalt tile, vinyl tile, linoleum, etc)
N   = Nonresilient (marble, terrazzo, travertine, ceramic tile, quarry tile)

F = Fluorescent
I = Incandescent

TOILET FIXTURES

Showers, toilets, urinals, and sinks (multiple/single)

---

### Exterior Requirements

| | | | |
|---|---|---|---|
| Area to be mowed | 9,888 Sq Ft | Linear feet of hedge trimming | _____ Ft |
| Area to be watered | 9,888 Sq Ft | Area for snow/ice removal | _____ Sq Ft |
| Area to be policed | 22,313 Sq Ft | Linear feet of edging | 520 Ft |

Paved area to be swept  12,425 Sq Ft

Page 1 of 1

ATTACHMENT 2

## Frequency of Performance Schedule

### Facility/Location  SANTA ROSA TX 78593

### Part I - Tasks Performed More Than Once a Week

| Area of Performance | Task | Sat | Sun | Mon | Tue | Wed | Thu | Fri |
|---|---|---|---|---|---|---|---|---|
| Workroom Toilet | Clean | – | – | X | X | X | X | X |
| | Wet Mop | – | – | X | X | X | X | X |
| Workroom | Clean | – | – | X | X | X | X | X |
| | Police | – | – | – | – | – | – | – |
| Service/Box Lobby | Clean | – | – | X | X | X | X | X |
| | Damp Mop | – | – | X | X | | X | X |
| | Wet Mop | – | – | – | – | X | – | – |
| Platform (Dock) | Clean | – | – | – | X | – | X | – |
| | Police | – | – | – | – | – | – | – |
| Exterior Area | Police | – | – | X | X | X | X | X |
| Janitor Closet | Clean | – | – | X | X | X | X | X |
| | Damp Mop | – | – | X | X | X | X | X |
| Trash Removal | Remove | – | – | X | X | X | X | X |

*(Column header: Day Of Performance)*

Page 1 of 3

ATTACHMENT 2 (Continued)
Frequency of Performance Schedule
Facility/Location  SANTA ROSA TX 78593
Part II - Tasks Performed Weekly, Biweekly, Monthly, etc.

| Area of Performance | Task | Wk | Bi | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Active Storage | Clean | _ | _ | X | X | X | X | X | X | X | X | X | X | X | X |
| Inact. Storage | Clean | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
| Light Fixtures | Dust | _ | _ | X | _ | _ | X | _ | _ | _ | _ | _ | X | _ | _ |
|  | Wash | _ | _ | _ | _ | _ | _ | _ | _ | X | _ | _ | _ | _ | _ |
| Venetian Blinds | Dust | _ | _ | X | _ | _ | X | _ | _ | _ | _ | _ | X | _ | _ |
|  | Wash | _ | _ | _ | _ | _ | _ | _ | _ | X | _ | _ | _ | _ | _ |
| Lobby Glass | Wash | _ | X | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
| Int/Ext Glass | Wash | _ | _ | _ | X | _ | _ | X | _ | _ | X | _ | _ | X | _ |
| Exter. Paved | Sweep | X | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
| Carrier Case | Clean | _ | _ | _ | _ | _ | _ | X | _ | _ | _ | _ | X | _ | _ |
| Other Case | Clean | _ | _ | _ | _ | _ | _ | _ | _ | X | _ | _ | _ | _ | _ |
| PO Boxes | Clean | _ | _ | X | _ | _ | X | _ | _ | X | _ | _ | X | _ | _ |
| Floors |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Resilient | DM |  |  | X | X | X | X | X | _ | X | X | X | X | X | X |
|  | INT | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
|  | PER | _ | _ | _ | X | X | X | X | X | X | X | X | X | X | X |
| Concrete | DM | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
|  | INT | _ | _ | _ | _ | _ | _ | _ | X | _ | _ | _ | _ | _ | _ |
|  | PER | _ | _ | X | _ | _ | X | _ | _ | _ | _ | X | _ | _ | X |
| Others |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| CEILING FAN | DUST | _ | _ | _ | X | _ | _ | X | _ | _ | X | _ | _ | X | _ |

INT = Initial Preparation, PER = Periodic Maintenance, DM = Damp Mop
VAC = Vacuum, SHAMP = Shampoo, Wk = Weekly, Bi = Biweekly (once every 2 weeks)

**Page 2 of 3**

**ATTACHMENT 2 (Continued)**
**Frequency of Performance Schedule**
**Facility/Location  SANTA ROSA TX 78593**

**Part III - Tasks Performed Seasonally**

| Area of Performance | Task | Wk | Bi | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Performance During Each Month Checked Below | | | | | | | | | | | |
| Lawn | Mow | _ | _ | 1 | 1 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 1 | 1 |
| | Water | _ | _ | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | Edge | _ | _ | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Hedge | Trim | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
| | Water | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |
| Snow/Ice | REM | _ | _ | . | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ | _ |

REM = Removal, Wk = Weekly, Bi = Biweekly (once every 2 weeks)

**Page 3 of 3**

# CLEANING SERVICES DAILY WORK LOG

CALENDAR YEAR _____ PAY PERIOD _____

Location: _____

Contract Number: _____   Contractor Name: _____

Effective Dates of Contract: Beginning on _____ and ending _____

| Date | Time In | Time Out | # of Hrs/ Minutes Worked | Contr- actor Initial | Description of Work Performed | COR Initial | COR Comments |
|------|---------|----------|--------------------------|----------------------|-------------------------------|-------------|--------------|
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
| TOTAL OF HOURS WORKED THIS BIWEEKLY PERIOD | | | | | | | |

THE HOURS REPORTED MUST BE THE HOURS ACTUALLY WORKED, AND NOT AN ESTIMATE OF THE HOURS. UNDER NO CIRCUMSTANCES SHOULD THE CONTRACTOR BE ALLOWED TO USE THE TIME CLOCK

Calendar Year 1s equivalent to USPS calendar year, Pay Periods 1 thru 26.

Page 1 of 4

U.S. DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
WAGE AND HOUR DIVISION
WASHINGTON, D.C.   20210

REGISTER OF WAGE DETERMINATIONS UNDER
THE SERVICE CONTRACT ACT
By direction of the Secretary of Labor

Alan L. Moss        Division of
Director            Wage Determinations

State: Texas

Area: TX COUNTIES: BROOKS, CAMERON, DUVAL
HIDALGO, JIM HOGG, KENEDY, STARR, WEBB
WILLACY, ZAPATA

Wage Determination No.: 74-0777 (Rev. 21) Date: 08/07/19.

SEP 1992
...DEPARTMENT
...ICE OFFICE
...LLAS, TX

| Class of Service Employees | LOCALITY Minimum Hourly Wage | Fringe Benefit Payments | | | |
|---|---|---|---|---|---|
| | | Health & Welfare | Vacation | Holiday | Other |

General Services and Support Occupations,
Transportation, and Miscellaneous:

| Class of Service Employees | Minimum Hourly Wage |
|---|---|
| 1. Baker | $ 6.88 |
| 2. Cook I | $ 5.79 |
| 3. Cook II | $ 6.88 |
| 4. Meat Cutter | $ 4.85 |
| 5. Mess Attendant | $ 4.85 |
| 6. Cleaner, Vehicles | $ 4.85 |
| 7. Gardener | $ 4.85 |
| 8. Housekeeping Aide I | $ 5.17 |
| 9. Housekeeping Aide II | $ 4.85 |
| 10. Janitor, Porter, Cleaner | $ 4.85 |
| 11. Laborer, Grounds maintenance | $ 5.79 |
| 12. Pest Controller | $ 4.85 |
| 13. Refuse Collector | $ 5.17 |
| 14. Window Washer/Cleaner | $ 12.96 |
| 15. Embalmer | $ 12.96 |
| 16. Mortician | $ 5.79 |
| 17. Truckdriver, Refuse Collection | $ 5.79 |
| 18. Taxi Driver | $ 5.79 |
| 19. Tractor Operator | $ 5.79 |
| 20. Ambulance Driver | $ 5.79 |
| 21. Emergency Medical Technician | $ 5.79 |

Page 2 of 4

U.S. DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
WAGE AND HOUR DIVISION
WASHINGTON, D.C.   20210

REGISTER OF WAGE DETERMINATIONS UNDER
THE SERVICE CONTRACT ACT
By direction of the Secretary of Labor

Alan L. Moss                Division of
Director                    Wage Determinations

| | State: Texas |
|---|---|
| LOCALITY | Area: TX COUNTIES: BROOKS, CAMERON, DUVAL HIDALGO, JIM HOGG, KENEDY, STARR, WEBB WILLACY, ZAPATA |

Wage Determination No.: 74-0777 (Rev. 21) Date: 08/07/19

| Class of Service Employees | Minimum Hourly Wage | Fringe Benefit Payments | | |
|---|---|---|---|---|
| | | Health & Welfare | Vacation | Holiday | Other |
| 22. Recreation Specialist | $ 10.60 | | | |
| 23. Registered Industrial Nurse | $ 12.96 | | | |
| 24. Swimming Pool Operator | $ 5.31 | | | |
| 25. Vending Machine Attendant | $ 5.46 | | | |
| 26. Vending Machine Repairer | $ 6.88 | | | |
| 27. Vending Machine Repairer Helper | $ 5.79 | | | |

Fringe benefits applicable to all classes of service employees engaged in contract performance:

                                           1/            2/            3/

1/ HEALTH & WELFARE:   $0.83 per hour or $12.00 per week or $18.00 per month

2/ VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 10 years of service. Length of service includes the whole span of continuous service with the present (successor) contractor, wherever employed, and with the predecessor contractors in the performance of similar work at the same Federal facility. (Reg. 4.173)

3/ HOLIDAYS: 8 paid holidays per year: New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Veterans' Day, Thanksgiving Day, and Christmas Day. (A contractor may substitute for any of the named holidays another day off with pay in accordance with a plan communicated to the employees involved.)

WAGE DETERMINATION   74-0777 (Rev. 21)        DATE 08/07/1992        Page 3 of 4

NOTE: The contracting officer shall require that any class of service employee which is not listed herein and which is to be employed under the contract (i.e., the work to be performed is not performed by any classification listed in the wage determination), be classified by the contractor so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination. Such conformed classes of employees shall be paid the monetary wages and furnished the fringe benefits as are determined. Such conforming procedures shall be initiated by the contractor prior to the performance of contract work by such unlisted class(es) of employees. A written report of the proposed conforming action, including information regarding the agreement or disagreement of the authorized representative of the employees involved or, where there is no authorized representative, the employees themselves, shall be submitted by the contractor to the contracting officer no later than 30 days after such unlisted class(es) of employees performs any contract work. The contracting officer shall review the proposed action and promptly submit a report of the action, together with the agency's recommendation and all pertinent information including the position of the contractor and the employees, to the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, for review. (See section 4.6 (b)(2) of Regulations 29 CFR 4)

UNIFORM ALLOWANCE: If employees are required to wear uniforms in the performance of this contract (either by the terms of the Government contract, by the employer, by the state or local law, etc.), the cost of furnishing such uniforms and maintaining (by laundering or dry cleaning) such uniforms is an expense that may not be borne by an employee where such cost reduces the hourly rate below that required by the wage determination. The Department of Labor will accept payment in accordance with the following standards as compliance:

The contractor or subcontractor is required to furnish all employees with an adequate number of uniforms without cost or to reimburse employees for the actual cost of the uniforms. In addition, where uniform cleaning and maintenance is made the responsibility of the employee, all contractors and subcontractors subject to this wage determination shall (in the absence of a bona fide collective bargaining agreement providing for a different amount, or the furnishing of contrary affirmative proof as to the actual cost), reimburse all employees for such cleaning and maintenance at a rate of $3.80 a week (or 76 cents a day); and effective April 1, 1991, the note shall be $4.25 per week (or $.85 cents per day). However, in those instances where the uniforms furnished are made of "wash and wear" materials, may be routinely washed and dried with other personal garments, and do not require any special treatment such as dry cleaning, daily washing, or commercial laundering in order to meet the cleanliness or appearance standards set by the terms of the Government contract, by the contractor, by law, or by the nature of the work, there is no requirement that employees be reimbursed for uniform maintenance costs.

WAGE DETERMINATION  74-0777 (Rev. 21)          DATE 08/07/1992          Page 4 of 4

NOTE:  The duties of employees under job titles listed are those described in the Service Contract
Act Directory of Occupations, Second Edition, July 1986, unless otherwise indicated.  See also 29
CFR Part 4 Section 4.152.

**UNITED STATES
POSTAL SERVICE**

## CONTRACT/ORDER MODIFICATION

| | |
|---|---|
| 1. | **MODIFICATION NO.: MO1 TO CONTRACT/ORDER NO.:   483083-94-X-1333** |

| | | |
|---|---|---|
| 2. | a. Date Issued:    02/27/96 | b. Request No.: 96-1903 |
| | c. Finance No:   **488105** | |

| | | |
|---|---|---|
| 3. | Contractor: | 4. Issued By: |

ELENA OLIVAREZ
P O BOX 785
SANTA ROSA  TX  78593-0785

(210) 636-2262

**TIN: 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**

ATTENTION:

Purchasing and Materials Service Center
P O Box 667190
Dallas TX 75266-7190

FOR INFORMATION CALL:
Lynne Hale
(214) 819-7121
ACO CODE:   483083

---

5.  The above numbered contract/order is modified as set forth in Block 6, by change order issued pursuant to authority of Clause OB-515, "Term of Contract". .  The contractor is required to sign and return one copy of this modification to the Issuing Office.    (See Block 4).

---

6.  **DESCRIPTION OF MODIFICATION:          (CLEANING SERVICES CONTRACT  RENEWAL)**

Pursuant to the above referenced clause, the Postal Service elects to exercise the first two-year renewal option for the subject contract.  The contract, as extended, shall include all terms and provisions as stated in the original contract.  The period of performance for this first option shall be:  **04/13/96 TO  04/10/98**

The hourly rate is: **$ 7.33**     Bi-Weekly Hours: **21**   Bi-weekly Rate: **$ 153.93**    Annual Rate: $ **4,002.18**

The DOL Wage Determination #94-2519 dated 01/31/95 is hereby incorporated into contract #483083-94-X-1333 effective 04/13/96.

OFFICE:   SANTA ROSA  TX  78593

Except as provided herein, all terms and conditions of the document referenced in Block 1, as heretofore changed, remain unchanged and in full force and effect.

---

7.  ACCOUNTS PAYABLE DATA is changed, SEE BLOCK 6.

| | | |
|---|---|---|
| Previous Grand Total | : | $   7,644.00 |
| Value of Modification | : | $   8,004.36 |
| New Grand Total | : | $ 15,648.36 |
| New Net Total (less discounts) : | | |

---

8.  SIGNATURES:  CONTRACTOR          U. S. POSTAL SERVICE

*Elena Olivarez* 3/05/96          *Saundra J Smith* 3/12/96
ELENA Olivarez                    Signature                    Date
Signature                         Date

**ELENA OLIVAREZ**                **SAUNDRA J. SMITH**
Name of Person Authorized     Title    Name of Contracting Officer
to Sign (Type or Print)                Dallas P&MSC

**EXHIBIT
2**

GISTER OF WAGE DETERMINATIONS UNDER
THE SERVICE CONTRACT ACT
direction of the Secretary of Labor

an L. Moss   Division of
rector       Wage Determinations

U.S. DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
WAGE AND HOUR DIVISION
WASHINGTON, D.C.  20210

Wage Determination No.: 94-2519
Revision No.: 1
Date of Last Revision: 01/31/1995

State(s): Texas

Area: TEXAS COUNTIES OF BROOKS, CAMERON, DUVAL, HIDALGO, JIM HOGG, KENEDY,
STARR, WEBB, WILLACY, ZAPATA.

** Fringe Benefits Required For All Occupations Included In
This Wage Determination Follow The Occupational Listing **

OCCUPATION CODE AND TITLE                          MINIMUM HOURLY WAGE

ADMINISTRATIVE SUPPORT AND CLERICAL:

| Code | Title | Wage |
|---|---|---|
| 01011 | Accounting Clerk I | $ 6.08 |
| 01012 | Accounting Clerk II | $ 6.25 |
| 01013 | Accounting Clerk III | $ 7.50 |
| 01014 | Accounting Clerk IV | $ 10.67 |
| 01030 | Court Reporter | $ 8.33 |
| 01050 | Dispatcher, Motor Vehicle | $ 8.33 |
| 01060 | Document Preparation Clerk | $ 6.25 |
| 01090 | Duplicating Machine Operator | $ 6.25 |
| 01110 | Film/Tape Librarian | $ 7.95 |
| 01115 | General Clerk I | $ 4.94 |
| 01116 | General Clerk II | $ 6.00 |
| 01117 | General Clerk III | $ 8.42 |
| 01118 | General Clerk IV | $ 9.43 |
| 01120 | Housing Referral Assistant | $ 8.33 |
| 01131 | Key Entry Operator I | $ 6.00 |
| 01132 | Key Entry Operator II | $ 7.77 |
| 01191 | Order Clerk I | $ 6.08 |
| 01192 | Order Clerk II | $ 6.25 |
| 01220 | Order Filler | $ 7.50 |
| 01261 | Personnel Assistant (Employment) I | $ 7.50 |
| 01262 | Personnel Assistant (Employment) II | $ 7.95 |
| 01263 | Personnel Assistant (Employment) III | $ 8.33 |
| 01264 | Personnel Assistant (Employment) IV | $ 9.33 |
| 01270 | Production Control Clerk | $ 8.33 |
| 01290 | Rental Clerk | $ 7.95 |
| 01300 | Scheduler, Maintenance | $ 7.95 |
| 01311 | Secretary I | $ 7.95 |
| 01312 | Secretary II | $ 8.33 |
| 01313 | Secretary III | $ 9.33 |
| 01314 | Secretary IV | $ 10.74 |
| 01315 | Secretary V | $ 12.39 |
| 01320 | Service Order Dispatcher | $ 7.95 |
| 01341 | Stenographer I | $ 6.61 |
| 01342 | Stenographer II | $ 7.17 |
| 01400 | Supply Technician | $ 10.74 |
| 01420 | Survey Worker(Interviewer) | $ 7.95 |

| | | |
|---|---|---:|
| .460 | Switchboard Operator-Receptionist | $ 5.44 |
| .531 | Travel Clerk I | $ 6.89 |
| .532 | Travel Clerk II | $ 7.22 |
| .533 | Travel Clerk III | $ 7.48 |
| 1551 | Typist I | $ 6.08 |
| 1552 | Typist II | $ 6.71 |
| 1611 | Word Processor I | $ 6.25 |
| 1612 | Word Processor II | $ 7.95 |
| 1613 | Word Processor III | $ 8.33 |

## ?OMATIC DATA PROCESSING:

| | | |
|---|---|---:|
| 3010 | Computer Data Librarian | $ 8.01 |
| 3041 | Computer Operator I | $ 7.05 |
| 3042 | Computer Operator II | $ 8.49 |
| 3043 | Computer Operator III | $ 10.18 |
| 3044 | Computer Operator IV | $ 11.36 |
| 3045 | Computer Operator V | $ 12.61 |
| 3071 | Computer Programmer I 1/ | $ 9.43 |
| 3072 | Computer Programmer II 1/ | $ 11.68 |
| 3073 | Computer Programmer III 1/ | $ 14.07 |
| 3074 | Computer Programmer IV 1/ | $ 17.55 |
| 3101 | Computer Systems Analyst I 1/ | $ 12.45 |
| 3102 | Computer Systems Analyst II 1/ | $ 14.76 |
| 3103 | Computer Systems Analyst III 1/ | $ 16.98 |
| 3160 | Peripheral Equipment Operator | $ 8.01 |

## ?TOMOTIVE SERVICE:

| | | |
|---|---|---:|
| )5005 | Automobile Body Repairer, Fiberglass | $ 11.90 |
| )5010 | Automotive Glass Installer | $ 10.59 |
| )5040 | Automotive Worker | $ 10.59 |
| )5070 | Electrician, Automotive | $ 11.31 |
| )5100 | Mobile Equipment Servicer | $ 9.40 |
| )5130 | Motor Equipment Metal Mechanic | $ 11.90 |
| )5160 | Motor Equipment Metal Worker | $ 10.59 |
| )5190 | Motor Vehicle Mechanic | $ 11.90 |
| 05220 | Motor Vehicle Mechanic Helper | $ 8.93 |
| 05250 | Motor Vehicle Upholstery Worker | $ 10.00 |
| 05280 | Motor Vehicle Wrecker | $ 10.59 |
| 05310 | Painter, Automotive | $ 11.31 |
| 05340 | Radiator Repair Specialist | $ 10.59 |
| 05370 | Tire Repairer | $ 9.40 |
| 05400 | Transmission Repair Specialist | $ 11.90 |

## ?OOD PREPARATION AND SERVICE:

| | | |
|---|---|---:|
| 07010 | Baker | $ 7.43 |
| 07041 | Cook I | $ 6.96 |
| 07042 | Cook II | $ 7.43 |
| 07070 | Dishwasher | $ 5.23 |
| 07100 | Food Service Worker | $ 5.23 |
| 07130 | Meat Cutter | $ 7.43 |
| 07250 | Waiter/Waitress | $ 5.60 |

## ?URNITURE MAINTENANCE AND REPAIR:

| | | |
|---|---|---:|
| 09010 | Electrostatic Spray Painter | $ 11.31 |
| 09040 | Furniture Handler | $ 7.97 |

```
    070 Furniture Refinisher                    $ 11.31
    100 Furniture Refinisher Helper             $  8.93
    110 Furniture Repairer, Minor               $ 10.00
    130 Upholsterer                             $ 11.31
```

**ERAL SERVICES AND SUPPORT:**

```
    .030 Cleaner, Vehicles                      $  5.23
    .060 Elevator Operator                      $  5.23
    .090 Gardener                               $  6.59
    .121 Housekeeping Aide I                    $  4.99
    .122 Housekeeping Aide II                   $  5.23
    .150 Janitor                                $  5.23
    .180 Laborer                                $  5.94
    .210 Laborer, Grounds Maintenance           $  5.60
    .240 Maid or Houseman                       $  4.92
    .270 Pest Controller                        $  6.96
    .300 Refuse Collector                       $  5.23
    .360 Window Cleaner                         $  5.60
```

**ALTH:**

```
    2010 Ambulance Driver                       $  7.66
    2040 Emergency Medical Technician           $  9.09
    2070 Licensed Practical Nurse               $  9.09
    2100 Medical Assistant                      $  8.13
    2130 Medical Laboratory Technician          $  8.13
    2160 Medical Record Clerk                   $  8.13
    2190 Medical Record Technician              $ 11.26
    2220 Nursing Assistant                      $  7.24
    2250 Pharmacy Technician                    $ 10.13
    2280 Phlebotomist                           $  8.13
    .2311 Registered Nurse I                    $ 11.26
    .2312 Registered Nurse II                   $ 13.77
    .2313 Registered Nurse II,                  $ 13.77
          Specialist
    .2314 Registered Nurse III                  $ 16.66
    .2315 Registered Nurse III,                 $ 16.66
          Anesthetist
    .2316 Registered Nurse IV                   $ 19.97
```

**FORMATION AND ARTS:**

```
    13002 Audiovisual Librarian                 $ 11.36
    13011 Exhibits Specialist I                 $  9.85
    13012 Exhibits Specialist II                $ 12.21
    13013 Exhibits Specialist III               $ 14.07
    13041 Illustrator I                         $  9.85
    13042 Illustrator II                        $ 12.21
    13043 Illustrator III                       $ 14.07
    13050 Library Technician                    $  8.49
    13071 Photographer I                        $  8.81
    13072 Photographer II                       $  9.85
    13073 Photographer III                      $ 12.21
    13074 Photographer IV                       $ 14.07
    13075 Photographer V                        $ 17.55
```

**AUNDRY, DRY CLEANING, PRESSING:**

```
    15010 Assembler                             $  5.03
    15030 Counter Attendant                     $  5.18
    15040 Dry Cleaner                           $  5.18
```

| 5070 Finisher, Flatwork, Machine | $ 5.18 |
| 5090 Presser, Hand | $ 5.18 |
| 5100 Presser, Machine, Dry Cleaning | $ 5.18 |
| 5130 Presser, Machine, Shirts | $ 5.18 |
| 5160 Presser, Machine, Wearing Apparel, Laundry | $ 5.18 |
| 5190 Sewing Machine Operator | $ 6.62 |
| 5220 Tailor | $ 7.30 |
| 5250 Washer, Machine | $ 5.18 |

**MACHINE TOOL OPERATION AND REPAIR:**

| 9010 Machine-tool Operator (Toolroom) | $ 11.31 |
| 9040 Tool and Die Maker | $ 13.69 |

**MATERIALS HANDLING AND PACKING:**

| 1010 Fuel Distribution System Operator | $ 9.40 |
| 1020 Material Coordinator | $ 10.00 |
| 1030 Material Expediter | $ 10.00 |
| 1040 Material Handling Laborer | $ 7.50 |
| 1071 Forklift Operator | $ 8.93 |
| 1100 Shipping/Receiving Clerk | $ 8.45 |
| 1130 Shipping Packer | $ 8.45 |
| 1150 Stock Clerk | $ 8.45 |
| 1210 Tools and Parts Attendant | $ 8.93 |
| 1400 Warehouse Specialist | $ 8.93 |

**MECHANICS AND MAINTENANCE AND REPAIR:**

| 23010 Aircraft Mechanic | $ 11.90 |
| 23040 Aircraft Mechanic Helper | $ 8.93 |
| 23060 Aircraft Servicer | $ 10.00 |
| 23070 Aircraft Worker | $ 10.59 |
| 23100 Appliance Mechanic | $ 11.31 |
| 23120 Bicycle Repairer | $ 9.40 |
| 23125 Cable Splicer | $ 11.90 |
| 23130 Carpenter, Maintenance | $ 11.31 |
| 23140 Carpet Layer | $ 10.59 |
| 23160 Electrician, Maintenance | $ 11.90 |
| 23181 Electronics Technician, Maintenance I | $ 10.59 |
| 23182 Electronics Technician, Maintenance II | $ 12.17 |
| 23183 Electronics Technician, Maintenance III | $ 14.72 |
| 23260 Fabric Worker | $ 10.00 |
| 23290 Fire Alarm System Mechanic | $ 11.90 |
| 23310 Fire Extinguisher Repairer | $ 9.40 |
| 23340 Fuel Distribution System Mechanic | $ 11.90 |
| 23370 General Maintenance Worker | $ 11.31 |
| 23400 Heating, Refrigeration and Air Conditioning Mechanic | $ 11.90 |
| 23430 Heavy Equipment Mechanic | $ 11.90 |
| 23460 Instrument Mechanic | $ 11.90 |
| 23500 Locksmith | $ 11.31 |
| 23530 Machinery Maintenance Mechanic | $ 11.90 |
| 23550 Machinist, Maintenance | $ 11.90 |
| 23580 Maintenance Trades Helper | $ 8.93 |

| | | |
|---|---|---|
| 3640 | Millwright | $ 11.90 |
| 3700 | Office Appliance Repairer | $ 11.31 |
| 3740 | Painter, Aircraft | $ 11.31 |
| 3760 | Painter, Maintenance | $ 11.31 |
| 3790 | Pipefitter, Maintenance | $ 11.90 |
| 3800 | Plumber, Maintenance | $ 11.31 |
| 3820 | Pneudraulic Systems Mechanic | $ 11.90 |
| 3850 | Rigger | $ 11.90 |
| 3870 | Scale Mechanic | $ 10.59 |
| 3890 | Sheet-metal Worker, Maintenance | $ 11.90 |
| 3910 | Small Engine Mechanic | $ 10.59 |
| 3930 | Telecommunications Mechanic I | $ 11.90 |
| 3940 | Telecommunications Mechanic II | $ 12.50 |
| 3950 | Telephone Lineman | $ 11.90 |
| 3960 | Welder, Combination, Maintenance | $ 11.90 |
| 3965 | Well Driller | $ 11.90 |
| 3970 | Woodcraft Worker | $ 11.90 |
| 3980 | Woodworker | $ 9.40 |

**RSONAL NEEDS:**

| | | |
|---|---|---|
| 4570 | Child Care Attendant | $ 7.95 |
| 4600 | Chore Aide | $ 4.92 |
| 4630 | Homemaker | $ 10.74 |

**ANT AND SYSTEM OPERATION:**

| | | |
|---|---|---|
| 5010 | Boiler Tender | $ 11.90 |
| 5040 | Sewage Plant Operator | $ 11.31 |
| 5070 | Stationary Engineer | $ 11.90 |
| 5190 | Ventilation Equipment Tender | $ 8.93 |
| 5210 | Water Treatment Plant Operator | $ 8.45 |

**ROTECTIVE SERVICE:**

| | | |
|---|---|---|
| 27004 | Alarm Monitor | $ 9.21 |
| 27010 | Court Security Officer | $ 9.68 |
| 27040 | Detention Officer | $ 9.68 |
| 27070 | Firefighter | $ 9.68 |
| 27101 | Guard I | $ 5.04 |
| 27102 | Guard II | $ 9.21 |
| 27130 | Police Officer | $ 9.68 |

**ECHNICAL:**

| | | |
|---|---|---|
| 29020 | Archeological Technician | $ 12.21 |
| 29030 | Cartographic Technician | $ 12.21 |
| 29040 | Civil Engineering Technician | $ 12.21 |
| 29061 | Drafter I | $ 7.84 |
| 29062 | Drafter II | $ 8.81 |
| 29063 | Drafter III | $ 9.85 |
| 29064 | Drafter IV | $ 12.21 |
| 29070 | Embalmer | $ 13.77 |
| 29081 | Engineering Technician I | $ 7.84 |
| 29082 | Engineering Technician II | $ 8.81 |
| 29083 | Engineering Technician III | $ 9.85 |
| 29084 | Engineering Technician IV | $ 12.21 |
| 29085 | Engineering Technician V | $ 14.07 |
| 29086 | Engineering Technician VI | $ 17.55 |
| 29090 | Environmental Technician | $ 12.21 |

Case 1:02-cv-00017 Document 53 Filed in TXSD on 05/07/2004 Page 147 of 153

| | | |
|---|---|---|
| 9210 | Laboratory Technician | $ 10.72 |
| 9240 | Mathematical Technician | $ 12.21 |
| 9330 | Mortician | $ 13.77 |
| 9390 | Photooptics Technician | $ 12.21 |
| 9480 | Technical Writer | $ 16.66 |
| 9620 | Weather Observer, Senior 2/ | $ 11.36 |
| 9621 | Weather Observer, Combined 2/ | $ 10.18 |
| | Upper Air and Surface Programs | |
| 9622 | Weather Observer, Upper Air 2/ | $ 10.18 |

ANSPORTATION/MOBILE EQUIPMENT
ERATION:

| | | |
|---|---|---|
| 1030 | Bus Driver | $ 8.07 |
| 1100 | Driver Messenger | $ 7.61 |
| 1200 | Heavy Equipment Operator | $ 10.02 |
| 1290 | Shuttle Bus Driver | $ 7.66 |
| 1300 | Taxi Driver | $ 6.84 |
| 1361 | Truckdriver, Light Truck | $ 7.66 |
| 1362 | Truckdriver, Medium Truck | $ 8.07 |
| 1363 | Truckdriver, Heavy Truck | $ 8.95 |
| 6364 | Truckdriver, Tractor-Trailer | $ 8.95 |

ISCELLANEOUS:

| | | |
|---|---|---|
| 99005 | Aircraft Quality Control Inspector | $ 15.31 |
| 99020 | Animal Caretaker | $ 5.99 |
| 99030 | Cashier | $ 6.00 |
| 99040 | Child Care Center Clerk | $ 9.33 |
| 99050 | Desk Clerk | $ 6.25 |
| 99260 | Instructor | $ 13.77 |
| 99300 | Lifeguard | $ 7.24 |
| 99350 | Park Attendant (Aide) | $ 8.33 |
| 99400 | Photofinishing Worker | $ 6.25 |
| 99500 | Recreation Specialist | $ 10.74 |
| 99510 | Recycling Worker | $ 6.54 |
| 99610 | Sales Clerk | $ 6.25 |
| 99630 | Sports Official | $ 7.24 |
| 99658 | Survey Party Chief | $ 10.96 |
| 99659 | Surveying Technician | $ 8.95 |
| 99660 | Surveying Aide | $ 7.27 |
| 99690 | Swimming Pool Operator | $ 7.43 |
| 99720 | Vending Machine Attendant | $ 6.54 |
| 99730 | Vending Machine Repairer | $ 7.43 |
| 99740 | Vending Machine Repairer Helper | $ 6.54 |

## ** Fringe Benefits Required For All Occupations Included In This Wage Determination **

HEALTH & WELFARE: $0.90 per hour or $36.00 per week or $156.00 per month.

VACATION: 2 weeks paid vacation after 1 year of service with a contractor or successor; 3 weeks after 10 years of service. Length of service includes the whole span of continuous service with the present

contractor or successor, wherever employed, and with the predecessor
contractors in the performance of similar work at the same Federal
facility. (Reg. 4.173)


HOLIDAYS: A minimum of eight paid holidays per year: New Year's Day,
Washington's Birthday, Memorial Day, Independence Day, Labor Day,
Veterans' Day, Thanksgiving Day, and Christmas Day. (A contractor may
substitute for any of the named holidays another day off with pay in
accordance with a plan communicated to the employees involved.) (See
29 CFR 4.174)


1/

Does not apply to employees employed in a bona fide executive,
administrative, or professional capacity as defined and delineated in
29 CFR 541. (See 29 CFR 4.156)

2/

APPLICABLE TO WEATHER OBSERVERS ONLY - NIGHT PAY & SUNDAY PAY: If you
work at night as a part of a regular tour of duty, you will earn a
NIGHT DIFFERENTIAL and receive an additional 10% of basic pay for any
hours worked between 6pm and 6am. If you are a full-time employee (40
hours a week) and Sunday is part of your regularly scheduled workweek,
you are paid at your rate of basic pay plus a Sunday premium of 25% of
your basic rate for each hour of Sunday work which is not overtime
(i.e. occasional work on Sunday outside the normal tour of duty is
considered overtime work).


## ** UNIFORM ALLOWANCE **

If employees are required to wear uniforms in the performance of
this contract (either by the terms of the Government contract, by
the employer, by the state or local law, etc.), the cost of
furnishing such uniforms and maintaining (by laundering or dry
cleaning) such uniforms is an expense that may not be borne by an
employee where such cost reduces the hourly rate below that
required by the wage determination. The Department of Labor will
accept payment in accordance with the following standards as
compliance:

The contractor or subcontractor is required to furnish all
employees with an adequate number of uniforms without cost or to
reimburse employees for the actual cost of the uniforms. In
addition, where uniform cleaning and maintenance is made the
responsibility of the employee, all contractors and subcontractors
subject to this wage determination shall (in the absence of a bona
fide collective bargaining agreement providing for a different
amount, or the furnishing of contrary affirmative proof as to the
actual cost), reimburse all employees for such cleaning and
maintenance at a rate of $4.25 per week (or $.85 cents per day).
However, in those instances where the uniforms furnished are made
of "wash and wear" materials, may be routinely washed and dried
with other personal garments, and do not require any special
treatment such as dry cleaning, daily washing, or commercial
laundering in order to meet the cleanliness or appearance standards
set by the terms of the Government contract, by the contractor, by
law, or by the nature of the work, there is no requirement that
employees be reimbursed for uniform maintenance costs.

## ** NOTES APPLYING TO THIS WAGE DETERMINATION **

**Source of Occupational Titles and Descriptions:**

The duties of employees under job titles listed are those described in the "Service Contract Act Directory of Occupations," Fourth Edition, January 1993, as amended by First Supplement December 1993, unless otherwise indicated. This publication may be obtained from the Superintendent of Documents, at 202-783-3238, or by writing to the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402. Copies of specific job descriptions may also be obtained from the appropriate contracting officer.

REQUEST FOR AUTHORIZATION OF ADDITIONAL CLASSIFICATION AND WAGE RATE (Standard Form 1444 (SF 1444))

**Conformance Process:**

The contracting officer shall require that any class of service employee which is not listed herein and which is to be employed under the contract (i.e., the work to be performed is not performed by any classification listed in the wage determination), be classified by the contractor so as to provide a reasonable relationship (i.e., appropriate level of skill comparison) between such unlisted classifications and the classifications listed in the wage determination. Such conformed classes of employees shall be paid the monetary wages and furnished the fringe benefits as are determined. Such conforming process shall be initiated by the contractor prior to the performance of contract work by such unlisted class(es) of employees. The conformed classification, wage rate, and/or fringe benefits shall be retroactive to the commencement date of the contract. (See Section 4.6 (C)(vi)) When multiple wage determinations are included in a contract, a separate SF 1444 should be prepared for each wage determination to which a class(es) is to be conformed.

The process for preparing a conformance request is as follows:

1) When preparing the bid, the contractor identifies the need for a conformed occupation(s) and computes a proposed rate(s).

2) After contract award, the contractor prepares a written report listing in order proposed classification title(s), a Federal grade equivalency (FGE) for each proposed classification(s), job description(s), and rationale for proposed wage rate(s), including information regarding the agreement or disagreement of the authorized representative of the employees involved, or where there is no authorized representative, the employees themselves. This report should be submitted to the contracting officer no later than 30 days after such unlisted class(es) of employees performs any contract work.

3) The contracting officer reviews the proposed action and promptly submits a report of the action, together with the agency's recommendations and pertinent information including the position of the contractor and the employees, to the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, for review. (See section 4.6(b)(2) of Regulations 29 CFR Part 4).

Case 1:02-cv-00017:94  Document 53   Filed in TXSD on 05/07/2004   Page 150 of 153

4) Within 30 days of receipt, the Wage and Hour Division approves, modifies, or disapproves the action via transmittal to the agency contracting officer, or notifies the contracting officer that additional time will be required to process the request.

5) The contracting officer transmits the Wage and Hour decision to the contractor.

6) The contractor informs the affected employees.

Information required by the Regulations must be submitted on SF 1444 or bond paper.

When preparing a conformance request, the "Service Contract Act Directory of Occupations" (the Directory) should be used to compare job definitions to insure that duties requested are not performed by a classification already listed in the wage determination. Remember, it is not the job title, but the required tasks that determine whether a class is included in an established wage determination. Conformances may not be used to artificially split, combine, or subdivide classifications listed in the wage determination.

**UNITED STATES**
**POSTAL SERVICE**

## CONTRACT/ORDER MODIFICATION

1.  **MODIFICATION NO.: MO2 TO CONTRACT/ORDER NO.: 483083-94-X-1333**

2.  a. Date Issued:    04/13/98                    b. Request No.: 98-2269
    c. Finance No:    **488105**

---

3.  Contractor:                                        4. Issued By:

    ELENA OLIVAREZ                                     Purchasing and Materials Service Center
    P O BOX 785                                        P O Box 667190
    SANTA ROSA TX 78593-0785                           Dallas TX 75266-7190

    (210) 636-2262
    **TIN: 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**                               FOR INFORMATION CALL:
                                                       Lynne Hale
    ATTENTION:                                         (214) 819-7121
                                                       ACO CODE:  483083

---

5.  The above numbered contract/order is modified as set forth in Block 6, by change order issued pursuant
    to authority of Clause OB-515, "Term of Contract". .  The contractor is required to sign and return one copy
    of this modification to the Issuing Office.  (See Block 4).

---

6.  **DESCRIPTION OF MODIFICATION:**              **(CLEANING SERVICES CONTRACT  RENEWAL)**

    Pursuant to the above referenced clause, the Postal Service elects to exercise the second two-year renewal
    option for the subject contract.  The contract, as extended, shall include all terms and provisions as stated
    in the original contract.  The period of performance for this second option shall be:  **04/11/98 TO  04/08/00**

    The hourly rate is: **$ 7.75**    Bi-Weekly Hours: **21**   Bi-weekly Rate: **$ 162.50**    Annual Rate: **$ 4,231.50**

    OFFICE:  SANTA ROSA  TX  785933

    Except as provided herein, all terms and conditions of the document referenced in Block 1, as heretofore
    changed, remain unchanged and in full force and effect.

---

7.  ACCOUNTS PAYABLE DATA is changed, SEE BLOCK 6.

    Previous Grand Total              :        $ 15,648.36
    Value of Modification             :        $   8,463.00
    New Grand Total                   :        $ 24,111.36
    New Net Total (less discounts) :

---

8.  **SIGNATURES:  CONTRACTOR**                      **U. S. POSTAL SERVICE**

    *Elena Olivarez*    4/13/98              *Saundra J Smith*         4-20-98
    Signature            Date                    Signature                Date

    **ELENA OLIVAREZ**    _____          **SAUNDRA J. SMITH**
    Name of Person Authorized    Title             Name of Contracting Officer
    to Sign (Type or Print)                        **Dallas P&MSC**

**EXHIBIT**
*3*

UNITED STATES POST OFFICE
SANTA ROSA TX 78593


TO:    Purchasing and Materials Service Center
       United States Postal Service
       P O Box 667190
       Dallas TX 75266-7190

RE:    Certification for Cleaning Services - Days Missed During Pay Period

Facility Finance Number:        **488105**
Contractor Name:                 Elena Olivarez
SSN/Tax I.D. Number:             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
Contract Number:                 483083-94-X-1333
Biweekly Rate of Pay:            $162.75
No. of Days Svcs Scheduled:      10
--------------------------------------------------------------------------------------------------------------------

Pay Period: _____    Fiscal Year: _____

I certify that:

( )    No service was performed during the pay period:

( )    No service was performed on _____ scheduled days(s)
                                    (number of )
       because:   _____
                  _____
                  _____

( )    PS Form 1264 is no longer available from the St. Louis ASC,
       Contractual Services Branch, Contract Cleaning Section, P. O. Box 80105,
       St. Louis MO 63180-0105. A copy of this letter has been submitted in lieu
       thereof.

( )    Contractor resigned effective _____.
                                     (Date)


_____         _____
Signature                    Date

# CLEANING SERVICES DAILY WORK LOG

CALENDAR YEAR _____    PAY PERIOD _____

Location: __Santa Rosa TX 78593__    Contract No. __483083-94-X-1333__    Contractor Name: __Elena Olivarez__

Effective Dates of Contract, Initial Term: __04/16/94__ to __04/12/96__    Option 1: __04/13/96__ to __04/10/98__    Option 2: __4/11/98__ to __4/08/2000__

Option 3: _____ to _____    Option 4: _____ to _____

| Date | Time In | Time Out | # of Hrs/ Minutes Worked | Contr- actor Initial | Description of Work Performed | COR Initial | COR Comments |
|------|---------|----------|--------------------------|----------------------|-------------------------------|-------------|--------------|
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |
|      |         |          |                          |                      |                               |             |              |

TOTAL OF HOURS WORKED THIS BIWEEKLY PERIOD

THE HOURS REPORTED MUST BE THE HOURS ACTUALLY WORKED, AND NOT AN ESTIMATE OF THE HOURS. UNDER NO CIRCUMSTANCES SHOULD THE CONTRACTOR BE ALLOWED TO USE THE TIME CLOCK.

Calendar Year is equivalent to USPS calendar year, Pay Period 1 thru 26.